# EXHIBIT 5

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC, F/K/A HCRE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY'S APPENDIX TO MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455 |

**APPENDIX TO MEMORANDUM OF LAW IN SUPPORT OF**
**AMENDED RENEWED MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**

James Dondero, Highland Capital Management Fund Advisors, L.P., The Dugaboy Investment Trust, Get Good Trust, and NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC (collectively, "Movants") file this Appendix to Memorandum of Law in Support of Amended Renewed Motion to Recuse Pursuant to 28 U.S.C § 455:

| Exhibit | Description | Appendix Page No. |
|---|---|---|
| **A** | December 3, 2019, Hearing Transcript | APP. 0001 – APP. 0010 |
| **B** | January 9, 2020, Hearing Transcript | APP. 0011 – APP. 0021 |
| **C** | February 19, 2020, Hearing Transcript | APP. 0022 – APP. 0034 |
| **D** | June 30, 2020, Hearing Transcript | APP. 0035 – APP. 0053 |

| E | July 8, 2020, Hearing Transcript | APP. 0054 – APP. 0062 |
| F | July 14, 2020, Hearing Transcript | APP. 0063 – APP. 0074 |
| G | September 23, 2020, Hearing Transcript | APP. 0075 – APP. 0080 |
| H | October 21, 2020, Hearing Transcript | APP. 0081 – APP. 0091 |
| I | December 10, 2020, Hearing Transcript | APP. 0092 – APP. 0097 |
| J | December 16, 2020, Hearing Transcript | APP. 0098 – APP. 0103 |
| K | January 8, 2021, Hearing Transcript | APP. 0104 – APP. 0112 |
| L | January 26, 2021, Hearing Transcript | APP. 0113 – APP. 0121 |
| M | February 8, 2021, Hearing Transcript | APP. 0122 – APP. 0147 |
| N | February 23, 2021, Hearing Transcript | APP. 0148 – APP. 0155 |
| O | May 10, 2021, Hearing Transcript | APP. 0156 – APP. 0161 |
| P | May 20, 2021, Hearing Transcript | APP. 0162 – APP. 0171 |
| Q | June 8, 2021, Hearing Transcript | APP. 0172 – APP. 0177 |
| R | June 10, 2021, Hearing Transcript | APP. 0178 – APP. 0183 |
| S | June 25, 2021, Hearing Transcript | APP. 0184 – APP. 0189 |
| T | March 1, 2022, Hearing Transcript | APP. 0190 – APP. 0195 |
| U | August 31, 2022, Hearing Transcript | APP. 0196 – APP. 0212 |
| V | September 12, 2022, Hearing Transcript | APP. 0213 – APP. 0239 |

| W | August 4, 2021, Hearing Transcript | APP. 0240 – APP. 0246 |
|---|---|---|

Dated: October 17, 2022

Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

*/s/ Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Attorneys for Movants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 17, 2022, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

*/s/ Michael J. Lang*
Michael J. Lang

# EXHIBIT A

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 6 of 125   PageID 15537
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 5 of 249

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 1 of 137

1

1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF DELAWARE

4  - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6  HIGHLAND CAPITAL MANAGEMENT, L.P.,      Case No.

7          Debtor.                  19-12239(CSS)

8  - - - - - - - - - - - - - - - - - - - -x

9

10

11              United States Bankruptcy Court

12              824 North Market Street

13              Wilmington, Delaware

14

15              December 2, 2019

16              10:07 AM

17

18

19  B E F O R E:

20  HON. CHRISTOPHER S. SONTCHI

21  CHIEF U.S. BANKRUPTCY JUDGE

22

23  ECR OPERATOR:  LESLIE MURIN

24

25

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 7 of 125   PageID 15538
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 6 of 249

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 77 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    77

1    Acis, learned all about Acis' relationship to Highland.  But

2    the real issue before Your Honor is what does that have to do

3    with this debtor, this debtor's assets and liabilities, and

4    this debtor's operations.  And as my comments will show, we

5    think that's a significantly overblown argument.

6           Your Honor, during their presentation, Counsel really

7    strayed a little bit from what the motion and the joinders sort

8    of said.  There they went through a painstaking analysis of the

9    various factors supporting venue.  I know Your Honor said that

10   over three factors, you don't find that helpful, but the courts

11   have relied on a series of factors.

12          And I think the reason why they have strayed away from

13   that and focused on the committee being the one to support the

14   transfer-of-venue motion and the facts of the Acis case is

15   because when you pare it down, the actual factors demonstrate

16   that there is no way the committee can carry its burden to

17   demonstrate that venue should be transferred.

18          However -- Your Honor pointed to this at the

19   beginning, in mentioning comments about forum-shopping -- the

20   committee and Acis are really being disingenuous, and they have

21   not told you the real reason that they want the case before

22   Judge Jernigan.

23          At the first-day hearing, Your Honor, Acis said they

24   intended to file a motion for an appointed trustee.  The

25   committee has told the debtor it intends to file a motion to

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 8 of 125   PageID 15539
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 7 of 249

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 78 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                78

1   appoint a trustee after this hearing.  The motion has not yet

2   been filed, Your Honor, because they want Judge Jernigan to

3   rule on that motion.  And it's not because she's familiar with

4   this debtor's business, this debtor's assets, or this debtor's

5   liabilities, because she generally is not.  It is because she

6   formed negative views regarding certain members of the debtor's

7   management that the committee and Acis hope will carry over to

8   this case.

9          The convenience of the parties and the interests of

10  justice and how this case is so unique are just a pretext.

11  They want a trustee to run the debtor, and they want Judge

12  Jernigan and not Your Honor to rule on that motion.  That, Your

13  Honor, is not a proper reason to transfer venue, but rather a

14  transparent litigation ploy.

15         Similarly, Acis also wants the case to proceed in its

16  home court where it has enjoyed success in litigating against

17  the debtor.  Your Honor mentioned the conflicts-of-interest

18  theories.  They're not just conflicts of interest between two

19  jointly administered debtors.  These go to the crux of what the

20  Acis case is about and significant claims against the debtor.

21         The Court may ask, appropriately -- and the Court

22  did -- why would the debtor file the case in Delaware?  Chapter

23  11 is all about a fresh start.  The debtor recognized concerns

24  that the creditors had with certain aspects of its pre-petition

25  conduct, and proactively appointed Brad Sharp as chief

Case 3:21-cv-00879-K    Document 41-3    Filed 04/04/23    Page 9 of 125    PageID 15540
Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Appendix    Page 8 of 249

Case 19-12239-CSS    Doc 181    Filed 12/03/19    Page 79 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    79

1    restructuring officer with expanded powers, to oversee the

2    debtor's operations.

3            Mr. Sharp worked with the debtor and Counsel to craft

4    a protocol for transactions that would be subject to increased

5    transparency.  The debtor didn't have to do that.  As Your

6    Honor mentioned at the first-day hearing, the debtor operates

7    its business in the ordinary course.  But given the

8    circumstances surrounding this case, given the history, we

9    felt, and the CRO, importantly, felt it was important to get on

10   the table what the debtor, through the CRO, believed was

11   ordinary and what was not, so we could have a transparent

12   discussion, discussion that, while we've made headway with the

13   committee, we have not yet been able to come to an agreement.

14           The debtor filed the case in this district because it

15   wanted a judge to preside over this case that would look at

16   what's going on with this debtor, with this debtor's

17   management, this debtor's post-petition conduct, without the

18   baggage of what happened in a previous case, which contrary to

19   what Acis and the committee says, has very little to do with

20   this debtor.

21           These form insufficient grounds, Your Honor, to

22   overturn the debtor's choice of venue, and the motion should be

23   denied.

24           I would like to now walk through the statutory

25   analysis, something that Counsel avoided, because again, I

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 10 of 125   PageID 15541
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 9 of 249

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 80 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                              80

1    think it highlights the weakness of their argument.

2            It is clear that the Delaware venue is proper, and

3    1408 says the places where a Chapter 11 debtor can file the

4    case.  As the vast majority of debtors who file cases in this

5    district, the debtor filed here because it was domiciled in

6    Delaware.  It is a Delaware LP.  But it goes further than that.

7    99.94 percent of its LP interests are owned by Delaware

8    entities.  And the general partner, Strand Advisors, is a

9    Delaware general partner.

10           While many cases, Your Honor, before this court, rely

11   on the domicile of one affiliate to bring other non-Delaware

12   related affiliates before the court, that's not the case here.

13   All you have, virtually, are Delaware entities, through the

14   ownership structure.

15           As I will also discuss in a few moments, Your Honor,

16   domicile is not the only connection that this debtor has to

17   this district, as significant litigation matters involving the

18   debtor, including those commenced by committee members, that

19   was the catalyst to the filing, are pending in Delaware.

20   Accordingly, the committee acknowledges, as they must, that

21   Delaware is, of course, a proper venue.

22           However, they rely on 1412 which sets forth the

23   standard -- test that the movant has to meet in order to

24   transfer venue, either for the convenience of the parties or

25   the interest of the justice.

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 11 of 125   PageID 15542
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 10 of 249

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 89 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    89

1   willingness to hire Delaware Counsel.

2          The last argument --

3          THE COURT:  Even when you do have mom and -- again, to

4   comment on reality, even when you do have mom-and-pop creditors

5   in businesses that are very locally focused, general practice

6   today is to make their claims irrelevant, in that to the extent

7   they have avoidance claims, they're paid on the first day.

8   Their real concern is whether the business will continue or

9   not.

10         Now, it's certainly true that pension claims are

11  important, and proofs of claim are important.  But we have

12  many -- all courts have many procedures in place to ensure that

13  those types of creditors can participate without having to go

14  to the courthouse.

15         MR. POMERANTZ:  Yes.  So, Your Honor, Judge Gross also

16  mentioned that in the Restaurants Acquisition case, which was a

17  Texas-based --

18         THE COURT:  He's a smart guy.

19         MR. POMERANTZ:  We'll be sorry to see him go, Your

20  Honor.

21         THE COURT:  Yeah, absolutely.

22         MR. POMERANTZ:  Which was a Texas-based restaurant

23  chain that had more of a local flair.  But he made the comments

24  Your Honor made.

25         The last argument the committee makes is that Texas is

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 12 of 125   PageID 15543
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix    Page 11 of 249

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 90 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    90

1   more convenient.  And this is really the crux, which I'll spend

2   some time over the next few minutes.

3           Texas is more convenient -- convenient -- because the

4   Texas bankruptcy court, where Acis is pending has, in their

5   words, already expended great time and effort familiarizing

6   itself with the debtor and its operations.  You've heard

7   statements like "learning curve".  You heard statements about

8   everything that the debtor -- that Judge Jernigan has found out

9   about this debtor, and how important and how helpful it is, and

10  how Your Honor will be behind the learning curve.  We just

11  don't buy that, Your Honor.

12          And aside from that argument, the arguments that the

13  committee makes for transfer are arguments that could be made

14  in any case before Your Honor.

15          THE COURT:  Yeah, I was going to say that's kind of an

16  interesting argument, because actually it assumes Judge

17  Jernigan's going to ignore the rules of evidence in making

18  factual findings, because you're limited to the record before

19  you on a specific motion.  And what fact you may have learned

20  with regard to something a person has done, maybe that goes

21  into questions of credibility on cross-examination or direct

22  testimony, but to actually base your decision on a fact that's

23  not in the record for the specific proceeding would be

24  improper.

25          MR. POMERANTZ:  Look, I agree, Your Honor.  And the

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 13 of 125   PageID 15544
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 12 of 249

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 91 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    91

1    familiarity with the type of business -- if I wasn't speaking

2    to Your Honor or your brethren or many other judges around the

3    country, I'd say well, maybe there are certain judges who

4    haven't dealt with large financial services company, may not

5    know what a CLO, may not know what a hedge fund is or private

6    equity fund is.  I'm very confident that Your Honor has had

7    many cases with sophisticated financial instruments, likely CLO

8    obligations, so that Your Honor not only has a good base of

9    knowledge that would give you the same base of knowledge that

10   Judge Jernigan has, but as we've also found, you are a fairly

11   quick study and that I have no doubt that you could come up-to-

12   speed without very little effort.

13           So their argument is a grossly overstated

14   interpretation of what the Acis case was about and that what

15   was learned in that case has any relevance.  As a part -- as a

16   result of the Acis plan confirmation, Acis is no longer part of

17   the debtor's organizational structure.  The debtor owns no

18   equity in Acis.  And the debtor no longer provides any advisory

19   services to Acis.

20           We admit that Judge Jernigan conducted many hearings,

21   and she issued several lengthy opinions, and she heard from a

22   variety of witnesses.  And I'm sure Your Honor -- if Your Honor

23   has not -- Your Honor might read the opinions that she wrote

24   that are attached to the exhibits, the plan confirmation

25   opinion, the arbitration opinion, the involuntary opinion; and

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 14 of 125   PageID 15545
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 13 of 249

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 116 of 137

116

1

2                        C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10                                          December 3, 2019

11   _____     _____

12   CLARA RUBIN                         DATE

13

14   eScribers, LLC

15   352 Seventh Avenue, Suite #604

16   New York, NY 10001

17   (973) 406-2250

18   operations@escribers.net

19

20

21

22

23

24

25

# EXHIBIT B

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                    )   Case No. 19-34054-sgj-11
 3    In Re:                        )   Chapter 11
                                    )
 4    HIGHLAND CAPITAL              )   Dallas, Texas
      MANAGEMENT, L.P.,             )   January 9, 2020
 5                                  )   9:30 a.m. Docket
                                    )
 6            Debtor.               )
                                    )   DEBTOR'S MOTION TO COMPROMISE
 7                                  )   CONTROVERSY WITH OFFICIAL
                                    )   COMMITTEE OF UNSECURED
 8    _____)   CREDITORS [281]

 9                         TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                    UNITED STATES BANKRUPTCY JUDGE.

11    APPEARANCES:

12    For the Debtor:              Jeffrey N. Pomerantz
                                   PACHULSKI STANG ZIEHL & JONES, LLP
13                                 10100 Santa Monica Blvd.,
                                    13th Floor
14                                 Los Angeles, CA  90067-4003
                                   (310) 277-6910
15
      For the Debtors:             Ira D. Kharasch
16                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                   10100 Santa Monica Blvd.,
17                                  13th Floor
                                   Los Angeles, CA  90067-4003
18                                 (310) 277-6910

19    For the Debtor:              John A. Morris
                                   PACHULSKI STANG ZIEHL & JONES, LLP
20                                 780 Third Avenue, 34th Floor
                                   New York, NY  10017-2024
21                                 (212) 561-7700

