# EXHIBIT M

APP. 0122
APP.2954

```
                   IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                  )    Case No. 19-34054-sgj-11
 3  In Re:                        )    Chapter 11
                                  )
 4  HIGHLAND CAPITAL              )    Dallas, Texas
    MANAGEMENT, L.P.,             )    Monday, February 8, 2021
 5                                )    9:00 a.m. Docket
                                  )
 6          Debtor.              )
                                  )    BENCH RULING ON CONFIRMATION
 7                                )    HEARING [1808] AND AGREED
                                  )    MOTION TO ASSUME [1624]
 8  _____)

                        TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.
10
    WEBEX APPEARANCES:
11
12  For the Debtor:               Jeffrey Nathan Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
                                  10100 Santa Monica Blvd.,
13                                  13th Floor
                                  Los Angeles, CA  90067-4003
14                                (310) 277-6910

15  For the Official Committee    Matthew A. Clemente
    of Unsecured Creditors:       SIDLEY AUSTIN, LLP
16                                One South Dearborn Street
                                  Chicago, IL  60603
17                                (312) 853-7539

18  For James Dondero:            D. Michael Lynn
                                  John Y. Bonds, III
19                                Bryan C. Assink
                                  BONDS ELLIS EPPICH SCHAFER
20                                  JONES, LLP
                                  420 Throckmorton Street,
21                                  Suite 1000
                                  Fort Worth, TX  76102
22                                (817) 405-6900

23  For Get Good Trust and        Douglas S. Draper
    Dugaboy Investment Trust:     HELLER, DRAPER & HORN, LLC
24                                650 Poydras Street, Suite 2500
                                  New Orleans, LA  70130
25                                (504) 299-3300
```

6

1    of evidence, considering testimony from five witnesses and

2    thousands of pages of documentary evidence, in considering

3    whether to confirm the Plan pursuant to Sections 1129(a) and

4    (b) of the Bankruptcy Code.

5        The Court finds and concludes that the Plan meets all of

6    the relevant requirements of Sections 1123, 1124, and 1129 of

7    the Code, and other applicable provisions of the Bankruptcy

8    Code, but is issuing this detailed ruling to address certain

9    pending objections to the Plan, including but not limited to

10   objections regarding certain Exculpations, Releases, Plan

11   Injunctions, and Gatekeeping Provisions of the Plan.

12       The Court reserves the right to amend or supplement this

13   oral ruling in more detailed findings of fact, conclusions of

14   law, and an Order.

15       First, by way of introduction, this case is not your

16   garden-variety Chapter 11 case.  Highland Capital Management,

17   LP is a multibillion dollar global investment advisor,

18   registered with the SEC pursuant to the Investment Advisers

19   Act of 1940.  It was founded in 1993 by James Dondero and Mark

20   Okada.  Mr. Okada resigned from his role with Highland prior

21   to the bankruptcy case being filed.  Mr. Dondero was in

22   control of the Debtor as of the day it filed bankruptcy, but

23   agreed to relinquish control of it on or about January 9,

24   2020, pursuant to an agreement reached with the Official

25   Unsecured Creditors' Committee, which will be described later.

7

1        Although Mr. Dondero remained on as an unpaid employee and

2     portfolio manager with the Debtor after January 9, 2020, his

3     employment with the Debtor terminated on October 9, 2020.  Mr.

4     Dondero continues to work for and essentially control numerous

5     nondebtor companies in the Highland complex of companies.

6        The Debtor is headquartered in Dallas, Texas.  As of the

7     October 2019 petition date, the Debtor employed approximately

8     76 employees.

9        Pursuant to various contractual arrangements, the Debtor

10    provides money management and advisory services for billions

11    of dollars of assets, including CLOs and other investments.

12    Some of these assets are managed pursuant to shared services

13    agreements with a variety of affiliated entities, including

14    other affiliated registered investment advisors.  In fact,

15    there are approximately 2,000 entities in the Byzantine

16    complex of companies under the Highland umbrella.

17       None of these affiliates of Highland filed for Chapter 11

18    protection.  Most, but not all, of these entities are not

19    subsidiaries, direct or indirect, of Highland.  And certain

20    parties in the case preferred not to use the term "affiliates"

21    when referring to them.  Thus, the Court will frequently refer

22    loosely to the so-called, in air quotes, "Highland complex of

23    companies" when referring to the Highland enterprise.  That's

24    a term many of the lawyers in the case use.

25       Many of the companies are offshore entities, organized in

8

1    such faraway jurisdictions as the Cayman Islands and Guernsey.

2        The Debtor is privately owned 99.5 percent by an entity

3    called Hunter Mountain Investment Trust; 0.1866 percent by the

4    Dugaboy Investment Trust, a trust created to manage the assets

5    of Mr. Dondero and his family; 0.0627 percent by Mark Okada,

6    personally and through family trusts; and 0.25 percent by

7    Strand Advisors, Inc., the general partner.

8        The Debtor's primary means of generating revenue has

9    historically been from fees collected for the management and

10    advisory services provided to funds that it manages, plus fees

11    generated for services provided to its affiliates.

12        For additional liquidity, the Debtor, prior to the

13    petition date, would sell liquid securities in the ordinary

14    course, primarily through a brokerage account at Jefferies,

15    LLC.  The Debtor would also, from time to time, sell assets at

16    nondebtor subsidiaries and distribute those proceeds to the

17    Debtor in the ordinary course of business.

18        The Debtor's current CEO, James Seery, credibly testified

19    that the Debtor was "run at a deficient for a long time and

20    then would sell assets or defer employee compensation to cover

21    its deficits."  This Court cannot help but wonder if that was

22    necessitated because of enormous litigation fees and expenses

23    that Highland was constantly incurring due to its culture of

24    litigation, as further addressed hereafter.

25        Highland and this case are not garden-variety for so many

14

1    11 case is its postpetition corporate governance structure.

2    Highland filed bankruptcy October 16, 2019.  Contentiousness

3    with the Creditors' Committee began immediately, with first

4    the Committee's request for a change of venue from Delaware to

5    Dallas, and then a desire by the Committee and the U.S.

6    Trustee for a Chapter 11 or 7 trustee to be appointed due to

7    concerns over and distrust of Mr. Dondero and his numerous

8    conflicts of interest and alleged mismanagement or worse.

9        After many weeks of the threat of a trustee lingering, the

10   Debtor and the Creditors' Committee negotiated and the Court

11   approved a corporate governance settlement on January 9, 2020

12   that resulted in Mr. Dondero no longer being an officer or

13   director of the Debtor or of its general partner, Strand.

14       As part of the court-approved settlement, three eminently-

15   qualified Independent Directors were chosen by the Creditors'

16   Committee and engaged to lead Highland through its Chapter 11

17   case.  They were James Seery, John Dubel, and Retired

18   Bankruptcy Judge Russell Nelms.  They were technically the

19   Independent Directors of Strand, the general partner of the

20   Debtor.  Mr. Dondero had previously been the sole director of

21   Strand, and thus the sole person in ultimate control of the

22   Debtor.

23       The three independent board members' resumes are in

24   evidence.  James Seery eventually was named CEO of the Debtor.

25   Suffice it to say that this changed the entire trajectory of

15

1    the case.  This saved the Debtor from a trustee.  The Court

2    trusted the new directors.  The Creditors' Committee trusted

3    them.  They were the right solution at the right time.

4         Because of the unique character of the Debtor's business,

5    the Court believed this solution was far better than a

6    conventional Chapter 7 or 11 trustee.  Mr. Seery, in

7    particular, knew and had vast experience at prominent firms

8    with high-yield and distressed investing similar to the

9    Debtor's business.  Mr. Dubel had 40 years of experience

10   restructuring large, complex businesses and serving on their

11   boards of directors in this context.  And Retired Judge Nelms

12   had not only vast bankruptcy experience but seemed

13   particularly well-suited to help the Debtor maneuver through

14   conflicts and ethical quandaries.

15        By way of comparison, in the Chapter 11 case of Acis, the

16   former affiliate of Highland that this Court presided over two

17   or three years ago, which company was much smaller in size and

18   scope than Highland, managing only five or six CLOs, a Chapter

19   11 trustee was elected by the creditors that was not on the

20   normal rotation panel for trustees in this district, but

21   rather was a nationally-known bankruptcy attorney with more

22   than 45 years of large Chapter 11 case experience.  This

23   Chapter 11 trustee performed valiantly, but was sued by

24   entities in the Highland complex shortly after he was

25   appointed, which this Court had to address.  The Acis trustee

16

1    could not get Highland and its affiliates to agree to any

2    actions taken in the case, and he finally obtained

3    confirmation of a plan over Highland and its affiliates'

4    objections in his fourth attempted plan, which confirmation

5    then was promptly appealed by Highland and its affiliates.

6         Suffice it to say it was not easy to get such highly-

7    qualified persons to serve as independent board members and

8    CEO of this Debtor.  They were stepping into a morass of

9    problems.  Naturally, they were worried about getting sued, no

10   matter how defensible their efforts might be, given the

11   litigation culture that enveloped Highland historically.  It

12   seemed as though everything always ended in litigation at

13   Highland.

14        The Court heard credible testimony that none of them would

15   have taken on the role of Independent Director without a good

16   D&O insurance policy protecting them, without indemnification

17   from Strand, guaranteed by the Debtor; without exculpation for

18   mere negligence claims; and without a gatekeeper provision,

19   such that the Independent Directors could not be sued without

20   the bankruptcy court, as a gatekeeper, giving a potential

21   plaintiff permission to sue.

22        With regard to the gatekeeper provision, this was

23   precisely analogous to what bankruptcy trustees have pursuant

24   to the so-called "Barton Doctrine," which was first

25   articulated in an old U.S. Supreme Court case.

17

1     The Bankruptcy Court approved all of these protections in

2  a January 9, 2020 order.  No one appealed that order.  And Mr.

3  Dondero signed the settlement agreement that was approved by

4  that order.

5     An interesting fact about the D&O policy came out in

6  credible testimony at the confirmation hearing.  Mr. Dubel and

7  an insurance broker from Aon, named Marc Tauber, both credibly

8  testified that the gatekeeper provision was needed because of

9  the so-called, and I quote, "Dondero Exclusion" in the

10  insurance marketplace.

11     Specifically, the D&O insurers in the marketplace did not

12  want to cover litigation claims that might be brought against

13  the Independent Directors by Mr. Dondero because the

14  marketplace of D&O insurers are aware of Mr. Dondero's

15  litigiousness.  The insurers would not have issued a D&O

16  policy to the Independent Directors without either the

17  gatekeeping provision or a "Dondero Exclusion" being in the

18  policy.

19     Thus, the gatekeeper provision was part of the January 9,

20  2020 settlement.  There was a sound business justification for

21  it.  It was reasonable and necessary.  It was consistent with

22  the Barton Doctrine in an extremely analogous situation --

23  *i.e.*, the independent board members were analogous to a three-

24  headed trustee in this case, if you will.  Mr. Dondero signed

25  off on it.  And, again, no one ever appealed the order

18

1  approving it.

2      The Court finds that, like the Creditors' Committee, the

3  independent board members here have been resilient and

4  unwavering in their efforts to get the enormous problems in

5  this case solved.  They seem to have at all times negotiated

6  hard and with good faith.  As noted previously, they changed

7  the entire trajectory of this case.

8      Still another reason why this was not your garden-variety

9  case was the mediation effort.  In summer of 2020, roughly

10  nine months into the Chapter 11 case, this Court ordered

11  mediation among the Debtor, Acis, UBS, the Redeemer Committee,

12  and Mr. Dondero.  The Court selected co-mediators, since this

13  seemed like such a Herculean task, especially during COVID-19,

14  where people could not all be in the same room.  Those co-

15  mediators were Retired Bankruptcy Judge Allan Gropper from the

16  Southern District of New York, who had a distinguished career

17  presiding over complex Chapter 11 cases, and Ms. Sylvia Mayer,

18  who likewise has had a distinguished career, first as a

19  partner in a preeminent law firm working on complex Chapter 11

20  cases, and subsequently as a mediator and arbitrator in

21  Houston, Texas.

22      As noted earlier, the Acis claim was settled during the

23  mediation, which seemed nothing short of a miracle to this

24  Court, and the UBS claim was settled many months later, and

25  this Court believes the groundwork for that ultimate

19

1  settlement was laid, or at least helped, through the

2  mediation.  And as earlier noted, other enormous claims have

3  been settled during this case, including that of the Redeemer

4  Committee, who, again, had asserted approximately or close to

5  a $200 million claim; HarbourVest, who asserted a $300 million

6  claim; and Patrick Daugherty, who asserted close to a $40

7  million claim.

8      This Court cannot stress strongly enough that the

9  resolution of these enormous claims and the acceptance of all

10  of these creditors of the Plan that is now before the Court

11  seems nothing short of a miracle.  It was more than a year in

12  the making.

13      Finally, a word about the current remaining Objectors to

14  the Plan before the Court.  Once again, the Court will use the

15  phrase "not garden-variety."  Originally, there were over one

16  dozen objections filed to this Plan.  The Debtor has made

17  various amendments or modifications to the Plan to address

18  some of these objections.  The Court finds that none of these

19  modifications require further solicitation, pursuant to

20  Sections 1125, 1126, 1127 of the Code, or Bankruptcy Rule

21  3019, because, among other things, they do not materially

22  adversely change the treatment of the claims of any creditor

23  or interest holder who has not accepted in writing the

24  modifications.

25      Among other things, there were changes to the projections

20

1  that the Debtor filed shortly before the confirmation hearing

2  that, among other things, show the estimated distribution to

3  creditors and compare plan treatment to a likely disbursement

4  in a Chapter 7.

5      These do not constitute a materially adverse change to the

6  treatment of any creditors or interest holders.  They merely

7  update likely distributions based on claims that have now been

8  settled, and they've otherwise incorporated more recent

9  financial data.  This happens often before confirmation

10  hearings.  The Court finds that it did not mislead or

11  prejudice any creditors or interest holders, and certainly

12  there was no need to resolicit the Plan.

13      The only Objectors to the Plan left at this time were Mr.

14  Dondero and entities that the Court finds are controlled by

15  him.  The standing of these entities to object to the Plan

16  exists, but the remoteness of their economic interest is

17  noteworthy, and the Court questions the good faith of the

18  Objectors.  In fact, the Court has good reason to believe that

19  these parties are not objecting to protect economic interests

20  they have in the Debtor, but to be disruptors.

21      Mr. Dondero wants his company back.  This is

22  understandable.  But it's not a good faith basis to lob

23  objections to the Plan.  The Court has slowed down

24  confirmation multiple times on the current Plan and urged the

25  parties to talk to Mr. Dondero.  The parties represent that

21

1    they have, and the Court believes that they have.

2         Now, to be specific about the remoteness of the objectors'

3    interests, the Court will address them each separately.

4    First, Mr. Dondero has a pending objection.  Mr. Dondero's

5    only economic interest with regard to the Debtor at this point

6    is an unliquidated indemnification claim.  And based on

7    everything this Court has heard, his indemnification claim

8    will be highly questionable at this juncture.

9         Second, a joint objection has been filed by the Dugaboy

10   Trust and the Get Good Trust.  As for the Dugaboy Trust, it

11   was created to manage the assets of Mr. Dondero and his

12   family, and it owns a 0.1866 percent limited partnership

13   interest in the Debtor.  The Court is not clear what economic

14   interest the Get Good Trust has, but it likewise seems to be

15   related to Mr. Dondero, and it has been represented to the

16   Court numerous times that the trustee is Mr. Dondero's college

17   roommate.

18        Another group of Objectors that has joined together in one

19   objection is what the Court will refer to as the Highland and

20   NexPoint Advisors and Funds.  The Court understands they

21   assert disputed administrative expense claims against the

22   estate.  While the evidence presented was that they have

23   independent board members that run these companies, the Court

24   was not convinced of their independence from Mr. Dondero.

25   None of the so-called independent board members of these

22

1   entities have ever testified before the Court.  Moreover, they

2   have all been engaged with the Highland complex for many

3   years.

4        The witness who testified on these Objectors' behalves at

5   confirmation, Mr. Jason Post, their chief compliance officer,

6   resigned from Highland after more than twelve years in October

7   2020, at the same time that Mr. Dondero resigned or was

8   terminated by Highland.  And a prior witness recently for

9   these entities whose testimony was made part of the record at

10   the confirmation hearing essentially testified that Mr.

11   Dondero controlled these entities.

12        Finally, various NexBank entities objected to the Plan.

13   The Court does not believe they have liquidated claims.  Mr.

14   Dondero appears to be in control of these entities as well.

15        To be clear, the Court has allowed all of these objectors

16   to fully present arguments and evidence in opposition to

17   confirmation, even though their economic interests in the

18   Debtor appear to be extremely remote and the Court questions

19   their good faith.  Specifically on that latter point, the

20   Court considers them all to be marching pursuant to the orders

21   of Mr. Dondero.

22        In the recent past, Mr. Dondero has been subject to a TRO

23   and preliminary injunction by the Bankruptcy Court for

24   interfering with the current CEO's management of the Debtor in

25   specific ways that were supported by evidence.  Around the

23

1   time that this all came to light and the Court began setting

2   hearings on the alleged interference, Mr. Dondero's company

3   phone supplied to him by Highland, which he had been asked to

4   turn in, mysteriously went missing.  The Court merely mentions

5   this in this context as one of many reasons that the Court has

6   to question the good faith of Mr. Dondero and his affiliated

7   objectors.

8       The only other pending objection besides these objections

9   of the Dondero and Dondero-controlled entities is an objection

10  of the United States Trustee pertaining to the release,

11  exculpation, and injunction provisions in the Plan.

12      In juxtaposition to these pending objections, the Court

13  notes that the Debtor has resolved earlier-filed objections to

14  the Plan filed by the IRS, Patrick Daugherty, CLO Holdco,

15  Ltd., numerous local taxing authorities, and certain current

16  and former senior-level employees of the Debtor.