22    For the Debtors:             Melissa S. Hayward
                                   Zachery Z. Annable
23                                 HAYWARD & ASSOCIATES, PLLC
                                   10501 N. Central Expressway,
24                                  Suite 106
                                   Dallas, TX  75231
25                                 (972) 755-7104
```

51

1          MS. LAMBERT:  Well, I mean, either that or we need to

2     clear the room.

3          THE COURT:  I've read the arbitration award.

4          MS. LAMBERT:  Right.

5          THE COURT:  It's in my brain.

6          MS. LAMBERT:  Right.  Okay.

7          THE COURT:  Uh-huh.

8          MS. LAMBERT:  And so one of the arguments here today

9     is that the U.S. Trustee is representing the SEC and

10    representing other Government agencies and things.  No.

11    Obviously, that is not the U.S. Trustee --

12         THE COURT:  I didn't hear that.

13         MS. LAMBERT:  Okay.  The -- one of the positions has

14    been, in the papers, is, well, that we don't have standing to

15    raise their issues.  And that's true.

16         THE COURT:  Okay.

17         MS. LAMBERT:  But the problem is that the U.S.

18    Trustee has been constrained from discussing those issues with

19    the SEC.  The arbitration award is very relevant to the SEC's

20    oversight.  I anticipate the evidence today will be that the

21    SEC, after the financial crisis of 2008, imposed restrictions

22    on this Debtor on breach of fiduciary duty issues.  I

23    anticipate that the arbitration findings would be very

24    relevant to whether those issues are ongoing or not.

25         THE COURT:  Okay.  Let me weigh in.  I view the legal

52

1    standard that this Court has to weigh today as being:  Is the

2    Debtor proposing something that is reflective of sound

3    business judgment, reasonable business judgment?  And to the

4    extent this is a compromise of controversies with the

5    Committee, is this fair and equitable and in the best interest

6    of the estate?

7        And as Mr. Pomerantz has said, you know, a lot of this

8    maybe doesn't even need Court approval.  But to the extent

9    there are aspects of this that are appropriate to seek Court

10   approval on, you know, this is my task.  I have to look at

11   what's presented, and is this reflective of sound business

12   judgment?  Is this fair and equitable?  Is it in the best

13   interest?

14       So, assuming there are tons of bad facts here reflected in

15   the arbitration award, reflected in other evidence, bad facts

16   that might justify a trustee, a Chapter 11 trustee, is this

17   nevertheless, what's proposed today, a reasonable compromise

18   of, you know, the trustee arguments the Committee could make

19   or, you know, is this a reasonable framework for going

20   forward?  Okay?

21       So I guess what I'm saying is I'm confused about, you

22   know, do I need to look at the arbitration award?  Do we need

23   to have evidence of all of that?  I can assume that there are

24   terrible facts out there that might justify a trustee, but I'm

25   looking at what's proposed.  Is this a fair and equitable way

53

1    to resolve the disputes?  Is it sound business judgment?

2    Frankly, is it a pragmatic solution here to preserve value?

3    So that's the legal standard I have in my mind here.

4            MS. LAMBERT:  Yes, Your Honor.

5            THE COURT:  Okay.

6            MS. LAMBERT:  The standard is whether it is fair and

7    equitable to resolve the issues in the Chapter 11 trustee

8    motion, and it is the U.S. Trustee's position that they are

9    not resolved by this.  And how are they not resolved?  Number

10   one, they're not resolved because the problems that led to the

11   breach of fiduciary duty issues and findings are more

12   pervasive, both based on this Court' finding in the *Acis* case

13   and in the arbitration court's finding in Mr. Dondero.  Other

14   officers are implicated.

15           THE COURT:  But how --

16           MS. LAMBERT:  Other employees are implicated.

17           THE COURT:  Okay.  I feel like maybe we're talking at

18   each other, not getting each other.  I've got a proposed

19   solution here to totally change the playing field, if you

20   will.  Bring in incredibly qualified people to --

21           MS. LAMBERT:  Those people --

22           THE COURT:  -- to change out the, you know, the

23   person that you say breached fiduciary duties, the, you know,

24   mismanagement, whatever bad labels we have here, but bring in

25   a clean slate.

77

1    very compelling appeal.  Among them, certainly, the Committee

2    that's negotiated this term sheet retains the right at any

3    time to move for a Chapter 11 trustee if it believes there are

4    grounds.  The Committee is granted standing to pursue estate

5    claims, certain estate claims right off the bat, without

6    having to come back and ask the Court, without having to rely

7    on the Debtor to pursue that.  There are document production

8    provisions, document preservation provisions, a shared

9    privilege negotiated, that are very powerful tools for the

10   Committee, and certainly operating protocols that have been

11   negotiated regarding the Debtor's operations that are very

12   powerful tools for the Committee.

13        I said many times during the *Acis* case -- those who were

14   here will remember -- that the company, *Acis*, was not a great

15   fit for Chapter 11.  Lots of companies aren't great fits for

16   Chapter 11, I suppose, but the kind of business it was was

17   kind of tough to maneuver in Chapter 11.  Human beings and

18   their expertise create value.  And while we had a Chapter 11

19   trustee, a stranger come in and take control over Acis, you

20   know, there's great uncertainty whether that stranger is going

21   to be able to preserve value and have the smooth transition

22   into Chapter 11 that's really going to be the best fit.

23        Here, as I've said earlier, the legal standard I view as

24   controlling here is 363 and whether what has been proposed

25   reflects reasonable business judgment.  Is there a sound

78

1    business justification for proposing the independent slate of

2    directors at the GP level for the Debtor, the protocols, the

3    negotiation with the Committee, the document sharing, the

4    standing given to them?  Does all of this reflect reasonable

5    business judgment?  And I find, quite clearly, it does.  I

6    find it to be a pragmatic solution to the Committee's concerns

7    about existing management and control.

8        And I think I used the words "fair and equitable," not

9    just Ms. Lambert, because it is also presented to the Court as

10   a 9019 compromise of disputes with the Committee, and we

11   traditionally use a fair and equitable and best interest of

12   the estate analysis in this context.  So, to the extent that

13   applies, I do find this a fair and equitable way of resolving

14   the disputes with the Committee, and I find this to be in the

15   best interest of the estate.  So I do approve this.

16       And by approving this motion, I'm approving the term sheet

17   as it's been presented, the various terms therein, the

18   exhibits thereto.  I'm specifically approving the new

19   independent directors, the document management and

20   preservation process, the standing to the Committee over

21   certain of the estate claims, the reporting requirements, the

22   operating protocols, the whole bundle of provisions.

23       Now, there is one specific thing I want to say about the

24   role of Mr. Dondero.  When Ms. Patel got up and talked about

25   the newest language that has been added to the term sheet, she

79

1  highlighted in particular the very last sentence on Page 2 of

2  the term sheet, the sentence reading, "Mr. Dondero shall not

3  cause any related entity to terminate any agreements with the

4  Debtor."  Her statement that that was important, it really

5  resonated with me, because, you know, as I said earlier, I

6  can't extract what I learned during the *Acis* case, it's in my

7  brain, and we did have many moments during the *Acis* case where

8  the Chapter 11 trustee came in and credibly testified that,

9  whether it was Mr. Dondero personally or others at Highland,

10  they were surreptitiously liquidating funds, they were

11  changing agreements, assigning agreements to others.  They

12  were doing things behind the scenes that were impacting the

13  value of the Debtor in a bad way.

14       So not only do I think that language is very important,

15  but I am going to require that language to be put in the

16  order.  Okay?  So we're not just going to have an order

17  approving the term sheet that has that language.  I want

18  language specifically in the order.  You know, you can figure

19  out where the appropriate place to stick it in the order is,

20  but I want specific language in here regarding Mr. Dondero's

21  role.  I also -- the language in there that his role as an

22  employee of the Debtor will be subject at all times to the

23  supervision, direction, and authority of the Debtors, I want

24  that language in there as well.  Let's go ahead and put the

25  language in there that at any time, in any event, the

80

1  independent directors can determine he's no longer going to be

2  retained.  I want that in the order.

3      And I'm sure most of you can read my mind why, but I want

4  it crystal clear that if he violates these terms, he's

5  violated a federal court order, and contempt will be one of

6  the tools available to the Court.  He needs to understand

7  that.  Mr. Ellington needs to understand that.  You know, if

8  there are any games behind the scene, not only do I expect the

9  Committee  is going to come in and highlight that to the Court

10 and file a motion for a trustee or whatever, but we're going

11 to have a contempt of court issue.

12     So, anybody want to respond to that?

13         MR. POMERANTZ:  Your Honor, Jeff Pomerantz; Pachulski

14 Stang Ziehl & Jones.

15     We hear Your Honor.  What I thought I'd do now is I have a

16 clean redline of the order, of course not including the

17 provision you just requested, --

18         THE COURT:  Uh-huh.

19         MR. POMERANTZ:  -- which we will go back and upload

20 and hope to get an order signed by Your Honor today, if you're

21 around.  But to go over the other changes, the changes to

22 Jefferies, the other language changes I discussed before.  I

23 gave a copy to Ms. Lambert and to the Committee.  May I

24 approach with a --

25         THE COURT:  You may.

81

1          MR. POMERANTZ:  Thank you.

2          THE COURT:  Okay.  All right.  (Pause.)  All right.

3    The form of order looks fine to me.  Obviously, you'll add the

4    Dondero-related language, and we may have further wording

5    tweaks negotiated with the CLO Issuers.  But, again, I approve

6    all of this.  I didn't say on the record the compensation, but

7    certainly I am approving that as reasonable.  I expect these

8    three directors are going to be working very, very hard.  And

9    so, as you said, not 50,000-foot level monitoring, actually

10   rolling up sleeves on-site, so I think the compensation is

11   reasonable.

12         MR. POMERANTZ:  Thank you, Your Honor.  We will

13   submit an order shortly that includes Your Honor's language

14   requested.

15         THE COURT:  Okay.

16         MR. POMERANTZ:  Are you around this afternoon?

17         THE COURT:  I am around, --

18         MR. POMERANTZ:  Okay.

19         THE COURT:  -- so just pick up the phone or send an

20   email to Traci, my courtroom deputy, --

21         MR. POMERANTZ:  Yes.

22         THE COURT:  -- so she can tell me, "It's in your

23   queue to sign."

24         MR. POMERANTZ:  She has been extremely helpful and

25   responsive.

90

1          THE COURT:  All right.  Very good.  I'll sign your

2     order on the CRO, then.

3          MR. DEMO:  Okay.  Thank you, Your Honor.

4          THE COURT:  All right.  Well, if there's nothing

5     else, I'll be on the lookout for your orders.  And, again, if

6     you could coordinate with Traci to make sure she's clear on

7     everything you need set on the 21st.

8          MR. POMERANTZ:  Thank you very much, Your Honor.

9          THE COURT:  All right.

10          MR. CLEMENTE:  Thank you, Your Honor.

11          MR. DEMO:  Thank you, Your Honor.

12          THE CLERK:  All rise.

13     (Proceedings concluded at 11:54 a.m.)

14                          --oOo--

15

16

17

18

19

20                          CERTIFICATE

21     I certify that the foregoing is a correct transcript from
      the electronic sound recording of the proceedings in the
22     above-entitled matter.

23     /s/ Kathy Rehling                    12/10/2020

24     _____    _____
      Kathy Rehling, CETD-444                      Date
25     Certified Electronic Court Transcriber

# EXHIBIT C

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION

                                    )   Case No. 19-34054-sgj-11
    In Re:                          )
                                    )
    HIGHLAND CAPITAL                 )   Dallas, Texas
    MANAGEMENT, L.P.,                )   February 19, 2020
                                    )   9:30 a.m.
            Debtor.                 )
                                    )   MOTIONS
                                    )
    _____

                         TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.

    APPEARANCES:

    For the Debtor:              Greg Demo
                                 John A. Morris
                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                 780 Third Avenue, 34th Floor
                                 New York, NY  10017-2024
                                 (212) 561-7700

    For the Debtor:              Jeffrey N. Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                 10100 Santa Monica Blvd., 13th
                                    Floor
                                 Los Angeles, CA  90067
                                 (310) 277-6910

    For the Debtor:              Melissa S. Hayward
                                 Zachery Z. Annable
                                 HAYWARD & ASSOCIATES, PLLC
                                 10501 N. Central Expressway,
                                    Suite 106
                                 Dallas, TX  75231
                                 (972) 755-7104

    For the Official Committee   Matthew A. Clemente
    of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                 One South Dearborn Street
                                 Chicago, IL  60603
                                 (312) 853-7539
```

Nelms - Direct                            61

1   the original motion but which the Debtor no longer seeks to

2   pursue?

3   A    One of the matters that was pending when we took office

4   was an appeal, and I believe it was still in the District

5   Court, and that related to an alleged conflict of interest by

6   the Winstead firm.  And so there was an objection to their

7   fees and an appeal concerning payment of Winstead fees.  And

8   the Board has decided not to go forward with that appeal.

9   Q    Okay.  So the Board -- did you hear the opening from

10  Acis's counsel that charged that the Debtor was just doing

11  more scorched-earth litigation tactics?  Did you hear that

12  charge?

13  A    I heard that, yes.

14  Q    Okay.  But yet the Board has instructed Foley not to

15  pursue the Winstead matter; is that right?

16  A    That's correct.

17  Q    And just again, for the record, why did the Board make

18  that decision?

19  A    The Board made that decision because we just thought it

20  was in the best interest of the Debtor and this estate not to

21  do that.

22  Q    And did the Debtor see any benefit to pursuing that

23  particular litigation?

24  A    You know, there -- a benefit could be articulated, but we

25  decided not to pursue it.

Nelms - Direct                          62

1   Q    Okay.  So, that, plus the Neutra appeal, are two -- I

2   mean, I apologize, withdrawn.  That, plus the DAF matter, are

3   two examples where the Board exercised its judgment not to

4   pursue pending litigation; is that fair?

5   A    That's correct.

6   Q    Okay.  Is the Board supportive of the Debtor's application

7   to retain Foley for the three matters you have described?

8   A    It is.

9   Q    And without revealing privileged communications, can you

10  describe generally the diligence that the Board conducted to

11  reach that decision?

12  A    Well, we met with some of the people that work at

13  Highland.  We met with the Debtor's attorneys, the Pachulski

14  firm.  We did have a couple of meetings with Ms. Patel and Mr.

15  Terry.  Some of us have reviewed the pleadings, some more than

16  others.  And, well, we may have done other things, but those

17  are the ones that come to mind right now.

18  Q    I don't know if you mentioned it, but did you confer with

19  Ms. O'Neil?

20  A    Oh, yes, we did.  We talked with Ms. O'Neil about it.

21  Q    Okay.  And what was the purpose of the diligence that you

22  just described for the Court?

23  A    Well, ultimately, what we as a board were trying to do was

24  to conduct kind of a cost-benefit analysis to the estate:  How

25  much will this potentially cost us?  What's the potential

                              Nelms - Direct                      63

 1   upside of pursuing it?  And based upon that cost-benefit

 2   analysis, we thought that this was the best thing to do.

 3   Q    Okay.  Let's just focus on a couple of very narrow 327(e)

 4   issues.  Is the Debtor seeking to retain Foley to act as

 5   general bankruptcy counsel?

 6   A    No.

 7   Q    And which firm serves as general bankruptcy counsel?

 8   A    That would be the Pachulski firm.

 9   Q    Okay.  And do you know whether Foley Gardere represented

10   the Debtor's interest in each of the three matters that you've

11   described?

12   A    It has been representing the Debtor previously.

13   Q    Okay.  So let's talk about those three matters.  The first

14   one I believe you said was with respect to the representation

15   of the Debtor in connection with an $8 million claim that it

16   has against Acis; is that right?

17   A    That's correct.

18   Q    And is that the claim -- is that the subject of a formal

19   proof of claim?

20   A    Yes.

21   Q    Okay.

22   A    It is a claim filed in the Acis case.

23   Q    I've placed before you an exhibit binder, and I would ask

24   you to turn first to Exhibit 4.

25   A    Okay.

173

1    that benefits everybody.

2        So I guess, Your Honor, I mean, I don't know what else to

3    say about the benefits of the Neutra appeal except that the

4    testimony, I think, speaks for itself.  But, you know, I --

5    and in terms of --

6            THE COURT:  Again, fight the claim of a creditor.

7    Foley can represent Highland in the adversary proceeding,

8    wherever that goes forward.

9            MR. DEMO:  Yeah.

10           THE COURT:  Probably District Court, not this Court.

11   At least some of it, if not all of it.  But anyway, I'm

12   digressing.  They can object to Acis's proof of claim.  They

13   can object to Terry's proof of claim.  I mean, --

14           MR. DEMO:  And conversely, Your Honor, if -- if --

15           THE COURT:  -- this has nothing to do with -- I mean,

16   I don't get the appeal.  I mean, I --

17           MR. DEMO:  Right.

18           THE COURT:  Neutra can appeal, HCLOF can appeal, but

19   I'm not seeing the benefit to Highland.

20           MR. DEMO:  And I guess the only thing I would say,

21   Your Honor, is if there is an improper benefit, we are not

22   saying that the fee applications are sacrosanct.  People can

23   challenge the improper benefit there.

24       And again, the settlement gave broad discretion to the

25   Committee to pursue insider claims.  So if an insider is

174

 1  receiving a benefit from this, the Committee has standing to

 2  pursue that.

 3      So it's not a null set, Your Honor, whereas cutting off

 4  the appeal now does take away that possibility.

 5          THE COURT:  How would I be cutting off the appeal?

 6  I'm not cutting off the appeal.  King & Spalding can go in

 7  there and fight hard.  Foley can go in there and fight hard

 8  for Neutra.  So, --

 9          MR. DEMO:  One second, Your Honor.

10      (Counsel confer.)

11          MR. DEMO:  And I guess, you know, Your Honor, and I

12  do want to reiterate that there is no other party with an

13  economic incentive to fight the Neutra appeal the way that the

14  Debtor has an economic incentive.

15          THE COURT:  That makes no sense to me.  HCLOF is the

16  one who hated this injunction.

17          MR. DEMO:  That's not the Neutra appeal, Your Honor.

18  That's the confirmation order.

19          THE COURT:  Well, okay.  Neutra gets its company back

20  if they win.

21          MR. DEMO:  And we would get our contracts back.

22          THE COURT:  And arguably, it can control Acis, maybe,

23  okay, and it can assign management contracts to whoever it

24  wants.  That just -- and it says it'll assign them to

25  Highland.  If you can trust Jim Dondero, then Highland's going

175

1    to benefit if Neutra wins that appeal.  Right?

2           MR. DEMO:  Yes.  Yes, Your Honor.

3           THE COURT:  Okay.  So that --

4           MR. DEMO:  Highland would benefit greatly --

5           THE COURT:  Okay.

6           MR. DEMO:  -- if Neutra were to win that appeal.

7           THE COURT:  Okay.  Okay.  Well, but first Neutra

8    benefits, right?  And then --

9           MR. DEMO:  No.

10          THE COURT:  -- Highland only secondarily benefits --

11          MR. DEMO:  I -- I --

12          THE COURT:  -- if Jim Dondero keeps his word and

13   gives the management contracts back to Highland.

14          MR. DEMO:  Jim Dondero would also have to repay the

15   $8 million in claim, even if he didn't reinstate those

16   contracts.  And that $8 million would be hundred-cent dollars.

17          THE COURT:  Okay.

18          MR. DEMO:  So, worst case, --

19          THE COURT:  It would have been nice to have him

20   testify as to all of this.

21          MR. DEMO:  Worst --

22          THE COURT:  It would be more compelling if I had him.

23          MR. DEMO:  Well, --

24          THE COURT:  Okay?  But I don't think --

25          MR. DEMO:  -- I can only do so much, Your Honor.

176

1                THE COURT:  -- that's going to happen anytime soon.

2                MR. DEMO:  But I guess worst-case scenario is that

3     it's $8 million in hundred-cent dollars.

4                THE COURT:  Okay.

5                MR. DEMO:  And that's not nothing for $500,000.  And

6     only a portion of that $500,000.

7                THE COURT:  Okay.

8                MR. DEMO:  Thank you, Your Honor.

9                THE COURT:  Okay.  Mr. Lamberson?

10               MR. LAMBERSON:  Your Honor, do you want a closing

11    from me?  Or no?

12               THE COURT:  I don't really need it.  Thank you.

13               MR. LAMBERSON:  Okay.

14               THE COURT:  Okay.

15               MR. LAMBERSON:  Because I know your hearing starts in

16    about two minutes.