17      With that rather detailed factual background addressed,

18  because certainly context matters here, the Court now

19  addresses what it considers the only serious objections raised

20  in connection with confirmation.  Specifically, the Plan

21  contain certain releases, exculpation, plan injunctions, and a

22  gatekeeper provision which are obviously not fully consensual,

23  since there are objections.  Certainly, these provisions are

24  mostly consensual when you consider that parties with hundreds

25  of millions of dollars' worth of legitimate claims have not

36

1       Now, after all of that, this Court believes the following

2   can be gleaned from *Pacific Lumber*.  First, the Fifth Circuit

3   hinted that consensual exculpations and/or consensual

4   nondebtor third-party releases are permissible.  The Court

5   was, of course, dealing with nonconsensual exculpations in

6   *Pacific Lumber*.  In this regard, I note Page 252, where the

7   Court cited various prior Fifth Circuit authority and then

8   stated, "These cases seem broadly to foreclose nonconsensual

9   nondebtor releases and permanent injunctions."

10      The second thing that can be gleaned from *Pacific Lumber*:

11  The Fifth Circuit hinted that nondebtor releases may be

12  permissible in cases involving global settlements of mass

13  claims against the debtors and co-liable parties.  The Court,

14  of course, referred to 524(g), but various other cases which

15  approved nondebtor releases where mass claims were channeled

16  to a specific pool of assets.

17      Third, the Fifth Circuit outright held that exculpations

18  from negligence for a Creditors' Committee and its members are

19  permissible because the concept is both consistent with

20  1103(c), "which implies Committee members have qualified

21  immunity for actions within the scope of their duties," and a

22  good policy result, since "if members of the Committee can be

23  sued by persons unhappy with the outcome of the case, it will

24  be extremely difficult to find members to serve on an official

25  committee."

37

1      Fourth, the Fifth Circuit recognized in *Pacific Lumber*

2   that *res judicata* may bar complaints regarding an

3   impermissible plan release, citing to its earlier *Republic*

4   *Supply v. Shoaf* opinion.

5      Now, being ever-mindful of the Fifth Circuit's words in

6   *Pacific Lumber*, this Court cannot help but wonder about at

7   least three things.

8      First, did the Fifth Circuit leave open the door that

9   facts/equities might sometimes justify approval of an

10   exculpation for a person other than a Creditors' Committee and

11   its members?  For example, the Fifth Circuit stated, in

12   referring to the plan proponents Marathon and MRC, that "Any

13   costs the released parties might incur defending against suits

14   alleging such negligence are unlikely to swamp either of these

15   parties or the consummated reorganization."  Here, this Court

16   can easily expect the proposed exculpated parties to incur

17   costs that could swamp them and the reorganization based on

18   the past litigious conduct of Mr. Dondero and his controlled

19   entities.  Do these words of the Fifth Circuit hint that

20   equities/economics might sometimes justify an exculpation?

21      Second, did the Fifth Circuit's rationale for permitted

22   exculpations to Creditors' Committee and their members, which

23   was clearly policy-based, based on their implied qualified

24   immunity flowing from their duties in Section 1103 and their

25   disinterestedness, and the importance of their role in a

38

1    Chapter 11 case, did this rationale leave open the door to

2    sometimes permitting exculpations to other parties in a

3    particular Chapter 11 case besides Creditors' Committees and

4    their members?  For example, in a situation such as the

5    Highland case, in which Independent Directors, brought in to

6    avoid a trustee, are more like a Creditors' Committee than an

7    incumbent board of directors.

8        Third, the Fifth Circuit's sole statutory basis was

9    Section 524(e).  This Court would humbly submit that this is a

10   statute dealing with prepetition liability in which some

11   nondebtor is liable with the Debtor.  Exculpation is a concept

12   dealing with postpetition liability.

13       The Ninth Circuit recently, in a case called *Blixseth v.*

14   *Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020), approved the

15   validity of an exculpation clause incorporated into a

16   confirmed Chapter 11 plan that purported to absolve certain

17   nondebtor parties that were "closely involved" in drafting the

18   plan.  They were the largest secured creditor, a purchaser,

19   and an individual who was an indirect owner of certain of the

20   debtor companies.  The exculpation was from any negligence,

21   liability, for "any act or omission in connection with,

22   related to, or arising out of the Chapter 11 cases."

23       By the time the appeal was before the Ninth Circuit, the

24   only issue was the propriety of the exculpation clause as to

25   the large secured creditor, which was also a plan proponent,

39

1  since all the other exculpated parties had settled with the

2  appellant.

3       The Court, in determining that the exculpation clause was

4  permissible as to the secured lender, concluded that Section

5  524(e) "does not bar a narrow exculpation clause of the kind

6  here at issue -- that is, one focused on actions of various

7  participants in the plan approval process and relating only to

8  that process," Page 1082.  Why?  Because "Section 524(e)

9  establishes that discharge of a debt of the debtor does not

10 affect the liability of any other entity on such debt."  In

11 other words, the discharge in no way affects the liability of

12 any other entity for the discharged debt.  By its terms,

13 524(e) prevents a bankruptcy court from extinguishing claims

14 of creditors against nondebtors over the very discharged debt

15 through the bankruptcy proceedings.

16      The Court went on to explicitly disagree with *Pacific*

17 *Lumber* in its analysis of 524(e), reiterating that an

18 exculpation clause covers only liabilities arising from the

19 bankruptcy proceedings and not of any of the debtor's

20 discharged debt.  Footnote 7, Page 1085.

21      Ultimately, the Court held that under Section 105(a),

22 which empowers a bankruptcy court to issue any order, process,

23 or judgment that is necessary or appropriate to carry out the

24 provisions of Chapter 11 and Section 1123, which establishes

25 the appropriate content of the bankruptcy plan, under these

40

1  sections, the bankruptcy court had authority to approve an

2  exculpation clause intended to trim subsequent litigation over

3  acts taken during the bankruptcy proceedings and so render the

4  plan viable.

5      This Court concludes that, just as the Fifth Circuit left

6  open the door for consensual exculpations and releases in

7  *Pacific Lumber*, just as it left open the door for consensual

8  exculpations and releases in *Pacific Lumber*, its dicta

9  suggests that an exculpation might be permissible if there is

10 a showing that "costs that the released parties might incur

11 defending against suits alleging such negligence are likely to

12 swamp either the Exculpated Parties or the reorganization."

13 Again, that was a quote from the Fifth Circuit.

14     If ever there were a risk of that happening in a Chapter

15 11 reorganization, it is this one.  The Debtor's current CEO

16 credibly testified that Mr. Dondero has said outside the

17 courtroom that if Mr. Dondero's own pot plan does not get

18 approved, that he will "burn the place down."  Here, this

19 Court can easily expect the proposed exculpated parties might

20 expect to incur costs that could swamp them and the

21 reorganization process based on the past litigious conduct of

22 Mr. Dondero and his controlled entities.

23     Additionally, this Court concludes that the Fifth

24 Circuit's rationale in *Pacific Lumber* for permitted

25 exculpations to Creditors' Committees and their members, which

41

1   was clearly policy-based based on their implied qualified

2   immunity flowing from Section 1103 and their importance in a

3   Chapter 11 case, leaves the door open to sometimes permitting

4   exculpations to other parties in a particular Chapter 11 case

5   besides a UCC and its members.

6       Again, if there was ever such a case, the Court believes

7   it is this one, in which Independent Directors were brought in

8   to avoid a trustee and are much more like a Creditors'

9   Committee than an incumbent board of directors.  While,

10  admittedly, there are a few exculpated parties here proposed

11  beyond the independent board, such as certain employees, it

12  would appear that no one is invulnerable to a lawsuit here if

13  past is prologue in this Highland saga.

14      The Creditors' Committee was initially not keen on

15  exculpations for certain employees.  However, Mr. Seery

16  credibly testified that there was a contentious arm's-length

17  negotiation over this and that he needs these employees to

18  preserve value implementing the Plan.  Mr. Dondero has shown

19  no hesitancy to litigate with former employees in the past, to

20  the *nth* degree, and there is every reason to believe he would

21  again in the future, if able.

22      Finally, in this situation, in the case at bar, we would

23  appear to have a *Shoaf* reason to approve the exculpations.

24  The January 9, 2020 order of this Court, Docket Entry 339,

25  which approved the independent board and an ongoing corporate

44

1  appropriate.  They are entirely consistent with and

2  permissible under Bankruptcy Code Sections 1123(a)(5),

3  1123(a)(6), 1141(a) and (c), and 1142, as well as Bankruptcy

4  Rule 3016(c), which articulates the form that a plan

5  injunction must be set forth in a plan.

6      The Court finds the objections to the Plan Injunctions to

7  be unfounded, and they are thus overruled without much

8  discussion here.

9      Now, lastly, the Gatekeeper Provision.  It appears at

10  Paragraph 4 of Article IX.F of the Plan and provides, in

11  pertinent part, "Subject in all respects to Article XII.D, no

12  Enjoined Party may commence or pursue a claim or cause of

13  action of any kind against any Protected Party that arose or

14  arises from or is related to the Chapter 11 case, the

15  negotiation of the Plan, the administration of the Plan, or

16  property to be distributed under the Plan, the wind-down of

17  the business of the Debtor or Reorganized Debtor, the

18  administration of the Claimant Trust or the Litigation Sub-

19  Trust, or the transactions in furtherance of the foregoing,

20  without the Bankruptcy Court (1) first determining, after

21  notice and a hearing, that such claim or cause of action

22  represents a colorable claim of any kind, including but not

23  limited to negligence, bad faith, criminal misconduct and

24  willful misconduct, fraud, or gross negligence against a

25  Protected Party; and (2) specifically authorizing such

45

1  Enjoined Party to bring such claim or cause of action against

2  such Protected Party, provided, however, that the foregoing

3  will not apply to a claim or cause of action against Strand or

4  against any employee other than with respect to actions taken,

5  respectively, by Strand or any such employee from the date of

6  appointment of the Independent Directors through the effective

7  date.  The Bankruptcy Court will have sole and exclusive

8  jurisdiction to determine whether a claim or cause of action

9  is colorable and, only to the extent legally permissible and

10  as provided for in Article XI, shall have jurisdiction to

11  adjudicate the underlying colorable claim or cause of action."

12      This gatekeeper provision appears necessary and reasonable

13  in light of the litigiousness of Mr. Dondero and his

14  controlled entities that has been described at length herein.

15  Provisions similar to this have been approved in this district

16  in the *Pilgrim's Pride* case and the *CHC Helicopter* case.  The

17  provision is within the spirit of the Supreme Court's Barton

18  Doctrine.  And it appears consistent with the notion of a pre-

19  filing injunction to deter vexatious litigants that has been

20  approved by the Fifth Circuit in such cases as *Baum v. Blue*

21  *Moon Ventures*, 513 F.3d 181, and in the *In re Carroll* case,

22  850 F.3d 811, which arose out of a bankruptcy pre-filing

23  injunction.

24      The Fifth Circuit, in fact, noted in the *Carroll* case that

25  federal courts have authority to enjoin vexatious litigants

46

1    under the All Writs Act, 28 U.S.C. § 1651.  And additionally,

2    under the Bankruptcy Code, a bankruptcy court can issue any

3    order, including a civil contempt order, necessary or

4    appropriate to carry out the provisions of the Code, citing,

5    of course, 105 of the Bankruptcy Code.

6         The Fifth Circuit stated that, when considering whether to

7    enjoin future filings against a vexatious litigant, a

8    bankruptcy court must consider the circumstances of the case,

9    including four factors:  (1)  the party's history of

10   litigation; in particular, whether he has filed vexatious,

11   harassing, or duplicative lawsuits; (2) whether the party had

12   a good faith basis for pursuing the litigation, or perhaps

13   intended to harass; (3) the extent of the burden on the courts

14   and other parties resulting from the party's filings; and (4)

15   the adequacy of alternatives.

16        In the *Baum* case, the Fifth Circuit stated that the

17   traditional standards for injunctive relief -- *i.e.*,

18   irreparable harm and inadequate remedy at law -- do not apply

19   to the issuance of an injunction against a vexatious litigant.

20        Here, although I have not been asked to declare Mr.

21   Dondero and his affiliated entities as vexatious litigants *per*

22   *se*, it is certainly not beyond the pale to find that his long

23   history with regard to the major creditors in this case has

24   strayed into that possible realm, and thus this Court is

25   justified in approving this provision.

47

1    One of the Objectors' lawyers stated very eloquently in

2    closing argument, in opposing the plan injunction and

3    gatekeeping provisions, that "Even a serial killer has

4    constitutional rights," suggesting that these provisions would

5    deprive Mr. Dondero and his controlled entities of fundamental

6    rights or due process somehow.  But to paraphrase the district

7    court in the *Carroll* case, no one, rich or poor, is entitled

8    to abuse the judicial process.  There exists no constitutional

9    right of access to the courts to prosecute actions that are

10   frivolous or malicious.  The Plan injunction and gatekeeper

11   provisions in Highland's plan simply set forth a way for this

12   Court to use its tools, its inherent powers, to avoid abuse of

13   the court system, protect the implementation of the Plan, and

14   preempt the use of judicial time that properly could be used

15   to consider the meritorious claims of other litigants.

16   Accordingly, the Objectors' objections to this provision

17   are overruled.

18   As earlier stated, this Court reserves the right to alter

19   or supplement this ruling in a written order.  In this regard,

20   the Court directs Debtor's counsel -- I hope you are still

21   awake; it's been a long time -- the Court directs Debtor's

22   counsel to submit a form of order.  And specifically, I assume

23   that you've already prepared or have been in the process of

24   preparing a set of findings of fact, conclusions of law, and

25   confirmation order that tracks the confirmation evidence and

50

1    to win, I turned it off.

2        I'm sorry.  That's terrible.  You know, my law clerk, my

3    law clerk that you can't see, Nate, he is from Ann Arbor,

4    Michigan, University of Michigan, and he almost cried when I

5    said I didn't like Tom Brady the other day.  So, I apologize.

6            MR. POMERANTZ:  Your Honor, one other comment.  We

7    had our motion to assume our nonresidential real property

8    lease that was also on.  It got missed in all the fanfare, but

9    it was -- it has been unopposed and essentially done pursuant

10   to stipulation.  So we'd like to submit an order on that as

11   well.

12           THE COURT:  Okay.  I have seen that, and I approve it

13   under 365.  You may submit the order.  Okay.  Thank you.

14           MR. POMERANTZ:  Thank you, Your Honor.

15           THE CLERK:  All rise.

16       (Proceedings concluded at 10:35 a.m.)

17                            --oOo--

18

19

20                          CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                        **02/09/2021**

24   _____      _____
     Kathy Rehling, CETD-444                           Date
25   Certified Electronic Court Transcriber