17               THE COURT:  All right.  So, I just hate it that we

18    spent so much time on this.  I hate it that we spent so much

19    time, but, I mean, I understand.  I understand.  You know, I

20    think the employment application was filed pretty early in the

21    case, right, and -- October 29th.  And it was continued,

22    continued, continued, because we were getting objections from

23    the Committee, or they wanted time to look at it, I guess.

24    And now you're kind of up against the wire, right, because

25    oral arguments are set at the Fifth Circuit next month.  So I,

177

1   you know, I hate it that we were here, but I understand it.

2       But I'm concerned.  I'm concerned -- well, here's the

3   deal.  We have a great board, and I totally get that

4   Bankruptcy Courts should defer heavily to the reasonable

5   exercise of business judgment by a board.  And we've got great

6   professionals.  And we've got this case, I think, on a good

7   track as a general matter now.  But I'm concerned that Dondero

8   or certain in-house counsel has -- you know, they're smart,

9   they're persuasive -- that -- what are the words I want to

10  look for -- they have exercised their powers of persuasion or

11  whatever to make the Board and the professionals think that

12  there is some valid prospect of benefit to Highland with these

13  appeals, when it's really all about Neutra, HCLOF, and Mr.

14  Dondero.  That's what I believe.

15      I mean, this is awkward, right, because you want to defer

16  to the debtor-in-possession, but I have this long history, and

17  I can think through the scenarios.  If this is reversed, here

18  is how it will play out.  If this is reversed, here is how it

19  might play out.  And I know, you know, there are multiple ways

20  it might play out, but I cannot believe there is a chance in

21  the world there is economic benefit to Highland if these

22  things get reversed.  Economic benefit to Neutra:  Yeah,

23  maybe.  Economic benefit to HCLOF:  Well, they'll get what

24  they want.  You know, whether it's an economic benefit, I

25  don't know.  But benefit to Highland?  I just don't think the

178

1 evidence has been there to convince me it's reasonable

2 business judgment for Highland to pay the legal fees

3 associated with the appeal.

4     And even more concerning to me is a valid point was made

5 that Highland is in bankruptcy because of litigation,

6 litigation, litigation.  The past officers and directors and

7 controls' propensity to fight about everything.  This isn't a

8 balance sheet restructuring, okay?  It's not a Chapter 11

9 caused by operational problems or revenue disruption or who

10 knows what kind of disruption.  It's about years of litigation

11 finally coming home to roost.  And this just appears to be

12 more of the same, potentially.

13     Okay.  Parties have a right to appeal.  I respect that.

14 Neutra, go for it.  HCLOF, go for it.  But this estate and its

15 creditors should not bear the burden of having Highland pay

16 for that, when, again, I don't think there's any evidence to

17 suggest they could benefit at the end of the day.

18     So what I'm going to do is I'm going to approve the

19 retention of Foley to represent Highland in the Acis case.  We

20 all know the adversary is stayed right now.  It may or may not

21 ever be un-stayed, depending on what strategies people want to

22 pursue.  But Highland, I think a meritorious case has been

23 presented, and under 327(e) I will approve Foley representing

24 Highland in all Acis matters.  Okay?  The Acis bankruptcy

25 case.  The adversary proceeding, if it goes forward.  And so

179

1   that's my ruling.

2       I will additionally rule, for the avoidance of doubt, that

3   if Foley wants to represent Neutra in the appeals and get paid

4   by Neutra, I don't have any problem with that.  In other

5   words, I'm not going to find something like there's a conflict

6   with the estate, you know, because of its simultaneous

7   representation of Neutra.  That's fine.  But I'm not going to

8   approve Highland paying anything in connection with either of

9   those appeals.  So that is the ruling of the Court.

10      Have I left any gaps here?

11          MR. DEMO:  Your Honor, just one clarification.

12          THE COURT:  Uh-huh.

13          MR. DEMO:  Foley is representing Highland Capital

14  Management in the appeal of the confirmation order to the

15  Fifth Circuit.  I just want to clarify that your ruling that

16  Highland can represent -- I'm sorry -- Foley can represent

17  Highland in all Acis matters extends to their representation

18  of Highland Capital Management in the appeal of the

19  confirmation order that's set for March 30th.

20          THE COURT:  Okay.  Let me think through that.

21          MR. DEMO:  And again, Your Honor, there's been no

22  objection to that.

23          THE COURT:  King & Spalding is in there representing

24  HCLOF.  Foley would be representing both Neutra and Highland

25  in connection with the confirmation order?

186

1          THE COURT:  Okay.  Thank you all.

2      (Proceedings concluded at 1:44 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                   CERTIFICATE

21      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/20/2020**

24  _____      _____

25  Kathy Rehling, CETD-444                    Date
Certified Electronic Court Transcriber

# EXHIBIT D

```
 1                   IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
 2                              DALLAS DIVISION

 3                                    )    Case No. 19-34054-sgj11
         In Re:                       )
 4                                    )
         HIGHLAND CAPITAL             )    Dallas, Texas
 5       MANAGEMENT, L.P.,            )    June 30, 2020
                                      )    9:30 a.m. Docket
 6              Debtor.               )
                                      )    MOTION FOR REMITTANCE OF FUNDS
 7                                    )    HELD IN REGISTRY OF COURT
                                      )    FILED BY CLO HOLDCO, LTD.
 8       ─────────────────────────────)    (590)

 9                          TRANSCRIPT OF PROCEEDINGS
                     BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                      UNITED STATES BANKRUPTCY JUDGE.

11       WEBEX/TELEPHONIC APPEARANCES:

12       For the Debtor:              Jeffrey N. Pomerantz
                                      PACHULSKI STANG ZIEHL & JONES, LLP
13                                    10100 Santa Monica Blvd.,
                                       13th Floor
14                                    Los Angeles, CA  90067
                                      (310) 277-6910
15
         For the Debtor:              John A. Morris
16                                    Greg Demo
                                      PACHULSKI STANG ZIEHL & JONES, LLP
17                                    780 Third Avenue, 34th Floor
                                      New York, NY  10017-2024
18                                    (212) 561-7700

19       For CLO Holdco, Ltd.,        John J. Kane
         Movant:                      Brian W. Clark
20                                    KANE RUSSELL COLEMAN LOGAN, P.C.
                                      901 Main Street, Suite 5200
21                                    Dallas, TX  75202
                                      (214) 777-4261
22
         For the Official Committee   Matthew A. Clemente
23       of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                      One South Dearborn Street
24                                    Chicago, IL  60603
                                      (312) 853-7539
25
```

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 41 of 125   PageID 15572
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 40 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 21 of 100

21

1    the argument that you can't look at the Bankruptcy Code to

2    determine whether the money should come out of the registry or

3    not, and then be back in front of you, you know, three or four

4    weeks later to relitigate any of those issues.

5        So that was absolutely my recollection and understanding,

6    Your Honor, and I think from your comments I intuit that it

7    was your understanding as well, that this was not something

8    that we were going to deal with again very quickly, but was

9    something to preserve the status quo, a reasonable solution,

10   an equitable solution under Section 105.  And I believe that's

11   what Your Honor ordered.

12        THE COURT:  All right.  Well, I'll let you go ahead

13   and make your opening statement.  I think Mr. Kane was

14   finished before I started asking my questions.

15        MR. CLEMENTE:  Okay.

16        THE COURT:  Mr. Clemente, you may proceed.

17        MR. CLEMENTE:  Thank you, Your Honor.  I appreciate

18   that.  So, and I'll try and be brief on the opening.

19        OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

20                    UNSECURED CREDITORS

21        MR. CLEMENTE:  Your Honor, like it or not, CLO Holdco

22   is not an independent, unrelated, third-party investor merely

23   seeking distributions on account of its own arm's-length

24   independent investments.  Instead, CLO is a related party in

25   literally every sense of the word.  That's not in dispute.

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 42 of 125   PageID 15573
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix     Page 41 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 22 of 100

22

1   That is part of the Jim Dondero or Mr. Dondero web of

2   entities.

3        CLO Holdco is effectively controlled by Mr. Dondero.  It

4   was seeded and received assets transferred from the Debtor,

5   including the assets giving rise to the distribution that's in

6   the registry.  None of that is in dispute.  All of this at a

7   time when Mr. Dondero controlled the Debtor as well as the

8   parties through the various intermediate transactions that

9   ultimately resulted in the assets arriving in CLO Holdco.

10  That is not in dispute.

11       Mr. Dondero's past fraudulent conduct, including

12  fraudulent transfers, is also not in dispute.  He was on all

13  sides of this transaction.  And therefore this transaction,

14  along with many of the others, must be viewed with skepticism

15  and scrutinized very closely by the Committee and by this

16  Court.

17       The Committee has only just begun such work, Your Honor.

18  And given the Byzantine empire created by Mr. Dondero, it will

19  take time and significant resources to fully and properly

20  conduct an investigation.

21       And Mr. Kane referred to, did we do discovery?  We did

22  not.  Our reaction to this motion was the same as Your Honor.

23  And as you can see by the stipulations that we have agreed to

24  for purposes of this hearing, we didn't want this to be a

25  situation where the estate would spend a tremendous amount of

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 43 of 125   PageID 15574
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix     Page 42 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 23 of 100

23

1    resources to deal with something that we thought that was

2    dealt with on March 4th.

3        But aside from that, given the web that's been created

4    here, we can't just isolate one piece of it.  We can't just be

5    like, I'm going to look at the CLO Holdco documents and be

6    able to develop a full theory.  This is a tapestry of

7    interrelated entities that is opaque and vague and purposely

8    so.  So you can't just focus on one piece and then try and

9    say, well, I know what this piece is, because that piece has

10   many interrelated complex ramifications and relationships

11   where, frankly, you can't just say, okay, let's focus on this

12   one issue, because you're going to miss the entire tapestry.

13       We still need to examine, as I mentioned, the whole thing,

14   and this takes time and it takes an investment.  So while I

15   understand CLO Holdco wants to receive its distribution, I

16   also understand that my constituency wants to be paid, some of

17   whom have been waiting for over a decade.

18       To be clear, Your Honor, my constituency didn't choose to

19   be here in the bankruptcy.  But CLO Holdco chose to associate

20   itself with Mr. Dondero and to take assets from Highland in

21   convoluted related-party transactions and reap the benefits of

22   those transactions.  CLO Holdco can't now step away from that

23   and try and suggest to Your Honor that this is about taking

24   time under 28 U.S.C. 2042.  That was never what it was about

25   on March 4th, and it's not what it's about today.

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 44 of 125   PageID 15575
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 43 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 67 of 100

67

1   Holdco has or doesn't have, we have no idea.  And it's

2   controlled, ultimately, let us not lose sight of the fact, by

3   Mr. Dondero.

4       So, allowing CLO Holdco to take distributions will place

5   them with an offshore entity, potentially outside the

6   jurisdiction of this Court, or at the very least, placed in

7   five or six entities removed or who knows where, including

8   potentially other foreign entities.

9       Therefore, exercising authority under Section 105 is

10  consistent with preserving, protecting, and maximizing the

11  value of the Debtor's estate, which estate includes claims,

12  causes of action, and avoidance actions.

13      As you know, 105 is the means and -- circumstances (audio

14  gap) preserve and protect the estate.

15      And to be sure, this is not inconsistent with any other

16  provision of the Bankruptcy Code, and it's, in fact, from our

17  perspective, in furtherance of the goals of the Code.

18      Your Honor, regarding the payments that Mr. Kane (audio

19  gap), the fact that a few payments were made on the note

20  doesn't change the fact that Section 105 applies and the Court

21  should deny the motion.

22      As with all that is Highland, nothing is simple or easy.

23  First, CLO Holdco received millions more in assets and

24  transfers, aside from the interests giving rise to the

25  distributions at issue.  So the fact that there were payments

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 45 of 125   PageID 15576
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix     Page 44 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 68 of 100

68

 1    on the notes really speak nothing to the fact of whether the

 2    overall transaction was for reasonably equivalent value or

 3    otherwise problematic, especially when there is nothing in the

 4    record regarding the Dugaboy Trust, its wherewithal to pay, or

 5    the fairness of the terms of the note, or any of that.  Or why

 6    the note was structured this way or, you know, what the Get

 7    Good Trust and the Dugaboy Trust do, how they interact, who

 8    makes decision on what gets paid and doesn't get paid.

 9         The few payments, while interesting, Your Honor, again, do

10    not establish reasonably equivalent value or the propriety, in

11    our view, of the transfers.

12         Finally, as this Court knows, reasonably equivalent value

13    is not determinative of whether the transfer was intentionally

14    fraudulent or otherwise potentially avoidable or problematic.

15    So, while deeds are interesting, Your Honor, I would submit

16    that they don't move the needle in changing the fact that the

17    motion should be denied.

18         Now, Your Honor, to the point that you raised with me

19    before I started my remarks here.  Much has been made about

20    inappropriate prejudgment remedy or attachment or similar

21    arguments.  I submit this case is moot, Your Honor.  Again, at

22    the risk of repeating myself, I will emphasize that CLO Holdco

23    is not an independent third party.  Like it or not, it is tied

24    up in a ruinous web with Mr. Dondero, and that in and of

25    itself makes this case unique and distinguishes it from the

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 46 of 125   PageID 15577
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix     Page 45 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 69 of 100

69

 1   other cases cited by CLO Holdco.

 2        Additionally, Your Honor, the current circumstances are

 3   distinguishable because the Debtor had control over these

 4   funds.  That's why we were in front of you on March 4th.  I

 5   agree, and I'm not arguing, that the Debtor did not own these

 6   funds.  But it clearly had control over them at the time that

 7   it sought to make the distributions on March 4th.  So, in my

 8   humble opinion, Your Honor, that means the Court had control

 9   over that.

10        Having them held in a registry while an investigation

11   occurs is not akin to slapping a lien on someone's house or

12   taking possession of an automobile, like the cases cited by

13   Mr. Kane where they require there's some -- an adversary

14   proceeding or some type of complaint.

15        The situation here, again, Your Honor, matters.  The

16   Debtor was before you seeking your authority to make this

17   distribution.  That is entirely different than if I were to

18   walk in here and say my colleague, Mr. Twomey, I think that,

19   you know what, I don't like him and so I have a claim against

20   him, and I want Your Honor to enjoin him from being able to

21   sell his automobile.  That is entirely different, and in my

22   view completely distinguishes it from any of the cases that

23   Mr. Kane cited, including, of course, I have much respect for

24   Judge Houser, but including the case authored by Judge Houser.

25        So, Your Honor, again, having them held in the registry is

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 47 of 125   PageID 15578
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix     Page 46 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 79 of 100

79

1    attachment.  Bankruptcy Rules aren't structured like that.

2        But importantly, Mr. Clemente presented no facts to

3    support his balancing of harms argument and presented no facts

4    to establish that he has any viable claims against CLO Holdco.

5    Arguments that James Dondero participated in frauds does not

6    mean that there's a claim or cause of action that the

7    Committee can assert against CLO Holdco, which is what would

8    be required to obtain an injunction.

9        This is a big if.  If the Committee is seeking to obtain

10   an injunction, it must satisfy its burden of proving under

11   7065 and the four-factor test established by *Janvey v. Alguire*

12   in the Fifth Circuit in 2011 and the many cases before that.

13   And it just can't do it.

14       So I want to leave the Court with one case citation,

15   because if the Court is considering some means of entering a

16   preliminary injunction outside of an adversary proceeding, I

17   was able to find a grand total of one case that address that

18   in the Fifth Circuit.  And that is the 1995 decision of *In re*

19   *Zale* in which the Fifth Circuit noted that the only way a

20   105(a) preliminary injunction could be issued, after a finding

21   of these unusual circumstances and the like, was if all of the

22   protections of an adversary proceeding had been afforded to

23   the non-movant and if the party that was requesting the

24   injunction satisfied the four-factor test that's found in

25   7065.

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 48 of 125   PageID 15579
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix     Page 47 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 80 of 100

80

1          There are no extraordinary circumstances or unusual

2     circumstances here.  And if this Court believes that the

3     context of this case warrants that, then the Committee would

4     still have to satisfy that four-factor test for a preliminary

5     injunction.  And it has the burden of proof on those four

6     factors.  It hasn't presented any evidence whatsoever to

7     support that it can meet the first, let alone the second,

8     third, and fourth factors of that test.

9          So, Your Honor, with that, I'll close our case, unless you

10    have additional questions, and request that the Court grant

11    CLO Holdco's motion.

12          THE COURT:  A couple of follow-up questions.  I have

13    certain facts in my brain, and I can't remember if they're in

14    evidence or stipulated to or I read them in a pleading.  So, I

15    just want to ask:  Somewhere I remember seeing that CLO

16    Holdco, or, you know, maybe it's its parent, I think -- Mr.

17    Clemente said we have a Byzantine structure here and we have a

18    sub-web within a bigger web with regard to CLO Holdco.  But,

19    anyway, CLO Holdco or its parent has assets of approximately

20    $225 million?  Is that evidence or undisputed?

21          MR. KANE:  Your Honor, that was contained in one of

22    the pleadings asserted, I believe, by the Committee, and that

23    was the Charitable DAF entities, not necessarily CLO Holdco.

24    There hasn't been any evidence presented by the Committee of

25    the assets held by CLO Holdco other than what we have before

81

1    the Court.

2            THE COURT:  Okay.  So it's not something you would

3    stipulate or offer one way or another?

4            MR. KANE:  No, Your Honor, I think that's factually

5    incorrect and I don't stipulate to that.