# EXHIBIT N

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION
 2
                                      )    Case No. 19-34054-sgj-11
 3   In Re:                           )    Chapter 11
                                      )
 4   HIGHLAND CAPITAL                  )    Dallas, Texas
     MANAGEMENT, L.P.,                 )    Tuesday, February 23, 2021
 5                                     )    9:00 a.m. Docket
              Debtor.                  )
 6   _____)
                                      )
 7   HIGHLAND CAPITAL                  )    Adversary Proceeding 20-3190-sgj
     MANAGEMENT, L.P.,                 )
 8                                     )
              Plaintiff,               )    PLAINTIFF'S MOTION FOR ORDER
 9                                     )    REQUIRING JAMES DONDERO TO
     v.                               )    SHOW CAUSE WHY HE SHOULD NOT
10                                     )    BE HELD IN CIVIL CONTEMPT FOR
     JAMES D. DONDERO,                 )    VIOLATING THE TRO [48]
11                                     )
              Defendant.               )
12   _____)
                                      )
13   HIGHLAND CAPITAL                  )    Adversary Proceeding 21-3010-sgj
     MANAGEMENT, L.P.,                 )
14                                     )
              Plaintiff,               )    DEBTOR'S EMERGENCY MOTION FOR
15                                     )    MANDATORY INJUNCTION REQUIRING
     v.                               )    THE ADVISORS TO ADOPT AND
16                                     )    IMPLEMENT A PLAN FOR THE
     HIGHLAND CAPITAL MANAGEMENT )     TRANSITION OF SERVICES BY
17   FUND ADVISORS, L.P.,              )    FEBRUARY 28, 2021 [2]
     et al.,                          )
18                                     )
              Defendants.              )
19   _____)
```

20                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
21               UNITED STATES BANKRUPTCY JUDGE.

22   WEBEX/TELEPHONIC APPEARANCES:

23   For the Debtor/Plaintiff:   Jeffrey N. Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
24                               10100 Santa Monica Blvd.,
                                  13th Floor
25                               Los Angeles, CA  90067-4003
                                 (310) 277-6910

231

1    really was just a termination of the agreement, in accordance

2    with the terms.  And I had put the provisions up before the

3    Court during my opening and walked Mr. Seery through.  That's

4    the basis for the --

5              THE COURT:  Okay.

6              MR. MORRIS:  -- termination of the agreement.  It's

7    not rejection at all.

8              THE COURT:  Fair point.

9              MR. RUKAVINA:  And Your Honor, there's no -- there's

10   no -- yeah, there's no problem.  There's no problem on that.

11   We do not disagree.  We do not disagree with Mr. Morris.

12             THE COURT:  Fair point.  I made the mistake of belts

13   and suspenders, trying to fill in any hole there might be.

14   But yes, I had the evidence that there was a termination of

15   both agreements on November 30th.  One of them had a 60-day

16   window before it became effective, the other a 30-day.  So

17   they are terminated.

18       All right.  Mr. Morris, anything else from you?

19             MR. MORRIS:  No.  We'll prepare a form of order.

20             THE COURT:  All right.  Mr. Rukavina, anything

21   further from you?

22             MR. RUKAVINA:  Your Honor, obviously, I have

23   questions.  I have reservations.  I need to look at whether

24   the Court's findings are going to be binding in this adversary

25   proceeding.  So, at this point in time, I'm just not prepared

232

1  to really say anything lest I get myself in trouble.  But I

2  thank you for your time today.

3          THE COURT:  All right.  Well, they are what they are,

4  and I hope we're not in an argument about that down the road.

5  But it seems like my hopes are always dashed when I want

6  things to be worked out.

7      I don't want you to think my calm demeanor means I am a

8  happy camper.  I am not.  I am beyond annoyed.  I mean, I

9  can't even begin to guesstimate how many wasted hours were

10  spent on the drafting Option A, Option B.  Wait.  Let me pull

11  up the exact words.  Mr. Norris confirming, We withdrew Option

12  B after the Debtor accepted it.

13      I mentioned fee-shifting once before in a different

14  context, and, of course, we haven't even gotten to the motion

15  for a show cause order declaring Mr. Dondero in contempt.  I

16  don't know if the lawyers fully appreciate how this looks.

17  Mr. Rukavina, you said that I have formed opinions that you

18  don't think are fair and made comments about vexatious

19  litigation and whatnot.  But while I continue, I promise you,

20  to have an open mind, it is days like this that make me come

21  out with statements that Mr. Dondero, repeating his own words,

22  apparently, he's going to burn the house down if he doesn't

23  get his baby back.

24      I mean, it seems so obviously transparent that he's just

25  driving the legal fees up.  It's as though he doesn't want the

233

1  creditors to get anything, is the way this looks.  If he wants

2  me to have a different impression, then he needs to start

3  behaving differently.  I mean, I can't even imagine how many

4  hundreds of thousands of dollars of legal fees were probably

5  spent the past two weeks on Option A, Option B, and all the

6  different sub-agreements and whatnot.  And as recently as

7  Friday afternoon, the K&L Gates lawyer saying we have a deal,

8  and then, oh, wait, maybe not, maybe we do, maybe we don't.

9  And then Mr. Dondero acting like he had no clue what the K&L

10 Gates lawyers were saying as far as we have a deal.  And Mr.

11 Norris distancing himself from having seen any of that, and I

12 didn't have power.  You know, I'm sure he had a cell phone,

13 like the rest of us, that gets emails.  I'm making a

14 supposition.  I shouldn't make that.  But it just feels like

15 sickening games.

16     And again, if this keeps on, if this keeps on, one day,

17 one day, there may be an enormous attorney fee-shifting order.

18 And, of course, I would have to find bad faith, and I wouldn't

19 be surprised at all if I get there.

20     So I don't know if Mr. Dondero is listening.  I suspect,

21 if he is, he doesn't care much.  But I am --

22          MR. DONDERO:  I'm on the line, Judge.

23          THE COURT:  Okay.

24          MR. DONDERO:  I'm on the line.

25          THE COURT:  I'm glad you're on the line.  I cannot

234

1    overstate how very annoyed I am by hearing all these hours of

2    testimony and to feel like none of it was necessary.  None of

3    it was necessary.  Okay?  There could have been a consensual

4    deal --

5            MR. DONDERO:  Judge, you have to pay attention --

6    Judge, you have to pay attention to what's going on, okay?

7            THE COURT:  I am --

8            MR. DONDERO:  When I was president of Highland, --

9            THE COURT:  -- razor-sharp focused on what is going

10   on.  Okay?  I read every piece of paper.  I listen to every

11   sentence of testimony.  And what is going on --

12           MR. DONDERO:  Okay.  How about this, Your Honor?

13           THE COURT:  -- is an enormous waste of parties and

14   lawyer time and resources.  People need to get their eye on

15   the ball.  Well, certain people do have their eye on the ball,

16   but certain people do not.  Okay?  So we're done.  You've got

17   your divorce now.  Okay?  And if the operating plan is all

18   shored up, as Mr. Norris testified, it sounds like you're in

19   good shape.  All right?

20       Mr. Morris, I'll look for the order from you.

21           MR. MORRIS:  Thank you, Your Honor.

22           THE CLERK:  All rise.

23       (Pause.)

24           THE COURT:  Oh, Michael?

25       (Court confers with Clerk.)

235

1          THE CLERK:  Hello?  Hang on.  Mr. Morris?

2          THE COURT:  Is anyone still there?

3          THE CLERK:  Mr. Rukavina is still there.  Mr.

4   Rukavina, Mr. Morris, are you all still there?

5          MR. RUKAVINA:  Judge, this is Davor.

6          THE COURT:  All right.

7          MR. RUKAVINA:  I think we're all wondering whether

8   we're going to have the contempt hearing.

9          THE COURT:  Well, yes, that's why I came back in.

10          MR. RUKAVINA:  I can't hear you, Judge.  We can't

11   hear you.

12          THE COURT:  I realized I -- it's 4:19 Central time.

13   We are not starting the contempt hearing.

14      Mr. Morris, are you there now?

15          MR. MORRIS:  I am.  I did have one suggestion.

16          THE COURT:  All right.  I neglected to mention our

17   other setting, but we are not going to start at 4:19 Central

18   time.  Do we want to talk about scheduling on that?

19          MR. MORRIS:  I did, Your Honor.  And it's just an

20   idea, and I understand we've had a long day.  But I was going

21   to suggest if there was any way to just get their motion *in*

22   *limine* out of the way today, so that when we come back for the

23   evidentiary hearing parties are fully prepared.  If you don't

24   want to do it, that's fine.  Otherwise, I'm available at Your

25   Honor's convenience.

238

1          THE CLERK:  All rise.

2      (Proceedings concluded at 4:23 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                  CERTIFICATE

21      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        **02/24/2021**

24  _____          _____
   Kathy Rehling, CETD-444                     Date
25  Certified Electronic Court Transcriber

# EXHIBIT O

```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
 2                             DALLAS DIVISION

 3                                    )    Case No. 19-34054-sgj-11
         In Re:                       )    Chapter 11
 4                                    )
         HIGHLAND CAPITAL             )    Dallas, Texas
         MANAGEMENT, L.P.,            )    Monday, May 10, 2021
 5                                    )    1:30 p.m. Docket
                                      )
 6              Debtor.               )
         _____)
 7                                    )
         HIGHLAND CAPITAL             )    Adversary Proceeding 20-3190-sgj
         MANAGEMENT, L.P.,            )
 8                                    )
                                      )
 9              Plaintiff,            )    - TRIAL DOCKET CALL
                                      )    - DEFENDANT'S EMERGENCY MOTION
         v.                           )      TO STAY PROCEEDINGS PENDING
10                                    )      RESOLUTION OF DEFENDANT'S
                                      )      PETITION FOR WRIT OF
11       JAMES D. DONDERO,           )      MANDAMUS [154]
                                      )
12              Defendant.            )
         _____)

13                         TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                    UNITED STATES BANKRUPTCY JUDGE.

15       WEBEX APPEARANCES:

16       For the Plaintiff:          John A. Morris
                                     PACHULSKI STANG ZIEHL & JONES, LLP
17                                   780 Third Avenue, 34th Floor
                                     New York, NY  10017-2024
18                                   (212) 561-7700

19       For the Plaintiff:          Jeffrey Nathan Pomerantz
                                     PACHULSKI STANG ZIEHL & JONES, LLP
20                                   10100 Santa Monica Blvd.,
                                      13th Floor
21                                   Los Angeles, CA  90067-4003
                                     (310) 277-6910
22

23

24

25
```

42

1    permanent.  I mean, I understand the -- well, right, I mean,

2    with respect to the relief being sought, but with respect to

3    preliminary (garbled) in attendance at the preliminary

4    injunction hearing.

5             THE COURT:  Okay.  Unfortunately, you have

6    connectivity issues suddenly.

7             MR. WILSON:  You know, I've got -- I've got a

8    different view on those things.  I mean, the contempt hearing

9    has some things --

10            THE COURT:  Mr. Wilson, I don't know if --

11            MR. WILSON:  And I think we lost Mr. Morris on the

12   screen.  Can you hear --

13            THE COURT:  -- you can hear me, but we suddenly have

14   very bad connectivity.

15            MR. WILSON:  Can you hear me?

16            THE COURT:  Your screen is frozen, your video is

17   frozen, and I really didn't get any of the last two minutes.

18            MR. WILSON:  Is it better now, Your Honor?

19            THE COURT:  Well, I heard you say, "Is it better

20   now?"

21            MR. WILSON:  I'm going to log off and log back on.

22            THE COURT:  Okay.  We're going to have to -- we're

23   going to have to cut this --

24            MR. WILSON:  I'm going to try to log off and log on.

25            THE COURT:  No.  I'm ready to be finished with this

43

1   hearing.  You need to go back and look at this, because I am

2   leaning towards what Mr. Morris is arguing, and that is that

3   this is really bad faith.  Okay?  There is no change of

4   issues.  It's been the same issue at the TRO hearing, at the

5   preliminary injunction hearing.  Okay.  The motion for

6   contempt, we were looking backwards a little at behavior.  But

7   the issues are not expanded.  Okay?  It's just duration of the

8   injunction.  And now a slightly skinnied-down injunction.

9        So, of course, I am willing to consider evidence I've

10  heard at the TRO hearing and the preliminary injunction

11  hearing.  And I would note that on many, many, many of these

12  exhibits, you didn't object.  Or if you did, you argued it and

13  I overruled it.

14       So you need to go back and look at this and think hard

15  whether you're really going to press these issues at the

16  trial.  Okay?  This is -- again, *Dondi*, we require counsel to

17  work in good faith to streamline trials and work with people.

18  If you can agree, if you can stipulate to evidence, that's

19  what you need to do.  And this looks like -- I don't know what

20  it looks like.  But if this is any guidance to you, it should

21  be, if I admitted it at the TRO hearing, if I admitted it at

22  the preliminary injunction hearing, it's fair game to consider

23  it now.

24       Here's the last thing I want to say, and this is very big-

25  picture, not unique to this adversary proceeding.

44

1       Can everyone hear me okay?  I don't know if we're having

2   connectivity issues.  Can everyone hear me?

3               MR. MORRIS:  Yes, Your Honor.

4               THE COURT:  Can you hear me, Mr. Wilson?

5               MR. MORRIS:  Yes, Your Honor.

6               MR. WILSON:  Yes, Your Honor.

7               THE COURT:  Okay.  I have been pondering something

8   the past few days.  And I haven't figured out how I want to

9   address it, but maybe Mr. Dondero's counsel and counsel from

10  some of the Dondero-controlled entities, maybe they can listen

11  to what I'm about to say and figure out a solution.

12      As you all know, there are so many law firms, so many

13  lawyers involved now that are basically singing the same tune

14  at a lot of these hearings as far as objections, me too, me

15  too, me too.  And so just quickly eyeballing what we have, we

16  obviously have Mr. Dondero represented by Bonds Ellis.  There

17  is another firm that represents Mr. Dondero that filed a

18  motion asking that I recuse myself.  I can't remember the name

19  of that firm, but I think they appealed my denial of that

20  motion.  So, I can't remember who that was.  Then we have the

21  various affiliates.  We have -- well, I'll just start

22  chronologically.  Highland CLO Funding, Ltd. has historically

23  been represented by King & Spalding.  I don't know if that's

24  -- I know there were some changes there with the ownership of

25  that entity, so maybe they're gone.  But then we have NexPoint

54

1    Can we just have an hoc committee each time?

2        I don't even think I listed all the law firms.  I know a

3    new law firm filed a lawsuit in front of Judge Jane Boyle

4    recently.  We've got a hearing on that coming up in June.  I

5    mean, and now you're -- I'm hearing there are going to be

6    more.  Well, if you don't figure out a way to rein it in, then

7    I'm just going to have to get that list of who are the

8    stakeholders in these entities, under oath, because I don't

9    understand it.  I don't understand why we need these many

10   lawyers filing position papers.

11       So, all right.  Well, we're going to adjourn, and I guess

12   I'll see you next Monday, right?

13           MR. MORRIS:  Thank you, Your Honor.  Yes.

14           THE COURT:  Okay.  Thank you.

15           THE CLERK:  All rise.

16       (Proceedings concluded at 3:07 p.m.)

17                       --oOo--

18

19

20                    CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                    **05/11/2021**

24   _____      _____
     Kathy Rehling, CETD-444                    Date
25   Certified Electronic Court Transcriber

# EXHIBIT P

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 19-34054-sgj11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) |
| | ) |
| Debtor. | ) |
| | ) |
| ──────────────────────────── | ) |
| | ) |
| OFFICIAL COMMITTEE OF UNSECURED | ) Adv. Proc. No. 20-03195-sgj |
| CREDITORS, | ) |
| | ) PLAINTIFF'S MOTION for |
| Plaintiff, | ) CONTINUANCE |
| | ) |
| v. | ) |
| | ) |
| CLO HOLDCO, LTD., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| ──────────────────────────── | ) |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) Adv. Proc. No. 21-03003-sgj |
| | ) |
| Plaintiff, | ) |
| | ) DEFENDANT DONDERO'S MOTION |
| v. | ) to COMPEL DISCOVERY, the |
| | ) TESTIMONY OF JAMES P. |
| JAMES DONDERO, | ) SEERY, JR. |
| | ) |
| Defendant. | ) May 20, 2021 |
| ──────────────────────────── | ) Dallas, Texas (Via WebEx) |

Appearances in 21-03003:

For Plaintiff Highland        John A. Morris
Capital Management,          Pachulski Stang Ziehl & Jones LLP
                             10100 Santa Monica Bᵒᵘlevard, 13th Floor
                             Los Angeles, California  90067

For Defendant-Movant         Michael P. Aigen
James Dondero:               Stinson, L.L.P.
                             3102 Oak Lawn Avenue, Suite 777
                             Dallas, Texas  75219

                             Bryan C. Assink
                             Bonds Ellis Eppich Schafer Jones LLP
                             420 Throckmorton Street, Suite 1000
                             Forth Worth, Texas  76102

Appearances continued on next page.

*Adversary 21-3003, Motion to Compel Discovery*                    19

1   We — it was more just a coordination thing.  We intend that he

2   will be at all hearings before, Your Honor, you know, Friday's

3   hearing and substantive hearings.  I just — I think this is more

4   of a coordination issue, Your Honor, and I apologize.

5              THE COURT:  Okay.

6              MR. ASSINK:  There has been a lot going on.

7              THE COURT:  Oh, don't I know.  There's two of us, me

8   and my Law Clerk working on this, and there are a bunch of

9   y'all.  So, yes, I feel — I feel absolutely what you feel and

10  more as far as a lot going on.

11             So let me clarify.  My language that ordered Mr.

12  Dondero to be at every hearing was in the preliminary injunction

13  that's now superseded by the agreed order y'all announced

14  Tuesday.  So are you telling me you thought now that mandate

15  didn't apply?  Is that one of the things —

16             MR. ASSINK:  Not — not specifically, Your Honor, —

17             THE COURT:  — I'm hearing?

18             MR. ASSINK:  Not specifically, Your Honor.  We thought

19  perhaps the formal mandate in the order was no longer applying,

20  but our understanding was you would want Mr. Dondero at

21  substantive hearings going forward, and that has been our

22  understanding.  And we would expect him to be before Your Honor

23  at all such hearings.  Part of the basis, the reasoning he's not

24  here today was perhaps as an oversight on my part due to the

25  scheduling, and I had a lot of deadlines yesterday and I think

*Adversary 21-3003, Motion to Compel Discovery*                    20

1    it just maybe fell through the cracks, and I apologize, Your

2    Honor.

3              THE COURT:  All right.

4              MR. ASSINK:  You know, we — Your Honor, —

5              THE COURT:  Well, I'm going to say a couple of things.

6    You know this could have been raised Tuesday, when we were here

7    on the adversary proceeding, in which the preliminary injunction

8    was issued, okay, it would have been — it would have been wise,

9    it would have been very wise to raise the issue.

10             Second, it screams irony, if nothing else, that at a

11   time when I have under advisement a motion to hold Mr. Dondero

12   in contempt of Court that there would be a trip-up, the

13   second-recent trip-up, by the way, where he didn't appear at a

14   hearing.  There was a time a few weeks ago, two or three weeks

15   ago, can't remember what hearing it was then, but he wasn't

16   here.

17             Okay.  The —

18             MR. ASSINK:  Well, Your Honor, I just want to say —

19             THE COURT:  — the third thing I'm going to say — the

20   third thing I'm going to say is I guess I'll issue an order in

21   the main case now, you know, a one- or two-sentence order in the

22   main case saying repeating the sentence that was in the

23   preliminary injunction, that he's going to show up at every

24   hearing.  I never said only at substantive hearings.  The only

25   thing I hesitated on at all, because I've done this in other

*Adversary 21-3003, Motion to Compel Discovery*          21

1    cases, is sometimes I'll say any hearing at which, you know, the

2    person is taking a position, okay, an opposition, an objection,

3    you know, even if you file a pleading taking a neutral stand, if

4    he's going to file a pleading that requires the Court and all

5    the lawyers' attention to some extent, he's going to need to be

6    in court.  So that's something I thought about doing, but then I

7    was reminded, that I said, no, he's just going to be at all

8    hearings in the future.

9          And procedural, substantive, I never made that

10   distinction and I never would because — because it's taking up

11   time, it's taking up time of the Court, lawyers, parties.  And

12   if he is going to use the offices of this Court or, you know,

13   take up the time of any lawyers, then he needs to be a part of

14   it, okay?

15         MR. ASSINK:  Your Honor, yes, I —

16         THE COURT:  So I thought I made that very clear the

17   last time he didn't show up, but I think —

18         MR. ASSINK:  Your Honor, I apologize.  You know that's

19   certainly not our intention here.  We've been rushing around.  I

20   think this is more — this is more on — on me and just the fast

21   pace with everything.  We would intend that he would be here at

22   all hearings.  We're not trying to make any exception.  We're

23   not trying to say that the preliminary injunction got rid of his

24   obligation to be before, Your Honor.  You know, we weren't clear

25   exactly what the directive was for these kinds of hearings, or

*Adversary 21-3003, Motion to Compel Discovery*                    22

1   at least perhaps I wasn't fully, and — but, nevertheless, Your

2   Honor, we would — we would have had him be here.  I think the

3   fast pace with the hearing settings and just everything going

4   on, it might have slipped through the cracks.  It's not — there

5   was no ill will with him not being here, Your Honor.  I

6   apologize.  It's just an oversight on our part.  We would

7   anticipate that he will be here for all future hearings.  You

8   know it's no disrespect to the Court.  It was not an intentional

9   thing.  We apologize, Your Honor.  So I understand the Court's

10  comments.  It's — but I just want to make clear it's we're not

11  trying to be cute, we're not trying to say that, oh, the

12  preliminary injunction is gone, he doesn't have to be here.

13  That's not our intention, Your Honor.  It was I think just an

14  oversight and a scheduling issue this time, but Mr. Dondero will

15  of course appear before Your Honor in all matters going forward,

16  so I apologize.

17          THE COURT:  All right.  Well, again, you're

18  scheduling.  You sought the scheduling, you sought the emergency

19  hearing, and this is the second time we've had this discussion

20  in less than a month.

21          All right.  So, Mr. Morris, back to you.  I think —

22          MR. MORRIS:  Yeah.

23          THE COURT:  — you were about to answer the question of

24  if Mr. Seery is going to be produced and talk about 13 different

25  topics, why is it a big deal to talk about these other seven

*The Court's Ruling on the Motion to Compel*                              33

1   that condition subsequent was, it was the liquidation of certain

2   assets.  Since the liquidation of those assets has not been

3   completed, by definition, no other maker could have had a note

4   or an oral agreement or an agreement of any kind of the type

5   that Mr. Dondero has.  So yet another reason why it fails to

6   meet the burden, they fail to meet the burden under Rule 26.

7   Nobody could have ever had the same note forgiven or agreement,

8   because the condition subsequent hasn't been met yet.

9                  THE COURT'S RULING ON THE MOTION TO COMPEL

10             THE COURT:  All right.  Well, I'm going to deny the

11   motion to compel.  I don't think that the burden has been met to

12   establish the relevance of these, I guess it's — one, two,

13   three, four, five — six topics that are now at issue, topics 9,

14   14 through 17, or 20, and, you know, I don't think the

15   proportionality standard is met here.

16             I do think it would be not proportionate to the needs

17   of the case for the CEO, who came in place in 2020,

18   postpetition, two years after these notes were executed, to have

19   to go do research about any loans made by Highland to any

20   officers and employees over the years and, you know, I don't

21   know who he's going to question, what policy he is going to look

22   into that might be some substance or evidence as to oral

23   agreements or forgiveness.  I don't think he should have any

24   obligation to search files and interview people to figure out

25   what the affirmative defenses and Mr. Dondero are all about or

*The Court's Ruling on the Motion to Compel*                    34

1   based in.  And, again, no one would have better information

2   about his own compensation than Mr. Dondero himself.

3          I mean I want to stress that this comes against a

4   backdrop of — well, it seems like some antagonism, to say the

5   least, on the part of Mr. Dondero where Mr. Seery's concerned.

6   It seems like it's always a fight with Mr. Seery.  And you say,

7   well, we didn't handpick him as the 30(b)(6) witness, but, you

8   know, the motion to compel names him by name.  It just — it

9   feels like another antagonistic move.

10          You've got him for a deposition next Monday on 13 or

11  so different topics.  I think it is appropriate to draw the line

12  on these six or so topics that again just don't seem relevant or

13  proportional to the needs of the case.

14          All right.  So, Mr. Morris, would you please upload

15  just a simple order reflecting the Court's ruling?

16          MR. MORRIS:  I would be happy to, Your Honor.

17          THE COURT:  Okay.  Actually I'm going to ask Mr. Aigen

18  to do it.  I'm sorry.  I need to be thinking about attorney's

19  fees and who should bear the costs of what.

20          So, Mr. Aigen, would you please electronically submit

21  an order?

22          MR. AIGEN:  Yes.

23          THE COURT:  All right.  Thank you.

24          All right.  Well, if there's nothing else on this

25  particular adversary, let me just double check.  Any

*Adversary 20-3195, Committee's Motion to Stay*                    35

1    housekeeping matters before I move onto the other adversary?

2              MR. AIGEN:  Not from the debtor, Your Honor.

3              MR. CLUBOK:  Your Honor, —

4              THE COURT:  All right.

5              MR. CLUBOK:  I don't know if you're about to move on.

6    Your Honor, can you hear me?

7              THE COURT:  I'm sorry, Mr. Clubok?

8              MR. CLUBOK:  Your Honor, —

9              THE COURT:  Were you weighing in on —

10             MR. CLUBOK:  Yeah, I'm — I'm sorry.  It's not about

11   that proceeding, but are you about to move on beyond — beyond

12   the Highland matters?

13             THE COURT:  No, no, no.

14             MR. CLUBOK:  There was another Highland matter —

15             THE COURT:  I was next — I was next going to go to the

16   other adversary, the dispute between the committee and seven or

17   so defendants.  And, yes, I know we have UBS I guess all day

18   tomorrow unless anything has changed.  So we'll — we'll hear

19   before we're done any previews about tomorrow.

20             All right, so moving on —

21             MR. CLUBOK:  Thank you.

22             THE COURT:  — the Committee versus CLO Holdco,

23   20-3195.  We have a committee motion to basically stay the

24   adversary proceeding for 90 days.  So I will get lawyer

25   appearances on that.

State of California           )
                             )      SS.
County of San Joaquin         )


        I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of Texas, Office of
the Clerk, of the proceedings taken on the date and time
previously stated in the above matter.

        I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer
Reporting Services is approved by the Administrative Office of
the United States Courts to officially prepare transcripts for
the U.S. District and Bankruptcy Courts.


                              Susan Palmer
                              Palmer Reporting Services

                              Dated May 22, 2021

# EXHIBIT Q

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                       )   Case No. 19-34054-sgj-11
 3   In Re:                            )   Chapter 11
                                       )
 4   HIGHLAND CAPITAL                  )   Dallas, Texas
     MANAGEMENT, L.P.,                 )   Tuesday, June 8, 2021
 5                                     )   9:30 a.m. Docket
                                       )
          Debtor.                      )
 6                                     )   - SHOW CAUSE HEARING (2255)
                                       )   - MOTION TO MODIFY ORDER
 7                                     )     AUTHORIZING RETENTION OF
                                       )     JAMES SEERY (2248)
 8                                     )   - MOTION FOR ORDER FURTHER
                                       )     EXTENDING THE PERIOD WITHIN
 9                                     )     WHICH DEBTOR MAY REMOVE
                                       )     ACTIONS (2304)
10   _____)

11                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
12                UNITED STATES BANKRUPTCY JUDGE.

13   APPEARANCES:

14   For the Debtor:            Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
15                              10100 Santa Monica Blvd.,
                                  13th Floor
16                              Los Angeles, CA  90067-4003
                                (310) 277-6910
17
     For the Debtor:            John A. Morris
18                              Gregory V. Demo
                                PACHULSKI STANG ZIEHL & JONES, LLP
19                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
20                              (212) 561-7700

21   For the Debtor:            Zachery Z. Annable
                                HAYWARD & ASSOCIATES, PLLC
22                              10501 N. Central Expressway,
                                  Suite 106
23                              Dallas, TX  75231
                                (972) 755-7104
24

25
```