6            THE COURT:  Okay.  I think my notes show that that

7    was the alleged amount of assets as of September 30, 2019.

8    But, again, that may have just been a pleading, not anything

9    in evidence.

10       All right.  And are Mr. Scott or Mr. Dondero on the phone

11   today or on the video?  I'm just curious.

12           MR. KANE:  Your Honor, I lost you on the video a

13   little bit, but assuming you can hear me, though, Mr. Scott is

14   not.  We had conversations with the Committee about various

15   exhibits and whether or not Mr. Scott would be here to testify

16   to prove up exhibits.  Once the exhibits were all stipulated

17   as admissible, then there was no need for Mr. Scott to

18   participate.

19           THE COURT:  Okay.  I was not going to ask him

20   anything.  I just was curious if he was listening in.  Or Mr.

21   Dondero, for that matter.  I guess Mr. Dondero is not on the

22   line, correct?  (Pause.)  All right.  I'll --

23           MR. KANE:  Your Honor, I -- I think -- I'm sorry.

24   I've had no conversations with Mr. Dondero.  I have no idea

25   whether he's on the line.

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 82 of 100

82

 1          THE COURT:  Okay.  I'll take silence to mean he's

 2    probably not, but --

 3       All right.  I asked that question for, I guess, a couple

 4    of reasons.  But the main reason I asked is -- and I'm going

 5    to say this as kindly as I can.  They're not here to hear it

 6    anyway.  But I feel like perhaps they are a little tone deaf,

 7    for lack of a better term, on how this all looks to the Court

 8    today.  And what I mean by that is, obviously, I assume it was

 9    their decision to bring this motion, at least Mr. Scott's, and

10    likely Mr. Dondero as well had some involvement in that

11    decision.  And the reason I say that it feels like they're a

12    little tone deaf about how this looks is that we just had an

13    extensive hearing and some very thorough pleadings, a lot of

14    evidence uploaded, on a $2.5 million issue.  And I don't --

15    you know, I appreciate that that is a significant sum of

16    money, but we've used the word context a lot this morning:  In

17    the context of this reorganization, it seems like a very big

18    deal was raised here, at the choice of Mr. Scott and Mr.

19    Dondero, over a $2.5 million issue, in the context of a

20    reorganization that involves at least hundreds of millions of

21    dollars of debt, if not over a billion.  UBS says they're owed

22    a billion.

23       And I just asked my question a minute ago about the value

24    of assets that the DAF or CLO Holdco or that sub-structure has

25    managed, because while no one will commit, is it $225 million

83

1   or not, you know, I take it that the Committee had a good

2   faith basis for saying that, and if it's not that, it's

3   probably a quite sizable number.

4       Again, so I'm kind of thinking out loud about the

5   proportionality of this issue.  $2.5 million, not anything to

6   sneeze at, but we're talking about a Charitable DAF that

7   probably has many, many, many more times that of assets.  And

8   so there was certainly no equitable argument of hardship or,

9   you know, significant detriment that's befalling CLO Holdco by

10  the tying up of this money in the registry of the Court for

11  this relatively short time period.  So, again, it feels a

12  little tone deaf to be bringing this argument, occupying so

13  much time from the parties, the lawyers, the Court, over this

14  issue.

15      And just to further elaborate on that, it matters to me,

16  and I say this about the tone-deafness, partly because I

17  thought -- I said this at the beginning of the hearing, and I

18  still say it -- we already put this issue to rest, albeit

19  temporarily, in March.  And in April, we get this new motion.

20  Again, I recognize the language of the March order reserved

21  everyone's rights to come back and argue about this, but,

22  again, the buzzwords for this hearing are going to be context

23  matters, I guess.  Mr. Clemente, you get credit for that buzz

24  phrase, those buzzwords.

25      Again, I issued the order with regard to putting these

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 52 of 125   PageID 15583
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix     Page 51 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 84 of 100

84

1    monies in the registry of the Court at the suggestion of Mr.

2    Dondero's very wonderful lawyer, retired Judge Lynn.  And,

3    again, the context was we had a protocol order early in this

4    case that the Committee negotiated heavily with regard to

5    monies being disbursed out under the control of the Debtor,

6    and heavily negotiated.  I remember the CLO Issuers, I think,

7    had some pause and concerns and got their language into that

8    order.

9        So we had this protocol order.  Debtor was worried about

10   violating the protocol order, so Debtor files the motion

11   February 24th, wanting the blessing of a court order before it

12   transferred these monies to CLO Holdco and some other

13   Highland-affiliated entities.  There were vehement objections,

14   and the Court issued the order saying, Let's put these monies

15   into the registry of the Court, at the suggestion of very able

16   counsel as to how we could resolve that contested matter we

17   were there on on March 4th.

18       So, you know, a month later, April, we have this new

19   motion of CLO Holdco reviving the dispute, the $2.5 million

20   dispute that we had just put to rest temporarily in March at

21   the suggestion of lawyers.  I didn't issue a 105 injunction

22   outside the context of an adversary proceeding just on my own,

23   *sua sponte*.  It was suggested to me that this was a good

24   solution.  People embraced it.  That's what we did.  And I

25   sure didn't have in my brain that a month later we'd have a

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 53 of 125   PageID 15584
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix     Page 52 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 85 of 100

85

1    brand new motion regarding whether these monies should be

2    disbursed to CLO Holdco all over again, when that was the

3    issue that was already before the Court in March.

4         I, again, fully recognize that everybody reserved their

5    rights, but I focus on this context because, again, I wish Mr.

6    Dondero and Mr. Scott were on the call to hear this:  This

7    almost feels like a good faith issue to me.  You know, maybe I

8    would feel slightly different if there had been a broad

9    emphasis, heavy emphasis, CLO Holdco standing up through a

10   lawyer that day saying, We're just letting you know, we're

11   going to get together a motion in very short order and tee

12   this up again.  Because I would have probably said no.  You

13   know, if -- let's just hear it right now today, if this is

14   only a three-week mandate or whatever.  So, good faith is

15   something that I can't help but scratch my head and be

16   troubled by.

17        So, I want to emphasize that CLO Holdco's lawyer has made

18   perfect arguments regarding the potential legal issues here.

19   There are some valid arguments here about is this tantamount,

20   holding the money in the registry of the Court that a non-

21   debtor asserts is its property, is that tantamount to a

22   prejudgment remedy?  You know, did it require an adversary

23   proceeding?  Did it require the traditional four-prong prove-

24   up for a preliminary injunction?  And did the Court just give

25   short shrift to those legal technicalities?

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 54 of 125   PageID 15585
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix     Page 53 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 86 of 100

86

1        Again, these are compelling arguments, but I'm overruling

2    the arguments because, again, I believe it ignores the context

3    that CLO Holdco essentially consented, acquiesced, in this

4    placeholder keep-the-status-quo solution.  And I question its

5    good faith in, so quickly after consenting, bringing this

6    motion.

7        But moreover, I do find that in the unique context of the

8    disputes before the Court on March 4th, I did have authority

9    to issue a 105 injunction.  105, as we all know, at Subsection

10   (a) gives a bankruptcy court authority to issue orders

11   necessary or appropriate to carry out provisions of Title 11,

12   and the last sentence even provides a mechanism for the Court

13   to *sua sponte* take action to, among other things, prevent an

14   abuse of process or just do what's necessary or appropriate to

15   implement court orders or rules.

16       So I think, again, in the context before the Court, it was

17   not only a consensual thing, but the Court had authority.  And

18   the backdrop of this, again, cannot be overstated.  Again, to

19   use Mr. Clemente's word, we have this Byzantine structure

20   here.  It's a lot for the Committee to get its arms around.

21   And even the CLO Holdco structure -- again, I'm looking at my

22   notes, my fancy chart -- we have CLO Holdco, a Cayman Island

23   entity.  Its parent is Charitable DAF Fund, LP, another Cayman

24   Island entity.  It, in turn, is owned by Charitable DAF

25   Holdco, Ltd., yet another Cayman Island entity.  Its general

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 55 of 125   PageID 15586
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix    Page 54 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 87 of 100

87

1   partner happens to be a Delaware entity, Charitable DAF GP,

2   LLC, but the beneficial owners of it are the three Highland

3   Foundations, of which Dondero is president and director, and

4   Mr. Scott the treasurer and director.

5        So, I'm not saying the Byzantine structure is in and of

6   itself problematic, although one might wonder why a charitable

7   organization needs to have three offshore entities as part of

8   its structure.  I digress.  But we all know a Byzantine

9   structure and ties to Dondero do not mean something is

10  attackable in and of itself, but we have had issues raised

11  about the Dynamic Fund and the various transfers with regard

12  to Dugaboy, the Dondero Family Trust, and Get Good Trust and

13  the note.  All of that is worthy of examination, and the

14  Committee has not had all that long in this case to

15  investigate it.

16       So, I'm going to say a couple of more things.  First, the

17  motion is denied, but I'm going to put more strings on it than

18  that.  I'm denying the motion, but as part of this ruling I'm

19  going to order that the Committee has 90 days, unless the

20  Court happens to extend that on motion or agreement of the

21  parties, to file an adversary proceeding against CLO Holdco or

22  the money shall be released.  Okay?

23       So, again, I intended it, as I think everybody did, to be

24  a placeholder, to keep the status quo little bit.  Again, Mr.

25  Kane has raised good arguments that maybe an adversary

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 56 of 125   PageID 15587
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 55 of 249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 88 of 100

88

1    conceivably was necessary or might become necessary.  So here

2    we have a requirement of an adversary within 90 days or the

3    money shall be released to Holdco -- again, unless someone

4    moves to extend that or I get an agreement to extend that and

5    I happen to decide to issue an order extending that.

6        I presume that if an adversary is filed, then if the

7    Committee wants that money to continue to be held in the

8    registry of the Court, then they would have to file an

9    application for injunctive relief, essentially, to keep the

10   money in the registry of the Court pending the resolution of

11   the adversary proceeding.

12       So that is the ruling of the Court.  Mr. Clemente, I'll

13   ask you to draft up the order.  And I reserve the right to

14   supplement this oral ruling in that form of order.  And please

15   run it by Mr. Kane before electronically submitting it to the

16   Court.

17       Now, I'm going to say a couple of other things, and then

18   I'll, before closing, I'll ask if there are questions or other

19   announcements.  I have told the parties and the lawyers to

20   focus on a plan and problem-solving how we're going to pay

21   creditors.  And I think I expressed my strong hope that people

22   would stop litigating everything.  I think I'm remembering

23   saying this most recently at the UBS hearing a few weeks ago

24   on a motion to lift stay.  Once again, we had a very lengthy

25   hearing that day.  I denied the motion.  And here we are

99

1   as I can to distance CLO Holdco from that taint, because

2   understanding that it's in what has been alleged as a

3   Byzantine web, we think it's important to separate CLO Holdco

4   and its operations to ensure that things are done in an

5   appropriate fashion with square corners.

6       That's all I have, Your Honor.  We have no objection to

7   the additional funds being pled into the registry of the

8   Court.  We can agree those funds would be adjudicated as part

9   of this dispute.  We understand that we did not prevail, and

10  we appreciate your Court hearing our argument.

11      (Proceedings concluded at 12:06 p.m.)

12                          --oOo--

13

14

15

16

17

18

19                      CERTIFICATE

20      I certify that the foregoing is a correct transcript to
    the best of my ability from the electronic sound recording of
21  the proceedings in the above-entitled matter.

22   **/s/ Kathy Rehling**                        **07/02/2020**

23  _____      _____

24  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber

25

# EXHIBIT E

```
                    IN THE UNITED STATES BANKRUPTCY COURT
  1                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
  2
                                  )    Case No. 19-34054-sgj11
  3   In Re:                       )
                                   )
  4   HIGHLAND CAPITAL             )    Dallas, Texas
      MANAGEMENT, L.P.,            )    July 8, 2020
  5                                )    1:30 p.m. Docket
                                   )
  6           Debtor.              )
                                   )    - MOTION TO EXTEND EXCLUSIVITY
  7                                )      PERIOD (737)
                                   )    - MOTION TO EXTEND TIME TO
  8                                )      REMOVE ACTIONS (747)
      _____)
  9                         TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
 10                UNITED STATES BANKRUPTCY JUDGE.

 11   WEBEX/TELEPHONIC APPEARANCES:

 12   For the Debtor:              Jeffrey N. Pomerantz
                                   PACHULSKI STANG ZIEHL & JONES, LLP
 13                                10100 Santa Monica Blvd.,
                                    13th Floor
 14                                Los Angeles, CA  90067
                                   (310) 277-6910
 15
      For the Official Committee   Matthew A. Clemente
 16   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
 17                                Chicago, IL  60603
                                   (312) 853-7539
 18
      For the Debtor:              Zachery Z. Annable
 19                                Melissa S. Hayward
                                   HAYWARD & ASSOCIATES, PLLC
 20                                10501 N. Central Expressway,
                                    Suite 106
 21                                Dallas, TX  75231
                                   (972) 755-7104
 22
      For Acis Capital            Rakhee V. Patel
 23   Management GP, LLC:         Annmarie Antoinette Chiarello
                                  WINSTEAD, P.C.
 24                               2728 N. Harwood Street, Suite 500
                                  Dallas, TX  75201
 25                               (214) 745-5250
```

41

1   been working very cooperatively with our creditors over the

2   last few months and we're just seeking to do it the best way.

3       So nothing I've said today, nothing, you know, should come

4   as and will come as a surprise to the Committee, but we're

5   working better, recognizing that ultimately the creditors want

6   to be paid, and doing that in an appropriate manner and a

7   thoughtful manner is what the Debtor is committed to do with

8   its partner, the Committee, in this process.

9           THE COURT:  Okay.  Sort of jumping back, I forgot to

10  ask earlier when we were talking about Acis:  Has the Fifth

11  Circuit rescheduled oral argument on the appeal of the Acis

12  confirmation order and order for relief?

13          MR. POMERANTZ:  I believe -- Your Honor, maybe Ms.

14  Patel would know off the top of her head.

15          THE COURT:  Ms. Patel?

16          MS. PATEL:  Your Honor, it was -- it was briefly -- I

17  -- and I say briefly, it was briefly we had -- we got a notice

18  at some point, I believe in early June, that the Fifth Circuit

19  had reset oral argument.  And then approximately, I can't

20  remember exactly, but it was like, I don't know, a week or

21  maybe ten days later, we got a notice that it was cancelled

22  again.  We have not received notice that it is rescheduled, so

23  it is still pending.  But it has not been taken off oral -- it

24  has not been taken off oral argument at some juncture.

25          THE COURT:  Okay.  Well, I acknowledge that that is a

42

1  pandemic disruption for sure.  It would have been nice to have

2  that resolved one way or another by now.

3          MS. PATEL:  Agreed, Your Honor.  We were trying to

4  figure out, frankly, in the week to ten days that it took from

5  the scheduling to how it was cancelled, exactly how our team

6  was going to get down to New Orleans.  And the -- I think the

7  leading contender was to rent an RV and drive down so we could

8  safely get there.  So it certainly has been a casualty of the

9  pandemic.

10          THE COURT:  Okay.  All right.  Two more questions.

11  And this one has been a bit of a tough one for me to decide

12  whether I should broach this topic or not.  You know, I read

13  the newspapers, the financial papers, just like everyone else,

14  and I saw a headline that I wished almost I wouldn't have

15  seen, and it was a headline about Dondero or Highland

16  affiliates getting three PPP loans.  And, you know, I'm only

17  supposed to consider evidence I hear in the courtroom, right,

18  or things I hear in the courtroom, but I've got this

19  extrajudicial knowledge right now thanks to just keeping up on

20  current events.  I decided I needed to ask about this.

21      What can you tell me about this, Mr. Pomerantz?  I mean, I

22  assumed, from less-than-clear reporting, that it wasn't

23  Highland Capital Management, LP, but I'd like to hear anything

24  you can report about this.

25          MR. POMERANTZ:  So, look, Your Honor, the first I

43

1  could say is that, to my knowledge, Highland Capital, the

2  Debtor, has not obtained a PPP loan.  I know there have been

3  discussions with certain funds that basically have certain

4  assets, private operating companies, about obtaining PPP

5  loans.  I don't have the specifics for Your Honor.  I'm happy

6  to provide that.

7       Of course, to the extent Mr. Dondero, on any of his

8  affiliated funds that are under the control of the Debtor, I

9  would have no way of answering that, but I'm happy to follow

10  up with that with the Board and report back to Your Honor in

11  whatever appropriate manner you felt to obtain that

12  information.

13       THE COURT:  Okay.  Well, let's have a report on that

14  on the 14th when we come in.  You know, maybe Mr. Seery or Mr.

15  Sharp or some other person.  But you can probably imagine the

16  different things going through my brain.  You know, well,

17  first, let's see if it was -- you know, I don't -- again, I'm

18  not expecting it to be Highland Capital Management, LP.  I

19  would be beyond shocked if, you know, that somehow happened

20  when they're in bankruptcy.  And, you know, I think it would

21  require a 364 motion, just like any other borrowing, although

22  I know it's kind of a forgivable loan.  Strange bird.

23       But then if it's some affiliate of Highland, I still feel

24  like we need some transparency and disclosure on that.  I

25  mean, I -- and who were the human beings behind it.  It just

45

1   busiest judges in the country right now.  I'm wondering when

2   were they contacted.  Was it really recently, or a week or two

3   ago?  Because they've probably gotten ten new mega-cases in

4   the past two weeks.