293

1   the Committee maintaining a two-person membership at this

2   point.

3        In terms of whether the MGM transaction is a game-changer,

4   we've not yet seen, to Your Honor's point, how all of that

5   rolls up through the various interests that the Debtor may or

6   -- you know, may have --

7             THE COURT:  Okay.

8             MR. CLEMENTE:  -- that would be implicated by the MGM

9   transaction.  If ultimately the MGM transaction has to

10  actually occur, right?  I mean, so, you know, just based on

11  what I read in the public documents, we're not sure when that

12  transaction may actually happen.  But obviously it's a good

13  thing for the Debtor's estate because it's going to recognize

14  value for the estate.

15       In terms of whether it ultimately changes how Mr. Dondero,

16  you know, wishes to proceed, that's entirely up to him, Your

17  Honor.  But we don't see it as something at this point that

18  would suggest that there's an overall back to let's talk about

19  a pot plan because of where the MGM transaction might

20  ultimately come out.

21       So I don't know if that's helpful to Your Honor, but those

22  are -- that's my perspective.

23            THE COURT:  Well, and I'm not trying to, you know,

24  push a pot plan on anyone.

25            MR. CLEMENTE:  No, I understand.

294

1          THE COURT:  I'm just saying it looked like an

2     economic windfall.  I just -- I don't know how much is

3     Highland versus other entities in the so-called byzantine

4     complex, but, gosh, I just hoped that there might be something

5     there to change the dynamic of, you know, lawsuit, lawsuit,

6     lawsuit, lawsuit, motion for contempt, motion for contempt.

7          MR. CLEMENTE:  Agreed, Your Honor.

8          THE COURT:  Uh-huh.

9          MR. CLEMENTE:  And like I said, it was a very

10    positive development obviously for the creditors for the

11    Debtor.  But whether it's the game-changer that Your Honor

12    would envision, I'm not sure that I can suggest at this point

13    that it is.

14       I think that, you know, obviously, we don't like to see

15    these lawsuits continue to be filed.  That's the whole point

16    of the gatekeeper order, Your Honor.

17          THE COURT:  Uh-huh.

18          MR. CLEMENTE:  I didn't say anything during the

19    hearing, but obviously the January 9th order, as Your Honor

20    has said many times, was in the context of a trustee being

21    appointed.

22          THE COURT:  Right.  Right.

23          MR. CLEMENTE:  Right?  So, and the July 16th order,

24    very similar vein, it's an outshoot of that.  In fact, it was

25    contemplated in the January 9th settlement that a CEO could be

295

1    appointed.

2        So I think, again, it's just -- it's important, the

3    context in which that January 9th order came into play, for

4    this very reason, so we could avoid this type of litigation,

5    Your Honor.

6                THE COURT:  Uh-huh.

7                MR. CLEMENTE:  And so again, I didn't -- I obviously

8    didn't rise to mention that during the hearing, but Your Honor

9    is already aware of that.  I didn't need to remind Your Honor

10   of that.

11               THE COURT:  Uh-huh.  Okay.

12               MR. CLEMENTE:  Anything else for me, Your Honor?

13               THE COURT:  No.  Thank you.

14               MR. CLEMENTE:  Okay, then, Your Honor.

15               THE COURT:  Sorry I picked on you.  But, all right.

16   Well, again, I hope the message has landed in the way I hope

17   will matter, and that is I'm going to look at your documents

18   but I feel very strongly that, unless there's something in

19   there that, whoa, is somehow eye-opening, I'm going to find

20   contempt of court.  It's just a matter of who and what the

21   damages are.  There's just not a thing in the world ambiguous

22   about Paragraph 5 of the July 9th, 2020 order.  So I'll get to

23   it as soon as we humanly can get to it.

24       Mr. Morris, anything else?

25               MR. MORRIS:  Nothing.  No, thank you.

296

1          THE COURT:  I guess I'll see you Thursday on the

2    WebEx.  Thank you.

3          THE CLERK:  All rise.

4      (Proceedings concluded at 6:00 p.m.)

5                    --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21      I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                        06/09/2021

24   _____    _____
     Kathy Rehling, CETD-444                     Date
25   Certified Electronic Court Transcriber

# EXHIBIT R

```
1                   IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
2                             DALLAS DIVISION

3    In Re:                         )   Case No. 19-34054-sgj-11
                                     )   Chapter 11
4    HIGHLAND CAPITAL               )
     MANAGEMENT, L.P.,              )   Dallas, Texas
5                                    )   Thursday, June 10, 2021
              Debtor.               )   9:30 a.m. Docket
6                                    )
                                     )   MOTION TO COMPEL COMPLIANCE
7                                    )   WITH BANKRUPTCY RULE 2015.3
                                     )   FILED BY GET GOOD TRUST AND
8                                    )   THE DUGABOY INVESTMENT TRUST
     _____)   (2256)
9                                    )
     HIGHLAND CAPITAL               )   Adversary Proceeding 21-3006-sgj
10   MANAGEMENT, L.P.,              )
                                     )
11        Plaintiff,                )   DEFENDANT'S MOTION FOR LEAVE
                                     )   TO FILE AMENDED ANSWER AND
12   v.                             )   BRIEF IN SUPPORT [15]
                                     )
13   HIGHLAND CAPITAL               )
     MANAGEMENT SERVICES, INC.,     )
14                                   )
          Defendant.               )
15   _____)
                                     )
16   HIGHLAND CAPITAL               )   Adversary Proceeding 21-3007-sgj
     MANAGEMENT, L.P.,              )
17                                   )
          Plaintiff,                )   DEFENDANT'S MOTION FOR LEAVE
18   TO                             )   TO AMEND ANSWER TO PLAINTIFF'S
     v.                             )   COMPLAINT [16]
19                                   )
     HCRE PARTNERS, LLC             )
20   N/K/A NEXPOINT REAL            )
     ESTATE PARTNERS, LLC,          )
21                                   )
          Defendant.               )
22   _____)

23              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
24              UNITED STATES BANKRUPTCY JUDGE.

25
```

86

1          MS. DRAWHORN:  Uh-huh.  Yes.  And I understand that,
2    Your Honor.  And the issue, I think, with you -- we need to
3    have this motion resolved, because it -- unless the Court is
4    going to continue discovery or stay.  You know, one of the
5    reasons why we had initially requested the expedited hearing
6    was because of the discovery is continued -- continuing to --
7    discovery deadlines are continuing to move.  And obviously
8    whatever the Court decides on this motion for leave to amend
9    will determine what the scope of that discovery is.
10         Similarly, if the Debtor decides to amend, that could
11   change the scope of discovery as well.
12         So we are open to continuing deadlines, and I think, you
13   know, might end up filing a motion to continue.  I haven't
14   conferred with Mr. Morris yet.  I suspect he's opposed, based
15   on our prior conversations.  But that's something that might
16   be helpful, especially if the Court is concerned on how it
17   will affect the motion to withdraw the reference, to -- maybe
18   we continue some of these upcoming deadlines, and that might
19   appease, you know, solve some of your concerns.
20         THE COURT:  All right.  Well, Rule 15(a), of course,
21   is the governing rule here, and the case law is abundant that
22   courts "should freely give leave when justice so requires."
23   And the law is also abundantly clear that the rule "evinces a
24   bias in favor of granting leave to amend."  And again and
25   again, cases say that leave should be granted unless there's

87

1  substantial reason to deny leave, and courts may consider

2  factors such as delay or prejudice to the non-movant, bad

3  faith or dilatory motives on the part of the movant, repeated

4  failure to cure deficiencies, or futility of the amendment.

5      While the Debtor has presented arguments that there might

6  be bad faith here on the part of the Movants and there might

7  be futility in allowing the amendments because of various

8  strong arguments and defenses the Debtor believes it has to

9  this issue of agreements with regard to the notes that

10 allegedly provide affirmative defenses, the Court believes the

11 rule requires me to allow leave to amend the answer.

12     Now, a couple of things.  I am going to require, though,

13 that the amended answer be more specific than has been

14 suggested.  I am going to agree that if new affirmative

15 defenses are made that there was this agreement to forgive

16 when certain conditions happened, then there does need to be

17 identification of who the human beings were that were involved

18 in making the agreement, the date of any agreement or

19 agreements, and disclose what documents substantiate the

20 agreement or reflect the agreement.  All right?  So if that

21 could --

22         MR. MORRIS:  Your Honor?

23         THE COURT:  Yes?

24         MR. MORRIS:  John Morris.  I apologize for

25 interrupting, but just a fourth thing is what is the

88

1    agreement?  I mean, what is the agreement?

2           THE COURT:  Well, okay.  That's fair enough.  What is

3    the agreement?  I guess --

4           MR. MORRIS:  And -- and --

5           THE COURT:  -- that needs to be spelled out.  I mean,

6    I guess I was assuming that that would be spelled out in --

7    but maybe it's not.  So we'll go ahead and add that.

8        As far as extension of the discovery, Ms. Drawhorn has

9    offered that.  I think it would be reasonable if the Debtor or

10   Plaintiff wants that.  Do you want an extension of discovery?

11          MR. MORRIS:  What I really want, Your Honor, is a

12   direction for them to serve this amended answer within 24 or

13   48 hours and grant leave to the Debtor to promptly file

14   written discovery.  We've got Nancy Dondero -- if it turns out

15   -- and maybe Ms. Drawhorn can just answer the question right

16   now.  Who entered the agreement on behalf of the Debtor?

17   Because I'm already taking Nancy Dondero's deposition on the

18   28th.  And it seems to me, if they would just answer the

19   question of whether Ms. Dondero is the person who did that, I

20   could just add a notice of deposition and take the deposition

21   on that date, too, and it would be, really, more efficient for

22   everybody.

23          THE COURT:  Ms. Drawhorn, who was the human being?

24          MS. DRAWHORN:  Yes.  It was -- yes, Nancy Dondero

25   entered into the -- the subsequent agreement.

90

 1        THE COURT:  Please upload an order, Ms. Drawhorn,

 2   granting your motion with these specific requirements that

 3   I've orally worked in.

 4      I think clients need to be careful what they ask for.  I'm

 5   very concerned.  And I know it was just argument and I'll hear

 6   evidence, but of all of the things that I guess -- well, I'm

 7   concerned about a lot of things, but do we have audited

 8   financial statements that didn't disclose these agreements

 9   with regard to --

10        MR. MORRIS:  Yes, Your Honor.

11        THE COURT:  I mean, that's -- I'm just -- you know,

12   there's a lot to be concerned about on that point alone, I

13   would think.  But, all right.  If there's nothing further, we

14   are adjourned.  Thank you.

15        THE CLERK:  All rise.

16      (Proceedings concluded at 11:58 a.m.)

17                        --oOo--

18

19                     CERTIFICATE

20      I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                          **06/12/2021**

23   _____        _____

     Kathy Rehling, CETD-444                        Date
24   Certified Electronic Court Transcriber

25

# EXHIBIT S

```
                     IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                    )  Case No. 19-34054-sgj-11
 3   In Re:                         )  Chapter 11
                                    )
 4   HIGHLAND CAPITAL               )  Dallas, Texas
     MANAGEMENT, L.P.,              )  Friday, June 25, 2021
 5                                  )  9:30 a.m. Docket
                                    )
          Debtor.                   )
 6                                  )
                                    )  EXCERPT:  MOTION FOR
 7                                  )  MODIFICATION OF ORDER
                                    )  AUTHORIZING RETENTION OF JAMES
                                    )  P. SEERY, JR. DUE TO LACK OF
 8                                  )  SUBJECT MATTER JURISDICTION
                                    )  (2248)
 9   ───────────────────────────────)

10                        TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11                    UNITED STATES BANKRUPTCY JUDGE.

12   WEBEX APPEARANCES:

13   For the Debtor:            Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
14                              10100 Santa Monica Blvd.,
                                  13th Floor
15                              Los Angeles, CA   90067-4003
                                (310) 277-6910
16
     For the Debtor:            John A. Morris
17                              PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
18                              New York, NY  10017-2024
                                (212) 561-7700
19
     For CLO Holdco, Ltd. and   Jonathan E. Bridges
20   The Charitable DAF Fund,   Mazin Ahmad Sbaiti
     LP:                        SBAITI & COMPANY, PLLC
21                              JP Morgan Chase Tower
                                2200 Ross Avenue, Suite 4900 W
22                              Dallas, TX  75201
                                (214) 432-2899
23
     For Get Good Trust and     Douglas S. Draper
24   Dugaboy Investment Trust:  HELLER, DRAPER & HORN, LLC
                                650 Poydras Street, Suite 2500
25                              New Orleans, LA  70130
                                (504) 299-3300
```

108

1   any exceptional circumstances to declare the order or any of

2   its provisions void.  The Movants have put on no evidence that

3   constitutes surprise or constitutes newly-disputed evidence.