5            MR. POMERANTZ:  So, Your Honor, the last -- the last

6   two weeks, again, probably since June 15th, we had been

7   discussing the structure of a mediation.  We, the Debtor,

8   proposed perhaps a combination of Judge Isgur and Jones.  We

9   initially had that conversation with Mr. Clemente, and then we

10  socialized it with the rest of the Committee members.  As of

11  last Thursday, I believe it was, we had consensus that Judge

12  Jones, and if available, also Judge Isgur, would make sense.

13     I sent an email to Judge Jones' clerk, indicating that we

14  had a hearing today, that it would be helpful if we got a

15  response, and this morning, two hours before the hearing,

16  Judge Jones' clerk responded and told Mr. Clemente and I that

17  he is available and ready and suggested that we have a

18  conference with -- again, I'm not sure if it'll be him or his

19  clerk, to talk about availability.  Of course, we didn't want

20  to go ahead and have that discussion until, you know, we got

21  Your Honor's input on it.

22            THE COURT:  Okay.  I mean, a couple of things come to

23  mind.  One is I am just flabbergasted that they would have any

24  availability.  I know they're -- I'm aware of Judge Jones

25  doing hearings on weekends.

46

1    But second, I'm also concerned what is their idea of

2    availability.  Because in order for a mediator to meaningfully

3    help you on this, I mean, it's going to take not just hours

4    but days of time, unless you want the mediator to just have a

5    30,000-foot view.  And I mean, I just cannot imagine, --

6             MR. POMERANTZ:  So, --

7             THE COURT:  -- once again, that they would have days

8    and days to come up to speed with, you know, 11 years of

9    litigation or however long it was, not that long, with UBS,

10   you know the years with Acis, you know, the various alleged

11   claims and causes of action, and, you know, the Byzantine

12   structure here.  I mean, you know, not that they have to be,

13   you know, as educated as a judge presiding over litigated

14   matters, but I just cannot imagine they could meaningfully

15   spend time on this.

16   So what are you all envisioning?  Because I know what I'm

17   envisioning, and maybe we're not seeing it the same way.  I

18   mean, what are you thinking?  That you'll go in and spend a

19   day with, you know, maybe just each of you doing a 25-page

20   white paper, and you'll either settle it by the end of the day

21   or not, or what?

22            MR. POMERANTZ:  So, let me start by saying that when

23   everyone raised the issue of Judge Jones and Isgur, everyone

24   had the same potential concern that Your Honor has mentioned.

25   You know, my firm and me personally, I'm involved in a couple

47

1    of cases before Judge Jones now, significant cases.  So there

2    was a concern.

3         I think people also generally thought that if they

4    accepted and they knew what they were getting into, they would

5    want to do a good job and they'd have the time.

6         We have not had the ability to have an extensive

7    discussion.  That discussion could either occur with Mr.

8    Clemente and myself speaking to the clerk or the judge, or if

9    Your Honor -- nothing stops Your Honor from picking up the

10   phone, speaking to Judge Jones and asking him as well.

11        But I expect it to be a very intensive mediation process.

12   I do understand that Judge Jones only does mediations in

13   person, so this would require people getting to Houston,

14   which, in my experience, while I have participated in

15   mediations virtually on the phone, it's a lot more effective

16   to be in person.  We would anticipate detailed mediation

17   briefs.  We would envision each of the parties speaking to

18   Judge Jones to give him their perspective.  But it would be --

19   it would be a significant assignment.

20        Again, whether we would conclude at the end of August, I

21   don't know, but I would contemplate a good two, three days of

22   in-person mediation at the end of August, and then probably,

23   if necessary, to set up for something else, which, again,

24   there are several different things.  And I mentioned in my

25   opening remarks why I think people like Judge Jones -- and

57

1   nothing else, we'll go ahead and adjourn for today.  And I'll

2   keep -- if there's anything worthwhile to report on the

3   mediation front before we have our hearing on the 14th, I'll

4   have my courtroom deputy reach out to all counsel by email and

5   let you know.  Okay?  All right.

6           MR. POMERANTZ:  Thank you very much, Your Honor.

7           MS. PATEL:  Thank you, Your Honor.

8           THE COURT:  Thank you.  We stand adjourned.

9           THE CLERK:  All rise.

10      (Proceedings concluded at 3:00 p.m.)

11                          --oOo--

12

13

14

15

16

17

18

19                       CERTIFICATE

20
        I certify that the foregoing is a correct transcript to
21  the best of my ability from the electronic sound recording of
    the proceedings in the above-entitled matter.
22
     **/s/ Kathy Rehling**                        **07/09/2020**
23
    _____        _____
24  Kathy Rehling, CETD-444                         Date
    Certified Electronic Court Transcriber
25

# EXHIBIT F

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 68 of 125   PageID 15599
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix     Page 67 of 249

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 1 of 134

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3                             )   Case No. 19-34054-sgj11
     In Re:                    )
 4                             )
     HIGHLAND CAPITAL          )   Dallas, Texas
     MANAGEMENT, L.P.,         )   July 14, 2020
 5                             )   1:30 p.m. Docket
           Debtor.            )
 6                             )   APPLICATIONS TO EMPLOY JAMES
                               )   P. SEERY AND DEVELOPMENT
 7                             )   SPECIALISTS, INC. (774, 775)
     _____)
 8                      TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                UNITED STATES BANKRUPTCY JUDGE.
10
     WEBEX/TELEPHONIC APPEARANCES:
11
     For the Debtors:          Jeffrey N. Pomerantz
12                             PACHULSKI STANG ZIEHL & JONES, LLP
                               10100 Santa Monica Blvd.,
13                               13th Floor
                               Los Angeles, CA  90067
14                             (310) 277-6910

15   For the Debtors:          John A. Morris
                               Greg Demo
16                             PACHULSKI STANG ZIEHL & JONES, LLP
                               780 Third Avenue, 34th Floor
17                             New York, NY  10017-2024
                               (212) 561-7700
18
     For the Debtors:          Ira D. Kharasch
19                             PACHULSKI STANG ZIEHL & JONES, LLP
                               10100 Santa Monica Blvd.,
20                               13th Floor
                               Los Angeles, CA  90067-4003
21                             (310) 277-6910

22   For the Debtors:          Zachery Z. Annable
                               Melissa S. Hayward
23                             HAYWARD & ASSOCIATES, PLLC
                               10501 N. Central Expressway,
24                               Suite 106
                               Dallas, TX  75231
25                             (972) 755-7104
```

Seery - Direct                              52

 1   file Multi-Strat as a bankruptcy, it was hard to get folks to

 2   really come to the table and think about how to settle that

 3   issue.

 4       These issues in regard to the total case are much more

 5   complicated.  We're going to file a plan.  We believe that

 6   will set a bit of a crucible to folks to think about how to

 7   move forward with their claims.  We are, as Jeff Pomerantz

 8   mentioned last time, agreed in principle, but we have some

 9   issues to work through with Redeemer that we hope to be able

10   to resolve by this week.  And so that's my internal goal, but

11   I expect to be able to do it.

12       The reason that's complex is not that it's simply a -- the

13   arbitration award is not simply a money award; it actually

14   requires certain offsets, it requires certain assets be sold

15   and paid for.  And we're trying to carve our way around some

16   of those, because they (inaudible) agreement, because they're

17   -- they're more difficult than simply exchanging cash for

18   assets, because we don't have the ability to do that right

19   now.  We don't have the cash, and we're in bankruptcy.

20       So I do believe that we can get these done.  And then if

21   mediation is something that would work, great.  We're going to

22   try to do it without mediation as well.  Going to try to do it

23   before we get to mediation and resolve claims.  And if we're

24   unable to do that, hopefully mediation will push it forward or

25   we have to have a fallback, which will be dispositive motions

Seery - Direct                          53

```
 1   with respect to certain of the claims.

 2       But we expect to have and I think we have a number of

 3   claims objections that have (inaudible).  We've resolved

 4   those.  We're really down to three claims.  And one of them is

 5   almost done.

 6   Q   All right.  At the last hearing, --

 7           MR. MORRIS:  Your Honor, that really does finish the

 8   substance of the testimony with respect to this motion, but at

 9   the last hearing Your Honor raised some questions about PPP

10   loans.

11           THE COURT:  Yes.

12           MR. MORRIS:  Would you like me to just take a moment

13   with Mr. Seery to address that?

14           THE COURT:  Yes, please.

15           MR. MORRIS:  Okay.

16   BY MR. MORRIS:

17   Q   Mr. Seery, you're aware that the Judge raised some

18   questions about whether and to what extent the Debtor may have

19   been involved in any of the PPP loans?

20   A   Yes.

21   Q   And have you done any work to try to figure out the

22   answers to the questions the Judge posed?

23   A   Well, work in response to the question, but also work

24   previously.  So, just a -- quickly, as I think we all know,

25   the PPP program was put forth to try to give companies cash
```

Seery - Direct                                54

 1  that they had to use for employee payments, to continue to

 2  keep payroll supported and to continue to have folks hold

 3  their jobs.

 4      We have -- and I think the *Business Insider* article, which

 5  I'm not familiar, I know the publication is not something I

 6  seen much, but I'm not familiar with the specifics of that

 7  article, and -- but any PPP, away from the assets that HCMLP

 8  actually owns or controls.  And we've got -- we've got three

 9  -- and I think there's some substance to the article.  But

10  we've got three businesses.  And these are -- this is public,

11  but I'll go into the -- sort of the obvious reasons without

12  going into the specifics of the business around the ones that

13  I know of well.

14      Carey Limousine is a business that transports folks in

15  high-quality cars from airports or from events or between

16  businesses.  It was hit severely by the COVID-19 pandemic.,

17  particularly with respect to the air transportation, which was

18  really one of its biggest areas.  The business,

19  notwithstanding Uber and the other type of shared ride

20  services, had actually done quite well, and Highland was an

21  owner of a significant portion of that business related to

22  some loans that it held in various funds.

23      That business's management, with its own outside counsel,

24  sought a PPP loan.  Then our director came to us and discussed

25  with the Board the propriety of that loan.  We engaged outside

Seery - Direct                          55

1   counsel, not bankruptcy counsel but counsel that had

2   particularized expertise in PPP, and spent a ton of time

3   really understanding both the law as well as the specific

4   regs.  Carey did get a PPP loan.  It is potentially

5   forgivable, depending on how it's used.

6       The second entity that was similar but didn't come to the

7   Board, we have a business called SSP, which is an excellent

8   highway business that provides equip -- materials for a lot of

9   different road construction, but primarily highway road

10  construction.  Very well run business.  That entity got a PPP

11  loan as well, primarily worried about whether the construction

12  on the highways would shut down.

13      So it's been -- I don't believe that's really happened in

14  Texas, which is where most of their business is, but they

15  qualified for that loan.  They did not come to the Board.  A

16  very specific carve-out, because one of the interest holders

17  that we share that position with is a Small Business

18  Administration fund and, so it was very clear that it was

19  entitled to that loan.

20      Then there's a third entity called Roma that got a very

21  small PPP loan.  We don't control the entity and we were not

22  involved in its acquisition of that loan.  Again, it would

23  have to be used as required.

24      One of the things I want to make sure that is in the

25  record and for Your Honor with respect to Carey, we spent a

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 73 of 125   PageID 15604
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix     Page 72 of 249

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 56 of 134

Seery - Direct                        56

1   lot of time as a Board focused on, one, whether it was legal

2   to get that loan, first.  We're doing everything right, by the

3   book.  We're not going to play in the gray.  There is no gray.

4   There's black and white in these areas.

5        Number two, was it ethical, was it appropriate that we

6   went and got this loan or that Carey went and got this loan?

7   Management, with the outside counsel, was sure that we could

8   do it, but we didn't want to take their word for it, so we

9   went out and got our own counsel, third-party counsel for the

10  Board to make sure that this was appropriate.

11       Three, the requirements around these loans are significant

12  and the penalties for violating them are severe.  So if you

13  get a loan by mistake, are you really required to pay it back?

14  And if you're mistaken, that will be expensive, but it won't

15  be a real penalty.  But if you get a loan that's really

16  inappropriate, that you shouldn't have gotten, that was a

17  material misstatement of any of the facts around it, the

18  penalties are significant.  And not only in terms of the

19  opprobrium that you'd suffer in the press, because that's

20  coming, but in terms of how you use the funds.

21       So they can only be used in very specific ways, and we

22  were exceptionally careful around this program.

23       The basis of the program is to keep people employed.  And

24  with a business like Carey Limousine in particular, where

25  there's a significant amount of debt, where the business is

Seery - Examination by the Court          57

 1   shut down by COVID, where we didn't have the funds to put into

 2   Carey, nor even if we wanted to, we might not have been able

 3   to do it without the Committee's approval because of the

 4   protocol, a PPP loan was not only legal but it was

 5   appropriate.  And it's being used in that fashion, meaning to

 6   keep employees employed.

 7   Q   Thank you very much, Mr. Seery.

 8          MR. MORRIS:  Your Honor, I have no further questions

 9   of Mr. Seery.  Does the Court have any questions?

10          THE COURT:  I actually have a follow-up question

11   regarding the PPP, just to kind of put a bow on this.

12                    EXAMINATION BY THE COURT

13          THE COURT:  I'm looking at the demonstrative aide.  I

14   don't know if you, Mr. Seery, have it there handy.

15          THE WITNESS:  I do, Your Honor.

16          THE COURT:  Okay.  So I'm turning to Page 6, the

17   chart, the subchart, Investments and Subsidiaries.  The third

18   column, Privately-Held Equity, Various Companies.  I mean,

19   that would be the type of investment entity we're talking

20   about here that got the PPP loan:  Carey Limousine, SSP, Roma?

21   Nothing that was -- well, I'm going to say Highland affiliate.

22   Affiliate, that's a dicey term, but that's the type of entity

23   in the organizational structure we're talking about, correct?

24          THE WITNESS:  Those are the ones -- I want to be very

25   careful, because I know what I know and I know I won't

Seery - Examination by the Court                 58

1    represent anything that I don't know.

2        So, with respect to the entities that HCMLP, the Debtor,

3    controls, that's absolutely the case.  I don't know, and I can

4    try to find out, but they are not HCMLP-controlled entities.

5    Whether other entities in the related-party complex received

6    loans -- so, obviously, HCMLP did not receive a loan.  And the

7    only entities that we were involved with is the ones I

8    mentioned to you.

9        And I should mention, there are other entities in the

10   privately-held equity that got other government money, in the

11   medical space, that they didn't even ask for.  HHS pushed

12   forward payments to folks in the business, medical healthcare-

13   providing businesses, to assure that they had liquidity to

14   provide.  And so -- and this has been described to me exactly

15   this way, that they woke up in the morning and found money in

16   their account.  And with one of the companies, they actually

17   returned a bunch of the money because it was from a dormant

18   provider number and they didn't believe it was appropriate to

19   keep that money.  So that was one of the entities that we

20   control with other investors.

21       But with respect to our HCMLP entities, these are the only

22   ones I know.  With respect to other related entities that

23   might be in the family of businesses, for lack of a better

24   term, that were alluded to in the *Business Insider* article, I

25   don't know that answer.  So, I -- if I -- I can try to find

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 76 of 125   PageID 15607
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 75 of 249

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 59 of 134

Seery - Examination by the Court                59

```
 1  out.  I just don't know the answer, Your Honor.

 2          THE COURT:  All right.  Thank you.  Well, this has

 3  been extremely helpful.

 4      I should ask does anyone have any questions of Mr. Seery?

 5  The Committee counsel, perhaps?  Anyone else?

 6          MR. CLUBOK:  Your Honor, this is Andrew Clubok.  In

 7  light of the testimony, I do have some questions on behalf of

 8  UBS.

 9          THE COURT:  All right.  Briefly.  Go ahead.

10          MR. CLUBOK:  Okay.

11          MR. MORRIS:  Your Honor?  Your Honor, I'm sorry to

12  interrupt, but there's no objection lodged here.  If Your

13  Honor wants to permit it, that's obviously the Court's

14  prerogative.  But as just a point of order, having not lodged

15  an objection, I don't know what right anybody has to cross-

16  examine the witness.

17          THE COURT:  All right.  Well, that's why I said

18  briefly.  I think that Mr. Morris makes a good point, Mr.

19  Clubok.  You could have filed a written objection, response,

20  comment, or something.  So, you're a party in interest.  I'll

21  give you a little bit of leeway here.  But please keep it

22  brief.