4   So why are there no exceptional circumstances here such that

5   the Court might find, you know, a void order or void

6   provisions of an order?

7        First, this Court concludes that there's no credible

8   argument that the Court overreached its jurisdiction with the

9   gatekeeping provisions in the order.  Gatekeeping provisions

10  are not only very common in the bankruptcy world -- in

11  retention orders and in plan confirmation orders, for example

12  -- but they are wholly consistent with the *Barton* case, the

13  U.S. Supreme Court's *Barton's* case, and its progeny that has

14  become known collectively as the *Barton* doctrine.  Gatekeeping

15  provisions are wholly consistent with 28 U.S.C. Section

16  959(a)'s complete language.

17       The Fifth Circuit has blessed gatekeeping provisions in

18  all sorts of contexts.  It has blessed them in the situation

19  of when *Stern* claims are involved in the *Villegas* case.  It

20  even blessed Bankruptcy Courts' gatekeeping functions a long

21  time ago, in 1988, in a case that I don't think anyone

22  mentioned in the briefing, but as I've said, my brain

23  sometimes goes down trails, and I'm thinking of the *Louisiana*

24  *World Exposition* case in 1988, when the Fifth Circuit blessed

25  there a procedure where an unsecured creditors' committee can

109

1    bring causes of action against persons, such as officers and

2    directors or other third parties, if they first come to the

3    Bankruptcy Court and show a colorable claim.  They have to

4    come to the Bankruptcy Court, show they have a colorable claim

5    and they're the ones that should be able to pursue them.  Not

6    exactly on point, but it's just one of many cases that one

7    could cite that certainly approve gatekeeper functions of

8    various sorts of Bankruptcy Courts.

9         It doesn't matter which court might ultimately adjudicate

10   the claims; the Bankruptcy Court can be the gatekeeper.

11        And the Court agrees with the many cases cited from

12   outside this circuit, such as the case in Alabama, in the

13   Eleventh Circuit, and there was another circuit-level case, at

14   least one other, that have held that the *Barton* doctrine

15   should be extended to other types of case fiduciaries, such as

16   debtor-in-possession management, among others.

17        Finally, as I pointed out in my confirmation ruling in

18   this case, gatekeeping provisions are commonplace for all

19   types of courts, not just Bankruptcy Courts, when vexatious

20   litigants are involved.  I have commented before that we seem

21   to have vexatious litigation behavior with regard to Mr.

22   Dondero and his many controlled entities.

23        Now, as far as the Movants' argument that there was not

24   just improper gatekeeping provisions but actually an improper

25   discharge in the Seery retention order of negligence claims or

110

1  other claims that don't rise to the level of gross negligence

2  or willful misconduct, again, I reiterate there's nothing

3  exceptional in the bankruptcy world about exculpation

4  provisions like this.  They absolutely are a term of

5  employment very often.  Just like compensation, they're

6  frequently requested, negotiated, and approved.  They are

7  normal in the corporate governance world, generally.  They are

8  normal in corporate contracts between sophisticated parties.

9  And most importantly of all, even if this Court overreached

10  with the exculpation provisions in the Seery retention order,

11  even if it did, res judicata bars the attack of these

12  provisions at this late stage, under cases such as *Shoaf*,

13  *Republic Supply v. Shoaf* from the Fifth Circuit, the *Espinosa*

14  case from the U.S. Supreme Court, and even *Applewood*, since

15  the Court finds the language in this order was clear,

16  specific, and unambiguous with regard to the gatekeeping

17  provisions and the exculpation provisions.

18      Last, and this is the part where I said I'm going to get

19  to this agreement that has been submitted, the Second Amended

20  and Restated Investment Advisor Agreement or whatever the

21  title is.  I am more than a little disturbed that so much of

22  the theme of the Movants' pleadings and arguments, and I think

23  even representations to the District Court, have been they

24  have these sacred jury trial rights, these inviolate jury

25  trial rights, and an Article I Court like this Court should

121

1    annoyance or anything like that.  I guess what I'm trying to

2    do is I don't want anyone to mistake the delay in ruling on

3    the contempt motion to mean I'm just not that -- you know, I'm

4    not prioritizing it, other things are more serious to me or

5    important to me, or I'm going to take two months to get to it.

6    It's literally been I've been in trial almost all day long

7    every day since you were here.  But trust me, I'm about as

8    upset as upset can be about what I heard on June 8th, and I'm

9    going to get to that ruling, and I know what I'm going to do.

10   And, well, like I said, it's just a matter of figuring out

11   dollars and whom, okay?  There's going to be contempt.  I just

12   haven't put it on paper because I've been in court all day and

13   I haven't come up with a dollar figure.  Okay?

14       So I hope -- I don't know if that matters very much, but

15   it should.

16       All right.  We stand adjourned.

17       (Proceedings concluded at 3:35 p.m.)

18                            --oOo--

19

20                          CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                        **06/29/2021**

24   _____     _____
     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

# EXHIBIT T

```
 1                   IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
 2                             DALLAS DIVISION

 3                                    )    Case No. 19-34054-sgj-11
          In Re:                      )    Chapter 11
 4                                    )
          HIGHLAND CAPITAL            )    Dallas, Texas
          MANAGEMENT, L.P.,           )    March 1, 2022
 5                                    )    1:30 p.m. Docket
               Reorganized Debtor.    )
 6                                    )    - REORGANIZED DEBTOR'S MOTION
                                      )      FOR ENTRY OF AN ORDER
 7                                    )      APPROVING SETTLEMENT WITH
                                      )      PATRICK DAUGHERTY [3088]
 8                                    )    - REORGANIZED DEBTOR'S MOTION
                                      )      FOR ENTRY OF AN ORDER
 9                                    )      FURTHER EXTENDING THE PERIOD
                                      )      WITHIN WHICH IT MAY REMOVE
10                                    )      ACTIONS [3199]
          _____)
11                                    )
          ELLINGTON,                  )    Adversary Proceeding 22-3003-sgj
12                                    )
               Plaintiff,             )
13                                    )    STATUS CONFERENCE
          v.                          )    (NOTICE OF REMOVAL)
14                                    )
          DAUGHERTY,                  )
15                                    )
               Defendant.             )
16        _____)

17                        TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
18                  UNITED STATES BANKRUPTCY JUDGE.

19        APPEARANCES:

20        For the Debtor:          John A. Morris
                                   PACHULSKI STANG ZIEHL & JONES, LLP
21                                 780 Third Avenue, 34th Floor
                                   New York, NY  10017-2024
22                                 (212) 561-7700

23        For Scott Ellington:     Debra A. Dandeneau
                                   Laura R. Zimmerman
24                                 BAKER & MCKENZIE, LLP
                                   452 Fifth Avenue
25                                 New York, NY  10018
                                   (212) 626-4875
```

82

1    consent to Bankruptcy Court adjudication or are we going to

2    have a motion for remand.

3        So I don't know what we're going to attempt to accomplish

4    here because later in this month we have set a hearing on Mr.

5    Ellington's motion for remand and abstention.  So I'll ask

6    counsel, did you all view this setting as something that, you

7    know, we needed to address issues on, or is it premature

8    before we have the hearing on the motion for remand and

9    abstention?

10            MR. YORK:  Your Honor, this is Drew York from Gray

11   Reed.  I represent Mr. Daugherty in the adversary action.  And

12   I agree with the Court that it is, based upon the motion to

13   abstain and remand that was filed, it's premature.  We set the

14   status conference at the Court's request immediately after we

15   filed the removal notice.  I think we can address all of the

16   issues at the hearing at the end of the month.

17            THE COURT:  All right.  Ms. --

18            MS. DANDENEAU:  Your Honor?

19            THE COURT:  Go ahead.

20            MS. DANDENEAU:  We agree with Mr. York and the Court,

21   Your Honor.

22            THE COURT:  Okay.  Well, so I guess we will see you

23   at the end of the month.  I think, what is it, maybe March

24   28th, something like that?  March 29th?

25            MS. DANDENEAU:  I believe it's March 29th.

83

1              THE COURT:  Okay.  And you know that I tend to

2     sometimes share my views just to see if it will spur a fit of

3     reasonableness or encourage people to settle or walk away.

4     I'm pretty exasperated with that attempt in this case.  But

5     this litigation is -- I'm going to call it the stalking

6     lawsuit.  Okay?  Every time -- I don't know how much longer it

7     will be in my court, but as long as it's in my court I'm going

8     to call it what it is, a stalking lawsuit.  It is one grown

9     man accusing another grown man of stalking.  You know, it's

10    just embarrassing to me, and it should be embarrassing to

11    those involved.

12       Now, I have read the lawsuit and I have read that Mr.

13    Ellington accuses Mr. Daugherty of driving by his house,

14    driving by his father's house, driving by his sister's house,

15    driving by his office, 143 sightings, he's taking pictures.

16    And you know, if that's true, again, that's embarrassing.  If

17    -- I don't even know what to say except this is embarrassing.

18    One grown man accusing another grown man of stalking.  Okay?

19    A statute, by the way, that was designed to protect, you know,

20    ex-wives, girlfriends, battered women, from abusive men.  You

21    know, gender doesn't matter, but wow.  It's just -- I don't

22    know what to say except people should be embarrassed, and so

23    that's what I'm going to say.

24       I don't know if it's going to make a whit of difference in

25    anyone's litigation posture.  But we'll come back on March

84

1  29th and we'll do what we need to do on the motions before the

2  Court.

3      (Proceedings concluded at 3:41 p.m.)

4                              --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                          CERTIFICATE

20     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
21  above-entitled matter.

22   **/s/ Kathy Rehling**                        **03/07/2022**

23  _____        _____

24  Kathy Rehling, CETD-444                          Date
   Certified Electronic Court Transcriber

25

**APP. 0194**

84

1    29th and we'll do what we need to do on the motions before the

2    Court.

3        (Proceedings concluded at 3:41 p.m.)

4                              --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                              CERTIFICATE

20        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                           **03/07/2022**

23   _____        _____

24   Kathy Rehling, CETD-444                          Date
     Certified Electronic Court Transcriber

25

# EXHIBIT U

```
 1                IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
 2                         DALLAS DIVISION

 3                              )    Case No. 19-34054-sgj-11
      In Re:                    )    Chapter 11
 4                              )
      HIGHLAND CAPITAL          )    Dallas, Texas
      MANAGEMENT, L.P.,         )    August 31, 2022
 5                              )    9:30 a.m. Docket
                                )
 6         Reorganized Debtor.  )
                                )    STATUS CONFERENCE RE: MOTION
 7                              )    FOR FINAL APPEALABLE ORDER
                                )    FILED BY JAMES DONDERO
 8                              )    [3406]
      _____)

 9                      TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                 UNITED STATES BANKRUPTCY JUDGE.

11    APPEARANCES:

12    For the Reorganized        Jeffrey Nathan Pomerantz
      Debtor:                    PACHULSKI STANG ZIEHL & JONES, LLP
13                               10100 Santa Monica Blvd.,
                                   11th Floor
14                               Los Angeles, CA  90067
                                 (310) 277-6910
15
      For the Reorganized        Melissa S. Hayward
16    Debtor:                    HAYWARD, PLLC
                                 10501 N. Central Expressway,
17                                 Suite 106
                                 Dallas, TX  75231
18                               (972) 755-7104

19    For James Dondero,         Michael Justin Lang
      Movant:                    CRAWFORD WISHNEW & LANG, PLLC
20                               1700 Pacific Avenue, Suite 2390
                                 Dallas, TX  75201
21                               (214) 817-4500

22    Recorded by:               Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
23                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
24                               (214) 753-2062

25
```

12

1    And when he, being Judge Kinkeade, after the briefs were

2    filed, he obviously was looking at it, he questioned his

3    jurisdiction, he requested briefing on the jurisdiction,

4    because in that order that he sent out requesting the

5    briefing, he pointed out -- you know, one of the issues he

6    pointed out was the Court's language, the reservation language

7    in the order.  And, again, Highland argued that because of

8    that language, among other things, that language made the

9    order not final.

10       So all we're saying, all we're asking is just remove that

11   language so when we file the writ of mandamus that argument

12   isn't there.  The Court is done dealing with the issue.

13   Nobody can disagree with it.

14       You know, nobody -- Highland is not agreeing that we, you

15   know, can seek mandamus, so I'm not saying that.  And I'm not

16   asking the Court to agree to that.  Mandamus is a -- we

17   believe is an option.  It's still on the table.  And we're

18   just dealing with one issue that came up before and just

19   trying to head it off before -- so that we don't have to come

20   back down and ask the Court to remove it later.

21           THE COURT:  All right.  Mr. Pomerantz, what do you

22   want to say about this?

23           MR. POMERANTZ:  So, Your Honor, this is extremely

24   frustrating.  I know Your Honor had said you didn't want to

25   waste Court time.  There has already been a tremendous amount

13

1  of Court time that's wasted.

2      When we got this motion, it was a head-scratcher.  We read

3  it as seeking way more things than what Mr. Lang is saying

4  now.  If he had called up and asked us if we had any issue,

5  subject to Your Honor's agreement, to remove that last

6  sentence, we would have said we don't, because the briefing

7  before the District Court and the District Court's decision

8  have really nothing to do with that last sentence.  Maybe the

9  -- Judge Kinkeade mentioned it in his December order, but it's

10  clear, as Your Honor mentions, from the reading of the

11  District Court opinion that it is irrelevant.

12      And the argument that the Court, the District Court which

13  denied interlocutory appeal is somehow, once that sentence is

14  eliminated, going to entertain and grant a writ of mandamus is

15  farcical.  It's just not going to happen.  And unfortunately,

16  what's going to happen is we're going to have to spend more

17  time, more money, and more effort.

18      And Your Honor, I know the motion to strike has been

19  resolved, but I'd just like to mention it, because this is --

20  continues to be frustrating from the Highland side.  They

21  filed an appendix that sought to slip in three letters written

22  by attorneys for various Dondero entities that were

23  essentially a smear campaign, a smear campaign on Mr. Seery, a

24  smear campaign on the Independent Directors, incidentally,

25  which may be actionable in its own right.

14

1       That had nothing to do with bias.  They wanted to slip

2   that in, somehow it would get into the appellate record, if

3   and when they ever got to an appeals court.

4       So what do we do, Your Honor?  We called them up, called

5   Mr. Lang up and said, will you withdraw the letters?  There's

6   no basis for those to be included in the appendix.  He said

7   no.  Said, okay, will you make the deponents -- the people who

8   wrote the letters available for deposition?  Wouldn't agree to

9   that, either.

10      And then we go to the time and the money, we file our

11  motion to strike, and lo and behold, which has become a

12  considerable pattern in this case, Your Honor, what does Mr.

13  Lang do?  He calls up and says, I will withdraw the letters.

14  Okay?  That's aside.  We got what we wanted.  There's nothing

15  we can do.  But it is kind of frustrating, how that -- how

16  that played out.

17      Your Honor, this motion, to the extent it asks for that

18  sentence to be removed, that's fine.  Again, we think it's a

19  legal nullity.  What Mr. Lang asked for in his motion is for

20  Your Honor to issue a final order.  Your Honor can't determine

21  whether your order is final.  We've made that point in our

22  opposition.  It seems maybe now Mr. Lang is walking back on

23  that.  There's nothing you can do.  Your Honor can issue an

24  order; it'll be up to the District Court.

25      With respect to the supplement, Your Honor, as we put in

15

1  the record, we think all the quote/unquote evidence that was

2  submitted just is a severe mischaracterization of the record.

3  And it's important, Your Honor, that not only does the -- we

4  agree that the evidence can come in, but we think Your Honor

5  has to make a determination whether those additional

6  allegations of bias and evidence do in fact demonstrate bias.

7  What we think Mr. Lang wanted to do, or the Appellants wanted

8  to do, or the Movants, they wanted to have that information

9  come in and argue at first blush to the Appellate Court that

10  that is bias, without having had Your Honor make the initial

11  determination, as you would have if there was a motion to

12  reconsider, as you would have if there was a new motion.

13      And so we think it's very important that Your Honor

14  consider those additional allegations.  We think categorically

15  they do not demonstrate any bias, and our Exhibit A goes

16  through each item and points out the severe

17  mischaracterizations.

18      So, Your Honor, we've wasted a lot of time.  We've wasted

19  a lot of money.  But if all they want is to remove that

20  sentence, supplement the record, have Your Honor deny the

21  motion yet again after considering the additional evidence, we

22  do not have an opposition to that.  But it was -- kind of took

23  a long time and a lot of money to get to this place.

24      Thank you, Your Honor.

25          THE COURT:  All right.  And Mr. Lang, on the subject

16

1   of it took a lot of time and a lot of money, estate resources,

2   to get to this place, I just want to note a couple of things.

3   And I guess I'm happy to hear any response to these things

4   that I feel very frustrated about.

5       Again, my focus at this point is judicial resources as

6   well as estate resources.  And no judge, no judge looks

7   lightly on a motion to recuse.  Okay?  Any judge, I would

8   think, is going to have some self-introspection.  Like, oh my

9   goodness, what would motivate someone to think this needs to

10  be urged?

11      But, so on the topic of -- again, I want you to respond to

12  this, Mr. Lang -- my concern about judicial resources and

13  estate resources.