23          MR. CLUBOK:  Yeah.  Thank you, Your Honor.  It's just

24  some of the things that Mr. Seery said which we didn't expect

25  to hear that has raised a few questions that I just very
```

Seery - Cross                          60

1    briefly will try to address.

2                        CROSS-EXAMINATION

3    BY MR. CLUBOK:

4    Q    Mr. Seery, good afternoon.  I'm Andrew Clubok, Latham &

5    Watkins, on behalf of UBS.

6         Mr. Seery, you talked about the fiduciary duties you've

7    understood yourself to have with respect to certain parties,

8    and my question to you is:  Have you understood, since the

9    beginning of your service as an Independent Director of

10   Strand, that you had fiduciary duties to the unsecured

11   creditors of the Debtor?

12   A    It's a -- it's a -- the answer is I understand the

13   fiduciary duties very well.  I think we have fiduciary duties

14   to the estate.  So Highland -- what I tried to explain is that

15   Highland, as an asset manager, has very specific fiduciary

16   duties that are set forth in (inaudible) in the cases and the

17   rules that have interpreted it.  We, as directors of Strand,

18   have a duty to the estate.

19        I don't think it's -- I don't think it's fair, and I'd

20   have to subject myself to some education from counsel, I don't

21   think it's fair to say we had a specific fiduciary duty to a

22   particular creditor.

23        So, for example, if I had a fiduciary duty to UBS, it

24   would be very difficult for me to object to UBS's claim.  It

25   would be -- I don't know how I could do that as a fiduciary.

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 78 of 125   PageID 15609
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 77 of 249

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 133 of 134

133

1    yesterday counsel for Mr. Dondero filed a joinder in the

2    Debtors' objection to Acis's claim.  So, again, just thinking

3    about this in the context of mediation, I think, with that

4    joinder, they will be a necessary party.  So, going back to

5    Mr. Seery's point, this is not just --

6            THE COURT:  Oh, absolutely.  Mr. Dondero is --

7            MS. PATEL:  -- a two-party --

8            THE COURT:  -- going to be a required party in

9    mediation.  Absolutely.  So, --

10           MS. PATEL:  Thank you, Your Honor.

11           THE COURT:  All right.  Well, if there's nothing

12   further, we'll see you on the 21st.  And, again, my courtroom

13   deputy may be reaching out before then if we've got things

14   nailed down on mediation.

15       (Proceedings concluded at 4:54 p.m.)

16                           --oOo--

17

18

19

20

21                        CERTIFICATE

22       I certify that the foregoing is a correct transcript to
     the best of my ability from the electronic sound recording of
     the proceedings in the above-entitled matter.

23    /s/ Kathy Rehling                          07/16/2020

24   _____    _____

25   Kathy Rehling, CETD-444                         Date
     Certified Electronic Court Transcriber

# EXHIBIT G

**APP. 0075**
APP.2907

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 80 of 125   PageID 15611
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 79 of 249
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 1 of 53

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

```
In Re:                           ) Case No. 18-30264-SGJ-11
                                 ) Case No. 18-30265-SGJ-11
                                 ) (Jointly administered under
ACIS CAPITAL MANAGEMENT, L.P.    )  Case No. 18-30264-SGJ-11)
and ACIS CAPITAL MANAGEMENT GP,  )
LLC,                             ) DEBTORS' MOTION to FILE
                                 ) REDACTED QUARTERLY REPORTS
                Debtors.         )
                                 ) September 23, 2020
_____  ) Dallas, Texas
```

Appearances via video and/or telephone:

```
For the Reorganized      Annemarie Chiarello
Debtors:                 Rahkee V. Patel
                         Winstead PC
                         500 Winstead Building
                         2728 North Harwood Street
                         Dallas, Texas  75201

For James Dondero:       D. Michael Lynn, of Counsel
                         Bonds Ellis Eppich Schafer Jones LLP
                         420 Throckmorton Street, Suite 1000
                         Forth Worth, Texas  76102

For William T. Neary,    Lisa L. Lambert, Assistant U.S. Trustee
United States Trustee:   Office of the U.S. Trustee, Region 6
                         1100 Commerce Street, Room 976
                         Dallas, Texas  75242-1496

Digital Court            United States Bankruptcy Court
Reporter:                Northern District of Texas
                         Michael F. Edmond, Judicial
                          Support Specialist
                         Earle Cabell Building, U.S. Courthouse
                         1100 Commerce Street, Room 1254
                         Dallas, Texas  75242
                         (214) 753-2062, direct; 753-2072, fax




Certified Electronic     Palmer Reporting Services
Transcriber:             1948 Diamond Oak Way
                         Manteca, California  95336-9124
```

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 81 of 125   PageID 15612
Case 19-34054-sgj11    Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix    Page 80 of 249
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 50 of 53

*The Ruling of the Court*                                                    50

1    thing that it might be is commercial information, but I really

2    don't think there's been a showing that it is of the nature that

3    107(b) is intended to address.

4           Now don't get me wrong, I am very troubled by some of

5    what I've heard today.  I doubt Mr. Dondero is listening in

6    personally, but I'm going to say, and maybe it will get back to

7    him, maybe it won't, but that I'm very troubled by hearing that

8    Dondero-controlled entities, and I believe the DAF, based on

9    what I've heard in the past, is Dondero controlled, I'm very

10   troubled that Dondero-controlled entities are suing Acis and

11   parties that have dealt with Acis, U.S. Bank, Brigade, and the

12   Moody's one is really mind-boggling, but I'm very troubled that

13   this could be hampering Acis' ability to do a reset and it's

14   driving up expenses.

15          And if these lawsuits were brought before me through a

16   removal or any other mechanism, you know, first, I would have to

17   look at subject matter jurisdiction of the Bankruptcy Court.

18   Yes, we're way past the effective date of Acis' plan, but the

19   Fifth Circuit case authority provides that if there is a dispute

20   postconfirmation that bears on the interpretation,

21   implementation, or execution of a confirmed plan, then the

22   Bankruptcy Court has subject matter jurisdiction in that

23   context.  And it sure sounds like, hearing Mr. Terry's version

24   of things today, which sounded very credible, that this is

25   potentially impinging on the reorganization and plan of Acis.

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 82 of 125   PageID 15613
Case 19-34054-sgj11    Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix    Page 81 of 249
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 51 of 53

*The Ruling of the Court*                                51

1          So it's very troubling to me that — well, I've said it

2    before in Highland hearings, that these battles just continue

3    on, but if it's impairing with a plan I confirmed, it's

4    impairing a plan I confirmed, it's impairing the ability to

5    perform under that plan, then that is a problem for the

6    plaintiffs.

7          Now I've heard there is no pending litigation in that

8    regard, but I'm troubled by the April 2020 letter I saw that is

9    essentially a suggestion we may start this up again, the

10   litigation that we dismissed.  It's just ridiculous, for lack of

11   a better term, that Dondero and his entities would be doing some

12   of the things it sounds like they're doing:  Suing Moody's, for

13   crying out loud, for not downgrading the Acis CLOs.  If Mr.

14   Dondero doesn't think that is so transparently vexatious

15   litigation, yeah, I'm going out there and saying that.  I

16   haven't seen it, but, come on.

17         So, bottom line, I don't find the 107 standard here is

18   met today, so I am denying entirely the motion.  I haven't been

19   convinced that this is commercial information that 107(b)

20   justifies redacting or sealing.  But, again, I am most troubled

21   by what I've heard today.

22         I have found Mr. Terry to be a very credible witness

23   today on these points.  He's testified in this Court many times

24   and I continue to find him a very credible witness.

25         And so to the extent Mr. Dondero is listening or gets

APP. 0078
APP.2910

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 83 of 125   PageID 15614
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 82 of 249
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 52 of 53

*The Ruling of the Court*                                        52

1    a transcript, I hope it's loud and clear to him that to the

2    extent you are engaging in efforts surreptitious or overt to

3    derail Acis in its reorganization, there is going to be a price

4    to pay for that.  So I hope that message gets to him.

5              Very troubled, very troubled by what I've heard today.

6              All right.  Well, I think that concludes our business

7    here today.  Is there anything else anyone wants to raise?

8              MS. LAMBERT:  Judge Jernigan, Ms. Lambert for the U.S.

9    Trustee.  Would you like me to prepare an order just as for the

10   reasons stated?

11             THE COURT:  I would like you to do that.  Thank you

12   very much.  All right.

13             MS. LAMBERT:  And I think I will order the — I think I

14   will order the transcript and have it sent to Mr. Lynn.

15             THE COURT:  All right.  Thank you.

16        (The hearing was adjourned at 5:21 o'clock p.m.)

17                            —o0o—

18

19

20

21

22

23

24

25

Case 3:21-cv-00879-K   Document 41-3   Filed 04/04/23   Page 84 of 125   PageID 15615
Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Appendix   Page 83 of 249
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 53 of 53

```
State of California           )
                              )     SS.
County of San Joaquin         )
```

        I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of Texas, Office of
the Clerk, of the proceedings taken on the date and time
previously stated in the above matter.

        I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer
Reporting Services is approved by the Administrative Office of
the United States Courts to officially prepare transcripts for
the U.S. District and Bankruptcy Courts.

Susan Palmer
Palmer Reporting Services

Dated September 26, 2020

# EXHIBIT H

```
                  IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

                                  )   Case No. 19-34054-sgj-11
 In Re:                           )   Chapter 11
                                  )
 HIGHLAND CAPITAL                 )   Dallas, Texas
 MANAGEMENT, L.P.,                )   Wednesday, October 21, 2020
                                  )   10:00 a.m. Docket
            Debtor.               )
                                  )   MOTION TO COMPROMISE
                                  )   CONTROVERSY WITH ACIS CAPITAL
                                  )   MANAGEMENT [1087]
                                  )   Continued from 10/20/2020
 _____  )

                        TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.

 WEBEX/TELEPHONIC APPEARANCES:

 For the Debtor:             Ira D. Kharasch
                             Jeffrey N. Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067
                             (310) 277-6910

 For the Debtor:             John A. Morris
                             Gregory V. Demo
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

 For Acis Capital            Annmarie Antoinette Chiarello
 Management GP, LLC:         WINSTEAD, P.C.
                             2728 N. Harwood Street, Suite 500
                             Dallas, TX  75201
                             (214) 745-5250

 For Acis Capital            Brian Patrick Shaw
 Management GP, LLC:         ROGGE DUNN GROUP, P.C.
                             500 N. Akard Street, Suite 1900
                             Dallas, TX  75201
                             (214) 239-2707
```

9

1    motion that ever comes before it.

2        I daresay that Mr. Terry and Ms. Patel and Mr. Shaw firmly

3    believe that their client has been wronged and that they're

4    entitled to $75 million or more.  Thankfully, they were able

5    to check their egos at the door and come to an agreement, I

6    guess, that they believe represents a fair and reasonable

7    compromise.

8        So I understand that while -- that Mr. Dondero embraced

9    and appreciated the arguments that the Debtor made in its

10   pleading, but the fact of the matter is the Debtor came to a

11   position when it had the choice of either going forward with

12   that litigation, with all of the costs and risks and

13   uncertainty that were described, or taking this settlement.

14   And it came to the -- I believe the record shows -- the very

15   considered and reasonable decision to end all of the

16   litigation with Acis on the terms set forth in the agreement.

17       And I just wanted to kind of -- that doesn't go to any of

18   the particular -- necessarily go to any of the particular

19   elements of the legal standard, but so much time was spent

20   trying to tie Mr. Seery and the Debtor to the objection, and I

21   think -- I think it's important for the Court to look at this

22   in context.

23       And frankly, there are other very substantial claims out

24   there.  And Mr. Seery was very clear that each case is going

25   to be judged on its own merits.  And just because we've

10

1   settled a case where we put forth a strong legal position

2   here, it's only because we got to terms that the Debtor felt

3   were fair and reasonable.  We've taken -- and parties do this

4   all the time.  They take their litigation position and we're

5   going to take our litigation position.  But when it comes to

6   settlement, you have to view:  What are the alternatives?  And

7   that's all Mr. Seery did.  That's what the board did, servant

8   of their fiduciary duties.

9        And I'm going to talk in a few minutes about the benefits

10  to the estate that this settlement entails, but I just -- I

11  was a little surprised that anybody would try to say that

12  because we took a position in litigation we're not allowed to

13  compromise that position.  Because if that were the standard,

14  Your Honor, no 9019 would ever be approved, because, by

15  definition, 9019s are compromises.

16       So let me turn for a moment now to the actual elements of

17  the standard under 9019.  The first one is the probability of

18  success on the merits.  As I said, Mr. Seery felt strongly

19  about the position, but he also articulated some very, very

20  specific concerns, from *Mirant* to the Court's views on

21  equities that may not be -- the Court may not share our views

22  on equities.  The Court may not share.  The Court has a lot of

23  experience with these particular litigants.  The Court has

24  already assessed the credibility of certain witnesses in

25  relation to the claims at issue in this matter.  The Court has

11

1   already rendered decisions with respect to certain aspects of

2   this matter.  And so the Debtor took all of those things into

3   account in assessing the probability of success on the merits,

4   and that's all very much in the record.

5       But I did want to point to one other piece of evidence

6   that hasn't been discussed yet, and that is Professor

7   Rapoport's expert report that has now been admitted into

8   evidence.  You know, I question the weight that the Court

9   should give, but never -- only because I'm not sure how -- the

10  depth of the opinion.  But nevertheless, Professor Rapoport

11  specifically says at the top of Page 5, on Page 13, at the

12  very end of her opinion as to Question 1, she says, in

13  substance, if the Court follows *Mirant* and otherwise finds

14  that damages would benefit the Acis estate, then the Acis

15  claim, valued by Acis at least $75 million, could have

16  significant value.  Still, that value would depend on how the

17  Court found -- how the facts fall after the Court hears

18  testimony and is able to weigh the evidence.

19      That's kind of what Mr. Seery did.  So I'm not even sure

20  that there's a dispute, frankly, over the probability of

21  success.  Nobody has quantified it.  Nobody asked Mr. Seery to

22  quantify it.  We haven't gone down that path.

23      But Professor Rapoport, in her very first opinion, said:

24  Could be zero, could be $75 million or more.  It depends on

25  where the Court comes out.

33

1    consistent with the Bankruptcy Rules.  The notice was given on

2    September 23rd, so we're certainly good from notice and

3    opportunity to be heard, from that standpoint.

4        As we all know and as I went through yesterday in ruling

5    on the Redeemer Committee settlement, I am consulting

6    Bankruptcy Rule 9019 as well as the abundance of jurisprudence

7    that tells bankruptcy courts how they are to evaluate

8    compromises and settlements:  Cases such as *AWECO*, *Jackson*

9    *Brewing*, *TMT Trailer*, *Cajun Electric*, and *Foster Mortgage*,

10   significantly, among the cases.

11       I am to look at, obviously, whether the proposed

12   compromise is fair and equitable and in the best interest of

13   creditors when considering probability of success in future

14   litigation, with due consideration for the uncertainty of law

15   and fact; when considering the complexity and likely duration

16   of future litigation and any attendant inconvenience and

17   delay; and all other factors bearing on the wisdom of the

18   compromise.

19       Case law also talks about the Court probing into whether a

20   settlement is within the range of reasonableness, and

21   obviously the Court should consider the paramount interests of

22   creditors.

23       So, here, giving all due consideration of the record

24   before me and the very eloquent arguments, I am going to

25   approve the compromise today.

34

1       I'm going to turn for a moment to Mr. Seery's testimony.

2   Just as I found his testimony to be very credible with regard

3   to the Redeemer Committee settlement, I once again found it to

4   be very credible and compelling in connection with the Acis

5   and Terry settlements.

6       Among other things, I believe his testimony reflected a

7   deep understanding of the risks and rewards of further

8   litigation and the uncertainty that there was in both the law

9   and the fact.  He mentioned his understanding of the *Mirant*

10  holding and how that absolutely posed some risks for the

11  estate in challenging the claims of the reorganized Acis.  He

12  mentioned what I consider significant due diligence that he

13  performed.  He mentioned not only reading many of the rulings

14  of this Court throughout the tortured history of the Acis

15  bankruptcy, but he mentioned meeting with the board members.

16  In fact, meeting with Mr. Terry and Acis's professionals.  He

17  picked out certain of the issues, the fact issues, the $10

18  million note transfer that was argued to be a fraudulent

19  transfer.  He described the disputes regarding the changing of

20  the fee structure imposed by Highland or Highland entities on

21  Acis, and he expressed concerns regarding the cost of

22  litigating all of that.

23      He spoke in depth about Mr. Terry's claims regarding his

24  retirement funds, and said he thought it was a pretty

25  straightforward win for the Terrys that he thought should have

35

1    been settled years ago for full value.

2        He mentioned his knowledge about the Guernsey litigation,

3    that being a jurisdiction where loser pays.  So that was sort

4    of an open-shut one as far as he was concerned.  And he talked

5    about the Acis GP proof of claim in some depth, regarding the

6    lawsuits in New York.

7        So, again, I find that he was very compelling and his

8    testimony reflected significant due diligence.

9        Now, the next thing I want to highlight that is very

10   compelling to me in deciding I should approve this settlement

11   is -- and I probably should have mentioned this first and

12   foremost -- this was a mediated settlement.  This is certainly

13   some indication of its good faith and arm's-length nature, and

14   certainly is a point in favor of the wisdom of the settlement,

15   given that we had two very respected co-mediators, retired

16   Judge Gropper from the Bankruptcy Court of the Seventh

17   District of New York.  Ms. Mayer was a partner at Weil Gotshal

18   with a very impressive career background.  And so it, again,

19   it is a point very much in favor of the *bona fides* of this

20   settlement.  So I cannot overstate that one.

21       A few other points I will make.  In looking at the risks

22   and rewards and likely expense and inconvenience of further

23   litigation, while Professor Rapoport estimated maybe $350,000

24   to $1.1 million of fees might be incurred for future

25   litigation of the issues between Highland and Acis, and while

36

1   I respect her views tremendously -- I know she's been a fee

2   examiner in many, many cases and really has some *bona fides* in

3   speaking about fees in bankruptcy cases -- I tend to think

4   that is an extremely low estimate.  And I can't separate from

5   this analysis my own experience and knowledge with how

6   litigious and expensive things have historically been between

7   Acis and Highland.

8       I cannot remember the final fee application amounts of the

9   Chapter 11 Trustee and his professionals, but I know that in a

10  year-plus of the Acis case, the fees were much, much larger

11  than this amount, and I seem to remember that at least Foley

12  Lardner had a very, very large unsecured claim in this case

13  related to its fees representing *Highland v. Acis*, millions of

14  dollars.

15      So, with complete respect to Professor Rapoport, I believe

16  with all my heart that that number is way, way low as far as

17  future fees and expenses.

18      And as Ms. Chiarello pointed out and I think Mr. Morris

19  pointed out, we don't actually have evidence of Mr. Dondero's

20  willingness to pay legal fees for fights of *Highland v. Acis*.

21  While certainly I believe one hundred percent that Mr. Lynn

22  was told that Dondero would pay those fees and he has every

23  reason to believe him, I just don't have the equivalent of

24  evidence there that I can point to, evidence being Mr. Dondero

25  testifying that he would do that and maybe putting something

37

1    else in front of me to show a commitment.

2         So I again will turn to Ms. Rapoport's report.  While she

3    used words to the effect of, you know, she thought challenging

4    this would be a reasonable endeavor, I think that, all in all,

5    Mr. Seery was just very credible in his evaluation of things

6    and his strong feeling from the beginning that we're going to

7    fight this, it should be zero, and then as he did his due

8    diligence, as he looked at some of the issues -- and I will

9    point out that Professor Rapoport identified 16 issues of law

10   this Court would have to determine, in her estimation, and

11   then there could be potentially 12 fact issues the Court might

12   have to rule on, depending on how I ruled on the 16 issues of

13   law.  I don't think I could do that as swiftly as maybe this

14   case needs and deserves to get on its way to reorganization,

15   and I do think the settlement enhances the likelihood of

16   confirmation of a plan in the near future.  While we may have

17   miles to go before we get there, I think this settlement is a

18   step in the right direction, just like the settlement with the

19   Redeemer Committee is a step in the right direction.  And

20   that's a big factor in my mind.  I'm supposed to look at all

21   factors bearing on the wisdom of the compromise, and I think

22   the compromise enhances the prospect of a reorganization

23   sooner rather than later.

24        All right.  I reserve the right to supplement in more

25   detailed findings and conclusions, but Mr. Morris, I'm going

47

1          THE COURT:  All right.

2          MR. KHARASCH:  If we need more time, obviously, we

3    will be letting you know.

4          THE COURT:  All right.  So, rescheduled for 10:30

5    tomorrow morning.  And if there's nothing further, we're

6    adjourned.  Thank you.

7          MR. KHARASCH:  Thank you, Your Honor.  Appreciate it.

8          THE CLERK:  All rise.

9       (Proceedings concluded at 11:26 a.m.)

10                            --oOo--

11

12

13

14

15

16

17

18

19

20                       CERTIFICATE

21     I certify that the foregoing is a correct transcript to
     the best of my ability from the electronic sound recording of
22   the proceedings in the above-entitled matter.

23    **/s/ Kathy Rehling**                    **10/24/2020**

24   _____      _____
     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

# EXHIBIT I