14      The timeline here -- and I always talk about timelines, I

15  know -- but this Court signed the confirmation order in this

16  case February 22, 2021, and your motion to recuse was filed

17  about a month later, March 18, 2021.  Now, here's the first

18  thing I'll mention about judicial resources and estate

19  resources.  Your motion and brief to recuse included an

20  appendix that was 200 -- no, excuse me, 2,722 pages long.

21  Okay?

22      So any judge, again, has to take it seriously when a

23  motion to recuse is filed.  And the standard is I have to

24  stand back and look at would a reasonable person have concerns

25  here.  So I can't just say, I know I'm not biased, I don't

17

1   think I'm biased; I have to look at what a reasonable person

2   might think.

3       So you presented to me a 2,722-page appendix for me to do

4   my job and look at what would a reasonable person think.  So,

5   then would it raise a doubt in the mind of a reasonable

6   observer as to the judge's impartiality?

7       So I think here's another point that goes to judicial

8   resources.  I had my law clerk, just out of curiosity, count

9   up for me how many orders that I had signed as of the day that

10  the motion to recuse was filed, March 18, 2021, and I had

11  presided over the bankruptcy case for 15 months at that point,

12  but it had been in Delaware for two months before Dallas.  On

13  the day you had filed your motion to recuse, March 18, 2021, I

14  had signed 263 orders in the Highland bankruptcy case and the

15  adversary proceedings.  It's a lot more now, of course.  But

16  so I suppose, if I was really to do my job thoroughly, I might

17  look not merely at your 2,722 pages of appendix attached to

18  your motion to recuse, but all 263 orders I had entered to

19  see, hmm, would a reasonable observer question my

20  impartiality?

21      So, anyway, this is all about judicial resources and

22  estate resources.  So, going down the timeline, March 23,

23  2021, five days after you filed the motion to recuse -- after,

24  I will tell you, I won't say I dropped everything to pore

25  through this, but spent a lot of time -- I issued an order

18

1    denying the motion to recuse.

2        Now, here's inside baseball, okay, if there ever was:  The

3    last sentence, reserving the right to supplement or amend,

4    here's why I did it.  I didn't know it would cause a brouhaha.

5    Maybe I didn't give it enough thought.  But in reading the

6    case law during those many days and hours I spent focusing on

7    your motion to recuse, I realized that most of the case law

8    says you don't have to have a hearing, okay, the statute

9    doesn't require a hearing, the case law says you don't have to

10   have a hearing.  And I cited some of that my order.  But I

11   thought, these Movants, after seeing this order, they may come

12   back and say, you didn't give us our day in court.  We wanted

13   a hearing.  We weren't just going to rely on our 2,722-page

14   appendix.  We wanted to put on witnesses.

15       So I didn't have to stick that sentence in there, but I

16   was just sort of anticipating what the Movants might do.

17       Okay.  So, live and learn.  I guess I won't, if I'm ever

18   confronted with the situation again, do that.  But that's what

19   that was about.

20       So, my law clerk went and looked at the appellate record

21   in the past few days, because, I mean, again, head-scratcher.

22   We were trying to get a feel for how big a deal was this

23   sentence, okay, to the District Court, if at all.  But anyway,

24   we happened to note that in July, July 20, 2021, the District

25   Court record on appeal was supplemented with 1,001 more pages

19

1    of record.  So I guess, goodness gracious, poor Judge Kinkeade

2    and his staff, they had 3,723 pages of appendix.  I don't even

3    know if that's all.  You know, I don't know.

4         But so Judge Kinkeade dismissed the appeal because he said

5    my order was interlocutory on February 9, 2022, and then we

6    didn't see a motion for rehearing or an appeal to the Fifth

7    Circuit or a petition for writ of mandamus to the Fifth

8    Circuit.  Five and half months later, this new motion for

9    final appealable order and supplement to the motion to recuse

10   is filed, containing 365 more pages.  And then I see that, Mr.

11   Lang, you filed an amended motion to take out certain of the

12   items, with the agreement, the stipulation that was reached

13   with Debtor's counsel, so it's now a 154-page appendix.

14        But I should add that, in Highland's objection to your

15   latest motion, they attached 86 exhibits, and I couldn't count

16   all those exhibits, but it was more than 5,500 pages.  And it

17   was, as I understood it, sort of almost like a rule of

18   optional completeness.  If you're going to submit these 154

19   pages to supplement the record, we think you need to attach

20   more than snippets of a transcript here and there.  You need

21   to have the whole context.

22        So, anyway, I -- you know, look at what you're doing.  I'm

23   just -- and I guess I could totally appreciate and understand

24   if there had been a brief order from Judge Kinkeade saying,

25   because of that one sentence, this is an interlocutory order,

20

1   no leave to appeal an interlocutory order is warranted, end of

2   order.  And, frankly, when you filed your motion, this latest

3   motion, having not seen Judge Kinkeade's order, I thought

4   that's what it was going to say.

5       So, from the tone of your motion, it sounded like that's

6   all his order was about, just:  I have a problem with this

7   last sentence, it makes the whole order interlocutory.  And

8   then I go back and read it and he gives four or five different

9   reasons why an order denying a motion to recuse is

10  interlocutory until the end of the case.  I know that's a

11  bizarre concept in the world of bankruptcy, but he considered

12  this is even the rule in the world of bankruptcy.

13      So, anyway, help me to understand why this isn't

14  unnecessary carpet-bombing the Court, me and whoever might

15  hear your petition for writ of mandamus, and the Debtor

16  estate, carpet-bombing us with paper and causing us to expend

17  resources.  And, again, we've got this backdrop of the

18  original motion to recuse being filed 15 months after I

19  started presiding over the case and after I had signed 263

20  orders.

21      Please, Mr. Lang, please help me to understand if this is

22  warranted.  Why, I mean, help me to understand why this is not

23  wasting resources in your view and why this isn't just some

24  strategy.  Again, I'm trying to not play psychologist, I'm

25  really trying to understand why you think this is fine.

21

1           MR. LANG:  Well, Your Honor, we've moved to recuse,

2   and we've stated the grounds, and we have put in documents

3   from the record that we think support those grounds.  We have

4   not unnecessarily carpet-bombed.  We've cited to the various

5   transcripts.  The length of the record is directly related to

6   the length of the transcripts mostly, the various transcripts

7   throughout the proceeding.  And so, you know, with respect to

8   the 2,722 pages of appendix, most of those are just complete

9   copies of transcripts.

10          But again, we're just creating our record to support our

11  position on our motion.  And the current motion is eight

12  pages.  It's got reference to the additional grounds that

13  we've set forth that we think support our motion.  And we

14  attached the various documents and transcripts that, again,

15  support -- we think support our position.  And we're making

16  our record for appeal.

17          And as far as Mr. Pomerantz and the withdrawing of the

18  letters, you know, I was getting ready for trial when Mr.

19  Morris called.  And he said, they're hearsay.  We had a brief

20  conversation.  I disagreed.  They filed their motion.  When I

21  got the time to look at it, I read through it, and Mr. Morris

22  and I had a conversation, and we decided, you know what, we

23  don't need them, we'll pull them out.  Let's just do away with

24  this issue.  It's not worth the time to deal with it.

25          I'm sorry they had to file their motion.  But, you know, I

22

1   couldn't drop everything at that moment to look through.  And

2   again, the reason that he gave was hearsay.  So, you know,

3   it's not gamesmanship.  It was just, look, you know, when we

4   got down to looking at it, when I looked at it, I decided it

5   wasn't worth the effort and the hassle, and we agreed to pull

6   them down and withdraw them.  And that's why I filed the

7   amended motion.

8         As far as the current appendix, Your Honor, we're just

9   making a record.  You know, we're trying to get this thing

10  reviewed.  We're making sure the Court is aware of all the

11  grounds and having considered all the grounds and all the

12  actions that we think support our motion.  We're giving the

13  Court the opportunity to look at it, and then just enter the

14  order without that language and we'll deal with the mandamus.

15        Again, the issue is ultimately going to be reviewed.

16  We're trying to get it reviewed.  And you're right, you know,

17  we don't have to, you know, you didn't have to have a hearing

18  on the first deal, you don't have to have a hearing on this

19  one.

20             THE COURT:  Okay.

21             MR. POMERANTZ:  Your Honor, this is -- this is just

22  one more match in furtherance of Mr. Dondero's stated desire,

23  as you've heard many times, to burn the place down.  We would

24  have hoped, and I guess it would have been naïve to hope, as I

25  know Your Honor has hoped throughout the case, that at some

23

1    point in time the Dondero side would stop blaming Your Honor,

2    blaming Mr. Seery, blaming the estate, and actually look at

3    what he can do to put an end to this.  Pay his notes, stop

4    raising frivolous claims, so everyone can go on with his life.

5    That's what the estate wanted to do and wants to do.  That's

6    what Mr. Seery wants to do.  Unfortunately, Mr. Dondero

7    doesn't seem capable of it, and this is just one more match on

8    the flames.  And Mr. Lang, doing his job, following his

9    client's wishes, is just one more player in that.  But it is

10   extremely frustrating.

11         THE COURT:  Okay.  All right.  Here's what I'm going

12   to do.  First, I'm simply going to deny the pending amended

13   motion for final appealable order and supplement to motion to

14   recuse, as it is procedurally improper as framed.  Okay?  It

15   was kind of like a Rule 54 motion.  It was kind of like a new

16   motion to recuse.  It was kind of like a Rule 59 motion for,

17   you know, new -- to put in new evidence, have a new trial, but

18   way untimely for that.

19      So I'm just denying the motion that's before me.  Okay?

20   And by doing that, I mean, I guess, I guess the stipulation

21   and order that's before me on the motion to strike and the

22   motion to compel, I guess I'll -- it's in my queue, I'll sign

23   it, unless someone tells me there is a reason it doesn't make

24   sense to sign it.

25      But I'm denying the motion before me.  But just so it's

24

1   clear, Mr. Lang, it's without prejudice to you either filing a

2   simple Rule 54 motion, without attachments, that simply asks

3   me to strike the last sentence of my original order denying

4   your motion to recuse from March 2021.

5       If you give me a simple Rule 54-based motion simply asking

6   me to strike that sentence, I'll sign it.  Without a waiting

7   period.  Without a hearing.  And I assume Mr. Pomerantz

8   doesn't have a problem with that.

9           MR. POMERANTZ:  That is correct, Your Honor.  If all

10  that motion asks for, we would not oppose that.

11          THE COURT:  Okay.  It's also, my ruling today denying

12  your motion, is without prejudice to you filing a new motion

13  to recuse, if that's what you want to do, to start this over

14  and supplement the record.

15      But, you know, proceed as you will.  This Court is going

16  to do its duty.  And, well, if you want to do that, you do

17  that, but I'll have a more elaborate order if I have to rule

18  on a new motion to recuse.  Among other things, I'm going to

19  point out to the Court above, whoever hears this, that because

20  I think timeliness was always an issue I raised in your

21  original order, you know, filing a motion to recuse after

22  confirmation, 15 months after this judge was assigned to the

23  case, and after the judge had signed 263 orders.

24      You know, we have case authority, as I'm sure you

25  researched and know, that talk about timeliness.  Even though

25

1   it's not baked into the statute, 28 U.S.C. Section 455, it is

2   a factor.  And so this is not *A v. B* litigation.  This is a

3   case affecting many, many people.  And at some point, don't we

4   have to wonder why a motion would be filed after 263 orders?

5   If your clients legitimately think there was bias, I don't

6   know why they didn't raise the issue way, way earlier in the

7   case.

8        And that's why these appendices are so huge, right?  It

9   dovetails with the timeliness.  Okay?  Fifteen months.

10  There's a huge, huge, huge, huge record.

11       So, anyway, do you have any questions, Mr. Lang?

12       Again, I  will say it for at least the third time this

13  morning:  I'm worried about judicial resources and estate

14  resources.  Okay?  And, you know, I have to worry about I'll

15  loosely call my bosses, okay, you know, the courts that grade

16  my papers.  The District Court who hears appeals and hears

17  petitions for writ of mandamus.  The Fifth Circuit.  They're

18  going to get frustrated with me if -- well, you know, if, for

19  example, I had ruled on this motion before me today, a clearly

20  procedurally defective motion.  And if I just willy-nilly let

21  people put things in the record without a procedurally proper

22  basis, it just makes more work for the Court of Appeals,

23  right?

24       So it's not just about the lawyers here.  It's not just

25  about me and my staff.  It's about the people who grade my

26

1   papers.  If I granted your motion as it's pending here before

2   me today, I have every reason to think, whether it's Judge

3   Kinkeade or the Fifth Circuit, they would think, what is this

4   judge doing?  Okay?  So it's just procedurally defective, what

5   you filed.  Okay?  But, again, you've got the ruling.  Do you

6   have any questions?

7          MR. LANG:  I don't.

8          THE COURT:  We're adjourned.

9          THE CLERK:  All rise.

10     (Proceedings concluded at 10:25 a.m.)

11                            --oOo--

12

13

14

15

16

17

18

19

20                        CERTIFICATE

21     I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                      **08/31/2022**

24   _____      _____

     Kathy Rehling, CETD-444                    Date
25   Certified Electronic Court Transcriber

# EXHIBIT V

```
                    UNITED STATES BANKRUPTCY COURT
                   NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                    .   Case No. 19-34054-11(SGJ)
                          .
HIGHLAND CAPITAL          .   Earle Cabell Federal Building
MANAGEMENT, L.P.,         .   1100 Commerce Street
                          .   Dallas, TX  75242-1496
                          .
            Debtor.       .   Monday, September 12, 2022
. . . . . . . . . . . . . .   9:40 a.m.


TRANSCRIPT OF HEARING ON MOTION TO WITHDRAW PROOF OF CLAIM #146
              BY HCRE PARTNERS, LLC (3443) AND
  REORGANIZED DEBTOR'S (A) OBJECTION TO MOTION TO QUASH AND FOR
              PROTECTION [DOCKET NO. 3464] AND
  (B) CROSS-MOTION TO ENFORCE SUBPOENAS TO ENFORCE SUBPOENAS AND
              TO COMPEL A DEPOSITION (3484)

                BEFORE HONORABLE STACEY G. JERNIGAN
                UNITED STATES BANKRUPTCY COURT CHIEF JUDGE




TELEPHONIC APPEARANCES:

For Highland Capital       Pachulski Stang Ziehl & Jones LLP
Management, L.P.:          BY:  JOHN MORRIS, ESQ.
                          780 3rd Avenue, 34th Floor
                          New York, New York 10017


For NexPoint Real          Hoge & Gameros, L.L.P.
Estate Partners LLC       BY:  CHARLES W. GAMEROS, JR., ESQ.
f/k/a HCRE Partners       6116 North Central Expressway
LLC:                      Suite 1400
                          Dallas, Texas 75206


Audio Operator:            Michael F. Edmond

 Proceedings recorded by electronic sound recording, transcript
                produced by a transcript service.
```

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail:  DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

31

1   we've already said the Court should allow us to withdraw the

2   proof of claim and condition it with prejudice.

3            There is no other lawsuit out there.  There is no

4   other position being taken anywhere.  Frankly, Your Honor, the

5   reason why I said admit the exhibits and I question their

6   relevance is because none of them go to actual legal prejudice.

7   Can't show it, hasn't shown it, hasn't demonstrated it.  It

8   says they did a lot of work, gave you the greatest hits of some

9   email, but quite frankly, Your Honor, that goes to merit, not

10  legal prejudice.  That goes to, I believe, part of their story

11  as to what happened.

12           The story that matters to me is we think things were

13  going to happen during the estate, he's right.  We didn't move

14  for them.  We looked back at it and said we don't need the

15  proof of claim anymore, we should withdraw it.  That's the only

16  thing that's happened, and that's why we're here.  We don't

17  think he's entitled to discovery as to why we withdrew the

18  proof of claim.

19           It's his burden to show legal prejudice.  He can show

20  it or he can't.  He hasn't.

21           THE COURT:  Okay.

22           MR. GAMEROS:  The estate hasn't.

23           THE COURT:  Mr. Gameros?

24           MR. GAMEROS:  (Indiscernible) Mr. Dondero.

25           THE COURT:  I have a question.  I mean I'm looking at

**WWW.LIBERTYTRANSCRIPTS.COM**

32

1  your pleading, your motion to withdraw the proof of claim, and

2  I'm looking at this wonderful chart you have on Page 7 saying

3  here are the standards under Bankruptcy Rule 3006, you, Court,

4  should consider.  They were articulated in the <u>Manchester</u> case.

5          And it's not merely about is there any prejudice to

6  the estate.  I mean you set forth five factors.  One is "reason

7  for dismissal."  One is diligence in bringing the motion to

8  withdraw.  One is undue vexatiousness.  One is the matter's

9  progression including trial preparation.  One is duplication of

10  expense of relitigation.

11         This is your own authority, which I believe actually

12  is correctly articulating the standards.  It's not just about

13  prejudice.  Yes, I agree that some of the case law has zeroed

14  in on that one in particular.  But I mean you say yourself

15  reason for dismissal is a factor the Court must consider.

16         MR. GAMEROS:  That's correct, Your Honor.  Those are

17  the factors, and I think our analysis on them is correct.

18         If we go all the way to trial and the result is that

19  our proof of claim is denied, we're in the same position we are

20  right now.  So why should the parties, the estate, and the

21  Court go through that exercise?

22         THE COURT:  Okay.  Well, that's another issue, I

23  think, other than the reason for dismissal.  But a follow-up

24  question to what you just said is this.

25         Would you agree to a condition on the withdrawal of

**WWW.LIBERTYTRANSCRIPTS.COM**

33

1  your proof of claim that your client agrees that Highland has a

2  46-point whatever it was percent interest in SE Multifamily

3  Holdings and your client waives any right in the future to

4  challenge that interest?

5          MR. GAMEROS:  Your Honor, if that's what the Court

6  wants to put in an order and I have a chance to confer with my

7  client on it, I'm pretty sure that would be agreeable.

8          THE COURT:  Today's the day.  I'm not going to

9  continue.  I've got, you know, the whole day booked if I needed

10 it because I wasn't sure what you all were going to want to put

11 on.