```
                  IN THE UNITED STATES BANKRUPTCY COURT
1                FOR THE NORTHERN DISTRICT OF TEXAS
                         DALLAS DIVISION
2
3                              )   Case No. 19-34054-sgj-11
   In Re:                      )   Chapter 11
4                              )
   HIGHLAND CAPITAL            )   Dallas, Texas
   MANAGEMENT, L.P.,           )   December 10, 2020
5                              )   9:30 a.m. Docket
                               )
        Debtor.                )
6  _____)
                               )
7  HIGHLAND CAPITAL            )   Adversary Proceeding 20-3190-sgj
   MANAGEMENT, L.P.,           )
8                              )
        Plaintiff,             )   - MOTION FOR PRELIMINARY
9                              )     INJUNCTION
   v.                          )   - MOTION FOR TEMPORARY
10                             )     RESTRAINING ORDER
   JAMES D. DONDERO,           )
11                             )
        Defendant.             )
12 _____)

13              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14             UNITED STATES BANKRUPTCY JUDGE.

15 WEBEX/TELEPHONIC APPEARANCES:

16 For the Plaintiff:          Jeffrey N. Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
17                             10100 Santa Monica Blvd.,
                                13th Floor
18                             Los Angeles, CA  90067-4003
                               (310) 277-6910
19
   For the Plaintiff:          John A. Morris
20                             PACHULSKI STANG ZIEHL & JONES, LLP
                               780 Third Avenue, 34th Floor
21                             New York, NY  10017-2024
                               (212) 561-7700
22
   For the Official Committee  Matthew A. Clemente
23 of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                               One South Dearborn
24                             Chicago, IL  60603
                               (312) 853-7539
25
```

23

1          THE COURT:  Yes.

2          MR. BONDS:  Can I have a second?  Mr. Dondero did

3    apologize to counsel and to Mr. Seery as well, and so the idea

4    that Mr. Dondero has not apologized is not entirely correct.

5          THE COURT:  Okay.  Well, if I misunderstood, I

6    apologize.  But I guess what I was really trying to convey is,

7    in a situation like this, I think coming into court and taking

8    his lumps and saying things under oath might have been a

9    better way to proceed.

10       I guess the second thing I want to say is I wish Mr.

11   Dondero was here, because maybe I'm reading this wrong, but I

12   think he needs to hear and know he is not in charge anymore of

13   Highland.  It may have been his baby.  He may have created its

14   wealth.  But when he and the board made the decision to file

15   Chapter 11, number one, that changed everything.  And then

16   number two, when the Committee was formed and was threatening

17   "We think we need a Chapter 11 trustee because of conflicts of

18   interest of Mr. Dondero and others," and when the Committee

19   negotiated something short of that with the Debtor in January

20   2020, you know, a settlement that involved Mr. Dondero no

21   longer being in charge, no longer being CEO, no longer having

22   any role except portfolio manager with the Debtor, and when

23   various protocols were negotiated, heavily negotiated, for

24   weeks, detailed, complex protocols, life changed even further.

25   It changed when he filed Chapter 11, when he put his baby,

24

1    Highland, in Chapter 11, and then it changed further in

2    January 2020 when this global corporate governance settlement

3    was reached.  As we know, it involved independent new board

4    members coming in and eventually a new CEO.  He's not in

5    charge.

6        Now, that doesn't mean he's not a party in interest, and

7    he can certainly weigh in with pleadings in the bankruptcy

8    court.  But these communications that I've admitted into

9    evidence, and the declaration, the sworn declaration of Mr.

10   Seery, suggest to me that he's not fully appreciating that,

11   sorry, you're not in charge.  And when you chose to put the

12   company in bankruptcy because of the overwhelming debt, it

13   started a cascade of events, so that now I'm depending on a

14   debtor-in-possession with a new board and a new CEO and a

15   Committee of very sophisticated members and professionals who

16   are working in tandem with the Debtor to be in charge,

17   basically.  All right?  So that's another thing I just feel

18   compelled to say for Mr. Dondero's benefit.

19       I guess another thing is there was a little bit of a

20   theme, Mr. Bonds, in your comments that Mr. Dondero is just

21   concerned, more than anything else, about the way employees

22   are being treated, or at least that's a major concern.  And I

23   don't find that to be especially compelling.  I mean, maybe if

24   he was sworn under oath and testified, I would believe that,

25   but it doesn't feel like what's really going on here.  Again,

25

1   he took the step of deciding that the company should file

2   Chapter 11.  We had the change in corporate governance in

3   January.  And he has the ability -- everyone, I think, would

4   very much be interested in a plan that he supports.  You know,

5   he wants to get the company back.  That has been made clear in

6   hearings from time to time, and I believe, from Seery's

7   declaration and Highland's lawyers, that they've been and will

8   remain receptive to Mr. Dondero's ideas for a different type

9   of plan that might allow him to get back into control of

10  Highland, if he puts in adequate consideration that makes the

11  Committee and others happy.

12      But we're in a proverbial the-train-is-leaving-the-station

13  posture right now.  Okay?  We've got confirmation coming up

14  the second week of January or something like that.  Okay.  So

15  the train is leaving the station, so we're running out of time

16  to hear what Dondero might want to do as far as an alternative

17  plan.

18      So, as far as the requested TRO, I appreciate that Mr.

19  Dondero and his counsel are worried about some ambiguity, but

20  I'm looking through the literal wording that has been

21  proposed, and the wording proposed is that Dondero is

22  temporarily enjoined and restrained for communicating, whether

23  orally, in writing, or otherwise, directly or indirectly, with

24  any board member, unless Mr. Dondero's counsel and counsel for

25  the Debtor are included in such communications.  Not ambiguous

57

1    Court next Wednesday, he needs to testify.  And if NexPoint,

2    through whoever their decision-maker is, is wanting to urge a

3    position to the Court, they need a human being to testify.

4    And I'll hear Seery and I'll hear Dondero and I'll hear

5    whoever that person is, and that's what's going to matter, you

6    know, most to me.  Yeah, we have some legal issues, certainly,

7    but I like to hear business people explain things, no offense

8    to the lawyers.  But it's always very helpful to hear the

9    business people in addition to the lawyers.  All right.  So,

10   Mr. Morris, you're going to upload that TRO for me.

11           MR. MORRIS:  Yes, Your Honor.

12           THE COURT:  Mr. Wright, you can upload your order

13   setting your motion for hearing next Wednesday at 1:30.  And I

14   think we have our game plan for now.  Anything else?  All

15   right.  We're adjourned.

16           THE CLERK:  All rise.

17       (Proceedings concluded at 11:33 a.m.)

18                        --oOo--

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript to
     the best of my ability from the electronic sound recording of
22   the proceedings in the above-entitled matter.

23    **/s/ Kathy Rehling**                    **12/11/2020**

24   _____      _____

25   Kathy Rehling, CETD-444                      Date
     Certified Electronic Court Transcriber

# EXHIBIT J

```
1                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
2                               DALLAS DIVISION

3                                   )    Case No. 19-34054-sgj-11
     In Re:                         )    Chapter 11
4                                   )
     HIGHLAND CAPITAL               )    Dallas, Texas
     MANAGEMENT, L.P.,              )    Wednesday, December 16, 2020
5                                   )    1:30 p.m. Docket
            Debtor.                 )
6                                   )    - MOTION FOR ORDER IMPOSING
                                    )    TEMPORARY RESTRICTIONS [1528]
7                                   )    - DEBTOR'S EMERGENCY MOTION TO
                                    )    QUASH SUBPOENA AND FOR ENTRY
8                                   )    OF PROTECTIVE ORDER [1564,
                                    )    1565]
9                                   )    - JAMES DONDERO'S MOTION FOR
                                    )    ENTRY OF ORDER REQUIRING
10                                  )    NOTICE AND HEARING [1439]
                                    )
11   _____
                         TRANSCRIPT OF PROCEEDINGS
12            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.
13
     WEBEX APPEARANCES:
14
     For the Debtor:           Jeffrey N. Pomerantz
15                             PACHULSKI STANG ZIEHL & JONES, LLP
                               10100 Santa Monica Blvd.,
16                                13th Floor
                               Los Angeles, CA  90067-4003
17                             (310) 277-6910

18   For the Debtor:           John A. Morris
                               Gregory V. Demo
19                             PACHULSKI STANG ZIEHL & JONES, LLP
                               780 Third Avenue, 34th Floor
20                             New York, NY  10017-2024
                               (212) 561-7700
21
     For the Official Committee Matthew A. Clemente
22   of Unsecured Creditors:   SIDLEY AUSTIN, LLP
                               One South Dearborn Street
23                             Chicago, IL  60603
                               (312) 853-7539
24

25
```

62

1    The Movants are not parties to those agreements.  The

2    testimony is undisputed that there are many holders of

3    preferred shares and notes that have had no notice of this

4    proceeding that will undoubtedly be impacted by the tying of

5    the hands of the portfolio manager.  The chart that was

6    attached as Exhibit B expressly shows just what a large

7    portion of interested parties and people who would be affected

8    by this motion are not -- they didn't get notice.  There was

9    no attempt to get notice.  There was no attempt to get their

10   consent.  All of that testimony is now in the record, and I

11   think due process alone would prevent the entry or even the

12   consideration of an order of this type.

13       There is nothing improper that's been alleged.  There is

14   no -- there is no allegation of fraud.  There is no allegation

15   of breach of contract of any kind.  There's not even a

16   question of business judgment.  The Movants didn't even do

17   their diligence to ask the Debtor why they made these

18   transactions.  There is nothing in the record that shows that

19   the Debtor, as the portfolio manager of the CLOs, did anything

20   improper.

21       The only thing that the Movants care about is that they

22   don't like the results in two particular trades.  I don't

23   think that that meets their burden of persuasion that the

24   Court should enter an order of this type, and I would like to

25   relieve Mr. Seery of the burden, frankly, and the Court, of

63

1   having to put on testimony to justify transactions that really

2   aren't even being questioned, Your Honor.

3       So the Debtor would respectfully move for the denial of

4   the motion and the relief sought therein.

5           THE COURT:  All right.  Your request for a directed

6   verdict, something equivalent to a directed verdict here, is

7   granted.  I agree that the Movant has wholly failed to meet

8   its burden of proof here today to show the Court, persuade the

9   Court that, as Mr. Morris said, I should essentially tie the

10  hands of the Debtor as a portfolio manager here, as stated.

11  Nothing improper has been alleged.  There has been no showing

12  of a statutory right here, or a contractual right here, on the

13  part of the Movants.

14      I am -- I'm utterly dumbfounded, really.  I agree with the

15  -- I was going to say innuendo; not really innuendo -- I agree

16  with part of the theme, I think, asserted by the Debtor here

17  today that this is Mr. Dondero, through different entities,

18  through a different motion.  I feel like he sidestepped the

19  requirement that I stated last week that if we had a contested

20  hearing on his motion, Dondero's motion, that I was going to

21  require Mr. Dondero to testify.  He apparently worked out an

22  eleventh hour agreement with the Debtor on his motion to avoid

23  that.  But, again, these so-called CLO Motions very clearly,

24  very clearly, in this Court's view, were pursued at his sole

25  direction here.

64

1    This is almost Rule 11 frivolous to me.  You know, we're

2   -- we didn't have a Rule 11 motion filed, and, you know, I

3   guess, frankly, I'm glad that a week before the holidays begin

4   we don't have that, but that's how bad I think it was, Mr.

5   Wright and Mr. Norris.  This is a very, very frivolous motion.

6   Again, no statutory basis for it.  No contractual basis.  You

7   know, you didn't even walk me through the provisions of the

8   contracts.  I guess that would have been fruitless.  But you

9   haven't even shown something equitable, some lack of

10  reasonable business judgment.

11   Bluntly, don't waste my time with this kind of thing

12  again.  You wasted my time.  We have 70 people on the video.

13  Utter waste of time.

14   All right.  So, motion is denied.  Mr. Morris, please

15  upload an order.

16        MR. MORRIS:  Thank you, Your Honor.

17        THE COURT:  All right.  Do we have any other business

18  to accomplish today?

19        MR. POMERANTZ:  I don't think so, Your Honor.  I know

20  we will see you tomorrow in connection with Mr. Daugherty's

21  relief from stay motion.

22        THE COURT:  Well, yeah, we do have that.  Okay.  We

23  will see you tomorrow.  We stand adjourned.

24        MR. CLEMENTE:  Thank you, Your Honor.

25        MR. MORRIS:  Thank you, Your Honor.

65

1          THE CLERK:  All rise.

2          (Proceedings concluded at 3:05 p.m.)

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                    CERTIFICATE

20     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
21 above-entitled matter.

22   **/s/ Kathy Rehling**                    **12/17/2020**

23 _____    _____
   Kathy Rehling, CETD-444                  Date
24 Certified Electronic Court Transcriber

25

# EXHIBIT K

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3    In Re:                        )    Chapter 11
                                    )
 4    HIGHLAND CAPITAL              )    Dallas, Texas
      MANAGEMENT, L.P.,             )    Friday, January 8, 2021
 5                                  )    9:30 a.m. Docket
             Debtor.               )
 6    _____)
                                    )
 7    HIGHLAND CAPITAL              )    Adversary Proceeding 20-3190-sgj
      MANAGEMENT, L.P.,             )
 8                                  )
             Plaintiff,             )    PRELIMINARY INJUNCTION
 9                                  )    HEARING [#2]
      v.                            )
10                                  )
      JAMES D. DONDERO,             )
11                                  )
             Defendant.            )
12    _____)

13                       TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                    UNITED STATES BANKRUPTCY JUDGE.

15    WEBEX/TELEPHONIC APPEARANCES:

16    For the Debtor/Plaintiff:    Jeffrey N. Pomerantz
                                   PACHULSKI STANG ZIEHL & JONES, LLP
17                                 10100 Santa Monica Blvd.,
                                    13th Floor
18                                 Los Angeles, CA  90067-4003
                                   (310) 277-6910
19
      For the Debtor/Plaintiff:    John A. Morris
20                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                   780 Third Avenue, 34th Floor
21                                 New York, NY  10017-2024
                                   (212) 561-7700
22

23

24

25
```

Dondero - Cross                          118

1   David Klos, who is the person who put the model together, who

2   has been working on it for six or nine months, and no one else

3   S has a copy of?  Yes.  Yeah, I have to -- I have to access

4   him.  I don't believe that's the -- inappropriate or in any

5   way violating the spirit of the TRO.

6        I believe settlement in this case is only going to happen

7   with somebody fostering communication.  And Ellington's role,

8   which I thought was a good one and I thought he was performing

9   well as settlement counsel, was an important role.  And I used

10  him for things like -- and Seery also used him for things.  As

11  recently as two days before Ellington was fired, Seery gave

12  him a shared services proposal to negotiate with me.