12         MR. GAMEROS:  Your Honor, we'd agree with that.

13         MR. MORRIS:  Your Honor, I'm sorry to interrupt, but

14 a waiver of any appeal, too.  I just hard that if that's what

15 you want to put in the order, that's okay.  But this case has

16 to end, and that's what we're looking for.

17         We're a post-confirmation estate that will not go

18 forward with the possibility hanging over its head that it may

19 be divested of this asset.  That is what this proof of claim

20 and this dispute is about.

21         And what the debtor needs in order to avoid legal

22 prejudice is the complete elimination of any uncertainty that

23 it owns 46.06 percent of SE Multifamily.  And if HCRE is not

24 willing to give that comfort today, we again renew our request

25 for a direction that the three HCRE witnesses appear for

**APP. 0217**
APP.3049

34

1   substantive depositions and we get this on the trial calendar.

2          MR. GAMEROS:  Your Honor, we'll agree to it.

3          THE COURT:  Well, you know what, this is such a big

4   deal I really need a client representative to say that.  It

5   would be that --

6          MR. GAMEROS:  I don't have one here today, but I can

7   get you one.

8          THE COURT:  How soon --

9          MR. GAMEROS:  Do you want me to file a stipulation or

10  an affidavit?

11         THE COURT:  Pardon?

12         MR. GAMEROS:  Do you want me to file an affidavit?

13         THE COURT:  Well, let's be a hundred percent clear.

14  Your client would state that with the granting of the motion to

15  withdraw proof of claim number 146, HCRE is irrevocably waiving

16  the right to ever challenge Highland Capital Management's 46

17  percent interest -- and I know it's 46-point something -- 46

18  percent interest in SE Multifamily Holdings, LLC and is,

19  likewise, waiving the right to appeal or challenge the order to

20  this effect.

21         MR. MORRIS:  Your Honor, if I may, perhaps we can

22  take a ten-minute recess and allow him to consult with his

23  client and perhaps get a client representative on the phone who

24  can make that representation?

25         THE COURT:  All right.  Mr. Gameros, you think you

**WWW.LIBERTYTRANSCRIPTS.COM**

35

1  can get a client rep on the WebEx?

2          MR. GAMEROS:  I'm pretty sure I can, Your Honor.

3          THE COURT:  All right.  Well, how about we take a 15-

4  minute recess.  Does that sound a reasonable amount of time?

5  We've got, you know, two dozen people --

6          MR. GAMEROS:  It does, Your Honor.

7          THE COURT:  Two dozen people on the WebEx.  I don't

8  know if maybe one is a client representative, but we'll take a

9  15-minute break and I'll come back.  Okay.

10          THE CLERK:  All rise.

11      (Recess at 10:33 a.m./Reconvened at 10:50 a.m.)

12          THE CLERK:  All rise.

13          THE COURT:  Please be seated.

14          We're back on the record in Highland.

15          Mr. Gameros, how did you want to proceed now?

16          MR. GAMEROS:  Your Honor wanted me to get a

17  representative of NexPoint Real Estate Partners to state that

18  they agree that the estate has its 46 percent interest in the

19  company agreement subject to the company agreement.  And I've

20  got Mr. Sauter here who has authority to speak on behalf of

21  NexPoint Real Estate Partners.

22          THE COURT:  All right.  Well, so what is his position

23  with HCRE?

24          MR. SAUTER:  Your Honor, I don't have -- this is DC

25  Sauter.  I don't have an official position with HCRE, but I

**WWW.LIBERTYTRANSCRIPTS.COM**

36

1   have spoken with Mr. Dondero and he has authorized me to appear

2   here today and agree to the conditions that Mr. Gameros just

3   outlined.

4           THE COURT:  All right.  Well, it sounds like hearsay

5   to me.  I don't know -- Counsel, let me have you both respond.

6   You know, I worry about this will fall apart the minute Mr.

7   Dondero is instructing a lawyer, I never agreed to that.  I

8   mean I just don't know.  This is highly unusual.

9           First --

10          MR. GAMEROS:  Your Honor, if I might?

11          THE COURT:  Please.

12          MR. GAMEROS:  Mr. Sauter is an officer of the Court.

13  He works, you know, with Mr. Dondero at his business at

14  NexPoint; certainly an authorized agent on behalf of NexPoint

15  Real Estate Partners to make this agreement on behalf of

16  NexPoint Real Estate Partners.

17          To the extent that the condition that you originally

18  described as a conclusory matter, in other words, how to end

19  the withdrawal, we already agreed to that, that we also can

20  agree on the record to waive any appeal.  Mr. Sauter is

21  authorized to agree to that, as well.

22          So I think as an agent and a lawyer on behalf of

23  NexPoint Real Estate Partners, he's fully able to do that.

24          THE COURT:  How do I know he's able to do that?

25          And, by the way, if Mr. Dondero is in I guess the

**WWW.LIBERTYTRANSCRIPTS.COM**

37

1   last 15 minutes given him authority to testify before the

2   Court, why couldn't Dondero just get on the WebEx himself?

3            MR. SAUTER:  Your Honor, I think he felt more

4   comfortable with me being a lawyer agreeing to those terms so

5   that he wouldn't misstate something.  He has been listening.  I

6   believe he's still on, although I'm not certain.

7            THE COURT:  Mr. Morris, do you want to respond?  I

8   mean I'm not sure, frankly, I care what you say, no offense.  I

9   don't think I have a person with clear authority here.

10           MR. MORRIS:  I'll just be quick and say I agree.

11           THE COURT:  Okay.  Mr. Gameros --

12           MR. GAMEROS:  As an attorney for NexPoint Real Estate

13   Partners, I have the authority to make that agreement on the

14   record and it be binding.  Mr. Sauter is confirming that

15   authority having spoken with Mr. Dondero about it.

16           I think that the Court is fully --

17           THE COURT:  Mr. Gameros --

18           MR. GAMEROS:  -- capable of doing that --

19           THE COURT:  Mr. Gameros, come on.  You know this is

20   the client's decision to make.  Okay.  I don't have a client

21   representative.  I don't have an officer or controlling

22   equityholder as evidence here of --

23           MR. MORRIS:  Mr. Dondero --

24           THE COURT:  -- the willingness to make the agreement.

25           Pardon?

**WWW.LIBERTYTRANSCRIPTS.COM**

38

1         MR. MORRIS:  Can Mr. Dondero make the representation

2  on the record to the Court that he is authorizing Mr. Sauter to

3  waive any claim that HCRE has to Highland's 46.06 percent

4  interest in SE Multifamily along with any appeal?  This is just

5  step one.  But if Mr. Dondero was on the phone, let him speak

6  up and make it crystal clear that he is delegating the full

7  authority to Mr. Sauter to negotiate and enter into this

8  consensual order on behalf of HCRE.

9         THE COURT:  All right.  Mr. Gameros, do you want to

10 give your client authority to speak up?  Your client

11 representative, someone who's actually an officer or a

12 controller or equity owner?

13        MR. GAMEROS:  Your Honor, if Mr. Dondero can do that,

14 that would be great.  I don't know if he's in a place where he

15 can do that.

16        THE COURT:  All right.  Mr. Dondero, if you can hear

17 us, are you willing to give some quick testimony in that

18 regard?

19    (No audible response)

20        MR. DONDERO:  I can't see the box --

21        UNIDENTIFIED SPEAKER:  Surprising that -- surprising

22 he was on the phone before, but now he's not after delegating.

23 Just I'm not --

24        MR. SAUTER:  Your Honor, he's on the phone.  I'm just

25 -- if you will give me a minute, I got to run around the corner

39

1  and try to make sure he knows how to unmute himself.

2          THE COURT:  Star 6.  If he's on a phone, star 6 is

3  the way to unmute himself.  But I want to see video, too.

4          THE OPERATOR:  There we go.  Try again.

5          MR. DONDERO:  Hello?

6          THE COURT:  All right.

7          MR. DONDERO:  Hello?

8          THE COURT:  Mr. Dondero, is that you?

9          MR. DONDERO:  It's me.  I've been on the entire time.

10         THE COURT:  All right.  Can you turn your video on,

11 please?

12         MR. DONDERO:  I am on my cell phone.

13         THE COURT:  Okay.  Well, so I guess you just called

14 in on your cell phone, you don't have a WebEx connection on

15 your cell phone?

16         MR. DONDERO:  I don't have a WebEx.

17         THE COURT:  Okay.  Well -- yeah, it sounded like you

18 were in the same office as Mr. Sauter.  Is that -- did I

19 misunderstand?

20         MR. DONDERO:  We work in the same office.  I'm in my

21 car.  I just stepped out of my car.

22         THE COURT:  All right.  Well, this is not ideal, you

23 know, without us seeing you.  But I'll go ahead and swear you

24 in.  All right.  Can you hear me okay?  I need to swear you in.

25         MR. DONDERO:  Yes.


**WWW.LIBERTYTRANSCRIPTS.COM**

```
                         Dondero - Direct                    40
1            THE COURT:  All right.

2                JAMES DONDERO, HCRE'S WITNESS, SWORN

3            THE COURT:  All right.

4            Mr. Gameros, do you want to ask him the questions we

5    need to hear answers on, please?

6            MR. GAMEROS:  Thank you, Your Honor.

7                      DIRECT EXAMINATION

8    BY MR. GAMEROS:

9    Q    Mr. Dondero, on behalf of HCRE, do you agree as a

10   condition for withdrawing the proof of claim that HCRE will not

11   challenge the estate's ownership or equity interest in SE

12   Multifamily subject to the company agreement?

13   A    Yes.

14   Q    Do you agree that you will not appeal and that, therefore,

15   HCRE is waiving any appeal right to that determination as a

16   condition of withdrawing the proof of claim?

17   A    Yes.

18           MR. GAMEROS:  Those are the questions for Mr.

19   Dondero.

20           MR. MORRIS:  Your Honor, if I may?

21           THE COURT:  Mr. Morris, you may.

22           MR. MORRIS:  I'm very uncomfortable.  I'm very

23   uncomfortable with the inclusion of the language subject to the

24   company agreement.  It sounds like a very conditional waiver.

25   We need an irrevocable unconditional admission by HCRE that
```

**WWW.LIBERTYTRANSCRIPTS.COM**

41

1  Highland owns 46.06 percent of SE Multifamily, period, full

2  stop.  If they want to keep conditions in there and make it

3  conditional and make it subject to other things, let's please

4  deny the motion and proceed to trial.

5          THE COURT:  All right.  Well, Mr. --

6          MR. GAMEROS:  The equity that they own is part of the

7  company agreement.  It's not modifying the company agreement by

8  saying.

9          THE COURT:  Well --

10         MR. MORRIS:  Our ownership is not subject to the

11 agreement.  We either have an ownership interest or we don't.

12 Our rights and obligations as a member of SE Multifamily are

13 subject to the agreement, but our ownership interest is not.

14 And that's the ambiguity that we need to remove.

15         THE COURT:  Okay.  Well, Mr. Gameros, do you want to

16 rephrase the question or are you not willing to make the

17 agreement as specific as Mr. Morris says he needs it?

18         MR. GAMEROS:  That's what I'm -- I guess I don't

19 understand what his complaint is.  If the estate owns 46

20 percent of the equity of SE Multifamily, it owns that subject

21 to the company agreement.  It's not a separate ownership

22 interest.  So I don't know what the problem is.

23         THE COURT:  Okay.  Let me try to phrase it as I

24 understand it.

25         What I understand has been asserted in the proof of

**WWW.LIBERTYTRANSCRIPTS.COM**

42

1  claim is that what was set forth in the agreement was a

2  mistake, okay.  A mistake.  And it sounds like you're using

3  language that says we'll agree the agreement, you know, they

4  have a 46 percent interest pursuant to the agreement.  But that

5  doesn't change -- that does not really zero in on the argument

6  made in the proof of claim that there was a mistake in the

7  agreement, right?

8          So you'd have to go broader to completely resolve the

9  issues raised in your proof of claim and say we agree, Highland

10 has a 46.06 interest in SE Multifamily and we agree that is

11 correct and we waive any right to challenge it in the future

12 and we waive any right to appeal this order.

13         MR. GAMEROS:  And, Your Honor, if that's the

14 condition, I guess my concern is that the 46 percent is still

15 part of the company agreement.  We agree not to challenge it on

16 the basis of anything asserted in the proof of claim, that

17 being mistake, lack of consideration, or failure of

18 consideration.  Their 46 percent is their ownership interest in

19 SE Multifamily and HCRE won't challenge that.

20         Is that sufficient?

21         THE COURT:  Well, I need to hear from your client.  I

22 mean he needs to be asked every which way from Sunday whether

23 he is waiving the right to challenge Highland's 46.06 interest

24 from now until eternity, okay.  That's basically, you know, we

25 either have that agreement or we'll just have a trial.

**WWW.LIBERTYTRANSCRIPTS.COM**

                          Dondero - Direct                        43
1                    CONTINUED DIRECT EXAMINATION
2   BY MR. GAMEROS:
3   Q    Mr. Dondero, do you agree that NexPoint Real Estate
4   Partners will not challenge in any way the estate's interest in
5   SE Multifamily, its 46-point whatever percent interest that is?
6   A    I think the nuance is that agreement is okay in current as
7   of today.  But it's part of an operating agreement, and that
8   percentage ownership can change due to capital calls and other
9   things.  And it could change over time.  It's never in a
10  partnership agreement fixed into perpetuity.  And so no
11  businessman can agree to that.
12      If the Court wants it fixed into perpetuity, that would be
13  very odd.
14           MR. MORRIS:  Can we go to trial, Your Honor?  Can we
15  just deny the motion and go to trial?  Let me have my
16  depositions and go to trial.  This is -- if Mr. Dondero wants
17  to take that position, he's welcome to do that.  But I'm
18  entitled to finality, and I'd like to get there.
19           THE COURT:  All right.  Well, Mr. Gameros, anything
20  else you want to ask your client that you think might be
21  helpful?
22  BY MR. GAMEROS:
23  Q    Mr. Dondero, you desire to withdraw the proof of claim.
24  Correct?
25  A    Yes.

                    **WWW.LIBERTYTRANSCRIPTS.COM**

44

1  Q    And you agree to an order denying the proof of claim with

2  prejudice.   Correct?

3  A    Yes.

4  Q    And can you agree that HCRE will not challenge the equity

5  ownership of its member in SE Multifamily of the estate?

6  A    Yes.

7          MR. GAMEROS:  Your Honor, I think there it is.

8          THE COURT:  Mr. Morris, do you have any --

9          MR. GAMEROS:  He agrees.

10          THE COURT:  -- do you have any follow-up questions --

11          MR. MORRIS:  The waiver of the right to --

12          THE COURT:  -- Mr. Dondero?

13          MR. MORRIS:  The waiver of the right to any appeal

14  whatsoever.  And I do have -- you know, there are the other

15  conditions that we mentioned earlier, right?  Either they have

16  to also agree that Mr. Seery's deposition transcript shall

17  never be used for any purpose at any time or they need to level

18  the playing field and submit their witnesses to examination.

19          The playing field needs to be level here.  Either if

20  they want to use that deposition transcript for some purpose, I

21  have no problem with that.  Just let me take my depositions.

22  If they don't want to submit their witnesses to depositions,

23  then they also have to agree that that transcript will never be

24  used for any other purpose.  It's as if this proof of claim has

25  never been filed, right, for that purpose, right.  Because

**WWW.LIBERTYTRANSCRIPTS.COM**

APP. 0228
APP.3060

45

1  that's just not fair.  That's the legal prejudice.

2         How do you take my client's deposition on Wednesday

3  and file this motion on Friday knowing your client's supposed

4  to be deposed on Tuesday?  Level the playing field.  That's

5  conditional number two.

6         And condition number three, frankly, Your Honor, this

7  proof of claim was fraudulent.  I mean my client has been

8  damaged.  My client has spent an enormous amount of money on

9  this, and I'd like them to agree to if not make us whole, you

10 know, do something because it's wrong.  It's just wrong that

11 Mr. Dondero files proofs of claim under penalty of perjury that

12 have absolutely no basis in fact.

13        It's distressing.  I'd like those two last issues

14 addressed, as well.

15        MR. GAMEROS:  Your Honor, in terms of the Court's

16 questions in terms of finality with respect to the membership

17 interest in SE Multifamily, Mr. Dondero agrees with the Court.

18 He's already said that he won't waive -- that he waives, rather

19 -- I'm sorry, let me start again.

20        He has said very clearly that he has waived appeal of

21 this order allowing the withdrawal of the proof of claim with

22 the conditions that you asked for.  I think you should grant

23 the motion to withdraw and we can put an end to all of this.

24        THE COURT:  Okay.

25        MR. MORRIS:  Here's the thing, Your Honor.  We know

**WWW.LIBERTYTRANSCRIPTS.COM**

APP. 0229
APP.3061

51

1  but it's also a big deal because we want to make sure only

2  parties with legitimate claims are given a seat at the table,

3  so to speak, in bankruptcy as far as, you know, their right to

4  a distribution, their right to be heard in a case.

5           So, you know, that's the reason for the rule.  We

6  don't see it come into play very often, but it's there because

7  we want to make sure that we protect the integrity of the

8  bankruptcy process.  And if someone files a proof of claim and

9  it's pending and, you know, activity happens in the bankruptcy

10 case as a result of it, that we don't just let a party say

11 never mind.

12          So the Manchester case, which you both cited in your

13 pleadings, has set forth fact-intensive factors -- fact-

14 intensive inquiry.  And, again, I'm just looking at HCRE's

15 motion, Page 7.  There was a chart and it sets forth the

16 Manchester factors.  Factor number one, diligence in bringing

17 the motion to withdraw the proof of claim.

18          In Mr. Gameros' chart, his response to that factor is

19 that HCRE brought its motion to withdraw immediately after

20 conferring with debtor's counsel.  I don't even know what that

21 means, okay.  But what I do know is in looking at diligence of

22 bringing the motion, the proof of claim was filed April 8th,

23 2020.  It was objected to, the proof of claim, July 30th, 2020.

24 And then on August 12th, 2022, this motion to withdraw the

25 proof of claim was filed.

**WWW.LIBERTYTRANSCRIPTS.COM**

52

1          So two years and one month after the objection was

2   filed to the proof of claim HCRE withdraws it.  So that doesn't

3   seem very diligent.  It's not diligent at all, to be honest.