13  Ellington has always been the go-between from a settlement and

14  a legal standpoint.  I think his role there was -- it was

15  valued.  To try to honor the TRO was things like Multi-Strat,

16  that I didn't remember correctly.  Ninety percent of the time

17  or for the last 20 years I would have gone directly to

18  Accounting and Dave Klos for it, but I purposely went to

19  settlement counsel in terms of Ellington in order to get the

20  Multi-Strat information which we needed in order to put the

21  pot plan together that we went to the Independent Board with

22  at the end of December.

23  Q    (faintly)  And do you recall the questions that Debtor's

24  counsel had regarding the letters sent by K&L Gates to clients

25  of the Debtor?

Dondero - Cross                          119

1           MR. MORRIS:  I'm sorry, Your Honor.  I had trouble

2    hearing that question.

3           THE COURT:  Please repeat.

4           MR. BONDS:  Sure.

5    BY MR. BONDS:

6    Q    Do you recall the questions Debtor's counsel had regarding

7    the letters sent by K&L Gates to the clients of the Debtor --

8    to the Debtor?

9    A    Yes.

10   Q    You testified on direct that the letters were sent to do

11   the right thing; is that correct?

12   A    Yes.

13   Q    What did you mean by that?

14   A    I don't want to repeat too much of what I just said, but

15   the Debtor has a contract to manage the CLOs, which in no way

16   is it not in default of.  It doesn't have the staff.  It

17   doesn't have the expertise.  Seery has no historic knowledge

18   on the investments.  The investment staff of Highland has been

19   gutted, with me being gone, with Mark Okada being gone, with

20   Trey Parker being gone, with John Poglitsch being gone.

21        And there's -- there's a couple analysts that are a year

22   or two out of school.  The overall portfolio is in no way

23   being understood, managed, or monitored.  And for it to be

24   amateur hour, incurring losses for no business purpose, when

25   the investors have requested numerous times for their account

Dondero - Cross                           120

1    not to be traded, is crazy to me.  Where the investors say, We

2    just want our account left alone.  We just want to keep the

3    exposure.  And Jim Seery decides no, there's -- I'm going to

4    turn it into cash for no reason.  I'm just going to sell your

5    assets and turn them to cash and incur losses by doing it the

6    week of Thanksgiving and the week of Christmas.  I think it's

7    -- it's shameful.  I'm glad the compliance people and the

8    general counsel at HFAM and NexPoint saw it the same way.  I

9    didn't edit their letters, proof their letters, tell them how

10   to craft their letters.  They did that themselves, with

11   regulatory counsel and personal liability.  They put forward

12   those letters.

13          MR. MORRIS:  Your Honor (garbled) the testimony that

14   Mr. Dondero just gave about these people saw it.  They're not

15   here to testify how they saw it.  We know that Mr. Dondero

16   personally saw and approved the letters before they went out.

17   He can testify what he thinks, what he believes.  I have no

18   problem with that.  But there should be no evidence in the

19   record of what the compliance people thought, believed,

20   understood, anything like that.  It's not right.

21          THE COURT:  All right.  That's essentially a --

22          MR. BONDS:  Your Honor?

23          THE COURT:  -- a hearsay objection, I would say, or

24   lack of personal knowledge, perhaps.  Mr. Bonds, what is your

25   response?

```
                        Dondero - Cross                    121

 1          MR. BONDS:  Your Honor, my response would be that

 2    there are several exhibits the Debtor introduced today that

 3    stand for the proposition that the compliance officers were

 4    concerned.  So I think there is ample evidence of that in the

 5    record.

 6          THE COURT:  I didn't --

 7          MR. MORRIS:  Your Honor, the letter --

 8          THE COURT:  I did not understand what you said is in

 9    the record.  Say again.

10          MR. BONDS:  Your Honor, I'm sorry.  The -- there are

11    -- there are references that are replete in the record that

12    have to do with the compliance officers' understanding of the

13    transactions.

14          THE COURT:  I don't know what you're referring to.

15          THE WITNESS:  Your Honor?

16          THE COURT:  I've got a lot of exhibits.  You're going

17    to have to point out what you think --

18          THE WITNESS:  Can I -- can I -- can I -- can I answer

19    for -- that for a second?  The letters that were signed by the

20    compliance people or by the businesspeople at NexPoint and

21    HFAM objecting to the transactions, those letters were their

22    beliefs, their researched beliefs.  They weren't --

23          THE COURT:  Okay.

24          THE WITNESS:  -- micromanaged by me.  You know, they

25    weren't -- I agree with them, but those weren't my beliefs
```

Dondero - Cross                                122

 1   that they've stated.  Those were their own beliefs and their

 2   own research, --

 3              THE COURT:  All right.

 4              THE WITNESS:  -- and the record should reflect --

 5              THE COURT:  This is clearly hearsay.  I mean, it's

 6   one thing to have a letter, but to go behind the letter and

 7   say, you know, what the beliefs inherent in the words were is

 8   inadmissible.  All right?  So I strike that.

 9              THE WITNESS:  Maybe ask your question again.

10   BY MR. BONDS:

11   Q   Yeah.  What is your understanding of the rights that these

12   parties had and what do you believe that was intended to be

13   conveyed by the compliance officers?

14              MR. MORRIS:  Objection.  Calls -- calls for Mr.

15   Dondero to divine the intent of third parties.  Hearsay.

16              THE COURT:  I sustain.

17              MR. BONDS:  Your Honor, --

18              MR. MORRIS:  No foundation.

19              MR. BONDS:  -- I don't agree.  I think that this is

20   asking Mr. Dondero what he thinks.

21              MR. MORRIS:  The letters speak for themselves, Your

22   Honor.

23              THE COURT:  Okay.  I sustain --

24              MR. MORRIS:  And Mr. --

25              THE COURT:  I sustain the objection.

Dondero - Cross                              123

1           MR. MORRIS:  All right.  Thank you.

2           THE WITNESS:  Ask me what I know.  Or ask me what my

3    concerns --

4    BY MR. BONDS:

5    Q    Let me ask you this.  What were your concerns relating to

6    the compliance officers' exhibit?

7    A    My concerns regarding the transaction, the transactions,

8    which may repeat what I've said before, but I do want to make

9    sure it gets in the record.  So if we have to make a -- these

10   were my concerns, whether or not they were the compliance

11   people's concerns.  I believe they were, and I believe they

12   were similar, but I'm just going to say these are -- these

13   were my concerns.

14        The Debtor, with its contractual -- with its contract with

15   the CLOs, were in no way -- was in no way compliant with that

16   contract or not in default of that contract.  Bankruptcy is a

17   reason for default.  Not having the key men specified in the

18   contract currently employed by the Advisor is a violation.

19   Not having adequate investment staff to manage the portfolio

20   is a violation of that contract.  Announcing that you're

21   laying off everybody and will no longer be a registered

22   investment advisor is proclaiming that you, if you even have

23   any -- any -- pretend that you're qualified or in compliance

24   with the contract now, you're broadcasting that you won't be

25   in three weeks, are -- are all mean that you're not in good

204

1          MR. BONDS:  Thank you, Your Honor.

2      (Proceedings concluded at 4:09 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                   CERTIFICATE

19     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
20 above-entitled matter.

21   **/s/ Kathy Rehling**                    **01/11/2021**

22 _____      _____
   Kathy Rehling, CETD-444                      Date
23 Certified Electronic Court Transcriber

24

25

# EXHIBIT L

```
                    IN THE UNITED STATES BANKRUPTCY COURT
1                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
2
                                   )    Case No. 19-34054-sgj-11
3     In Re:                       )    Chapter 11
                                   )
4     HIGHLAND CAPITAL             )    Dallas, Texas
      MANAGEMENT, L.P.,            )    Tuesday, January 26, 2021
5                                  )    9:30 a.m. Docket
                                   )
6             Debtor.              )
                                   )    MOTION FOR ENTRY OF ORDER
7                                  )    AUTHORIZING DEBTOR TO
                                   )    IMPLEMENT KEY EMPLOYEE
8     _____)    PLAN [1777]
                                   )
9     HIGHLAND CAPITAL             )    Adversary Proceeding 21-3000-sjg
      MANAGEMENT, L.P.,            )
10                                 )
                                   )
11            Plaintiff,           )
                                   )
12    v.                           )    PLAINTIFF'S MOTION FOR A
                                   )    PRELIMINARY INJUNCTION AGAINST
13    HIGHLAND CAPITAL             )    CERTAIN ENTITIES OWNED AND/OR
      MANAGEMENT FUND ADVISORS,    )    CONTROLLED BY MR. JAMES
14    L.P., et al.                 )    DONDERO [5]
                                   )
15            Defendants.          )
16    _____)
                        TRANSCRIPT OF PROCEEDINGS
17            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.
18
      WEBEX APPEARANCES:
19
      For the Debtor:              Jeffrey Nathan Pomerantz
20                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                   10100 Santa Monica Blvd.,
21                                  13th Floor
                                   Los Angeles, CA  90067-4003
22                                 (310) 277-6910

23    For the Debtor:              John A. Morris
                                   PACHULSKI STANG ZIEHL & JONES, LLP
24                                 780 Third Avenue, 34th Floor
                                   New York, NY  10017-2024
25                                 (212) 561-7700
```

250

1   can't talk them about specifically, but they're at least 20

2   percent better than what the Debtor has put forward as far as

3   a plan.  And what we put forward is elegant, it's simpler, it

4   treats the employees fairly, it gives the business continuity,

5   it gives investors continuity, and it's not just a harsh,

6   punitive liquidation that's going to end up in a myriad of

7   litigation.

8       We're paying a premium, it's a capitulation price, to try

9   and get to some kind of settlement.  And I encourage you to

10  look at it.  It's elegant.  It's straightforward.  It's

11  simple.  And now that you've encouraged and gotten us up to a

12  number that's well in excess of the Debtor, maybe a little

13  pressure on other people to treat employees fairly, maybe not

14  liquidate a business that's important in Dallas, that has been

15  a big business for a number of years, doing enormous good

16  things for a lot of people.

17      You know, we went into bankruptcy with $450 million of

18  assets and almost no debt.  And we've been driven into the

19  ground by the process.  And then the plan is to just harshly

20  liquidate going forward.  I -- I -- it's crazy.  I don't know

21  what else to do to stop the train other than what we've

22  offered.

23          THE COURT:  All right.  Well, I hear what you're

24  saying, and I do, just because -- I don't know if you left the

25  room or not, but we did have discussion of Section 206 of the

251

1    Investment Advisers Act today.  It was put on the screen.  Mr.

2    Post was asked what was unlawful as far as what had happened

3    here, what was going on here, what was fraudulent, deceptive,

4    or manipulative, in parsing through the words of the statute.

5    And he said Mr. Seery engaged in deceptive acts because he

6    wasn't trying to maximize value.  Okay?  I'm not an expert on

7    the Investment Advisers Act, but I know that that was not a

8    deceptive act.

9         And so I'll allow the plan to be filed under seal, but

10   it's not going to be unsealed absent an order of the Court.

11   Okay?  So we'll just leave it at that for now.  And while I

12   still encourage good-faith negotiations here, I've said it

13   umpteen times, where you're tired of the cliché, probably:

14   The train is leaving the station.  And if you want the Court

15   to have patience in the process and if you want the parties to

16   cooperate in good faith, it might help if we didn't have

17   things like Dugaboy and Get Good Trust filing a motion for an

18   examiner 15 months into the case.

19        I mean, it feels to me, Mr. Dondero, whether I'm right or

20   wrong, that it's like you've got a twofold approach here:  I

21   either get the company back or I burn the house down.  And I'm

22   telling you right now, if we don't have agreements, --

23             MR. DONDERO:  That's not true.

24             THE COURT:  -- if we don't have agreements and we

25   come back on the 5th for a continuation of this hearing and a

APP. 0116
APP.2948

252

1   motion to hold you in contempt, you know, I'm leaning right

2   now, based on what I've heard so far, and I know I haven't

3   heard everything, but I'm leaning right now towards finding

4   contempt and shifting a whole bundle of attorneys' fees.

5   That, to me, seems like the likely place we're heading.

6      I mean, I commented at the December hearing on the

7   preliminary injunction against you personally that it had been

8   like a $250,000 hearing, I figured, okay, just guesstimating

9   everybody's billable rate times the hours we spent.  Well,

10  here we were again, and I know we've got all this time outside

11  the courtroom preparing, taking depositions.  I mean, what

12  else is a judge to think except, by God, let's drive up

13  administrative expenses as much as we can; if we can't win,

14  we're going to go down fighting?  That's what this looks like.

15  Okay?  So if it's not really what's going on, then you've got

16  to work hard to change my perceptions at this point.

17         MR. RUKAVINA:  Your Honor, I hear everything what

18  you're saying, and I'm going to discuss it very bluntly with

19  my clients.  But we're being asked not to exercise contract

20  rights in the future.  This is not a contempt hearing.  And

21  Your Honor, we did ask and offered the estate a million

22  dollars, found money, plus to waive almost all our plan

23  objections, if they would just put this case on pause for 30

24  days.

25     So we are trying.  We are trying creative solutions here.

253

1   We know that the train is leaving.  We've put our money where

2   our mouth is.  We will continue trying.  But Your Honor, this

3   is not a contempt proceeding, and my clients are not Mr.

4   Dondero.  You've heard they're independent boards.

5          MR. POMERANTZ:  I can't leave that last comment

6   without a response.  Yes, there was an offer of a million

7   dollars, by an entity that owes the estate multiples of that.

8   So they are offering to pay us something that they already owe

9   us.  So Mr. Rukavina continues try to do this.  We will not

10   stand for it.

11          MR. RUKAVINA:  That is not a fair statement, sir.  I

12   misrepresented nothing.  We were offering you a million

13   dollars, with no conditions, earned upon receipt, with no

14   credit, no deduction for any of our liability.  So you're free

15   to say no, sir, but you're not going to tell the judge that I

16   misrepresented something.

17          THE COURT:  All right.

18          MR. POMERANTZ:  Should tell the Court --

19          THE COURT:  You know what?

20          MR. POMERANTZ:  -- that that entity owed the Debtor.

21          THE COURT:  You know what?  You know what?  I am more

22   focused on, Mr. Rukavina, your comment that this Court can't

23   enjoin your clients from exercising contractual rights when,

24   again, in January of 2020, the representation was made and it

25   was ordered, "Mr. Dondero shall not cause any related entity

254

1   to terminate any agreements with the Debtor."  Okay?  That was

2   -- go back and look at the transcript.  That was so meaningful

3   to me.

4       We were facing a possible trustee.  And that's what I did

5   in the *Acis* case.  Okay?  I had a Chapter 11 trustee.  And it

6   was not a perfect fit, to be sure.  But it is where we were

7   heading in this case, had the lawyers and parties not

8   negotiated what they did.  That was a very important

9   provision, convincing me that, you know what, I think the

10  structure they've got will be better than a trustee.  And it

11  has, for the most part.  But the fees have gone out the roof,

12  and I lay that at the feet of Mr. Dondero, for the most part.

13  Okay?  We have a bomb thrown every five minutes by either him

14  personally or the Dugaboy or the Get Good Trust or the Funds

15  or the Advisors or I don't know who else.  Okay?

16      So the train is leaving the station, unless you all come

17  to me and say, okay, we've maybe got a -- Mr. Pomerantz's word

18  -- grand solution here.  Okay?  If you get there in the next

19  few days, wonderful.  Okay?  But I don't know what else to say

20  except I'm tired of the carpet-bombing, and if I had to rule

21  this minute, there would be a huge amount of fee-shifting for

22  what we went through today, for what we went through in

23  December, for the restriction motion that, after I called it

24  frivolous, the lawyers were sending letters pretty much

25  regurgitating the same arguments.  All right.  So, not a happy

255

1   camper.

2        But upload your order on the motion to seal the plan.

3   And, again, it's not going to be unsealed absent a further

4   order of the Court.  And if you all come to me next week and

5   say, hey, we've got something in the works here, okay, I'll

6   consider unsealing it and letting you go down a different

7   path.  But I'm not naïve.  I feel like this is just more

8   burning the house down, maybe.  I don't know.  I hope I'm

9   wrong.  I hope I'm wrong.  But all right.  So I guess we'll

10  see you next week.

11            MR. POMERANTZ:  Thank you, Your Honor.

12            MR. MORRIS:  Thank you, Your Honor.

13            THE COURT:  All right.  We're adjourned.

14            MR. RUKAVINA:  Thank you, Your Honor.

15            THE CLERK:  All rise.

16       (Proceedings concluded at 6:08 p.m.)

17                         --oOo--

18

19

20                      CERTIFICATE

21       I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23    **/s/ Kathy Rehling**                    **01/28/2021**

24  _____      _____
    Kathy Rehling, CETD-444                      Date
25  Certified Electronic Court Transcriber

255

1   camper.

2        But upload your order on the motion to seal the plan.

3   And, again, it's not going to be unsealed absent a further

4   order of the Court.  And if you all come to me next week and

5   say, hey, we've got something in the works here, okay, I'll

6   consider unsealing it and letting you go down a different

7   path.  But I'm not naïve.  I feel like this is just more

8   burning the house down, maybe.  I don't know.  I hope I'm

9   wrong.  I hope I'm wrong.  But all right.  So I guess we'll

10  see you next week.

11           MR. POMERANTZ:  Thank you, Your Honor.

12           MR. MORRIS:  Thank you, Your Honor.

13           THE COURT:  All right.  We're adjourned.

14           MR. RUKAVINA:  Thank you, Your Honor.

15           THE CLERK:  All rise.

16      (Proceedings concluded at 6:08 p.m.)

17                          --oOo--

18

19

20                       CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **01/28/2021**

24  _____        _____
    Kathy Rehling, CETD-444                      Date
25  Certified Electronic Court Transcriber