4          Your second factor, you cited, Mr. Gameros, undue

5   vexatiousness, and you say HCRE has not been vexatious in

6   pursuing its proof of claim.  And outside the motion to

7   disqualify previous counsel, which is not substantive,

8   everything in the matter has proceeded by agreement and there

9   have been no hearings set or held.

10         Okay.  Well, debtor has represented in its pleadings

11  and today through counsel on the record that it has spent

12  hundreds of thousands of dollars litigating this.  It has

13  mentioned that four depositions have been taken.  It was Mr.

14  Mark Patrick.  It was the tax accounting firm.  We had the B --

15  the entity -- BH Equities, LLC, their representative.  And then

16  Mr. Seery.  So four depositions, and I'm told a lot of written

17  discovery.

18         And on the day before the -- well, the day after, day

19  or two after the Seery deposition, the motion to withdraw the

20  proof of claim was filed after 5:00 in the evening on a Friday,

21  August 12th, and I guess a couple of business days before the

22  depositions were to occur of Mr. Dondero and the fellow, Mr.

23  McGraner, and I feel like there was one other deposition.  I'm

24  losing track of those.

25         But --

**WWW.LIBERTYTRANSCRIPTS.COM**

53

1          THE CLERK:  The 30(b)(6).

2          THE COURT:  Oh, the 30(b)(6).  The 30(b)(6)

3   representative.

4          So on top of all of that, you know, Highland argues

5   there was just simply no good-faith basis for the proof of

6   claim.  Proof of claim asserted the membership interest,

7   Highland's 46.06 interest, set forth in the Multifamily LLC

8   agreement were the result of mistake.

9          Mr. Dondero signed the agreement for both parties,

10  HCRE and Highland.  And then now the motion to withdraw says

11  something to the effect of the anticipated issues have not

12  materialized.  So anyway, the undue vexatiousness factor I

13  think weighs -- because of these factors I've mentioned, weighs

14  in favor of there has been undue vexatiousness.

15         Factor number three, according to HCRE's motion to

16  withdraw the proof of claim, is matter's progression including

17  trial preparation.  Again, four depositions, thousands of pages

18  of written discovery.  We were days away from the last

19  depositions occurring, those of HCRE's potential witnesses and

20  we have trials set.  We have a trial set in November.  So that

21  factor, again, seems to weigh heavily in favor of Highland's

22  objection here.

23         Duplication of expense of relitigation, here's why we

24  got Mr. Dondero on the phone or wanted to have a witness with

25  authority.  Highland is saying we are concerned about

**WWW.LIBERTYTRANSCRIPTS.COM**

54

1  relitigation of this ownership interest issue.  And as part of

2  its argument, Highland has said we've got claims, we've got our

3  own claims for breach of agreement and different things that

4  are going to cause us to have to drill down on terms of the LLC

5  agreement.

6        And we can't -- we don't want to face exposure on

7  this issue of, well, you don't have the ownership interest or

8  the rights you say you do, Highland.  So, you know, if we could

9  get ironclad language here of, you know, we waive the right, we

10 agree that Highland has the 46.06 interest and we waive the

11 right to challenge that, then I don't think we'd have to worry

12 about relitigation of the issues in the proof of claim.  But it

13 feels like we had a little bit of reluctance to say it as

14 forcefully as we would need to have it said to avoid

15 relitigation.

16        Reason for dismissal, I don't know.  I don't know

17 what the reason for dismissal.  Again, to quote HCRE's pleading

18 on Page 7, the reason for dismissal is, "The operation of the

19 company" -- I think that means SE Multifamily -- "during the

20 case and the anticipated issues therewith have not materialized

21 and NREP no longer desires to proceed in the matters raised in

22 the proof of claim."

23        I mean that's just not in sync with the theory

24 espoused in the proof of claim that we think there was a

25 mistake made in the LLC agreement.  So, again, looking at these

**WWW.LIBERTYTRANSCRIPTS.COM**

55

1   legal factors, I do not think that the correct result is to

2   grant the motion to withdraw the proof of claim under Rule 3006

3   under the <u>Manchester</u> factors.  I will throw in that I think

4   there is potential for prejudice here of the debtor.

5        I mean not even considering that hundreds of

6   thousands of dollars have been spent over two-plus years on

7   this issue, you know, I remember very well the disqualifying

8   motion.  And I said Wick Phillips should be disqualified.  I

9   didn't shift fees because I just wasn't sure at the time that,

10  frankly, HCRE should be imposed with the fees attributable to

11  its lawyers, not recognizing the conflict of interest when they

12  saw one.  It was just a little fuzzy in my mind.

13       But I'm just letting you know that now that we are

14  here many years later, many months later and we have all the

15  sudden, okay, never mind, this is just a situation where I have

16  some regrets I didn't shift fees, to be honest.  But -- so the

17  motion is denied.  The depositions shall go forward.  I'm not

18  sure, you know, if the dates that have been proposed are still

19  workable, but if someone wants to speak up now about those

20  deposition dates to avoid an emergency hearing, I'm willing to

21  hear that.

22       I think what I heard was, well, I don't know what --

23  have you talked about dates at all?  Probably not, Mr. Morris,

24  in light of this hearing today.

25       MR. MORRIS:  We have not, Your Honor.  But I do think

**WWW.LIBERTYTRANSCRIPTS.COM**

56

1  that Counsel and I can work that out.  I'm not available until

2  the week of the 26th.  So it won't be early that week but

3  sometime between let's say the 28th of September and the 7th of

4  October, I'll be prepared to take these depositions.  And I

5  would respectfully request, and we can work with Ms. Ellison to

6  try to find a trial date sometime the last week of October,

7  first week of November so we can get this finished.

8          THE COURT:  Okay.  Did I dream up that there was a

9  trial set already in November?

10         MR. MORRIS:  You know what?

11         You know what, let's just keep that date, Your Honor.

12 Let's just keep that date.

13         THE COURT:  All right.  Traci, are you still on the

14 line?  Can you confirm my memory?  I thought we had a two-day

15 trial set aside for this in November.

16         MS. ELLISON:  Is this on the merits of HCRE's claims,

17 Judge Jernigan?  I have a note holding November 1 and 2.

18         THE COURT:  Okay.

19         MR. MORRIS:  Yeah.

20         THE COURT:  So we'll go ahead and mark that down.

21         Now the last -- so you'll work on an a mutually

22 agreeable date for these three remaining depositions sometime,

23 you know, late September, early October.  And I trust you will

24 --

25         MR. MORRIS:  Yeah.  I would respectfully request that

**WWW.LIBERTYTRANSCRIPTS.COM**

57

1  Counsel just propose dates for the depositions.  I'll wait to

2  hear from him.  But I think -- I'm representing to the Court

3  that any time between September 28th and let's just give it two

4  full weeks, October 12th.  That's plenty of time in advance of

5  the trial.

6          THE COURT:  All right.  Mr. Gameros, anything you

7  want to add on that?

8          MR. GAMEROS:  No, Your Honor.  I'm sure we can work

9  with Mr. Morris to get those scheduled.

10          THE COURT:  All right.  And here's actually the last

11  thing I wanted to say.

12          You know, I had thought about, you know, waiting 24

13  hours to give you a ruling on this motion to withdraw the proof

14  of claim and directing you all to kind of talk and see if maybe

15  you could work out language, you know, without the pressure of

16  the Court hovering over you that could make both of your

17  clients satisfied.

18          I still encourage you to do that, but I'm going to

19  pick on our U.S. Trustee.  I see she's observing today, and I'm

20  not going to ask you to say anything, Ms. Lambert.  But if you

21  all do agree, if you all in the next, you know, 24 hours come

22  to some sort of agreement, I don't mean to be alarming, but I

23  want it run by the U.S. Trustee because, you know, I've heard

24  some things that have troubled me about the, you know, lack of

25  good faith with regard to the proof of claim and, you know,

**WWW.LIBERTYTRANSCRIPTS.COM**

APP. 0236
APP.3068

58

1  alleged gamesmanship.

2       And, you know, I talked earlier about this goes to
3  the integrity of the system, you know, filing a proof of claim
4  under penalty of perjury.  Anyway, I'm feeling a little bit
5  uncomfortable about signing off on an agreed order where there
6  may be quid pro quos that went back and forth in connection
7  with withdrawing a proof of claim.  I mean at some point --
8  well, that's why we have scrutiny of these things under Rule
9  3006, right?

10       Again, there are integrity issues.  And so I just --
11  you know, if you were to work out language, I want you to run
12  it by Ms. Lambert and I want to hear that either she was okay
13  with it or she wasn't okay with it or maybe she declines to
14  comment.  You know, I'm not going to tell her how to do her
15  job, but I feel like that needs to happen, okay?

16       It's just something uncomfortable going on in my
17  brain about, you know, again a proof of claim being on file
18  two, almost two and a half years and then, you know, okay,
19  never mind, okay, I agree to never mind as long as you agree to
20  XYZ.

21       And I have no idea what's in the Seery transcript.  I
22  don't have it before me.  But, you know, I don't even know what
23  that's all about.  I don't even know if I care what that's all
24  about.  I just know if there are quid pro quos I feel like, you
25  know, maybe I need to have the U.S. Trustee, you know, not per

59

1  se signing off on any agreed order but at least kind of looking

2  at it and telling me either U.S. Trustee's fine with it, U.S.

3  Trustee is not fine with it, or U.S. Trustee declines to

4  comment.  Just I know that I've gone through the drill, okay?

5          So just letting you know I am still, you know, all

6  open to an agreed resolution of this, okay.  But we're going

7  forward as if you can't get there, okay?

8          All right.  I'll look for -- what am I going to look

9  for?  I'm going to look for an order denying the motion to

10  withdraw proof of claim.  I'm going to look for an order

11  granting the -- well, an order resolving the objection to

12  motion to quash and cross-motion for subpoenas saying that

13  these three witnesses are going to appear at a mutually

14  agreeable time either late September or early October.

15          All right.  We're adjourned.

16          THE CLERK:  All rise.

17          MR. MORRIS:  Thank you, Your Honor.

18      (Proceedings concluded at 11:35 a.m.)

19                      * * * * *

20

21

22

23

24

25

**WWW.LIBERTYTRANSCRIPTS.COM**

APP. 0238
APP.3070

60

**C E R T I F I C A T I O N**

1

2          I, DIPTI PATEL, court-approved transcriber, certify

3    that the foregoing is a correct transcript from the official

4    electronic sound recording of the proceedings in the above-

5    entitled matter, and to the best of my ability.

6

7    /s/ Dipti Patel

8    DIPTI PATEL, CET-997

9

10   LIBERTY TRANSCRIPTS          DATE: September 13, 2022

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WWW.LIBERTYTRANSCRIPTS.COM**

# EXHIBIT W

```
                 IN THE UNITED STATES BANKRUPTCY COURT
 1              FOR THE NORTHERN DISTRICT OF TEXAS
                        DALLAS DIVISION
 2
                                 )   Case No. 19-34054-sgj-11
 3   In Re:                      )   Chapter 11
                                 )
 4   HIGHLAND CAPITAL            )   Dallas, Texas
     MANAGEMENT, L.P.,           )   Wednesday, August 4, 2021
 5                               )   9:30 a.m. Docket
            Debtor.             )
 6                               )   - STATUS CONFERENCE RE:
                                 )     APPLICATION FOR
 7                               )     ADMINISTRATIVE EXPENSES
                                 )     (1888)
 8                               )   - MOTION FOR ORDER AUTHORIZING
                                 )     SALE OF CERTAIN PROPERTY
 9                               )     (2535)
                                 )   - MOTION FOR ORDER AUTHORIZING
10                               )     SALE OF CERTAIN LIMITED
                                 )     PARTNERSHIP INTERESTS (2537)
11   _____)

12                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
13                 UNITED STATES BANKRUPTCY JUDGE.

14   WEBEX APPEARANCES:

15   For the Debtor:          Jeffrey Nathan Pomerantz
                              PACHULSKI STANG ZIEHL & JONES, LLP
16                            10100 Santa Monica Blvd.,
                               13th Floor
17                            Los Angeles, CA   90067-4003
                              (310) 277-6910
18
     For the Debtor:          John A. Morris
19                            Gregory V. Demo
                              PACHULSKI STANG ZIEHL & JONES, LLP
20                            780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
21                            (212) 561-7700

22   For the NexBank          Lauren K. Drawhorn
     Entities:                WICK PHILLIPS
23                            3131 McKinney Avenue, Suite 100
                              Dallas, TX  75204
24                            (214) 692-6200

25
```

76

1    motions.

2           THE COURT:  All right.  Anything else before I give a

3    ruling?

4        All right.  Well, the Court, of course, has jurisdiction

5    over these two motions.  I'll call them the Maple Avenue

6    Motion and the PetroCap III Motion.  The Court will

7    specifically note for the record that notice has been proper

8    under the Rules and sufficient.  I'd note that July 8th these

9    motions were filed.

10       The Court will also note for the record that the only

11   objections that were lodged to these motions were withdrawn

12   during the hearing before the evidence, as were separate bids

13   that had been submitted.  Thus, there are no pending

14   objections, no pending bids at this juncture.

15       363(b) of the Bankruptcy Code applies to these proposed

16   transactions.

17       With regard to Maple Holdings, this is, of course,

18   technically a motion under 363(b) for approval for the Debtor

19   to exercise its management rights in Maple Avenue Holdings,

20   LLC to cause Maple Avenue Holdings, LLC to sell the real

21   property at 2817 Maple Avenue, Dallas, Texas.  So it's a

22   usage, I guess you could say, of property outside the ordinary

23   course of business.

24       And then with regard to the PetroCap III transaction, once

25   again, 363(b) is the governing authority.  The transaction is

77

1    either in the nature of a sale or usage in the form of a

2    forfeiture of certain of the limited partnership interests and

3    other rights in the agreements described in the motion.

4         The Court finds that the evidence very well demonstrated a

5    sound business justification for both of these transactions

6    and a reasonable business judgment has been exercised and

7    these transactions are in the best interests of the estate.

8         First, with regard to the Maple Avenue transaction, the

9    evidence showed that the purchase price, $9.75 million, is

10   certainly within the range of market values that expert

11   brokers and the Debtor's informal marketing process revealed.

12   The Court believes that the Debtor and its professionals

13   marketed the property appropriately, and this appears to be a

14   sale process that has been undertaken in good faith without

15   conclusion -- without collusion, I should say.  The purchaser,

16   Stonelake Capital Holdings, LP, is not an insider, and again

17   appears to be a participant in an arm's length, good faith,

18   and fair transaction.

19        The Court is not in the least troubled that we didn't have

20   an auction.  While auctions in the universe of Chapter 11 are

21   a very common protocol, there's nothing in the Bankruptcy Code

22   or Bankruptcy Rules that requires a public auction.  And when

23   we're talking about real estate, it's very common not to have

24   an auction.

25        But in any event, the Court reiterates that the marketing

78

1    of this property and the sale process appear to be in all ways

2    adequate and in good faith and have yielded fair value for the

3    property.  In any event, this is the highest and best offer

4    the Debtor received.

5        So the Court approves the Maple Avenue Holdings, LLC

6    transaction.  The Court reserves the right to supplement this

7    ruling in a written form of order.

8        Turning now specifically to PetroCap III, the Court

9    likewise believes that there has been a reasonable effort on

10   the part of the Debtor to maximize the value of these

11   interests and rights.  The Court believes that this

12   transaction is the highest and best transaction that can be

13   achieved by the estate.  The Court believes this was arm's

14   length and that all parties, including PetroCap, have acted in

15   good faith.  And so I should add both of these transactions

16   are going to be free and clear of any interests, with those

17   interests to attach to the proceeds.

18       The Court once again reserves the right to supplement in a

19   more fulsome written ruling, but the Court hereby approves the

20   PetroCap transaction.

21       To the extent these parties have asked for waiver of the

22   14 days under 6004, I can't remember if that request was made

23   on both transactions or just the real estate transaction.  Is

24   that a request for both transactions, Mr. --

25           MR. POMERANTZ:  Your Honor, I'm not sure it's even a

79

1    request for the Maple, because I think the closing is not

2    expected to occur until after that 14-day period.

3              THE COURT:  Okay.

4              MR. POMERANTZ:  With respect to PetroCap, I'll ask

5    Mr. Demo.  Since he was going to present the specific facts,

6    he may know the answer to whether we asked for the 14-day stay

7    waiver there.

8              MR. DEMO:  We did ask, Your Honor.  Again, this is

9    Greg Demo from Pachulski Stand Ziehl & Jones.  So if we could

10   have the 14-day waiver, that would be wonderful.

11             THE COURT:  All right.  Well, given that we have no

12   objection and so no concern for an appeal, and otherwise given

13   the circumstances of this transaction, I think that it is a

14   reasonable request -- I see it right now -- to waive 6004(h).

15   And so that request is granted.  All right.

16             MR. DEMO:  Thank you.

17             THE COURT:  Well, is there any more business before

18   we adjourn?

19             MR. POMERANTZ:  Nothing from the Debtor, Your Honor.

20             THE COURT:  All right.  Well, I thank you all.  You

21   know, I'm --

22             MR. POMERANTZ:  Your Honor, I just may point out that

23   we do expect to be going effective either the end of this week

24   or sometime beginning to middle of next week.  So there'll

25   obviously be a watershed event in the case that has been --

81

1   pretty much gone with these contempt motions.

2       And, again, read my last paragraph.  I can understand

3   getting bored reading that thing, but please read the last

4   paragraph to know that it's going to get worse if we have

5   another one of these hearings and I do find contempt.

6       So, all right.  Well, we will see you all I guess on the

7   19th is my next -- I think that's where we have our next

8   hearing.

9       (Proceedings concluded at 11:31 a.m.)

10                          --oOo--

11

12

13

14

15

16

17

18

19                      CERTIFICATE

20      I certify that the foregoing is a correct transcript from
        the electronic sound recording of the proceedings in the
21      above-entitled matter.

22    **/s/ Kathy Rehling**                        08/05/2021

23   _____      _____

      Kathy Rehling, CETD-444                      Date
24   Certified Electronic Court Transcriber

25