# EXHIBIT 6

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) *(admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

**HIGHLAND'S OBJECTION TO RENEWED MOTION TO**
**RECUSE PURSUANT TO 28 U.S.C. § 455 AND BRIEF IN SUPPORT**

---

[1] Highland's last four digits of its taxpayer identification number are (8357).  The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

PROCEDURAL BACKGROUND .......................................................................... 4

I.     GENERAL BACKGROUND TO THE BANKRUPTCY CASE ..................................... 4

II.    MOVANTS' INITIAL MOTION IS DENIED .................................................. 5

III.   MOVANTS' APPEAL OF THE RECUSAL ORDER IS DISMISSED .......................... 6

IV.   MOVANTS FILE THE SUPPLEMENTAL MOTION .................................................. 7

V.    THE COURT HOLDS A STATUS CONFERENCE ............................................... 8

VI.   MOVANTS FILE THE RENEWED MOTION ..................................................... 9

ADDITIONAL BACKGROUND ........................................................................ 11

I.    MULTIPLE COURTS HAVE QUESTIONED MR. DONDERO'S CONDUCT
       OR SANCTIONED HIM AND HIS CONTROLLED ENTITIES ............................... 11

II.    HIGHLAND FILES BANKRUPTCY; THE CASE IS TRANSFERRED TO
       THIS COURT ............................................................................. 13

III.   THE BASIS FOR RECUSAL ASSERTED IN THE RENEWED MOTION ................ 14

      A.    The December 2019 Transfer Motion ................................................. 14

      B.    The January 2020 Settlement Hearing ................................................. 15

      C.    The February 19, 2020 Application-to-Employ Hearing ............................ 16

      D.    The June 2020 CLO HoldCo, Ltd., Hearing ......................................... 18

      E.    The July 2020 Exclusivity Hearing .................................................. 20

      F.    The December 2020 Restriction Motion .............................................. 20

           i       Highland Had the Exclusive Contractual Right to Buy and Sell
                   CLO Assets ....................................................................... 21

           ii      The Dondero Parties Did Not Accuse Highland of Any
                   Wrongdoing ....................................................................... 21

           iii     Mr. Dondero Controls the Dondero Parties and Caused the
                   Restriction Motion to Be Filed ................................................ 22

           iv     Mr. Norris Was Not a Competent Witness and Had No Credibility ....... 22

           v       Movants Did Not Notify Any Other CLO Investors of the
                   Restriction Motion ............................................................... 22

      G.    The January 2021 Hearing on Highland's Motion for Injunctive Relief ............. 24

      H.    January 2021 Examiner Motion ...................................................... 26

      I.     February 2021 Confirmation Hearing ................................................ 27

|   | J. | January and July 2021 Orders Requiring Mr. Dondero's Appearance | 29 |
|---|----|---|---|
|   | K. | May 2021 Denial of Mr. Dondero's Motion to Compel Testimony | 30 |
|   | L. | August 2021 Order Finding Certain Movants in Contempt of this Court | 31 |
|   | M. | September 2022 Denial of HCRE's Motion to Withdraw Its Proof of Claim. | 34 |
| ARGUMENT | | | 39 |
| I. | | THE RENEWED MOTION MUST BE DENIED AS UNTIMELY | 41 |
| II. | | THE RENEWED MOTION MUST BE DENIED ON THE MERITS | 45 |
|   | A. | There Is No Extrajudicial Bias Present Here | 45 |
|   | B. | This Court Does Not Have Deep-Seated Antagonism Toward Movants | 47 |
| III. | | THIS COURT LACKS THE AUTHORITY TO GRANT MOVANTS' ALTERNATIVE RELIEF | 49 |
| CONCLUSION | | | 50 |

DOCS_NY:46569.9 36027/003

APP.3082

## TABLE OF AUTHORITIES

### CASES

*Andrade v. Chojnacki,*
    338 F.3d 448 (5th Cir. 2003) ............................................................ 41, 45, 46, 48

*Brown v. Oil States Skagit Smatco,*
    664 F.3d 71 (5th Cir. 2011) ............................................................ 45

*Charitable DAF Fund L.P. v. Highland Cap. Mgmt., L.P.,*
    2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022)........................ 31, 34

*Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap.
    Mgmt., L.P.)*
    2022 Bankr. LEXIS 659 (Bankr. N.D. Tex. Mar. 11, 2022) ....................... 32

*Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap.
    Mgmt., L.P.)*
    643 B.R. 162 (N.D. Tex.2022)........................................................... 32

*Conkling v. Turner,*
    138 F.3d 577 (5th Cir. 1998) ............................................................ 45, 46

*Da Silva Moore v. Publicis Groupe,*
    868 F. Supp. 2d 137 (S.D.N.Y. 2012)................................................. 43, 44

*Delesdernier v. Porterie,*
    666 F.2d 116 (5th Cir. 1982) ............................................................ 40

*Friendly Fin. Serv.-Eastgate, Inc. v. Dorsey (In re Dorsey),*
    489 Fed. Appx. 763, 764 (5th Cir. 2012)............................................. 49

*Garcia v. Woman's Hosp. of Tex.,*
    143 F.3d 227 (5th Cir. 1998) ............................................................ 48

*Grambling Univ. Nat'l Alumni Ass'n v. Bd. of Supervisors for La. System,*
    286 Fed. App'x 864 (5th Cir. 2008) ................................................... 40, 43

*Henderson v. Dep't of Pub. Safety and Corrs.,*
    901 F.2d 1288 (5th Cir. 1990) .......................................................... 46, 48

*Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Cap. Mgmt., L.P.),*
    2021 Bankr. LEXIS 1533 (Bankr. N.D. Tex. Jun. 7, 2021) ..................... 5

*Hill v. Breazeale,*
    197 Fed. App'x 331 (5th Cir. 2006) ................................................... 40, 42

*Hill v. Schilling,*
    495 Fed. App'x 480 (5th Cir. 2012) ................................................... 40, 43, 44

*In re Chevron U.S.A., Inc.,*
    121 F.3d 163 (5th Cir. 1997) ............................................................ 47

*Liteky v. United States,*
    510 U.S. 540 (1994)....................................................................... 45, 46, 47, 48

*Manchester, Inc. v. Lyle (In re Manchester, Inc.)*
    2008 Bankr. LEXIS (Bankr. N.D. Tex. Dec. 19, 2008)........................... 36, 37, 39

*Martin v. Monumental Life Ins. Co.,*
    240 F.3d 223 (3d Cir. 2001)............................................................. 44

DOCS_NY:46569.9 36027/003

*Miller v. Sam Houston State Univ.*,
   986 F.3d 880 (5th Cir. 2021) ................................................................. 47

*NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt., L.P.*,
   2022 U.S. App. LEXIS 25107 (5th Cir. Sept. 7, 2022) ............................. 4, 5, 28

*Nix v. Major League Baseball*,
   2022 U.S. Dist. LEXIS 104770 (S.D. Tex. Jun. 13, 2022) ......................... 25

*Travelers Ins. Co. v. Liljeberg Enters., Inc.*,
   38 F.3d 1404 (5th Cir. 1994) ................................................................. 40

*United States v. Bremers*,
   195 F.3d 221 (5th Cir. 1999) ................................................................. 41

*United States v. Jordan*,
   49 F.3d 152 (5th Cir. 1995) ................................................................... 41

*United States v. Landerman*,
   109 F.3d 1053 (5th Cir. 1997) ............................................................... 48

*United States v. Olis*,
   571 F. Supp. 2d 777 (5th Cir. 2008) ...................................................... 44

*United States v. Sanford*,
   157 F.3d 987 (5th Cir. 1998) ............................................................. 40, 43

*United States v. Williams*,
   127 Fed. App'x 736 (5th Cir. 2005) ...................................................... 48

*United States v. York*,
   888 F.2d 1050 (5th Cir. 1989) ............................................................... 44

*Vieux Carre Prop. Owners, Residents & Assocs. v. Brown*,
   948 F.2d 1436 (5th Cir. 1991) ............................................................... 41

*Weisshaus v. Fagan*,
   456 Fed. App'x 23 (2d Cir. 2012) ..................................................... 43, 44

**STATUTES**

11 U.S.C. § 330 ..................................................................................... 17

18 U.S.C. § 3057(a) ............................................................................... 39

28 U.S.C. § 158(a) ............................................................................ 7, 49

28 U.S.C. § 158(a)(1) ............................................................................ 49

28 U.S.C. § 455(a) ................................................................................. 40

28 U.S.C. § 455(b)(1) ............................................................................ 40

**RULES**

FRBP 3006 ............................................................................................ 36

FRBP 5004(a) ........................................................................................ 40

Highland Capital Management, L.P. ("Highland"), by and through its undersigned counsel, hereby files this objection (the "Objection")[1] to *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Renewed Motion to Recuse* [Docket Nos. 3541, 3542] (the "First Renewed Motion"),[2] as amended by Docket Nos. 3570 and 3571  (as amended, the "Renewed Motion").[3]  In support of its Objection, Highland states as follows:

## PRELIMINARY STATEMENT[4]

1.     Under Mr. Dondero's direction, Highland was forced to file bankruptcy in October 2019 to protect itself from an avalanche of adverse rulings that had either been entered against it and its Dondero-controlled affiliates or were about to be entered.  For nearly a decade, courts and arbitration panels in Texas, Delaware, New York, and in foreign jurisdictions such as the Cayman Islands, Bermuda, and Guernsey, have issued a series of rulings against Mr. Dondero and his enterprise, some with stinging rebukes.

2.     Now, Mr. Dondero has filed the Renewed Motion to recuse this Court in the misguided belief that he might have more success with a different judge.  But the lengthy record proves that Mr. Dondero's problem is not judicial bias.  It is the never-ending, meritless, vindictive, and vexatious litigation strategy that Mr. Dondero stubbornly clings to regardless of the burdens

---

[1] Concurrently herewith, Highland is filing its *Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support* (the "Appendix").  Citations to the Appendix are annotated as follows:  Ex. #, Appx. #.

[2] Citations to the First Renewed Motion refer to *Movants' Memorandum of Law in Support of Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455* [Docket No. 3542].

[3] Citations to the Renewed Motion refer to *Movants' Amended Memorandum of Law in Support of Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455* [Docket No. 3571].

[4] All capitalized terms used but not defined in this Preliminary Statement have the meanings given to them below.

DOCS_NY:46569.9 36027/003

APP.3085

imposed on the judicial system, the havoc wrought, and the damage inflicted on himself, Highland's creditors, and even his own steadfast loyalists.

3.      The Renewed Motion is Movants'[5] third attempt to recuse this Court from all matters relating to Highland's bankruptcy.  Like Movants' Initial and Supplemental Motions to recuse, it is untimely, replete with factual misstatements and omissions, premised on final orders or orders upheld on appeal, and must be denied.

4.      The Initial Motion was filed on March 18, 2021—(a) sixteen months after the Petition Date, (b) fourteen months after venue was transferred to this Court, (c) one month after entry of the Confirmation Order, (d) just before the first contempt hearing, and (e) after more than 2,000 documents were filed on the main docket.[6]  The Supplemental Motion was filed on July 19, 2022—(a) twenty-two months after the Petition Date, (b) twenty months after venue was transferred, (c) eleven months after entry of the Confirmation Order, (d) five months after the District Court denied Movants' appeal of the Initial Motion, and (e) after more than 3,400 documents were filed on the main docket, all in an effort to prevent this Court from adjudicating the Kirschner Adversary.  Now, nearly three years after Highland's bankruptcy proceeding was transferred to this Court, Movants—for the third time—complain that this Court is biased against Mr. Dondero—as if no other judge or fact-finder had previously ruled against him and the entities he controls.

5.      Movants' Renewed Motion largely regurgitates the "evidence" in the untimely Initial Motion; namely, snippets of out-of-context quotes and eight rulings out of the hundreds

---

[5] "Movants" means, collectively, James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. ("NexPoint"), The Dugaboy Investment Trust ("Dugaboy"), Get Good Trust ("Get Good"), and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC ("HCRE").

[6] This does not include hundreds of docket entries in adversary proceedings in which Mr. Dondero and/or his affiliates were parties.

entered by this Court (some of which have now been affirmed by the appellate courts). However, Movants do cite to five additional orders as "new" evidence of this Court's alleged bias. Like the old evidence, the "new" evidence is untimely[7] and fails to support any credible claim of bias or prejudice.

6.    Movants thus failed to seek disqualification "at the earliest possible moment." They instead sat on their hands for almost a year and a half before filing the Initial Motion (and substantially longer before filing the Supplemental and Renewed Motions) after supposedly concluding that this Court was biased. As this Court previously ruled, Movants' indefensible delay in seeking recusal is fatal, and the Renewed Motion, like the Initial Motion, must be denied as untimely. The Renewed Motion also fails on the merits—largely for the same reasons the Initial Motion did. Movants have not, and cannot, meet their heavy burden of proving this Court is biased or somehow prejudiced against Movants. Seen in context, the record demonstrates that (a) numerous courts and tribunals have consistently ruled against Mr. Dondero and his enterprise, thereby demonstrating that this Court does not stand alone, (b) this Court's rulings and orders are sound (and have largely been upheld on appeal), (c) there is no evidence presented of extrajudicial bias or prejudice, and (d) no objective person would find that Mr. Dondero and his enterprise are the victims of improper judicial conduct rising to the extraordinary remedy of recusal. Mr. Dondero's desire to re-litigate the record using the Renewed Motion is both unavailing and procedurally improper.

7.    Further, this Court, respectfully, cannot grant Movants' alternative request to "make clear that any order denying recusal is final so that Movants may appeal the Court's order to the Northern District of Texas." This request is precluded by the District Court's February

---

[7] One order was entered before the Initial Motion was filed and three were entered in mid-2021, over a year ago.

Order dismissing Movants' appeal of the denial of the Initial Motion; as Movants concede, this Court simply lacks the authority to unilaterally determine that its orders are final and appealable. And, while this Court could remove the reservation of rights from its Recusal Order, it cannot force the District Court to hear an appeal of that interlocutory order.

## PROCEDURAL BACKGROUND

### I.   General Background to the Bankruptcy Case

8.      On October 16, 2019 (the "Petition Date"), Mr. Dondero caused Highland to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").  The Delaware Court entered an order transferring venue of Highland's bankruptcy case to this Court [Docket No. 186][8] on December 4, 2019.

9.      On February 22, 2021, this Court, over the objections of Mr. Dondero and his controlled affiliates, entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (the "Plan").  The Plan became effective on August 11, 2021 [Docket No. 2700].

10.      On September 8, 2022, the U.S. Court of Appeals for the Fifth Circuit (the "Fifth Circuit") affirmed, in material part, the Confirmation Order's factual findings and legal conclusions.  *NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt., L.P.*, 2022 U.S. App. LEXIS 25107 (5th Cir. Sept. 7, 2022).

---

[8] Unless otherwise indicated, all docket numbers refer to the main docket maintained by this Court.

APP.3088

## II.   **Movants' Initial Motion Is Denied**

11.   On March 18, 2021, Movants—Mr. Dondero and entities he controls[9]—filed their motion to recuse this Court [Docket Nos. 2060, 2061, 2062] (the "Initial Motion").[10]   The Initial Motion asked this Court to recuse itself from any adversary proceedings and future contested matters involving Movants or any entity connected to Mr. Dondero.

12.   On March 23, 2021, this Court denied the Initial Motion [Docket No. 2083] (the "Recusal Order") finding that "the timing does not seem to pass muster."   The Initial Motion (a) "was filed more than 15 months after" this case was transferred to this Court; (b) "comes after many dozens of orders have been issued by the [Bankruptcy] Court," and (c) "comes on the eve of a contempt hearing."[11]   Recusal Order at 7.   This Court further found that, even if the Initial Motion had been timely, recusal was not warranted on the merits.[12]   Accordingly, this Court determined, in an exercise of its discretion, that Movants' assertions did not "rise to the threshold standard of

---

[9] Confirmation Order ¶ 19; *see also NexPoint Advisors, L.P.*, 2022 U.S. App. LEXIS 25107, at *24-26.

[10] Citations to the Initial Motion refer to *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Brief in Support of Their Motion to Recuse 28 U.S.C. § 455* [Docket No. 2061].

[11] On June 7, 2021, Mr. Dondero was held in contempt for violating this Court's injunction. *Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Cap. Mgmt., L.P.)*, 2021 Bankr. LEXIS 1533 (Bankr. N.D. Tex. Jun. 7, 2021).   Mr. Dondero subsequently appealed this Court's ruling.   On August 17, 2022, the District Court affirmed this Court's findings in all material respects. *Order*, Case No. 3:21-cv-01590-N, Docket No. 42 (N.D. Tex. Aug. 17, 2021). Ex. 1, Appx. 1-14. Notably, Movants do not contend that this Court's contempt order is evidence of its bias.

[12] This Court noted that Movants' allegations of "extrajudicial" bias resulting from the Acis Bankruptcy (defined below) were "at the heart of the" Initial Motion (Recusal Order at 7) but explained it did not form any animus or bias toward Movants during the Acis Bankruptcy and concluded that any knowledge learned from the Acis Bankruptcy did not constitute "extrajudicial" knowledge warranting recusal. *Id.* This Court also found that "more generally," it did not harbor, and has not shown, any "personal bias or prejudice" against Movants. Recusal Order at 10. This Court explained that it "has merely addressed motions, objections and other pleadings as they have been presented," and "has issued and enforced orders where requested and warranted." *Id.* "This court and all courts sometimes use strong words as part of managing a complex and contentious case.   None of this should be interpreted as 'bias' or 'prejudice … clashes between a court and counsel for a party [are] an insufficient basis for disqualification under Section 455." *Id.* (citations omitted).   This Court stated it has "the utmost respect for [Movants]" and has "no disrespect for Mr. Dondero on a personal level or any of the [Movants]." *Id.*

5

raising a doubt in the mind of a reasonable observer as to" this Court's impartiality.[13]  (*Id.* at 10).

**III.    Movants' Appeal of the Recusal Order Is Dismissed**

13.    Movants appealed the Recusal Order to the U.S. District Court for the Northern District of Texas (the "District Court") on April 1, 2021.[14]  On June 28, 2021, Movants filed their appellate brief[15] (a) arguing the Initial Motion was "timely" and (b) otherwise restating their baseless arguments that this Court is prejudiced and biased and exhibits antagonism towards Movants.  On July 28, 2021, Highland filed its appellate brief (the "Highland Brief").[16]  Exs. 5-6, Appx. 184-2048.

14.    On December 10, 2021, the District Court, *sua sponte*, issued an order questioning the finality of the Recusal Order, directing supplemental briefing, and observing that this Court "expressly 'reserve[d] the right to supplement or amend'" the Recusal Order.  Ex. 9, Appx. 2069-2073.  On December 15, 2021, Movants filed their supplemental brief.  Ex. 10, Appx. 2074-2084.  Highland filed its supplemental brief on December 20, 2021.  Ex. 11, Appx. 2085-2097.

15.    On February 9, 2022, the District Court denied Movants' appeal finding that under clear Fifth Circuit precedent, the Recusal Order was *per se* interlocutory, could only be reviewed upon final judgment, and was not subject to the collateral order doctrine (the "February Order").[17]

---

[13] Movants contend that "the Court … applied a subjective standard [in the Recusal Order], based entirely on self-assessment."  Renewed Motion at 1.  This contention is spurious and belied by this Court's explicit statements to the contrary.  *See, e.g.,* Ex. 2, Appx. 31-32 ("And the standard is I have to stand back and look at would a reasonable person have concerns here.  So I can't just say, I know I'm not biased, I don't think I'm biased; I have to look at what a reasonable person might think.  So you presented to me a 2,722-page appendix for me to do my job and look at what a reasonable person would think.  So, then would it raise a doubt in the mind of a reasonable observer as to the judge's impartiality?").

[14] Case No. 3:21-cv-00879-K (N.D. Tex.).

[15] Case No. 3:21-cv-00879-K, Docket Nos. 16, 17 (N.D. Tex.).

[16] The District Court granted Highland's motion to intervene over Movants' objection.  Exs. 7-8, Appx. 2049-2064.

[17] The February Order did not rely on this Court's reservation of rights in its analysis but simply held that the Recusal Order, like all orders denying recusal, was interlocutory and could not be appealed until a final judgment in this case, which the record reflected had not—and still has not—occurred.  *See* Ex. 36, Appx. 4165-4169.

6

The District Court also rejected Movants' arguments that (a) a different standard of finality applied in bankruptcy proceedings and (b) the Recusal Order was appealable under the "collateral order doctrine." *Id.* Appx. 2105-2106.[18]

16.    Movants did not appeal the February Order or file a petition for rehearing.

## IV.    **Movants File the Supplemental Motion**

17.    On July 20, 2022, more than five months after the District Court entered the February Order, Movants filed their supplemental motion to recuse this Court [Docket No. 3406] (the "Supplemental Motion") asking this Court to enter a final, appealable version of the Recusal Order (implying this Court could dictate to the District Court that its orders are appealable and could do so by deleting the reservation of rights from the Recusal Order).[19] Movants also sought to introduce new "examples" of this Court's bias "to preserve their record for appeal and to ensure that all potential grounds for recusal may be considered by an appellate court." Supplemental Motion ¶ 8.

18.    On August 15, 2022, Highland objected [Docket No. 3444] (the "Highland Objection") arguing that (a) this Court lacked the authority to determine whether the Recusal Order was final; (b) the Supplemental Motion was procedurally improper as it required (i) a motion under Federal Rule of Civil Procedure ("FRCP") 54(b) or (ii) an entirely new motion predicated solely on Movants' "new" examples of bias; and (c) Movants' new "examples" of bias were meritless. The Highland Objection included an extensive, annotated chart [Docket No. 3444-1] proving that Movants' new "examples" (a) were premised on material distortions or omissions of (i) fact, (ii)

---

[18] The District Court also ruled on Movants' request for leave to appeal an interlocutory order (*i.e.*, the Recusal Order) under 28 U.S.C. § 158(a)(3). After a lengthy analysis, the District Court held that Movants "failed to satisfy any of the three § 1292(b) criteria" and denied Movants' request to appeal the Recusal Order. Ex. 12, Appx. 2106-2110.

[19] Supplemental Motion ¶ 6 ("On appeal of the [Recusal Order] … Judge Kinkeade dismissed the appeal, holding that the [Recusal Order] was non-final and non-appealable. In doing so, Judge Kinkeade pointed to language in the [Recusal Order] in which the Court expressly 'reserve[d] the right to amend or supplement' its ruling.")

this Court's rulings, and/or (iii) statements on the record and (b) viewed fairly, were not the product of bias, prejudice, or lack of impartiality.

19.     On August 22, 2022, Movants filed their reply seeking to have their Supplemental Motion treated as a motion to supplement the record pursuant to FRCP 54 and, again, reiterating their procedurally and substantively improper request that this Court "amend the [Recusal Order] to make it final."  [Docket No. 3463].

**V.     The Court Holds a Status Conference**

20.     On August 31, 2022, this Court held a status conference on the Supplemental Motion during which it asked Movants to clarify their position, the relief requested, and the procedural basis for that relief.[20]  Movants responded that, notwithstanding the confusion caused by their procedurally and substantively deficient Supplemental Motion, they were seeking two things: (a) removal of the reservation of rights from the Recusal Order and (b) supplementation of the appellate record.  At the Status Conference, Highland stated that it was not opposed to Movants' requested relief *per se* but would *not* consent to Movants' procedurally improper request to have this Court designate the Recusal Order "final."  Ex. 2, Appx. 29.

21.     Ultimately, on September 1, 2022, this Court denied the Supplemental Motion as "procedurally improper" but allowed Movants to file "(1) a simple motion … seeking only a revised and amended Recusal Order that removes" the reservation of rights or "(2) a new motion to recuse … based on any alleged new evidence or grounds for recusal that were not considered … at the time of [this Court's] consideration of the original Recusal Order" [Docket No. 3479] (the "September Order").

---

[20] On August 19, 2022, this Court entered an order [Docket No. 3462] converting the hearing on the Supplemental Motion to a status conference and requiring Movants to clarify the legal and procedural basis for the Supplemental Motion.

## VI.    **Movants File the Renewed Motion**

22.     On September 27, 2022, Movants filed the First Renewed Motion—their third motion to recuse—and amended it on October 17, 2022.  In the Renewed Motion, Movants incorporate the entirety of the Initial Motion by reference (Renewed Motion at n. 11)[21] and ask this Court to recuse itself.  In the alternative, Movants reiterate their improper request that this Court "make clear that any order denying recusal is final so that Movants may appeal the Court's order to the Northern District of Texas."  *Id.* at 24.

23.     The Renewed Motion, and the relief it requests, thus violates this Court's September Order.[22]

24.     Moreover, like the Initial and Supplemental Motions, the Renewed Motion is untimely and is, again, premised on material distortions or omissions of fact, this Court's rulings, and/or statements on the record.  In the Renewed Motion, Movants argue the following are a basis to recuse this Court:

- This Court's knowledge gained during the 2019 Acis Bankruptcy (defined below);

- The February 2020 hearing on Highland's retention of Foley Gardere, Foley & Lardner LLP ("Foley");

- The June 2020 hearing regarding the release of approximately $2.5 million from the court registry;

---

[21] In contrast, the Renewed Motion does *not* incorporate the Supplemental Motion or cite to the "examples" of this Court's bias included therein nor does it include certain of the "examples" of bias raised in the appeal of the Recusal Order.  Consequently, Movants have waived their right to rely on those un-cited "examples" of alleged bias and Highland will not address them here.  Movants' First Renewed Motion also referenced an Appendix A which allegedly "list[ed] many other, similar examples" of this Court's bias.  First Renewed Motion at 6 n.27.  However, Movants amended the First Renewed Motion to eliminate footnote 27 and the reference to Appendix A.  Docket No. 3571.  Highland reserves all rights to object if Movants ever seek to rely on any alleged "examples" of bias not specifically identified or incorporated in the Renewed Motion.

[22] On August 31, 2022, this Court stated from the bench that Movants could file (a) a simple motion to remove the reservation of rights under FRCP 54 or (b) "a new motion to recuse … to start this over and supplement the record."  Ex. 2, Appx. 39.  Based on the entirety of the August 31, 2022, transcript and the clear language of the September Order, however, it is clear that this Court did not intend Movants to re-argue the entirety of the Initial Motion.

DOCS_NY:46569.9 36027/003

- The July 2020 hearing at which this Court inquired as to whether Highland had received PPP loans;

- The December 2020 hearing on the Dondero Parties' (defined below) attempt to halt Highland's trading in the CLOs;

- The January 2021 injunction prohibiting the Dondero Parties from interfering with Highland's management of the CLOs;

- The January 2021 motion to appoint an examiner filed by Dugaboy and Get Good, Mr. Dondero's family trusts, and joined by Mr. Dondero;

- The February 2021 confirmation hearing and Confirmation Order;

- The January 2021, May 2021, and July 2021 orders requiring Mr. Dondero and Dugaboy, respectively, to appear at certain hearings;

- The May 2021 denial, in part, of Mr. Dondero's motion to compel the deposition testimony of James P. Seery, Jr.;

- The August 2021 order finding certain Movants and others in contempt for violation of this Court's orders; and

- The September 2022 hearing denying HCRE's motion to withdraw its proof of claim.

Of the foregoing "examples," twelve are orders entered by this Court. Movants appealed only two of those orders; the appellate courts denied both appeals and affirmed this Court's orders. All Movants' "examples" (other than the August 2021 contempt order and the September 2022 denial of claim withdrawal) were previously asserted by Movants in either the Initial Motion or Supplemental Motion and debunked as false by Highland at great expense.[23] Yet, Movants double down on these "examples" as if they were true and ignore Highland's detailed factual corrections.

     25.     Ultimately, the Renewed Motion, like Movants' prior attempts to recuse, provides no credible evidence of this Court's bias, prejudice, or lack of impartiality and, like the Initial Motion which it largely duplicates, should be summarily denied.

---

[23] Highland Objection, Exhibit A; Highland Brief, Ex. 5, Appx. 196-219.

DOCS_NY:46569.9 36027/003

APP.3094

## ADDITIONAL BACKGROUND

### I.    Multiple Courts Have Questioned Mr. Dondero's Conduct or Sanctioned Him and His Controlled Entities

26.    Between 2008 and the Petition Date, courts and arbitration panels in multiple domestic and foreign jurisdictions issued a plethora of judgments and orders against Mr. Dondero, Highland, and other entities then under Mr. Dondero's control.[24]

27.    For example, in March 2019, a blue-ribbon arbitration panel issued a 56-page decision in which it (a) rejected nearly every argument advanced by Highland and made highly critical assessments of the credibility of Highland's witnesses; (b) found Highland had breached its fiduciary duties to its investors, breached certain agreements, and engaged in other wrongful conduct; and (c) rendered an award against Highland in excess of $150 million.[25]  Just two months later, in an unrelated case, the Delaware Chancery Court found that the Dondero-related defendants improperly withheld dozens of documents in discovery on privilege grounds and ruled that there was "a reasonable basis to believe that a fraud has been perpetrated" such that the Chancery Court applied the "crime-fraud exception" to the attorney-client privilege.[26]

---

[24] An overview of some of the prepetition litigation involving Highland and other Dondero-related parties is set forth in the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Docket No. 1473 at 20-24.

[25] *See Partial Final Award* rendered in the arbitration captioned *Redeemer Comm. of the Highland Crusader Fund v. Highland Capital Management, L.P.*, Case No. 01-16-0002-6927. Ex. 13, Appx. 2113-2175. The Partial Final Award was incorporated into the arbitration panel's final award (Ex. 14, Appx. 2176-2199), and a hearing in the Delaware Chancery Court to have the award confirmed was about to begin when Mr. Dondero caused Highland to file for bankruptcy protection for the purpose of gaining the protection of the automatic stay.

[26] *Daugherty v. Highland Cap. Mgmt., L.P.*, C.A. No. 2018-0488-MTZ, May 17, 2019 transcript (bench ruling on motion to compel production of documents) at 10-15.  Ex. 15, Appx. 2210-2215.  The Dondero-related defendants made three desperate but unsuccessful attempts to overturn or stay the Chancery Court's rulings.  *See Order Denying Application to Certify Interlocutory Appeal*, entered in C.A. No. 2018-0488-MTZ on July 8, 2019 ¶ K-L.  Ex. 16, Appx. 2303-2304.

28.     The adverse rulings against Mr. Dondero and his controlled entities are legion[27]—
and have resulted in the imposition of judgments and awards totaling more than $1 billion
(inclusive of interest).  This Court had no involvement in any of these cases (except, in certain
cases, to adjudicate proposed claim settlements under Bankruptcy Rule 9019).

29.     This Court's experience with Mr. Dondero and Highland began in January 2018,
when it was assigned a case captioned *In re Acis Capital Management, L.P.* (the "Acis
Bankruptcy").[28]  The Acis Bankruptcy was involuntarily commenced by Joshua Terry, a former
Highland executive who had obtained an $8 million arbitration award against the Acis entities then
under Mr. Dondero's control, but who could not collect on the judgment because Mr. Dondero
allegedly orchestrated a fraudulent transfer of assets that left the Acis debtors judgment proof.  Mr.
Dondero and Mr. Terry were the chief antagonists in the highly contested Acis Bankruptcy, and
this Court made numerous credibility findings against Mr. Dondero and his associates before
confirming a plan of reorganization that effectively transferred control of a valuable business from
Mr. Dondero and Highland to Mr. Terry.[29]  Mr. Dondero and entities controlled by him appealed

---

[27] Movants argue that, prior to the bankruptcy, Mr. Dondero and his controlled entities were merely defendants in
litigation (Renewed Motion at 2) and that Mr. Dondero had never been held personally "liable for any misconduct in
relation to his management of [Highland's] business" (*Id.*).  Movants ignore that each Movant is controlled by Mr.
Dondero and Mr. Dondero's controlled entities have incurred significant liability to third parties at Mr. Dondero's
direction and under his oversight.  In any event, as relevant here, there is no dispute that—regardless of whether he or
an entity he controlled was the plaintiff or the defendant—numerous tribunals entered a string of adverse orders and
judgments just as this Court has.  Again, the problem is not this Court; it is that Mr. Dondero and his loyalists advance
meritless positions and therefore lack credibility.

[28] Case No. 18-30264-sgj11 (Bankr. N.D. Tex.).

[29] *See, e.g.*, (a) *Order Denying Alleged Debtors' Joint Motion to Dismiss the Involuntary Petitions Filed by Joshua N.
Terry for Lack of Subject Matter Jurisdiction or, Alternatively, to Compel Arbitration*, Case No. 18-30264-sgj11,
Docket No. 75 (Bankr. N.D. Tex. Mar. 20, 2018) (Ex. 17, Appx. 2312-2316); and (b) *Findings of Fact, Conclusions
of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan
for Acis Capital* Management, *L.P. and Acis Capital Management GP, LLC, as Modified,* Case No. 18-30264-sgj11,
Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019) (Ex. 18, Appx. 2317-2546).

the Acis confirmation order, but the appeals were denied by the District Court and the Fifth

Circuit.[30]

## II.    <u>Highland Files Bankruptcy; the Case Is Transferred to this Court</u>

30.    With various judgment creditors bearing down, on October 16, 2019, Mr. Dondero

caused Highland to file this case in the Delaware Court hoping it would be a more hospitable

forum.  Less than two weeks later, on November 1, 2019, the Committee sought to transfer the

case to this Court [Docket No. 86] (the "<u>Transfer Motion</u>").  Ex. 21, Appx. 2637-2796.  The

Committee set out its intentions in filing the Transfer Motion:

> [T]he Dallas Bankruptcy Court is already intimately familiar with the Debtor's
> principals and complex organizational structure [because the Acis Bankruptcy is
> pending in that Court].  Specifically, the Dallas Bankruptcy Court has (a) heard
> multiple days' worth of material testimony from the Debtor's principal owner
> (James Dondero), the Debtor's minority owner (Mark Okada), the Debtor's general
> counsel, at least two assistant general counsels, and numerous other employees of
> the Debtor and other witnesses; and (b) issued at least six published opinions . . .
> [This Court is] intimately familiar with the Debtor's business, principal owner, and
> key executives.  For these reasons, the Dallas Bankruptcy Court is uniquely
> positioned to oversee this chapter 11 case.

*Id.* Appx. 2639.

31.    The Delaware Court agreed.  At a December 2, 2019 hearing, the Delaware Court

stated that it would grant the Transfer Motion, reasoning:

> This is a unique case … [T]his case is very focused on responding to existing [Acis]
> litigation. And that existing litigation of a former affiliate, as of a few months ago,
> and a pending appeal that could make it a current affiliate, is located in the Northern
> District of Texas.  The [Bankruptcy Court] has done a tremendous amount of work
> and has … issued a number of opinions, had a number of trials.  That work creates
> a familiarity with the facts, issues, and players in a case ….

---

[30] *See* (a) *Opinion* affirming Confirmation Order Case, No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18,
2019), Ex. 19, Appx. 2547-2631; (b) *Opinion* affirming Confirmation Order, Case No. 19-10847 (5th Cir. June 17,
2021), Ex. 20, Appx. 2632-2636.

*See* Ex. 22, Appx. 2905-2906.  Mr. Dondero and Movants knew **on December 2, 2019** they were being sent back to the very Court that took a serious and informed view of Mr. Dondero and his associates.  Indeed, that is exactly why Highland (then under Mr. Dondero's control) opposed the Transfer Motion.  [Docket No. 122].

32.     Fully cognizant that he would soon face this Court, which had substantial knowledge of (some of) his business practices, Mr. Dondero never caused Highland to appeal the Delaware Court's order granting the Transfer Motion or seek this Court's recusal on the basis of bias or prejudice (at least not until March 2021, more than fourteen months after he was forced to relinquish control of Highland).

III.    **The Basis for Recusal Asserted in the Renewed Motion**

33.     As set forth above, on September 27, 2022—nearly three years after this case was transferred to this Court and seven months after the District Court entered the February Order—Movants filed the Renewed Motion restating the request that this Court recuse itself relying on much of the same "evidence" set forth in the Initial Motion.  Like the Initial Motion, the Renewed Motion is untimely and premised on a mischaracterization of facts, cherry-picked and out-of-context quotations, and a willful ignorance of the considerable evidence supporting each of the orders at issue.

A.    **The December 2019 Transfer Motion**

34.     Movants argue that the risk of prejudice to Mr. Dondero was first noted when this case was filed in the Delaware Court, citing comments made during the hearing on the Transfer Motion by Highland's counsel about this Court's pre-existing, negative view of Mr. Dondero from the Acis Bankruptcy and resulting "baggage."  Renewed Motion at 5-6; Initial Motion ¶¶ 4-5.  As noted *supra*, Mr. Dondero controlled Highland and directed its counsel to oppose the Transfer Motion on this basis during the December 2, 2019 hearing.  The Delaware Court rejected this

14

argument and in fact relied on this Court's extensive familiarity with the parties as one of the bases for transferring venue of this case to this Court.  Ex. 22, Appx. 2905.

35.     No party appealed the order transferring venue to this Court.

**B.     The January 2020 Settlement Hearing**

36.     Movants cite to this Court's comments made during a January 9, 2020, hearing as evidence of this Court's alleged bias toward Mr. Dondero resulting from the Acis Bankruptcy. Renewed Motion at 6; Initial Motion ¶¶ 9-13.  This hearing occurred fourteen months prior to the Initial Motion and thirty-three months prior to the Renewed Motion.

37.     On January 9, 2020, this Court held an evidentiary hearing on a motion to approve a settlement [Docket No. 281] (the "Settlement Motion") between Highland and its Official Committee of Unsecured Creditors (the "Committee"), which was necessitated by (a) the Committee's and the Office of the U.S. Trustee's (the "UST") concerns about the integrity of Highland's management (under Mr. Dondero's stewardship) due to its history of self-dealing, creditor-avoidance asset transfers, and other breaches of fiduciary duty and (b) the possibility that the Committee and the UST might seek the appointment of a trustee.

38.     Following the hearing, this Court entered an order granting the Settlement Motion [Docket No. 339] (the "Settlement Order").[31]  Pursuant to the Settlement Order, Mr. Dondero, Highland's founder and former Chief Executive Officer, voluntarily surrendered control of Highland to an independent board of three directors, Russell Nelms, John Dubel, and James P. Seery, Jr. (the "Independent Board").  The Settlement Order directed Mr. Dondero not to "cause any Related Entity to terminate any agreements with the Debtor."  *Id*. at ¶ 9.  In finding that this "language is very important" to protect Highland, this Court noted that in the Acis Bankruptcy,

---

[31] Notwithstanding the Settlement Order, the UST still sought to appoint a chapter 11 trustee [Docket No. 271].

Mr. Dondero was "surreptitiously liquidating funds" and "doing things behind the scenes that were impacting the value of Highland in a bad way." Ex. 23, Appx. 3015. Notwithstanding Movants' implications that this language unfairly targeted Mr. Dondero, Mr. Dondero did not object to the inclusion of this language in the Settlement Order and, in fact, affirmatively approved and signed off on the Settlement Order and the documents which effectuated it.

39.     No party appealed the Settlement Order.

**C.      The February 19, 2020 Application-to-Employ Hearing**

40.     Movants cite to the February 19, 2020 hearing on Highland's application to retain Foley as special Texas counsel [Docket No. 68] (the "Foley Application") as another manifestation of this Court's "early distrust" of and "predisposition against" Mr. Dondero. Renewed Motion at 6-8; Initial Motion ¶¶ 14-15. This hearing occurred thirteen months prior to filing the Initial Motion and thirty-one months prior to filing the Renewed Motion.

41.     Movants argue that this Court discounted the testimony of Russell Nelms—an Independent Board member—concerning Highland's business judgment and the need to retain Foley and "*sua sponte* expressed a belief (untethered to evidence) that Mr. Dondero may have used his 'powers of persuasion' to unduly influence the Independent Board's business judgment." Renewed Motion at 7; *see also* Initial Motion ¶¶ 14-16. Movants' further note this Court's "unsolicited commentary" regarding Highland's litigiousness—not Mr. Dondero's—and that of its past officers and directors as further evidence of this Court's predisposition against Mr. Dondero. Renewed Motion at 7. Movants mischaracterize the facts of this hearing.

DOCS_NY:46569.9 36027/003

APP.3100

42.     *First*, as set forth above, Highland had a history and culture of litigiousness while under Mr. Dondero's control.[32]  That culture was necessarily propagated by human beings, not corporate entities, and the suggestion that Mr. Dondero—the person with sole authority over Highland and its employees—can shift the blame for Highland's litigiousness from himself to those employees is extremely disingenuous.  This Court's observations were accurate.

43.     ***Second***, Movants are wrong about the Foley Application.  Through the Foley Application, Highland sought to retain Foley on behalf of both Highland ***and*** a non-Debtor entity, Neutra Ltd. ("Neutra"), in the appeal of the Acis confirmation order and related matters (the "Acis Appeal").  In support of the Foley Application, Highland disclosed that: (a) Neutra was owned by Mr. Dondero and his partner, Mark Okada, and (b) Highland intended to pay for Foley's representation of Neutra in the Acis Appeal.[33]  The Committee and Acis objected to the Foley Application on the ground that Highland should not be permitted to use estate assets to support Neutra, a Dondero-controlled entity.  [Docket No. 120]

44.     Mr. Nelms testified in support of the Foley Application but was subject to a lengthy cross-examination which undermined Highland's arguments.  Ex. 24, Appx. 3086-3142.  This Court approved Highland's retention of Foley but determined that the evidence was insufficient to justify expending estate assets to pay Neutra's legal fees, a non-Debtor entity in which Highland

---

[32] In light of the substantial orders and judgments entered against Highland and other entities controlled by Mr. Dondero in other forums, Movants' attempt "to play the victim" is absurd.  Renewed Motion at 7 n.30.  Movants also imply that Highland, while under the control of the Independent Board, was equally litigious as it had objected to proofs of claim filed in this bankruptcy.  Again, Movants ignore the facts, including that, postpetition, Highland *actually settled* the claims against its estate.

[33] Highland justified its payment of Neutra's fees under 11 U.S.C. § 330 (which does not allow the payment of non-debtor legal fees) by arguing, *inter alia*, that if Neutra were successful in its appeal of the involuntary petition entered in the Acis Bankruptcy (a) the Acis Bankruptcy would be unwound, (b) the equity in Acis would return to Highland, (c) Highland would regain the benefit of certain management fees that were otherwise being paid to Acis for the benefit of its new owner, Mr. Terry, and (d) Highland would have negotiating leverage with respect to Acis' $75 million claim against Highland's estate.  Ex. 24, Appx. 3180-3181; Docket Nos. 69, 165.

DOCS_NY:46569.9 36027/003

held no interest. *Id.* Appx. 3204-3209.  This Court's ruling on the Foley Application was not, as Movants contend, a magnification of this Court's "early distrust" of Mr. Dondero or evidence of bias towards him.  Renewed Motion at 7.  Rather, it was based on its determination that Highland failed to prove that the estate would benefit by paying a non-Debtor's legal fees, as required by applicable law.

45.      No party appealed this Court's denial of the Foley Application.

**D.      The June 2020 CLO HoldCo, Ltd., Hearing**

46.      Movants argue this Court's animus towards Mr. Dondero is evidenced by its rulings with respect to CLO HoldCo, Ltd. ("CLOH"), a wholly owned subsidiary of the "Charitable" Donor Advised Fund, Ltd. (the "DAF"), and its questioning CLOH's good faith in filing its motion in April 2020 [Docket No. 590] seeking release of $2.5 million from the court registry.  Again, Movants' arguments are premised on factual inaccuracies.[34]

47.      *First*, neither CLOH nor the DAF are Movants, and Movants make no effort to explain how alleged bias towards CLOH or the DAF constitutes bias towards Movants.  This is perplexing.  Movants argue at length (*see* ¶¶ 81-87 *infra*) that this Court's factual findings regarding Mr. Dondero's control over CLOH and the DAF are baseless and are themselves examples of bias.  Movants cannot have it both ways.  Either CLOH and the DAF are controlled by Mr. Dondero or they are not.[35]

48.      *Second*, Movants ignore that the $2.5 million was deposited into the court registry *at CLOH's request*.  The Settlement Order implemented certain operating protocols [Docket Nos.

---

[34] Movants had initially argued that this Court was biased because it "has not released [the $2.5 million] to CLO HoldCo."  First Renewed Motion at 8.  That statement is not true.  Movants amended the First Renewed Motion to correct this error but elected not to correct any of the myriad other factual errors.

[35] This statement is rhetorical; there is clear evidence that Mr. Dondero controls the DAF and CLOH.  Movants' attempt to hide behind corporate forms is a further example of Mr. Dondero's misuse of his controlled entities and abuse of the judicial process.

354, 466], which prohibited distributions (a) from Highland or entities managed by Highland (b) to certain "Related Entities," such as CLOH.  On February 24, 2020, Highland filed a motion seeking authority to cause two of its managed funds to make distributions to CLOH and Mark Okada—both "Related Entities."  The Committee objected, arguing, among other things, the distributions to CLOH should be offset against amounts CLOH owed to Highland.  [Docket No. 624]  At the March 4, 2020, hearing on the motion, *CLOH's counsel* asked this Court to resolve Highland's motion by depositing the funds directly into the court's registry.[36]  This Court, with the consent of the Committee, adopted CLOH's proposal and entered an order requiring the $2.5 million be deposited into the court's registry.  Despite its conduct in March, CLOH filed a motion with this Court seeking the release of the $2.5 million from the registry in April 2020—less than one month later.  [Docket No. 590]  CLOH's April motion to release the funds was vigorously opposed by the Committee.  [Docket No. 624]

49.    Consequently, there was evidence of CLOH's bad faith—CLOH entered into a settlement in open court and then attempted to unwind that settlement a month later.  But despite CLOH's conduct, this Court, again, did not leave it without a remedy or deny its motion outright. Instead, this Court entered an order that provided for the release of the $2.5 million to CLOH

---

[36] Ex. 25, Appx. 3260-3261:

> We'd like to suggest the following should the Court determine that the motion should be denied. And that is that instead of the debtor retaining the funds, that the debtor distribute the funds into the registry of the Court. That way, they lose control over the funds and they can say that they've distributed them in accordance with their agreements and applicable law.

> The funds would remain there until either a recipient or prospective recipient posts a bond or other suitable collateral or the Creditors Committee agrees to the distribution to the insider or there is a Court entered for another reason after a showing made before Your Honor. The debtor and the Creditors Committee would, of course, retain all rights to seek the funds they would have had, which rights they would have had immediately before the distribution to the registry, plus any rights that would be gained by reason of the distribution itself.

> The debtor thus distributes, the Creditors Committee retains its rights, the Court retains control, and this can all be done, we believe, by a Court order and we hope this may give the Court a suitable alternative.

*See also id.* Appx. 3262.

*unless* the Committee fixed the procedural deficiencies in its objection by filing an adversary proceeding to enjoin the release of the money from the registry.  [Docket No. 825]  CLOH and the Committee subsequently resolved the Committee's objection,[37] and the $2.5 million was released to CLOH pursuant to this Court's order in October 2021.  [Docket No. 2946]

###### E.   The July 2020 Exclusivity Hearing

50.   Movants bizarrely contend that this Court's inquiries into COVID-related "PPP loans" at a July 8, 2020, hearing was evidence of bias against Mr. Dondero.  Renewed Motion at 8-9; Initial Motion ¶ 52.  That hearing occurred nine months prior to the Initial Motion and twenty-eight months prior to the Renewed Motion.  As fully disclosed by this Court, the inquiries were prompted by an extrajudicial source (a newspaper article) that purportedly noted that "Mr. Dondero or affiliates" received PPP loans.  Because of the vagueness of the article, this Court sought information about *Highland*—not Movants—and ordered Highland to disclose any PPP loans it had received.  Highland responded to the Court at a subsequent hearing that Highland had not obtained any PPP loans.  Neither Mr. Dondero nor any of his affiliated entities were directed to provide any information, no action was taken against them, and the issue was never raised again.  Movants' attempt to falsely recast this event is emblematic of the lack of merit—and candor—in the Renewed Motion.

###### F.   The December 2020 Restriction Motion

51.   Movants cite this Court's comments and rulings at the conclusion of an evidentiary hearing held on December 16, 2020 (the "December Hearing") on Movants' motion to restrict Highland's contractual right to manage its CLOs [Docket No. 1522] (the "Restriction Motion") as evidence of bias.  Movants argue this Court improperly (a) denied their Restriction Motion as

---

[37] *Stipulation and [Proposed] Order Regarding Registry Funds and Dismissal of Motion for Preliminary Injunction*, Adv. Pro. No. 20-03195-sgj, Docket No. 89.

"frivolous," despite it being filed in "good faith" and (b) found that Mr. Dondero was behind the filing of the Restriction Motion.  Renewed Motion at 9-10; Initial Motion ¶¶ 18-26.

52.    The December Hearing occurred four months prior to the Initial Motion and twenty-two months prior to the Renewed Motion.

53.    In their Restriction Motion, the movants (*i.e.*, the Advisors and certain investment funds managed by the Advisors (the "Retail Funds," and with the Advisors, the ("Dondero Parties")) asked this Court to "impose a temporary restriction on Highland's ability, as portfolio manager, to cause CLOs to sell assets."  Restriction Motion ¶ 17.  The Dondero Parties called as their only witness Dustin Norris, the Executive Vice President of each of the Dondero Parties. During the December Hearing, Mr. Norris made the following admissions:

i    **Highland Had the Exclusive Contractual Right to Buy and Sell CLO Assets**

•    Highland is the portfolio manager for each of the CLOs in which the Advisors caused the Retail Funds to invest (Ex. 26, Appx. 3380);

•    Highland's management of the CLOs is governed by written agreements (*id.* Appx. 3380-3381);

•    None of the Dondero Parties is a party to Highland's CLO management agreements (*id.* Appx. 3381);

•    Highland, as the CLO Portfolio Manager, has the responsibility to buy and sell assets on behalf of the CLOs (*id.* Appx. 3381);

•    Nobody other than Highland has any right or authority to buy and sell assets in the CLOs in which the Retails Funds invested (*id.* Appx. 3381-3382); and

•    Holders of preferred CLO shares, such as the Retail Funds, "do not make investment decisions on behalf of the CLOs" and the Advisors knew that when they caused the Retail Funds to make their investments (*id.* Appx. 3382).

ii    **The Dondero Parties Did Not Accuse Highland of Any Wrongdoing**

•    The Dondero Parties did not allege or contend that Highland (a) engaged in fraudulent conduct; (b) breached any agreement by effectuating any transactions; or (c) violated any CLO management agreement (*id.* Appx. 3388-3389); and

DOCS_NY:46569.9 36027/003

- The Dondero Parties did not question Highland's business judgment nor could they since they did not know why Highland executed the transactions and never even asked (*id.* Appx. 3389-3390).

### iii   Mr. Dondero Controls the Dondero Parties and Caused the Restriction Motion to Be Filed

- Mr. Dondero owns and controls the Advisors (*id.* Appx. 3367; Appx. 3374-3375);

- The Advisors manage the Retail Funds; Mr. Dondero serves as the Portfolio Manager of each of the Retail Funds and caused the Retail Funds to invest in the CLOs managed by Highland (*id.* Appx. 3367-3368; Appx. 3375);

- The "whole idea" for the Restriction Motion began with Mr. Dondero (*id.* Appx. 3368; Appx. 3380); and

- The Retail Funds' Boards did not authorize the filing of the Restriction Motion (*id.* Appx. 3376-3377).

### iv   Mr. Norris Was Not a Competent Witness and Had No Credibility

- Mr. Norris admitted that he does not make investment decisions, is not an investment manager, and has never worked for a CLO (*id.* Appx. 3378);

- Mr. Norris (a) did not write his Declaration filed in support of the Restriction Motion, (b) did not provide any substantive comments to his Declaration, and (c) relied on the Advisors' "management" (including Mr. Dondero) for all "key information" in his Declaration (*id.* Appx. 3379); and

- Mr. Norris did not bother to review the very CLO management agreements the Dondero Parties were seeking to interfere with (*id.* Appx. 3381).

### v   Movants Did Not Notify Any Other CLO Investors of the Restriction Motion

- The Dondero Parties hold (a) less than 50% of the preferred interests in 12 of the 15 CLOs at issue, and (b) less than 70% of the preferred interests in the other three CLOs at issue (*id.* Appx. 3383-3384);

- Yet, the Restriction Motion was pursued solely on behalf of the Dondero Parties and no other holder of interests in the CLOs (*id.* Appx. 3385);

- The Dondero Parties did not notify any other holder of CLO interests of the Restriction Motion and made no attempt to do so (*id.* Appx. 3386);

- The Dondero Parties made no attempt to obtain the consent of all of the holders of the preferred shares to seek the relief sought in the Restriction Motion (*id.* Appx. 3386);

DOCS_NY:46569.9 36027/003

APP.3106

- Mr. Norris did not know whether any other holder of CLO preferred shares wanted the relief sought in the Restriction Motion (*id.* Appx. 3386);

- Mr. Norris did not know whether Highland's counterparties in the CLO management agreements (*i.e.*, the CLOs) wanted the relief sought in the Restriction Motion (*id.* Appx. 3386-3387); and

- Mr. Norris had no personal knowledge of the two transactions described in his Declaration; he testified that he was "very remote" and he didn't have "much knowledge." (*id.* Appx. 3392-3394).

54.     Based considerably on Mr. Norris's testimony, this Court (a) found that there was no factual or legal basis for the Restriction Motion, (b) declared the Restriction Motion "frivolous," and (c) granted Highland's motion for a directed verdict. *Id.* Appx. 3403.  While Movants contend this Court improperly "opined that Mr. Dondero was behind the [Restriction Motion] notwithstanding that it was filed by separate and distinct legal entities represented by independent counsel (Renewed Motion at 9), Mr. Norris provided all the evidence the Court needed to reach its conclusion:

Q:     The whole idea for this motion initiated with Mr. Dondero; isn't that right?

A:     The concern, yes, the concern originated, and his concern was voiced to our legal and compliance team.

*Id.* Appx. 3380.[38]

55.     The Restriction Motion was a misguided effort by Mr. Dondero and his associates to exert control over Highland and its estate and was frivolous.[39]

56.     No party appealed the denial of the Restriction Motion.

---

[38] *See also id.* Appx. 3368 ("the initial cause for concern was raised by Mr. Dondero himself"); Appx. 3367 (Mr. Dondero has a control relationship with the Advisors); Appx. 3365 (responsibility for the Retail Funds' portfolio management and investment decisions are delegated to the Advisors); Appx. 3374-3375 (Mr. Dondero owns and controls the Advisors); Appx. 3376-3377 (the Retail Funds' Boards did not authorize the filing of the Restriction Motion).

[39] The Restriction Motion largely focused on Mr. Dondero's efforts to prevent Highland's managed entities from selling certain securities, including Avaya Holdings Corp. common equity (TICKER: AVYA).  Ultimately, and notwithstanding Mr. Dondero's efforts, more than 2 million shares of AVYA were sold at an average price of $23.26. Since then, AVYA has traded as low as $0.61 and closed on October 28, 2022 at $1.46.

APP.3107

G.      **The January 2021 Hearing on Highland's Motion for Injunctive Relief**

57.      Not chastened by the debacle of the December Hearing, Mr. Dondero caused the

Advisors and Retails Funds to continue interfering with, and unjustifiably threatening, Highland.

Consequently, on January 6, 2021, Highland filed its *Verified Original Complaint for Declaratory*

*and Injunctive Relief* against the Advisors and Retail Funds (Adv. Pro. No. 21-03000-sgj, Docket

No. 1) seeking injunctive relief after they interfered with Highland's trading activities and sent

Highland a flurry of written correspondence (the "K&L Gates Letters") (Exs. 27-28, Appx. 3406-

3413) threatening to terminate Highland's CLO management agreements and asserting spurious

claims.  This Court held an exhaustive evidentiary hearing on the TRO Motion on January 26,

2021 (the "TRO Hearing"), during which it admitted voluminous documentary evidence and

assessed the credibility of multiple witnesses, including that of Mr. Dondero.  Ex. 29, Appx. 3430-

3433; 3456-3613.  At the conclusion of the TRO Hearing, this Court determined that the TRO was

necessary to protect Highland's interests pending a hearing on the preliminary injunction.  *See*

*generally id.*

58.      The TRO Hearing occurred two months prior to the Initial Motion and twenty-one

months prior to the Renewed Motion.

59.      Movants cite to two aspects of the TRO Hearing as evidence of this Court's alleged

bias against Mr. Dondero, while ignoring their own misconduct:  (a) singling Mr. Dondero out for

criticism when, according to Movants, the "evidence was undisputed that Mr. Dondero did not

influence or cause the advisors or retail funds to take any action" and (b) approving the TRO when

"[i]t was abundantly clear … that [Highland] could not make the requisite showing for injunctive

relief."  Renewed Motion at 10; Initial Motion ¶¶ 27-35.  Consistent with much of the Renewed

Motion, Movants misrepresent the record by failing to disclose keys facts.

60.     *First*, Movants now admit the K&L Gates Letters were sent for an improper purpose—to procure the same relief sought in the Restriction Motion, relief this Court denied less than a month earlier.[40]   That conduct—seeking previously denied relief through alternative means—is quintessentially vexatious and sanctionable conduct.  *See, e.g., Nix v. Major League Baseball*, 2022 U.S. Dist. LEXIS 104770, at *58-65 (S.D. Tex. Jun. 13, 2022).

61.     *Second*, the Settlement Order, which Mr. Dondero agreed to, expressly prohibited Mr. Dondero from "caus[ing] any Related Entity to terminate any agreements with the Debtor." Settlement Order ¶ 9.  The evidence established that the Dondero Entities were "Related Entities" for purposes of the Settlement Order,[41] yet the K&L Gates Letters improperly threatened to seek to terminate Highland's CLO management agreements.

62.     *Third*, Mr. Dondero's TRO enjoined him from, among other things, "causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly" making express or implied threats against Highland or interfering with Highland's business.  *See Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero*, Adversary Pro. No. 20-03190-sgj, Docket No. 10.  Yet, that is precisely what the evidence showed he did.  Ex. 29, Appx. 3456-3521.

63.     Given the evidence and the clear and unambiguous orders in effect, it would have been shocking if this Court ignored Mr. Dondero and instead treated the Dondero Parties as if they

---

[40] Initial Motion ¶ 27 ("In December of 2020, due to the Court's denial of the Restriction Motion, K&L Gates … exchanged correspondence with counsel for Debtor … for the following reasons: to reiterate the Advisors' and the Retail Funds' objection to the Debtor's handing of the Retail Funds' investments; to request, again, that Debtor not liquidate the CLOs; to reserve any rights that the Advisors and the Retail Funds might have against Debtor for failure to maximize the value of the investment as required under the [CLO] Portfolio Management Agreements; and to notify Debtor that the Retail Funds … intended to initiate the procedure to remove Debtor as fund manager of the CLOs.")

[41] This fact was (a) first established during the December Hearing (*see* ¶¶ 53-54 *supra*), (b) was confirmed at the TRO Hearing, and (c) was subsequently admitted to by the defendants as part of the resolution of the adversary proceeding. *See* Docket No. 2590, Ex. A ¶ 2(c) (settlement agreement in which each of the Advisors represents and warrants that it (a) is controlled by Mr. Dondero and (b) is a "Related Party" for purposes of paragraph 9 of the Settlement Order).

were independent third-party actors.  Mr. Dondero controlled (and controls) the Dondero Parties.
He clearly "caused" or "encouraged" or "conspired" with them to improperly attempt to re-assert
control over Highland.  The Court's focus on Mr. Dondero was entirely justified—particularly
when seen in the context of this Court's pertinent orders which Movants pretend did not exist.

64.     No party appealed the TRO.

**H.     January 2021 Examiner Motion**

65.     Movants allege this Court's bias is manifested in its "repeated disenfranchisement
of Movants from [sic] judicial process" and how it has "wielded its scheduling powers … often
preventing any real consideration of legitimate motions filed by Movants."  Renewed Motion at
10-11.  Despite Movants' extremely strong language about the consistency with which this Court
has disenfranchised them and abused its powers, Movants only cite to a single alleged example of
that conduct:  Dugaboy and Get Good's motion to appoint an examiner [Docket No. 1752] (the
"Examiner Motion") filed on January 14, 2021.  Renewed Motion at 10-11.  This, again, misstates
the facts and is belied by Movants' own admissions.

66.     *First*, Movants' allegations about disenfranchisement are false.  Movants have been
heard multiple times by this Court and appealed a significant number of this Court's orders.  This
Court has never prohibited them from doing so or prevented them from being heard
notwithstanding their tenuous standing.  Confirmation Order ¶¶ 18-19.

67.     *Second*, Movants admit the Examiner Motion, which was not supported by any
non-Dondero party,[42] was filed for improper purposes—to force a delay of the long-scheduled
Confirmation Hearing (defined below), to collaterally attack this Court's final orders, and to have
Movants' Plan objections adjudicated away from this Court in a forum deemed more hospitable to

---

[42] The only party to support the Examiner Motion was Mr. Dondero.  [Docket No. 1756].

Movants.  Initial Motion ¶ 37 ("[W]hen the Trusts made the Examiner Motion, they believed that the motion would cause delay or a continuance of the confirmation hearing on the Plan …."); Renewed Motion at 11 ("The Trustees sought the appointment of an examiner to address … (i) the issues raised … in the Restriction Motion [*i.e.*, a motion this Court had denied a month earlier], [and] (ii) various objections to the proposed [Plan] raised by the advisors, the retail funds, and the [UST].")  Again, quintessentially vexatious.

68.     Accordingly, Movants' claim of prejudice because this Court did not accede to their demands to delay confirmation (contrary to the interests of creditors), collaterally attack its orders, and forum shop is ridiculous, particularly in light of Movants' unequivocal admission of their actual intent.

69.     No party appealed the denial of the Examiner Motion.

**I.      February 2021 Confirmation Hearing**

70.     Movants cite to the February 2021 confirmation hearing on the Plan (the "Confirmation Hearing") to support their argument that this Court was biased. Renewed Motion at 11-13; Initial Motion ¶¶ 38-50.  Movants principally contend that during the Confirmation Hearing, this Court: (a) "summarily rejected all of the Plan objections lodged by Movants, decreeing them as filed in bad faith" (Renewed Motion at 12) when such objections were no different than those raised by the UST whose good faith was "not questioned;" (b) found the objections were not asserted in good faith; (c) concluded, "without basis," that the entity Movants were "controlled by Mr. Dondero"; (d) disregarded witness testimony of Mr. Jason Post on the ground that the witness had left Highland's employ to work for one of the Advisors; and (e) wrongfully accused of Movants of being "vexatious litigants."  *See* Initial Motion ¶¶ 38-50.

71.     As a threshold matter, Movants simply ignore the Fifth Circuit's opinion affirming the Confirmation Order in relevant part.  In its opinion, the Fifth Circuit expressly upheld this

Court's factual findings, including some of the very findings Movants' complain of here, *e.g.*, Mr. Dondero's control of the Funds and Advisors, Mr. Post's credibility, and Mr. Dondero's penchant for litigation. *NexPoint Advisors, L.P.,* 2022 U.S. App. LEXIS 25107 at *20-24, 27-37.[43]

72.     Substantively, and contrary to Movants' suggestion, this Court provided Movants with a full and fair opportunity to present and pursue their objections, notwithstanding their tenuous standing.  Confirmation Order ¶¶ 18-19.  Rather than being "summarily" overruled, this Court conducted a two-day evidentiary hearing during which Movants' counsel made their arguments and cross-examined witnesses unimpeded. The Court subsequently made detailed findings of fact and conclusions of law in the Confirmation Order supporting the overruling of all the objections, including those of Movants.  Movants are obviously unhappy with the Court's findings and conclusions—which were, again, upheld in material part by the Fifth Circuit—but fail to present any evidence of bias or prejudice arising in connection with confirmation.

73.     Finally, Movants' contention that they were treated differently than the UST disingenuously equates the objectors and is also meritless.  Movants asserted spurious objections to (a) plan provisions that had no impact on them as they held no claims in the subject classes (the absolute priority rule); (b) the assumption of certain executory contracts to which they were not party (the actual contract counterparties had consented to assumption of the contracts); and (c) common plan provisions like debtor releases, plan supplements, and a plan injunction.  In contrast,

---

[43] Movants' allegation that this Court found them to be "vexatious litigants" is contrary to the record.  This Court did *not* find or conclude that Movants are "vexatious litigants."  Rather, this Court determined that Mr. Dondero's litigation history supported the inclusion of a gatekeeper provision in the Plan.  *See* Confirmation Order ¶¶ 80-81; Ex. 30, Appx. 3717-3719.  Significantly, the Fifth Circuit affirmed this Court's findings and concluded that the gatekeeper provision was justified and "sound."  *NexPoint Advisors, L.P.,* 2022 U.S. App. LEXIS 25107 at *5-6.

the UST filed a six-page "limited objection" that addressed only the scope of the Plan's exculpation clause—ironically, the only issue reversed on appeal.[44]

74.     In sum, Movants' stubborn instance that this Court's findings or conduct of the confirmation hearing reflect bias and prejudice *after* those same issues have been affirmed by the Fifth Circuit demonstrates the bad-faith nature of the Renewed Motion.

**J.     January and July 2021 Orders Requiring Mr. Dondero's Appearance**

75.     In the Renewed Motion, Movants assert a new "example" of this Court's bias:  Its orders—entered in January 2021, May 2021, and June 2021—"target[ing] Mr. Dondero (as well as his sister Nancy Dondero) by requiring their presence at all hearings, regardless of whether their presence is needed."  Renewed Motion at 16.  Again, Movants misstate the facts.

76.     During the January 8, 2021, proceeding to determine whether to grant a preliminary injunction against Mr. Dondero, Mr. Dondero admitted that he had not attended the earlier TRO hearing or read the transcript and had "never bothered to read the TRO."[45]  Concerned that his failure to fully participate would create an opportunity for "plausible deniability," this Court ordered Mr. Dondero—*two months before the Initial Motion was filed*—to appear at all hearings to ensure his compliance with this Court's orders.[46]  Incredibly, Mr. Dondero subsequently failed to appear at a hearing thereby validating the Court's concerns.  Consequently, this Court entered an order on May 24, 2021—sixteen months before the Renewed Motion—clarifying that Mr.

---

[44] *Compare* Docket Nos. 1661 (Dondero), 1667 (Trusts), 1670 (Funds and Advisors), and 1673 (HCRE) *with Limited Objection of the U.S. Trustee* [Docket No. 1671].

[45] Ex. 31, Appx. 3755 ("Q … At least as of today, you never bothered to read the TRO that was entered against you, correct?  A  Correct.").

[46] *Order Granting Debtor's Motion for a Preliminary Injunction Against James Dondero*, Adv. Proc. No. 20-03190-sgj, Docket No. 59.  Members of the Independent Board and/or Highland's Chief Executive Officer have been present at virtually every hearing in this case.

29

Dondero was required to appear at all hearings in the bankruptcy case. [Docket No. 2362] Mr. Dondero did not appeal the preliminary injunction or the May 2021 order.

77.     This Court has *never* ordered Nancy Dondero to appear at any hearings. Instead, on June 17, 2021—fifteen months before the Initial Motion—the Court ordered the trustee of Dugaboy and Get Good to appear at all hearings and proceedings but only "where either of the Trusts are a party or take a position." [Docket No. 2458] The Court provided a detailed rationale for its order and it was never appealed. Nevertheless, Movants now falsely assert that Ms. Dondero was required to appear at all hearings "regardless of whether [her] presence [was] needed."

**K.     May 2021 Denial of Mr. Dondero's Motion to Compel Testimony**

78.     In the Renewed Motion, Movants assert as another "new" example of bias this Court's denial of a "routine litigation step[]" to compel Mr. Seery's deposition testimony and thereby indicating that it "will treat such [routine actions] as nefarious 'antagonistic move[s]' rather than ordinary invocation of legal process."  Renewed Motion at 16.  This is not what happened.

79.     On May 24, 2021—sixteen months before the Renewed Motion—this Court denied Mr. Dondero's motion to compel deposition testimony[47] concerning six (out of twenty) Rule 30(b)(6) topics on the grounds that the topics were either irrelevant or sought information in Mr. Dondero's possession. Ex. 32, Appx. 3963-3964.  Despite referencing the "antagonism" between Mr. Dondero and Mr. Seery, this Court did not prevent Mr. Dondero from deposing Mr. Seery on fourteen other deposition topics.

80.     Mr. Dondero did not appeal this ruling.

---

[47] Adv. Proc. No. 21-03003, Docket No. 49.

APP.3114

### L.   August 2021 Order Finding Certain Movants in Contempt of this Court

81.   In the Renewed Motion, Movants cite an order entered on August 4, 2021—thirteen months before the Renewed Motion—holding Mr. Dondero and various non-Movants in civil contempt [Docket No. 2660] (the "Contempt Order")[48] as "[p]erhaps one of the most telling" examples of this Court's bias.  Renewed Motion at 14-15.  Movants, again, misstate the facts and the record and—most importantly—ignore the District Court's order affirming this Court's factual and legal findings in the Contempt Order in all material respects.[49]

82.   *First*, Movants materially misstate the facts of the April 12, 2021, complaint (the "HV Complaint").[50]  Movants allege the HV Complaint addressed Highland's "brokering the sale of CLO interests held by HarbourVest … without prior notice to other CLO investors and without respecting those investors' right of first refusal" in violation of some undisclosed duty.  Renewed Motion at 14.  That is wrong, and Movants should know that.  They drafted the HV Complaint.

83.   As this Court knows, the facts are as follows:  Prior to Highland's bankruptcy, HarbourVest[51] purchased certain of CLOH's interests in Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey-based investment vehicle,[52] for approximately $80 million ultimately owning 49.98% of HCLOF's interests.  After Highland's bankruptcy, HarbourVest filed claims against Highland in excess of $300 million and sought rescission of its investment in HCLOF

---

[48] The Contempt Order is the second time that Mr. Dondero has been held in contempt for violating this Court's orders. *See* n.11 *supra*.

[49] *Charitable DAF Fund L.P. v. Highland Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022).  The only finding not affirmed was the payment of $100,000 if an appeal was filed.  Movants only mention of the District Court order is a one line footnote.  Renewed Motion at 15 n.72.

[50] Adv. Proc. No. 21-03067-sgj, Docket No. 1.

[51] "HarbourVest" means, collectively, HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.

[52] HCLOF is managed by its Guernsey-based board of directors and is not controlled by Highland.

31

APP.3115

alleging it was fraudulently induced by factual misrepresentations and omissions made by Mr. Dondero and certain of Highland's employees prior to the bankruptcy.

84.     Highland and HarbourVest settled HarbourVest's claims, and Highland filed a motion [Docket No. 1625] seeking Court approval.  Under the settlement, HarbourVest received allowed claims totaling $80 million in aggregate and transferred its interests in HCLOF to a Highland subsidiary, effectively rescinding HarbourVest's investment in HCLOF.  All aspects of the settlement were publicly disclosed in Highland's motion.  Mr. Dondero, Dugaboy, Get Good, and CLOH all objected.  CLOH argued it had a right of first refusal to HarbourVest's HCLOF interests.  However, after reviewing Highland's pleadings, HCLOF's governing documents, and applicable law, CLOH determined it had no such right and knowingly and intentionally withdrew its objection.  This Court approved the settlement, including the transfer of HarbourVest's interests in HCLOF.

85.     Three months later, CLOH, among others (collectively, the "Dondero Plaintiffs"), filed the HV Complaint seeking, among other things, to enforce their alleged right of first refusal—a right CLOH had conceded did not exist.[53]  Shortly thereafter, the Dondero Plaintiffs sought to add Mr. Seery as a defendant in clear violation of the Settlement Order and the order appointing Mr. Seery as Highland's chief executive officer and chief restructuring officer [Docket No. 854].

---

[53] The District Court referred the HV Complaint to this Court for adjudication under the standing order reference, and, on March 11, 2022, this Court dismissed the HV Complaint on the basis of collateral and judicial estoppel. *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 659 (Bankr. N.D. Tex. Mar. 11, 2022).  The Dondero Plaintiffs appealed, and the District Court reversed and remanded.  Ex. 33, Appx. 4017-4038.  Contrary to Movants' statements, the District Court did not find, in any way, that the HV Complaint "had merit."  Renewed Motion at 15 n.72.  Instead, it found that this Court appropriately applied collateral estoppel *sua sponte* and that all of the elements of collateral estoppel were met except one—"actually litigated"—because a settlement under Rule 9019 has a different legal standard.  *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 643 B.R. 162, 173 (N.D. Tex. 2022).  The District Court also found that the first two elements of judicial estoppel—"inconsistency" and "court's acceptance"—were met but that this Court failed to assess the third element—"inadvertence."  *Id.* at 175.  The District Court remanded to this Court to determine if CLOH's withdrawal of its objection was "inadvertent."  On October 14, 2022, Highland filed a renewed motion to dismiss the HV Complaint.  Adv. Proc. No. 21-03067-sgj, Docket No. 122 (Bankr. N.D. Tex. Oct. 14, 2022).

DOCS_NY:46569.9 36027/003

Accordingly, this Court, after an evidentiary hearing, issued the Contempt Order finding Mr.

Dondero and others in contempt.

86.     *Second,* Movants falsely allege Mr. Dondero credibly testified "he was not

involved at all in authorizing or preparing the motion to add Mr. Seery" and there was no evidence

to the contrary.  Renewed Motion at 15.  This is directly contradicted by the actual record.  As the

District Court explained:

> Ample evidence supports the bankruptcy court's factual findings.  Dondero has had
> a significant role in DAF for over a decade.  DAF's assets come in part from
> Dondero and his "family trusts."  Dondero "was DAF's managing member until
> 2012," and he remains "DAF's informal investment advisor."  After Dondero
> stepped down as managing member, that role went to Grant Scott, "Dondero's long-
> time friend, college housemate, and best man at his wedding."  Scott ultimately
> resigned due to "disagreements with … Dondero."

> Patrick replaced Scott as "DAF's general manager on March 24, 2021"—19 days
> before the Seery Motion.  Patrick initially had "no reason to believe that Mr. Seery
> had done anything wrong with respect to the HarbourVest transaction."  Only once
> "Dondero told [him] that an investment opportunity was essentially usurped" did
> Patrick "engage[] the Sbaiti firm to launch an investigation" and ask "Mr. Dondero
> to work with the Sbaiti firm with respect to their investigation of the underlying
> facts."  After that, Dondero "communicated directly with the Sbaiti firm"—Patrick
> did not.  Dondero "saw versions of the complaint before it was filed" and had
> "conversations with attorneys" about the complaint pre-filing.  That complaint
> focused on "Seery's allegedly deceitful conduct" and "mention[ed] Mr. Seery 50
> times."  Further, when listing the parties, the complaint listed each party named in
> the caption along with "[p]otential party James P. Seery, Jr.," providing his
> citizenship and domicile.

> Further, although Dondero averred that he did not direct the Sbaiti firm to add Seery
> to the complaint, Dondero also contradicted himself, first claiming that he did not
> know that "the Sbaiti firm intended to file a motion for leave to amend their
> complaint to add Mr. Seery," but then agreeing during the hearing that he
> "[p]robably" was "aware that that motion was going to be filed prior to the time
> that it actually was filed."  He also testified to conversations about the Seery
> Motion, noting that it involved a "very complicated legal preservation" issue.

> Based on all that evidence, the Court is not left with a definite and firm conviction
> that the bankruptcy court erred.  After being stymied in the bankruptcy court,
> Dondero manufactured the exigency for the lawsuit that challenged Seery's
> conduct.  Dondero's claim that he "did not suggest that Mr. Seery should be added
> as a defendant" is not credible.  Dondero gave Patrick the idea of challenging

Seery's conduct, and he worked with the Sbaiti firm to bring that idea to fruition in the complaint—a complaint that clearly contemplated adding Seery to the lawsuit. Likewise, his plea that he "had no involvement with the Seery Motion" is not credible. Dondero himself testified to the contents of attorney communications concerning the Seery Motion, eventually admitting that he "probably" had knowledge of the Motion before it was filed. In short, the bankruptcy court did not err, after considering the "totality of the evidence," in finding that Dondero had "the idea of" suing to "challenge Mr. Seery's … conduct," that he "encouraged Mr. Patrick to do something wrong," and that Patrick "abdicated responsibility to Mr. Dondero with regard to . . . executing the litigation strategy."

*Charitable DAF Fund, L.P.*, 2022 U.S. Dist. LEXIS 175778, at *18-21. The District Court, like this Court, included ample citations to the record, including the direct testimony of both Mr. Dondero and Mr. Patrick, to support its factual findings.[54] It is inconceivable this Court and the District Court both erred in assessing the evidence concerning Mr. Dondero's direct involvement in violating this Court's orders, yet Movants ignore the District Court.

87.     *Third,* Movants allegations about this Court's sanctions are false. Movants falsely allege Highland submitted invoices showing it had incurred just $38,796.50 defending against Mr. Dondero's contemptuous actions. Not true. Highland submitted invoices for $187,795. [Docket Nos. 2421-1, 2421-2; Ex. 34, Appx. 4048-4102]. Although this Court added to that amount to compensate for additional costs, this Court's sanction of $239,655 was affirmed by the District Court. *Charitable DAF Fund, L.P.*, 2022 U.S. Dist. LEXIS 175778, at *13-17. Again, Movants ignore the facts and the District Court.

### M.     September 2022 Denial of HCRE's Motion to Withdraw Its Proof of Claim.

88.     Finally, Movants cite to the September 12, 2022, hearing on the withdrawal of HCRE's proof of claim as an example of this Court's bias. Renewed Motion at 16-19. This

---

[54] Mr. Patrick was a long-time employee of Highland and, on information and belief, works for Skyview—an entity created to service Mr. Dondero and his controlled entities. Mr. Patrick has exclusively worked for Mr. Dondero and/or his controlled entities as a tax attorney for almost fifteen years.

DOCS_NY:46569.9 36027/003

example, like the others, is premised on a material distortion of the record and requires a complete factual reset before Movants' baseless allegations can be addressed.

89.     On April 8, 2020, HCRE filed a proof of claim with this Court (Claim No. 146) (the "HCRE Claim") that was signed by Mr. Dondero, HCRE's manager, and filed under penalty of perjury.  The HCRE Claim challenged Highland's interest in SE Multifamily Holdings, LLC ("SEMF"):

> HCRE … contends that all or a portion of Debtor's equity, ownership, economic rights, equitable or beneficial interests in SE Multifamily does [not] belong to the Debtor or may be the property of [HCRE]. Accordingly, [HCRE] may have a claim against the Debtor.

HCRE Claim, Ex. A.  On July 30, 2020, Highland objected to the HCRE Claim [Docket No. 906].

90.     On October 16, 2020, HCRE responded [Docket No. 1197] (the "HCRE Response") asserting, among other things, that it believed the SEMF governing documents "improperly allocate[] the ownership percentages of the members thereto due to mutual mistake, lack of consideration, and/or failure of consideration."  HCRE Response ¶ 5.  The HCRE Response was filed by the law firm of Wick Phillips Gould & Martin LLP ("Wick Phillips").

91.     During initial discovery, Highland discovered that Wick Phillips had represented Highland with respect to SEMF.  Wick Phillips refused to withdraw despite the conflict, and Highland moved to disqualify them on April 14, 2021 (the "Motion to Disqualify").[55]  The Motion to Disqualify was fully briefed[56] and heavily contested with significant pre-trial discovery.  On November 30, 2021, this Court held a lengthy hearing on the Motion to Disqualify and ultimately disqualified Wick Phillips from representing HCRE in connection with the HCRE Claim.

---

[55] Docket Nos. 2196, 2197, 2198.

[56] Docket Nos. 2278, 2279, 2294, 2893, 2894, 2895, 2927, 2928, 2952.

DOCS_NY:46569.9 36027/003

APP.3119

92.     In January 2022, HCRE retained replacement counsel.  After six months of HCRE's

silence, the parties agreed to an amended scheduling order on June 9, 2022 [Docket Nos. 3356,

3368] and restarted discovery.   Discovery included significant document production and

depositions of Mark Patrick, BH Equities (a third-party investor in HCRE), Barker Viggato LLP

(HCRE's accountant), and James P. Seery, Jr., as Highland's 30(b)(6) witness.

93.     Mr. Dondero and Matthew McGraner (a SEMF equity holder) were scheduled to

be deposed, and trial was set for early November 2022.

94.     However, on August 12, 2022, two days after Mr. Seery's deposition, HCRE filed

its motion to withdraw the HCRE Claim [Docket No. 3443] (the "Motion to Withdraw") pursuant

to Federal Rule of Bankruptcy Procedure ("FRBP") 3006 and unilaterally canceled the previously

scheduled depositions of Mr. Dondero and Mr. McGraner.

95.     The Motion to Withdraw (correctly) cited *Manchester, Inc. v. Lyle (In re*

*Manchester, Inc.)* for the test to determine whether a claim could be withdrawn under FRBP 3006.

2008 Bankr. LEXIS, at *11-12 (Bankr. N.D. Tex. Dec. 19, 2008) (weighing (1) movant's diligence

in bringing the motion; (2) movant's "undue vexatiousness;" (3) extent to which the suit has

progressed and the costs and expenses incurred by the non-party in preparing for trial; (4)

duplicative expense of re-litigation; and (5) adequacy of movant's explanation for withdrawal).

96.     On September 2, 2022, Highland filed its opposition to the Motion to Withdraw

[Docket No. 3487] (the "Objection to Withdraw") asking this Court to deny the Motion to

Withdraw and require Mr. Dondero and Mr. McGraner to sit for the previously agreed depositions

or, in the alternative, to condition the withdrawal of the HCRE Claim pursuant to FRBP 3006.

Objection to Withdraw ¶¶ 4, 76-80.

97.     On September 12, 2022, this Court held a hearing on the Motion to Withdraw.

Contrary to Movants' allegations, this Court did not show bias towards Movants at that hearing.

Instead, the following is clear from the record:

- HCRE presented *no* evidence regarding the *Manchester* factors and only addressed one *Manchester* factor—legal prejudice—in argument.[57]

- HCRE's only explanation for withdrawing the HCRE Claim was that HCRE "[didn't] need the proof of claim anymore."[58]  HCRE did not address why it believed there was a mutual mistake when it filed the HCRE Claim in April 2020 or provide any other explanation for the withdrawal of the HCRE Claim on the eve of trial.

- Highland, in distinction, introduced significant evidence with respect to each of the *Manchester* factors.  Specifically, Highland showed that:

  1) HCRE was not diligent in filing the Motion to Withdraw having filed it twenty-eight months after filing the HCRE Claim;

  2) HCRE was "unduly vexatious" as it (a) had no good faith basis for filing the HCRE Claim in the first instance, (b) forced Highland to spend hundreds of thousands of dollars on discovery, depositions, and the Motion to Disqualify, and (c) withdrew the HCRE Claim only after it had completed its discovery while denying Highland the opportunity to depose Messrs. Dondero and McGraner;

  3) The HCRE Claim had been litigated for two years and was, with the exception of the depositions of Mr. Dondero and Mr. McGraner, trial-ready;

  4) There was a material risk of duplicative litigation.  HCRE (and Mr. Dondero) consistently declined to answer whether withdrawal of the HCRE Claim would preclude future challenges to Highland's ownership interest in SEMF—the subject matter of the HCRE Claim; and

  5) HCRE had no adequate explanation for withdrawing the HCRE Claim.  HCRE provided no evidence justifying its concern about Highland's interference in SEMF's management and no articulated basis for no longer asserting mutual mistake.

Ex. 35, Appx. 4112-4132.

98.     Notwithstanding HCRE's complete lack of evidence, at the hearing, Highland

stated, on the record, it would consent to the withdrawal of the HCRE Claim if HCRE (a) made

---

[57] Ex. 35, Appx. 4109-4110.

[58] *Id.* Appx. 4109-4110; Appx. 4134.

"an ironclad commitment that HCRE is irrevocably waiving its right to challenge Highland's interest in [SEMF];" (b) waived its right to appeal; (c) agreed not to rely on its deposition of Mr. Seery for any purpose; and (d) reimbursed Highland's costs incurred in the two years of litigation on the HCRE Claim. *Id.* Appx. 4114-4115; Appx. 4129; Appx. 4136-4137.

99.     HCRE, however, was unable to satisfy even the first requested condition—waiver of its right to challenge Highland's interest in SEMF.

- First, HCRE's counsel, Bill Gameros,[59] attempted to enter into an agreement on behalf of his client; however, it was clear from the record that Mr. Gameros had not spoken with his client about the proposed resolution, that he needed "to confer with [his] client" before he could agree, and he had no authority to bind his client.

- Second, after a fifteen minute recess to allow Mr. Gameros to produce a client representative, D.C. Sauter appeared before this Court. This Court asked Mr. Gameros "what is [Mr. Sauter's] position with HCRE." Mr. Sauter replied: "I don't have an official position with HCRE" but alleged, without evidence or support, that Mr. Dondero had authorized him to speak on HCRE's behalf despite his not being an officer, director, employee, interest holder, or even counsel of HCRE. Mr. Sauter clearly had no legal capacity to bind HCRE.[60]

- Third, Mr. Dondero, HCRE's manager, appeared before this Court by telephone.[61] Mr. Dondero, however, refused to give an unconditional response to his counsel's question: "Mr. Dondero, do you agree that [HCRE] will not challenge in any way the estate's interest in [SEMF], its 46-point whatever percent interest it is" Instead, Mr. Dondero stated Highland's ownership interest in SEMF "could change over time" and that "no business man can agree" to Mr. Gameros' question.

---

[59] Highland and this Court were both justifiably concerned about Mr. Gameros' ability to make a binding deal based on their experience with, among other things, the HV Complaint. In early 2021, CLOH, through counsel, conceded on the record that it had no right of first refusal to HarbourVest's interests in HCLOF. Three months later, CLOH, through new counsel, filed the HV Complaint arguing it did have a right of first refusal. *See* ¶ 84 *infra*.

[60] Movants allege this Court chastised Mr. Sauter. Renewed Motion at 17 ("[T]he Court responded [to Mr. Sauter]: 'I mean I'm not sure I care what you say, no offense. I don't think I have a person with clear authority here.'") The Court directed that statement at John Morris, Highland's counsel, not Mr. Sauter. Ex. 35, Appx. 4140 ("Mr. Morris, do you want to respond? I mean I'm not sure, frankly, I care what you say….")

[61] Movants allege this Court "rebuffed [Mr. Dondero] for failing to have access to video, even though he [had] no previous notice he would have to give testimony at the hearing." Renewed Motion at 18. This Court was justifiably confused by Mr. Dondero's lack of access to video. Moments before Mr. Dondero's appearance, Mr. Sauter said he had "to run around the corner and try to make sure [Mr. Dondero] knows how to unmute himself." *Id.* Appx. 4141-4142. The logical inference from that statement is that Mr. Dondero was in the office with Mr. Sauter, not in his car as he claimed. Regardless, all this Court said about Mr. Dondero's lack of video was "this is not ideal, you know, without us seeing you." *Id.* Appx. 4142. That is no "rebuff."

*Id.* Appx. 4135-4146. Consequently, because of HCRE's (a) inability to satisfy the condition to withdraw and (b) failure to satisfy any of the *Manchester* factors, this Court denied HCRE's request to withdraw the HCRE Claim.

     100.    Notwithstanding the allegations in the Renewed Motion:

- This Court did not find that HCRE "had acted with 'undue vexatiousness' … merely because [Highland] opposed the claim and had spent 'hundreds of thousands of dollars' doing so." Renewed Motion at 18. As set forth above, "undue vexatiousness" is a *Manchester* factor which this Court had to assess. After reviewing Highland's voluminous evidence and the lack of evidence from HCRE, this Court simply found "the undue vexatiousness factor … weigh[ed] in favor of there has been undue vexatiousness." *Id.* Appx. 4156.

- This Court did not "order[] additional depositions to take place and the parties to attend trial." Renewed Motion at 18. The Motion to Withdraw was denied, and, accordingly, the hearing on the HCRE Claim and Highland's previously scheduled depositions of Mr. Dondero and Mr. McGraner would naturally proceed. *Id.* Appx. 4158.

- This Court did not, "as a parting shot," direct the UST to investigate HCRE and Mr. Dondero. Renewed Motion at 18. Significant evidence had been produced at the hearing on the lack of good faith of the HCRE Claim (and Mr. Dondero's potential perjury) (*Id.* Appx. 4117-4123), and this Court was obligated by law to report the matter to the UST pursuant to 18 U.S.C. § 3057(a).[62]

## **ARGUMENT**

     101.    Section 455 of Chapter 28 of the United States Code provides, in relevant part, that:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

     (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.

---

[62] *See* 18 U.S.C. § 3057(a) ("Any judge, receiver, or trustee having reasonable grounds for believing that any violation under chapter 9 of this title or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed.")

28 U.S.C. § 455(a), (b)(1).  "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstances arises or, if appropriate, shall be disqualified from presiding over the case."  FRBP 5004(a).

102.    Recusal motions brought under Section 455(a) must be "timely."  *Hill v. Schilling*, 495 Fed. App'x 480, 483 (5th Cir. 2012); *see also Grambling Univ. Nat'l Alumni Ass'n v. Bd. of Supervisors for La. System*, 286 Fed. App'x 864, 867 (5th Cir. 2008) (noting that while "[s]ection 455 does not contain an explicit timeliness requirement … this Court has consistently inferred such a requirement") (citing *United States v. Sanford*, 157 F.3d 987, 988 (5th Cir. 1998)).  "The timeliness rule requires that 'one seeking disqualification must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification.'" *Sanford*, 157 F.3d at 988–89 (quoting *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994)). "The most egregious delay—the closest thing to *per se* untimeliness—occurs when a party already knows the facts purportedly showing an appearance of impropriety but waits until after an adverse decision has been made by the judge before raising the issue of recusal."  *Sanford*, 157 F.3d at 988–89; *see also Delesdernier v. Porterie*, 666 F.2d 116, 122 (5th Cir. 1982) ("Congress did not enact § 455(a) to allow counsel to make a game of the federal judiciary's ethical obligations; we should seek to preserve the integrity of the statute by discouraging bad faith manipulation of its rules for litigious advantage.")

103.    Even if a motion is timely, whether to grant it is committed to the sound discretion of the targeted court. *See Hill v. Breazeale*, 197 Fed. App'x 331, 335 (5th Cir. 2006).  "The judge abuses [his or her] discretion in denying recusal where a reasonable [person], cognizant of the relevant circumstances surrounding [the] judge's failure to recuse, would harbor legitimate doubts

about that judge's impartiality." *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999) (a motion to recuse is committed to the discretion of the targeted judge).  "The standard for bias is not 'subjective' … but, rather, 'objective.'" *Andrade v. Chojnacki*, 338 F.3d 448, 454-55 (5th Cir. 2003) (citing *Vieux Carre Prop. Owners, Residents & Assocs. v. Brown*, 948 F.2d 1436, 1448 (5th Cir. 1991)).  In other words, it "is with reference to the 'well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person' that the objective standard is currently established."  *Id.* (quoting *United States v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995)). "Another maxim is that review should entail a careful consideration of context, that is, the entire course of judicial proceedings, rather than isolated incidents."  *Id.* at 455.  Finally, the common-law doctrine called the "extrajudicial source rule" under Section 455 "divides events occurring or opinions expressed in the course of judicial proceedings from those that take place outside of the litigation context and holds that the former rarely require recusal."  *Id.*  The movant must: (1) demonstrate that the alleged comment, action, or circumstance was of "extrajudicial" origin, (2) place the offending event into the context of the entire trial, and (3) do so by an "objective" observer's standard.  The movant must also demonstrate the "court's refusal to recuse was not merely erroneous, but, rather, an abuse of discretion." *Id.* at 456-62.

104.    Here, it is indisputable that (a) the Renewed Motion, which largely restates the Initial Motion, is "untimely;" (b) "bias" does not exist; (c) there is no "deep seated antagonism;" and (d) there is no evidence of "extrajudicial knowledge."  The exceptional and rare remedy of recusal is not warranted and the Renewed Motion, like the Initial Motion, must be denied.

## I.    The Renewed Motion Must Be Denied as Untimely

105.    This Court denied the Initial Motion on the basis that it was untimely and should deny the Renewed Motion on the same grounds.

41

APP.3125

106.    This Court determined the Initial Motion was "untimely" because it was filed: (a) "more than 15 months after the case was transferred to this Court" and after Movants learned about the facts purportedly showing an "appearance of impropriety," (b) "after many dozens of orders" were issued by this Court, and (c) "on the eve of a contempt hearing." Recusal Order at 7.  Yet, Movants did not seek recusal until March 2021 and allowed this Court to expend significant judicial resources overseeing this case and Movants' litigation.  Movants offered no credible explanation for the delay in bringing the Initial Motion.

107.    The Renewed Motion suffers from the same infirmities but is even less "timely" than the Initial Motion.  *First*, the Renewed Motion incorporates the Initial Motion and its "examples" of bias.  Those examples were untimely when the Initial Motion was filed in March 2021 and are even more so now.  *Second*, the Renewed Motion was filed (a) thirty-four months after this case was transferred to this Court, (b) seven months after the District Court denied the appeal of the Recusal Order, and (c) after this Court entered many hundreds more orders.  The "new" examples of bias in the Renewed Motion are also untimely.  With one meritless exception, all "new" examples occurred on or before August 4, 2021—over a year ago—with one actually occurring before the Initial Motion was filed.  Like the Initial Motion, the Renewed Motion was also filed to prevent this Court from entering orders adverse to Movants—denying the dispositive motions to dismiss filed in the Kirschner Adversary.[63]  Supplemental Motion ¶¶ 7, 9.

108.    This, alone, constitutes "*per se* untimeless."  *See Hill*, 197 Fed. App'x at 335 (holding district court did not abuse its discretion in denying motion to recuse as untimely where party "waited, for no given reason, to raise the issue until after the district court ruled against

---

[63] "Kirschner Adversary" means *Marc S. Kirschner, as Litigation Trustee for the Litigation Sub-Trust v. James D. Dondero, et al.*, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.).

DOCS_NY:46569.9 36027/003

him"); *Sanford*, 157 F.3d at 989 (affirming district court's denial of recusal motion as untimely where party "knew of the facts purportedly causing an appearance of impropriety," but waited until after an adverse decision to raise the recusal issue); *Grambling*, 286 Fed. App'x at 867-88 (affirming denial of recusal motion as "*per se*" untimely where "despite having knowledge of the facts underlying its recusal argument," party "did not immediately move to have this case assigned to a judge from another division or district and instead allowed the case to linger … for nearly ten months. When the [party] finally acted, it did so only after [the judge] had dismissed its claims"); *Hill v. Schilling*, 2014 WL 1516193, at *3 (N.D. Tex. Apr. 17, 2014) (affirming judge's finding that motion to recuse was untimely where it was brought "some eleven months after [plaintiff] and his counsel first became aware of the" facts giving rise to alleged perception of bias); *Da Silva Moore v. Publicis Groupe*, 868 F. Supp. 2d 137, 155 (S.D.N.Y. 2012) ("Plaintiffs here had the requisite knowledge no later than January 4, 2012, but the recusal request did not come until nearly three months later," noting "I have made no efforts to hide my views, relationships or affiliations. If plaintiffs truly believed that any of these issues, individually or collectively, created a bias or the appearance of partiality, they should have promptly moved for my recusal.")

109.    This Court also appropriately considered the fact that the Initial Motion came on the "eve of the contempt hearing." Recusal Order at 7. Similarly, Movants seek recusal now, after Mr. Dondero has been twice found in contempt, to prevent this Court from ruling in the Kirschner Adversary. Supplemental Motion ¶ 7. That is, in itself, grounds for denial. *See Weisshaus v. Fagan,* 456 Fed. App'x 23, 34 (2d Cir. 2012) (noting that "[a]lthough there was no dispositive ruling as to [defendant] at the time [plaintiff] brought her recusal motion, the district court aptly noted that the motion came on the heels of its direction that [plaintiff] submit to a deposition, thus strongly    suggesting    that    the motion    was    a    mere    fall-back    position    in    response    to

43

APP.3127

an adverse ruling."); *Da Silva*, 868 F. Supp. 2d at 154 (denying recusal motion where "[i]t appears that plaintiffs are improperly using the recusal motion as a 'fall-back position' to an unfavorable ruling.")

110.    In light of the expansive nature of this case and this Court's extensive knowledge of the proceedings that it has overseen throughout the last thirty-four months, interests of judicial economy also support this Court's denial of the Renewed Motion. *See United States v. Olis*, 571 F. Supp. 2d 777 (5th Cir. 2008) (affirming denial of recusal motion as untimely where party was aware of facts stated in recusal motion "well before he filed" the motion, noting that party "had duty to file [ ] motion for recusal before the court's judicial resources were spent on resolution of motions" and party "neither argues nor explains why his delay" was reasonable); *Hill*, 495 Fed. App'x at 484 ("Particularly in light of the expansive nature of these proceedings, considerations of judicial economy likewise countenance our conclusion that the district court did not abuse its discretion"); *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989) ("The motivation behind a timeliness requirement [for Section 455] is [] to a large extent one of judicial economy"); *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 237 (3d Cir. 2001) ("After a massive proceeding such as this, when the court has invested substantial judicial resources and there is indisputably no evidence of prejudice, a motion for recusal of a trial judge should be supported by substantial justification, not fanciful illusion"); *Weisshaus*, 456 Fed. App'x at 34 (affirming district court's denial of recusal motion as untimely where party "waited almost nineteen months" to file the recusal motion, at which point the district court had already expended substantial judicial resources overseeing and adjudicating" the parties' claims).

111.    Accordingly, this Court is well within its discretion to deny the Renewed Motion—like the Initial Motion—as untimely.

## II.   The Renewed Motion Must Be Denied on the Merits

112.    Even if the Renewed Motion had been timely, it must be denied on the merits.  The Renewed Motion fails to prove that any of the circumstances that would require disqualification under Section 455 are present here.

### A.    There Is No Extrajudicial Bias Present Here

113.    The core of Movants' argument in the Renewed Motion is, as in the Initial Motion, that this Court's "extrajudicial" bias toward Movants stemmed from opinions formed during the Acis Bankruptcy.  Renewed Motion at 4-5; Initial Motion ¶¶ 4-13.  That argument is still frivolous.

114.    As articulated by the Supreme Court, "[o]pinions formed by the judge on the basis of facts of prior proceedings do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Conkling v. Turner*, 138 F.3d 577, 592 (5th Cir. 1998) ("As a general rule, for purposes of recusal, a judge's 'personal' knowledge of evidentiary facts means 'extrajudicial,' so facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification") (internal quotations omitted).  Rather, opinions or beliefs formed from events on the record or from prior proceedings, or "intrajudicial" opinions, are subject to a "deferential" review, and are the "type of opinions/expressions that *Liteky* holds nearly exempt from causing recusal." *Andrade*, 338 F.3d at 460-62.

115.    Any opinion allegedly formed by this Court from the Acis Bankruptcy, a prior proceeding, is thus not an "extrajudicial" source and is precisely the type of opinion exempt from warranting recusal.  *See Liteky*, 510 U.S. at 555; *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 81 (5th Cir. 2011) (affirming denial of motion for recusal where "the only facts the [judge] learned about [party's] conduct were learned from judicial proceedings in the instant case and in previous

45

APP.3129

cases"); *Conkling*, 138 F.3d at 592 ("As a general rule, for purposes of recusal, a judge's 'personal' knowledge of evidentiary facts means 'extrajudicial,' so facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification") (internal quotations omitted).[64]

116.    For these same reasons, Movants' reliance on this Court's rulings as evidence of "antagonism" is equally deficient.  "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion … and can only in the rarest circumstances evidence the degree of favoritism or antagonism required … when no extrajudicial source is involved." *Liteky*, 510 U.S. at 555.  Here, and as set forth above, Movants rely on various rulings issued by this Court to demonstrate "bias."  These rulings, none of which involve an extrajudicial source, simply do not rise to the rare circumstance of evidencing the degree of antagonism warranted for recusal.  *See Liteky*, 510 U.S. at 555 ("Almost invariably, judicial rulings are proper grounds for appeal, not for recusal"); *Andrade*, 338 F.3d at 456 (denying recusal based on judicial rulings where events cited "are embodied in judicial actions that Movants could have, but did not, appeal").  Simply put, Movants offer no credible legal or factual basis for recusal. *See Henderson v. Dep't of Pub. Safety and Corrs.*, 901 F.2d 1288, 1296 (5th Cir. 1990) ("[E]ven the most superficial research would have put [the party] on notice that the factual circumstances he alleged were not grounds for recusal" under *Liteky*, noting "there is absolutely no case authority cited by [party] to the contrary.")

117.    Movants' "due process" argument that they "are entitled to a full and fair opportunity to make their case in an impartial forum—regardless of their history with that forum" (Renewed Motion at 19-20) is frivolous and should be summarily rejected.  Movants fail to support

---

[64] Movants rely on only one allegedly "extrajudicial" source relating to this Court's inquiries into COVID-related "PPP loans."  Renewed Motion at 8-9; Initial Motion ¶ 52.  However, as noted *supra*, this Court took no action against Mr. Dondero or any of the other Movants and did not even ask them to respond.

46

APP.3130

any notion of a "due process" violation. Nor could they. The record of this case shows the great lengths this Court has gone through to respect Movants' due process rights, notwithstanding their limited, if any, skin in the game. The cases cited by Movants in support of their contention are entirely inapplicable. *Miller v. Sam Houston State Univ.,* 986 F.3d 880, 893 (5th Cir. 2021) does not address the standard for "recusal" under Section 455 or the "extrajudicial" source rule. Rather, *Miller* deals with whether a case should be reassigned to a different district court judge on remand after the original judge did not give plaintiff the opportunity for discovery and *sua sponte* dismissed a plaintiff's claim of sex discrimination and retaliation under the Fair Labor Standards Act. Movants' other case on this point is equally irrelevant.[65] The types of exceptional circumstances warranting recusal in those cases are not present here. Movants otherwise offer no legal basis in support of their argument. Accordingly, this Court properly exercised its discretion in finding that there was no "extrajudicial" source warranting recusal.

### B. This Court Does Not Have Deep-Seated Antagonism Toward Movants

118.     Similarly, there is no basis to find that this Court has "demonstrate[d] such a 'high degree of favoritism or antagonism as make fair judgment impossible.'" Renewed Motion at 22. Movants contend the "record is replete with examples" of this Court's "antagonism" such that a reasonable observer would doubt this Court's impartiality. *Id.* Movants' arguments are without merit.

119.     "Judicial remarks that are critical or disapproving of, or even hostile to, counsel for the parties or their cases, ordinarily do not support a bias or partiality challenge." *Liteky,* 510 U.S. at 555. In support of their argument that this Court harbored "bias" toward Movants, Movants

---

[65] The Court in *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 167 (5th Cir. 1997), denied a petition for a writ of mandamus challenging denial of recusal premised on racist remarks, where, although a "reasonable person might indeed harbor doubts about the trial judge's impartiality" in a "racially-charged case such as the instant one," the judge had already presided over the case for so long such that recusal at that stage "would be unprecedented."

refer to a number of this Court's statements regarding Mr. Dondero and his conduct. *See generally* ¶¶ 29-32, 34-100 *supra*. In relying on such statements, Movants disregard the law on recusal. *See Andrade*, 338 F.3d at 459 (affirming denial of recusal motion premised on judge's negative comments made on the record—including describing a witness as a "crazy, murdering son-of-a-bitch" and referring to parties' attempt to introduce certain evidence as "bullcrap") (citing *Liteky*, 510, U.S. at 555)). As this Court previously found, Movants' cited remarks are, at best, "clashes between a court and counsel," and such remarks are "simply insufficient" for recusal. Recusal Order at 10; *see also United States v. Landerman*, 109 F.3d 1053, 1066 (5th Cir. 1997) (affirming denial of motion to recuse where district judge allowed "the Government more leeway during its questioning and did interrupt defense counsel's questioning more often than the Government's questioning"); *Garcia v. Woman's Hosp. of Tex.*, 143 F.3d 227, 230 (5th Cir. 1998) (affirming denial of motion to recuse where district judge had made unflattering comments about plaintiff's ability to prove her case).

120.   Based on the entirety of the proceedings before this Court, in which all events raised by Movants relate to either this Court's knowledge of prior proceedings or this Court's remarks during these proceedings, the exceptional remedy of recusal is not warranted. *See United States v. Williams*, 127 Fed. App'x 736, 737-38 (5th Cir. 2005) ("As our review of the entire context of the judicial proceedings in which the events challenged in this case arose reveals no disqualifying judicial bias, we conclude that there was no abuse of discretion in the district court's denial of [the] recusal motion"); *Henderson*, 901 F.2d at 1296 (affirming court's denial of recusal motion, where "none of the circumstances requiring disqualification under § 455 are present here" and "the trial judge was well within his discretion in finding that the motion for recusal was not well founded, either in fact or in law.")

121.     This Court, respectfully, should again find that that Movants' assertions do not "rise to the threshold standard of raising doubt in the mind of a reasonable observer as to the judge's impartiality" (Recusal Order at 10) and deny the Renewed Motion.

## III.     This Court Lacks the Authority to Grant Movants' Alternative Relief

122.     Pursuant to 28 U.S.C. § 158(a), the District Court sits as a court of appeals over this Court and reviews (a) this Court's final orders and (b), if leave is granted by the District Court, its interlocutory orders.  28 U.S.C. § 158(a)(1), (3).  In its February Order, the District Court held that, as a matter of law, an order denying a motion to recuse is "an interlocutory order from which no appeal lies prior to this Court entering a final judgment" and is not an appealable collateral order.  *See, e.g.*, Ex. 12, Appx. 2106.  And, as set forth on Exhibit 36 (Appx. 4165-4169), there is still no final judgment; multiple matters are currently pending before this Court or are on appeal to the District Court or the Fifth Circuit.[66]  Yet, Movants, again, ask this Court to "make clear that any order denying recusal is final so that Movants may appeal this Court's order to the Northern District of Texas."  Renewed Motion at 24.

123.     As discussed above, in the Highland Objection, and at the August 31, 2022 status conference, it is not for this Court to determine whether its orders are final and appealable.  Movants' therefore request this Court to take actions that, respectfully, it has no authority to take: (a) enter an order declaring any interlocutory order it enters denying the Renewed Motion "final" and (b) dictate to the District Court that it has jurisdiction to hear an appeal of that interlocutory order.  Movants' request should be denied as a matter of law.

---

[66] *See Friendly Fin. Serv.-Eastgate, Inc. v. Dorsey (In re Dorsey)*, 489 Fed. Appx. 763, 764 (5th Cir. 2012) ("Here, there is a final judgment from the bankruptcy court, but the appeal of that judgment has not been fully resolved. … [W]e lack jurisdiction to review the motion to recuse.  Friendly Finance must await the final resolution of its appeal.")

DOCS_NY:46569.9 36027/003

APP.3133

## <u>CONCLUSION</u>

124.    For the foregoing reasons, Highland respectfully requests that this Court deny the

Renewed Motion and grant such other relief the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

50

APP.3134

Dated: October 31, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Tel: (310) 277-6910
Fax:  (310) 201-0760
Email:      jpomerantz@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:46569.9 36027/003

APP.3135

# EXHIBIT 7

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC, F/K/A HCRE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY'S AMENDED REPLY IN SUPPORT OF AMENDED RENEWED MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455 |

### MOVANTS' AMENDED REPLY IN SUPPORT OF AMENDED RENEWED MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................... 1

II.     HCMLP'S ITERATION OF THE "FACTS" IS IRRELEVANT AND WRONG ............ 1

        A.      HCMLP Misrepresents The Procedural History Of This Case .............................. 2

        B.      HCMLP Misreads The Court's Order On Movants' Motion To
                Supplement ........................................................................................................ 3

        C.      HCMLP's Arguments About The Outcome Of Various Rulings Are
                Irrelevant ........................................................................................................... 5

        D.      HCMLP Distorts The Factual Record And Fails To Cite Relevant
                Evidence ............................................................................................................ 5

        E.      HCMLP's Factual Arguments Only Underscore Why Recusal Is
                Necessary ......................................................................................................... 12

III.    HCMLP'S LEGAL ARGUMENTS ARE MERITLESS .............................................. 14

        A.      HCMLP's Argument Regarding Timeliness Is Wrong ...................................... 14

        B.      Movants Do Not Rely On Extrajudicial Bias, Nor Is It Required For
                Recusal ............................................................................................................ 16

        C.      There Can Be No Doubt Of The Court's Antagonism For Movants .................. 18

        D.      HCMLP Mischaracterizes The Alternative Relief Sought By Movants ............. 21

IV.     CONCLUSION ........................................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baldwin v. Zurich Am. Ins. Co.*,
  2017 WL 2963515 (W.D. Tex. July 11, 2017) ........................................................12

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009).................................................................................................14

*Davis v. Board of School Com'rs of Mobile Cnty.*,
  517 F.2d 1044 (5th Cir. 1975) ...............................................................................15

*Delesdernier v. Porterie*,
  666 F.2d 116 (5th Cir. 1982) .................................................................................15

*Dondero v. Hon. Stacey G. Jernigan*,
  Civ. Action No. 3-21-CV-0879-K, Dkt. 39 .......................................................21, 22

*Grambling Univ. Nat'l Alumni Ass'n v. Bd. of Supervisors for La. System*,
  286 F. App'x 864 (5th Cir. 2008) ..........................................................................15

*Hill v. Schilling*,
  495 F. App'x 480 (5th Cir. 2012) .....................................................................14, 15

*Johnson v. Sawyer*,
  120 F.3d 1307 (5th Cir. 1997) ...............................................................................20

*Matter of Johnson*,
  921 F.2d 585 (5th Cir. 1991) .................................................................................20

*Levitt v. Univ. of Texas at El Paso*,
  847 F.2d 221 (5th Cir. 1988) .................................................................................16

*Liteky v. United States*,
  510 U.S. 540 (1994).........................................................................................16, 17

*Liljeberg v. Health Servs. Acquisition Corp.*,
  486 U.S. 847 (2001).................................................................................................20

*NexPoint Advisors, L.P. et al. v. Highland Cap. Mgmt., L.P.*,
  No. 21-10449 (5th Cir. Aug. 19, 2022)..................................................................13

*Nix v. Major League Baseball*,
  2022 U.S. Dist. LEXIS 104770 (S.D. Tex. June 13, 2022) ....................................9

*Rorrer v. City of Stow,*
743 F.3d 1025 (6th Cir. 2014) ................................................................20

*Sentis Grp., Inc., Coral Grp., Inc. v. Shell Oil Co,*
559 F.3d 888 (8th Cir. 2009) ..................................................................20

*In re Shank,*
569 B.R. 238 (Bankr. S.D. Tex. 2017) .....................................................5

*Travelers Ins. Co. v. Liljeberg Enters., Inc.,*
38 F.3d 1404 (5th Cir. 1994) ..................................................................15

*United States v. Bergrin,*
682 F.3d 261 (3d Cir. 2012)....................................................................21

*United States v. Microsoft Corp.,*
56 F.3d 1448 (D.C. Cir. 1995) ................................................................20

*United States v. Olis,*
571 F. Supp. 2d 777 (5th Cir. 2008) .......................................................15

*United States v. Sanford,*
157 F.3d 987 (5th Cir. 1998) ...........................................................14, 15

*United States v. Whitman,*
209 F.3d 619 (6th Cir. 2000) ..................................................................21

*United States v. York,*
888 F.2d 1050 (5th Cir. 1989) .........................................................15, 16

*United Student Aid Funds, Ins. v. Espinosa,*
559 U.S. 260 (2010)..................................................................................5

**Statutes**

28 U.S.C. § 455.........................................................................14, 16, 20

Tex. Civ. Prac. & Rem. Code § 11.054 ........................................................12

**Other Authorities**

H. Rep. No. 1453, 93rd Cong., 2d Sess. 1 (1974).......................................14

iii

## I.  INTRODUCTION

The Objection to Renewed Motion to Recuse ("Objection") filed by Highland Capital Management, L.P. ("HCMLP" or the "Debtor") only underscores why recusal is not just warranted but necessary in this case.  HCMLP devotes only nine pages of its Objection to actual legal argument.  But that argument fails to address or distinguish much of the case law cited in Movants' Amended Renewed Motion to Recuse (the "Renewed Motion") [Doc. 3570] and relies on a litany of irrelevant cases that are easily distinguishable.  The remaining 41 pages of the Objection consist of procedural background (critical parts of which are wrong) and "additional background," which is largely rhetoric designed to exploit the Court's existing bias.

The main thrust of HCMLP's Objection is that the Renewed Motion is untimely and that the Court's rulings are correct and final.  But HCMLP cites the wrong legal standard for timeliness and relies on cases that have nothing to do with the posture of *this* case.  HCMLP's other refrain— that all of the Court's rulings discussed in the Renewed Motion are correct and final—is both ironic (given HCMLP's argument that the Court's order on recusal cannot be considered "final") and irrelevant to the ultimate issue of whether the Court's treatment of Movants is objectively biased such that recusal is appropriate.  HCMLP's only answer to that key question is that the Court has said it is not biased, and so it must be true.  That is not the standard for recusal and provides no basis to deny Movants' Renewed Motion.  The Renewed Motion should be granted.

## II.  HCMLP'S ITERATION OF THE "FACTS" IS IRRELEVANT AND WRONG

HCMLP's 41-page recitation of "facts" is laden with unsubstantiated assertions, misinformation, and irrelevant arguments that appear largely designed to distort rather than educate.  Movants see little utility in addressing many of those statements, which are irrelevant to the underlying question of whether the Court bears an objective bias against Movants requiring recusal.  Instead, Movants address only the most egregious examples of factual misstatements.

A.       HCMLP Misrepresents The Procedural History Of This Case

Although not relevant to the legal question of whether recusal is warranted, HCMLP

devotes substantial space in its Objection to discussing actions that HCMLP took early in the

bankruptcy case and attempting to hold those actions against Mr. Dondero.  *See, e.g.*, Opp., ¶¶ 1,

30-32, 34.  For example, while HCMLP accuses Mr. Dondero of forum shopping in connection

with the filing of HCMLP's bankruptcy, HCMLP has been represented by the same counsel,

Pachulski Stang Ziehl & Jones LLP ("Pachulski"), since before the bankruptcy was filed.

Pachulski was the law firm that filed HCMLP's chapter 11 bankruptcy in Delaware on HCMLP's

behalf. Moreover, Pachulski mounted a lively argument to the Delaware court against transferring

HCMLP's bankruptcy to this Court based on some of the very same concerns Movants have raised

in their recusal motion.  Renewed Mot. at 5 and nn.20-22.

Additionally, while HCMLP also claims that Mr. Dondero cannot complain about this

Court's bias because HCMLP did not appeal the Delaware court's order transferring HCMLP's

bankruptcy to the Northern District of Texas, only HCMLP could appeal such a decision, not Mr.

Dondero. Notably, HCMLP completely omits any facts related to Pachulski's representation of

HCMLP at the time, including any legal advice or representations that Pachulski may have given

in connection with any decision regarding pursuing an appeal. It is exceptionally misleading for

Pachulski to now argue that Mr. Dondero did something wrong or otherwise sat on his hands.

HCMLP likewise alleges that Mr. Dondero "voluntarily surrendered control of Highland

to an independent board of directors" and failed to object to or appeal (and to the contrary,

"affirmatively approved") the language of the related Settlement Order restricting Mr. Dondero's

actions and allowing the Court to sanction him.  Obj., ¶¶ 38-39.[1]  But again, HCMLP does not

---

[1] Mr. Dondero surrendered his positions at Strand, not HCMLP.  *See* Settlement Order, Dkt. 339.  Notably, while HCMLP argues that Mr. Dondero "voluntarily surrendered" his positions, HCMLP at the same time argues

want to discuss the legal advice that Pachulski (which represented HCMLP at that time) may have given in connection with any of those decisions by HCMLP.

Finally, to justify the Court's treatment of Movants, HCMLP repeatedly invokes the supposed "history and culture of litigiousness" at HCMLP under Mr. Dondero's leadership as well as the "plethora" of rulings and other judgments issued against both Mr. Dondero and his affiliates prior to bankruptcy. *See* Obj., ¶¶ 1, 26, 42. Although Movants dispute HCMLP's characterization of the company's culture prior to bankruptcy, it is worth noting that the decisions made by Highland regarding litigation prior to bankruptcy were not "propagated" solely by Mr. Dondero but were often conceived of and approved by other "human beings," including Thomas Surgent, HCMLP's former and current Chief Compliance Officer, its former Deputy General Counsel, and its current General Counsel. *See* Obj., ¶ 42. HCMLP conveniently buries Mr. Surgent's significant role in the company's past. Further, HCMLP fails to cite a single pre-bankruptcy ruling or judgment *against Mr. Dondero*, and Movants are aware of none. Nonetheless, HCMLP is content to make this statement repeatedly as though it is fact, which is consistent with what HCMLP has done throughout these bankruptcy proceedings.

### B.     HCMLP Misreads The Court's Order On Movants' Motion To Supplement

At the outset of its Objection, HCMLP argues that Movants' Renewed Motion should be rejected because it was filed in violation of the Court's order denying Movants' Motion for Final, Appealable Order and Supplement to Motion to Recuse ("Motion to Supplement"). Obj., ¶ 23 & n.21. That order directed Movants to either (1) file a "simple motion," seeking only a "revised and amended recusal order" but removing language that Movants perceived to impede their appellate rights, or (2) "file a new motion . . . based on alleged new evidence or grounds for

---

confusingly and contradictorily that Mr. Dondero was "forced to resign." *Compare* Obj., ¶ 38, *with* Obj., ¶ 32.

APP.3143

recusal" not previously considered by the Court.  Order, Dkt. 3479 at 3.  Importantly, however, the Court's order on the Motion to Supplement came on the heels of a hearing in which the Court specifically told Movants they could file a "new motion to recuse . . . to start this over *and* supplement the record." App'x at 0210 (emphasis added).[2]  HCMLP now argues that what Movants were supposed to file was a motion to recuse limited to new record evidence of bias and nothing more.  That argument is both nonsensical and irrelevant.

The entire point of Movants' Motion to Supplement was to ensure that an appellate court, when reviewing Movants' request for recusal, has the benefit of the *entire* record supporting recusal, as Movants made clear in their Motion to Supplement and at the hearing on that motion. *See* Dkt. 3470 at 4; App'x at 0207.  If the Court's order were read in the manner suggested by HCMLP, that would mean an appellate court could only consider a small portion of the record on appeal from the Court's denial of Movants' Renewed Motion, which would give the appellate court only a fraction of the relevant picture.  That makes no sense and adopting HCMLP's reading of the order would only further impede Movants' due process right to build an appellate record based on all salient evidence, which is all Movants have been trying to do.  In fact, HCMLP acknowledges that such attempt to restrict the record would be improper, as it admits that the Court must focus on the "entirety of the proceedings."  Obj., ¶ 120.

In any event, HCMLP's argument makes no difference to whether the Court should grant or deny Movants' Renewed Motion.  Movants' basis for recusal is not a single fact or an isolated incident.  Instead, Movants seek recusal based on a pattern of treatment throughout the bankruptcy proceedings that, taken as a whole, demonstrate both the appearance of bias and actual animus toward Movants.  There is no procedural or statutory bar to filing a motion to recuse at any time

---

[2] All references to "App'x" are to Movants' Appendix filed concurrently with their Renewed Motion. *See* Dkt. 3542-1 and 3571-1.

4

under these circumstances, based on any record evidence the moving party deems relevant to the issue. The Court may disagree that the evidence cited supports the relief requested, but Movants' mere inclusion of prior evidence is not a reason to deny the Renewed Motion.

### C.   HCMLP's Arguments About The Outcome Of Various Rulings Are Irrelevant

HCMLP also spends much of its time arguing that various rulings by the Court are final, were not appealed or have been upheld on appeal, or were otherwise correct. *See, e.g.*, Obj., ¶¶ 6, 12 n.11, 35, 39, 45, 64, 69, 71, 80. That is irrelevant. As Movants acknowledged in their Renewed Motion, recusal ordinarily should not be used as a mechanism to challenge the outcome of rulings issued by the courts. *See* Renewed Mot. at 20. And that is not what Movants seek to do. Instead, Movants seek recusal because the Court's *process*—including its overt negative rhetoric, its departure from usual procedures, and its general treatment of Movants—reflects the type of deep-seeded animosity that would cause any objective observer to question the Court's impartiality.[3]

In short, it does not matter whether the Court "got it right" or not. Recusal is required where, as here, the Court has acted in a manner that is partial, or at the very least appears partial.

### D.   HCMLP Distorts The Factual Record And Fails To Cite Relevant Evidence

HCMLP spills a lot of ink describing (in a manner rife with misstatements and distortions but often lacking citations or evidentiary support) what happened at various hearings cited by Movants in the Renewed Motion as evidence of bias. Again, the outcome of various motions and

---

[3] In any event, it is ironic that HCMLP argues so strenuously that any order on recusal cannot be final when it argues that various other interlocutory orders of this Court are necessarily final. *See* Obj., ¶¶ 3, 67. Notably, the issue of finality in this context is not as simple as HCMLP would have this Court think. In chapter 11 cases, there typically is no "final judgment" the way there is in an ordinary civil case in federal district court. For that reason, courts have held that the order confirming the chapter 11 plan of reorganization is the "final judgment" in bankruptcy. *See, e.g.*, *In re Shank*, 569 B.R. 238, 249 (Bankr. S.D. Tex. 2017) (citing *United Student Aid Funds, Ins. v. Espinosa*, 559 U.S. 260, 269 (2010)). The Plan was confirmed and became effective more than a year ago in this case. The vast majority of HCMLP's assets have been liquidated. Unsecured creditors have been paid a significant percentage of their claims. Yet HCMLP would seemingly have the courts conclude that that the case still is not "final" for purposes of appeal.

APP.3145

hearings makes little difference to this analysis. *How* those results came to be, on the other hand, makes all the difference. Thus, in addition to clarifying some of the more egregious misstatements made by HCMLP in the Objection, Movants will also clarify its use of the Court's hearing and rulings to demonstrate the Court's bias.

   ***The June 2020 CLO Holdco Hearing.*** HCMLP argues the Court's statements and actions at the CLO HoldCo hearing are not evidence of bias because "neither CLOH nor the DAF are Movants." Obj., ¶ 47. HCMLP further argues that Movants have the facts wrong because, HCMLP insists, "the $2.5 million was deposited into the court registry *at CLOH's request*." Obj., ¶ 48 (emphasis in original). Both of these arguments are wrong.

   First, it makes no difference that CLOH and the DAF are not Movants in the Renewed Motion. Both HCMLP and the Court have repeatedly argued that every entity remotely connected to Mr. Dondero is "controlled" by him, including CLOH and the DAF.[4] Moreover, the whole point is that the Court's animus toward Mr. Dondero results in the Court treating all of Mr. Dondero's affiliates (or presumed affiliates) as inherently suspicious, leading to rulings that are at odds with the evidence and the law. This is precisely what happened at the CLO Holdco hearing.[5]

   Second, HCMLP's argument that CLOH's money was deposited into the Court registry because CLOH wanted it there is disingenuous at best. Indeed, even the Debtor argued to the

---

[4] Indeed, one of the reasons that the Court refused to release CLOH's money, despite the Debtor's argument that it should do so, is because Matt Clemente, on behalf of the Unsecured Creditors Committee, argued at the hearing that the Court should disallow the distributions to CLOH and the DAF because those entities were "owned and/or controlled by Mr. Dondero." HCMLP App'x, at 3245.

[5] HCMLP argues that "Movants cannot have it both ways" and "[e]ither CLOH and the DAF are controlled by Mr. Dondero or they are not." Obj., ¶ 18. They are not "related" but are "connected." But it is HCMLP that is trying to have it both ways: it has argued throughout the bankruptcy proceedings that CLOH and the DAF, like many other entities, are "controlled" by Mr. Dondero, but they take the position in their Objection that the Court's treatment of CLOH and the DAF has nothing to do with him. In any event, the Plan (a document drafted by HCMLP) identifies CLOH and the DAF as "Related Parties," meaning that HCMLP views Mr. Dondero, CLOH, and the DAF as operating in lock-step. *See* Plan at 14.

APP.3146

Court at the hearing that the money should be released to CLOH.  *See* March 4, 2020 Hr'g Tr. at 17:8-22, HCMLP App'x at 3234.   However, when it became apparent that the Court was disinclined to release the money, Mr. Dondero's counsel proposed that, in the event the Court denied the motion, the funds at issue should be distributed into the registry of the Court as an alternative to permitting HCMLP to retain them.  *See id.* at 3260.   CLOH and the DAF certainly did not request that the Court retain the funds in its registry indefinitely, nor did they argue that depositing the funds in the Court's registry was the correct course of action.

HCMLP also argues that the Court's actions were not biased because CLOH sought a release of its money from the Court's registry less than a month later, something HCMLP deems "evidence of CLOH's bad faith."  Obj., ¶ 19.  Accusing Mr. Dondero and any entity connected to him of "bad faith" is another favorite tactic of HCMLP, likely because the Court has demonstrated its receptiveness to accusations of bad faith against Mr. Dondero, even when there is no valid basis for or evidence supporting the accusation.  But in this particular instance, the Court did not find that CLOH was acting in bad faith by seeking a release of money that indisputably belonged to it. And again, CLOH never agreed that its money could remain in the Court's registry indefinitely. In any event, HCMLP's argument in this regard is particularly misleading because HCMLP agreed to the release of CLOH's money.  It did so because *there was no good faith reason* to refuse to do so.  Notably, although the parties objecting to the release of CLOH's funds indisputably had no legal basis to object and no right to the funds (i.e., *zero* ownership interest in the funds), at no time did the Court comment that their objections were "Rule 11 frivolous" or threaten the objectors with sanctions.

***The December 2020 Restriction Motion.***  HCMLP also argues at length about why the Court's actions at the hearing on the Restriction Motion do not support recusal.  Obj., ¶¶ 51-56.

APP.3147

In particular, HCMLP cites a string of "admissions" from one of HCMLP's former Executive Vice Presidents, Dustin Norris, to argue that Mr. Norris provided "all of the evidence the Court needed to reach its conclusion" that Mr. Dondero was the sole person responsible for filing the Restriction Motion (which sought to prevent the liquidation of certain CLO assets).  Obj., ¶¶ 54-55.  But HCMLP conveniently fails to include all of the testimony Mr. Norris provided regarding the decision by the Retail Funds and the Advisors to file the Restriction Motion.[6]  Mr. Norris actually testified that, while Mr. Dondero vocalized concern about HCMLP's decision to liquidate the CLO assets, the Advisors' internal legal team, compliance team, and Mr. Norris working with outside counsel, along with senior management of Highland Capital Management Fund Advisors decided to pursue filing the Restriction Motion.  *See* December 16, 2020 Hr'g Tr. at 29:21-30:1, HCMLP App'x at 3368.  This is the critical testimony, and the Court simply ignored because it did not fit the narrative that Mr. Dondero is the bad actor behind every legal motion made in HCMLP's bankruptcy proceeding and nobody around him is able to make their own informed decision.

*The January 2021 Injunctive Relief Hearing.*  Drawing on one of its favorite unsupported themes (i.e., Mr. Dondero as puppet master), HCMLP next argues that the Court's treatment of the Retail Funds and Advisors at the January 2021 injunctive relief hearing was appropriate because "Mr. Dondero caused the Advisors and Retail Funds to continue interfering with, and unjustifiably threatening, Highland."  Obj., ¶ 57.  Of course, HCMLP cites no evidence for this accusation.  Then HCMLP doubles down, and it accuses Movants of "failing to disclose key facts" relating to the hearing.  Obj., ¶ 59.  The first such "fact" is HCMLP's argument that Movants "now admit"

---

[6] The "Retail Funds" are Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. The "Advisors" are Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.  Renewed Mot. at 19-20.  Although there is no evidence of record that these entities are or were owned or controlled by Mr. Dondero (and HCMLP cites to none), in keeping with its tactic of arguing that every entity is "controlled" by Mr. Dondero, HCMLP labels the Retail Funds and Advisors the "Dondero Parties" and argues that the Retail Funds are "controlled" by him.  Obj., ¶¶ 53, 63.  They are not.

APP.3148

the K&L Gates Letters were improper.  Obj., ¶ 60.  In support of this argument, HCMLP quotes a

short-hand description of the K&L Gates Letters from Movants' original recusal motion.  *Id.*, ¶ 60

n.40.  Movants most certainly did not and do not admit that the K&L Gates Letters were improper.

Those letters did nothing more than tell the Debtor that the Retail Funds and Advisors intended to

*seek the Court's permission* to lift the automatic stay to exercise their contractual rights.

HCMLP nonetheless argues (again, under the guise of "fact") that the K&L Gates Letters

were "quintessentially vexatious and sanctionable conduct" because they sought previously denied

relief through alternative means.  Obj., ¶ 60 (citing *Nix v. Major League Baseball*, 2022 U.S. Dist.

LEXIS 104770, at *58-65 (S.D. Tex. June 13, 2022)).  It is unclear how a letter explaining the

Retail Funds' and Advisors' intent to seek Court permission to act could possibly be considered

vexatious, and the case cited by HCMLP does not clear up that mystery.  In *Nix*, the plaintiff filed

multiple repetitive lawsuits in various jurisdictions and also lawsuits in the same

jurisdiction alleging slightly different causes of action.  2022 U.S. Dist. LEXIS, at *58-65.  That

is vastly different from the situation involved here, where the Retail Funds and Advisors took non-

judicial action by asking the Debtor not to liquidate CLO assets at below market value and advising

the Debtor that they would seek Court intervention if necessary.

**The January 2021 Examiner Motion.**  HCMLP also argues that the Court's

disenfranchisement of Movants makes no difference because Movants "admit" they acted for an

improper purpose in seeking the appointment of an examiner in advance of the February 2021

confirmation hearing.  Obj., ¶ 67 (citing Movants' original recusal motion).  Specifically,

according to HCMLP, Movants "admit" that they filed a motion for an examiner "to force a delay

of the long-scheduled Confirmation Hearing."  *Id.*  But the quote HCMLP cites (which is from

Movants' original recusal motion as opposed to the Renewed Motion) is taken out of context.  The

very next sentence of the original recusal motion explains that Movants sought to have the examiner motion heard on an *expedited basis* to *prevent* delay of the confirmation hearing, which might occur if the motion was heard on an ordinary schedule. *See* Original Recusal Mot., Dkt. 2061, ¶ 37.[7]  Rather than provide expedited relief—something the Court has done many times at HCMLP's request—the Court set the hearing on Movants' motion on a date *after* the scheduled confirmation hearing, ensuring that Movants could not be meaningfully heard because, as the Court knew, an examiner cannot be appointed after plan confirmation.[8]

**_Orders Requiring Mr. Dondero to Appear._**  HCMLP does not meaningfully dispute that the Court took the extraordinary measure of requiring Mr. Dondero to appear at all hearings, including hearings that had nothing to do with him.  Instead, HCMLP argues (without citation) that Mr. Dondero proved that the Court's order was appropriate when he "subsequently failed to appear at a hearing thereby validating the Court's concerns."  Obj., ¶ 76.  This accusation is highly disingenuous.  As Mr. Dondero's counsel explained on the record at that hearing, the motion at issue (a motion to continue) was set on an expedited basis, Mr. Dondero's counsel was not aware that Mr. Dondero needed to attend non-evidentiary hearings in the main bankruptcy case and, therefore, counsel failed to coordinate with Mr. Dondero to apprise him of the hearing and his need to appear, which counsel admitted was an "oversight" on counsel's part.[9]  In other words, there is no evidence that Mr. Dondero deliberately flouted the Court's order.  Notwithstanding counsel's admission that the mistake was his, the Court *sua sponte* issued a new order requiring Mr. Dondero

---

[7] Notwithstanding that HCMLP ignores the context of the quote it relies on (which actually shows that Movants' intent was the opposite of delay), HCMLP deems Movants' act of filing the examiner motion "quintessentially vexatious." Obj., ¶ 67.

[8] For that reason, HCMLP's observation that "[n]o party appealed the denial of the Examiner Motion" makes no sense. As HCMLP's counsel is no doubt aware, an examiner cannot be appointed after plan confirmation, so any appeal of the Court's order would have been futile and no doubt would have been labeled by HCMLP as "vexatious."

[9] *See* Supp. App'x, Ex. Z, May 20, 2021 Hr'g Tr. at 17:20-22:26.

APP.3150

to appear at every hearing going forward, whether substantive or not, and whether he took a position on the issue to be heard or not. *See* Order dated May 24, 2021, Dkt. 2362.

HCMLP also strenuously argues that the Court "*never* ordered Nancy Dondero to appear at any hearings." Obj., ¶ 77. But HCMLP admits that the Court *did* order the trustee of The Dugaboy Investment Trust ("Dugaboy") and Get Good Trust to attend any hearings involving those entities or hearings at which those entities took a position. Order, Dkt. 2458. And the Court knew at that point that Mr. Dondero's sister, Nancy Dondero, was the acting trustee of Dugaboy. The Court only ordered the trustees to appear because it "ha[d] concerns whether these Trusts [were] simply acting at the direction of Mr. Dondero and are not independent parties." *Id.* at 3. In other words, the Court's order intentionally targeted Mr. Dondero.[10] In the more than three years since this bankruptcy proceeding began, the Court has not ordered any other party to attend all hearings.

**Other Supposed "Facts".** In addition to these factual misstatements and distortions, HCMLP also fails to cite evidence and, on numerous occasions, couches allegations as fact. By way of example only:

- HCMLP makes numerous statements of supposed "fact" without citing any evidence to support the allegation, including, but not limited to: Obj., ¶¶ 28 (Mr. Dondero and his entities are legion), 30 (chapter 11 filed in Delaware because Mr. Dondero thought it would be a more hospitable forum), 37 (settlement was necessary due to Dondero entities' history of self-dealing), 42 (Mr. Dondero and his entities have a history of litigiousness supported only by a footnote that is further factual argument rather than evidence to support such an allegation), 57 (Mr. Dondero continued to cause advisors to interfere with HCMLP), 63 (Mr. Dondero controls all of the Dondero entities and causes them to attempt to reassert control

---

[10] HCMLP also argues that the Court's order requiring the trustees for Dugaboy and Get Good to appear at hearings was much narrower than the order regarding Mr. Dondero. Obj., ¶ 77. While the Court did not order the trustees to attend all hearings, the order was nonetheless incredibly broad. It required Ms. Dondero as trustee to attend "all future hearings in th[e] Bankruptcy Case in which the Trusts have taken or are taking a position." Order, Dkt. 2458, at 3. The order further clarified: "This directive does not apply merely to evidentiary hearings or "substantive" hearings, and [sic] it applies to the underlying bankruptcy case as well as related adversary proceedings in which the Trusts are parties or take positions." *Id.*

APP.3151

over HCMLP), 82 (Movants filed the HV Complaint).

- HCMLP repeatedly attributes actions to the Movants that the Movants did not take and calls every party it describes a "Dondero party," again without citation to any evidence of ownership, control, or even involvement. *See, e.g.*, Obj., ¶ 1, 53, 63, 82, 85.

- In describing the Court's "experience with Mr. Dondero," HCMLP cites (as one example of Mr. Dondero's prior "bad acts") that "Mr. Dondero allegedly orchestrated a fraudulent transfer of assets that left the Acis debtors judgment proof." Obj., ¶ 29. It is unclear how an unsubstantiated "allegation" could support this Court's opinions of Mr. Dondero, but this highlights the problem.

HCMLP's recitation of supposed facts falls well short of providing any viable reason to reject Movants' Renewed Motion.

### E.    HCMLP's Factual Arguments Only Underscore Why Recusal Is Necessary

What is perhaps most telling about HCMLP's recitation of "facts" is its tendency to repeatedly emphasize those points that it believes will resonate with this Court, even where the point is untethered to fact.

Most notably, HCMLP repeats its allegations that the problem here is not judicial bias but "the never-ending, meritless, vindictive, and vexatious litigation strategy that Mr. Dondero stubbornly clings to regardless of the burdens imposed on the judicial system, the havoc wrought, and the damages inflicted on himself, Highland's creditors, and even his own steadfast loyalists." Obj., ¶ 2. That statement is remarkably ironic, for a number of reasons. First, as HCMLP acknowledges, "[t]his Court did *not* find or conclude that Movants are 'vexatious litigants.'" *Id.*, ¶ 71 n. 43 (emphasis in original).[11] Nonetheless, HCMLP uses that adjective to describe Mr.

---

[11] Under Texas law, a Court "'may find a *plaintiff* a vexatious litigant if the defendant shows that there is not a reasonable probability that the plaintiff will prevail in the litigation against the defendant' and one of three additional prerequisites has occurred within the last seven years … These additional elements include (1) the filing of at least five suits as a *pro se* litigant that have been dismissed against the plaintiff; (2) relitigating a case *pro se* after having previously received an adverse and final determination; and (3) a prior finding in state or federal court that the plaintiff is a vexatious litigant in an action concerning the same or substantially similar facts." *Baldwin v. Zurich Am. Ins. Co.*, 2017 WL 2963515, *4 (W.D. Tex. July 11, 2017) (citing Tex. Civ. Prac. & Rem. Code § 11.054).

12

APP.3152

Dondero no less than *12 times* in its Objection alone.[12]   HCMLP goes as far as using an out-of-context quote to describe Movants as "quintessentially vexatious."[13]   "Vexatious" is also the adjective most used by HCMLP and its counsel to describe Mr. Dondero when arguing before this Court.[14]   Consequently, it only makes sense that the adjective: (1) found its way into the Court's order confirming HCMLP's Fifth Amended Plan of Reorganization (as Modified) (the "Plan"), (2) provided the purported justification for the Court to adopt a sweeping channeling provision, and (3) has been subsequently regurgitated by appellate courts, as if there has been some finding or legal basis to declare Mr. Dondero "vexatious."[15]   There has not, which is why the Court's ubiquitous use of the term is so problematic and so emblematic of the Court's bias.

HCMLP likewise repeats the same tired accusation that a myriad of "courts and arbitration panels" in various states and foreign jurisdictions have adjudicated claims or ruled against Mr. Dondero.   Obj., ¶¶ 1, 6.[16]   HCMLP does not cite any examples of such judgments or rulings, because there are none.[17]   That reality does not seem to bother HCMLP; instead, HCMLP merely

---

[12] Obj., ¶¶ 2, 60, 67, 70, 71, 95, 97, 100; *see also id.*, ¶ 42 (describing the "culture of litigiousness" under Mr. Dondero's control).

[13] Obj., ¶¶ 67.

[14] *See, e.g.*, Dkt. 1828, ¶ 22 ("Exculpation is particularly appropriate in this case to stem the tide of frivolous and vexatious litigation against the Exculpated Parties which Dondero and his Related Entities are seeking so desperately to continue to pursue."); Dkt. 3487 at 2 ("abruptly moving to withdraw its Dondero-signed proof of claim after two years of litigation, and after taking Highland's deposition but days before its own Witnesses were to be deposed, is a textbook example of vexatiousness—and is just the latest instance of Mr. Dondero bringing motions, or asserting claims, or filing objections, only to withdraw them after forcing Highland to spend time, money, and effort addressing them."); Dkt. 3550, ¶ 22 ("The Gatekeeper was created to give Highland, among others, breathing room to consummate the Plan and manage Highland's assets free from Mr. Dondero's vexatious and harassing litigation for the benefit of all creditors.").

[15] *See, e.g.*, *NexPoint Advisors, L.P. et al. v. Highland Cap. Mgmt., L.P.*, No. 21-10449 (5th Cir. Aug. 19, 2022), Opinion at 8, 14.

[16] *See also id.*, ¶ 28 (claiming that "[t]he adverse rulings *against Mr. Dondero* and his entities are legion," but citing none).

[17] The only actual examples cited by HCMLP are the arbitration award issued in favor of the Redeemer Committee against HCMLP, and a discovery ruling issued by the Delaware Chancery Court in a totally separate proceeding.   Obj., ¶¶ 26-27 & nn.25-26.   But again, neither the arbitration award or the discovery ruling were issued against Mr. Dondero.

13

argues that the actual parties involved in those legal battles were controlled by Mr. Dondero, so the Court should attribute any bad findings to him.  Obj., ¶ 28 n.7.  Despite being legally and factually unsupported, the Court has previously adopted that logic, which is why HCMLP employs it here.

More importantly, it makes no difference whether *other* courts have ruled against parties controlled by Mr. Dondero on other issues.  The Due Process Clause of the United States Constitution requires an impartial and disinterested tribunal.  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877 (2009) ("It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process.").  Section 455 was enacted because litigants "ought not have to face a judge where there is a reasonable question of impartiality."  H. Rep. No. 1453, 93rd Cong., 2d Sess. 1 (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 6351, 6355.  Movants are entitled to fair treatment in *this* Court on the evidentiary record actually before it.

## III.    HCMLP'S LEGAL ARGUMENTS ARE MERITLESS

### A.    HCMLP's Argument Regarding Timeliness Is Wrong

Throughout its Objection, HCMLP repeatedly references the timing of Movants' Renewed Motion, arguing that the length of time that has passed since various rulings issued by the Court makes the Renewed Motion "per se" untimely.  Obj., ¶¶ 102, 108.  HCMLP's argument misstates the law and misses the point.

As a preliminary matter, the Fifth Circuit Court of Appeals has never adopted a "*per se* untimeliness*" rule.  To the contrary, the Fifth Circuit has expressly "declined" to do so.  *United States v. Sanford*, 157 F.3d 987, 988 (5th Cir. 1998).  Indeed, even in *Hill v. Schilling*, 495 F. App'x 480, 483 (5th Cir. 2012)—the case cited by HCMLP for its "per se untimeliness" argument—the Fifth Circuit did not adopt or apply a per se rule.  Instead, the Court, faced with *a single alleged act* of judicial impropriety, explained that "*the closest thing to* per se untimeliness"

14

occurs "when a party already knows the facts purportedly showing an appearance of impropriety but waits until after an adverse decision has been made by the judge before raising the issue of recusal." *Hill*, 495 F. App'x at 483 (emphasis added). In *Hill*, unlike here, the movants sought recusal based solely on their allegation that the trial judge's spouse held an economic interest in one of the parties. *Id.* Despite knowing about the economic interest for some time, the movants proceeded through trial and did not move to recuse the judge until after receiving an unfavorable judgment. *Id.* In that very different circumstance, the Fifth Circuit agreed that the motion to recuse was untimely.[18]

The Fifth Circuit's reasoning in *Hill* (and the remaining cases cited by Movants) has no application to this case, where Movants assert a *pattern of conduct* that, taken as a whole, reveals both the appearance of bias and actual animus towards Movants. *See Davis v. Board of School Com'rs of Mobile Cnty.*, 517 F.2d 1044, 1051 (5th Cir. 1975) (grounds for recusal exist "where such pervasive bias and prejudice is shown by otherwise judicial conduct as would constitute bias against a party"). Nor is this a situation where Movants have employed a "wait and see" approach and only sought recusal after an adverse judgment. As HCMLP itself argues, nothing in this case is "final," the Kirschner litigation (which the Court has recommended it should retain through trial) is in its nascent stages, the Court continues to preside over several other adversary proceedings involving Movants, and the Plan allows the Court to sit as gatekeeper over any potential disputes

---

[18] The entirety of the case law cited by HCMLP is similarly inapposite. In each of those cases, there was a single alleged basis for recusal, either the judge's personal relationship with one of the parties or the judge's economic interest in the outcome of the litigation. *See Sanford*, 157 F.3d at 988 (recusal based on fact that one party's counsel previously testified against judge); *United States v. Olis*, 571 F. Supp. 2d 777, 783 (5th Cir. 2008) (recusal based on judge's alleged social contacts with interested parties); *Grambling Univ. Nat'l Alumni Ass'n v. Bd. of Supervisors for La. System*, 286 F. App'x 864, 867 (5th Cir. 2008) (recusal based on court's prior working relationship with counsel, a former judge of the same court); *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994) (recusal based on judge's social contacts with interested parties); *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989) (recusal based on judge's knowledge of extrajudicial facts as a result of familial relationship with one party); *Delesdernier v. Porterie*, 666 F.2d 116, 122 (5th Cir. 1982) (recusal based on court's prior working relationship with counsel).

15

even touching upon the Plan.  Movants seek recusal now because the Court's bias and animus represents a *continuing and ongoing harm* that can only be remedied if a non-biased fact-finder presides over the myriad proceedings still before the Court.  There is no timing issue under these circumstances.

Further, HCMLP's contention that concerns of judicial economy render the Renewed Motion untimely is also wrong.  As Movants explained in their opening brief, the goal of 28 U.S.C. § 455 is to promote public confidence in the judicial system by avoiding *even the appearance* of partiality.  *See* Renewed Mot. at 19-20; *see also Levitt v. Univ. of Texas at El Paso*, 847 F.2d 221, 226 (5th Cir. 1988).  For that reason, courts addressing this issue have consistently chosen impartiality over judicial economy, including in cases where recusal was sought only on remand after trial.  *See* Renewed Mot. at 23 & n.122 (citing cases).  As these courts have explained, "the gain in protecting against actual bias, prejudice, or conflict of interest outweighs the loss to judicial economy . . ."  *See, e.g.*, *York*, 888 F.2d at 1055.  Judicial economy is not more important than impartial justice and certainly is no reason to deny the Renewed Motion.

### B.    Movants Do Not Rely On Extrajudicial Bias, Nor Is It Required For Recusal

HCMLP next contends that the "core" of the Renewed Motion is extrajudicial bias, which it claims does not exist.  Obj., ¶ 113.  This is a gross mischaracterization of Movants' arguments.  Movants expressly do not rely on extrajudicial bias as the basis for recusal, nor is extrajudicial bias a prerequisite to recusal, as Movants explained in their opening brief.  *See* Renewed Mot. at 20 n.102, 103.  Rather, in *Liteky*, a case on which HCMLP principally relies, the Supreme Court clarified that extrajudicial bias, while a common basis for establishing grounds for recusal, is not the exclusive means.  *Liteky v. United States*, 510 U.S. 540, 551, 554 (1994) ("The fact that an opinion held by a judge derives form a source outside judicial proceedings is not a *necessary* condition for 'bias or prejudice' recusal, since predispositions developed during the course of a

16

APP.3156

trial will sometimes (albeit rarely) suffice."). It bears repeating that "judicial remarks during the course of a trial" that "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible," *will* support a bias or partiality challenge. *Id.* at 555; Renewed Mot. at 21. The Fifth Circuit recognized this "pervasive bias" exception to the extrajudicial bias doctrine even before *Liteky*. *See Davis*, 517 F.2d at 1051.

In any event, as HCMLP acknowledges, Movants do point to at least one instance in which the Court relied on an extrajudicial source—a news article that the Judge read—to make inquiries about whether HCMLP applied for or received COVID-related Payroll Protection Plan ("PPP") loans. Obj., ¶ 46 n. 64. HCMLP nonetheless argues that the Court's reliance on an extrajudicial source is not evidence of bias because the Court took no action against Mr. Dondero or Movants and only required HCMLP to respond to the Court's inquiries. *Id.* HCMLP misses the point. The reason that Movants cite this particular example is because the Court raised the issue of PPP loans only because of the Court's unfavorable perception (untethered to any factual basis) of Mr. Dondero. Specifically, the Court stated that it had "extrajudicial knowledge thanks to keeping up with current events" and openly questioned in Court whether "Mr. Dondero or Highland affiliates" *improperly* obtained PPP loans.[19] An exchange then occurred between the Court and HCMLP's counsel in which HCMLP's counsel represented that the Debtor had not obtained a PPP loan but that he had "no way of answering" whether "Mr. Dondero, or any of his affiliated funds" had done so.[20] As a result, the Court required Debtor's counsel to investigate whether any such loan had been obtained and to report back to the Court, explaining "you can probably imagine the different things going through my brain," and clarifying, "I'm not expecting it to be Highland Capital

---

[19] Movants' App'x, Ex. E at 42:10-20.

[20] *Id.* at 42:25-43:22.

APP.3157

Management, LP."[21]   In short, the Court directed HCMLP to investigate Mr. Dondero and his affiliates for suspected wrongdoing based on an admittedly extrajudicial source.  That is evidence of bias based on an extrajudicial source that weighs in favor of recusal.

### C.   There Can Be No Doubt Of The Court's Antagonism For Movants

HCMLP next argues that there is no basis to find that the Court has demonstrated the degree of favoritism or antagonism necessary for recusal.  Obj., ¶ 22.  However, in making this argument, HCMLP cites little more than the Court's own subjective denial of bias.  *See* Obj., ¶ 12 (quoting Court's statements that it has "the utmost respect for [Movants]" and "no disrespect for Mr. Dondero"); *id.* at ¶ 119 (noting the Court's characterization of its statements as mere "clashes between a court and counsel" that are "simply insufficient" for recusal).  That cursory response ignores the substantial body of statements made by the Court throughout these proceedings, including statements where the Court accuses Mr. Dondero and his affiliates of wrongdoing (often based on little more than suspicion), describes them as bad actors, and determines that they lack credibility in virtually every situation in which they are called to give testimony.[22]

HCMLP's response also ignores the substantial body of case law cited in Movants' opening brief, which contain examples of bias warranting recusal that were far less egregious than what has occurred in this case.  If, as HCMLP insists, the Court focuses on the "entirety of the proceedings" (Obj., ¶ 120), there can be no doubt that the Court's statements amount to much more than mere "clashes between a court and counsel."  The Court's negative statements about Mr. Dondero and his affiliates are so consistent and pervasive that they have been regurgitated ad

---

[21] *Id.* at 43:13-22.

[22] *See, e.g.*, January 26, 2021 H'rg Tr. at 240:14-20 (The Court to Mr. Dondero: "But the more I hear, the more I feel you're just trying to burn the house down. Okay? Maybe it's an either/or proposition with you: I'll either get my company back or I'll burn the house down. That's what it feels like."); Confirmation Order, Dkt. 1943 at ¶ 19 ("[T]he Bankruptcy Court questions [the objectors'] good faith.  Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero.").

APP.3158

nauseum by his detractors, adopted by HCMLP as a method of bolstering almost every argument it makes before this Court, and repeated by appellate courts even when this Court's statements do not amount to true "findings" of fact.  By way of summary, the Court has:

- admitted that the negative opinions the Court formed about Mr. Dondero during the Acis Bankruptcy cannot be excised from the Court's mind;

- made repeated references to proceedings in the Acis Bankruptcy to justify findings in the HCMLP proceedings that are not otherwise supported by this bankruptcy record;

- made repeated negative statements about Mr. Dondero, as well as entities and individuals that the Court perceives to have some relationship to Mr. Dondero, in connection with the Court's ruling;

- repeatedly threatened Mr. Dondero and his counsel with sanctions, questioned Movants' good faith, or concluded Movants were acting in bad faith for simply: (1) defending lawsuits and motions; (2) asserting valid legal positions; and/or (3) preserving their rights, including in the exact manner in which others have been permitted to do so (e.g., the US Trustee's objections to the Plan);

- sanctioned Mr. Dondero in connection with a motion that he and others testified he had no role in filing or responsibility for authorizing;

- prophylactically sanctioned Mr. Dondero and other entities and counsel if and when they assert their lawful appellate rights;

- disregarded the presumption that related corporations have institutional independence and concluded, without supporting evidence, that any entity the Court demes to be connected to or controlled by Mr. Dondero (i.e., including highly regulated, publicly-traded funds governed by independent boards) is essentially no more than a tool of Mr. Dondero;

- disregarded the testimony of any witness with a connection to Mr. Dondero as per se less credible, which includes attorneys and persons who owe fiduciary duties and ethical obligations; and

- ruled against Mr. Dondero and Movants at ever possible opportunity, regardless of the evidence and the testimony before the Court.

In its Renewed Motion, Movants cited the Court to several cases in which the courts held that the same type of obvious antagonism displayed here was sufficient to require recusal. Renewed Mot. at 7 n.32, 9 n.40, 22 n.114.  HCMLP does not attempt to address those cases, much

19

APP.3159

less distinguish them.  And many of those cases involve much less antagonism than what is at issue here.  *See e.g.*, *Johnson v. Sawyer*, 120 F.3d 1307, 1334-38 (5th Cir. 1997) (appearance of bias found based on judicial remarks like: the court had a "bone to pick" with the Internal Revenue Service; questioning the witness's integrity because the testimony contradicted the court's prior order; expressing concern post-trail about the conduct of the lawyers; attributing assertions to the wrong counsel); *Sentis Grp., Inc., Coral Grp., Inc. v. Shell Oil Co*, 559 F.3d 888, 904-05 (8th Cir. 2009) (a "sufficiently high degree of antagonism" was found where the court directed profanities at Plaintiffs or Plaintiffs' counsel, denied Plaintiffs a meaningful opportunity to respond to Defendants' argument that misconstrued the court's prior orders, and dismissed Plaintiff's attempt to explain those orders); *see also United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995) (noting "the district judge's failure to accord any weight to Microsoft's interests in making its determination adds to the appearance of bias in this case").

The test for disqualification is simple: would it appear to a reasonable person that the court's impartiality may be questioned?  28 U.S.C. § 455(a); *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 850 (2001).  A cursory review of the record from these proceedings makes the answer to that question an easy "yes" here.  The Court's orders targeting Mr. Dondero (and those the Court deems associated with him) compromise the appearance of justice.  *Rorrer v. City of Stow*, 743 F.3d 1025, 1049-50 (6th Cir. 2014) (finding the appearance of impartiality from the court's issuance of a one-sided discovery order that limited the number of witness plaintiff may call without explanation or apparent rationale).  So do the Court's consistent expressions suggesting it has already decided Mr. Dondero is a bad actor.  *See Matter of Johnson*, 921 F.2d 585, 587 (5th Cir. 1991) (judge abused discretion in declining to recuse where the record included statements that the judge "all but made up [his] mind as to what he was going to do in the case and

that he was "not in the least inclined to be neutral"); *United States v. Bergrin*, 682 F.3d 261, 283-84 (3d Cir. 2012) (the court's repeated expressions of discomfort with the manner in which an indictment was plead allowed the court's impartiality to reasonably be questioned); *United States v. Whitman*, 209 F.3d 619, 625-26 (6th Cir. 2000) (the court's impromptu lecture of defendant's counsel's attitude during proceedings "had the unfortunate effect of creating the impression that the impartial administration of the law was not his primary concern"). Viewed wholistically, this record is more than sufficient to raise the appearance of partiality.

### D.   HCMLP Mischaracterizes The Alternative Relief Sought By Movants

Finally, HCMLP argues that this Court has no authority to grant Movants' request to issue a ruling on Movants' Renewed Motion that eliminates the retention of jurisdiction language that appeared in the Court's prior order denying recusal.  According to HCMLP, "it is not for this Court to determine whether its orders are final and appealable," and the Court "has no authority" to enter an order of the type requested by Movants.  Again, HCMLP mischaracterizes the relief sought by Movants and is wrong.

Contrary to HCMLP's argument, Movants do not expect (and do not ask) this Court to make any *ruling* that its order on recusal is final, or to otherwise include language of finality. Movants merely ask the Court to *eliminate* any existing "reservation" language that could be construed by an appellate court as rendering the order non-final on the issue.  As Movants have now explained multiple times, when Movants appealed this Court's denial of their original motion to recuse, the District Court held it lacked jurisdiction to consider the appeal because the Bankruptcy Court's ruling was non-final.  *See* Renewed Mot. at 2 & n.6; *see also* Movants' App'x, Ex. U at 5:11-6:9.  In describing the Bankruptcy Court's order, the District Court expressly noted the last sentence of that order, in which the Bankruptcy Court "reserve[d] the right to supplement or amend th[e] ruling."  *Id.*; *see also Dondero v. Hon. Stacey G. Jernigan*, Civ. Action No. 3-21-

APP.3161

CV-0879-K, Dkt. 39 at 2.  HCMLP itself argued on appeal that this reservation of rights language was important and impeded finality because "Judge Jernigan's potential future supplementation or amendment of the Recusal Order 'might change the calculus' of the order."  *See id.*, Dkt. 31 at 5. Movants simply ask this Court to remove any perceived impediment to appellate review.

 For that reason, HCMLP's argument that the Court does not have authority to give the alternative relief requested by Movants makes no sense.  This Court can obviously craft its orders using whatever language (or eliminating any language) it sees fit.  That is all Movants ask the Court to do.  HCMLP's final argument should be rejected.

## IV. CONCLUSION

 It is time to put motion practice relating to recusal to an end.  Movants respectfully request that the Court consider the *entirety* of the record supporting recusal and issue an order on Movants' motion that accounts for the lengthy history of this case and the whole body of evidence presented. Movants also request that the Court issue an order that does not contain reservation of rights or other limiting language that could be later interpreted by an appellate court as an impediment to appellate jurisdiction.

Dated: December 15, 2022   Respectfully submitted,

         **CRAWFORD, WISHNEW & LANG PLLC**

         */s/ Michael J. Lang*
         Michael J. Lang
         Texas State Bar No. 24036944
         mlang@cwl.law
         1700 Pacific Ave, Suite 2390
         Dallas, Texas 75201
         Telephone: (214) 817-4500

         *Attorneys for Movants*

APP.3162

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 15, 2022, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

/s/ Michael J. Lang
Michael J. Lang

23

# EXHIBIT 8

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC, F/K/A HCRE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF AMENDED RENEWED MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455 |

## MOVANTS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF AMENDED RENEWED MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455

James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "Movants") file this *Supplemental Memorandum of Law in Support of Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455,* supplementing their Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455 (the "Amended Renewed Recusal Motion") [DE # 3570-3571.1] with information regarding two books published by Judge Jernigan, which Movants recently learned about and read. Those books, which were written and published while the Court was presiding over the bankruptcies of Acis Capital Management, L.P., Acis Capital Management GP, LLC, and HCMLP (the "Bankruptcy Proceedings"), contain derisive commentary about financial industry executives, the financial industry generally, and the financial instruments specifically at issue in HCMLP's bankruptcy.

1

Further, the second novel appears based on Judge Jernigan's experiences with HCMLP and Mr. Dondero in the Bankruptcy Proceedings.

On February 27, 2023, Highland Capital Management Fund Advisors, LP filed a motion to recuse in the case styled: *In re: Highland Capital Management LP*, case number 21-03076, in the U.S. Bankruptcy Court for the Northern District of Texas. As addressed in that motion, the two novels at issue contain highly antagonistic statements about the hedge fund industry, hedge fund managers, and the same investment vehicles that the Court knows HCMLP managed pre-petition. While the Court claims at the outset of each novel that they are works of fiction, there can be little doubt, under the circumstances, that the books are based upon Judge Jernigan's experiences as a sitting bankruptcy judge—and, in particular, from the Court's experience presiding over the Bankruptcy Proceedings.

The first novel, *He Watches All My Paths*, was released on January 3, 2019, just weeks before the Court confirmed the joint bankruptcy plan of Acis Capital Management, L.P. and Acis Capital Management GP, LLC (collectively, "Acis")—companies for which Mr. Dondero served as CEO and for which HCMLP performed certain management services prior to Acis's bankruptcy. Against that backdrop, the book describes the financial industry as being dominated by "[h]igh flying hedge fund managers" that "suck up money like an i-robot vacuum" and seem to "make money no matter what" and who routinely show "outrageous amounts of hubris" as part of their "bro culture."  Moreover, the novel's central protagonist, a Dallas federal bankruptcy judge, suspects that the death threats she is receiving are coming from a hedge fund manager that has previously appeared in her court.

The second novel, *Hedging Death*, was released in March 2022, less than a year after HCMLP's Plan became effective and while the Bankruptcy Proceedings were still ongoing.

APP.3166

*Hedging Death* invokes even more details from the Bankruptcy Proceedings.  Again, the central

protagonist of the novel is a Dallas bankruptcy judge, and the protagonist's husband is, like Judge

Jernigan's husband, a retired police officer and private investigator.[1]  The story involves a Dallas

hedge fund manager who is described as a reckless investment manager and vexatious litigant—

the same language that the Court has described Mr. Dondero in the Bankruptcy Proceedings.  The

investment firm in the novel is called *Ranger* Capital and is experiencing economic distress largely

due to extensive litigation stemming from bad investments.  Notably, HCMLP's original name

was *Ranger* Asset Management, as is prominently disclosed on the website of Mr. Dondero's

investment firm NexPoint and which has been mentioned in other filings in the Bankruptcy

Proceedings.  In addition, HCMLP, like the "fictitious" Ranger Capital, initially sought chapter 11

protection because of investor litigation.  The similarities do not stop there.  In the novel, Ranger

Capital, like HCMLP, is a "multi-billion dollar conglomerate, which manage[s] not just hedge

funds but private equity funds, [collateralized debt obligations], CLOs, REITs, life settlements,

and all manner of complicated financial products."  HCMLP and its affiliates managed hedge

funds, private equity funds, CDOs, CLOs,[2] REITS, life settlement portfolios, and private

investment accounts for institutions around the world—exactly the same unusual mix of

investments at issue in the second "fictional" novel.[3]  There can be no question that the basis for

this mix of investments is derived from the Court's work in Acis and Highland Bankruptcies.

---

[1] *See Hedging Death*, back cover.
[2] Notably, Highland was a pioneer that launched one of the first ever CLOs and was the world's largest CLO manager for years.
[3] Notably, there are no other enterprises in Dallas that manage this mixture of product types. Moreover, this mixture includes products not normally found at the same firm because they (1) require divergent skill sets and teams to manage, (2) usually have significantly different time horizons for asset realization (which require a diverse base of investors with different timing needs), and (3) have limited overlap in which managed funds can take investments, such as CLOs and CDOs (which only can invest in debt), private equity (which is equity only), and REITs (which are real-estate only). Consequently, firms normally do not manage combinations of CLO and CDOs on one hand and REITs and private equity on the other, or products that are regarded as esoteric even within the finance community, such as life settlements portfolios.

APP.3167

Indeed, even financial hubs such as New York and Los Angeles have only a limited number of firms with the mixture of products found at HCMLP.[4] Notably, the novel describes the life settlement industry—an industry the Court knows that HCMLP and Mr. Dondero invested in—as "creepy," "immoral," "unethical," and "should be illegal."

In short, Judge Jernigan's writings, which any reasonable person would agree appear patterned after Mr. Dondero, are additional evidence that the Court harbors exceedingly negative views about hedge fund managers and the hedge fund industry, generally, as well as Mr. Dondero specifically. At the very least, the commentary made in the novels about the financial managers, the financial industry, and the financial products at issue would lead a reasonable observer to question the Court's impartiality in these Bankruptcy Proceedings, mandating recusal.

In short, the Court's negative opinions of Mr. Dondero, Movants, and their perceived affiliates—as set forth in the Amended Renewed Recusal Motion and as reflected by the Court's commentary in two recently-published novels—reveal a high degree of antagonism, which makes it nearly impossible for Mr. Dondero and the Affected Parties to fully defend themselves and assert their rights in this forum, including in connection with claims filed against Mr. Dondero and Affected Parties. At a minimum, that is the perception that has been created.[5]

Movants hereby supplement the Amended Renewed Recusal Motion. In doing so, pursuant to 28 U.S.C. § 455, Movants respectfully request the Court, after considering the Amended Renewed

---

[4] Highland's unique history created this diversity of product types. Highland primarily was a CLO manager that then created hedge funds to house its purchase of CLO equity tranches. Highland only opened its private equity funds when, in the 2008 financial crisis, bankruptcies forced many of the CLO's debt positions to convert to equity. Highland created REITs because Dondero made personal investments in real estate, and a transactional lawyer hired in the legal department evidenced a flare for real estate investments which proved successful enough to support a REIT business. Life settlements also were the idea of a single analyst from another business unit to whom Dondero gave an opportunity. The Highland mixture of products likely exists only at a sprawling firm that invests in almost all asset types, or but not at any other founder-managed mid-size firm.

[5] *Liteky v. United States*, 510 U.S. 540, 551 (1994); *In re Kansas Pub. Employees Retirement Sys.*, 85 F.3d 1353, 1358 (8th Cir. 1996).

APP.3168

Recusal Motion and this Supplement thereto, grant their Motion and recuse herself from presiding over this proceeding. In the alternative, Movants hereby request that the Court make clear that any order denying recusal is final on the issue so that Movants may pursue any appellate remedies that exist, including mandamus.

Dated: March 3, 2023                       Respectfully submitted,

                                           **CRAWFORD, WISHNEW & LANG PLLC**

                                           */s/ Michael J. Lang*
                                           Michael J. Lang
                                           Texas State Bar No. 24036944
                                           mlang@cwl.law
                                           1700 Pacific Ave, Suite 2390
                                           Dallas, Texas 75201
                                           Telephone: (214) 817-4500

                                           *Attorneys for Movants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 3, 2023, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

                                           */s/ Michael J. Lang*
                                           Michael J. Lang

APP.3169

# EXHIBIT 9

# Hedge Fund Alert

## THE WEEKLY UPDATE ON FUND MANAGEMENT INTELLIGENCE

**FEBRUARY 1, 2023**

2   Commodity Operation Expands Offerings

2   West Tower Builds for Expected Big Debut

3   Niederhoffer Maps Inflation-Shield Fund

4   Bankruptcy Litigant: Recuse Novelist Judge

5   Shikuma Touts New Tech, Same Strategy

6   Crypto Firm Seeks LPs for First Offering

6   Startup Courting Job Candidates Pre-Launch

9   LATEST LAUNCHES

## THE GRAPEVINE

**Ivan Chee** has signed on with **Millennium Management** as a senior portfolio manager. A quantitative specialist who trades mortgage products, Chee started at the New York multi-strategy firm in January. He previously spent more than six years at **Squarepoint Capital,** where his coverage included commercial mortgage-backed securities and related products, including derivatives and risk-transfer bonds. Chee earlier mined the asset class at **Premium Point Investments** and **Morgan Stanley.** Millennium manages $58 billion.

**Ron Biscardi** is in the midst of holding his largest conference ever at the Fontainebleau Miami Beach hotel this week, with the **iConnections** event expanding into the Eden Roc Miami Beach hotel next door. Nearly

❯ See GRAPEVINE on Back Page

## Equity Firm Led By Conatus Alum Shuts Down After Failing to Recover From Tech-Stock Swoon

A brutal first half last year appears to have undone **Emerson Point Capital,** with multiple sources saying the Larchmont, N.Y., equity shop recently closed its doors.

Emerson Point, led by former **Conatus Capital** portfolio manager **Amir Mokari,** generated strong returns over its first four years of operation, but last year's rout in growth stocks – and particularly technology shares – led to steep losses in all three of its funds. The firm, which managed $825 million of gross assets as recently as July, terminated its **SEC** registration on Jan. 26. The operation appears to have spent the latter half of 2022 unwinding its positions.

❯ See EMERSON POINT on Page 7

## Maounis Steers Verition to Fast-Growing AUM, Solid Performance Amid Hiring Binge

Buoyed by inflows and performance gains, **Verition Fund Management** continues to add staff at a blistering pace emblematic of the biggest hedge find giants.

The Greenwich, Conn., multi-strategy firm has hired at least 107 people in the past 12 months, including five portfolio managers in November alone and dozens of other investment professionals during the year.

The firm employed 220 people, including 135 investment pros, at yearend 2021 – up 115 total employees and 76 investment professionals from yearend 2020. Its investment professionals now number more than 200.

Verition, which has never had a down year since it began trading in 2008, also boosted its assets under management by 40% in 2022, from $4.8 billion to $6.7 billion.

❯ See VERITION on Page 7

## In Wild Crypto Field, Hunting Hill Revamps Plan, Delays DeFi Launch, Eschews Genesis Vets

**Hunting Hill Global Capital** has retooled the planned expansion of its digital-asset products, including delaying the launch of a fund and nixing the possible hire of two key staffers.

The move follows continuing upheaval in the cryptocurrency industry, including the Jan. 20 bankruptcy of **Genesis Global Holdco,** a major lender where the would-be employees last worked. A third Genesis alumnus who signed on with Hunting Hill remains there.

The $700 million hedge fund manager had sought to launch two products this quarter within a new digital-asset trading unit that would also take over management of Hunting Hill Global's existing $42 million market-neutral crypto fund.

❯ See HUNTING HILL on Page 8

This publication is intended for use by Howard Kapiloff at Hedge Fund Alert.
It may not be copied or disseminated to others without written permission.

**4**

## Niederhoffer ...From Page 3

that we want to address in our program, and it also has the impact of increasing our overall expected return even if none of these tail-risk scenarios occur," he said.

Based in Sunny Isles, Fla., R.G. Niederhoffer has more than $900 million under management. In addition to the flagship, it runs R.G. Niederhoffer Short Alpha, a UCITS vehicle linked to that strategy, and R.G. Niederhoffer Emerald.

Niederhoffer founded the firm in 1993 following a five-year run at hedge fund shop **Niederhoffer Investments,** headed by his brother, **Victor Niederhoffer.**

"I wouldn't normally be making a big deal over it," Roy Niederhoffer said about his inflation concerns. "[But] whether or not people invest with us in this fund, it's a message that everyone needs to hear, a risk factor everyone needs to consider." ■

## Bankruptcy Litigant: Recuse Novelist Judge

A U.S. bankruptcy proceeding in Texas involving hedge fund operator **Highland Capital Management** has gotten so contentious that one of the founders, **James Dondero,** is pressing the judge to recuse herself from the case.

Dondero says Judge **Stacey G.C. Jernigan** has labeled him "vexatious" and "litigious" and called Dallas-based Highland a "ruinous web," according to a motion for recusal. Her alleged animus stems from a previous case tried in her court involving Dondero, according to the motion, which was filed in September but which has not been previously reported.

Meanwhile, in a strange coincidence, Jernigan has penned a crime thriller portraying the sordid details of a fictional Dallas credit-fund manager that she says is not based on Dondero, though the firm's name in the novel is nearly identical to the name of an investment shop Dondero previously ran.

Dondero initially tried to get the judge to recuse herself in March 2021, a motion denied by Jernigan. Dondero followed in September 2022 by leveling several allegations, though he did not refer to Jernigan's novel.

"The Court's animus toward Movants [Dondero and affiliated parties] is so evident, persistent, and severe that Movants cannot receive fair treatment or justice in this Court," according to the 2022 motion. Jernigan, according to the filing, accused Dondero of "carpet-bombing us with paper and causing to expend resources," labeling Dondero as "vexatious" and "litigious" and calling him a bad actor. She also characterized Highland Capital as a "Byzantine empire" and "ruinous web," according to the filings.

"These accusations – which, to be clear, is all they are – have no basis in the realities of HCMLP's [Highland

Capital's] business or Mr. Dondero's management of it," the filing states.

Highland, whose assets peaked in 2007 at around $40 billion, was a credit shop founded in 1998 by Dondero and **Mark Okada.** Dondero now runs Dallas real estate investment shop **NexPoint Advisors,** which he started in 2012. Okada is now founder of **Sycamore Tree Capital** in Dallas.

Highland's hedge fund, Highland Crusader Fund, experienced severe losses in 2007 during the credit crisis, and its managers took steps similar to other credit-oriented hedge funds in that era, including the suspension of investor redemptions.

Highland became enmeshed in a frenzy of litigation, eventually filing for Chapter 11 bankruptcy protection a decade later in 2019 in **U.S. Bankruptcy Court** in Wilmington, Del. Highland took the drastic step "to bring its numerous long-running legal dramas to a close," according to a 2020 article in **Institutional Investor** headlined "Nothing Can Stop This Hedge Fund Soap Opera."

An independent three-person board, the Unsecured Creditors Committee, was formed with distressed-debt specialist **James Seery** emerging as chief executive and chief reorganization officer in July 2019. The venue of the bankruptcy was moved to Texas in January 2020 at the behest of the creditors committee.

The issue for Dondero is that he had been part of a previous bankruptcy case in the same court. That first case, his lawyers insist, spawned the judge's alleged animus toward Dondero.

That case involved **Acis Capital Management,** which managed a $100 million portfolio of collateralized loan obligations. Dondero, whose Highland was providing services to Acis, was also chief executive of Acis.

"Following transfer [to Texas], this Court foreshadowed that it would rely on the negative opinions it formed during the Acis Bankruptcy in dealing with Mr. Dondero, his former employees, and his affiliated entities," the filing says.

Jernigan, who declined to comment on the pending case, moonlights as a novelist. Her latest legal thriller, "Hedging Death," was published last March even as the case, first filed in her court in 2020, is ongoing.

In the novel, Jernigan's protagonist, Judge Avery Lassiter, is embroiled in a story of "death, debt, and deception in Dallas," according to one advertisement.

A major character in the book is wealthy Texas hedge fund manager Cade Graham, who is suspected of insurance fraud and is believed to have faked his own death. Graham is described in the novel as a "well-known playboy and high-flying Dallas hedge fund manager."

"Graham was the founder and CEO of Dallas-based Ranger Capital, a multibillion-dollar conglomerate, which managed not just hedge funds but private equity funds, CDOs, CLOs, REITs, life settlements and all manner of complicated financial ➤ See HIGHLAND on Page 5

This publication is intended for use by Howard Kapiloff at Hedge Fund Alert.
It may not be copied or disseminated to others without written permission.

APP.3172

## Highland ... From Page 4

products," a description of the novel reads.

A Highland Capital predecessor firm was called **Ranger Asset Management.** Separately, a Dallas firm unaffiliated with Highland or Dondero is called **Ranger Capital Group,** which runs traditional and alternative investment funds.

**Traci Ellison,** a courtroom deputy for Jernigan, said the judge "wanted me to share that no characters of any of her books are based on Mr. Dondero or any other actual person in a pending case. Her books are legal fiction."

Jernigan has a history of drawing criticism. In an unrelated bankruptcy case – Cadle Co. vs. Brunswick Homes, et al. – she was chastised by the **U.S. Court of Appeals** for the Northern District of Texas in 2014. The appellate court said it was "troubled by the bankruptcy court's use of indirect inferences," alleging Jernigan let her personal views and unfounded suspicions cause her to draw incorrect conclusions. ■

## Shikuma Touts New Tech, Same Strategy

**Shikuma Capital** is enhancing its investing technology to take full advantage of its short-term discretionary tactical-trading ideas.

Although Shikuma's strategy continues to have a high annualized return of 15% since inception in August 2018 – substantially higher than the 5.9% annualized return of the HFRI Macro Total Index – last year the firm missed a big surge among global-macro funds. Shikuma's hedge fund was down 12.5% in 2022, while the HFRI index was up 9%.

In part, last year's slump was because the London firm has yet to set up, for its short-term discretionary tactical-trading book, an application trading interface, or API. The API would allow the firm to quickly seize on advantageous times to get in and out of trades.

Shikuma now expects to have an API in place within the next several weeks. It will allow the firm to grow its short-term tactical-trading book from about 3% to 5% of Shikuma's total assets to, over time, as much as 20% of its portfolio. The strategy is heavily dependent on pricing data, including breakout, mean reversion and other pattern analyses conducted by Shikuma.

The firm launched a commingled fund in 2021 and is now trading about $22 million of partner and investor capital.

In all, about a third of the firm's assets are in discretionary strategies, with the rest systematically traded via algorithms based on pricing or economic models. The firm plans to, over time, bring that to a 50-50 split, although that may change depending on market conditions.

Despite the plan to increase its discretionary book and

the losses its systematic book cost it last year, Shikuma believes it's on the right track with its algorithmic models.

The firm wrote in a Jan. 10 letter to investors that now is not the time to change its approach to systematic investing.

"Our Asset Allocation models are rooted in fundamental principles – i.e., the impact that inflation, momentum, and liquidity have on assets' returns – and we believe that these are unlikely to change . … While there is always a margin for improvement and lessons to be learned, we believe that 2022 was simply a bad year and that sticking to our Asset Allocation strategy will start paying off before too long," Shikuma wrote. "Historical precedents suggest that when it does, it tends to do so with dividends."

Shikuma's correlation to other indexes, including other global-macro funds, is very low – only a 0.29 correlation to the HFRI Macro Index, for instance, and a 0.15 correlation to the S&P. The strategy also has handily beat the annualized return of the S&P 500 – which is 9.2% from August 2018 through yearend.

Shikuma was founded in 2020 by four executives, of whom two, chief investment officer **Tommaso Mancuso** and co-portfolio manager **Marco Tosi,** each spent 12 years at **Hermes Investment Management.** That entity is now known as **Federated Hermes** following Hermes Investment's purchase of **Federated Investors** in 2018. The combined entity managed $669 billion at yearend.

Mancuso headed and established a multi-strategy trading unit at Hermes in 2014 and earlier headed portfolio management at Hermes BKP, a $2.5 billion fund-of-hedge funds business. He joined Hermes in 2008 and earlier worked at **Pioneer Alternative.** Tosi worked with Mancuso as head of risk and quant for the multi-asset division and also worked at Hermes BKP and Pioneer Alternative.

While Shikuma's hedge fund launched in October 2021, the firm's trading strategies began while Mancuso and Tosi were still with Hermes. They had sought to launch the strategy at that firm, but Hermes was then, and remains, focused on investment strategies that embody environmental, social and governance issues.

So, Mancuso and Tosi's global-macro strategy couldn't fit within Hermes' ESG mandates. As a result, they were able to take their trading models and track record from Hermes and use it to form Shikuma. Until they launched their hedge fund, they had been running capital via separate accounts at Hermes and Shikuma.

Shikuma's other two co-founders are **Thomas Pontin** and **Anna McCutcheon.** Pontin previously headed sales and marketing for **ADG Capital** and also worked at **Harmonic Capital** and **Fulcrum Asset Management.**

McCutcheon previously founded her own systematic proprietary trading firm, **Nublu Investments,** and earlier headed asset-raising and was a portfolio manager for both **Fortelus Capital** and **Tisbury Capital.** ■

This publication is intended for use by Howard Kapiloff at Hedge Fund Alert.
It may not be copied or disseminated to others without written permission.

# EXHIBIT 10

3/11/23, 6:59 AM

Highland court saga tests fact vs fiction | Financial Times

Opinion **On Wall Street**

## Highland court saga tests fact vs fiction

Dallas judge's novel that features a financier is raised in court battle

**MARK VANDEVELDE**



Jim Dondero in 2011 © Brent Humphreys

**Mark Vandevelde** 7 HOURS AGO

Jim Dondero, the distressed debt investor who was once a scourge of private equity, is the kind of hard-charging financier you might read about in a novel. In fact, Dondero thinks it possible that you have read about him in a novel — one that, strikingly, was written by a federal judge who is overseeing the bankruptcy of Highland Capital Management, his once high-flying investment firm.

Highland's rise and messy fall is a story for the ages. During the go-go years, visitors to Dondero's Dallas office reported that the staff there worked under the glassy gaze of animals that he had shot dead from his porch. The firm raked in billions of dollars of capital in the years before 2008, investing some of it on consumer debt, real estate, even unwanted life insurance policies. Its core business, though, was owning the debt of companies that had been bought by private equity firms.

APP.3175

Dondero's enthusiasm for private equity was sometimes unrequited. Some of the biggest US buyout firms grew so tired of their shouting matches with his underlings that they tried to freeze Highland out of owning debt issued by the companies they bought. Yet the firm was difficult to avoid, and had a reputation for being quick to threaten legal action when deals went wrong. In one celebrated case, Highland reportedly delivered its demands to a recalcitrant borrower with a 10-minute ultimatum, and a warning that the firm already had a representative stationed outside a nearby bankruptcy court.

When the financial crisis struck, Dondero enjoyed a glimpse of the bonanza. His firm held some of the debt issued by Metro-Goldwyn-Mayer in connection with its ill-fated 2004-05 buyout by a consortium that included Texas Pacific Group. The deal soured, and Highland ended up owning a slice of the movie studio.

Distressed debt investors have only grown more influential since then, with about $272bn under management as of last year, according to a tally maintained by Preqin, more than double the amount 10 years earlier.

But Highland was not among the victors of the financial crisis. Its flagship vehicle, the Crusader fund, closed to investors in 2008 after suffering losses, triggering battles that are still echoing across American courtrooms. Perhaps it is the endless fighting, or perhaps it is just the passage of time, but Dondero looks less youthful now. According to a person who works with him, his hair has turned greyer.

After losing a legal skirmish with investors, Highland Capital Management entered bankruptcy in 2019. Initially filed in Delaware, the Highland case became a page-turner after it moved to a Dallas court, where judges are less frequently called upon to deal with complex corporate bankruptcies.

Dondero, who resigned as a director after a negotiation with creditors, grew unhappy with the proceedings. US bankruptcy judge Stacey Jernigan took exception to Dondero's conduct, too, twice ruling him in contempt of court. Jernigan imposed sanctions of nearly $240,000 on Dondero and others over one of those incidents, warning that if they appealed against her ruling and lost, she would hit them with $100,000 more.

What began as a routine business dispute has, over time, become something more poetic. Dim the courtroom lights, and you would have a real-life Texas noir.

APP.3176

One wonders whether that thought ever occurred to Jernigan, who is not only the bankruptcy court's chief judge but also a part-time author. Her most recent novel, *Hedging Death*, features a fund manager named Cade Graham. Her fictitious financier buys an eclectic range of assets, from commercial debt to life insurance policies whose original owners no longer want them — a trade that one character calls "creepy". "His boyish brown hair had turned silver," Jernigan writes of Graham, "and his sun-kissed smooth skin had grown weathered."

In a ruling handed down this week, in which she denied Dondero's request that she step aside on grounds of bias, Jernigan was emphatic: her novel, she wrote, was "entirely fiction", and "not about Mr Dondero or the hedge fund industry". In the story, she points out, Graham fakes his own death in Mexico after linking up with drug cartels. He is a Princeton graduate. (Dondero holds a degree from the University of Virginia.)

Authorial intention is a slippery notion but it is striking that a close observer of the distressed debt industry should devise an unappealing character whom Dondero sees as "patterned after" himself. Jernigan insists that any resemblance to actual people, living or dead, "is entirely coincidental".

*mark.vandevelde@ft.com*

Copyright The Financial Times Limited 2023. All rights reserved.

APP.3177

# EXHIBIT 11

# EXHIBIT F

*EXECUTION VERSION*

## THIRD AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This Third Amended and Restated Shared Services Agreement (this "*Agreement*") by and among Highland Capital Management, L.P., a Delaware limited partnership ("*HCMLP*"), and Acis Capital Management, L.P., a Delaware limited partnership ("*Acis*"), and any affiliate of Acis that becomes a party hereto, is dated effective as of January 1, 2016 (the "*Effective Date*"). Each of the signatories hereto is individually a "*Party*" and collectively the "*Parties*".

### RECITALS

WHEREAS, the Parties entered into that certain Second Amended and Restaed Shared Services Agreement dated January 1, 2015 (the "*Prior Agreement*"); and

WHEREAS, the Parties now desire to amend and restate the Prior Agreement in its entirety as set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, that the Prior Agreement is amended and restated in its entirety to read as follows:

### ARTICLE I
### DEFINITIONS

"*Actual Cost*" means, with respect to any period hereunder, one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period.

"*Affiliate*" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person. The term "*control*" (including, with correlative meanings, the terms "*controlled by*" and "*under common control with*") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble.

"*Allocation Percentage*" has the meaning set forth in Section 4.01.

"*Annual Revenue*" means for any fiscal year the aggregate revenue of HCMLP or Acis, as applicable, on a consolidated basis as reflected on its audited financial statements for such fiscal year.

"*Applicable Margin*" shall mean an additional amount equal to 5% of all costs allocated by Service Provider to the other parties hereto under Article IV Sections 4.01(a) and 4.01(b); provided that the parties may agree on a different margin percentage as to any allocation item or items to the extent the above margin percentage, together with the allocated cost of such item or service, would not reflect an arm's length value of the particular service or item allocated.

"*Change*" has the meaning set forth in Section 2.02(a).

"*Change Request*" has the meaning set forth in Section 2.02(b).

R018158

"*Code*" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

"*Effective Date*" has the meaning set forth in the preamble.

"*Governmental Entity*" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"*Indemnified Party*" has the meaning set forth in Section 8.03.

"*Indemnifying Party*" has the meaning set forth in Section 8.03.

"*Liabilities*" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"*Loss*" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "*Loss*" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"*New Shared Service*" has the meaning set forth in Section 2.03.

"*Notice of Claim*" has the meaning set forth in Section 8.03.

"*Party*" or "*Parties*" has the meaning set forth in the preamble.

"*Person*" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"*Quarterly Report*" has the meaning set forth in Section 5.01.

"*Recipient*" means Acis and any of Acis' direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Shared Services and/or Shared Assets.

"*Service Provider*" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Shared Services or Shared Assets.

"*Service Standards*" has the meaning set forth in Section 6.01.

"*Shared Assets*" shall have the meaning set forth in Section 3.03.

"*Shared Services*" shall have the meaning set forth in Section 2.01.

"*Shared Services and Employees Agreement*" has the meaning set forth in the recitals.

"*Subsidiary*" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

2

R018159

**App. 106**
APP.3181

"*Tax*" or "*Taxes*" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Shared Services and the Shared Assets; and (ii) tax-related surcharges or fees that are related to the Shared Services and the Shared Assets identified and authorized by applicable tariffs.

"*Term*" has the meaning set forth in Section 7.01.

ARTICLE II
SHARED SERVICES

Section 2.01    Services.  During the Term, Service Provider will provide Recipient with Shared Services, each as described more fully on **Annex A** attached hereto, the "*Shared Services*")

Section 2.02    Changes to the Shared Services.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service, including modifying the applicable fees for such Shared Service to reflect the then current fair market value of such service (a "*Change*").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "*Change Request*") and no Party receiving a Change Request may unreasonably withhold, condition or delay its consent to the proposed Change.

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Shared Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Shared Service in any material respect or increase Recipient's cost for such Shared Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Shared Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    New Shared Services.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specifically listed in Section 2.01 (a "*New Shared Service*").  Any agreement between the Parties on the terms for a New Shared Service must be in accordance with the provisions of Article IV and Article V hereof, will be deemed to be an amendment to this Agreement and such New Shared Service will then be a "*Shared Service*" for all purposes of this Agreement.

Section 2.04    Subcontractors.  Nothing in this Agreement will prevent Service Provider from, upon notice to Recipient, using subcontractors, hired with due care, to perform all or any part of a Shared Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

3

ARTICLE III
SHARED ASSETS

Section 3.01    Shared IP Rights.    Each Service Provider hereby grants to Recipient a non-exclusive right and license to use the intellectual property and other rights granted or licensed, directly or indirectly, to such Service Provider (the "*Shared IP Rights*") pursuant to third party intellectual property Agreements ("*Third Party IP Agreements*"), provided that the rights granted to Recipient hereunder are subject to the terms and conditions of the applicable Third Party IP Agreement, and that such rights shall terminate, as applicable, upon the expiration or termination of the applicable Third Party IP Agreement. Recipient shall be licensed to use the Shared IP Rights only for so long as it remains an Affiliate of HCMLP. In consideration of the foregoing licenses, Recipient agrees to take such further actions as a Service Provider deems to be necessary or desirable to comply with its obligations under the Third Party IP Agreements.

Section 3.02    Other Shared Assets.    Subject to Section 3.01, each Service Provider hereby grants Recipient the right, license or permission, as applicable, to use and access the benefits under the agreements, contracts and licenses that such Service Provider will purchase, acquire, become a party or beneficiary to or license on behalf of Recipient (the "*Future Shared Assets*" and collectively with the Shared IP Rights, the "*Shared Assets*").

ARTICLE IV
COST ALLOCATION

Section 4.01    Actual Cost Allocation Formula.    The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage. For purposes of this Agreement, "*Allocation Percentage*" means:

(a)    To the extent 100% of such item is demonstrably attributable to the Acis, 100% of the Actual Cost of such item shall be allocated to Acis;

(b)    To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for Acis), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or Acis, as applicable; and

(c)    All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above is agreed to be allocated between HCMLP and Acis in proportion to the fee earning assets managed by Acis. It is agreed in good faith between both parties that Actual Cost shall be calculated as follows: for each fund included within Annex B, Actual Cost shall be calculated in exact conformity with the calculation of management fees for such funds, except that the management fee rates applied in the calculation will be replaced by the fee rates described in Annex B. For avoidance of doubt, the calculation will apply to any form of management fees, except for incentive fees earned from any fund and subordinated management fees for collateralized loan obligation (CLO) funds.

For the avoidance of doubt, Acis shall separately reimburse HCMLP for the actual costs and expenses caused by, incurred or otherwise arising from or relating to business development services that are borne by HCMLP on behalf of or for the benefit of Acis.

Section 4.02    Non-Cash Cost Allocation.    The actual, fully burdened cost of any item relating to any Shared Services or Shared Assets that does not result in a direct, out of pocket cash expense may be allocated to HCMLP and Acis for financial statement purposes only, without any corresponding cash reimbursement required, in accordance with generally accepted accounting principles, based on the Allocation Percentage principles described in Section 4.01 hereof.

4

R018161

ARTICLE V
PAYMENT OF COST AND REVENUE SHARE; TAXES

Section 5.01    Quarterly Statements.  Within sixty (60) days following the end of each calendar quarter during the Term (or at such time as may be otherwise agreed by the parties), each Service Provider shall furnish the other Parties hereto with a written statement with respect to the Actual Cost paid by it in respect of Shared Services and Shared Assets provided by it, in each case, during such period, setting forth (i) the cost allocation in accordance with Article IV hereof together with the Applicable Margin on such allocated amounts, and (ii) any amounts paid pursuant to Section 5.02 hereof, together with such other data and information necessary to complete the items described in Section 5.03 hereof (hereinafter referred to as the "*Quarterly Report*").

Section 5.02    Settlement Payments.  At any time during the Term, any Party may make payment of the amounts that are allocable to such Party together with the Applicable Margin related thereto, regardless of whether an invoice pursuant to Section 5.03 hereof has been issued with respect to such amounts.

Section 5.03    Determination and Payment of Cost and Revenue Share.

(a)    Within ten (10) days of the submission of the Quarterly Report described in Section 5.02 hereof (or at such other time as may be agreed by the parties), the Parties shall (i) agree on the cost share of each of the Parties and Applicable Margin as calculated pursuant to the provisions of this Agreement; and (ii) prepare and issue invoices for the cost share and Applicable Margin payments that are payable by any of the Parties.

(b)    Within ten (10) days of preparation of the agreement and the issuance of the invoice described in Section 5.03(a) (or at such other time as may be agreed by the parties), the Parties shall promptly make payment of the amounts that are set forth on such cost allocation invoice.

Section 5.04    Taxes.

(b)    Recipient is responsible for and will pay all Taxes applicable to the Shared Services and the Shared Assets, provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Shared Services and the Shared Assets as a result of such payment by Recipient.  Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Shared Services and Shared Assets, costs for which such Taxes are levied.  Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(c)    Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider.  In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name.  Service Provider's authorization will not be unreasonably withheld.  Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings.  However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time.  Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all

5

proceedings.  Any adverse consequences suffered by Recipient as a result of the withdrawal will be submitted to arbitration pursuant to Section 9.14.  Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property.  Recipient agrees to indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

(d)     The provisions of this Section 5.04 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

ARTICLE VI
SERVICE PROVIDER RESPONSIBILITIES

Section 6.01     Service Provider General Obligations.  In providing the Services, the Service Provider:

(a)     will conform with (1) any applicable written procedures, policies and guidelines adopted by the applicable Recipient and furnished to the Service Provider, and (2) the Recipient's objectives, policies and restrictions as stated in the Recipient's Indenture, Management Agreement, Partnership Agreement, Bye-laws, and/or other governing documents, as applicable, each as supplemented or amended from time to time, as furnished to the Service Provider (such governing document, the "*Applicable Restrictions*").  Until the Recipient delivers any supplements or amendments to the Service Provider, the Service Provider shall be fully protected in relying on the Applicable Restrictions previously furnished by the Recipient to the Service Provider.  In providing the services in accordance with the requirements of this Section, the Service Provider shall be entitled to receive and act upon advice of counsel to the Recipient, or to the Service Provider that is also acceptable to the Recipient; and

(b)     will provide the Shared Assets, or the Services, as applicable, to Recipient on a non-discriminatory basis and will use commercially reasonable efforts to provide the Shared Assets, or the Services, as applicable, in the same manner as if it were providing such services and assets on its own account.  Service Provider will use its commercially reasonable efforts to conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the service standards.  The standards set forth in this Section 6.01 are referred to in this Agreement as the "*Service Standards*."

Section 6.02     Books and Records; Access to Information.  Service Provider will keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures.  Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services and Shared Assets, with respect to Service Provider's performance of its obligations hereunder.  This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider).  Service Provider will promptly respond to any reasonable requests for information or access.

Section 6.03     Return of Property and Equipment.  Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

6

ARTICLE VII
TERM AND TERMINATION

Section 7.01    Term.    The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "**Term**"), unless terminated earlier in accordance with Section 7.02. The Term shall automatically renew for successive one year periods unless sooner terminated under Section 7.02.

Section 7.02    Termination.

(a)    Subject to Section 7.02(b), either Party may terminate this Agreement upon at least 30 days advance written notice at any time prior to the expiration of the Term.

(b)    In the event of any proposed termination of this Agreement while services are being rendered hereunder with respect to any Recipient, the effectiveness of such termination shall be conditioned on either (i) Acis or HCMLP, as applicable, confirming, in a manner reasonably satisfactory to each such Recipient, that the termination of this Agreement would not cause an Adverse Account Event (as defined below), or (ii) the continued provision of the Shared Services and Shared Assets, and/or Investment Services, as applicable, on substantially the terms provided herein until such time as a replacement provider or providers of the Shared Services and Shared Assets, or Investment Services, can be engaged by Acis or HCMLP, as applicable, on terms that would not cause an Adverse Account Event. As used herein, "**Adverse Account Event**" means (i) any event that would constitute a violation of any of the Applicable Restrictions, (ii) any event that would result in a material adverse deviation from the Service Standards rendered to the Recipient immediately prior to such event, or (iii) in the case of any Recipient that is an issuer of structured finance securities under an indenture with notes rated by S&P or Moody's, the failure to receive rating agency confirmation consistent with the terms of such indenture that the termination of this Agreement would not cause either S&P or Moody's to effect a withdrawal, reduction, suspension or other adverse action with respect to any then current rating of any class of notes of such Recipient issued under such indenture. In the event Acis or HCMLP relies on clause (ii) above to avoid termination of this Agreement, such party agrees to use its commercially reasonable efforts to procure such replacement Shared Services and Shared Assets, or Investment Services, as applicable, as soon as reasonably practicable following the Service Provider's notice of its desire to terminate this Agreement.

ARTICLE VIII
LIMITED WARRANTY; LIMITATION ON LIABILITY; INDEMNIFICATION

Section 8.01    Limited Warranty.    Service Provider will perform the Shared Services hereunder in accordance with the Service Standards. Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Shared Services and the granting of the Shared Assets under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services and the Shared Assets for any purpose or use or purpose. Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Shared Service and Shared Asset, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

Section 8.02    Indemnification.    Subject to the limitations of liability set forth in Section 8.04, Service Provider and Recipient will indemnify and hold each other harmless against all Losses resulting from: (i) such Party's performance or failure to perform, in any material manner, any of its obligations under this Agreement; (ii) the breach by such Party, in any material manner, of any representation, warranty,

7

covenant or agreement contained herein; (iii) loss of or damage to tangible real or tangible personal property (including damage to their property), in any material manner, in each case to the extent that such Loss was proximately caused by any negligent or willful act or omission by the Party from whom indemnity is sought, its agents, employees or subcontractors, in connection with the provision or receipt of the Shared Services or the Shared Assets; (iv) such Party's use of the Shared Services and Shared Assets; (v) the breach by such Party of the license granted in Section 3.01; or (vi) the breach by such party of the Third Party IP Agreements.

Section 8.03   Notice and Procedures.   A Party seeking indemnification pursuant to Section 8.02 (the "*Indemnified Party*") will give prompt written notice in reasonable detail (the "*Notice of Claim*") to the indemnifying Party (the "*Indemnifying Party*") stating the basis of any claim for which indemnification is being sought hereunder within thirty (30) days after its knowledge thereof; provided, however, that the Indemnified Party's failure to provide any such notice to the Indemnifying Party will not relieve the Indemnifying Party of or from any of its obligations hereunder, except to the extent that the Indemnifying Party suffers prejudice as a result of such failure.  If the facts giving rise to such indemnification involve an actual or threatened claim by or against a third party:

(a)   the Parties will cooperate in the prosecution or defense of such claim and will furnish such records, information and testimony and attend to such proceedings as may be reasonably requested in connection therewith; and

(b)   the Indemnified Party will make no settlement of any claim that would give rise to liability on the part of the Indemnifying Party without the latter's prior written consent which will not be unreasonably withheld or delayed, and the Indemnifying Party will not be liable for the amount of any settlement affected without its prior written consent.

Section 8.04   Consequential Damages.   Except with respect to a Party's fraud or willful misconduct, and except with respect to damages sought by a third party in connection with a third party claim, none of the Parties, or their Affiliates, will be liable to the other Parties, or their Affiliates, for any damages other than direct damages. Each Party agrees that it is not entitled to recover and agrees to waive any claim with respect to, and will not seek, consequential, punitive or any other special damages as to any matter under, relating to or arising out of the transactions contemplated by this Agreement, except with respect to such claims and damages arising directly out of a Party's fraud or willful misconduct, or with respect to damages sought by third parties in connection with third party claims.

ARTICLE IX
MISCELLANEOUS

Section 9.01   No Partnership or Joint Venture; Independent Contractor.   Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or Acis or their respective successors or assigns.  The Parties understand and agree that, with the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  With the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, no Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services.

8

Section 9.02    Amendments; Waivers. Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.03    Schedules and Exhibits; Integration.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 9.04    Further Assurances.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

Section 9.05    Governing Law.  This Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 9.06    Assignment.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 9.07    Headings.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 9.08    Counterparts.  This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 9.09    Successors and Assigns; No Third Party Beneficiaries.  This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.10    Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i)immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

R018166

If to HCMLP, addressed to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Fax: (972) 628-4147

If to Acis, addressed to:

Acis Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Fax: (972)628-4147

Section 9.11    <u>Expenses</u>. Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

Section 9.12    <u>Waiver</u>. No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.13    <u>Severability</u>. If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties. All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 9.14    <u>Arbitration; Jurisdiction</u>. Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; <u>provided, however</u>, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service. The arbitrator(s) shall be duly licensed to practice law in the State of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each (each deposition is to be taken pursuant to the Texas Rules of Civil Procedure); (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production, provided, that, in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, which shall include electronic documents; and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the

10

American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules. The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

      Section 9.15   <u>General Rules of Construction</u>.   For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

R018168

**App. 115**
APP.3190

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:   Strand Advisors, Inc., its general partner

By:_____

Name: James Dondero

Title: President

**ACIS CAPITAL MANAGEMENT, L.P.**

By:   Acis Capital Management GP, LLC,
      its general partner

By:_____

Name: James Dondero

Title: President

R018169

**App. 116**
APP.3191

<u>**Annex A**</u>

**Shared Services**

Finance and Accounting
- Book keeping
- Cash management
- Financial reporting
- Accounts payable
- Accounts receivable
- Expense reimbursement
- Vendor management
- Tax preparation and filing
- CLO surveillance and monitoring
- Administrative assistance

Facilities
- Equipment and Office Supplies
- General Overhead
- Rent & Parking

Human Resources
- Payroll services
- Health insurance
- Employee benefits

Marketing and Public Relations
- Business Development
- Investor relations
- Investor due diligence
- Public relations

Legal
- In-house litigation support
- Compliance & Compliance Systems
- Document review and preparation

IT
- System infrastructure support
- Website management
- Email and Hardware support

Operations and Production
- Middle office services
- Procurement
- Trade settlement

R018170

**App. 117**
APP.3192

**Annex B**

**4.01(c) Fee Schedule – Acis Funds**

| Fund | Annualized Shared Service Fee Rate (bps) |
|---|---|
| Acis CLO 2013-1, Ltd. | 15 |
| Acis CLO 2013-2, Ltd. | 15 |
| Acis CLO 2014-3, Ltd. | 15 |
| Acis CLO 2014-4, Ltd. | 15 |
| Acis CLO 2014-5, Ltd. | 15 |
| Acis CLO 2015-6, Ltd. | 15 |
| Hewitt's Island CLO, Ltd. | 15 |
| Endurance Investments Holdings, Ltd. | 15 |
| Acis CLO Value Fund II | 15 |
| BayVK R2 Lux S.A. | 15 |

Additionally, for advised funds (including CLO's, hedge funds or any other advised accounts) following the Effective Date which are managed by Acis, Acis will pay HCMLP an annualized shared service fee at a rate of 15 basis points per year.

R018171

**App. 118**
APP.3193

# EXHIBIT G

**EXECUTION VERSION**

**THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

## TABLE OF CONTENTS

**Page**

1.     Appointment; Limited Scope of Services ........................................................................... 1

2.     Compensation .................................................................................................................. 3

3.     Representations and Warranties ....................................................................................... 3

4.     Standard of Care; Liability; Indemnification. ................................................................. 4

5.     Limitations on Employment of the Sub-Advisor; Conflicts of Interest. ......................... 7

6.     Termination; Survival ..................................................................................................... 8

7.     Cooperation with Management Company ........................................................................ 8

8.     Management Agreements and Related Agreements ......................................................... 8

9.     Amendments; Assignments ............................................................................................. 9

10.     Advisory Restrictions...................................................................................................... 9

11.     Records; Confidentiality. ............................................................................................... 10

12.     Notice ............................................................................................................................ 11

13.     Governing Law .............................................................................................................. 11

14.     WAIVER OF JURY TRIAL ......................................................................................... 11

15.     Severability ................................................................................................................... 11

16.     No Waiver ..................................................................................................................... 11

17.     Counterparts .................................................................................................................. 12

18.     Third Party Beneficiaries .............................................................................................. 12

19.     No Partnership or Joint Venture .................................................................................... 12

20.     Entire Agreement .......................................................................................................... 12

## THIRD AMENDED AND RESTATED
## SUB-ADVISORY AGREEMENT

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1.      Appointment; Limited Scope of Services.

(a)      Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of <u>Section 8</u>, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b)     Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i)     make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

(ii)     place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii)     identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv)     assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

(v)     provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

(vi)     assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii)     assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "<u>Services</u>."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company.  Furthermore, the

2

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)       The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein.  The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.       Compensation.

(a)       As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto.  The "Sub-Advisory Fee" shall be payable in accordance with Appendix A attached hereto, as such appendix may be amended by the Parties from time to time.

(b)       Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)       Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)       From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.       Representations and Warranties.

(a)       Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)       it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

3

(ii)     this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)     no consent, approval, authorization or order of or declaration or filing with any consent, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)     neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)     The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)     The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission.  The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.     Standard of Care; Liability; Indemnification.

(a)     Sub-Advisor Standard of Care.  Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

4

Related Agreements. To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)     Exculpation. To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages. To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

5

(c)  <u>Indemnification</u>.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person.  The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

(d)  <u>Other Sources of Recovery etc</u>.  The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

        (e)    <u>Rights of Heirs, Successors and Assigns</u>.  The indemnification rights provided by <u>Section 4(c)</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

        (f)    <u>Reliance</u>.  A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.  Each Covered Person may act directly or through his, her or its agents or attorneys.

        (g)    <u>Rights Under Management Agreements and Related Agreements</u>.  The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to <u>Section 8</u> if such indemnification and exculpation rights are not reasonably acceptable to it.

        5.    <u>Limitations on Employment of the Sub-Advisor; Conflicts of Interest</u>.

        (a)    The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

        (b)    So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)     The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in <u>Appendix B</u> hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such <u>Appendix B</u>, as amended from time to time with mutual consent of the Parties.

6.     <u>Termination; Survival</u>.

(a)     This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)     This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements.  Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and <u>Appendix A</u> hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)     All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.     <u>Cooperation with Management Company</u>.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor.  Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.     <u>Management Agreements and Related Agreements</u>.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement.  The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company.  No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

8

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9.   <u>Amendments; Assignments</u>.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)   Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)   The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10.   <u>Advisory Restrictions</u>.  This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof.  It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>").   If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

9

11.   <u>Records; Confidentiality</u>.

(a)     The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)     The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

12.   <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

      (a)      If to the Management Company:

           Acis Capital Management, L.P.
           300 Crescent Court
           Suite 700
           Dallas, TX 75201

      (b)      If to the Sub-Advisor:

           Highland Capital Management, L.P.
           300 Crescent Court
           Suite 700
           Dallas, TX 75201

13.   <u>Governing Law</u>.   This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.   <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.   <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.   <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

11

17.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.    <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.    <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.    <u>Entire Agreement</u>.   This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

12

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By:_____

Name: James Dondero

Title:   President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By:_____

Name: James Dondero

Title:  President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

### Appendix A

The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank*]

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

2

## APPENDIX B

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account.  Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise.  Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)    serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)    receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)    be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)    be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e)    sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)    underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

B-1

(g)     serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)     act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement.  Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account.  The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions.  The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement.  As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

B-4

# EXHIBIT H

**EXECUTION VERSION**

**FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS .................................................................................. 2

      Section 1.01     Certain Defined Terms ............................................................ 2

      Section 1.02     Interpretation ......................................................................... 3

ARTICLE II SERVICES ..................................................................................... 4

      Section 2.01     General Authority. ................................................................. 4

      Section 2.02     Provision of Services. ........................................................... 4

      Section 2.03     Shared Employees. ................................................................ 6

      Section 2.04     Applicable Asset Criteria and Concentrations. .................... 8

      Section 2.05     Compliance with Management Company Policies and
                              Procedures. ............................................................................ 8

      Section 2.06     Authority. .............................................................................. 8

      Section 2.07     Third Parties. ......................................................................... 9

      Section 2.08     Management Company to Cooperate with the Staff and
                              Services Provider. ................................................................. 9

      Section 2.09     Power of Attorney. ................................................................ 9

ARTICLE III CONSIDERATION AND EXPENSES ........................................ 9

      Section 3.01     Consideration ........................................................................ 9

      Section 3.02     Costs and Expenses ............................................................. 10

      Section 3.03     Deferral .............................................................................. 10

ARTICLE IV REPRESENTATIONS AND COVENANTS ............................ 10

      Section 4.01     Representations ................................................................... 10

ARTICLE V COVENANTS ............................................................................. 10

      Section 5.01     Compliance; Advisory Restrictions. .................................. 10

      Section 5.02     Records; Confidentiality. .................................................... 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION .......................... 12

      Section 6.01     Standard of Care ................................................................. 12

      Section 6.02     Exculpation. ........................................................................ 12

      Section 6.03     Indemnification by the Management Company. ................. 13

      Section 6.04     Other Sources of Recovery etc ........................................... 14

      Section 6.05     Rights of Heirs, Successors and Assigns ........................... 14

      Section 6.06     Reliance .............................................................................. 14

i

## TABLE OF CONTENTS
(continued)

**Page**

ARTICLE VII TERMINATION ................................................................................ 14

    Section 7.01     Termination. ............................................................................ 14

ARTICLE VIII MISCELLANEOUS ........................................................................ 15

    Section 8.01     Amendments ........................................................................... 15

    Section 8.02     Assignment and Delegation. ................................................... 15

    Section 8.03     Non-Recourse; Non-Petition. .................................................. 15

    Section 8.04     Governing Law. ...................................................................... 16

    Section 8.05     WAIVER OF JURY TRIAL. ................................................... 17

    Section 8.06     Severability ............................................................................ 17

    Section 8.07     No Waiver .............................................................................. 17

    Section 8.08     Counterparts .......................................................................... 17

    Section 8.09     Third Party Beneficiaries ....................................................... 17

    Section 8.10     No Partnership or Joint Venture ............................................. 17

    Section 8.11     Independent Contractor ......................................................... 17

    Section 8.12     Written Disclosure Statement ................................................ 18

    Section 8.13     Headings ............................................................................... 18

    Section 8.14     Entire Agreement .................................................................. 18

    Section 8.15     Notices .................................................................................. 18

**App. 144**
APP.3219

### FOURTH AMENDED AND RESTATED
### SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

### R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows.

# ARTICLE I

## DEFINITIONS

Section 1.01    <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"<u>Advisers Act</u>" shall have the meaning set forth in the Recitals to this Agreement.

"<u>Advisory Restriction</u>" shall have the meaning set forth in <u>Section 5.01(b)</u>.

"<u>Affiliate</u>" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble to this Agreement.

"<u>Applicable Asset Criteria and Concentrations</u>" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"<u>Applicable Law</u>" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"<u>CLO or Account</u>" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"<u>Covered Person</u>" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"<u>Governmental Authority</u>" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"<u>Highland</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Indebtedness</u>" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"<u>Management Company</u>" shall have the meaning set forth in the <u>preamble</u> to this Agreement.

"<u>Operating Guidelines</u>" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"<u>Parties</u>" shall have the meaning set forth in the <u>preamble</u> to this Agreement.

"<u>Portfolio</u>" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended.

"<u>Staff and Services Fee</u>" shall have the meaning set forth in <u>Section 3.01</u> of this Agreement.

"<u>Staff and Services Provider</u>" shall have the meaning set forth in the <u>preamble</u> to this Agreement.

"<u>Shared Employee</u>" shall have the meaning set forth in the <u>Recitals</u> to this Agreement.

Section 1.02   <u>Interpretation</u>.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

3

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

# ARTICLE II

## SERVICES

Section 2.01   <u>General Authority</u>.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   <u>Provision of Services</u>.  Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)   *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)   *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)   *Management of Collateral Obligations and CLOs and Accounts*.  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)   *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e)     *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f)     *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g)     *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h)     *Administrative Services.*  The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i)     *Shared Employees.*  The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

(j)     *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

(k)     *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Section 2.03   Shared Employees.

(a)     The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)     Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

6

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)     to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04     Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.2 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05     Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06     Authority.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

8

Section 2.07   <u>Third Parties</u>.

(a)      The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)      In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   <u>Management Company to Cooperate with the Staff and Services Provider</u>. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   <u>Power of Attorney</u>.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).   Any such power shall be revocable in the sole discretion of the Management Company.

# ARTICLE III

# CONSIDERATION AND EXPENSES

Section 3.01   <u>Consideration</u>.  As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.  The "<u>Staff and Services Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

9

Section 3.03    Costs and Expenses.  Each party shall bear its own expenses; *provided that* the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04    Deferral.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

<h2 style="text-align:center">ARTICLE IV</h2>

<h3 style="text-align:center">REPRESENTATIONS AND COVENANTS</h3>

Section 4.01    Representations.  Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

<h2 style="text-align:center">ARTICLE V</h2>

<h3 style="text-align:center">COVENANTS</h3>

Section 5.01    Compliance; Advisory Restrictions.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

10

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)     This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02   Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

11

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure.  This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01   Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02   Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To

12

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03   Indemnification by the Management Company.   The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

13

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05    Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06    Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01    Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

14

# ARTICLE VIII

# MISCELLANEOUS

Section 8.01    <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    <u>Assignment and Delegation</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

15

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive.  The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Section 8.04    Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts.  The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

16

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party.  Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09    Third Party Beneficiaries.    This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture.    Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor.    Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

17

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

    (a)    If to the Management Company:

    Acis Capital Management, L.P.
    300 Crescent Court
    Suite 700
    Dallas, TX 75201

    (b)    If to the Staff and Services Provider:

    Highland Capital Management, L.P.
    300 Crescent Court
    Suite 700
    Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

18

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: James Dondero
Title:   President

**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By:_____
Name: James Dondero
Title:  President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

### Appendix A

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table. Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder. Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank*.]

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

# EXHIBIT I

## JAMS ARBITRATION PROCEEDING

| | | |
|---|---|---|
| **JOSHUA N. TERRY,** | § | |
| | § | |
| **Claimant,** | § | |
| | § | |
| **v.** | § | **JAMS No. 1310022713** |
| | § | |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, LP, ACIS CAPITAL** | § | |
| **MANAGEMENT, LP, ACIS CAPITAL** | § | |
| **MANAGEMENT GP, LLC, JAMES** | § | |
| **DONDERO, as trustee of THE** | § | |
| **DUGABOY INVESTMENT TRUST, and** | § | |
| **MARK K. OKADA,** | § | |
| | § | |
| **Respondents.** | § | |

### AFFIDAVIT OF SCOTT S. HERSHMAN IN SUPPORT OF HIGHLAND'S REQUEST FOR ATTORNEYS' FEES

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, personally appeared Scott S. Hershman, who is personally known to me, and upon his oath deposed and said as follows:

1.    I am a partner with Lackey Hershman, L.L.P., counsel to Respondents in this case.  I am over eighteen (18) years of age and fully capable of making this affidavit.  The facts stated herein are true and correct and are based upon my personal knowledge.

2.    I have been an attorney for nearly thirty years and have been licensed in both Illinois and Texas state courts.  I have litigated disputes in the state and federal courts and arbitration tribunals in Texas, Illinois, New York, California, Hawaii, Nevada, Arizona, Tennessee, Michigan, Florida, North Carolina, Georgia, New Mexico, Colorado, Delaware, and Mississippi.  I have also litigated disputes in Mexico, Canada, the Far East, and Europe.  At the

AFFIDAVIT OF SCOTT S. HERSHMAN IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES – Page 1

appellate level I have practiced in the state and federal courts in Texas, Illinois, California, New Mexico, Arizona, Nevada, New York, and Louisiana.  I have also litigated in the state Supreme Courts of Texas, Illinois, California, Arizona, Delaware, and Nevada.  The vast majority of my practice has been in complex commercial litigation, much of which is substantively and procedurally similar to the case at bar.

3.      I have been designated as an expert on the reasonableness of attorneys' fees, professional responsibility, and professional malpractice too many times to count.  I am familiar with the current legal and factual standards in determining the reasonableness of attorneys' fees as well as the current practices, rates, and costs associated with litigation in cases such as the one at bar.

4.      I reviewed the substantive pleadings; a portion of correspondence between the lawyers; the court's and tribunal's rulings; portions of certain depositions and discovery; all of Respondents' redacted monthly billing statements;[1] and all of Claimant Joshua Terry's ("Terry") billing statements that were made available to Respondents (June 2016 – April 2017).  I also spoke with Jamie Welton.

5.      Highland's claim for attorneys' fees, costs, and expenses arise from the Employment Agreement and Terry's theft of company property in breach of that agreement and duties to his employer (Highland), both of which are governed by Texas law.  *See* Highland's Statement of Claim (May 24, 2017); (Employment Agreement § 7.6 (stipulating to the application of Texas law to all disputes "relating to the interpretation and enforcement of the provisions of this Agreement") (Resp. Tr. Ex. 1).

6.      Terry purports that his claim for attorneys' fees, costs, and expenses is made "[p]ursuant to Texas Civil Practice and Remedies Code section 38.001 and the LPA."  *See*

---

[1] True and correct copies of Respondents' redacted bills are attached as Exhibit 1.

**AFFIDAVIT OF SCOTT S. HERSHMAN IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES** – **Page 2**

Claimant's First Amended Statement of Claim (Jan. 11, 2017). The only claim based on Texas law asserted by Terry is his claim for wrongful termination under *Sabine Pilot*, which does not allow for the recovery of attorneys' fees. *See Ed Rachal Found. V. D'Unger*, 117 S.W.3d 348, 357-58 (Tex. App.—Corpus Christi 2003), *rev'd in part on other grounds*, 207 S.W.3d 330 (Tex. 2006); *Garcia v. Sunbelt Rentals, Inc.*, 310 F.3d 403, 404-05 (5th Cir. 2003). All of Terry's other claims arise out of or related to the LPA, which is governed by Delaware law. *See* LPA § 6.11 (Resp. Tr. Ex. 77).

7.      Both Texas and Delaware adhere to the American Rule, which prohibits the award of attorneys' fees unless they are expressly authorized by a statutory or contractual fee-shifting provision. *See LG Ins. Mgmt. Serv. L.P. v. Leick*, 378 S.W.3d 632, 640 (Tex. App.—Dallas 2012) ("Texas follows the 'American Rule' for the award of attorneys' fees, which prohibits the awarding of attorneys' fees unless they are permitted by statute or contract."); *In re Boomerang Tube, Inc. et al.*, 548 B.R. 69, 71-75 (Bankr. D. Del. 2016) (holding that any departures from the American Rule must be "specific and explicit" and "must authorize the award of a reasonable attorney's fee, fees, or litigation costs and usually refer to a prevailing party in the context of an adversarial action") (citations omitted); *TranSched Sys. Ltd. v. Versyss Transit Sols., LLC*, 2012 WL 1415466, *2 (Del. Super. Ct. Mar. 2012) (Requiring "clear and unequivocal articulation of intent" to deviate from the American Rule, and holding that parties "should not expect the court to deviate from the American Rule if care has not been taking in drafting a contract's language.").

8.      Highland is entitled to recover its attorneys' fees and costs on at least one of three separate grounds: (i) Section 5.4 of the Employment Agreement, which explicitly provides that Highland "shall be entitled" "to recover the Company's attorneys' fees, costs, and expenses

**AFFIDAVIT OF SCOTT S. HERSHMAN IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES** – **Page 3**

related to the breach" by Terry; (ii) TEX. CIV. PRAC. & REM. CODE § 38.001, which provides for the recovery of attorneys' fees in breach of contract cases; and (iii) TEX. CIV. PRAC. & REM. CODE §§ 134.005(b) and/or 134A005(3), which provide for the recovery of attorneys' fees in cases involving theft of company property or misappropriation of trade secrets.

9.      It is my opinion that none of the parties, including Terry, are entitled to recover attorneys' fees under the LPA because there is no "specific and explicit" statutory or "clear and unequivocal" contractual departure from the American Rule.  First, there is no applicable statutory basis under Delaware law for attorneys' fees, nor was one pled, and the LPA expressly superseded and waived ability to recover under Chapter 38 of the Texas Civil Practices & Remedies Code.  *See* Claimant's First Amended Statement of Claim (Jan. 24, 2017) (failing to assert any claim for attorneys' fees under Delaware law); LPA §6.12(b)(iv) (stipulating to the American Rule and providing it is "intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.") (Resp. Tr. Ex. 77).  Second, there is no specific or explicit contractual fee-shifting provision in the LPA, which, to the contrary, expressly incorporated the American Rule.  *See* LPA § 6.12(b)(iv) (stipulating to the American Rule) (Resp. Tr. Ex. 77).  Notably, the waiver of attorneys' fees under Chapter 38 of the Texas Civil Practices and Remedies Code does not apply to Highland's claims because such a waiver cannot be applied to a non-party to the LPA.  *See In re Boomerang Tube, Inc. et al.*, 548 B.R. 69, 71-75 (Bankr. D. Del. 2016) (holding that contractual waiver of attorneys' fees is not binding on persons or entities that are not a party to the subject contract).  And, in any event, there is an applicable fee-shifting provision in the Employment Agreement, which entitles Highland to recover its attorneys' fees, costs, and expenses related to Terry's breach of that agreement.  *See* Employment Agreement § 5.4 (Resp. Tr. Ex. 1).

**AFFIDAVIT OF SCOTT S. HERSHMAN IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES – Page 4**

10.     It is my conclusion that Highland's reasonable and necessary attorneys' fees that it should recover are $1,605,844.45.   It is my conclusion that Highland's reasonable and necessary costs that they should recover are $787,454.36.[2]  I base that on the following.

11.     Texas and Delaware courts suggest considering the following when determining the reasonableness of attorneys' fees:  the time and labor required; novelty and difficulty of questions involved; the skill required to perform the legal services properly; the likelihood the employment precludes other employment; customary fees; the amount involved and the results obtained; time limitations; the nature and length of the professional relationship; and the experience, reputation and ability of the lawyers.  Each of those factors, when applied to this case, confirm my conclusion.

12.     This dispute obviously required substantial time and labor.  Both sides employed numerous lawyers and several experts.  There were initially two forums, and once the arbitration is concluded, there is a substantial likelihood that the state court will also become involved once again.  Counting both forums, the parties filed or had to respond to dozens of motions, briefs, responsive papers, and other pleadings.  There were multiple hearings, both in the state court and in the arbitration.  Each of those had to be prepared for and attended.  There were 11 depositions, and substantial written discovery.  The case took a total of 13 months to try, culminating in an eight-day arbitration proceeding.   In addition to that final proceeding, there were several preliminary hearings, including emergency and injunctive hearings in the state court and discovery and dispositive hearings in the arbitration.

13.     This case presented numerous issues of law and fact, many of which were complex given the underlying business and transactions at issue.  These included, among other things, the issue of what claims should be arbitrated, given the conflicting provisions in the

---

[2] A true and correct summary of Respondents' recoverable costs is attached as Exhibit 2.

**AFFIDAVIT OF SCOTT S. HERSHMAN IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES** – **Page 5**

subject employment agreement and the LPA, and the existence of parties who were not party to those agreements.  This case also involved theft of company information and misappropriation of trade secrets; the rights to company information; and injunctive and emergency relief issues. The case also involved the analysis of and litigation over multiple commercial agreements, which were complicated by the nature of the underlying business and structured financial products.

14.    A great deal was at stake.  This case involved Terry's allegation that Respondents owed him more than $200 million dollars.[3]   Respondents were seeking to protect highly confidential and privileged information, the disclosure of which could damage Respondents and/or their investors.

15.    Because of the workload and expedited timing of the proceedings, including the parties' success in litigating this case in just over a year (rather than the 2 or 3 years that would be customary), employment in this case precluded other employment by the Respondents' attorneys to a substantial degree.

16.    Respondents' law firms have a long and deep professional relationship with Respondents.  Lackey Hershman has represented Highland Capital Management, L.P. and its affiliates for sixteen years.  This provided Respondents with extra value and inherent efficiencies of having lawyers that were familiar with their people and workings.  This relationship is invaluable in a case such as this and often saves a significant amount of fees.

17.    Respondents' lawyers have significant experience in this type of case and are extremely well thought of in the industry.  I have personally observed Jamie Welton and Marc Katz in court and believe they are two of the most extraordinary lawyers I have ever seen.

---

[3] Should the Panel consider awarding Terry his attorneys' fees, which, as detailed in this Affidavit, I do not believe he is entitled to, the Panel should consider reducing those fees based on, among other things, the fact that Terry significantly overstated his recoverable damages by a factor of twenty.

**AFFIDAVIT OF SCOTT S. HERSHMAN IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES** – Page 6

18.     Hourly rates for matters such as these typically range from $500.00 to $1,500.00 per hour for senior attorneys and $200.00 to $500.00 per hour for more junior attorneys. Respondents' billing rates were well within these parameters.  The weighted average of Respondents' hourly rate was approximately $585.00 per hour.  Jamie Welton, lead counsel for Respondents, was $700.00 per hour.  That amount was imminently reasonable for an attorney of his caliber and experience.  Terry's lead counsel billed at $685.00 per hour.  It appears that Terry and his lawyers then switched to a blended fee arrangement, where his lawyers billed at approximately 30-50% of their normal hourly rates in exchange for a partial contingency. Backing out the reduced rates, Terry's lawyers' blended rate is roughly the same as Respondents' blended rate.

19.     Lackey Hershman also capped its hours at 10 per day, despite several lawyers spending far more than that nearly every day of the arbitration and on several days preparing for the arbitration and during the course of the litigation.  Lackey Hershman also did not bill for paralegal time.

20.     In addition to the criteria suggested by Texas authority, I compared Terry's fees (for the 11 months Terry made available) to Respondents' fees.  In cases such as these, it is typical, if not uniformly true, that the fees of multiple corporate defendants are two to five times more than the fees of an individual petitioner/plaintiff.  This is the case for several reasons, including differences in factual investigation; discovery; and case management.

21.     With respect to factual investigation, an individual plaintiff and its lawyers have essentially one source for information—the plaintiff.  That was essentially the case here.  On the other hand, there were multiple parties on the other side, several of which were corporate entities, making any factual investigation a far broader and more complicated task.  This

**AFFIDAVIT OF SCOTT S. HERSHMAN IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES** – Page 7

typically involves interviewing numerous people, not just one plaintiff.  As is often the case, some of the witnesses no longer work for the parties and thus must be located, and contacted, often requiring the party to go through an individual's counsel.  General counsel and other legal and compliance department personnel are typically if not always involved in the process and thus adds an additional layer of complication.  There is also a need to avoid interfering with ongoing business, business relationships, and employee relationships, all of which makes factual investigation more complicated and time consuming.

22.     The same holds true with discovery.  In this case, when responding to discovery, the sole source of document production and interrogatory responses was Terry.  In this case, it appears that the only documents Terry had in his possession were those that he stole from Respondents.  On the other hand, Respondents' counsel had to review, locate, and analyze the documents produced by several entities, numerous employees, and third parties.  In responding to interrogatories, Respondents had to interview multiple individuals and analyze a significantly greater amount of documents.  There is simply an enormous difference between handling discovery when one represents a single, individual client versus handling discovery when one has multiple corporate entities with various deponents and employees.

23.     The same also holds true for case management.  All of the factors complicating discovery and factual investigation similarly complicate the case management.

24.     For the 11 months I had available to compare Respondents' bills with Terry's bills (June 2016 – April 2017), I found that Respondents' fees fell well within the expected norm.  For the 11 months I had available from Terry (June 2016 – April 2017), Respondents' lawyers billed approximately 1,170 hours.  Terry's lawyers billed approximately 813 hours. Respondents' lawyers' total hours were significantly less than I would have anticipated, given

**AFFIDAVIT OF SCOTT S. HERSHMAN IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES** – Page 8

Terry's lawyers' hours.   As noted above, Respondents' lawyers' blended hourly rate, and individual rates, were more than reasonable.

25.     Another factor supporting my determination that all of Respondents' fees were necessary and reasonable is that a substantial portion of those fees were made necessary by the litigation tactics of Terry and his counsel.   Terry filed an opposition and motion for sanctions because Respondents initiated a state court proceeding.   He did so even though the subject employment agreement provided that the exclusive venue for any disputes on the employment agreement would be in the state or federal courts in Dallas County.   He did so despite the fact that it was black letter law one must seek injunctive relief in the state or federal courts, even in the face of a binding arbitration provision.   He did so even though Highland was not party to the LPA.   Terry also fought hard, in both forums, in resisting the return of documents and information that was irrefutably the property of Highland.   Terry and his lawyers also failed to disclose (and return) certain documents Terry had in his possession that should have been quickly disclosed and returned.   *See generally* Bench Brief of Professor Moss; Respondents' Post-Hearing Brief.

26.     Respondents incurred a total of $1,605,844.45 in fees in this dispute.   Based on the eight-day length of that trial; the work necessary to prepare for and present the case; the complexity of the issues at hand; and all the other factors detailed above, it is my opinion that that amount is imminently reasonable and necessary, and should be recovered.

27.     Respondents also incurred $787,454.36 in costs, primarily experts, discovery, and arbitration fees.   Based on the above criteria, it is also my opinion that those, too, are all reasonable and necessary and recoverable by Respondents.   **In total, I believe Respondents should be awarded $2,393,298.81 in attorneys' fees and costs**.

**AFFIDAVIT OF SCOTT S. HERSHMAN IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES** – Page 9

28.     It is my opinion that neither party is, at this juncture, entitled to recover fees for anything that is to occur in the future, including post-trial motions, appeals to the extent permitted, and collection efforts.  In order to be entitled to such fees at this juncture, they must be not only reasonable and necessary, but foreseeable and expected.  Given the fact that the panel has yet to make an award, there is no way to determine what, if anything, will occur after the panel issues its award.  Respondents, however, are certainly entitled to petition the panel for fees at a later date.

29.     I also considered whether a portion of Highland's fees should be segregated. Based on my review of the file, I concluded that Highland's fees should not be segregated because Respondents' claims and defenses all arose out of and were inextricably interwoven with the breach of Employment Agreement claim against Terry and basis for his termination. Respondents' defense to Terry's claims were primarily the breach of his Employment Agreement, basis for his termination from Highland, and his theft of company property — the very same bases of Highland's claims against Terry.  As such, both Highland's claims and Respondents' defenses to Terry's claims, entailed the very same facts and law and are thus intertwined and not subject to segregation.

**AFFIDAVIT OF SCOTT S. HERSHMAN IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES – Page 10**

This concludes my affidavit testimony.

_____
Scott S. Hershman

SUBSCRIBED AND SWORN TO BEFORE ME on this the 13th day of October, 2017.



_____
Notary Public, State of Texas

AFFIDAVIT OF SCOTT S. HERSHMAN IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES – Page 11

# EXHIBIT J



October 20, 2017

**VIA EMAIL AND FIRST CLASS MAIL**

NOTICE TO ALL PARTIES
(Please See Service List)

      **Re:**    *Terry, Joshua N. vs. Highland Capital Management, LP., et al.*
              *JAMS Ref. No.: 1310022713*

Dear Counsel:

Enclosed please find the **Final Award** executed by the arbitrator.

Please feel free to contact me should you have any questions.

Thank you,

Judy E. Stephenson
Senior Case Manager
jstephenson@jamsadr.com

Enclosure

8401 NORTH CENTRAL EXPRESSWAY   SUITE 610   DALLAS, TX 75225   TEL   214-744-5267   FAX   214-720-6010

**JAMS**

| | | |
|---|---|---|
| **TERRY, JOSHUA N.** | § | |
| | § | |
| **Claimant,** | § | |
| | § | |
| v. | § | **JAMS ARBITRATION NO.  1310022713** |
| | § | |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, LP, ACIS CAPITAL** | § | |
| **MANAGEMENT, LP, ACIS CAPITAL** | § | |
| **MANAGEMENT GP, LLC, DONDERO** | § | |
| **JAMES D. as TRUSTEE/THE DUGABOY** | § | |
| **INVESTMENT TRUST and** | § | |
| **OKADA, MARK K.** | § | |
| | § | |
| **Respondents.** | § | |

**FINAL AWARD**

**Parties and Counsel**:  The parties are identified in the caption and are represented as follows:

> Brain P. Shaw
> Rogge Dunn
> Clouse Dunn LLP
> 1201 Elm Street, Suite 5200
> Dallas, TX 75270
> Phone:  214-220-3888; Fax:  214-330-3833
> Email:  shaw@clousedunn.com
> Email:  rogge@clousedunn.com
> Counsel for Claimant, Joshua N. Terry

> Paul B. Lackey
> Jamie R. Welton
> Bruce E. Bagelman
> Lackey Hershman LLP
> 3102 Oak Lawn Avenue, Suite 777
> Dallas, TX 75219
> Phone:  214-560-2201; Fax:  214-560-2203
> Email:  pbl@lhlaw.net
> Email:  jrw@lhlaw.net

Email: beb@lhlaw.net

AND

Marc D. Katz
Robert M. Hoffman
Andrews Kurth LLP
1717 Main Street, Suite 3700
Dallas, TX 75201
Phone: 214-659-4400; Fax: 214-659-4401
Email: marckatz@andrewskurth.com
Email: robhoffman@andrewskurth.com
Counsel for Respondents, Highland Capital Management, LP,
ACIS Capital Management, LP, ACIS Capital Management GP,
LLC, Dondero, James D. as Trustee/The Dugaboy Investment
Trust, and Okada, Mark K.

**Arbitrator**:                   Hon. Harlan Martin
                                  Hon. Glen M. Ashworth (Ret.)
                                  Hon. Mark Whittington (Ret.)
                                  JAMS
                                  8401 N. Central Expressway, Suite 610
                                  Dallas, Texas 75225
                                  Telephone: 214-744-5267; Fax: 214-720-6010

**Case Manager**:                 Judy Stephenson
                                  JAMS
                                  8401 N. Central Expressway, Suite 610
                                  Dallas, Texas 75225
                                  Email: jtephenson@jamsadr.com
                                  Telephone: 214-891-4523; Fax: 214-720-6010

## HEARING

In accordance with the Parties' agreement to arbitrate and Court Order, disputes between

Claimant, Joshua N. Terry ("Terry") and Highland Capital Management, LP, ("Highland"), ACIS

**App. 181**
APP.3256

Capital Management, LP ("ACIS"), ACIS Capital Management GP, LLC ("ACIS GP"), James

Dondero, as Trustee of the Dugaboy Investment Trust ("Trust"), and Mark K. Okada ("Okada"),

all Respondents were submitted to binding arbitration before JAMS. The Arbitration Panel

members are the Hon. Glen M. Ashworth (Ret.), the Hon. Mark Whittington (Ret.) and the Hon.

Harlan Martin (Former), serving as Chairman of the Panel.

The arbitration hearing was conducted in Dallas, Texas on the dates of September 2, 3, 6,

7, 8, 11, 12, 13, 14 and 15, 2017, with additional briefing submitted thereafter. The briefing was

closed and the hearing was complete on September 28, 2017.


## PROCEDURAL BACKGROUND

In Cause No. DC-16-11396, styled Highland Capital Management, LP vs. Joshua N.

Terry, the 162nd Judicial District Court stayed the litigation and Ordered the parties to arbitration.

The Panel has previously dismissed all claims stated by Terry against Jams Dondero,

individually. James Dondero is not an appropriate party to this proceeding and did not obligate

himself to the Parties' arbitration agreement.

The Panel has previously dismissed Terry's claims for Declaratory Judgment relief.

The Panel has previously dismissed Terry's claims for Exemplary Damages, as same are

an excluded remedy by the terms of the Parties' arbitration agreement.

The Panel has previously denied Respondents' Motion to Disqualify Clouse Dunn and

ruled that the firm is not disqualified to represent Terry.

The Panel has declined to entertain any request for injunctive relief.

**App. 182**
APP.3257

### REMAINING CLAIMS STATED BY PARTIES

Terry states claims against Highland for Sabine Pilot wrongful termination and seeks damages for deferred compensation, unpaid wages, future wages and reimbursement of benefits not paid.  Terry states claims against ACIS, ACIS GP and Highland for reputational damages, resulting from statements published in the pending District Court litigation and a press release to Law 360.

Terry states claims against ACIS, ACIS GP, Trust and Okada for breach of contract and seeks damages for amounts due under the terms of the ACIS LPA and damages resulting from overcharging expenses and withholding of retirement assets.

Terry states claims against ACIS and ACIS GP for fraud.

Terry states claims against ACIS GP for breach of fiduciary duty.

Terry states claims against ACIS, ACIS GP and Highland for conversion of assets, fraudulent transfer of ACIS assets, recovery of his attorney's fees and costs, together with pre and post award interest.

Highland states claims against Terry, "subject to, and without waiver of its contention that Highland is not a party to a valid arbitration agreement with Terry and its claims against him are not arbitrable or within the scope of any applicable arbitration agreement, which contentions remain fully reserved."  With this reservation, Highland states claims against Terry for breach of employment agreement, theft/theft of trade secrets, breach of fiduciary duty/self-dealing and recovery of its attorneys' fees and costs together with pre and post award interest.

### BACKGROUND FACTS

Terry began his employment with Highland in 2005. During the ensuing years he achieved remarkable success and ultimately became Highland's most productive portfolio manager and had direct responsibility for more than ten billion dollars of assets under his management.

In 2011, Terry, James Dondero and Okada formed ACIS as a registered investment advisor to raise money from third-party investors to invest in collateralized loan obligations, (CLOs). ACIS earns a fee for managing the loans.

As the general partner of ACIS, ACIS GP owned .1%. As limited partners of ACIS, Trust owned 59.9%; Okada owned 15% and Terry owned 25%.

James Dondero owned 100% of Trust and was an officer of ACIS GP, and in fact made or approved the financial strategies and decisions of ACIS. While Okada was less active, Terry was responsible for the day-to-day management of ACIS. Terry managed well, attracted significant investors and grew ACIS assets under his management from nothing to three billion seven hundred million dollars in less than six years.

Prior to 2016, Terry enjoyed a good relationship with Dondero. Terry had never been criticized, written up or disciplined during his eleven years of employment with Highland. Terry had been paid millions of dollars in Highland salary, bonuses and ACIS profit distributions, as he had produced many more millions for Highland and his ACIS partners.

Thereafter, tensions arose between Terry and Dondero which were centered in Dondero's plans to have Trussway Holdings, Inc. acquire Targa, a Brazilian latex manufacturer, out of bankruptcy. Trussway is a Highland affiliated company controlled by Dondero. The plan was to have Highland managed CLOs loan Trussway approximately seventeen million dollars so

App. 184
APP.3259

Trussway could loan a Highland affiliated Brazilian entity the money to acquire Targa and have Trussway use its cash to acquire its own equity to effectively increase Highland's ownership in Trussway.

At this time, Trussway's only lenders were the Highland CLOs and it owed the Highland CLOs approximately fifty six million dollars in Trussway notes coming due on May 31, 2016. Trussway did not have the money to pay the notes. Trussway did have more than twenty three million dollars still available on its revolver note (credit line), with the Highland CLOs. Dondero's plan was to extend the notes then due within days and finance Trussway's acquisition of Targa by drawing down the revolver funds. Dondero's plan was to not pay any of the CLOSs' notes until such time as Trussway could be refinanced or sold.

All of the Highland CLOs lending to Trussway were "pre-crisis" 2009, CLOs. One of the CLOs, Pamco-Cayman, had matured years before and its notes were in technical default. Another, Vahalla was maturing within four months.

Terry was opposed to Dondero's plan and saw a need to vigorously oppose the plan. Terry was the portfolio manager of these Highland CLOs and was convinced it would be a breach of his fiduciary duty to allow the Pamco-Cayman and Vahalla notes to be extended, as they were past or near maturity. Terry's opposition escalated at the May 2016 Conflicts Committee meeting and having been told that outside counsel had approved the transaction, Terry was sure they could not know all of the facts. Terry then informed outside counsel of "the facts" and his opposition to Dondero's plan. Outside counsel was in agreement with Terry and thereafter, on June 9, 2016, the Conflicts Committee approved the Trussway/Targa Transaction, but with the Pamco-Cayman and Vahalla notes being paid off and not extended. Thus, less cash was available to Dondero to fund his plan.

App. 185
APP.3260

On June 9, 2016, following the Conflicts Committee meeting, Dondero told Terry that

"he had lost all trust in him"; that "he could not go through another conflicts process with him";

and "it was best that Terry work with Surgent, Highland's Chief Compliance Officer (CCO), on

an exit or transition out of Highland." The next day, Dondero emailed Terry and told him to

focus on a "clean break scenario" and not come back to the office. On June 13, 2106, Terry

received an email from Highland's Human Resources (H/R) director advising that he had been

terminated for cause, but that Highland was "willing to consider the separation package

previously offered", presumably referring to CCO Surgent's email of June 10, 2106, wherein he

acknowledges that, "We are in agreement that we would like the termination of this relationship

to be amicable." On June 13, 2016, Terry communicates with Dondero protesting his

termination and demanding he be paid by Highland and ACIS. Thereafter, Highland's outside

counsel sent a letter to Terry's counsel, demanding the return of all Highland related documents

in the possession of Terry. Terry's counsel responds and reminds Highland's counsel of Terry's

prior offer to return appropriate documents to Highland, and suggests a protocol for managing

the electronically stored documents and electronic devices in possession of ESI, a third party

forensics vendor, and demands redemption of Terry's and his wife's retirement account

investments in ACIS CLO Value Fund II (CLOVF). Terry first requested redemption of these

retirement account investments on June 20, 2016.

Thereafter, on June 27, 2016, Terry returns documents to Highland and continues to await

an agreement on ESI return protocols. However, on July 27, 2016, Highland's counsel rejects

the proposed ESI return protocols and does not suggest alternate protocols. In the same e-mail

string, Highland's counsel responds to Terry's request for redemption of the retirement

investments in CLOVF, advising that; "we do not contest that Mr. Terry has submitted a request

for redemption in full of all of his accounts. However, please note that those accounts do not have any value." On September 1, 2016, the CCO, for the first time, memos Terry's "compliance file" with allegations of Terry's breach of fiduciary duty, self-dealing and material compliance violations regarding the CLOVF. This memo alleges an investor loss in the CLOVF attributed solely to Terry's actions and that Highland in part offset such loss against "Mr. Terry's" remaining interest in the CLOVF, "in accordance with Section 3.5(c) of the Agreement of Limited Partnership." Thus, Terry's and his wife's retirement investment in the CLOVF was swept by Highland or others and "those accounts have no value," as stated in Highland's counsel's email of July 27, 2016.

On September 7, 2016, the Parties mediated their dispute, but did not settle. The next day Highland filed suit against Terry alleging the same facts which the CCO alleged in his September 1, 2016 memo, and alleging Terry had a sexual relationship with a number of his subordinates, and alleging that Terry made disparaging/disrespectful remarks about Dondero. Highland's suit stated claims for breach of employment agreement, breach of fiduciary duty/self-dealing, violation of the Texas Uniform Trade Secrets Act and sought declaratory relief that Terry was terminated for cause.

On September 12, 2106, Highland files its Application for Temporary Restraining Order and Motion to Disqualify Terry's attorneys, and Terry files his Motion to Compel Arbitration. On September 28, 2106, the Court issued its Order compelling the Parties to arbitration and Ordered the litigation (Cause No. DC-16-11396, 162nd Judicial District Court) stayed pending a Final Award in Arbitration.

### ANALYSIS OF FACTS AND CLAIMS

The Panel first addresses Terry's claims for breach of contract stated against ACIS and ACIS GP and breach of fiduciary duty stated against ACIS GP.

The evidence establishes that Highland terminated Terry's employment on June 9, 2016.  The ACIS Limited Partnership Agreement (LPA), Section 4.04 requires that, "upon the resignation, death, disability or termination of employment with the Partnership or any Affiliate Employer (for any reason whatsoever) (as such event, a 'Removal Event') of any Limited Partner, the Partnership Interest of such Limited Partner shall automatically be forfeited to the Partnership and such Limited Partner shall be entitled to receive in consideration of such interest an amount equal to (i) 100% of such Limited Partners Percentage Interest of all Net Available Cash through the first year end following the Removal Event, (ii) 66 2/3% of such Limited Partner's Percentage Interest of all Net Available Cash through the second year end following such Removal Event, (iii) 33 1/3% of such limited Partner's Percentage Interest of Net Available Cash through the third year end following such Removal Event…; provided, that if the basis of such Removal Event was termination of employment with the Partnership or any Affiliate Employer for cause…such partner shall automatically forfeit its right to any further compensation or consideration for its Partnership Interest."

Because Highland stated that Terry was terminated for cause, ACIS and ACIS GP invoked the provided clause and deemed all of Terry's limited partnership interest and entitlement to payout as forfeit.  Thus, ACIS and ACIS GP claim to owe Terry nothing for his 25% limited partnership interest in ACIS, as Terry claims he is contractually owed twelve million nine hundred and eight two thousand dollars for his 25% limited partnership interest in ACIS.

The evidence establishes that ACIS and ACIS GP did not just simply rely on Highland's statement of terminating Terry for cause.  ACIS and ACIS GP became part of Highland's and

Dondero's efforts to construct a pretext of "for cause" termination so Terry could be denied the value of his limited partnership interest in ACIS. ACIS and ACIS GP knowingly and willingly pretextually characterized Terry's termination from Highland as a "for cause" termination to deny Terry the value of his limited partnership interest, all in contractual breach of the ACIS LPA and in breach of fiduciary duty to Terry as its limited partner. ACIS and ACIS GP have no employees. All who act for ACIS and ACIS GP are officers or employees of Highland and perform multiple roles.

The evidence establishes that Highland's termination of Terry was, in fact, pre-textual, without basis of cause and only because Dondero wanted him gone. Terry's opposition to Dondero's Trussway/Targa plan was not self-dealing and not a breach of fiduciary duty. Terry's opposition to Dondero's plan to not pay investors and extend past due and near due notes was appropriate and was ultimately accepted by all to be the correct approach to complete the Trussway/Targa acquisition. Dondero was simply angry and realized Terry was not a "yes man" willing to let Dondero have his wrongheaded way, so Dondero fired Terry on the spot and later sought to characterize Terry's termination of employment as "for cause."

Respondents' offer to prove that Terry's termination was "for cause" is not persuasive. The contrasts between the true facts and their temporal relationship to Terry's termination, as those "facts" are characterized by Respondents as a predicate for his "for cause" termination, are not credible. The CCO's memo to Terry's file of September 1, 2016 was the first documentation of his alleged breach of fiduciary duty or self-dealing as a justification for his "for cause" termination.

There is no credible evidence that anyone ever discussed any prior sexual relationship between Terry and a co-worker, other than Terry in a "father/son" talk with Dondero in January 2015. That admitted relationship had ended months earlier, was not significant to Dondero and he told Terry there was no need to report the relationship to Human Resources. Respondents alleged

other sexual relationships between Terry and co-workers which are denied by Terry. One is alleged to have occurred in 2011, but there is no credible evidence that it even occurred. It is simply not credible that a rumored relationship four years prior was any motivation for or could be any justification for Terry's "for cause" termination. Respondents' allegation that Terry had a sexual relationship with a Highland junior attorney is most offensive, as the relationship did not occur and was denied by both Terry and the junior attorney. This allegation was based solely on someone's fantasy related to costumes they wore at an office Halloween party and their common attendance at a business conference. It is not credible that a sophisticated CCO and H/R director would reasonably rely on such as a basis for Terry's "for cause" termination and resulting forfeiture of the value of his limited partnership interest in ACIS. The evidence establishes that Terry did not have a sexual relationship with the junior attorney, and the Respondents or others, in good faith, could not have reasonably believed he did.

The Panel is persuaded that the Respondents, feeling need to find motive for the junior attorney's assistance of Terry and her involvement in the CLOVF restructure, sponsored these allegations to support their claims that Terry was seeking the restructure of the CLOVF out of self-interest and in breach of his fiduciary duties, and establish the motives of the junior attorney in "knowingly" facilitating Terry's alleged breach of duty. This is a pretextual construct of the CCO and is simply not credible.

The proposed restructure of the CLOVF began in early 2015 and was always known by Dondero, Highland's legal department and CCO. The CLOVF was small, only had a few investors, was subject to investor redemption requests, had been co-opted to be supported by Highland employee's investment of their retirement accounts and not structured in a way to attract a target

group of investors. The proposal was to restructure the CLOVF to make it more "hedge fund like", and grow the CLOVF with new investors.

The CLOVF routinely paid profit distributions to its investors. This is not "hedge fund like" because profits were distributed rather than retained to be reinvested for growth. The two primary investors, referred to as Rampart and Kyser did not require routine distributions and sought growth. Highland employees had access to investing in the CLOVF by investing in its ITA retirement accounts, which were basically IRAs. Employee investors who wished to invest more in their ITA retirement accounts were required to invest in the CLOVF's interest bearing notes at a ratio of 80% notes to support 20% investment in their ITA retirement accounts. If the CLOVF was to no longer distribute profits to accomplish "hedge fund like" reinvestment for growth, no distributions would be available to pay interest on the employee investment notes and the notes would need to be paid off. If there was no longer a vehicle to support aggressive employee investment in the CLOVF (the four to one ratio), the ITA did not need to continue to exist. The employee's retirement accounts could simply be redeemed or transferred to other IRAs.

Terry was the portfolio manager of the CLOVF and its third largest investor. Like other investors, Terry had rights to redeem his investment, but he did not seek to redeem and continued to invest in CLOVF notes and he and his wife continued to invest their retirement funds in the ITA. Nonetheless, Respondents allege that a dichotomy of interest led Terry to lie and scheme to have his investment in the CLOVF paid while others were encouraged to invest. This is the substance of Respondents' allegations of Terry's self-dealing and breach of fiduciary duty, supporting both their allegations of "for cause" termination and Highland's claims for damages and offset in the District Court suit. As noted, these claims were never documented or disclosed to Terry prior to the CCO's memo of September 1, 2016, and Highland's District Court suit.

As noted, the proposed restructure of CLOVF began in early 2015 and continued for a year thereafter. The business purpose of the restructure was well known to Dondero and the CCO. As early as the fall of 2015, Dondero and Terry were discussing the appropriateness of continuing the CLOVF without new investors. Dondero did not want to close the CLOVF and suggested that the DAF would become a major investor. The DAF (Donor Advised Fund), CLO Hold Co is the Parties' reference to a group of charitable foundations which were invested in Highland managed CLOs. The DAF's trustee is a Highland employee and Dondero's former college roommate. Apparently, Dondero knew he could direct the DAF's investment in the CLOVF and support its continuation. Dondero and the Highland CCO were aware of the planned restructure and its consequential effect on the ITA and the employee investor notes supporting the employee's retirement investments in the ITA. By December 2015, Dondero approves the restructure plan, payment of employee investor notes and the windup of the ITA. The Highland CCO expresses concern that Rampart's and Kyser's written approval is necessary for the CLOVF to stop paying profit distributions. Later the necessary approval is documented, apparently to the CCO's satisfaction, and the restructure plan proceeds. The DAF contributes sixteen million six hundred thousand dollars of Highland managed assets to the CLOVF, employee investor notes are paid and the ITA is wound up by the end of April 2016.

Following Terry's termination and later notice of "for cause" termination, Terry requested redemption of his and his wife's remaining investments in the CLOVF. Five weeks later, on July 27, 2016, he is advised that his investment has no value. Apparently, when the ITA was wound up in late April, Terry's and his wife's retirement investments were somehow re-characterized as Terry's capital account in the ACIS CLO Value Master Fund II, L.P. or his capital account in the CLOVF.

On or about July 19, 2106, Highland rescinded the DAF contributions to the CLOVF and returned the contributed assets to the DAF.  Respondents state this rescission was necessary because they had "recently discovered (a) conflict of interest regarding an ex-employee."  However, the Rescission Agreement itself recites that, "the Parties have each determined that it is in their respective best interests of each of the Parties to rescind and cancel the Contribution."

Incident to the rescission, the CLOVF returned all of the contributed assets to the DAF and paid in cash or transfer of additional assets the total value of seven hundred and eight thousand dollars, "to make the DAF whole", and economically in the same position as before its contribution to the CLOVF.

The "recently discovered conflict of interest" is the CCO's recent epiphany that Terry must have lied when he advised that the CLOVF investors Rampart and Kyser "requested" that distributions be terminated to accommodate reinvestment growth.  The CCO's testimony that he called these investors and confirmed this lie is not persuasive and begs credibility.  The only documented evidence are the investors written approvals which the CCO required.

The July 27, 2016 advice that Terry's and his wife's retirement accounts had no value is only accurate because the value was taken and used to pay the DAF following the rescission.  In the District Court suit, Highland states a claim for damages and offset for the additional value paid to the DAF.  Respondents' witness testified that the retirement fund's value was in Terry's capital account and it was swept pursuant to Section 3.5(c) of the ACIS CLO Value Master Fund II, L.P.'s limited partnership agreement.

Terry is a limited partner in the CLOVF and the CLOVF is a limited partner in the ACIS CLO Value Master Fund II (CLOVMF) but the evidence does not show Terry to be a partner in the CLOVMF.  Assuming that Terry is a partner, as referenced in Section 3.5(c), Respondents' claimed

authority to sweep the accounts in satisfaction of or offset of damage or loss is directly dependent upon a nexus in causation between the alleged damage or loss and the conduct of Terry.

The evidence establishes that the CCO's claims of "recently discovered conflict of interest" is yet another construct and pretext to support Respondents' denial of limited partnership value based on a "for cause" termination and was not in fact the reason for the DAF rescission. It would make little difference to Highland which of its CLOs managed the DAF investments. Dondero simply reconsidered his decision to support the continuation of the CLOVF with Highland managed funds and realized, that in fact, as Terry had advised, the fund would be too small to manage without significant investors. The CLOVF was ultimately closed out because Dondero did not see benefit to its continuation. The evidence establishes that no conduct of Terry was a cause of damage or loss to the CLOVMF or the CLOVF.

Section 3.10(a) of the ACIS LPA limits compensation and reimbursement of expenses payable to the General Partner and any Affiliate of the General Partner to an amount not to exceed 20% of Revenues without the consent of all members of the Founding Partner Group. There is no dispute that Terry is a member of the Founding Partner Group. There is no evidence that Terry offered written consent to any expenses paid by ACIS in excess of 20% of Revenues. It is undisputed that ACIS habitually paid more than 20% of Revenues to Highland for providing ACIS with overhead and administration. Respondents' evidence and arguments that Terry waived or consented to ACIS's payment of excess expenses is not persuasive. At most, Terry accepted his ACIS distributions without regard to the expenses paid to Highland. This is not consent contemplated by the ACIS LPA. Highland is owned 75% by Dondero and 25% by Okada and Terry is not a partner in Highland. Terry had no reason to consent to excess expenses being paid to Highland. Additionally, the ACIS LPA has an express waiver clause at Section 6.09 which states,

"Waiver.  No failure by any party to insist upon strict performance of any covenant, duty, agreement, or condition of this Agreement or exercise of any right or remedy consequent upon breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition."

The evidence establishes that Terry did not consent to ACIS payments of expenses in excess of 20% of Revenue and Terry has not waived his right to claim damages directly resulting from ACIS' and ACIS GP's breach of contract and breach of fiduciary duty.  Clearly ACIS and ACIS GP ignored Terry's contractual rights and ACIS GP as a general partner has a fiduciary duty not to benefit itself or another at the expense of its limited partner, as they ignore and breach the terms of the partnership agreement and diminish Terry's distributions.

The Panel next addresses Terry's claim for conversion of the ITA retirement accounts stated against Highland, ACIS and ACIS GP.

Without again reciting the convoluted structure and history of the ITA retirement accounts in issue, it is established that there is no remaining value to the accounts because its value was swept and used by Highland or CLOVF to pay the DAF incident to the DAF rescission.  It is noted that Respondents argue and offer to prove that Terry has no standing to state a claim for conversion of three of the five accounts because his wife is the trustee and owner of those three accounts.  She is the trustee and owner of those accounts.  Yet those accounts too were swept to pay the DAF and construct a pretextual damage and offset claim for having paid the DAF.  While this establishes conversion of the accounts to the damage of Terry and his wife, the converters (CLOVF, CLOVMF, ACIS CLO VF GP), are not parties to this arbitration. The claims for breach of contract and conversion and damages should be stated against those parties or others, elsewhere.

The Panel next addresses Terry's claims for reputational damages and fraudulent transfer stated against Highland, ACIS and ACIS GP.

App. 195
APP.3270

The evidence establishes that Highland and not ACIS or ACIS GP was the publisher of any false or defamatory statements. Whether those statements in pleadings or press release to Law360 are actionable against Highland is a matter deferred for the District Court suit. Terry's claims for reputational damages stated against ACIS or ACIS GP are not proved.

Terry states a claim against Highland, ACIS and ACIS GP for the fraudulent transfer or conveyance of assets under the Texas Fraudulent Transfer Act. In October 2016, ACIS sold to Highland a participation interest in ACIS's Service Fees (management fees) which ACIS would receive between November 2016 and through August 2019. This sale of a participation interest represents near one-half of ACIS revenues during the covered period. Highland is to pay, in cash and promissory note with interest at 3%, ACIS a total of thirteen million three hundred and thirty three thousand dollars, plus interest for the participation interest. Highland's payment is scheduled as follows:

- October 7, 2016 - $666,655.00 – cash at closing

- May 31, 2017 - $3,370,694.00 – principal and interest

- May 31, 2018 - $5,286,243.00 – principal and interest

- May 31, 2019 - $4,677,690.00 – principal and interest

The transactional documents recite business purpose and reasonable consideration for the sale. Terry offers no evidence that ACIS did not receive reasonable equivalent value in the transaction or that ACIS made the transfer with "actual intent to hinder, delay or defraud." Terry has not proved a claim for fraudulent transfer or conveyance.

The Panel next addresses Terry's claims for wrongful termination and resulting damages stated against Highland.

Terry's employment with Highland was "At Will" and he could have been terminated for any reason other than an unlawful reason. Terry did not prove that the sole reason for his termination was his refusal to commit an illegal act, as is required under Sabine Pilot. The evidence establishes that Dondero terminated Terry because he was angry with Terry's opposition to his Trussway/Targa acquisition plan and he wanted Terry gone. "At Will" employment contemplates that if the boss wishes, one's employment is terminated and the termination is not actionably wrongful. Even as an "At Will" employee, Terry may have claims for damages against Highland for his unpaid severance, unused vacation, deferred compensation and unreimbursed expenses, but these claims are a matter deferred for the District Court suit. Terry's claims stated against Highland for Sabine Pilot wrongful termination are not proved.

Although Trust and Okada are limited partners in ACIS and are named as Respondents in this arbitration, Terry has failed to offer any evidence of actionable claims against Trust or Okada. All claims stated by Terry in this arbitration against Trust or Okada are not proved.

The Panel next addresses Highland's claims for breach of employment agreement, theft/theft of trade secrets and breach of fiduciary duty stated against Terry.

Although Highland is a party to the District Court suit Ordered to arbitration, Highland is not a party to an arbitration agreement and has stated claims against Terry with the above noted reservation, "subject to and without waiver." To the extent these claims are stated in this Arbitration in affirmative avoidance of Terry's claims stated against ACIS and ACIS GP they are addressed in this Award.

The evidence does not establish that Terry breached his employment agreement or any fiduciary duty to Highland, ACIS or ACIS GP or that Terry self-dealt in anyway. On the contrary, Terry's actions in opposing Dondero's Trussway/Targa acquisition plan and his efforts to restructure

the CLOVF were reasonable and appropriate and as his portfolio manager duties required.  These claims are not proved and are not an affirmative defense or avoidance available to ACIS or ACIS GP.

The evidence does not establish that Terry is guilty of theft or theft of trade secrets. Respondents offered no evidence of a trade secret or a protectable trade secret interest in the documents in issue.  Although Highland's claim for turnover is overreaching, it was heard in this Arbitration at Respondents' insistence and the record and all evidence admitted in that preliminary hearing was offered and admitted in the final hearing.  This claim is not proved and is not an affirmative defense or avoidance available to ACIS or ACIS GP.  Otherwise, the Panel issues its turnover decision in this Award.

The evidence does not establish that any disparaging remarks of Terry were ever communicated to Dondero prior to Terry's termination or that the alleged remarks could have been a reason for Terry's "for cause" termination.  All of Respondents' alleged bases of "for cause" termination of Terry's employment are not proved and none are an affirmative defense or avoidance available to ACIS or ACIS GP.

## ANALYSIS OF TERRY'S DAMAGES

The Panel only addresses proved claims stated against appropriate Parties to this Arbitration.

Terry has proved his claims stated against ACIS and ACIS GP for breach of contract and claims stated against ACIS GP for breach of fiduciary duty incident to their payment of excess expenses to Highland and their wrongful forfeiture of Terry's contractual right to be paid for his ACIS limited partnership interest.

The evidence establishes that ACIS and ACIS GP paid excess expenses to Highland during the years of 2013, 2014, 2015 and January through May 2016. These expenses paid exceeded the 20% of Revenues cap stated in Section 3.10(a) of the ACIS LPA. The payment of these excess expenses reduced Terry's ACIS partnership distributions during this period. Had excess expenses not been paid and only the contractually capped expenses had been paid, Terry would have received additional ACIS profits distributions of $1,755,481.00 for his 25% partnership interest in ACIS.

The best evidence of the value of the Section 4.04 limited partnership payout is Terry's June 13, 2016 calculations, which he communicated to Dondero within days of his termination. Terry was the portfolio manager of ACIS and as such was most aware of ACIS's financial performance and expected performance within the payout period. The calculations do not include an assumed growth rate of ACIS revenues and are not burdened by Highland's after termination manipulations of ACIS managed assets or ACIS revenues.

The evidence establishes that Terry's ACIS limited partnership payout upon termination had a total value of $5,688,351.00.

Because ACIS and ACIS GP breached the ACIS LPA and ACIS GP breached its fiduciary duty in June 2016 when they repudiated their obligations to their limited partner, Terry's contractual entitlement to payout under the ACIS LPA is liquidated, accelerated and is now fully due.

Additionally, Terry is entitled to pre-award interest at the rate of five percent (5%) per annum from the date of commencement of this Arbitration, September 20, 2016, until entry of Final Award in the amount of $372,192.00.00.

## FINDINGS AND CONCLUSIONS

Based upon the Parties' offers of proof, evidence submitted and argument of counsel, the following facts and conclusions are found by these Arbitrators to be established by the evidence to be true and necessary to this Award. To the extent these findings and conclusions differ from any Parties' position that is the result of these Arbitrators determinations as to credibility, relevance, burden of proof considerations, and the weighing of the evidence, both oral and written.

The Arbitration Panel finds and concludes as follows:

1. This dispute is arbitrable pursuant to the Parties' agreement to arbitrate and prior Court Order in Cause No. DC-16-11396, 162nd Judicial District Court, Dallas County, Texas.

2. The Arbitration panel has jurisdiction to resolve all disputes presented and not deferred to the 162nd District Court.

3. JAMS Comprehensive Arbitration Rules and Procedures govern the resolution of this dispute with the law of the States of Texas and Delaware.

4. Prior to his termination on June 9, 2016, Terry was an at will employee of Highland and a 25% limited partner in ACIS.

5. Highland's termination of Terry's employment was not, in fact, "for cause." Highland's stated "for cause" termination of Terry's employment was, in fact, pretextual and for purpose of denying Terry benefits of employment payable at his termination and as a basis for the forfeiture of the value of Terry's limited partnership interest in ACIS.

6. ACIS and ACIS GP knowingly and willingly invoked Highland's false pretext of "for cause" termination to deny Terry the value of his 25% limited partnership in ACIS.

7. ACIS and ACIS GP paid Highland expenses in excess of the contractual limit imposed by Section 3.10(a) of the ACIS LPA.

8. ACIS and ACIS GP wrongfully denied Terry his contractual rights to payment for his limited partnership interest in ACIS and are liable for and owe Terry for same.

9. In breach of contract and fiduciary duties, ACIS and ACIS GP are liable to and owe Terry his ACIS profits distributions which were payable but for the wrongful payment of excess expenses to Highland.

10. ACIS GP's actions were willful and wanton breaches of their fiduciary duties to Terry as their limited partner.

11. All claims stated by Highland, "subject to and without waiver" against Terry are not proved and as such none are an affirmative defense or avoidance of Terry's claims stated against ACIS and ACIS GP.

12. All claims stated by Terry against Trust and Okada are not proved and are denied.

13. All claims stated by Terry against ACIS and ACIS GP for fraudulent transfer or conveyance are not proved and are denied.

14. Terry's fraud claims stated against ACIS and ACIS GP are not proved and are denied.

15. All claims, not denied or awarded, are deferred to the 162nd District Court, Dallas County, Texas or other appropriate venue.

16. ACIS's and ACIS GP's breaches of contract and ACIS GP's breach of fiduciary duties have injured Terry and resulted in damages, together with pre-award interest in the total amount of Seven Million Eight Hundred Sixteen Thousand Twenty-Four Dollars and No/100 ($7,816,024.00).

17. The Parties' agreement to arbitrate does not allow the award of prevailing party attorneys' fees.  All claims for attorneys' fees are denied.

18. The Parties' agreement to arbitrate allows the Panel discretion to award the prevailing party costs of arbitration.  Terry is entitled to recover his JAMS arbitration cots.

19. Terry is awarded One Hundred Thirty Three Thousand, Seven Hundred Twenty Five and 15/100 Dollars ($133,725.15) for his JAMS arbitration costs.

20. Terry is entitled to recover post-award interest on all amounts awarded herein.

## AWARD

### TURNOVER:

Claimant, Joshua N. Terry may retain:  all recordings of conversations to which he is a party; all agreements to which he is a signatory; all "track record" documents regarding his performance; all documents in the public domain; all documents relating to his investment in or ownership of any Highland affiliated entity; all personal notes or memoranda derived from conversations to which he is a party; all notes or memoranda prepared for and offered to his attorneys.

Except for attorney work product, claimant's attorneys Clouse Dunn LLP may retain copies of all documents which were admitted into evidence in this Arbitration until five business days following the latter of, issuance of this Final Award or final confirmation of this Final Award, no longer subject to appeal.  At such time, Clouse Dunn LLP shall turnover these documents to Respondents' attorneys and verify the destruction of electronically formatted documents turned over.

Otherwise, Claimant, Terry, shall turnover all documents, not subject to his awarded right of retention, related to Highland affiliated entities within five business days of entry of this Final Award.

**MONETARY AWARD:**

Claimant, Joshua N. Terry is Awarded and shall have and recover jointly and severally against Respondents, ACIS Capital Management, LP and ACIS Capital Management GP, LLC, the total sum of Seven Million, Nine Hundred Forty Nine Thousand, Seven Hundred Forty Nine and 15/100 Dollars ($7,949,749.15).

All sums payable by the terms of this Final Award shall accrue post-award interest at the legal rate until fully paid.

FINAL AWARD                                                                                      PAGE 24

All claims for relief, not awarded herein or deferred to the Court, are denied.


_____          Dated:  October 20, 2017
Hon. Harlan Martin
Panel Chair


_____          Dated:  October 20, 2017
Hon. Glen M. Ashworth (Ret.)
Arbitrator


_____          Dated:  October 20, 2017
Hon. Mark Whittington (Ret.)
Arbitrator

App. 204
APP.3279

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Terry, Joshua N. vs. Highland Capital Management, LP., et al.
Reference No. 1310022713

I, Judy Stephenson, not a party to the within action, hereby declare that on  October 20, 2017, I

served the attached Cover Letter, Final Award and Proof of Service on the parties in the within action by Email

and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the

United States Mail, at Dallas, TEXAS, addressed as follows:

| | |
|---|---|
| Brian P. Shaw Esq. | Marc Daniel Katz Esq. |
| Rogge Dunn Esq. | Robert M. Hoffman Esq. |
| Clouse Dunn LLP | Andrews Kurth LLP |
| 1201 Elm St. | 1717 Main St. |
| Suite 5200 | Suite 3700 |
| Dallas, TX  75270 | Dallas, TX  75201 |
| Phone: 214-220-3888 | Phone: 214-659-4400 |
| shaw@clousedunn.com | marckatz@andrewskurth.com |
| Rogge@clousedunn.com | robhoffman@andrewskurth.com |
|    Parties Represented: |    Parties Represented: |
|    Joshua N. Terry |    ACIS Capital Management GP, LLC |
| |    ACIS Capital Management, LP |
| |    Highland Capital Management, LP |
| |    James D. Dondero as trustee/The Dugaboy Inve |
| |    Mark K. Okada |

Jamie R. Welton Esq.
Paul B. Lackey Esq.
Bruce E. Bagelman Esq.
Lackey Hershman LLP
3102 Oak Lawn Ave.
Suite 777
Dallas, TX   75219
Phone: 214-560-2201
jrw@lhlaw.net
pbl@lhlaw.net
beb@lhlaw.net
   Parties Represented:
   ACIS Capital Management GP, LLC
   ACIS Capital Management, LP
   Highland Capital Management, LP
   James D. Dondero as trustee/The Dugaboy Inve
   Mark K. Okada

      I declare under penalty of perjury the foregoing to be true and correct. Executed at Dallas, TEXAS

on  October 20, 2017.


Judy Stephenson
jstephenson@jamsadr.com

# EXHIBIT K

CAUSE NO. DC-17-15244

| | | |
|---|---|---|
| JOSHUA N. TERRY, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | OF DALLAS COUNTY, TEXAS |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | |
| | § | |
| Defendants. | § | 44th JUDICIAL DISTRICT |

## ORDER CONFIRMING ARBITRATION AWARD

On December 13, 2017, came on to be heard the Petition to Confirm Arbitration Award and Enter Judgment on Same (the "Petition") filed by Plaintiff Joshua N. Terry ("Terry"), seeking confirmation of the arbitration award entered in JAMS Arbitration No. 1310022713 on October 20, 2017 (the "Award"). After considering the Petition and other pleadings, any evidence timely presented at the hearing, and the argument of counsel, the Court believes that it is proper to enter an order confirming the Award.

IT IS THEREFORE ORDERED that the Award is confirmed. All relief not expressly granted herein is hereby denied.

Signed this 18th day of December, 2017.

_____
PRESIDING JUDGE

ORDER CONFIRMING ARBITRATION AWARD – Page 1

# EXHIBIT L

CAUSE NO. DC-17-15244

| | | |
|---|---|---|
| JOSHUA N. TERRY, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | OF DALLAS COUNTY, TEXAS |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | |
| | § | |
| Defendants. | § | 44th JUDICIAL DISTRICT |

## FINAL JUDGMENT

On December 13, 2017, came on to be heard the Petition to Confirm Arbitration Award and Enter Judgment on Same (the "Petition") filed by Plaintiff Joshua N. Terry ("Terry"), seeking judgment against Defendants Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP") on the arbitration award entered in JAMS Arbitration No. 1310022713 on October 20, 2017 (the "Award"). Terry, Acis LP and Acis GP appeared by and through counsel. After considering the Petition and other pleadings, any evidence timely presented at the hearing, and the argument of counsel, the Court believes that it is proper to enter judgment on the Award.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Joshua N. Terry shall have judgment against Acis Capital Management, L.P. and Acis Capital Management GP, LLC, jointly and severally, in the amount of seven million nine hundred forty-nine thousand seven hundred forty-nine and 15/100 dollars ($7,949,749.15), together with interest at five percent (5%) per annum from and after October 20, 2017, until paid in full.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Terry shall h ave judgment for its costs of court.

FINAL JUDGMENT – Page 1

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Terry has all writs of process and orders necessary to execute this Judgment.

All relief not expressly granted herein is hereby denied. This final judgment disposes of all parties and all claims. This is a final and appealable judgment.

Signed this 18th day of December, 2017.

_____
PRESIDING JUDGE

# EXHIBIT M

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 210 of 511   PageID 15991
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 110 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 1 of 53





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed April 13, 2018

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-7 |
| | § | |
| Alleged Debtor. | § | |

_____

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, | § | CASE NO. 18-30265-SGJ-7 |
| L.L.C., | § | |
| | § | |
| Alleged Debtor. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDERS FOR RELIEF ISSUED AFTER TRIAL ON CONTESTED INVOLUNTARY BANKRUPTCY PETITIONS

Joshua N. Terry (the "Petitioning Creditor" or "Mr. Terry") filed involuntary bankruptcy

petitions (the "Involuntary Petitions") against each of the two above-referenced related

1

**App. 213**
APP.3288

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 211 of 511   PageID 15992
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 111 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 2 of 53

companies (the "Alleged Debtors") on January 30, 2018.[1]  The Involuntary Petitions were

contested, and the court held a multi-day trial (the "Trial") spanning March 21, 22, 23, 27, and

March 29, 2018.[2]  This constitutes the court's findings of fact, conclusions of law and ruling,

pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014.[3]  As explained below, the court has decided

that Orders for Relief are legally required and appropriate as to each of the Alleged Debtors.

**I.**    **FINDINGS OF FACT**

    **A.**    **Introduction.**

    1.    The Alleged Debtors—Acis Capital Management, L.P. ("Acis LP"), a Delaware

limited partnership, and ACIS Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware

limited liability company—are two entities in the mega-organizational structure of a company

that is known as Highland Capital Management, L.P. ("Highland").

    2.    Highland is a Dallas, Texas-based company that is a Registered Investment

Advisor.  Highland was founded in 1993 (changing its original name from "Protective Asset

Management" to Highland in 1997) by James D. Dondero ("Mr. Dondero"), originally with a

---

[1] Exhs. 50 & 51.

[2] Shortly after the Involuntary Petitions were filed, the court held hearings on February 6-7, 2018, on the Petitioning Creditor's Emergency Motion to Abrogate or Modify 11 U.S.C. § 303(f), Prohibit Transfer of Assets, and Import, Inter Alia, 11 U.S.C. § 363 [DE # 3] (the "303(f) Motion") and the Alleged Debtors' Emergency Motion to Seek Emergency Hearing on the Alleged Debtors' Motion to Dismiss Involuntary Petitions and Request for Award of Fees, Costs, and Damages [DE # 9] (the "Emergency Motion to Set Hearing on Motion to Dismiss").  The court ultimately granted the 303(f) Motion and denied the Emergency Motion to Set Hearing on Motion to Dismiss. Both the Petitioning Creditor and the Alleged Debtors have proposed that the court should consider the evidence it heard at the hearings held on February 6-7, 2018, in determining whether it should enter orders for relief.  The court has, accordingly, considered such evidence in this ruling.

[3] Bankruptcy subject matter jurisdiction exists in this contested matter, pursuant to 28 U.S.C. § 1334(b). This is a core proceeding over which the bankruptcy court may exercise subject matter jurisdiction, pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This bankruptcy court has Constitutional authority to issue a final order or judgment in this matter, as it arises under a bankruptcy statute— 11 U.S.C. § 303. Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Alleged Debtors have their business headquarters in this district.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 212 of 511   PageID 15993
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 112 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 3 of 53

75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.[4]

3.        Both Mr. Dondero and Mr. Akada provided witness testimony at the Trial on the Involuntary Petitions, and their names are mentioned numerous times herein—since they were generally the subject of significant evidence and argument presented at the Trial.  Mr. Dondero is the chief executive officer for Highland and Mr. Akada is the chief investment officer.  Mr. Dondero is also the president of each of the two Alleged Debtors.

4.        Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles ranging from:  collateral loan obligation funds ("CLOs"); private equity funds; and mutual funds.

5.        Highland's CLO business was front-and-center at the Trial on the Involuntary Petitions.  The Alleged Debtor, Acis LP, for approximately the past seven years, has been the vehicle through which Highland's CLO business has been managed.

6.        The Petitioning Creditor, Mr. Terry, became an employee of Highland in the year 2005, starting as a portfolio analyst, promoting to a loan trader, then ultimately becoming the portfolio manager for (and 25% limited partner in) Highland's CLO business—specifically, Mr. Terry was the human being who was acting for the CLO manager, Acis LP.

7.        Mr. Terry was highly successful in his role in the CLO business, managing billions of dollars of assets during his tenure, but Mr. Terry and Mr. Dondero had a bitter parting of ways on June 9, 2016.  Specifically, Mr. Terry's employment was terminated on that date (for

---

[4] Mr. Dondero testified at the Trial that, three years ago, Messrs. Dondero and Akada sold their interests in Highland to a charitable remainder trust in exchange for a 15 year note receivable.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 213 of 511   PageID 15994
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 113 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 4 of 53

reasons that have been highly disputed) and his 25% limited partnership interest in Acis LP was deemed forfeited without any payment of consideration to him.

8.      In September 2016, Highland sued Mr. Terry in the 162nd Judicial District Court of Dallas County, Texas ("State Court 1") for breach of fiduciary duty/self-dealing, disparagement, breach of contract, and various other causes of action and theories.  Mr. Terry asserted his own claims against Highland, and also claims against the two Alleged Debtors, Mr. Dondero, and others and demanded arbitration.  On September 28, 2016, State Court 1 stayed the litigation and ordered the parties to arbitrate.  The parties participated in ten days of arbitration in September 2017 before JAMS.  On October 20, 2017, Mr. Terry obtained an Arbitration Award (herein so called),[5] jointly and severally against both of the Alleged Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate, which was based on theories of breach of contract and breach of fiduciary duties.

9.      There are still claims pending between and among the Petitioning Creditor, Highland, and others (not including the Alleged Debtors) in State Court 1.

10.      A Final Judgment (herein so called) confirming the Arbitration Award was entered by the 44th Judicial District Court of Dallas County, Texas ("State Court 2") on December 18, 2017, in the same amount as that contained in the Arbitration Award—$7,949,749.15.[6]

11.      Mr. Terry began pursuing post-judgment discovery soon after obtaining his Arbitration Award and even more so after entry of the Final Judgment.  Mr. Terry undertook a UCC search on November 8, 2017, to investigate whether there were any liens on the Alleged

---

[5] Exh. 1.

[6] Exh. 105.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 214 of 511   PageID 15995
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 114 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 5 of 53

Debtors' assets (none appeared).[7]  Mr. Terry also pursued a garnishment of an Acis LP bank

account (at a time when there was only around $2,000 in the account).  Mr. Terry's counsel

deposed Highland's General Counsel Scott Ellington (who sat for the deposition as a

representative of Acis, LP) on January 26, 2018, and asked numerous questions about: (a) how

many creditors the Alleged Debtors had, [8] and (b) whether Acis LP was able to pay its debts as

they became due,[9] but did not receive meaningful answers.

     12.     Mr. Terry requested a temporary restraining order ("TRO") from State Court 2, on

January 24, 2018, after discovering certain transactions and transfers involving Acis LP's

interests, that he believed were pursued without any legitimate business purpose and with the

purpose of denuding Acis LP of its assets and to make it judgment proof.  Most particularly, it

appeared as though Highland was engaged in a scheme to transfer certain fee-generating CLO

management contracts of Acis LP away from it and into a Cayman Island affiliate of Highland.[10]

At a January 24, 2018 hearing on the request for a TRO, Acis LP agreed and State Court 2

ordered that, between that hearing and a later hearing on a request for a temporary injunction, no

CLO management contracts would be transferred away from Acis LP and that no monies would

be diverted from it.[11]

     13.     Then, on January 29, 2018, the Controller of and CPA for Highland  (David Klos)

submitted a Declaration to State Court 2 concerning the net worth of the Alleged Debtors, stating

---

[7] Exh. 84.

[8] Exh. 25, pp. 7-9.

[9] *Id.* at pp. 102-04.

[10] Exh. 27.

[11] Exh. 28.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 215 of 511   PageID 15996
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 115 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18    Entered 04/13/18 16:34:53    Page 6 of 53

that Acis GP/LLC had a net worth of $0 and that Acis LP might have a net worth, at best, of $990,141.[12]  Mr. Terry thought this was preposterous—given the management fees that Acis LP was entitled to and the receivables that should be owing to it.  Mr. Terry believes that the collateral management agreements on which Acis LP receives management fees have a present value of $30 million (about $6 million for each of the five CLOs which Acis LP has been managing).

14.     On January 29, 2018, the Alleged Debtors filed a motion for leave to post a supersedeas bond in the amount of **$495,070.50** with State Court 2 (purportedly half of the net worth of the two Alleged Debtors—as stated in the David Klos Declaration), so that they could suspend enforcement of the Final Judgment while they appealed it.[13]  Although there is a very stringent standard for appealing an Arbitration Award, the Alleged Debtors apparently believe they have an argument that State Court 2 lacked the subject matter jurisdiction to confirm the Arbitration Award (a motion to vacate the Final Judgment based on this argument has previously been denied by State Court 2).[14]

15.     Meanwhile, Mr. Terry was learning of more transactions and transfers involving Acis LP's assets and interests.  On January 29, 2018, Mr. Terry filed supplemental pleadings with State Court 2, alleging that further shenanigans (*i.e.,* transfers and transactions that would amount to fraudulent transfers) were underway at Acis LP and seeking a receiver.[15]  Also, at

---

[12] Exh. 26.

[13] Exh. 73.

[14] *See* DE # 35, in Case No. 18-30264 and DE # 34 in Case No. 18-30265.  Unless otherwise noted, references to "DE #" herein refer to the docket entry number at which a pleading appears in the docket maintained with the Bankruptcy Clerk in the Acis Capital Management L.P. bankruptcy case (Case No. 18-30264).

[15] Exhs. 28-31.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 216 of 511   PageID 15997
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 116 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 7 of 53

some point, in the weeks leading up to this, an Acis LP lawyer represented to Mr. Terry's

counsel that the Alleged Debtors were "judgment proof."[16]

16.    At approximately 11:57 p.m. on January 30, 2018 (on the evening before a

scheduled temporary injunction hearing in State Court 2—at which time State Court 2

presumably might have considered the Alleged Debtors' request to post the $495,070.50

supersedeas bond to stay enforcement of the Final Judgment), Mr. Terry filed the Involuntary

Petitions, as a sole petitioning creditor, against both Acis LP and Acis GP/LLC.

17.    For purposes of this Trial (and this Trial only), the Alleged Debtors do not dispute

that Mr. Terry has standing to be a petitioning creditor pursuant to Bankruptcy Code section

303(b)—in other words, they do not dispute that Mr. Terry is a holder of a claim against the

Alleged Debtors that is not contingent as to liability or the subject of a bona fide dispute as to

liability or amount and that aggregates at least $15,775 in unsecured amount.  However, the

Alleged Debtors argue that:  (a) the Alleged Debtors have *12 or more creditors* and, thus, three

or more petitioning creditors were required to prosecute the Involuntary Petitions pursuant to

Bankruptcy Code section 303(b)(1); (b) the Petitioning Creditor did not establish, pursuant to

Bankruptcy Code section 303(h)(1), that the Alleged Debtors are not *generally paying their*

*debts as such debts become due* unless such debts are the subject of a bona fide dispute as to

liability or amount; (c) regardless of whether the Petitioning Creditor has met the statutory tests

in sections 303(b)(1) and (h)(1), the Petitioning Creditor has acted in *bad faith*—which serves as

an equitable basis for dismissal of the Involuntary Petitions; and (d) if the court disagrees with

the Alleged Debtors and determines that the section 303(b) and (h) statutory tests are met, and

also determines that the Petitioning Creditor has not acted in bad faith, the court should

---

[16] Exh. 27 (exhibit 3 thereto).

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 217 of 511   PageID 15998
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 117 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 8 of 53

nevertheless *abstain* in this matter, pursuant to Bankruptcy Code *section 305*, since this is essentially a two-party dispute and the interests of creditors and the debtor would be better served by dismissal.

18.     The Petitioning Creditor argues that he has met the statutory tests of sections 303(b) and (h) but, even if he has not, there is a ***"special circumstances"*** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor—which "special circumstances," Mr. Terry alleges, have been established here.  Moreover, the Petitioning Creditor argues that the facts here ***do not warrant section 305 abstention*** because the interests of creditors and the Alleged Debtors would not be better served by dismissal.

19.     As further explained below, the court finds and concludes that the Petitioning Creditor has met his burden of proving by a preponderance of the evidence that the statutory tests of sections 303(b) and (h) are met here.  Thus, the court does not need to reach the question of whether there is a ***"special circumstances"*** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor, and—if so—whether the exception is applicable here.[17]

20.     Moreover, the Alleged Debtors have not shown by a preponderance of the evidence that the Petitioning Creditor acted in bad faith, such that the Involuntary Petitions should be dismissed.

---

[17] *See e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 218 of 511   PageID 15999
Case 18-03078-sgj    Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2    Page 118 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 9 of 53

21.     Finally, the Alleged Debtors also have ***not shown facts here that warrant section 305 abstention*** because they have not shown that the interests of creditors and the Alleged Debtors would be better served by dismissal.

    **B.      The CLO Business:  Understanding the Alleged Debtors' Business Operations, Structure, and What Creditors and Interest Holders They Actually Have.**

22.     Highland set up its first CLO in the year 1996.  Highland was one of the early participants in the CLO industry.

23.     The Alleged Debtors were formed in 2011 to be the new "brand" or face of the Highland CLO business, after Highland's name had suffered some negative publicity in the marketplace.

24.     Acis LP has acted as the portfolio manager of Highland's CLOs since 2011.  Acis LP currently has a contractual right to CLO portfolio management fees on five CLOs[18] which were referred to at the Trial as CLO 2013-1; CLO 2014-3; CLO 2014-4; CLO 2014-5; and CLO 2016-6.  CLOs typically have an 8-12 year life.  Thus, there are still several years of life left on these CLOs (since the oldest one was established in the year 2013).

25.     The key "players" in and features with regard to the Highland CLOs, during the time period relevant to the issues adjudicated at the Trial, have been:

    (a)     <u>The CLO manager.</u>  As mentioned earlier, the CLO manager is the Alleged Debtor, Acis LP.  Acis LP, has collateral management agreements (hereinafter, the "CLO Collateral Management Agreements") with the CLOs (which CLOs were set up as special purpose entities) and, pursuant thereto, receives

---

[18] There is still another Highland CLO (CLO 2017-7), set up in April 2017, as to which Acis LP's contractual right to manage was terminated shortly before the Petition Date, as will be further described herein.

9

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 219 of 511   PageID 16000
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 119 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18    Entered 04/13/18 16:34:53    Page 10 of 53

management fees[19] from the CLOs in exchange for managing the pool of assets within the CLOs and communicating with investors in the CLOs.[20]  As mentioned earlier, Mr. Terry was the human being that performed the management function at Acis LP until Highland fired him on June 9, 2016 and also terminated his limited partnership interest in Acis LP.  Mr. Terry, and all employees who have ever provided services to the CLO manager, are Highland employees—which were provided to Acis LP through shared and sub-advisory services agreements—as further explained below.  Thus, to be clear, Acis LP has always essentially subcontracted its CLO managerial function out to Highland.

(b)     <u>The pool of assets.</u> Within each CLO that the CLO manager manages is a basket of loans that the CLO manager purchases.  The basket of loans typically consists of approximately 200 loans-payable (or portions of loans payable), on which large well-known companies typically are the makers/obligors (and which loans, collectively, provide a variable rate of interest).[21]  The CLO manager can typically decide to buy and sell different loans to go into the pool of assets, with certain restrictions, during a four or five year reinvestment time period.

---

[19] These fees typically include "senior fees" (*e.g.,* 15 basis points); additional "subordinate fees" (*e.g.,* 25 basis points) if the CLOs are passing certain tests; and perhaps even an "incentive fee" beyond a certain hurdle rate (*e.g.,* after the equity in the CLO received an internal rate of return of 10%, the CLO manager would get 15% of the excess).  Exh. 82, p. 59, lines 14-25.

[20] *See,* as an example, Exh. 3 (the collateral management agreement between Acis LP and CLO 2014-3).  Note that the document is entitled "Portfolio Management Agreement" but, to avoid confusion with other similarly titled documents and to highlight the true nature of the agreement, the court uses the defined term "CLO Collateral Management Agreement," which terminology the lawyers also sometimes used at the Trial.

[21] Exh. 8.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 220 of 511   PageID 16001
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 120 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 11 of 53

(c)  The CLO investors (*i.e.,* CLO note holders).  These may be any number of

persons or entities, including pension funds, life insurance companies, or others

who decide to invest in the CLOs and contribute capital to fund the purchase of a

CLO's loan pool, and, in return, receive fixed rate notes payable—the ratings on

which can range anywhere from Triple-A to Single-B, depending upon the risk

option the investor chooses.  There are typically five or six traunches of notes

issued by the CLO (with the top AAA-rated traunche being the least risky and the

bottom traunche being the most risky) and—to be clear—the CLO itself (again, in

each case, the CLO is a special purpose vehicle) is the obligor.  As the CLO

manager receives income from the pool of loans in the CLO, he distributes that

income to the CLO investors, in accordance with their note indentures,[22] starting

with the top traunche of notes and then down to the other traunches.  The top

traunche of notes (AAA-rated) is considered the "controlling" class and a

majority of holders in this class can terminate the CLO manager (*i.e.,* Acis LP) for

cause on 45 days' notice, although all parties seem to agree this would be a rare

event.

(d)  The CLO equity holder.  The CLO equity holder actually is a holder of

subordinated notes issued by the CLOs (*i.e.,* the bottom traunche of notes on

which the CLO special purpose entity is obligated), and has voting rights and is

itself a capital provider, but it takes the most risk and receives the very last cash

---

[22] The indenture trustee on the CLO notes may actually operate as a payment agent in some cases, for purposes of making the quarterly note payments to holders.

11

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 221 of 511   PageID 16002
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 121 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 12 of 53

flow from the CLOs.  It, in certain ways, controls the CLO vehicle[23]—for example, by virtue of having the ability to make a redemption call after a certain "no-call" period—which would force a liquidation of the basket of loans in the CLO, with the proceeds paying down the traunches of notes, starting at the top with the Triple A's.  Note that, until recently, a separate entity known as Acis Loan Funding, Ltd. ("ALF"), which was incorporated under the laws of the island nation of Guernsey,[24] was the CLO equity holder.  To be clear, ***ALF was essentially the equity owner in the CLO special purpose entities—not the equity owner of Acis LP***.  Acis LP was a party to a separate portfolio management agreement with ALF (hereinafter, the "ALF Portfolio Management Agreement"—not to be confused with the CLO Collateral Management Agreements that Acis LP separately has with the special purpose CLOs).  No fees were paid from ALF to Acis LP pursuant to the ALF Portfolio Management Agreement (rather, fees are only paid to Acis LP on the CLO Collateral Management Agreements).  The complicated structure of the CLO business—all parties seemed to agree—has been developed, among other reasons, to comply with "risk-retention requirements" imposed by the U.S. Congress's massive Dodd-Frank financial reform legislation[25] enacted in year 2010, in response to the financial crisis and recession that first began in 2008.

---

[23] The top tranche of AAA notes also has certain control—such as the ability to terminate the portfolio manager for cause, on notice.

[24] Guernsey is located in the English Channel.  ALF was created in August 2015.

[25] Simply put, one of the results of the Dodd-Frank legislation (*i.e.*, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, H.R. 4173, 124 Stat. 1376-2223, 111th Congress, effective July 21, 2010), which was implemented over a period of several years, was that, ***subsequent to December 2016***, managers of securitizations needed to retain at least a 5% interest in that securitization.  Thus, if a $400 million CLO were to be

12

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 222 of 511   PageID 16003
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 122 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 13 of 53

(e)  <u>The Equity Owners of ALF</u>.  Until recently (*i.e.,* until October 24, 2017—four

days after the Arbitration Award), Acis LP itself, as required for a CLO manager,

had a 15% indirect ownership in ALF, in order to be regulatory compliant.[26]  The

parties sometimes refer to ALF (and the web of ownership between it and Acis

LP) as the "risk retention structure."[27]  The evidence at the Trial revealed that

ALF (which has recently been renamed), now, has three equity owners:  (i) a 49%

equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that

was seeded with contributions from Highland, is managed/advised by Highland,

and whose independent trustee is a long-time friend of Highland's chief executive

officer, Mr. Dondero; (ii) 2% is owned by Highland employees; and (iii) finally,

ALF ***may*** be 49% owned by a third-party institutional investor based in Boston

that Highland believed it was required to keep anonymous at the Trial.  Not only

is the court unaware of who this independent third-party is, but the evidence

seems to suggest that it may have acquired its interest fairly recently or may have

simply committed to invest recently.[28]

---

issued, the CLO manager would need to retain at least 5% or $20 million of the assets in the CLO (which 5% could be either all at the equity level or vertically, up and down the note traunches).  There are multiple ways to accomplish this 5% retention (*i.e.,* with either the CLO manager directly investing in at least 5% of the CLO or doing it through a controlled subsidiary).  This particular rule was announced in ***December 2014*** and the SEC thereafter issued a no action letter stating that ***if a CLO was issued prior to December 2014***, then any refinancing of such CLO that happens within four years can be done without risk retention in place.  Resets of any CLO (*i.e.,* changes in terms and maturity—as opposed to mere changes in interest rates), on the other hand, must have risk retention in place.  ***Four of Acis LP's current CLOs were issued prior to December 2014***.  Thus, these four CLOs are still technically able to do a refinancing without a risk retention structure in place.  In any event, by early-to-middle 2017, Acis LP was risk retention compliant.  Exh. 82, pp. 65-69 & 75.  That was recently changed—on October 24, 2017—four days after the Arbitration Award—as later explained herein.

[26] *See* n.23, *supra.*

[27] *See* Demonstrative Aid No. 3.

[28] *See* Exh. 173, which seems to suggest that the only equity owners of ALF just prior to October 24, 2017 were Acis LP and the DAF, until Acis LP's interest in ALF was sold back to ALF on October 24, 2017.  *See also* Exh. 82, p. 162, lines 2-7.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 223 of 511   PageID 16004
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 123 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 14 of 53

(f) <u>The underwriter for the CLO notes.</u>  As with any publicly traded notes, there is an underwriter for the CLO notes which solicits investors for the CLO notes (examples given at the Trial:  Mizuho Securities USA, LLC; Merrill Lynch; JP Morgan Chase).[29]  The CLO notes are traded on the Over-the-Counter Market.

(g) <u>The independent indenture trustee for the CLO notes.</u>  As also with any issuance of publicly traded notes, there is an indenture trustee (example given at the Trial: U.S. Bank).[30]

26.     Mr. Terry, the Petitioning Creditor, as earlier mentioned, began working for Highland in 2005 until his employment was terminated on June 9, 2016.

27.     Acis LP and Acis GP/LLC have never had any employees.  Rather, all employees that work for any of the Highland family of companies (including Mr. Terry) have, almost without exception, been employees of Highland itself.  Highland has approximately 150 employees in the United States.  Highland provides employees to entities in the organizational structure, such as Acis LP and Acis GP/LLC, through both the mechanism of:  (a) a Shared Services Agreement (herein so called),[31] which provides "back office" personnel—such as human resources, accounting, legal and information technology to the Highland family of companies; and (b) a Sub-Advisory Agreement (herein so called),[32] which provides "front office" personnel to entities—such as the managers of investments like Mr. Terry.  The evidence indicated that this is typical in the CLO industry to have such agreements.  The court notes that

---

[29] *See* Exh. 193.

[30] *See* Exh. 7.

[31] Exhs. 17, 99, 179 & 5.

[32] Exhs. 18, 178 & 4.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 224 of 511   PageID 16005
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 124 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 15 of 53

all iterations of the Shared Services Agreements and Sub-Advisory Agreements between Acis LP and Highland were signed by Mr. Dondero both as President of Acis LP and as President of the General Partner of Highland.

28.     Because Acis LP essentially subcontracts out all of its functions to Highland pursuant to the Shared Services Agreement and the Sub-Advisory Agreement, Acis LP has very few vendors or creditors.  Rather Highland incurs expenses and essentially bills them to Acis LP through these two agreements.[33]  In other words, Highland is one of Acis LP's largest and most frequent creditor.

29.     The evidence reflected that at all times Mr. Dondero has been the President of both of the Alleged Debtors, and there have been, at all times, very few, if any, other officers. It appears that the only other officer of Acis GP/LLC that ever existed was Frank Waterhouse, Treasurer.[34]  It also appears that the only other officer of Acis LP that ever existed was Frank Waterhouse, Treasurer, Mr. Terry as Portfolio Manager, and someone named Patrick Boyce as Secretary at one time.[35]

30.     Mr. Dondero testified that he has decision making authority for the Alleged Debtors but usually delegates that authority to Highland's in-house lawyers, Scott Ellington (General Counsel, Chief Legal Officer, and Partner of Highland) and Isaac Leventon (Assistant General Counsel of Highland) and is rarely involved in "nitty gritty negotiations."   Sometimes instructions will come to him from the compliance group headed up by Chief Compliance Officer Thomas Surgent.  Additionally, he testified that he signs hundreds of documents per

---

[33] Exh. 83, pp. 228 (line 8)-230 (line 14).

[34] *See, e.g.*, Exh. 10 & Exh. 173, p.3

[35] Exhs. 14 & 15.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 225 of 511   PageID 16006
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 125 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 16 of 53

week, and much of what he signs is on advice of counsel and he sometimes even delegates to his assistant the authority to sign his name.  As set forth above, Mr. Ellington (who *did not* testify at the Trial)[36] and Mr. Leventon (who *did* testify at the Trial) are not officers, directors, or employees of the Alleged Debtors.  Mr. Leventon is designated to be the representative for the Alleged Debtors (and testified as a Rule 30(b)(6) witness during pre-Trial discovery)—he explained that this representative-authority derives from the Shared Services Agreement.  Mr. Leventon testified that he takes his instructions generally through his direct supervisor, Mr. Ellington, although Highland partners can ask him to perform legal services for any of Highland's 2,000 entities.

   **C.    Transfers and Transactions Involving the Alleged Debtors Since the Litigation with Mr. Terry Commenced—and Especially After the Arbitration Award.**

   31.    Below is a listing of some (but not necessarily all) of the transfers and transactions that the Alleged Debtors, Highland, and related parties undertook *after* the litigation with Mr. Terry commenced.

   (a)    Acis LP's Sale to Highland of a "Participation Interest" in its CLO Cash Flow Stream.  On October 7, 2016 (approximately one month after the litigation arose among Mr. Terry, Highland, and the Alleged Debtors), Acis LP sold to Highland a participation interest in its expected future cash flow from the CLO Collateral Management Agreements—specifically, it sold a portion of the cash flow it expected to earn from November 2016 to August 2019 (not the full life of the CLOs), for $666,655 cash, plus a $12,666,446 note payable from Highland to

---

[36] Mr. Ellington did testify at a hearing in the bankruptcy court on February 6, 2018—which the parties asked this court to take judicial notice of—and also provided deposition testimony that was submitted into evidence. *See* Exh. 25.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 226 of 511   PageID 16007
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 126 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 17 of 53

Acis LP (hereinafter, the "Acis LP Note Receivable from Highland"). Mr.
Dondero signed the purchase and sale agreement for both purchaser and seller.[37]
Mr. Dondero signed the Acis LP Note Receivable from Highland, which accrued
interest at 3% per annum. It appears that the $666,665 cash down payment was
actually paid, and a payment required on the Acis LP Note Receivable from
Highland of $3,370,694 on May 31, 2017, was actually made. The Acis LP Note
Receivable from Highland was payable in three installments, with a $5,286,243
payment required on May 31, 2018, and a $4,677,690 payment required on May
31, 2019. When viewed in complete isolation, this transaction does not
necessarily appear problematic. Although there was evidence that Acis LP had
been managing the five CLOs for about $10 million per year of fees, some of the
recitals in the purchase and sale agreement suggest that there may have been a
sound business reason for the transaction and the arbitration panel,[38] viewing this
transaction in isolation, did not think it was necessarily problematic or actionable.
In any event, Highland is adamant it was a net neutral transaction.

(b)   Transfer of Acis LP's interest in ALF. Recall that ALF was the entity that held
equity (*i.e.,* the subordinated notes) in the CLO special purpose vehicles, and held
voting rights and was a capital provider to the overall risk retention structure
supporting the CLOs. And Acis LP, in turn, held a 15% indirect interest in ALF.
On October 24, 2017 (***four days after the Arbitration Award***), Acis, LP entered
into an agreement with ALF whereby ALF acquired back the shares that Acis LP

---

[37] Exhs. 14 & 15.

[38] Exh. 1, p. 18.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 227 of 511   PageID 16008
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 127 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 18 of 53

indirectly held in ALF (966,679 shares) for the sum of $991,180.13.[39]  No

credible business justification was offered for this transaction, other than mostly

uncorroborated (and self-serving) statements from Highland witnesses that Acis

LP was "toxic" in the market place (due to the litigation with Mr. Terry) and this

was a step in the process of extricating Acis LP from the CLO business.[40]  The

court finds the testimony about Acis LP's toxicity in the marketplace to not be

credible or at all convincing.  For one thing, a new CLO (Acis CLO 2017-7, Ltd.)

was closed on April 10, 2017 with Acis LP as the portfolio manager.  Moreover,

Acis LP subcontracts all of its CLO management function to Highland—and there

was no evidence to suggest that anyone in the marketplace at this juncture

differentiates between Acis LP (whose president is Mr. Dondero) and Highland

(whose president is Mr. Dondero).  ***In any event, the October 24, 2017***

***transaction had the highly consequential effect of making Acis LP***

***"noncompliant" or unable to continue serving as a CLO manager for***

***regulatory purposes for any new CLOs or reset CLOs (or for a refinancing of***

***any of the Highland CLOs that had been created after December 2014)[41]***

***because aspects of the federal Dodd Frank legislation require CLO managers to***

***have "skin in the game" with regard to the CLOs they manage (i.e., they must***

***retain at least 5% of CLOs they manage).***  Mr. Akada, who testified that he had

been involved with the CLO business from the beginning and that the CLO team

---

[39] Exh. 173.

[40] There were also a few hearsay-laden emails offered, that the court did not find probative.  Exhs. 19-22.

[41] *See* n.23 *supra.*

18

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 228 of 511   PageID 16009
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 128 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 19 of 53

reported to him (including Mr. Terry before his termination), testified that he had no knowledge of this particular transaction.  The document effectuating this transaction was signed by Frank Waterhouse, Treasurer for and on behalf of Acis LP, acting by its general partner, Acis GP/LLC.[42]

(c)   ALF Next Decides to Jettison Acis, LP as its Portfolio Manager and Replace it with a new Highland Cayman Island Entity.  On October 27, 2017 (seven days after the Arbitration Award), ALF—having purchased back the ownership interest that Acis LP had in it, just three days earlier—decided that it would no longer use Acis LP as its portfolio manager and entered into a new portfolio management agreement to supersede and replace the ALF Portfolio Management Agreement. Specifically, on October 27, 2017, ALF entered into a new Portfolio Management Agreement with a Cayman Island entity called Highland HCF Advisor, Ltd., replacing Acis LP in its role with ALF.[43]  This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017.[44]

(d)   The Acis LP Note Receivable from Highland is Transferred from Acis LP to Yet Another Highland Cayman Island Entity.  On November 3, 2017 (10 days after the Arbitration Award), Acis LP assigned and transferred its interests in the Acis LP Note Receivable from Highland—which at that point had a balance owing of over $9.5 million—to a Highland Cayman Island entity known as Highland CLO

---

[42] Exh. 173, p. 3.

[43] Exh. 43.

[44] Exh. 168.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 229 of 511   PageID 16010
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 129 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 20 of 53

Management Ltd. which apparently was created sometime recently to be the new collateral manager of the CLOs (in other words, the new Acis LP).[45]  The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for Acis LP and Mr. Dondero for Highland and some undecipherable name for Highland CLO Management Ltd.[46]  The document recites that (i) Highland is no longer willing to continue providing support services to Acis LP, (ii) Acis LP, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland CLO Management Ltd. agrees to step into the collateral manager role if Acis  LP will assign to it the Acis LP Note Receivable from Highland.   One more thing:  since Acis LP was expected to potentially incur future legal and accounting/administrative fees, and might not have the ability to pay them when due, ***Highland CLO Management Ltd.*** agreed to reimburse Acis LP (or pays its vendors directly) up to $2 million of future legal expenses and up to $1 million of future accounting/administrative expenses.[47]

(e)     <u>Various Additional Transactions that further Transitioned CLO Management and Fees Away from Acis LP to Highland Cayman Island Entity.</u>  On December 19, 2017—just one day after the Arbitration Award was confirmed with the entry of the Final Judgment—the vehicle that can most easily be described as the Acis LP "risk retention structure" (necessitated by federal Dodd Frank law) was transferred away from Acis LP and into the ownership of Highland CLO

---

[45] Exh. 16.

[46] *Id.* at p.6.

[47] *Id.* at pp. 1 & 2.

20

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 230 of 511   PageID 16011
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 130 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 21 of 53

Holdings, Ltd. (yet another Cayman Island entity, incorporated on October 27, 2017[48]).

(f)     In addition to transferring Acis LP's interest in the Acis LP risk retention structure on December 19, 2017, Acis LP also transferred its contractual right to receive management fees for Acis CLO 2017-7, Ltd. (which had just closed April 10, 2017), which Mr. Terry credibly testified had a combined value of $5 million, to Highland CLO Holdings, Ltd., another Cayman entity, purportedly in exchange for forgiveness of a $2.8 million receivable that was owed to Highland under the most recent iteration of the Shared Services Agreement and Sub-Advisory Agreement for CLO-7.[49]   In conjunction with this transfer, Highland CLO Holdings, Ltd. then entered into new Shared Services and Sub-Advisory Agreements with Highland.[50]

(g)     <u>Change of Equity Owners of the Alleged Debtors</u>.  When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners:  (a) Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the Trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest.   When Acis GP/LLC was formed

---

[48] Exh. 157.

[49] *See* Ex. 45 (the Transfer Document); *see also* Exh. 4 (the March 17, 2017 Third Amended and Restated Sub-Advisory Agreement between Acis LP and Highland); Exh. 5 (the March 17, 2017 4th Amended & Restated Shared Services Agreement between Acis LP and Highland); Exh. 165 (March 17, 2017 Staff and Services Agreement between Acis CLO Management, LLC and Acis LP); Exh. 166 (March 17, 2017 Master Sub-Advisory Agreement between Acis CLO Management, LLC and Acis LP).

[50] *See* Exhs. 161 & 162.

21

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 231 of 511   PageID 16012
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 131 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 22 of 53

(*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment

Trust.   After Mr. Terry was terminated by Highland, his 25% limited partnership

interest in Acis LP was forfeited and divided among the two remaining limited

partners: Mr. Akada (increasing his interest by 10% up to 25%), and Dugaboy

Investment Trust (increasing its interest by 15% up to 74.9%).   But, more

importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on

December 18, 2017), both Mr. Akada and Dugaboy Investment Trust conveyed

their entire limited partnership interests in Acis LP—25% and 74.9%,

respectively—to a Cayman Island entity called Neutra, Ltd., a Cayman Islands

exempted company.   Dugaboy Investment Trust also conveyed its 100%

membership interest in Acis GP/LLC to Neutra, Ltd.  Mr. Akada testified that he

did this on advice of counsel.  He also did not dispute that he had made millions

of dollars of equity dividends from his equity investment in Acis LP in recent

years[51]—which he conveyed away for no consideration on December 18, 2017.

(h)  <u>The Intended Reset of Acis CLO 2014-3.</u>  With all of the above maneuverings

having been accomplished, Highland was posed to do a reset on Acis CLO 2014-3

in February 2018 (until Mr. Terry filed the Involuntary Petitions).  The investment

bank Mizuho Securities USA, LLC was engaged November 15, 2017[52] and a final

offering circular was issued in January 2018[53]—contemplating a reset of Acis

CLO 20-14-3 with the recently created Highland CLO Management Ltd.

---

[51] Exh. 23, p.3.

[52] Exh. 104.

[53] Exh. 31.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 232 of 511   PageID 16013
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 132 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 23 of 53

Identified as the new portfolio manager, rather than Acis LP.  The act of

implementing a reset on the CLO was not in itself suspect.  However, the reset

would, of course, have the effect of depriving Acis LP from a valuable asset—an

agreement that could realistically be expected to provide millions of dollars of

future collateral management fees—coincidentally (or not) just after Mr. Terry

obtained his large judgment.

**D.     Findings Regarding Credibility of Witnesses.**

32.     The court found the testimony of Mr. Terry to be very credible.  He was very

familiar with the financial condition of the Alleged Debtors, since he presided over the business

of the Alleged Debtors from their inception until June 9, 2016, and has also closely followed

publicly available information regarding the companies since his termination.  Mr. Terry credibly

testified that the Alleged Debtors have never had a significant number of creditors, since most of

the Alleged Debtors' vendors are engaged by and send their invoices to Highland, and Highland

simply obtains reimbursement from the Alleged Debtors (and other entities in the Highland

family), as its in-house lawyers determine is appropriate, through the Shared Services Agreement

and Sub-Advisory Agreement.  Thus, Highland should at all times be the Alleged Debtors' main

creditor.  The court finds that Mr. Terry had a good faith belief that the Alleged Debtors had only

a handful of creditors (maybe four or so) besides him and Highland.  The court also finds that

Mr. Terry—at the time he filed the Involuntary Petitions—had a good faith belief that the

Alleged Debtors and those controlling them were engaged in an orchestrated, sophisticated effort

to denude the Alleged Debtors of their assets and value (*i.e.*, transferring assets and rights for

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 233 of 511   PageID 16014
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 133 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 24 of 53

less than reasonably equivalent value), which started with intensity after issuance of the

Arbitration Award (if not sooner).[54]

33.     The court found the testimony of almost all of the witnesses for the Alleged

Debtors to be of questionable reliability and, oftentimes, there seemed to be an effort to convey

plausible deniability.  For example, sometimes business decisions concerning the Alleged

Debtors were said to have been made by a "collective," and other times the in-house Highland

lawyers (who, of course, are not themselves officers or employees of Acis LP and Acis GP/LLC)

stressed that Mr. Dondero (the president and manager of the two entities) had ultimate decision

making authority for them.  Meanwhile, Mr. Dondero testified that, while he has decision

making authority at Acis LP, he usually delegates to Highland's in-house lawyers Scott Ellington

and Isaac Leventon.   He testified that he signs hundreds of documents per week and often must

rely on information of others when signing.  Additionally, Mr. Dondero (again, the President of

each of the Alleged Debtors) testified that he had never even read the Arbitration Award.  While

Mr. Dondero is the chief executive of a multi-billion dollar international investment company,

and naturally has widespread responsibilities and must delegate to and rely upon others including

lawyers, this court simply does not believe that he never read the Arbitration Award.  The court

perceived the animosity between Mr. Dondero and Mr. Terry to be rather enormous and Mr.

Dondero even testified (as did others) that the litigation with Mr. Terry was hurting Acis LP and

Highland in the CLO marketplace (*i.e.,* no investors or underwriters wanting to be associated

---

[54] The court also found that the deposition testimony of Brian Shaw and Rahkee Patel (counsel for Mr. Terry) was also credible and did not demonstrate any bad faith on their parts in filing the Involuntary Petitions on behalf of Mr. Terry.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 234 of 511   PageID 16015
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 134 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 25 of 53

with the Acis brand).[55]  If that were the case, it strains credulity to suggest Mr. Dondero never

even read the Arbitration Award.

34.     As mentioned earlier, in December 2017, Acis GP/LLC became 100% owned by

a Cayman Island entity known as Neutra, Ltd. (whose beneficial owner is a Dondero family

trust) and Acis LP became 99.9% owned by Neutra, Ltd.  The directors of Acis GP/LLC and

Acis LP are provided to it now by an entity known as "Maples Fiduciary Services"—another

Cayman Island entity, but the Highland Assistant General Counsel could not remember the

names of those directors provided to Acis GP/LLC and Acis LP, except for perhaps one.  Mr.

Dondero, when questioned about some of the recent transactions pertaining to Acis LP, testified

that there were tax reasons—tax lawyers recommended the recent transactions and transfers.  No

tax lawyers testified.  Mr. Dondero also testified that certain transactions were at the directive of

the Thomas Surgent group (the Highland chief compliance officer).  Neither Mr. Surgent nor

anyone else from the compliance group testified.

35.     Meanwhile, Mr. Akada, who, while testifying, seemed like a generally lovely

person and seemed as knowledgeable as a human being could possibly be on the topic of CLOs

generally, had no idea if he was an officer or director of the Alleged Debtors, nor did he know

whom its officers were.  He could not testify as to the meaning of certain transactions in which

Acis LP had engaged in during recent weeks and said that he signed certain documents on advice

of counsel.  He also could not even testify as to whether Highland was opposing the Involuntary

Petitions.

36.     Again, there was a lot of plausible deniability at Trial as to the "whos" and

"whys" for the recent maneuverings involving the Alleged Debtors assets and rights in the weeks

---

[55] No such investors or underwriters provided testimony.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 235 of 511   PageID 16016
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 135 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 26 of 53

since the Arbitration Award.  The one thing that the court was wholly convinced of was that

conflicts of interest among Highland and the Alleged Debtors abound, and no one is looking out

for the interests of the Alleged Debtors as a fiduciary should.

### E.    Evidence Regarding the Number of Creditors of the Alleged Debtors.[56]

37.    The Alleged Debtors do not dispute Mr. Terry's claim for the purposes of

counting creditors under section 303(b) of the Bankruptcy Code.  However, Mr. Terry asserts

that the Alleged Debtors have fewer than 12 creditors, and the Alleged Debtors dispute this fact.

Specifically, the Alleged Debtors initially filed on January 31, 2018, a Notice of List of Creditors

Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Dondero listing 18 creditors (the "Original

Notice of Creditors").[57]  The Alleged Debtors subsequently filed on February 5, 2018, a First

Amended Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr.

Leventon listing 19 creditors (the "First Amended Notice of Creditors").[58]  Finally, the Alleged

Debtors filed on March 6, 2018, a Second Amended Notice of List of Creditors Pursuant to Fed.

R. Bank. P. 1003(b) signed by Mr. Leventon listing 20 creditors (the "Second Amended List of

Creditors").[59]  The following chart summarizes the name, amount, and nature of the 20 creditors

listed by the Alleged Debtors in their Second Amended List of Creditors.

---

[56] The court notes that neither Mr. Terry nor the Alleged Debtors attempted to differentiate between the creditors of Acis GP/LLC versus the creditors of Acis LP, but rather presented evidence regarding the collective number of creditors for both of the Alleged Debtors.  This seems legally appropriate, since Acis LP is the entity that incurred most of the debt, and ACIS GP/LLC would be liable on such debt as the general partner of Acis LP.

[57] *See* DE # 7 in Case No. 18-30264 & DE # 7 in Case No. 18-30265.

[58] *See* DE # 17 in Case No. 18-30264 & DE # 16 in Case No. 18-30265.

[59] *See* DE # 39 in Case No. 18-30264 & DE # 38 in Case No. 18-30265.

26

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 236 of 511   PageID 16017
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 136 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 27 of 53

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness[60] |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

38.     First, the court believes it necessary to remove certain insider creditor claims, which are required not to be counted pursuant to section 303(b)(2) of the Bankruptcy Code.[61] This would clearly include Highland (the Alleged Debtors do not dispute this).

---

[60] The dollar amounts listed here are based upon the amounts listed in the Second Amended List of Creditors.

[61] *In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000).

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 237 of 511   PageID 16018
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 137 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 28 of 53

39.     Additionally, there were certain creditors that filed sworn statements saying they were not creditors of the Alleged Debtors or were subsequently removed from the creditor list by agreement of the Alleged Debtors.  These creditors would include Case Anywhere, CSI Global Deposition Services,[62] Elite Document Technology, JAMS, Inc.,[63] Stanton Advisors LLC,[64] and the TASA Group, Inc..[65]  Thus, the updated chart now shows 13 creditors of the Alleged Debtors.

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| ~~2~~ | ~~Case Anywhere, LLC~~ | ~~Law Firm Vendor~~ | ~~$417.20~~ |
| ~~3~~ | ~~CSI Global Deposition Services~~ | ~~Law Firm Vendor~~ | ~~$38,452.56~~ |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| ~~6~~ | ~~Elite Document Technology~~ | ~~Data Hosting/Law Firm Vendor~~ | ~~$199.72~~ |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| ~~8~~ | ~~Highland Capital Management, L.P.~~ | ~~Advisory and Participation Fees~~ | ~~$2,770,731.00~~ |
| ~~9~~ | ~~JAMS, Inc.~~ | ~~Law Firm Vendor~~ | ~~$1,352.27~~ |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |

---

[62] CSI Global Deposition Services was removed as a creditor by the agreement of the Alleged Debtors.

[63] JAMS, Inc. was removed as a creditor by agreement of the Alleged Debtors.

[64] Stanton Advisors LLC was removed as a creditor by agreement of the Alleged Debtors.

[65] *See* Exh. 40B, Exh. 186, Exh. 92, and Exh. 94.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 238 of 511   PageID 16019
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 138 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 29 of 53

| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

40.     Next, the court finds that there are certain creditors included in the "Law Firm Vendor" category (*e.g.*, experts, data hosting, document managers, court reporters) that are really creditors of the individual law firms and/or Highland, and that these law firm vendor creditors should not be considered creditors of the Alleged Debtors.  For these, there was no evidence of a direct contractual obligation on the part of either the Alleged Debtors or Highland—although the court certainly understands that, when the law firms would retain vendors, they would bill these to either the Alleged Debtors or Highland as an expense to be reimbursed.  Most of these were already eliminated with agreement of the Alleged Debtors but, from the remaining list of creditors, this would include David Langford (a Dallas County court reporter).[66]  To be clear, while the individual law firm creditors may ultimately have a right to reimbursement for these vendor expenses from Highland (who may then potentially have a right to reimbursement from the Alleged Debtors via the Shared Services and Sub-Advisory Agreements), the court does not find this vendor to have a claim ***directly*** against the Alleged Debtors for purposes of section 303(b) of the Bankruptcy Code.

---

[66] *See* Exh. 40D, Exh. 187, Exh. 40O.

29

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 239 of 511   PageID 16020
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 139 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 30 of 53

41.     Next, as to the Stanton Law Firm, the court finds that this creditor should also be removed from the pool of creditors that "count," for section 303(b) purposes, since this claim appears to be the subject of a "bona fide dispute as to liability or amount,"[67] based on the evidence presented at the Trial.  First, there was no engagement letter between either of the Alleged Debtors and the Stanton Law Firm produced.[68]  Second, the heavily redacted invoice of the Stanton Law Firm dated October 18, 2016 shows only that it was relating to the "Joshua Terry Matter" and that it was billed to Highland.[69]  Third, the Responses and Objections to Mr. Terry's Notice of Intention to Take Depositions by Written Questions sent to the Stanton Law Firm[70] provides the following responses:

> **Question No. 11**: What is the total amount of debt Acis Capital Management L.P. to the Firm. is liable to the Firm.
>
> **Answer**: Acis Capital Management L.P.'s debt to the Firm is unknown at this time.
>
> **Question No. 12**: What is the total amount of debt Acis Capital Management GP, LLC is liable for to the firm?
>
> **Answer**: Acis Capital Management GP, LLC to the Firm is unknown at this time.
>
> **Question No**. **13**: Is any other party also liable for the debt of Acis Capital Management L.P. to the Firm? If so, please state the liable party and portion of Acis Capital Management L.P. debt the other party is liable for to the Firm.

---

[67] *See Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 655 (5th Cir. 2014) (a claimholder does not have standing to file a petition under section 303(b) if its claim is "the subject of a bona fide dispute as to liability or amount"); *In re Smith*, 415 B.R. 222, 237 (Bankr. N.D. Tex. 2009) (only "a holder of a claim ... that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" is counted in determining the number of creditors necessary to file an involuntary petition).

[68] Rather, there is only an engagement letter between Lackey Hershman LLP (acting on behalf of its client, Highland) and Stanton Advisors LLC to act as an expert in the Terry litigation.  *See* Exh. 144.  As previously noted, the claim of Stanton Advisors LLC was removed from the creditor list by agreement of the Alleged Debtors.

[69] *See* Exh. 40R.

[70] The court notes that these responses were actually signed by James Michael Stanton, attorney for Stanton LLP.  *See* Exh. 139.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 240 of 511   PageID 16021
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 140 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18    Entered 04/13/18 16:34:53    Page 31 of 53

**Answer**: Whether any other party is also liable to the firm for the debt of Acis Capital Management, L.P. is unknown at this time.

**Question No**. **14**: Is any other party also liable for the debt of Acis Capital Management GP, LLC to Firm? If so, please state the liable party and portion of Acis Capital Management GP, LLC debt the other party is liable for to the Firm.

**Answer**: Whether any other party is also liable for the debt of Acis Capital Management GP, LLC is unknown at this time. . . .

**Question No. 21**: Does the Firm currently represent Acis Capital Management, L.P.? If so, please state the representation.

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time.

**Question No. 22**: Does the Firm currently represent Acis Capital Management GP, LLC? If so, please state the representation?

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time. . . .[71]

The court finds that this evidence demonstrates that the claim of the Stanton Law Firm is the subject of a bona fide dispute as to either liability or amount and should not be counted since there is no real way of even knowing who the Stanton Law Firm was engaged by and, thus, whether the Alleged Debtors are even responsible for these alleged legal fees.  The court would also specifically refer to the testimony of Mr. Leventon, the in-house lawyer employed by Highland who was in charge of allocating all of the bills that came into Highland's legal invoicing system, where he described a process in which all legal bills relating to the "Terry Matter" would automatically be assigned to the Alleged Debtors, without any real regard to whether the particular law firm had even been engaged by the Alleged Debtors or if whether the

---

[71] *See* Exhibit 139.

31

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 241 of 511   PageID 16022
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 141 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 32 of 53

representation was actually relating to one of the other parties in the Terry litigation (*e.g.*,
Highland, Mr. Dondero, etc.).  Accordingly, the court finds that there is a bona fide dispute as to
whether the Alleged Debtors are actually liable for the Stanton Law Firm legal fees and that they
should not be counted as a creditor for purposes of section 303(b) of the Bankruptcy Code.[72]

42.     Thus, it appears, at most, that there are 11 creditors[73] of the Alleged Debtors as
set forth in the chart below:

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| ~~2~~ | ~~Case Anywhere, LLC~~ | ~~Law Firm Vendor~~ | ~~$417.20~~ |
| ~~3~~ | ~~CSI Global Deposition Services~~ | ~~Law Firm Vendor~~ | ~~$38,452.56~~ |
| ~~4~~ | ~~David Langford~~ | ~~Court Reporter/Law Firm Vendor~~ | ~~$550~~ |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| ~~6~~ | ~~Elite Document Technology~~ | ~~Data Hosting/Law Firm Vendor~~ | ~~$199.72~~ |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| ~~8~~ | ~~Highland Capital Management, L.P.~~ | ~~Advisory and Participation Fees~~ | ~~$2,770,731.00~~ |
| ~~9~~ | ~~JAMS, Inc.~~ | ~~Law Firm Vendor~~ | ~~$1,352.27~~ |
| 10 | Jones Day | Legal Fees | $368.75 |

---

[72] *See also In re CorrLine Int'l, LLC*, 516 B.R. 106, 152 (Bankr. S.D. Tex. 2014) (bankruptcy court found
that creditors contained in the alleged debtor's list of creditors with uncertain or unknown amounts could not be
counted towards the numerosity requirement of section 303(b)).

[73] The court notes that, in all likelihood, the list of creditors that should be tallied for purposes of section
303(b) may actually be less than 11, because certain of the remaining creditors (*i.e.*, Drexel Limited, Highfield
Equities, Inc., Lackey Hershman LLP, and David Simek) received payments during the 90 days preceding the
Petition Date—and, thus, arguably should not be counted as creditors pursuant to section 303(b) of the Bankruptcy
Code (which instructs that transferees of voidable transfers should not be counted).  *See, e.g.,* Exh. 124 & Exh. 131.
Additionally, certain of the remaining law firm creditors that are owed legal fees are also creditors of Highland and
Highland-affiliates, not just the Alleged Debtors.  To elaborate, many of these law firm creditors were employed to
represent not only the Alleged Debtors, but also Highland and Highland-affiliates, so there may be an actual dispute
as to the allocation of these legal fees among Highland and the Alleged Debtors (thus there could be bona fide
disputes as to the amounts allocated by Highland's in-house lawyers to the Alleged Debtors).  *See, e.g.*, Ex. 123
(McKool Smith, P.C. engagement letter referencing representation of numerous parties) & Exhibit 90 (Reid Collins
& Tsai's Answers and Objections to Mr. Terry's Deposition by Written Questions, questions 13 & 14, stating that
based upon allocation determinations to be made by Highland, other individuals may be liable for the full amount of
the debt including Acis LP, Highland, Mr. Dondero, and Mr. Okada).

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 242 of 511   PageID 16023
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 142 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 33 of 53

| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees[74] | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| ~~16~~ | ~~Stanton Advisors LLC~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$10,000~~ |
| ~~17~~ | ~~Stanton Law Firm~~ | ~~Legal Fees~~ | ~~$88,133.99~~ |
| ~~18~~ | ~~The TASA Group. Inc.~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$14,530.54~~ |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

43.    Finally, on the topic of creditor numerosity, the court further finds that the evidence

strongly suggested hurried manufacturing of creditors on the part of the Alleged Debtors and

Highland, in order to bolster an argument that having a sole petitioning creditor was legally

inadequate in this case.[75]  For example, the Klos Declaration and other information, that was

provided to State Court 2 and in discovery, only days before the Involuntary Petitions were filed,

---

[74] Mr. Terry has also argued that certain of the law firm creditors (McKool Smith, P.C., Lackey Hershman, LLP, and Reid Collins & Tsai) are "insiders" that must be excluded from the creditor list pursuant to section 303(b) of the Bankruptcy Code.  While there may be some support in case law for such an argument, Mr. Terry would ultimately need to show by a preponderance of the evidence that the law firms exercised such control or influence over the Alleged Debtors as to render their transactions not at arm's length.  *See In re CorrLine Intern., LLC*, 516 B.R. 106, 157-58 (Bankr. S.D. Tex. 2014) (citing to *Kepler v. Schmalbach (In re Lemanski)*, 56 B.R. 981, 983 (Bankr.W.D.Wis.1986)).  *See also In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992) (in evaluating whether insider status existed for purposes of evaluating fraudulent conveyance court considered  (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length).  Because there was no evidence suggesting abuse or control by these law firm creditors, nor was there any evidence that would suggest that their dealings with the Alleged Debtors were anything but arm's length, the court finds that these law firm creditors should not be excluded from the creditor list as "insiders" pursuant to section 303(b) of the Bankruptcy Code.

[75] *See* the Original Notice of Creditors, the First Amended Notice of Creditors, and the Second Amended Notice of Creditors.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 243 of 511   PageID 16024
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 143 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 34 of 53

seemed to show only a small number of creditors of Acis LP—Mr. Terry credibly testified that he thought there were less than 12 creditors based on his review of such information, as well as his understanding of the Alleged Debtors' business. Yet, only a few days later, the Alleged Debtors filed their Original Notice of Creditors, which showed 18 creditors, which was amended twice to add another creditor and then yet another. This simply does not jive in the court's mind and supports this court's belief that the Alleged Debtors were scurrying to determine which Highland creditors might cogently be painted as Acis LP creditors—so as to preclude Mr. Terry from being able to file the Involuntary Petitions as the single, petitioning creditor.

### F. Evidence Regarding Whether the Alleged Debtors are Generally Not Paying Debts as They Become Due (Unless Such Debts are the Subject of a Bona Fide Dispute as to Liability or Amount).

44.     The evidence submitted reflects that, for the 11 creditors identified above, 9 out of 11 have unpaid invoices that were more than 90 days old. The remaining 2 of the 11 were McKool Smith, P.C. (current counsel for the Alleged Debtors) and the Petitioning Creditor.[76] The court makes findings with regard to each of the 11 creditors below—focusing specifically on whether the Alleged Debtors have been paying these creditors as their debts have become due.

45.     First, with regard to Andrews Kurth & Kenyon ("AKK"), the evidence reflected that out of the $211,088.13 allegedly owed by Acis LP to AKK, the great majority of it— $173,448.42—was invoiced on November 16, 2016[77] (more than 14 months before the Petition Date). Other, smaller amounts were invoiced on a monthly basis in each of the months August 2017, September 2017, October 2017, November 2017, and December 2017. Although requested in discovery, no engagement letter for AKK was produced and AKK represented in

---

[76] Exhs. 40 & 54.

[77] Exh. 40.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 244 of 511   PageID 16025
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 144 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 35 of 53

written discovery that, to its knowledge, none existed.[78]  The court notes anecdotally that AKK's

invoices (although allegedly related to Acis LP legal matters) were addressed to Highland.[79]  In

any event, AKK represented that both the Alleged Debtors and Highland are jointly and

severally liable for the fees owed to it.[80]  AKK also represented that, to its knowledge, the

amounts owing to it by Acis LP and Highland are not disputed.[81]  AKK also represented that it

has not provided legal work on a contingency basis for the Alleged Debtors or Highland.[82]  The

court makes a logical inference that AKK expected timely payment of its invoices—the largest

of which was dated more than 14 months prior to the Petition Date—and, thus, it has generally

not been paid timely.

46.     Next, with regard to Drexel Limited, the Petitioning Creditor concedes that its

$6,359.96 indebtedness (which is a fee rebate owing to it) is not past-due.

47.     Next, with regard to Highfield Equities, Inc., the Petitioning Creditor concedes

that its $2,510.04 indebtedness (which is also a fee rebate owing to it) is not past-due.

48.     Next, with regard to the Jones Day law firm, the $368.75 indebtedness owed to it

is well more than 90 days old.  Specifically, there is a six-and-a-half-month old invoice dated

July 19, 2017 invoice in the amount of $118.75, and two five-month old invoices dated August

30, 2017 (both in the amount of $150).[83]  The court makes a logical inference that Jones Day

---

[78] Exh. 98, Requests 1-2.

[79] Exh. 98, pp. AKK000061-AKK000060.

[80] Exh. 98, Question 13.

[81] Exh. 98, Questions 52-55.

[82] Exh.  98, Questions 73-75.

[83] Exh. 40K.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 245 of 511   PageID 16026
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 145 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18    Entered 04/13/18 16:34:53    Page 36 of 53

expected timely payment of its invoices prior to the Petition Date and, thus, it has generally not been paid timely.

49.     Next with regard to the Petitioning Creditor, Mr. Terry, the court notes that his liquidated claim in the amount of $8,060,827.84 first arose with the final Arbitration Award on October 20, 2017 (although such award was not confirmed by State Court 2 until December 18, 2017).  The judgment was unstayed as of the January 30, 2018 Petition Date, although the Alleged Debtors state that they still desire to appeal it—as difficult as that is in the situation of an arbitration award.  The court makes a logical inference that the Alleged Debtors had, on the Petition Date, no intention of paying this claim any time soon based on their conduct after the Arbitration Award—although the Arbitration Award had only been in existence for three-and-a-half months as of the Petition Date. The cash in the Alleged Debtors' bank accounts is wholly insufficient to cover the Arbitration Award and, meanwhile, corporate transactions have been ongoing to ensure that no cash streams will be coming into Acis LP in the future in the same way that they have in the past.  Thus, this court finds that this large claim, as of the Petition Date, was not being paid timely.

50.     Next with regard to KPMG LLP, the $34,000 indebtedness owed to it was for the service of auditing Acis LP's financial statements, pursuant to an engagement letter with it dated March 1, 2017.[84]  KPMG's engagement letter reflected a $40,000 flat fee was agreed to by Acis LP for the service, of which 40% was due October 2017 (*i.e.,* $16,000), with another 45% was due in January 2018 ($18,000), and the remaining 15% would be due at the time that a final bill was sent.  Acis LP has only paid $6,000 of the agreed upon amount—meaning $28,000 was overdue as of the January 30, 2018 Petition Date (with $10,000 of that being four months past

---

[84] Exh. 40M.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 246 of 511   PageID 16027
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 146 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 37 of 53

due).  The court makes a logical inference that KPMG LLP expected payment of its audit fees in accordance with its engagement letter and, thus, it has generally not been paid timely.

51.     Next with regard to Lackey Hershman LLP, the $236,977.54 indebtedness owed to it was for legal services provided to the Alleged Debtors and Highland in connection with the arbitration and litigation with Mr. Terry.  No engagement letter was provided, but the invoices for their services are all directed to Highland.[85]  The evidence reflected that three invoices had not been paid as of the Petition Date:  an October 31, 2017 invoice in the amount of $56,909.53; a November 30, 2017 invoice setting forth new fees in the amount of $84,789.83; and a December 31, 2017 invoice setting forth new fees in the amount of $95,278.18.[86]  The court makes a logical inference that Lackey Hershman LLP expected prompt payment on its invoices (if nothing else, the statement on its invoice indicating "Total now due")[87] and, thus, it has generally not been paid timely.

52.     Next with regard to Reid Collins & Tsai LLP, the $17,383.75 indebtedness owed to it was billed in an invoice dated August 31, 2017, indicating an August 31, 2017 "Due Date" (five months before the Petition Date).[88] Although requested in discovery, no engagement letter for this firm was produced and Reid Collins & Tsai LLP in fact represented in written discovery that none existed.[89]  Moreover, written discovery propounded on the law firm indicated that, while Acis LP was liable on this debt, other parties including Acis GP/LLC, Highland, Mr.

---

[85] Demonstrative Aid No. 1 (Lackey Hershman tab).

[86] Exh. 40, p. 3.

[87] Demonstrative Aid No. 1 (Lackey Hershman tab).

[88] Exh. 40P; Exh. 130, pp. 7-8.

[89] Exh. 90, Requests 1 & 2; Ex. 130, Requests 1 & 2.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 247 of 511   PageID 16028
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 147 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 38 of 53

Dondero, the Dugaboy Trust, and Mr. Akada might also be liable for the full amount of the debt—subject to Highland's allocation determinations.[90]  Based on this evidence, the court makes a logical inference that Reid Collins & Tsai LLP generally has not been paid timely.

53.      Next with regard to CT Corporation and the $517.12 indebtedness that the Alleged Debtors represent is owed, CT Corporation asserts that $4,074.84 is, in fact, owed to it by Acis LP and Acis GP/LLC.[91]  CT Corporation also believes Highland has liability for the Alleged Debtors' indebtedness.[92]  CT Corporation also believes the amount owed to it is undisputed.[93]  CT Corporation further represents that its invoices are due upon receipt.[94] CT Corporation produced several invoices in discovery, all showing due upon receipt, and one was dated as far back as December 31, 2016 (in the amount of $932).[95]  Based on this evidence, the court makes a logical inference that CT Corporation expected prompt payment on its invoices and, thus, has not been paid timely.

54.      Next with regard to David Simek, the Petitioning Creditor concedes that his $1,233.19 indebtedness (which is apparently an expense reimbursement relating to some consulting) is not past-due.

---

[90] Exh. 90, Questions 13 & 14; Exh. 130, Questions 13-14.

[91] Exh. 143, Questions 12 & 13.

[92] *Id.* at Question 14.

[93] *Id.* at Questions 22 & 23.

[94] *Id.* at Question 30.

[95] *Id.* at p. 8; Exh. 40T.

38

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 248 of 511   PageID 16029
Case 18-03078-sgj    Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2    Page 148 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53    Page 39 of 53

55.     In summary, the evidence reflects that the creditors of the Alleged Debtors are generally not being paid timely (except for perhaps four that are relatively insignificant and which may also be able to look to Highland for payment).[96]

56.     Further on the topic of timeliness, Mr. Leventon (Highland's in-house Assistant General Counsel) testified that 96% of bills submitted get paid more than 90 days after they are submitted, that approximately 70% of bills are later than 120 days after they are submitted, and some are even later than 150 days.  Mr. Leventon testified that this was a result of Acis LP receiving cash on a quarterly basis from the CLOs.  He further elaborated and testified that, for example, if Acis LP got cash on say February 1st, and it received a legal bill on that same day, that he would probably not approve it and allocate it until say February 8th.  By that time, Acis LP would have already used up all its cash, and that particular creditor would need to wait until the next quarterly payment was received in order to be paid.  He further testified that he explained this to law firms before their engagements and that, if they wanted the business, they would need to understand the process.  There are several things the court finds problematic about this testimony.  First, no testimony was offered showing that this was, in fact, the understanding of the law firms or other creditors, and, moreover, none of the engagement letters or invoices submitted into evidence reflect such payment terms.  Without this additional evidence, the court believes that the Alleged Debtors' testimony regarding how it paid invoices was mostly self-serving and did not support a finding that the Alleged Debtors were generally paying their debts

---

[96] Courts have also held that a debtor is generally not paying its debts as they become due when a debtor is found to have been transferring assets so as to avoid paying creditors.  *See, e.g., In re Moss*, 249 B.R. 411, 423 (Bankr. N.D. Tex. 2000) (bankruptcy court determined that an alleged debtor was not paying its debts as they came due when the alleged debtor "attempted to delay creditors through the transfers of assets she has made," concluding that "[the alleged debtor's] overall conduct of her financial affairs has been poor").  This court has also found that there may have been significant transfers of the Alleged Debtors' assets prior to the filing of the Involuntary Petitions to potentially avoid paying creditors (*i.e.*, Mr. Terry) and this may provide further support for the court's finding that the Alleged Debtors are generally not paying their debts as they become due under section 303(h).

39

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 249 of 511   PageID 16030
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 149 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18    Entered 04/13/18 16:34:53    Page 40 of 53

as they became due.[97]  Second, to the extent Mr. Leventon's testimony demonstrates that

creditors of the Alleged Debtors expected to be paid on a quarterly basis (at the latest), certain of

the remaining 11 creditors have debts that are significantly older than four months (*i.e.*, CT

Corporation, Jones Day, AKK, and possibly even Reid Collins & Tsai LLP).  Third, the

Financial Statements of Acis LP submitted into evidence do not support the notion that the cash

balances at Acis LP were only sufficient enough to pay vendors once every quarter.[98]  For

example, the balance sheet for January 31, 2017 shows a cash balance in Acis LP bank accounts

of $1,061,663.19; the balance sheet for February 28, 2017 shows a cash balance in Acis LP bank

accounts of $905,212.36; the balance sheet for March 31, 2017 shows a cash balance in Acis LP

bank accounts of $525,626.59; the balance sheet for April 30, 2017 shows a cash balance in Acis

LP bank accounts of $117,885.96; the balance sheet for May 31, 2017 shows a cash balance in

Acis LP bank accounts of $62,733.31; the balance sheet for June 30, 2017 shows a cash balance

in Acis LP bank accounts of $10,329.15; the balance sheet for July 31, 2017 shows a cash

balance in Acis LP bank accounts of $701,904.39; the balance sheet for August 31, 2017 shows a

cash balance in Acis LP bank accounts of $332,847.05.[99]  In summary, while there may be cash

fluctuations with Acis LP, there is not a clear pattern of Acis LP being only able to pay vendors

once every quarter.

---

[97] *See In re Trans-High Corp.*, 3 B.R. 1, 2-3 (Bankr. S.D.N.Y. 1980) (bankruptcy court found that evidence showing that the petitioning creditor gave the debtor generous terms of payment (90 days) which were substantially better than the terms set forth in the actual writings between the parties supported finding that the alleged debtors were generally paying debts as they became due and that the involuntary petition must be dismissed).

[98] Exh. 147.

[99] *Id.*

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 250 of 511   PageID 16031
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 150 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 41 of 53

## II.    Conclusions of Law

Section 303 of the Bankruptcy Code sets forth the various requirements for initiating an involuntary bankruptcy case.  First, pursuant to section 303(b) of the Bankruptcy Code, an involuntary case may be filed against a person by the filing with the bankruptcy court of a petition under Chapter 7—

> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount ... [that] aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,775 of such claims . . .[100]

Thus, if there are twelve or more eligible creditors holding qualified claims on the Petition Date, three or more entities must participate in the involuntary filing and must hold unsecured claims aggregating $15,775.00.  If there are less than twelve creditors, a single creditor with an unsecured claim of $15,775.00 may file the involuntary petition.  To the extent a bankruptcy court finds that the requisite number of petitioning creditors have commenced the involuntary case, the court shall order relief against the debtor under the chapter under which the petition was filed only if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."[101]

Here, as noted earlier, the Alleged Debtors have made four arguments as to why an order for relief should not be entered against the Alleged Debtors: (1) the Alleged Debtors have 12 or

---

[100] 11 U.S.C.A § 303(b) (West 2018).

[101] 11 U.S.C.A § 303(h) (West 2018).

App. 253
APP.3328

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 251 of 511   PageID 16032
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 151 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53    Page 42 of 53

more creditors, and, thus, with Mr. Terry being the sole petitioning creditor, the Involuntary

Petitions were not commenced by the requisite number of creditors; (2) the Alleged Debtors are

generally paying their debts as they become due; (3) the Involuntary Petitions were filed in bad

faith by Mr. Terry; (4) the interests of creditors and the debtors would be better served by

dismissal and the court should abstain pursuant to section 305 of the Bankruptcy Code.

### A.    *Have the Requisite Number of Creditors Commenced the Involuntary Proceedings?*

Pursuant to section 303(b)(2) of the Bankruptcy Code, a sole petitioning creditor holding

at least $15,775 in claims can initiate an involuntary bankruptcy case so long as the alleged

debtors have fewer than 12 creditors.  After the Second Amended List of Creditors was filed, Mr.

Terry had the burden, by a preponderance of the evidence, of showing that the Alleged Debtors

actually had less than 12 qualified creditors.[102]  Here, the court has found that the Alleged

Debtors have, ***at most***, 11 qualified creditors.[103]  Accordingly, Mr. Terry has met his burden of

showing that the Alleged Debtors have less than 12 creditors for section 303(b) purposes, and

that he, as the sole petitioning creditor, was permitted to file the Involuntary Petitions.  While

Mr. Terry has made additional arguments as to why certain of these 11 creditors should not be

counted as creditors for purposes of section 303(b) of the Bankruptcy Code, the court does not

believe it necessary to address these arguments at this time.[104]

---

[102] *See In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222, 229 (Bankr. N.D. Tex. 2009).

[103] To be clear, the court believes that even on these 11, there are likely bona fide disputes as to the liability or amount that ***Acis LP*** has—as opposed to the liability or amount that Highland or other insiders bear responsbility.

[104] Moreover, as previously stated, since the court has determined there are fewer than 12 creditors, the court need not address whether there is a "special circumstances" exception to the statutory requirements of section 303, in situations where an alleged debtor may have engaged in fraud, schemes, or artifice to thwart a creditor or creditors.  *See, e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 252 of 511   PageID 16033
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 152 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 43 of 53

**B.      Are the Alleged Debtors Generally Paying Their Debts as They Become Due?**

Section 303(h) of the Bankruptcy Code requires that a court shall enter order for relief in

an involuntary case "if … (1) the debtor is generally not paying such debtor's debts as such debts

become due unless such debts are the subject of a bona fide dispute as to liability or amount . . .

."[105]   Again, the burden is on the Petitioning Creditor to prove this element by a preponderance

of the evidence.[106]   The determination is made as of the filing date of the Involuntary

Petitions.[107]   In determining whether an alleged debtor is generally paying its debts as they come

due, courts typically look to four factors: (i) the number of unpaid claims; (ii) the amount of such

claims; (iii) the materiality of the non-payments; and (iv) the nature of the debtor's overall

conduct in its financial affairs.[108]   No one factor is more meritorious than another; what is most

relevant depends on the facts of each case.[109]   Courts typically hold that "generally not paying

debts" includes regularly missing a significant number of payments *or* regularly missing

payments which are significant in amount in relation to the size of the debtor's operation.[110]

---

[105] 11 U.S.C.A § 303(h) (West 2018).

[106] *See Norris v. Johnson (In re Norris)*, No. 96-30146, 1997 WL 256808, at *3-*4 (5th Cir. Apr. 11, 1997) (unpublished).

[107] *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 222 (5th Cir. 1993).

[108] *See, e.g., In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000) (citing *In re Norris*, 183 B.R. 437, 456-57 (Bankr. W.D. La. 1995)).

[109] *In re Bates*, 545 B.R. 183, 186 (Bankr. W.D. Tex. 2016) (also noting that petitioning creditors' counsel consistently argued that the final prong—overall conduct in financial affairs—should be afforded more weight than the other factors, and the court found no authority to support this assertion).

[110] *See, e.g., In re All Media Props., Inc.*, 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980).  See also *Concrete Pumping Serv., Inc. v. King Constr. Co. (In re Concrete Pumping Serv., Inc.)*, 943 F.2d 627, 630 (6th Cir.1991) (a debtor was not paying his debts as they became due where the debtor was in default on 100% of its debt to only one creditor); *Knighthead Master Fund, L.P. v. Vitro Packaging, LLC (In re Vitro Asset Corp.)*, No. 3:11–CV–2603–D (N.D.Tex. Aug. 28, 2012) (district court found error in bankruptcy court ruling that the debtors were generally paying their debts as they became due, where bankruptcy court had relied on the fact that the alleged debtors had a significant number of third-party creditors/trade vendors, which had been continually paid, even though the unpaid debts to the petitioning creditors far exceeded the paid debts in terms of dollar amount; petitioning creditors were holders of promissory notes that were guaranteed by the alleged debtors, as to which the primary obligor and alleged

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 253 of 511   PageID 16034
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 153 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 44 of 53

Furthermore, any debt which the alleged debtor is not current on as of the petition date should be considered as a debt not being paid as it became due.[111]

Here, the court concludes that the creditors of the Alleged Debtors—what few there are—are generally not being paid as their debts have become due (except for perhaps four[112] that are relatively insignificant and which may also be able to look to Highland for payment).  Mr. Terry has met his burden by a preponderance of the evidence as to section 303(h) of the Bankruptcy Code.

### C.    With the Section 303 Statutory Requirements Being Met by the Petitioning Creditor, Should the Court, Nonetheless, Dismiss the Involuntary Petitions Because They Were Filed in Bad Faith?

Despite Mr. Terry meeting the necessary statutory requirements for this court to enter orders for relief as to the Alleged Debtors pursuant to section 303 of the Bankruptcy Code, the Alleged Debtors have argued that the Involuntary Petitions must, nonetheless, be dismissed because they were filed in "bad faith" by Mr. Terry.  As support for this argument, the Alleged Debtors rely primarily on the Third Circuit's decision in *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015).  While the court certainly acknowledges that authority exists in other circuits that suggests that dismissal of an involuntary bankruptcy case may be appropriate—even when section 303's statutory requirements have been met—based upon an

---

debtors had ceased making interest payments; the unpaid debts represented 99.9% of the total dollar amount of debt of each of the alleged debtors); *Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350–51 (E.D.N.Y. 1996) (even though the debtor only had two outstanding debts, the total dollar amount failed to establish that, in terms of dollar amounts, the debtor was paying anywhere close to 50% of his liabilities, so he was not generally paying his debts as they became due); *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (while the debtor was paying small recurring debts, he was not paying 99 percent of his debts in the aggregate amount and thus was not generally paying his debts as they became due).

[111] *In re Bates*, 545 B.R. 183, 188 (Bankr. W.D. Tex. 2016).

[112] Those four are:  Drexel Limited ($6,359.96); Highfield Equities ($2,510.04); David Simek ($1,233.19); and McKool Smith ($70,082.18).

44

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 254 of 511   PageID 16035
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 154 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 45 of 53

independent finding of "bad faith," the court need not ultimately decide the efficacy or

applicability of such authority, because the court does not believe that the evidence demonstrated

any "bad faith" on the part of Mr. Terry (or his counsel) in filing the Involuntary Petitions.

Indeed, the evidence suggested that Mr. Terry and his counsel filed the Involuntary Petitions out

of a legitimate concern that Highland was dismantling and denuding Acis LP of all of its assets

and value and that a bankruptcy filing was the most effective and efficient way to preserve value

for the Acis LP creditors.  The court concludes that Mr. Terry was wholly justified in pursuing

the Involuntary Petitions.

> ### D. Should This Court, Nonetheless, Abstain and Dismiss the Involuntary Petitions Pursuant to Section 305 of the Bankruptcy Code?

Section 305(a)(1) of the Bankruptcy Code provides that:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or
> may suspend all proceedings in a case under this title, at any time if—
>> (1) the interests of creditors and the debtor would be better served by such
>> dismissal or suspension; . . .[113]

Courts construing section 305(a)(1) of the Bankruptcy Code have found that abstention in a

properly filed bankruptcy case is an *extraordinary remedy*.[114]  Moreover, granting an abstention

motion pursuant to section 305(a)(1) of the Bankruptcy Code requires more than a simple

balancing of harm to the debtor and creditors; rather, the interests of *both* the *debtor* and its

*creditors* must be served by granting the request to abstain.[115]  The moving party bears the

---

[113] 11 U.S.C.A. § 305(a)(1) (West 2018).

[114] *In re AMC Investors, LLC*, 406 B.R. 478, 487 (Bankr. D. Del. 2009); *see also In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007); *In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718, 726 (Bankr. N.D. Ill. 1996).

[115] *In re Smith*, 415 B.R. 222, 238-39 (Bankr. N.D. Tex. 2009) (citing to *AMC Investors, LLC*, 406 B.R. at 488).

App. 257
APP.3332

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 255 of 511   PageID 16036
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 155 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 46 of 53

burden to demonstrate that dismissal benefits the debtor and its creditors.[116]   Courts must look to

the individual facts of each case to determine whether abstention is appropriate.[117]

Case law has set forth a litany of factors to be considered by the court to gauge the

overall best interests of the creditors and the debtor for section 305(a)(1) purposes:

> (1) the economy and efficiency of administration;
> (2) whether another forum is available to protect the interests of both parties or
> there is already a pending proceeding in state court;
> (3) whether federal proceedings are necessary to reach a just and equitable solution;
> (4) whether there is an alternative means of achieving an equitable distribution of
> assets;
> (5) whether the debtor and the creditors are able to work out a less expensive out-
> of-court arrangement which better serves all interests in the case;
> (6) whether a non-federal insolvency has proceeded so far in those proceedings that
> it would be costly and time consuming to start afresh with the federal bankruptcy
> process; and
> (7) the purpose for which bankruptcy jurisdiction has been sought.[118]

While all factors are considered, not all are given equal weight in every case and the court should

not conduct a strict balancing.[119]

> i.   *Factor 1: The Economy and Efficiency of Administration.*

---

[116] *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008).

[117] *In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001).

[118] *Monitor Single Lift I, Ltd.*, 381 B.R. at 464-65 (citing to *In re Paper I Partners, L.P.*, 283 B.R. 661, 679
(Bankr. S.D.N.Y. 2002)); *see also Smith*, 415 B.R. at 239; *AMC Investors, LLC*, 406 B.R. at 488; *In re Euro-
American Lodging Corp.*, 357 B.R. 700, 729 (Bankr. S.D.N.Y. 2007); *but see Spade*, 258 B.R. at 231-32 (Bankr. D.
Colo. 2001) (applied a four criteria test in evaluating section 305 abstention which included:  (1) the motivation of
the parties who sought bankruptcy jurisdiction; (2) whether another forum was available to protect the interests of
both parties or there was already a pending proceeding in state court; (3) the economy and efficiency of
administration; and (4) the prejudice to the parties).  The Alleged Debtors cite to the case of *In re Murray*, 543 B.R.
484 (Bankr. S.D.N.Y. 2016), in particular, as support for why this court should abstain under section 305(a) of the
Bankruptcy Code and dismiss the Involuntary Petitions.  However, in *Murray*, Judge Gerber was analyzing
dismissal of an involuntary proceeding pursuant to section 707 of the Bankruptcy Code, more specifically for
"cause," and not based upon abstention under section 305(a) of the Bankruptcy Code.  Thus, the court is not
convinced *Murray* is relevant to this court's section 305 abstention analysis.

[119] *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (citing *Monitor Single Lift*, 381 B.R. at
464).

**App. 258**
APP.3333

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 256 of 511   PageID 16037
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 156 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18    Entered 04/13/18 16:34:53    Page 47 of 53

The economy and efficiency of administering a case in the bankruptcy court is routinely evaluated in considering abstention under section 305 of the Bankruptcy Code.  Here, the evidence suggests that the most economical and efficient forum for these parties to resolve their disputes is the bankruptcy court.  The court heard ample evidence that the Alleged Debtors are already, essentially, in the process of being liquidated by Highland.  This is not a situation where an ably-functioning, going-concern business is being foisted in disruptive fashion into a bankruptcy.[120]  Because of the fact that the Alleged Debtors are already in the process of being liquidated, the bankruptcy court (and not a state court) is the most efficient and economical forum to complete this liquidation and distribute whatever assets remain to creditors in accordance with the distribution scheme set forth in the Bankruptcy Code and with the oversight of a neutral third-party trustee.  Thus, with the bankruptcy court being the more economic and efficient forum for administering this case, this factor goes against abstention.

        ii.       *Factors 2, 3, 4, 5, and 6: Whether Another Forum is Available to Protect the Interests of Both Parties or There is Already a Pending Proceeding in State Court; Whether Federal Proceedings are Necessary to Reach a Just and Equitable Solution; Whether There is an Alternative Means of Achieving an Equitable Distribution of Assets; Whether the Debtor and the Creditors are Able to Work Out a Less Expensive Out-of-Court Arrangement Which Better Serves All Interests in the Case; and Whether a Non-Federal Insolvency Has Proceeded so Far in Those Proceedings That it Would Be Costly and Time Consuming to Start Afresh With the Federal Bankruptcy Process.*

---

[120] *See, e.g., In re The Ceiling Fan Distrib., Inc.*, 37 B.R. 701 (Bankr. M.D. La. 1983) (noting that while the dissection of a living business may not properly be the business of a bankruptcy court, the division of a "carcass" and the reclamation of pre-petition gouging may well be); *In re Bos*, 561 B.R. 868, 898-99 (Bankr. N.D. Fla. 2016) (citing as one of the reasons to abstain under section 305 of the Bankruptcy Code the fact that entities and subsidiaries under the alleged debtor's umbrella were still operating successful businesses and had employed more than 500 people); *but see Remex Elecs. Ltd. v. Axl Indus., Inc. (In re Axl Indus., Inc.)*, 127 B.R. 482, 484-86 (S.D. Fla. 1991) (in affirming the bankruptcy court's decision to dismiss an involuntary bankruptcy case, the district court also found that "the interests of a defunct business enterprise would be little affected by the pendency of a bankruptcy proceeding," which the district court believed favored abstention).

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 257 of 511   PageID 16038
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 157 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 48 of 53

The court believes that factors 2-6 should be grouped together for purposes of its abstention analysis, since all of these factors specifically touch on the availability of an alternative forum to achieve an *equitable* distribution.[121]  By way of example, where bringing a case into the bankruptcy court would simply add an additional layer of expense to the resolution of a two-party dispute and another forum already provides a suitable place to resolve the dispute, some courts have found that abstention is the more appropriate choice since keeping the case would transform the bankruptcy process into a collection device.[122]  Here, the Alleged Debtors have repeatedly argued that, because there is already pending state court litigation involving Mr. Terry, Highland, and the Alleged Debtors, these cases should be dismissed and the parties should go back to state court to resolve their issues.  The court does not agree for several reasons.

First, it is worth noting that this court has already heard multiple days of evidence in this case (including almost five days just for the Trial) and would certainly not be "starting afresh" by any means if things go forward in the bankruptcy court.  Additionally, while the Alleged Debtors have argued that a significant amount of attorney's fees have already been spent litigating this case in state court (which they believe supports abstention), the court surmises that these fees have not been wasted dollars, as the money expended by the parties developed discovery of facts that could assist a bankruptcy trustee in pursuing avoidance actions that may be viable and might lead to value that could pay creditors' claims.[123]

---

[121] *See, e.g., In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 460-70 (Bankr. S.D.N.Y. 2008).

[122] *AMC Investors, LLC*, 406 B.R. at 488; *see also Axl Indus., Inc.*, 127 B.R. at 484-86.

[123] *See, e.g., The Ceiling Fan Distributor, Inc.*, 37 B.R. at 703 (the court noted that, despite there being significant legal expenses in the state court, such expenses were not wasted since the legal work done to date would be quite helpful to a trustee).

**App. 260**
APP.3335

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 258 of 511   PageID 16039
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 158 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53    Page 49 of 53

Second, this court heard considerable evidence involving potentially voidable transfers that may have occurred involving the Alleged Debtors and Highland/Highland-affiliates and, while the state court certainly provides a forum for eventually bringing fraudulent transfer claims, the court also heard evidence that none of these claims have actually been brought in the state court.[124]  Moreover, to the extent fraudulent transfer claims were to be pursued in state court and were successful, the state court would still need the ability to reach the assets of alleged fraudulent transfer recipients (which, in this situation, include certain Highland-affiliates located in the Cayman Islands).  The bankruptcy court has concerns whether a state court process could efficiently accomplish this task.[125]  Similarly, it is worth noting that, while a request for a receiver was filed in the state court by Mr. Terry, such request had not yet been heard and decided by the state court.  Thus, at the present time, it does not appear that there is an alternative forum to address the pertinent issues in this case, without the necessity of significant, additional steps being taken by the parties in the state court.

Third, this court believes that a federal bankruptcy proceeding is necessary in order to achieve an equitable result in this case.  Specifically, the court heard evidence from the Alleged Debtors that, if this court chose to abstain and dismiss the Involuntary Petitions, the Alleged Debtors would ultimately pay all of their creditors in full, except for Mr. Terry.  This clearly demonstrates how keeping the case in the bankruptcy court is necessary to allow an equitable

---

[124] *See, e.g., In re Texas EMC Mgmt., LLC,* Nos. 11-40008 & 11-40017, 2012 WL 627844, at *3 (Bankr. S.D. Tex. 2012) (noting that one of the reasons abstention was proper under section 305 of the Bankruptcy Code was because the issues to be litigated amongst the parties were already joined in the state court litigation); *Spade,* 258 B.R. at 236 (court held that one of the reasons abstention was warranted under section 305 of the Bankruptcy Code was because the petitioning creditors had already filed and had pending a "collection case" in the state court).

[125] *See, e.g., Smith,* 415 B.R. at 239 (the bankruptcy court held that there "are remedies under the Bankruptcy Code that are not available to Rhodes under state law, due to Mr. Smith's transfer of the majority of his assets to the Cook Island Trust," and "federal proceedings may be necessary to reach a just and equitable solution").

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 259 of 511   PageID 16040
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 159 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 50 of 53

distribution to **all creditors**, including Mr. Terry.  Additionally, a federal bankruptcy court has

certain tools available to it that are not available to a state court such as the ability to invalidate

potential *ipso facto* clauses in contracts pursuant to section 365 of the Bankruptcy Code, sell

assets free and clear of liens, claims and encumbrances pursuant to section 363 of the

Bankruptcy Code, and impose the automatic stay pursuant to section 362 of the Bankruptcy

Code.  These are all useful tools available to the Alleged Debtors in a bankruptcy case that would

be lost if this court were to ultimately abstain.

      Finally, there was more than enough evidence showing the acrimonious and bitter

relationship that exists between Mr. Terry and Mr. Dondero.  Thus, the availability of an out-of-

court arrangement being obtained in this case is, in this court's mind, slim to none.

      In summation, the court finds that all of the factors above support this case staying with

the bankruptcy court.

          *iii.*    *Factor 7: The Purpose for Which Bankruptcy Jurisdiction Has Been Sought.*

      The Alleged Debtors have repeatedly argued that Mr. Terry filed this case in bad faith

and as a litigation tactic to gain some sort of advantage in the state court proceedings.  The court

has already found above that these cases were not filed in bad faith and that Mr. Terry has met

the necessary statutory requirements of section 303 of the Bankruptcy Code.  Moreover, it is

worth noting that at least one court has stated that the filing of an involuntary bankruptcy petition

is always a "litigation tactic," but whether the filing is inappropriate for abstention purposes is a

fact-dependent determination.[126]  Here, the facts show that there was no inappropriateness

---

[126] *In re Marciano*, 459 B.R. 27, 50 (B.A.P. 9th Cir. 2011) (noting that while the filing of the involuntary bankruptcy was a litigation tactic, the bankruptcy court did not abuse its discretion in denying the alleged debtor's motion to dismiss based upon the bankruptcy court's primary concern that the issue of equality of distribution would not effectively be dealt with in another forum).

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 260 of 511   PageID 16041
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 160 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18    Entered 04/13/18 16:34:53    Page 51 of 53

behind Mr. Terry's decision to file the Involuntary Petitions. Specifically, Mr. Terry repeatedly and credibly testified that the purpose for filing the Involuntary Petitions was to ensure that creditors (including him) were treated fairly and received an equal distribution from the Alleged Debtors' assets, not to gain some sort of advantage in the state court. This testimony was absolutely consistent with additional evidence showing that, since the entry of the arbitration award, there has been a calculated effort (largely by Highland) to effectively liquidate the Alleged Debtors. Unlike the bankruptcy court in *In re Selectron Mgmt. Corp.*,[127] which had no evidence or "smoking gun" showing that steps were being taken by the alleged debtor to evade payment on the petitioning creditor's judgment, thereby necessitating abstention, this court has heard ample evidence showing that the Alleged Debtors, with the aid of Highland, were transferring assets away from the Alleged Debtors, so that Mr. Terry would have nowhere to look at the end of the day.

In light of the court's analysis of all the seven factors above, the Alleged Debtors have not credibly shown how both the Alleged Debtors and the creditors are better served outside of bankruptcy. If this matter were to remain outside of bankruptcy, there seems to be a legitimate prospect that the Alleged Debtors and Highland will continue dismantling the Alleged Debtors, to the detriment of Acis LP creditors. Abstention would fly in the face of fundamental fairness and the principles underlying the Bankruptcy Code.

Beyond just addressing the factors above, the Alleged Debtors have also argued that, if this court were to not abstain under section 305 of the Bankruptcy Code, there would be

---

[127] *In re Selectron Mgmt. Corp.*, No. 10-75320-DTE, 2010 WL 3811863, at *6-7 (Bankr. E.D.N.Y. Sept. 27, 2010); *see also In re White Nile Software, Inc.*, No. 08–33325–SGJ–11, 2008 WL 5213393, at *4 (Bankr. N.D. Tex. Sept. 16, 2008) (finding that where the filing of a voluntary chapter 11 did not appear to be about insuring a distribution to creditors or winding down or giving a soft landing to a business or avoiding dismantling and dissipation of valuable assets or preserving avoidance actions, but rather was about changing the forum of ongoing litigation between the parties, abstention under section 305 was proper).

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 261 of 511   PageID 16042
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 161 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18    Entered 04/13/18 16:34:53    Page 52 of 53

significant harm to the "equity" of the Alleged Debtors.  Specifically, the Alleged Debtors have

argued that, if this court were to enter orders for relief, the equity would be forced to "call" and

ultimately liquidate CLO 2014-3 (and perhaps all of the CLOs Acis LP manages), resulting in

substantial losses to the equity on their investments.  First, to be clear, the current equity of the

Alleged Debtors is being held by a Highland-affiliate called Neutra, Ltd., which actually only

became the equity of the Alleged Debtors on December 19, 2017.  But this is not the "equity"

being referred to by the Alleged Debtors in its argument.  Rather, the so-called "equity," about

which the Alleged Debtors seemed so concerned, is actually *certain parties that own the equity*

*of the entity that owns the equity in the CLOs*—which includes (a) an unnamed third-party

investor out of Boston (49%),[128] (b) a charitable foundation managed by a Highland-affiliate

(49%), and (c) Highland employees (2%).  However, abstention under section 305 of the

Bankruptcy Code does not require this court to look at what is in the best interests of these third-

parties (who are not current creditors or interest holders of the Alleged Debtors), but rather what

is in the best interests of the Alleged Debtors and the creditors.  Accordingly, the Alleged

Debtors' effort to argue potential harm to these parties is misplaced for purposes of evaluating

abstention under section 305 of the Bankruptcy Code, and, if anything, further highlights who

the Alleged Debtors are really out to protect—Highland and Highland-affiliates.  Moreover, the

court would note that, even if there were to be a "call" and liquidation of CLO 2014-3, thereby

ending the Alleged Debtors' right to receive future management fees, there would still be

potential assets for a chapter 7 trustee to administer such as chapter 5 causes of action (which

include fraudulent transfers) as well as the Alleged Debtors' contingent claim for approximately

---

[128] Notably, this entity never appeared at the Trial or filed papers stating that it would be harmed by entry
of orders for relief in these cases.

**App. 264**
APP.3339

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 262 of 511   PageID 16043
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 162 of 403
Case 18-30264-sgj7 Doc 118 Filed 04/13/18   Entered 04/13/18 16:34:53   Page 53 of 53

$3 million in expense reimbursement owing by Highland CLO Management Ltd., as part of the November 3, 2017 transfer of the Acis LP Note Receivable from Highland.  Thus, even if the so-called doomsday scenario of an equity call on CLO 2014-3 (or other CLOs) were to happen, there is still a potential benefit to creditors if this court chooses not to abstain.

**III.**     **CONCLUSION**

In conclusion, these involuntary proceedings were appropriately filed under section 303, and orders for relief will be issued forthwith.   This court declines to exercise its discretion to abstain, because a chapter 7 trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP, as discussed above.  A chapter 7 trustee appears necessary to resolve the inherent conflicts of interest between the Alleged Debtors and Highland.  A chapter 7 trustee will have tools available to preserve value that a state court receiver will not have.  The bankruptcy court is single handedly the most efficient place to administer property of the estate for creditors.  This is not just a two party dispute between Mr. Terry and the Alleged Debtors, and even if it were, dismissal or abstention is clearly not warranted.

**###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###**

**App. 265**
APP.3340

# EXHIBIT N

Fill in this information to identify the case:

Debtor name    **Acis Capital Management GP, LLC**

United States Bankruptcy Court for the:   NORTHERN DISTRICT OF TEXAS

Case number (if known)   **18-30265**

☐ Check if this is an amended filing

## Official Form 207
## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy                04/16

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

### Part 1:   Income

1. **Gross revenue from business**

   ■ None.

   | Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | Sources of revenue Check all that apply | Gross revenue (before deductions and exclusions) |
   |---|---|---|

2. **Non-business revenue**
   Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

   ■ None.

   | | Description of sources of revenue | Gross revenue from each source (before deductions and exclusions) |
   |---|---|---|

### Part 2:   List Certain Transfers Made Before Filing for Bankruptcy

3. **Certain payments or transfers to creditors within 90 days before filing this case**
   List payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

   ■ None.

   | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer Check all that apply |
   |---|---|---|---|

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**
   List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

   ■ None.

   | Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
   |---|---|---|---|

5. **Repossessions, foreclosures, and returns**
   List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Case 3:21-cv-00879-K    Document 204 Page 165 of 403    Page 265 of 511    PageID 16046

Case 18-30265-sgj11 Doc 152 Filed 04/30/18    Entered 04/30/18 16:59:25    Page 2 of 8

Debtor    Acis Capital Management GP, LLC          Case number *(if known)*   18-30265

■ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

■ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

**Part 3:**   **Legal Actions or Assignments**

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None.

| | Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | Joshua N. Terry v. Acis Capital Management, L.P. and Acis Capital Management GP, LLC<br>DC-17-15244 | Petition to confirm arbitration award | 44th District Court<br>Hon. Bonnie Lee Goldstein, Presiding<br>George L. Allen, Sr. Courts Building<br>600 Commerce Street, 5th Floor New Tower<br>Dallas, TX 75202 | ☐ Pending<br>■ On appeal<br>☐ Concluded |
| 7.2. | Joshua N. Terry v. Highland Capital Management, L.P., Acis Capital Management, L.P., Acis Capital Management GP, LLC, James Dondero, as trustee of The Dugaboy Investment Trust, and Mark K. Okada<br>JAMS Arbitration No. 1310022713 | Wrongful termination, breach of contract, conversion, fraud, breach of fiduciary duty | JAMS<br>8401 N. Central Expressway, Suite 610<br>Dallas, TX 75202 | ☐ Pending<br>☐ On appeal<br>■ Concluded |

**8. Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

■ None

**Part 4:**   **Certain Gifts and Charitable Contributions**

**9.** List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000

■ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|

**Part 5:**   **Certain Losses**

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 166 of 403

Case 18-30265-sgj11 Doc 152 Filed 04/30/18    Entered 04/30/18 16:59:25    Page 3 of 8

Debtor    Acis Capital Management GP, LLC _____    Case number (if known)  18-30265

☐ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss | Dates of loss | Value of property lost |
|---|---|---|---|
| | If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received. | | |
| | List unpaid claims on Official Form 106A/B (Schedule A/B: Assets – Real and Personal Property). | | |

**Part 6:    Certain Payments or Transfers**

**11. Payments related to bankruptcy**
List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None.

| Who was paid or who received the transfer? Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|

**12. Self-settled trusts of which the debtor is a beneficiary**
List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

☐ None.

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|

**13. Transfers not already listed on this statement**
List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☐ None.

| Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|

**Part 7:    Previous Locations**

**14. Previous addresses**
List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☐ Does not apply

| Address | Dates of occupancy From-To |
|---|---|

**Part 8:    Health Care Bankruptcies**

**15. Health Care bankruptcies**
Is the debtor primarily engaged in offering services and facilities for:
- diagnosing or treating injury, deformity, or disease, or
- providing any surgical, psychiatric, drug treatment, or obstetric care?

☐ No. Go to Part 9.
☐ Yes. Fill in the information below.

Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Case 3:21-cv-00879-K   Document 20-4   Page 167 of 403   Page 267 of 511   PageID 16048
Appendix Volume 204 Page 167

Case 18-30265-sgj11 Doc 152 Filed 04/30/18   Entered 04/30/18 16:59:25   Page 4 of 8

Debtor   **Acis Capital Management GP, LLC**                              Case number *(if known)*  **18-30265**

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|

---

**Part 9:   Personally Identifiable Information**

**16. Does the debtor collect and retain personally identifiable information of customers?**

- ■ No.
- ☐ Yes. State the nature of the information collected and retained.

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

- ■ No. Go to Part 10.
- ☐ Yes. Does the debtor serve as plan administrator?

---

**Part 10:   Certain Financial Accounts, Safe Deposit Boxes, and Storage Units**

**18. Closed financial accounts**
Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

■ None

| Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

**19. Safe deposit boxes**
List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

■ None

| Depository institution name and address | Names of anyone with access to it Address | Description of the contents | Do you still have it? |
|---|---|---|---|

**20. Off-premises storage**
List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

■ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Do you still have it? |
|---|---|---|---|

---

**Part 11:   Property the Debtor Holds or Controls That the Debtor Does Not Own**

**21. Property held for another**
List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

■ None

---

**Part 12:   Details About Environment Information**

For the purpose of Part 12, the following definitions apply:
   *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

Official Form 207                       Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy                       page 4

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                                 Best Case Bankruptcy

| Debtor | Acis Capital Management GP, LLC | Case number (if known) | 18-30265 |
|---|---|---|---|

*Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

*Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

Report all notices, releases, and proceedings known, regardless of when they occurred.

22. **Has the debtor been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.**

   ■ No.
   ☐ Yes. Provide details below.

| Case title Case number | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|

23. **Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

   ■ No.
   ☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

24. **Has the debtor notified any governmental unit of any release of hazardous material?**

   ■ No.
   ☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

| **Part 13:** | **Details About the Debtor's Business or Connections to Any Business** |
|---|---|

25. **Other businesses in which the debtor has or has had an interest**
List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

   ☐ None

| Business name address | Describe the nature of the business | Employer identification number Do not include Social Security number or ITIN. |
|---|---|---|
| 25.1. Acis Capital Management, L.P. 300 Crescent Ct., Ste 700 Dallas, TX 75201 | Registered Investment Adviser | Dates business existed EIN: 27-2756329 From-To 5/27/2010 - Present |

26. **Books, records, and financial statements**
26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.
   ☐ None

| Name and address | Date of service From-To |
|---|---|
| 26a.1. Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 1/1/2011 - current |

Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Case 3:21-cv-00879-K    Document 204    Page 269 of 511    PageID 16050
Appendix Volume    Page 169 of 409

Case 18-30265-sgj11 Doc 152 Filed 04/30/18    Entered 04/30/18 16:59:25    Page 6 of 8

Debtor  **Acis Capital Management GP, LLC** _____    Case number (if known) **18-30265**

| Name and address | Date of service From-To |
|---|---|
| 26a.2.    **James Dondero**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | **1/1/2011 - current** |
| 26a.3.    **Frank Waterhouse**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | **1/20/2012 - current** |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

■ None

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

■ None

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

■ None

Name and address

**27. Inventories**
Have any inventories of the debtor's property been taken within 2 years before filing this case?

■ No
☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|

**28.** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Neutra, Ltd. | PO Box 309<br>Ugland House<br>Grand Cayman KY1-1104, Cayman Islands | Sole Member | 100 |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| James Dondero | 300 Crescent Ct., Ste 700<br>Dallas, TX 75201 | President | N/A |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Frank Waterhouse | 300 Crescent Ct., Ste 700<br>Dallas, TX 75201 | Treasurer | N/A |

**29.** Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?

**App. 272**

APP.3347

| Debtor | Acis Capital Management GP, LLC | | Case number (if known) 18-30265 |
|---|---|---|---|

☐ No
■ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| James Dondero | 300 Crescent Ct., Ste 700 Dallas, TX 75201 | Sole Member | 10/14/2015 - 12/19/2017 |

**30. Payments, distributions, or withdrawals credited or given to insiders**
Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

■ No
☐ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|

**31. Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☐ No
■ Yes. Identify below.

| Name of the parent corporation | | Employer Identification number of the parent corporation | |
|---|---|---|---|
| Immediately Prior to 12/19/2017 Federal: The Dugaboy Investment Trust | | EIN: | N/A |
| Immediately Prior to 12/19/2017 State (TX): Highland Capital Management, L.P.* | | EIN: | 75-2716725 |
| From 12/19/2017 Forward Federal: Neutra, Ltd. | | EIN: | 98-1090422 |
| From 12/19/2017 Forward State (TX): Highland Capital Management, L.P.* | | EIN: | 75-2716725 |

**32. Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

■ No
☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the parent corporation |
|---|---|

Note to question 31:

*Highland Capital Management, L.P. is not technically the parent of the Acis entities shown. However, the combined TX Franchise report for the entire group is filed under the name of Highland Capital Management, L.P.

Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Case 3:21-cv-00879-K   Document 204   Appendix-Volume 2 Page 171 of 403   Page 271 of 511   PageID 16052

Case 18-30265-sgj11 Doc 152 Filed 04/30/18   Entered 04/30/18 16:59:25   Page 8 of 8

Debtor   __Acis Capital Management GP, LLC_____   Case number (if known) __18-30265__

**Part 14:   Signature and Declaration**

> **WARNING --** Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    __April 30, 2018__

_____    __I saac Leventon__
Signature of individual signing on behalf of the debtor          Printed name

Position or relationship to debtor   __Authorized Signatory__

Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?
■ No
☐ Yes

# EXHIBIT O

| Fill in this information to identify the case: | |
|---|---|
| Debtor name    **Acis Capital Management, L.P.** | |
| United States Bankruptcy Court for the:    NORTHERN DISTRICT OF TEXAS | |
| Case number (if known)    18-30264 | ☐ Check if this is an amended filing |

## Official Form 207
## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy    04/16

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

**Part 1:    Income**

**1.  Gross revenue from business**

☐ None.

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | Sources of revenue Check all that apply | Gross revenue (before deductions and exclusions) |
|---|---|---|
| **From the beginning of the fiscal year to filing date:** From  1/01/2018 to Filing Date | ☑ Operating a business ☐ Other _____ | $1,057,615.91 |
| **For prior year:** From  1/01/2017 to 12/31/2017 | ☑ Operating a business ☐ Other _____ | $13,542,943.20 |
| **For year before that:** From  1/01/2016 to 12/31/2016 | ☑ Operating a business ☐ Other _____ | $14,473,422.41 |

**2.  Non-business revenue**

Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

☐ None.

| | Description of sources of revenue | Gross revenue from each source (before deductions and exclusions) |
|---|---|---|
| **From the beginning of the fiscal year to filing date:** From  1/01/2018 to Filing Date | Interest, external legal and admin support | $70,673.08 |
| **For prior year:** From  1/01/2017 to 12/31/2017 | Interest, external legal and admin support | $748,474.74 |
| **For year before that:** From  1/01/2016 to 12/31/2016 | Interest | $102,738.89 |

**Part 2:    List Certain Transfers Made Before Filing for Bankruptcy**

| Official Form 207 | Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy | page 1 |
|---|---|---|
| Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com | | Best Case Bankruptcy |

Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Case 3:21-cv-00879-K   Document 204 Page 174 Appendix Volume Page 274 of 511   PageID 16055

Case 18-30264-sgj11 Doc 165 Filed 04/30/18   Entered 04/30/18 17:14:18   Page 2 of 13

Debtor   Acis Capital Management, L.P.                              Case number (if known)  18-30264

3. **Certain payments or transfers to creditors within 90 days before filing this case**
List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None.

| | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>Check all that apply |
|---|---|---|---|---|
| 3.1. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75208 | 11/2/2017 | $234,013.63 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other__ |
| 3.2. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75208 | 11/3/2017 | $941,958.57 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other__ |
| 3.3. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75208 | 12/8/2017 | $89,655.14 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other__ |
| 3.4. | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545 | 11/15/2017 | $2,068.13 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other__ |
| 3.5. | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545 | 11/30/2017 | $24,266.71 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other__ |
| 3.6. | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545 | 12/12/2017 | $1,718.79 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other__ |
| 3.7. | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545 | 12/29/2017 | $25,000.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other__ |

**App. 277**

APP.3352

Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 175 of 403

Case 18-30264-sgj11 Doc 165 Filed 04/30/18   Entered 04/30/18 17:14:18   Page 3 of 13

| Debtor | Acis Capital Management, L.P. | | Case number (if known) | 18-30264 |
|---|---|---|---|---|

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>Check all that apply |
|---|---|---|---|
| 3.8. FINRA<br>1735 K Street, NW<br>Washington, DC 20006 | 11/22/2017 | $70.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>■ Suppliers or vendors<br>☐ Services<br>☐ Other___ |
| 3.9. Highland CLO Management, Ltd.<br>PO Box 309, Ugland House<br>Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**
List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. Insiders include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None.

| Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.1. Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/1/2017 | $976,688.47 | Contractual payment |
| 4.2. Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/1/2017 | $1,096,033.37 | Services |
| 4.3. Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/2/2017 | $3,574.80 | Expense reimbursement |
| 4.4. Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/14/2017 | $67.44 | Expense reimbursement |
| 4.5. Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 4/17/2017 | $315,574.30 | Services |
| 4.6. Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 4/18/2017 | $438,497.51 | Services |
| 4.7. Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 4/18/2017 | $375,855.01 | Contractual payment |

Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Case 3:21-cv-00879-K   Document 4-204 Filed 03/23/76 Page 276 of 511   PageID 16057
Appendix Volume Page 376 of 403

Case 18-30264-sgj11 Doc 165 Filed 04/30/18   Entered 04/30/18 17:14:18   Page 4 of 13

Debtor __Acis Capital Management, L.P._____   Case number (if known) _18-30264_____

| | Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.8. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 4/19/2017 | $330,249.69 | Services |
| 4.9. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/1/2017 | $974,426.41 | Services |
| 4.10 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/1/2017 | $974,426.41 | Contractual Payment |
| 4.11 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments incl interest |
| 4.12 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/31/2017 | $581,036.15 | Services |
| 4.13 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 7/18/2017 | $373,167.08 | Contractual payment |
| 4.14 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 8/1/2017 | $971,603.02 | Contractual payment |
| 4.15 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 8/7/2017 | $1,339,422.12 | Services |
| 4.16 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 8/16/2017 | $53.41 | Expense reimbursement |
| 4.17 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/18/2017 | $372,872.82 | Contractual payment |
| 4.18 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/18/2017 | $728,702.26 | Services |
| 4.19 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |

Debtor   Acis Capital Management, L.P.                                        Case number (if known) 18-30264

| Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.20   Highland Capital Management, L.P.<br>·        300 Crescent Court<br>        Suite 700<br>        Dallas, TX 75201 | 10/25/2017 | $46,648.82 | Expense reimbursement |
| 4.21   Highland Capital Management, L.P.<br>·        300 Crescent Court<br>        Suite 700<br>        Dallas, TX 75201 | 10/25/2017 | $67,966.85 | Expense reimbursement |
| 4.22   Highland Capital Management, L.P.<br>·        300 Crescent Court<br>        Suite 700<br>        Dallas, TX 75201 | 11/1/2017 | $967,223.91 | Contractual payment |

5. **Repossessions, foreclosures, and returns**
List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

■ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

6. **Setoffs**
List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

■ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

**Part 3:** Legal Actions or Assignments

7. **Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**
List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None.

| Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| 7.1.   Joshua N. Terry v. Acis<br>        Capital Management, L.P. and<br>        Acis Capital Management GP,<br>        LLC<br>        DC-17-15244 | Petition to confirm<br>arbitration award | 44th District Court<br>Hon. Bonnie Lee Goldstein,<br>Presiding<br>George L. Allen, Sr. Courts<br>Building<br>600 Commerce Street, 5th<br>Floor New Tower<br>Dallas, TX 75202 | ☐ Pending<br>■ On appeal<br>☐ Concluded |

Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Case 3:21-cv-00879-K   Document 13-4   Filed 02/23/23   Page 278 of 511   PageID 16059
Appendix - Volume 2 Page 178 of 403

Case 18-30264-sgj11 Doc 165 Filed 04/30/18   Entered 04/30/18 17:14:18   Page 6 of 13

Debtor   Acis Capital Management, L.P.                                  Case number *(if known)* 18-30264

| | Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.2. | Joshua N. Terry v. Highland Capital Management, L.P., Acis Capital Management, L.P., Acis Capital Management GP, LLC, James Dondero, as trustee of The Dugaboy Investment Trust, and Mark K. Okada<br>JAMS Arbitration No. 1310022713 | Wrongful termination, breach of contract, conversion, fraud, breach of fiduciary duty | JAMS<br>8401 N. Central Expressway, Suite 610<br>Dallas, TX 75225 | ☐ Pending<br>☐ On appeal<br>■ Concluded |

**8. Assignments and receivership**
List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

■ None

---

**Part 4:   Certain Gifts and Charitable Contributions**

9. List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000

■ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|

**Part 5:   Certain Losses**

10. All losses from fire, theft, or other casualty within 1 year before filing this case.

■ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss<br><br>If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received.<br><br>List unpaid claims on Official Form 106A/B *(Schedule A/B: Assets – Real and Personal Property)*. | Dates of loss | Value of property lost |
|---|---|---|---|

**Part 6:   Certain Payments or Transfers**

11. Payments related to bankruptcy
List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

■ None.

| Who was paid or who received the transfer?<br>Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|

12. Self-settled trusts of which the debtor is a beneficiary
List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

■ None.

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|

Official Form 207              Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy                page 6

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                      Best Case Bankruptcy

**App. 281**

| Debtor | Acis Capital Management, L.P. | Case number (if known) 18-30264 |
|---|---|---|

**13. Transfers not already listed on this statement**
List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

■ None.

| Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|

**Part 7:    Previous Locations**

**14. Previous addresses**
List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

■ Does not apply

| Address | Dates of occupancy From-To |
|---|---|

**Part 8:    Health Care Bankruptcies**

**15. Health Care bankruptcies**
Is the debtor primarily engaged in offering services and facilities for:
- diagnosing or treating injury, deformity, or disease, or
- providing any surgical, psychiatric, drug treatment, or obstetric care?

■ No. Go to Part 9.
☐ Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|

**Part 9:    Personally Identifiable Information**

**16. Does the debtor collect and retain personally identifiable information of customers?**

☐ No.
■ Yes. State the nature of the information collected and retained.

The borrowing base of the CLOs is determined at the time of issuance. Because the securities trade in the 144a markets, the debtor is unable to determine the current holders of such securities once the securities are traded in the secondary market. However, some of the debtor's affiliates hold equity positions in the CLOs and therefore, the debtor is privy to the affiliates' information.

Does the debtor have a privacy policy about that information?
☐ No
■ Yes

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

■ No. Go to Part 10.
☐ Yes. Does the debtor serve as plan administrator?

**Part 10:    Certain Financial Accounts, Safe Deposit Boxes, and Storage Units**

**18. Closed financial accounts**
Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses,

Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Case 3:21-cv-00879-K    Document 204-1    Filed 03/23/23    Page 280 of 511    PageID 16061
Appendix - Volume 1    Page 180 of 403

Case 18-30264-sgj11 Doc 165 Filed 04/30/18    Entered 04/30/18 17:14:18    Page 8 of 13

Debtor __Acis Capital Management, L.P._____    Case number *(if known)* __18-30264__

cooperatives, associations, and other financial institutions.

☐ None

| Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|
| 18.1. Jefferies LLC 520 Madison Avenue New York, NY 10022 | XXXX-0897 | ☐ Checking ☐ Savings ☐ Money Market ☒ Brokerage ☐ Other__ | 7/2017 | $0.00 |

**19. Safe deposit boxes**
List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☐ None

| Depository institution name and address | Names of anyone with access to it Address | Description of the contents | Do you still have it? |
|---|---|---|---|
| Jefferies LLC 520 Madison Avenue New York, NY 10022 | Highland Accounting 300 Crescent Court, Ste 700 Dallas, TX 75201 | No physical assets held at the time of closing | ☒ No ☐ Yes |

**20. Off-premises storage**
List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☒ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Do you still have it? |
|---|---|---|---|

**Part 11:    Property the Debtor Holds or Controls That the Debtor Does Not Own**

**21. Property held for another**
List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☐ None

| Owner's name and address | Location of the property | Describe the property | Value |
|---|---|---|---|
| Acis CLO 2013-1, Ltd. Clifton House 75 Fort Street, P.O. Box 1350 Grand Cayman, KY1-1108, Cayman Islands | n/a - contract | Management agreement | $0.00 |

| Owner's name and address | Location of the property | Describe the property | Value |
|---|---|---|---|
| Acis CLO 2014-3, Ltd. PO Box 1093 Boundary Hall, Cricket Square Grand Cayman, KY1-1102, Cayman Islands | n/a - contract | Management agreement | $0.00 |

Debtor   Acis Capital Management, L.P.                     Case number (if known)  18-30264

| Owner's name and address | Location of the property | Describe the property | Value |
|---|---|---|---|
| Acis CLO 2014-4, Ltd.<br>PO Box 1093<br>Boundary Hall, Cricket Square<br>Grand Cayman, KY1-1102, Cayman Islands | n/a - contract | Management agreement | $0.00 |
| Acis CLO 2014-5, Ltd.<br>PO Box 1093<br>Boundary Hall, Cricket Square<br>Grand Cayman, KY1-1102, Cayman Islands | n/a - contract | Management agreement | $0.00 |
| Acis CLO 2015-6, Ltd.<br>PO Box 1093<br>Boundary Hall, Cricket Square<br>Grand Cayman, KY1-1102, Cayman Islands | n/a - contract | Management agreement | $0.00 |
| BayVK R2 Lux S.A.<br>15, rue de Flaxweile<br>L-6776 Grevenmacher, Luxembourg | n/a - contract | Management agreement | $0.00 |
| Hewett's Island CLO I-R, Ltd.<br>PO Box 1093GT, Queensgate House<br>South Church St., George Town<br>Grand Cayman, KY1-1102, Cayman Islands | n/a - contract | Management agreement | $0.00 |

**Part 12:   Details About Environment Information**

For the purpose of Part 12, the following definitions apply:
*Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

*Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

*Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

22.  Has the debtor been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.

■ No.
☐ Yes. Provide details below.

| Case title<br>Case number | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|

23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Case 3:21-cv-00879-K    Document 14-204 Page 182 of 403 282 of 511    PageID 16063
Appendix Volume

Case 18-30264-sgj11 Doc 165 Filed 04/30/18    Entered 04/30/18 17:14:18    Page 10 of 13

| Debtor | Acis Capital Management, L.P. | | Case number *(if known)* 18-30264 |
|---|---|---|---|

24. Has the debtor notified any governmental unit of any release of hazardous material?

☑ No.

☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

**Part 13:** Details About the Debtor's Business or Connections to Any Business

25. Other businesses in which the debtor has or has had an interest
List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☐ None

| Business name address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN.<br>Dates business existed |
|---|---|---|
| 25.1. Acis CLO Value Fund II GP, LLC<br>300 Crescent Ct., Ste 700<br>Dallas, TX 75201 | General Partner of an investment fund | EIN: 90-0786733<br>From-To 7/2010 - Present |
| 25.2. Acis CLO Value Fund II Incentive Holding<br>300 Crescent Ct., Ste 700<br>Dallas, TX 75201 | Incentive holding | EIN: N/A<br>From-To 1/2013 - Present |
| 25.3. Acis CLO Value Master Fund II, L.P.<br>300 Crescent Ct., Ste 700<br>Dallas, TX 75201 | Investment fund | EIN: 98-1077730<br>From-To 7/2010 - Present |
| 25.4. Highland CLO Funding, Ltd.<br>c/o Highland HDF Advisor Ltd.<br>300 Crescent Ct., Ste 700<br>Dallas, TX 75201 | Private equity fund | EIN: N/A<br>From-To 1/9/2016 - 11/15/2017 |
| 25.5. Acis CLO Management, LLC<br>300 Crescent Ct., Ste 700<br>Dallas, TX 75201 | Relying advisor | EIN: 81-5194942<br>From-To 5/16/2014 - 12/19/2017 |
| 25.6. Acis CLO Management GP, LLC<br>300 Crescent Ct., Ste 700<br>Dallas, TX 75201 | General Partner of an investment fund | EIN: 36-4786631<br>From-To 5/16/2014 - 12/19/2017 |
| 25.7. Acis CLO Management Holdings, L.P.<br>PO Box 309, Ugland House<br>Grand Cayman, KY1-1104<br>Cayman Islands | Investment fund | EIN: 98-1347870<br>From-To 1/12/2017 - 12/19/2017 |

Debtor  **Acis Capital Management, L.P.**                      Case number (if known)  **18-30264**

| Business name address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN. |
|---|---|---|
| 25.8.  **Acis CLO Management<br>Intermediate<br>Holdings I, LLC<br>300 Crescent Ct., Ste 700<br>Dallas, TX 75201** | **Investment holding** | Dates business existed<br>EIN:     35-2586937<br><br>From-To   3/1/2017 - 12/19/2017 |

**26. Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☐ None

| Name and address | Date of service<br>From-To |
|---|---|
| 26a.1.  **Highland Capital Management, L.P.<br>300 Crescent Court, Ste 700<br>Dallas, TX 75201** | **1/1/2011 - current** |
| 26a.2.  **James Dondero<br>300 Crescent Court, Ste 700<br>Dallas, TX 75201** | **1/1/2011 - current** |
| 26a.3.  **Frank Waterhouse<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201** | **1/1/2012 - current** |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

■ None

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| Name and address | If any books of account and records are<br>unavailable, explain why |
|---|---|
| 26c.1.  **Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201** | |

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

■ None

Name and address

**27. Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

■ No

☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the<br>inventory | Date of inventory | The dollar amount and basis (cost, market,<br>or other basis) of each inventory |
|---|---|---|

**28. List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

Official Form 207                    Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy                            page 11

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                                    Best Case Bankruptcy

Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Case 3:21-cv-00879-K   Document Volume 204 Page 184 of 493   284 of 511   PageID 16065

Case 18-30264-sgj11 Doc 165 Filed 04/30/18   Entered 04/30/18 17:14:18   Page 12 of 13

Debtor   Acis Capital Management, L.P.                                    Case number (if known)  18-30264

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Acis Capital Management GP, LLC | 300 Crescent Ct., Ste 700 Dallas, TX 75201 | General Partner | 0.1 |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Neutra, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104 Cayman Islands | Limited Partner | 99.9 |

29. **Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☐ No
■ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| The Dugaboy Investment Trust | 300 Crescent Ct., Ste 700 Dallas, TX 75201 | Limited Partner | 1/21/2011 - 12/19/2017 |

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| Mark Okada | 300 Crescent Ct., Ste 700 Dallas, TX 75201 | Limited Partner | 1/21/2011 - 12/19/2017 |

30. **Payments, distributions, or withdrawals credited or given to insiders**
Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☐ No
■ Yes. Identify below.

| | Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|---|
| 30.1 | Highland CLO Management. Ltd. Maples Corporate Services Limited PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | $9,541,446.00 | 11/3/2017 | |
| | Relationship to debtor Affiliate | | | |

31. **Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☐ No
■ Yes. Identify below.

| Name of the parent corporation | Employer Identification number of the parent corporation |
|---|---|
| Immediately Prior to 12/19/2017 Federal: N/A (stand alone entity) | EIN:   N/A |

**App. 287**

APP.3362

Debtor   Acis Capital Management, L.P.                                      Case number (if known)  18-30264

| Name of the parent corporation | Employer Identification number of the parent corporation | |
|---|---|---|
| Immediately Prior to 12/19/2017 State (TX): Highland Capital Management, L.P.* | EIN: | 75-2716725 |
| From 12/19/2017 Forward Federal: Neutra, Ltd. | EIN: | 98-1090422 |
| From 12/19/2017 Forward State (TX): Highland Capital Management, L.P.* | EIN: | 75-2716725 |

32. Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?

■ No
☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the parent corporation |
|---|---|

### Part 14:   Signature and Declaration

**WARNING** -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   April 30, 2018

_____          I saac Leventon
Signature of individual signing on behalf of the debtor          Printed name

Position or relationship to debtor   Authorized Signatory

Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?
■ No
☐ Yes

Note to question 31:

*Highland Capital Management, L.P. is not technically the parent of the Acis entities shown.  However, the combined TX Franchise report for the entire group is filed under the name of Highland Capital Management, L.P.

# EXHIBIT P

# FORM ADV PART 2A



March 29, 2018

300 Crescent Court, Suite 700

Dallas, Texas 75201

(972) 628-4100

www.highlandcapital.com

This brochure provides information about the qualifications and business practices of Highland Capital Management, L.P., an investment adviser registered with the Securities and Exchange Commission. If you have any questions about the contents of this brochure, please contact us at (972) 628-4100. The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission or by any state securities authority. Additional information about Highland Capital Management, L.P. is also available at the Securities and Exchange Commission's website www.adviserinfo.sec.gov. Our registration as an investment adviser does not imply any level of skill or training.

# ITEM 2.   MATERIAL CHANGES

There were no material changes.

ii

# ITEM 3.    TABLE OF CONTENTS

ITEM 1.    COVER PAGE................................................................................................... i

ITEM 2.    MATERIAL CHANGES.................................................................................... ii

ITEM 3.    TABLE OF CONTENTS.................................................................................. iii

ITEM 4.    ADVISORY BUSINESS....................................................................................1

ITEM 5.    FEES AND COMPENSATION ........................................................................4

ITEM 6.    PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT ..........8

ITEM 7.    TYPES OF CLIENTS ......................................................................................9

ITEM 8.    METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF
LOSS .............................................................................................................10

ITEM 9.    DISCIPLINARY INFORMATION.................................................................21

ITEM 10.  OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS............22

ITEM 11.  CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT
TRANSACTIONS AND PERSONAL TRADING .............................................26

ITEM 12.  BROKERAGE PRACTICES ............................................................................41

ITEM 13.  REVIEW OF ACCOUNTS .............................................................................45

ITEM 14.  CLIENT REFERRALS AND OTHER COMPENSATION.................................48

ITEM 15.  CUSTODY.......................................................................................................49

ITEM 16.  INVESTMENT DISCRETION .......................................................................50

ITEM 17.  VOTING CLIENT SECURITIES ...................................................................51

ITEM 18.  FINANCIAL INFORMATION........................................................................52

ITEM 19.  REQUIREMENTS FOR STATE-REGISTERED ADVISERS ............................53

# ITEM 4.   ADVISORY BUSINESS

Highland Capital Management, L.P. ("we", "us", "our", "Company", or "Highland") is an investment adviser registered with the SEC and is one of the largest global alternative fixed income managers, specializing in bank loans, high yield credit, distressed debt, structured products, real assets, and long-short equities, with a global geographic reach. Our diversified Client base includes public pension plans, foundations and endowments, corporations, financial institutions, fund-of-funds, governments, and high net worth individuals. To best meet the different goals of these investors, we offer a variety of product types, including private equity-style funds, managed separate accounts, hedge funds, and structured product vehicles (e.g., collateralized loan obligations "CLOs").

HISTORY

| | |
|---|---|
| **1990** | James Dondero and Mark Okada (the "Founders") formed a joint venture with Protective Life Insurance Corporation ("Protective Life"), specializing in senior secured loans. |
| **1993** | An agreement established Protective Asset Management Company ("PAMCO"), a SEC-registered investment advisor owned 60% by Protective Life and 40% by the Founders. |
| **1996** | PAMCO launched its first CLO, one of the first non-bank CLOs in the industry. |
| **1997** | The Founders purchased Protective Life's stake, and later that year established Ranger Asset Management, L.P., an independent investment adviser registered with the SEC. |
| **1998** | Ranger Asset Management, L.P. changed its name to Highland Capital Management, L.P. |
| **2004** | Highland acquired the Columbia Floating Rate Fund and Columbia Floating Rate Advantage Fund from Columbia Asset Management, making its entry into the mutual fund business. |
| **2005** | Highland Capital Management Europe, Ltd. was established as an FSA-registered investment adviser in London, through the acquisition of ING Capital Management, Ltd. |
| **2012** | Highland Capital Management Europe, Ltd. sells European CLO business. |

OWNERSHIP OF HIGHLAND

Highland is controlled by James Dondero through his ownership of Strand Advisors, Inc., Highland's general partner. Substantially all of the non-voting, non-control limited partner interests in Highland are owned by the Hunter Mountain Investment Trust. John Honis, a former partner of Highland, who is also a director of two Highland portfolio companies and of Highland's affiliated registered investment funds, indirectly controls the Trust.

HIGHLAND REGULATORY ASSETS UNDER MANAGEMENT

Figures are in US$ millions as of 12/31/2017

| Total Assets Under Management | $8,269.75 |
|---|---|

*By Vehicle Type:*

*Discretionary*

| Structured Product Vehicles (Pooled Investment Vehicles) | $5,382.68 |
|---|---|
| Separate Accounts | $1,458.14 |

*Non-Discretionary*

| Unregistered Investment Funds | $2,428.93 |
|---|---|

OUR ADVISORY SERVICES

Highland provides investment advisory services in several different strategies and types of investment vehicles. Highland makes investment decisions with regard to bank loans, high yield credit, distressed debt, structured products, real assets, and long/short equities. Highland acts as an investment adviser or sub-adviser to structured product vehicles (including but not limited to CLOs and Collateralized Debt Obligations ("CDOs")) ("Structured Product Vehicles"), unregistered investment funds ("Unregistered Investment Funds"), single Client accounts ("Separate Accounts", together with Structured Product Vehicles, Unregistered Investment Funds, "Client Accounts" or "Clients").

- 2 -

TAILORING SERVICES

We tailor our investment advice to the needs of our Clients and are subject to applicable investment restrictions set forth in the governing documents for the applicable Clients.

**App. 295**

APP.3370

# ITEM 5.    FEES AND COMPENSATION

For providing investment advisory services, Highland typically charges Clients a management fee and/or performance fee or carried interest, and other fees as necessary and agreed to (including, but not limited to, expenses related to servicing accounts, such as administration and legal services).

Under appropriate circumstances and where permitted by applicable law, the terms of an investment advisory contract, including fees, terms of payment and performance fees and termination provisions, are negotiable.  In negotiating fees, Highland considers various factors, including assets under management, investment objectives, strategies and restrictions, and the resources required to meet investment objectives.

Clients incur brokerage and other transaction costs associated with Highland's management of Client Accounts.  Please see the section titled Brokerage Practices of this ADV Part 2 for a discussion of Highland's brokerage practices.

FEE SCHEDULE

The following summary of fees is typically updated in this brochure annually (on or about March 31) and does not reflect subsequent changes unless expressly indicated otherwise. Fees in the below Fee Schedule are annualized.

| Product | Management Fee | Performance Fee or Carried Interest | Other Fees |
|---|---|---|---|
| Structured Product Vehicles | From 0.15% to 0.85% | From 0.00% to 20.00% | None |
| Separate Accounts | From 0.375% to 1.25% | Up to 20.00% over IRR on some accounts | None |
| Unregistered Investment Funds | From 0.3% to 2.00% | From 0% to 20.00%[1] | None |

Certain investment vehicles managed by Highland invest in other investment vehicles managed by Highland or our affiliates.  Both investment vehicles may impose management fees, performance fees or other expenses (including administrative fees).  This results in

---

[1] In limited circumstances where Highland and/or its related parties may agree to bare a disproportionate share of losses, if any, with respect to an account, Highland and/or such applicable related party may contract in advance with such client to receive a performance fee and/or carried interest in excess of 20%.

greater expense to a Client than if such Client had invested directly in the underlying investment vehicle. Certain companies in which Clients are invested also use the products or services, or invest in investment vehicles, offered by Highland or its affiliates and pay fees or other compensation accordingly.

FOR INSTITUTIONAL INVESTORS

*Unregistered Investment Funds*

As compensation for our advisory services, each Unregistered Investment Fund typically pays Highland management fees that range from 0.3% to 2.00% annually. Management fees are based upon outstanding capital accounts or amounts of committed capital and are deducted quarterly in advance or in arrears depending on the specific fund. For accounts that also provide for incentive compensation, Highland also deducts performance fees or investment profit allocations in the form of carried interest ranging from 0% to 20% of returns, which may be after the achievement of a hurdle rate, and which is typically contingent on the manager of the applicable Unregistered Investment Fund eclipsing the high-water mark. In some cases, certain investors in an Unregistered Investment Fund enter into side letter agreements with Highland, under which they may pay a different fee than others based on the terms of their agreement with Highland or may otherwise receive certain additional rights. Upon termination of the applicable Unregistered Investment Fund's advisory agreement, any management fees that have been prepaid are generally returned on a pro-rated basis.

In addition to management fees, performance fees, and brokerage and transaction costs, investors in the Unregistered Investment Funds will indirectly bear the fees and expenses paid by the Unregistered Investment Funds, including custody fees, administration, legal, audit and tax preparation fees, and certain other fees and expenses. Each Unregistered Investment Fund's offering documents include more detailed information about the fees and expenses paid by such Unregistered Investment Fund.

STRUCTURED PRODUCT VEHICLES

As compensation for our advisory services, each Structured Product Vehicle pays Highland management fees ranging from 0.15% to 0.85% annually. Management fees are based on the principal balance of the assets held in the portfolio on defined determination dates. Management fees are established during structuring and remain constant for the duration of the life of the Structured Product Vehicle. Management fees also accrue during a payment period. Highland may also charge performance fees of up to 20% of any remaining interest or principal proceeds after a hurdle rate. Fees are calculated and paid on a quarterly basis by the Trustee in accordance with the governing documents. All fees are paid in arrears on the payment date. In some cases, certain investors in a Structured Product Vehicle pay a

- 5 -

different fee than others based upon, without limitation, the size of the investment and Highland's overall relationship with the investors in the vehicles.

In addition to management fees, performance fees, and brokerage and transaction costs, investors in Structured Product Vehicles will indirectly bear the fees and expenses paid by the Structured Product Vehicle, including administration, legal, audit and accounting fees, and certain other fees and expenses.  Each Structured Product Vehicle's governing documents include more detailed information about the fees and expenses paid by such Structured Product Vehicle.

SEPARATE ACCOUNTS

For our Separate Accounts, the agreement entered into with Highland will determine the fee structure. Typically, a Separate Account will pay Highland management fees ranging from 0.375% to 1.25% annually.  Management fees are based upon the average daily net assets, which may or may not be net of investment leverage.  Highland may also collect a performance fee of up to 20% after reaching an internal rate of return ("IRR").

Please see the section titled Performance-Based Fees and Side-By-Side Management of this ADV Part 2 for additional information regarding performance fees or investment profit allocations in the form of carried interest.

OTHER COMPENSATION

Client Accounts may hold significant positions, individually or collectively, in the securities issued by a company.  Accordingly, Highland may have the right to appoint a board member or officer for such company.  Highland may appoint an employee or a third party to such position as it sees fit in the best interest of the company and its Clients.  Employees are permitted to retain all compensation received for such positions except to the extent contrary to the governing documents for one or more Client Accounts, in which case the proportion of such compensation related to such Client Account(s) will be paid to those Account(s) (generally in proportion to relative assets of the Client Account as of the date paid).

In addition, to the extent permitted by the offering and/or governing documents of the applicable advised accounts, Highland and/or its affiliates receive other fees for services provided to portfolio companies, provided such fees are on arms-length terms.  See also Item 10. Other Financial Industry Activities and Affiliations.

We have established procedures designed to address possible conflicts of interest that such board or officer positions might present, including requiring authorization from the Chief Compliance Officer prior to an officer or employee serving as a board member.  As a result of such activities, Highland may acquire confidential information, which may restrict Client Accounts from transacting in certain securities.  As a result, we may not initiate a transaction on behalf of Clients which we otherwise might have.  Additional information regarding

- 6 -

certain conflicts of interest we face is contained in Item 11. Code of Ethics, Participation or Interest in Client Transactions and Personal Trading.

# ITEM 6.   PERFORMANCE-BASED FEES
## AND SIDE-BY-SIDE MANAGEMENT

As described above, certain Clients pay Highland a performance fee or investment profit allocations in the form of carried interest.   To the extent that Highland charges a performance-based fee, the performance-based fee will comply with the requirements of Section 205 and Rule 205-3 under the Investment Advisers Act of 1940 (the "Advisers Act"). In situations where Highland has entered into a performance fee arrangement, it has an economic incentive to make riskier investments and/or pursue riskier strategies than it might otherwise.   In addition, because Highland manages both accounts with an asset-based fee and accounts with a performance fee or a combination of an asset-based fee and performance fee, we have an incentive to favor Client accounts for which we receive a performance-based fee.   In addition, Highland and its principals also make investments through a number of proprietary accounts, including Highland Capital Management, L.P.  In order to mitigate any such conflicts, Highland has developed allocation procedures that are intended to result in fair and equitable allocation over time.   To mitigate any actual or perceived conflicts of interest, allocation of limited offering securities (such as IPOs and registered secondary offerings) to principal accounts that do not include third party investors may only be made after all other Client Account orders for the security have been filled. A more detailed summary of our allocation guidelines is available to Clients or prospective Clients upon request.  Additional information regarding certain conflicts of interest we face is contained in Item 11. <u>Code of Ethics, Participation or Interest in Client Transactions and Personal Trading</u>.

A description of performance-based fees is included in the section titled <u>Fees and Compensation</u>.

- 8 -

# ITEM 7.   TYPES OF CLIENTS

Our Clients include:

- ❖ Structured Product Vehicles

- ❖ Unregistered Investment Funds

- ❖ Separate Accounts

Investment advice is provided directly to Clients and not individually to investors in a particular Client.

Highland has minimum account requirements for Unregistered Investment Funds, Structured Product Vehicles and Separate Accounts and generally requires a minimum investment of $100,000 to $50 million depending on the structure.  Minimum account size may be waived for certain investors at Highland's discretion.

- 9 -

# ITEM 8.    METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS

The items below are types of investment strategies we currently utilize although we may add or subtract from this list based on various factors including macro-economic conditions.

INVESTMENT STRATEGIES

*Bank Loan Strategy*

Highland's bank loan strategy seeks to generate attractive absolute returns by opportunistically making investments across the capital structure, with a core focus in senior secured bank loans.  The bank loan strategy is long-biased and U.S. focused, but has the ability to invest in Canada and Europe.

The strategy may use hedging investments to manage interest rate, default, currency and systemic risks.

*Multi Strategy Credit Strategy*

Highland's Multi-Strategy Credit Strategy is focused across the credit markets in both private and public transactions.  It seeks to deliver attractive risk-adjusted returns to its investors by investing, directly or through one or more financing or swap vehicles or other arrangements for obtaining leverage, primarily in (i) bank loans; (ii) other high yield debt; (iii) credit default swaps; (iv) debt and equity securities issued by collateralized loan obligations; and (v) special situation investments.  It will take long and short positions.

*Long/Short Equity Strategy*

Highland's long/short equity strategy generally involves a fundamental, bottom-up stock picking style. Investments will be made in value and growth stocks with a domestic focus.  The strategy aims to generate equity-like returns over an entire market cycle with less volatility, lower drawdowns, and lower correlation compared to the equity markets. There is generally a strong focus on preservation of capital and risk management.  In addition to purchasing or taking "long" positions in equity securities, the strategy will include short selling, investments in derivatives, exchanged-traded funds, or fixed income securities.

Equity securities of U.S. or non-U.S. issuers in which Highland may invest include common stocks, preferred stocks, convertible securities, depositary receipts, warrants to buy common stocks and "derivatives" on any of the foregoing securities. The

- 10 -

exposure of the various funds will vary over time based on assessments of market conditions and other factors.

*Special Situations Strategy*

Highland's special situations strategy employs directional, capital structure arbitrage, relative value, and event-driven investment strategies across various credit markets where Highland holds significant investment experience, primarily the distressed, leveraged loan, high yield and structured products markets. It also utilizes an investment approach to exploit relative value and arbitrage opportunities within these markets. The objective is to maintain low correlation to the broader equity and corporate bond markets, as well as other alternative investment strategies, and to provide attractive risk-adjusted returns on capital. Highland also looks to implement selected trading strategies to exploit pricing inefficiencies across the credit markets and within an individual issuer's capital structure.

*Private Equity Strategy*

The private equity strategy targets investments in the fulcrum securities of distressed credits based in the U.S. and Western Europe.  It seeks to capitalize on the following market dynamics: balance sheets remain over levered and companies continue to address looming maturities, while financing markets are bifurcating between good and bad credits.  The strategy generally involves investing in undervalued senior secured loans and debt obligations of financially troubled companies to achieve value recoveries via refinancing, at par take-outs or conversions to equity and thereafter create value through operational and financial improvements. This strategy offers a compelling alternative to equity by providing a different downside risk while seeking positive risk-adjusted returns and upside potential in misunderstood industries and companies.

*Floating Rate Loan Strategy*

This strategy seeks to achieve its objective by investing, under normal market conditions, approximately 80% of its net assets in a portfolio of interests in adjustable rate senior loans, the interest rates of which float or vary periodically based upon a benchmark indicator of prevailing interests rates, to domestic or foreign corporations, partnerships and other entities that operate in a variety of industries and geographic regions.  The strategy may invest all or substantially all of its assets in senior loans that are rated below investment grade and unrated senior loans of comparable quality.  This strategy may also include investments in (i) high quality, short-term debt securities; (ii) warrants, equity securities and junior debt securities; (iii) senior loans of foreign issuers that are foreign currency denominated; and (iv) senior loans the interest rate of which are fixed and do not float.

- 11 -

*Structured Finance Investments*

Highland invests in various structured finance instruments, including asset-backed securities; collateralized loan obligations and collateralized debt obligations; and swaps (including total rate of return swaps) whose rates of return are determined primarily by reference to the total rate of return on one or more loans referenced in such instruments.  The rate of return on the structured finance instrument may be determined by applying a multiplier to the rate of total return on the reference loan or loans.  Application of a multiplier is comparable to the use of financial leverage, a speculative technique.  Leverage magnifies the potential for gain and the risk of loss, because of a relatively small decline in the value of a reference loan could result in a relatively large loss for the value of a structured finance instrument.

METHOD OF ANALYSIS

For all Client Accounts, we utilize both fundamental and technical analysis methods. Our investment philosophy is rooted in a value-oriented, long-term approach, which combines bottom-up research with top-down technical market analysis.  Our analysts follow a rigorous and time-tested bottom-up credit analysis for each credit we manage. We have also devised and applied an institutionalized process of credit evaluation and approval, via our Investment Committee, and have built a dedicated experienced restructuring team that has been integrated into Highland's investment process.

Highland's self-discipline is largely enforced by the ongoing monitoring of individual credit names by the responsible analyst and his or her supervisor.

Other sources of information include obtaining and reviewing due diligence packages prepared by debt issuers and underwriters of institutional private placements and meetings with management of issuers.

MATERIAL RISKS OF SIGNIFICANT STRATEGIES AND METHODS OF ANALYSIS:

In this section we summarize some of the material risks of Highland's investment strategies and methods of analysis. More complete information about the specific risks associated with each strategy or Client Account is available in the applicable offering documents.   All methods of investments in securities and loans involve risk of loss including risk that a Client will lose the entire value of their investment.

*Allocation of Investments*

There is a risk that the allocations methodology employed by Highland will not result in optimal allocation and may disadvantage one Client Account while benefiting another Client Account.  Since the process involves human input there is the risk that

- 12 -

human error may cause harm to a Client Account. Poor or mistaken allocation decisions could result in the loss of money for investors.

*Credit Risk*

Clients engage in transactions in securities and financial instruments that involve counterparties. Under certain conditions, a counterparty to a transaction could default or the market for certain securities and/or financial instruments may become illiquid. There is a risk that the issuer of a fixed income security will be unable to make timely principal and interest payments on the security. Certain Clients invest in securities rated below investment grade (which are commonly referred to as "high yield" securities or "junk" securities). These investments are regarded as predominately speculative with respect to the issuer's continuing ability to meet principal and interest payments. The downgrade of a security held by a Client Account may decrease its value. Securities are subject to varying degrees of credit risk, which are often reflected in ratings assigned by commercial rating companies such as Moody's Investor Service, Standard & Poor's Corporation, Duff & Phelps Credit Rating Co. and Fitch Investors Service.

*Currency Risk*

If a Client Account invests directly in non-U.S. currencies or in securities of issuers that trade in, and receive revenues in, non-U.S. currencies, or in derivatives that provide exposure to non-U.S. currencies, it will be subject to the risk that those currencies will decline in value relative to the U.S. dollar, or, in the case of hedging positions, that the U.S. dollar will decline in value relative to the currency being hedged. Currency rates in foreign countries may fluctuate significantly over short periods of time for a number of reasons, including changes in interest rates, intervention (or the failure to intervene) by U.S. or foreign governments, central banks or supranational entities such as the International Monetary Fund, or by the imposition of currency controls or other political developments in the United States or abroad. As a result, a Client's investments in foreign currency-denominated securities may reduce the returns of the Client Account.

*Derivatives Risk*

Derivatives, such as futures and options, are subject to the risk that changes in the value of a derivative may not correlate perfectly with the underlying asset, rate or index. Derivatives also expose the Client to the credit risk of the derivative counterparty. Derivative contracts may expire worthless and the use of derivatives may result in losses to the Client.

- 13 -

*Frequency of Trading*

Some of the strategies and techniques to be employed by Highland require frequent trades to take place and, as a consequence, portfolio turnover and brokerage commissions will be greater than for other investment vehicles of similar size that do not employ frequent trading techniques.

*Hedging*

Highland may (but is not required to) utilize financial instruments both for investment purposes and for risk management purposes in order to (i) protect against possible changes in the market value of a Client Account resulting from fluctuations in the markets and changes in interest rates; (ii) protect the unrealized gains in the value of a Client Account; (iii) facilitate the sale of any such investments; (iv) enhance or preserve returns, spreads or gains on any investment in a Client Account; (v) hedge against a directional trade; (vi) hedge the interest rate, credit or currency exchange rate on any of financial instruments; (vii) protect against any increase in the price of any financial instruments Highland anticipates purchasing at a later date; or (viii) act for any other reason that the Highland deems appropriate.  For a variety of reasons, Highland may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged.  Such imperfect correlation may prevent a Client from achieving the intended hedge or expose the Client to risk of loss.  The successful utilization of hedging and risk management transactions requires skills complementary to those needed in the selection of portfolio holdings.  Moreover, it should be noted that the Client Account will be exposed to certain risks that cannot be hedged.

*Illiquid Securities*

Highland may cause a Client to invest in a security that is illiquid.  This could present a problem in realizing the prices quoted (selling a bond at or near its true value) and in effectively trading the position(s).  The primary measure of liquidity is the size of the spread between the bid price and the offer price quoted by a dealer.  The greater the dealer spread, the greater the liquidity risk.  Liquidity risk is less relevant for investments that are intended to be held until maturity. Lack of liquidity means Highland may not be able to sell such investments at prices that reflect Highland's assessment of their value or the amount paid for such investments. Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale by Highland and other factors. Furthermore, the nature of Highland's investments, especially those in financially distressed companies, may require a long holding period prior to profitability.

- 14 -

*Inflation Risk*

Inflation risk results from the variation in the value of cash flows from a security due to inflation, as measured in terms of purchasing power.  For example, if Highland purchases a 5 year bond in which it can realize a coupon rate of 5 percent, but the rate of inflation is 6 percent, then the purchasing power of the cash flow has declined.  For securities other than adjustable bonds or floating rate bonds, the investment is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security.  To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

*Investments in Distressed Assets*

Debt obligations and other securities of distressed companies will by their nature relate to companies in unstable financial condition and entail substantial inherent risks. Consequently, many of these companies will likely have significantly leveraged capital structures, making them highly sensitive to declines in revenues and to increases in expenses and interest rates. The leveraged capital structure of such investments will increase the exposure of the portfolio companies to adverse economic factors such as downturns in the economy or deterioration in the condition of the portfolio company or its industry. Distressed investing also involves significant expenses of legal counsel, experts, consultants and other third parties.

*Investments in Equity Securities*

Investments in public equities are subject to the risk that stock prices will fall over short or long periods of time.  In addition, common stock represents a share of ownership in a company, and rank after bonds and preferred stock in their claim on the company's assets in the event of bankruptcy.

*Investments in Foreign Securities*

A Client may invest a portion of its assets in securities of companies domiciled or operating in one or more foreign countries.  Investing in foreign securities involves considerations and possible risks not typically involved in investing in securities of companies domiciled and operating in the U.S., including instability of some foreign governments, the possibility of expropriation, limitations on the use or removal of funds or other assets, foreign currency risk, changes in governmental administration or economic or monetary policy (in the U.S. or abroad) or changed circumstances in dealings between nations.  The application of foreign tax laws (e.g., the imposition of withholding taxes on dividend or interest payments) or confiscatory taxation may also affect investment in foreign securities.  Higher expenses may result from investment in foreign securities than would from investment in domestic securities because of the costs that must be incurred in connection with conversion between various currencies

- 15 -

and foreign brokerage commissions that may be higher than in the U.S.  Foreign securities markets also may be less liquid, more volatile and subject to less governmental supervision than in the U.S., including lack of uniform accounting, auditing and financial reporting standards and potential difficulties in enforcing contractual obligations.

*Investments in Structured Finance Instruments*

Highland may cause Clients to invest in structured finance instruments.  A portion of leveraged loans, high yield debt securities, structured finance instruments and synthetic securities (collectively the "Collateral Debt Obligations") may consist of equipment trust certificates, collateralized mortgage obligations, collateralized bond obligations, collateralized loan obligations or similar instruments.  Structured finance instruments present risks similar to those of the other types of Collateral Debt Obligations in which the Client may invest and such risks may be of greater significance in the case of structured finance instruments.  Moreover, investing in structured finance instruments entails a variety of unique risks, including prepayment risk.  In addition, the performance of a structured finance instrument will be affected by a variety of factors, including its priority in the capital structure of the issuer thereof, the availability of any credit enhancement, the level and timing of payments and recoveries on and the characteristics of the underlying receivables, loans or other assets that are being securitized, remoteness of those assets from the originator or transferor, the adequacy of and ability to realize upon any related collateral and the capability of the servicer of the securitized assets.  Each structured finance instrument to be purchased by a Client must be rated by a rating agency.

*Investments in Synthetic Securities*

Highland may cause Clients to invest in synthetic securities.  In addition to credit risks associated with holding non-investment grade loans and high yield debt securities, with respect to synthetic securities, Highland or its Clients will usually have a contractual relationship only with the counterparty of such synthetic securities, and not the obligor on a reference obligation (the "Reference Obligor").  Such agreement generally stipulates that Highland or its Client will have no right to directly enforce compliance by the Reference Obligor with the terms of the reference obligation (defined herein as the debt security or other obligation upon which the synthetic security is based), nor any rights of set-off against the Reference Obligor, nor have any voting rights with respect to the reference obligation.  In addition, in the event of insolvency of the counterparty, the Client will be treated as a general creditor of such counterparty, and will not have any claim with respect to the reference obligation.  Consequently, the Client will be subject to the credit risk of the counterparty as well as that of the Reference Obligor.  As a result, concentrations of synthetic securities in any one counterparty subject the notes to an additional degree

- 16 -

of risk with respect to defaults by such counterparty as well as by the Reference Obligor. Highland will not perform independent credit analyses of the counterparties, any such counterparty, or an entity guaranteeing such counterparty, individually or in the aggregate.

*Investments in Senior Secured Loans*

Senior secured loans have significant credit risks and material losses may occur. As with other debt obligations, claims and collateral may be difficult to enforce in the event of a default. No assurance can be made that full or significant recovery of principal and/or interest will be received or that any collateral recovered will be marketable or sufficient.

*Leverage*

When deemed appropriate by Highland and subject to applicable regulations, a Client may use leverage in its investment program, including the use of borrowed funds and investments in certain types of options, such as puts, calls and warrants, which may be purchased for a fraction of the price of the underlying securities while giving the purchaser the full benefit of movement in the market of those underlying securities. While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. To the extent a Client purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Client. If the interest expense on borrowings were to exceed the net return on the portfolio securities purchased with borrowed funds, the Client's use of leverage would result in a lower rate of return than if the Client were not leveraged.

*Maturity Risk*

In certain situations, Highland may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these circumstances, Highland will make an adjustment to account for the differential interest-rate risks in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

- 17 -

*Market or Interest Rate Risk*

The price of most fixed income securities move in the opposite direction of the change in interest rates. For example, as interest rates rise, the price of fixed income securities fall. If a Client holds a fixed income security to maturity, the change in its price before maturity will have little impact on the Clients performance; however, if the Client has to sell the fixed income security before the maturity date, an increase in interest rates will result in a loss. Senior secured bank loans generally pay interest at rates that are determined periodically by reference to a base lending rate plus a premium. These rates often are re-determined either daily, monthly, quarterly or semi-annually. Recently, domestic and international markets have experienced a period of acute stress starting in the real estate and financial sectors and then moving to other sectors of the world economy. This stress has resulted in unusual and extreme volatility in the equity and debt markets and in the prices of individual investments. These market conditions could add to the risk of short-term volatility of investments.

*Options*

A Client may use a number of option strategies. Put options and call options typically have similar structural characteristics and operational mechanics regardless of the underlying instrument on which they are purchased or sold. A put option gives the purchaser of the option, upon payment of a premium, the right to sell, and the writer the obligation to buy, the underlying security, commodity, index, currency or other instrument at the exercise price. A call option, upon payment of a premium, gives the purchaser of the option the right to buy, and the seller the obligation to sell, the underlying instrument at the exercise price.

With certain exceptions, exchange listed options generally settle by physical delivery of the underlying security or currency, although in the future cash settlement may become available. Index options are cash settled for the net amount, if any, by which the option is "in-the-money" (i.e., where the value of the underlying instrument exceeds, in the case of a call option, or is less than, in the case of a put option, the exercise price of the option) at the time the option is exercised. Frequently, rather than taking or making delivery of the underlying instrument through the process of exercising the option, listed options are closed by entering into offsetting purchase or sale transactions that do not result in ownership of the new option. The Client's ability to close out its position as a purchaser or seller of a listed put or call option is dependent, in part, upon the liquidity of the option market.

Over-the-counter ("OTC") options are purchased from or sold to securities dealers, financial institutions or other parties ("Counterparties") through direct bilateral agreement with the Counterparty. In contrast to exchange listed options, which generally have standardized terms and performance mechanics, all the terms of an

- 18 -

OTC option, including such terms as method of settlement, term, exercise price, premium, guarantee, and security, are set by negotiation of the parties. Unless the parties provide for it, there is no central clearing or guaranty function in an OTC option. As a result, if the Counterparty fails to make or take delivery of the security, currency or other instrument underlying an OTC option it has entered into with the Client or fails to make a cash settlement payment due in accordance with the terms of that option, the Client will lose any premium it paid for the option as well as any anticipated benefit of the transaction.

If a put or call option purchased by the Client were permitted to expire without being sold or exercised, its premium would be lost by the Client. The risk involved in writing a put option is that there could be a decrease in the market value of the underlying security caused by rising interest rates or other factors. If this occurred, the option could be exercised and the underlying security would then be sold to the Client at a higher price than its current market value. The risk involved in writing a call option is that there could be an increase in the market value of the underlying security caused by declining interest rates or other factors. If this occurred, the option could be exercised and the underlying security would then be sold by the Client at a lower price than its current market value. Purchasing and writing put and call options and, in particular, writing "uncovered" options are highly specialized activities and entail greater than ordinary investment risks.

*Short Sales*

A Client may sell securities short. Short selling involves the sale of a security that the Client does not own and must borrow in order to make delivery in the hope of purchasing the same security at a later date at a lower price. In order to make delivery to its purchaser, the Client must borrow securities from a third party lender. The Client subsequently returns the borrowed securities to the lender by delivering to the lender the securities it receives in the transaction or by purchasing securities in the open market. The Client must generally pledge cash with the lender equal to the market price of the borrowed securities. This deposit may be increased or decreased in accordance with changes in the market price of the borrowed securities. During the period in which the securities are borrowed, the lender typically retains his right to receive interest and dividends accruing to the securities. In exchange, in addition to lending the securities, the lender generally pays a fee for the use of the Client's cash. This fee is based on prevailing interest rates, the availability of the particular security for borrowing and other market factors.

*Valuation of Portfolio Investments*

From time to time, special situations affecting the valuation of the investments (such as limited liquidity, unavailability or unreliability of third-party pricing information

- 19 -

and acts or omissions of service providers to the Client) could have an impact on the value of a Client's investment, particularly if prior judgments as to the appropriate valuation of an investment should later prove to be incorrect after a net asset value-related calculation or transaction is completed. Generally, Highland is not required to make retroactive adjustments to prior subscription or withdrawal transactions, management fees or performance allocations based on subsequent valuation data. In addition, Highland may, but is not required to, discount the value of its positions due to limited liquidity, concentration levels or for other reasons. Due to the nature of its investments, Highland may not be able to place a precise value on positions and therefore may need to estimate values.

# ITEM 9.   DISCIPLINARY INFORMATION

On September 25, 2014, Highland Capital Management, L.P. ("Highland") entered into a settlement with the Securities and Exchange Commission ("SEC") resulting in the SEC issuing an order.  This order resolves the SEC's allegations that Highland violated Sections 204(a) and 206(3) of the Investment Advisers Act of 1940 ("Advisers Act") and Rule 204-2 thereunder by trading securities between its Clients' accounts and accounts in which Highland and its principals maintained an ownership interest without adhering to certain requirements set forth by the Advisers Act.  The transactions occurred between 2007 and 2009, and many were executed in an effort to generate or maintain liquidity for the advised accounts during September and October 2008.  Specifically, the order found that, during the relevant time period, Highland engaged in a number of transactions with its Client advisory accounts without disclosing in writing to those Clients that Highland was acting as principal, or obtaining Client consent to the transactions, before the trades were completed.  Highland did ultimately receive Client consent for many of the transactions; however, this consent was received after the transactions had settled, and therefore did not comply with the requirements of Advisers Act Section 206(3).  In addition, the order found that, during the relevant time period, Highland failed to keep and maintain true, accurate and current certain books and records as required by the Advisers Act.

The order requires Highland to cease and desist from committing or causing any violations and any future violations of Advisers Act Sections 204(a) and 206(3) and Rule 204-2; censures Highland; and requires Highland to pay a civil monetary penalty of $225,000.  Highland was also required to comply with certain undertakings, including retaining an independent consultant to conduct a comprehensive review of Highland's compliance and control systems relating to principal trades, and the creation and retention of its books and records. As of the date hereof, all such undertakings have been successfully completed.

- 21 -

# ITEM 10.  OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS

Highland and its advisory affiliates manage various strategies and some strategies are managed by more than one adviser. For this reason, certain Clients of Highland (or Clients of Highland's advisory affiliates) may be referred to and enter into advisory agreements with such affiliated adviser.  Neither Highland nor its advisory affiliates charge a fee for such referral.

BROKER-DEALER, BANKING, AND CONSULTING AFFILIATES

Mr. Dondero indirectly owns a majority interest in NexBank Capital, Inc., whose wholly owned subsidiaries include Nexbank Securities, Inc. (also doing business as Nexbank Capital Advisors and Nexbank Wealth Advisors)("NexBank Securities"), and NexBank SSB.. Certain employees of Highland, including James Dondero and Mark Okada, serve on the Board of Directors of Nexbank.

*NexBank Securities, Inc.*

NexBank Securities is a registered broker-dealer and a Member of FINRA/SIPC.  It may provide distribution assistance in connection with the sale or placement of funds managed by Highland. NexBank Securities, Inc., also doing business as NexBank Advisors, which is a SEC registered investment adviser.

*NexBank, SSB*

NexBank, SSB, a state chartered bank, is an affiliate of Highland and may, from time to time, provide banking and agency services to portfolio companies in which Client Accounts may be invested.  Client Accounts and portfolio companies may invest in assets originated by, or enter into loans, borrowings and/or financings with NexBank, including in primary or secondary transactions.  These services generally may result in compensation to NexBank, SSB in various forms, including administrative agent fees, structuring fees, origination and syndication fees, and assignment fees. As a result, we have an incentive to select, or attempt to influence the selection of, NexBank for such services.  Fees are charged at rates competitive with those offered by third parties.  Highland may also refer Client Accounts or controlled investments to NexBank, SSB for banking services. NexBank, SSB may charge its customary fees for the provision of such banking services.

To the extent permitted by applicable law, NexBank, SSB, may sell or offer participations to Highland Accounts in a variety of commercial loans for which NexBank will receive compensation.

- 22 -

*Highland Capital Funds Distributor, Inc.*

Highland Capital Funds Distributor, Inc., a SEC-registered broker dealer and a Member of FINRA/SIPC, is under common control through James Dondero's indirect ownership of Highland Capital Funds Distributor. It may provide distribution assistance in connection with the sale or placement of funds managed by Highland.

INVESTMENT ADVISER AFFILIATES

A related person of Highland is the general partner of a number of other collective investment vehicles organized as partnerships including those managed by the following affiliated investment advisers:

*Acis CLO Management, LLC*

Acis CLO Management LLC is a Relying Adviser and files a single Form ADV with Highland, the Filing Adviser. Therefore, Acis CLO Management LLC is under common control with Highland.

*Falcon E&P Opportunities GP, LLC*

Falcon E&P Opportunities GP, LLC, a SEC-registered investment adviser, may be deemed to be under common control with us because James Dondero controls this entity.

*Highland Capital Management Fund Advisors, L.P.*

Highland Capital Management Fund Advisors, L.P. a SEC-registered investment adviser, is under common control with us because James Dondero controls the Highland Capital Management Fund Advisors general partner.

Additionally, Highland Capital Management Fund Advisors serves as advisor or sub-advisor to investment companies registered under the Investment Company Act of 1940, as amended.

*Highland Capital Management Latin America, L.P.*

Highland Capital Management Latin America, L.P. is a Relying Adviser and files a single Form ADV with Highland, the Filing Adviser.  Therefore, Highland Capital Management Latin America is under common control with Highland.

*Highland Capital Management Korea Limited*

Highland Capital Management Korea Limited is a Relying Adviser and files a single Form ADV with Highland, the Filing Adviser.  Therefore, Highland Capital Management Korea Limited is under common control with Highland.

*Highland HCF Advisor, Ltd.*

Highland HCF Advisor, Ltd. is a Relying Adviser and files a single Form ADV with Highland, the Filing Adviser.  Therefore, Highland HCF Advisor is under common control with Highland.

*NexPoint Advisors, L.P.*

NexPoint Advisors, L.P., a SEC-registered investment adviser, is under common control with us because James Dondero controls the NexPoint Advisors general partner.

Thomas Surgent, our Chief Compliance Officer, is also the Chief Compliance Officer of Acis CLO Management, LLC, Highland Capital Management Latin America, L.P., Highland Capital Management Korea Limited, and Highland HCF Advisor, Ltd. Jason Post is the Chief Compliance Officer of Highland Capital Management Fund Advisors, L.P., and NexPoint Advisors, L.P. Eric Holt is the Chief Compliance Officer of NexBank Securities, Inc., also doing business as NexBank Wealth Advisors.

Highland and/or Highland personnel provide advisory services to each of these affiliated investment advisors, with the exception of Falcon E&P Opportunities GP, LLC, either through sub-advisory or "dual hatting" arrangements with respect to Highland personnel.  In addition Highland is a party to Shared Services Agreement with each of these advisors, under which Highland provides certain administrative and back office services to such advisors, including finance and accounting, human resources, marketing, legal, information technology and operations.

INSURANCE COMPANY AFFILIATES

Highland Capital Management Services, Inc. is an affiliate of Highland and parent company of Governance Re Ltd., a captive insurance agency issuing directors & officers' liability insurance and employment practice liability insurance to Highland its affiliates, and their respective portfolio companies.  NexVantage Title Services is a title insurance company

- 24 -

affiliated with NexBank and Highland, which may provide title insurance with respect to real property investments owned by Client Accounts or their portfolio companies. A conflict of interest exists due to the fact that these entities receive premiums from portfolio companies and/or Client Accounts. As a result, Highland is incentivized to choose these affiliates to provide these services over a third party even though such party's services may be better suited for the company.  Other Highland affiliates may provide insurance related products or services from time to time to Clients and/or portfolio companies and receive arm's length fees for such services.  See "Conflicts of Interest," in the section titled Code of Ethics, Participation of Interest in Client Transactions and Personal Trading.

INDEPENDENT BUSINESS ENTITIES

Employees, including the owners, of Highland also own personal interests in a variety of independent business entities.  A conflict of interest exists due to the potential for the owners' personal relationships and financial interests to conflict with our Client's interests.

BUSINESS ACTIVITIES WITH PORTFOLIO COMPANIES

Highland or its affiliates provide on a periodic basis certain services to portfolio companies including, but not limited to, forensic accounting, interim management consulting services and merger and acquisition advisory services.  Highland or our affiliates may also furnish operational consulting services to certain portfolio companies of Highland's Clients. The time spent by Highland with respect to such activities depends upon a number of factors including the size of the investment, the relationship with the portfolio company and the financial and strategic position of such company.  Highland or its affiliated advisors (including employees) may be directly or indirectly compensated for such services provided such compensation is received as a result of an arm's length contract between the company and such person. Employees of Highland may be granted equity or options in the portfolio companies for which they provide certain services.

Additional information regarding potential conflicts of interest arising from Highland's relationship and activities with its affiliates is provided in the section titled Code of Ethics, Participation or Interest in Client Transactions and Personal Trading.

## ITEM 11.   CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

Highland maintains a policy of strict compliance with the highest standards of ethical business conduct and the provisions of applicable federal securities laws, including rules and regulations promulgated by the SEC, and has adopted policies and procedures described in its Code of Ethics. The Code of Ethics applies to each employee of Highland and any other "access person" as defined under the Advisers Act. It is designed to ensure compliance with legal requirements of Highland's standard of business conduct.

A complete copy of Highland's Code of Ethics is available to any Client or prospective Client upon request.

STANDARDS OF CONDUCT

Highland and its access persons are expected to comply with all applicable federal and state laws and regulations.  Access persons are expected to adhere to the highest standards of ethical conduct and maintain confidentiality of all information obtained in the course of their employment and bring any risk issues, violations, or potential violations to the attention of the Chief Compliance Officer.  Access persons are expected to deal with Clients fairly and disclose any activity that may create an actual or potential conflict of interest between them and Highland or Client.

ETHICAL BUSINESS PRACTICES

Falsification or alteration of records or reports, also known as a prohibited financial practice, or knowingly approving such conduct is prohibited.  Payments to government officials or employees are prohibited except for political contributions approved by our Chief Compliance Officer.  We seek to outperform our competition fairly and honestly and seek competitive advantages through superior performance not illegal or unethical dealings.  Access persons are strictly prohibited from (i) participating in online blogging and communication with the media, unless approved by the Chief Compliance Officer or the Compliance Department, and (ii) spreading of false rumors pertaining to any publicly traded company.

CONFIDENTIALITY

Employees must maintain the confidentiality of Highland's proprietary and confidential information, and must not disclose that information unless the necessary approval is obtained.  Highland has a particular duty and responsibility, as investment adviser, to safeguard Client information.  Information concerning the identity and transactions of investors is confidential, and such information will only be disclosed to those employees and outside parties who need to know it in order to fulfill their responsibilities.

- 26 -

GIFT AND ENTERTAINMENT POLICY

Access persons are permitted, on occasion, to accept gifts and invitations to attend entertainment events. When doing so, however, employees should always act in our best interests and that of our Clients and should avoid any activity that might create an actual or perceived conflict of interest or impropriety in the course of our business relationship. Under no circumstances may (i) gifts of cash or cash equivalents be accepted or (ii) may any gifts be received in consideration or recognition of any services provided to or transactions entered into by, Client Accounts.

PERSONAL TRADING

*Personal Trading Policy*

Access persons are allowed to trade reportable securities during designated time periods, however all transactions in reportable securities other than ETFs must be pre-approved by the Chief Compliance Officer or his/her designee. Except in very limited circumstances approved by the Chief Compliance Officer, access persons are not permitted to trade any security of which we or a Client own any portion of the capital structure or that is on our restricted list without permission. Access persons who violate the personal trading policy are reprimanded in accordance with the sanctions provisions outlined in the Code of Ethics. Personal securities transactions are reviewed by the Chief Compliance Officer or his/her designee for compliance with the personal trading policy and applicable SEC rules and regulations.

*Prohibition against Insider Trading*

Highland forbids any access person from trading, either personally or on behalf of others, including Clients advised by Highland, on material non-public information or communicating material non-public information to others in violation of the law or duty owed to another party. This conduct is frequently referred to as "insider trading". The concepts of material non-public information, penalties for insider trading, and processes for identifying insider trading are addressed in detail in the Compliance Manual and Code of Ethics.

*Reporting Requirements*

In compliance with SEC rules, access persons are required to disclose all of their personal brokerage accounts and holdings within 10 days of initial employment with Highland, within 10 days of opening a new account, and annually thereafter. Additionally, the last day of the month following each quarter-end, all access persons must report all transactions in reportable securities over which the access person had any direct or indirect beneficial ownership. Access persons are also required annually to affirm all reportable transactions from the prior year.

- 27 -

POTENTIAL CONFLICTS

Highland, its affiliates and their respective officers, directors, trustees, stockholders, members, partners and employees and their respective funds and investment accounts (collectively, the "Related Parties") engage in a broad range of activities, including activities for their own account and for the accounts of Clients. This section describes various potential conflicts that may arise in respect of the Related Parties, as well as how we address such conflicts of interest. The discussion below does not describe all conflicts that may arise.

Any of the following potential conflicts of interest will be discussed and resolved on a case by case basis. Our determination as to which factors are relevant, and the resolution of such conflicts, will be made using our best judgment, but in our sole discretion. In resolving conflicts, we will take into consideration the interests of the relevant Clients, the circumstances giving rise to the conflict and applicable laws. Certain procedures for resolving specific conflicts of interest are set forth below.

*Allocation of Investment Opportunities*

Highland, together with its affiliated advisors (the "Related Advisors"), acts as investment adviser to Clients that have similar investment objectives and pursue similar strategies. Certain investments identified by the Related Advisors may be appropriate for multiple Clients. Investment decisions for such Clients are made by the applicable Related Advisors in their best judgment, but in their discretion, taking into account such factors as they believe relevant. Such factors may include investment objectives, regulatory restrictions, current holdings, availability of cash for investment, the size of investments generally, risk-return considerations, tax consequences, and limitations and restrictions on a Client's Account that are imposed by such Client. In addition, if it is fair and reasonable that certain Clients are fully filled of their appetite before others (e.g., for tax considerations, to avoid de minimis partial allocations, to cover or close out an existing position to mitigate risk or losses, etc.), then these Clients may receive full or disproportionate allocations, with the remaining amounts allocated in accordance with normal procedures among the other participating Clients. One or more of the foregoing considerations in this paragraph may (and are often expected to) result in allocations among accounts other than on a pari passu basis. Accordingly, particular investment may be bought or sold for only one Client or in different amounts and at different times for more than one but less than all Clients, even though it could have been bought or sold for other Clients at the same time. Likewise, a particular investment may be bought for one or more Clients when one or more other Clients are selling the investment. In addition, purchases or sales of the same investment may be made for two or more Clients on the same date. There can be no assurance that a Client will not receive less (or more) of a certain investment than it would otherwise receive if the applicable Related Advisors did not have a conflict of interest among Clients.

- 28 -

In effecting transactions, it is not always possible, or consistent with the investment objectives of the Related Advisors' various Clients, to take or liquidate the same investment positions at the same time or at the same prices. Certain investment restrictions may limit the Related Advisors' ability to act for a Client and may reduce performance. Regulatory and legal restrictions (including restrictions on aggregated positions) may also restrict the investment activities of the Related Advisors and result in reduced performance.

The Related Advisors seek to manage and/or mitigate these potential conflicts of interest described by following procedures with respect to the allocation of investment opportunities their Clients, including the allocation of limited investment opportunities. Our allocation policy is based on a fundamental desire to treat each Client Account fairly over time.

In addition to the investment strategies implemented by the portfolio managers for each of our Clients, such portfolio managers may also give trading desk personnel of the adviser general authorization to enter into a limited amount of short-term trades (purchases expected to be sold within 15 business days) in debt instruments on behalf of such Clients. Over time, it is expected that these trades will not exceed 2% of each such Client's assets. Such investments executed by authorized traders are generally allocated on a weighted rotational basis, based on the AUM of the accounts eligible to participate in such investment opportunities.

*Investment Negotiation*

In order to ensure compliance with Section 17(d) under the Investment Company Act whenever an investment professional proposes to negotiate a term other than price for an investment (including any amendments), he/she must check to see if the investment (or any other position in the issuer's capital structure) is held (or proposed to be invested) in any retail accounts of our advisory affiliates.

If the investment is held in any retail accounts, that person must contact the Chief Compliance Officer for guidance.

(i)      The transaction is generally permitted if all accounts are in the same part of the capital structure and participate in the investment pro rata

(ii)     Alternatively, impose "Chinese Wall" between retail/institutional investment decision-making

One person can negotiate, provided final investment decision still made separately.

May also consult outside counsel and/or the retail board for guidance.

- 29 -

*Capital Structure Conflicts*

Conflicts will arise in cases when Clients of the Related Advisors invest in different parts of an issuer's capital structure, including circumstances in which one or more Clients own private securities or obligations of an issuer and other Clients may own public securities of the same issuer.  In addition, one or more Clients may invest in securities, or other financial instruments, of an issuer that are senior or junior to securities, or financial instruments, of the same issuer that are held by or acquired for, one or more other Clients.  If such issuer encounters financial problems, decisions related to such securities (such as over the terms of any workout or proposed waivers and amendments to debt covenants) will raise conflicts of interests.  For example, a Client holding debt securities of the issuer may be better served by a liquidation of the issuer in which it may be paid in full, whereas a Client holding equity securities of the issuer might prefer a reorganization that holds the potential to create value for the equity holders.

In the event of conflicting interests within an issuer's capital structure, the Related Advisors will generally pursue the strategy that reflects what would be expected to be negotiated in an arm's length transaction with due consideration being given to our fiduciary duties to each of our accounts (without regard to the nature of the fees received from such accounts):

- This strategy may be recommended by one or more investment professionals of the Related Advisors
- A single person may represent more than one part of an issuer's capital structure
- The recommended course of action will be presented to our Conflicts Committee for final determination as to how to proceed.  We may elect, but are not required, to assign different teams to make recommendations for different parts of the capital structure as the Conflicts Committee determines in its discretion.
- It is acknowledged that the applicable retail portfolio manager will separately and independently make his or her decision on suitability as to the course of action for the applicable retail portfolio and will leave the Conflicts Committee meeting prior to the final determination being made by the Conflicts Committee.

The Related Advisors may elect, but are not required, to assign different teams to make recommendations for different parts of the capital structure as the Conflicts Committee determines in its discretion.

In the event any Related Parties serve on the Board of the subject company, they may recuse themselves from voting on transactions involving a capital structure conflict.

- Related Party board members may still make recommendations to the Conflicts Committee

- 30 -

- If any such persons are also on the Conflicts Committee, they may recuse themselves from the Committee's determination.

The Related Advisors may use external counsel for guidance and assistance.

The foregoing procedures are not applicable to the advisors to retail accounts, which advisors generally make their own independent determination as to the course of action that is most appropriate for the applicable retail accounts.

*Position Conflicts*

Another type of conflict may arise if we cause one Client account of a Related Advisor to buy a security and another Client account to sell or short the same security. Currently, such opposing positions are generally not permitted within the same account without prior trade approval by the Chief Compliance Officer. However, a portfolio manager may enter into opposing positions for different Clients to the extent each such Client has a different investment objective and each such position is consistent with the investment objective of the applicable Client.  In addition, transactions in investments by one or more affiliated Client accounts may have the effect of diluting or otherwise disadvantaging the values, prices or investment strategies of other Client accounts.

Generally, a Related Advisor does not purchase, sell or hold securities on behalf of Clients contrary to the current recommendations made to other affiliated Client accounts.  However, because certain Client accounts may have investment objectives, strategies or legal, contractual, tax or other requirements that differ (such as the need to take tax losses, realize profits, raise cash, diversification, etc.), a Related Advisor may purchase, sell or continue to hold securities for certain Client accounts contrary to other recommendations.  In addition, a Related Advisor may be permitted to sell securities or instruments short for certain Client accounts and may not be permitted to do so for other affiliated Client accounts.

*Principal Trading*

The Related Advisors, through their ownership interest in certain Unregistered Investment Funds, may be deemed a *related person* of such entity.  In situations where we determine that we are a *related person* by our ownership of greater than 25% of such entity, such fund is considered a "*Principal Account.*"

To the extent a Related Advisor wishes to trade an asset from a Client account to or from a Principal Account (a "Principal Cross Trade"), the SEC has stated that the Principal Cross Trade may only occur if the Client account on the other side from the Principal Account consents to the trade after a disclosure by the Related Advisor of

- 31 -

all material facts. Our Compliance Manual sets forth procedures for executing both cross trades and principal cross trades.

*Cross Trading*

In an effort to reduce transaction costs, increase execution efficiency, and capitalize on timing opportunities, we may execute cross trades, or sell a security for one affiliated Client to another affiliated Client, without interposing a broker-dealer. All cross trades are subject to the cross trade procedures set forth in our Compliance Manual. Cross trades present an inherent conflict of interest because we and/or our affiliates represent the interest of the buyer and seller in the same transaction. As a result, Clients involved in a cross trade bear the risk that the price obtained from a cross trade may be less favorable than if the trade had been executed in the open market.

*Conflicts Related to Investment Activities*

The Related Advisors may buy or sell the same securities for an affiliate's account that they buy or sell for a Client or may pursue the same investment strategies for an affiliate's account as for a Client's. The Related Advisors also may receive greater management or performance-based fees or incentives in connection with managing certain Client accounts than from other Client accounts. In addition, if the Related Advisors allocate a Client's assets among pooled vehicles managed by the Related Advisors, they may have an incentive to allocate assets into vehicles that produce the greatest fees for the Related Advisors. Each of these situations give rise to a potential conflict of interest in the allocation of investment opportunities. In addition, the Related Advisors have an incentive to resolve conflicts of interest in favor of affiliated Clients over non-affiliated Clients. As previously described, the Related Advisors adopted trade allocation policies and procedures that seek to ensure fair and equitable access to investment opportunities for all accounts.

*Trade Aggregation*

In some circumstances, the Related Advisors may seek to buy or sell the same securities contemporaneously for multiple Client accounts. The Related Advisors may, in appropriate circumstances, aggregate securities trades for a Client with similar trades for other Clients, but are not required to do so. In particular, the Related Advisors may determine not to aggregate transactions that relate to portfolio management decisions that are made independently for different accounts or if the Related Advisors determine that aggregation is not practicable, not required or inconsistent with Client direction. When transactions are aggregated and it is not possible, due to prevailing trading activity or otherwise, to receive the same price or execution on the entire volume of securities purchased or sold, the various prices may be averaged or allocated on another basis deemed to be fair and equitable. In addition,

- 32 -

under certain circumstances, the Clients will not be charged the same commission or commission equivalent rates in connection with a bunched or aggregated order. The effect of the aggregation may therefore, on some occasions, either advantage or disadvantage any particular Client.

From time to time, aggregation may not be possible because a security is thinly traded or otherwise not able to be aggregated and allocated among all affiliated Client accounts seeking the investment opportunity or a Client may be limited in, or precluded from, participating in an aggregated trade as a result of that Client's specific brokerage arrangements. Also, an issuer in which Clients wish to invest may have threshold limitations or aggregate ownership interests arising from legal or regulatory requirements or company ownership restrictions, which may have the effect of limiting the potential size of the investment opportunity and thus the ability of the applicable Client to participate in the opportunity.

*Company Errors*

For the Company's Clients, the Company's responsibility for its trade errors is set forth in the governing documents for the relevant Client. No soft-dollars may be used to satisfy any trade errors. In addition, the Company may not use the securities in one Client's account to settle the trade error in another Client's account.

*Conflicts Related to Valuation*

The Related Advisors may have a role in determining asset values with respect to Client accounts and may be required to price an asset when a market price is unavailable or unreliable. This may give rise to a conflict of interest because a Related Advisor may be paid an asset-based fee on certain Client accounts. In order to mitigate these conflicts, the Related Advisors determine asset values in accordance with valuation procedures, which generally are set forth in their applicable Compliance Manual.

*Conflicts Related to Investments in Affiliated Funds*

The Related Advisors purchase for Client accounts interests in other pooled vehicles, including Structured Product Vehicles, Unregistered Investment Funds and Retail Funds, offered by Related Parties. Investment by a Client in such a vehicle means Related Parties receive advisory or other fees from the Client in addition to advisory fees charged for managing the Client's Account. The details of any possible fee offsets, rebates or other reduction arrangements in connection with such investments are provided in the documentation relating to the relevant Client account and/or underlying investment vehicle. In choosing between vehicles managed by Related Parties and those not affiliated with Related Parties, Related Parties may have a financial incentive to choose Related Parties-affiliated vehicles over third parties by

- 33 -

reason of additional investment management, advisory or other fees or compensation Related Parties may earn. The potential for fee offsets, rebates or other reduction arrangements may not necessarily eliminate this conflict and Related Parties may nevertheless have a financial incentive to favor investments in Related Parties-affiliated vehicles. If the Related Advisors invest in an affiliated vehicle, a Client should not expect the Related Advisors to have better information with respect to that vehicle than other investors may have (and if the Related Advisors do have better information they may be prohibited from acting upon it in a way that disadvantages other investors).

Additionally, Related Parties may sponsor and manage funds and accounts that compete with the Related Advisors or make investment with funds sponsored or managed by third-party advisers that would reduce capacity otherwise available to the Related Advisors' Clients.

*Other Potential Conflicts*

Related Parties may provide services other than advice to a Client, including administration, organizing/managing business affairs, executing and reconciling trades, preparing financials and providing audit support, preparing tax documents, sales and investor relations support, and diligence and valuation services, for additional fees. A potential conflict arises in such circumstances because Related Parties are incentivized to favor its Clients that pay such additional fees. However, the individuals who provide advice to Clients do not provide these additional services.

The Related Advisors may cause a Client to purchase, sell or hold securities of issuers in which Related Parties make a market or has an equity, debt or other financial interest or securities of issuers or other investments in which Related Parties, their officers or employees or their affiliated broker-dealers and other Related Parties and their officers or employees have positions or other financial interests. For example, the Related Advisors may purchase on behalf of a Client unregistered securities for which an affiliate acts as placement agent, which may result in additional fees to the affiliate or assist the affiliate in meeting its contractual obligations. The Related Advisors may also cause a Client to borrow money from Related Parties, and the Related Parties may earn interest or fees on such transactions. Conflicts also may arise if the Related Advisors implement a portfolio decision or strategy (including a decision to hold an investment) for one Client ahead of, or contemporaneously with, another Client. Such transactions may have the effect of diluting or otherwise disadvantaging the values, prices or investment strategies of other Client accounts and could result in one Client receiving more favorable trading results or reduced costs at the expense of the other Client.

- 34 -

Related Parties may invest (or recommend that a Client invest) in securities issued by a Client and may hedge derivative positions by buying or selling securities issued by a Client. A potential conflict may arise in such circumstances because a Related Advisor may be incentivized to favor its Clients that issue securities, or such Clients of its affiliates, over other Clients. In addition to Clients, some of the Related Advisors' service providers are issuers of securities. The Related Advisors may determine that it is in the best interests of a Client to purchase securities issued by one of these entities. The Related Advisors have adopted policies and procedures designed to address conflicts of interest arising from the foregoing activities. Furthermore, it is the Related Advisors' general policy not to take into account the fact that an issuer is a Client, service provider or vendor when making investment decisions.

Certain qualified employees and affiliates may invest in Clients either through general partner entities or as limited partners, shareholders or otherwise. The Related Advisors generally reduce or waive all or a portion of the management fee, performance-based fee related to the investments by such persons.

*Conflicts Related to Information Possessed by or Provided by the Related Advisors*

Certain Related Parties may receive or create information (*e.g.*, proprietary technical models) that is not generally available to the public. The Related Advisors have no obligation to provide such information to Clients or effect transactions for Clients on the basis of such information and in many cases the Related Advisors will be prohibited from trading for the same Clients based on the information. Similarly, some Clients may have access to information regarding Related Parties' transactions or views that is not available to other Clients, and may act on that information through accounts managed by persons other than Related Parties. Such transactions may negatively impact other Clients (*e.g.*, through market movements or decreasing availability or liquidity of securities). Additionally, our personnel or those of our advisory affiliates may from time to time serve on the board of directors of portfolio companies, and in such capacity may recommend investment opportunities to such companies.

*Conflicts Related to the Related Advisors' Relationships with Third Parties*

The Related Advisors may advise third-parties regarding valuation, risk management, transition management and potential restructuring or disposition activities in connection with proprietary or Client investments, which may create an incentive to purchase securities or other assets from those third parties or engage in related activities to bid down the price of such assets, which may have an adverse effect on a Client.

- 35 -

The Related Advisors may work with pension or other institutional investment consultants and such consultants may also provide services to the Related Advisors. Consultants may provide brokerage execution services to Related Parties and Related Parties may attend conferences sponsored by consultants. The Related Advisors also may be hired to provide investment management or other services to a pension or other institutional investment consultant that works with a Client, which may create conflicts.

Related Parties may in-source or out-source to third parties certain processes or functions, which may give rise to conflicts. There may be conflict when negotiating with third-party service providers if Related Parties bear operational expenses of various Clients to the extent that a given fee structure would tend to place more expense on Clients for which Related Parties have a greater entitlement to reimbursement or less expense on Clients for which Related Parties have lesser (or no) entitlement to reimbursement. Related Parties may provide information about a Client's portfolio positions to unrelated third parties to provide additional market analysis and research to Related Parties and they may use such analysis to provide investment advice to other Clients.

Related Parties may purchase information (such as periodicals, conference participation, papers, surveys) from professional consultant firms, and such firms may have an incentive to give favorable evaluations of Related Parties to their Clients.

In selecting broker-dealers that provide research or other products or services that are paid with soft dollars, conflicts may arise between a Related Advisor and a Client because a Related Advisor may not produce or pay for these benefits but may use brokerage commissions generated by Client transactions. Soft dollar arrangements may also give a Related Advisor an incentive to select a broker-dealer based on a factor other than the Related Advisor's interest in receiving the most favorable execution. Conflicts of interest related to soft dollar relationships with brokerage firms may be particularly influential to the extent that a Related Advisor uses soft dollars to pay expenses it might otherwise be required to pay itself. Furthermore, research or brokerage services obtained using soft dollars or that are bundled with trade execution, clearing, settlement or other services provided by a broker-dealer may be used in such a way that disproportionately benefits one Client over another (*e.g.*, economics of scale or price discounts). For example, research or brokerage services paid for through one Client's commission may not be used in managing that Client's account. Additionally, where a research product or brokerage service has a mixed-use, determining the appropriate allocation of the product or service may create conflicts. Please refer to the section titled Brokerage Practices for information regarding the Related Advisors' use of soft dollars.

- 36 -

Conflicts may arise where a Related Advisor has the responsibility and authority to vote proxies on behalf of its Clients. Please refer to the section titled <u>Voting Client Securities</u> for information regarding the policies and procedures governing the Related Advisors' proxy voting activities.

Related Parties may serve on the boards of directors and/or investment committees of external organizations, including those organizations that are currently or may become Clients of Related Parties, and such service may present conflicts of interest to the extent the employee become aware of material non-public information and may be unable to initiate some transactions for other Clients while in possession of that information.

The Related Advisors may conduct business with institutions such as broker dealers or investment banks that invest, or whose Clients invest, in pooled vehicles sponsored or advised by the Related Advisors, or may provide other consideration to such institutions or recognized agents, and as a result the Related Advisors may have a conflict of interest in placing its brokerage transactions.

Related Parties may receive stock options from companies, the securities of which may be held in accounts of Related Parties' Clients, in exchange providing consulting work, including but not limited to, advisory services and financial services, for those companies.

*Other Accounts and Relationships*

As part of our regular business, Highland and its Related Parties hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective Clients, on a principal or agency basis, subject to applicable law including Section 206(3) of the Advisers Act, with respect to loans, securities and other investments and financial instruments of all types. The Related Parties also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets-oriented investment activities. The Related Parties will not be restricted in their performance of any such services or in the types of debt, equity, real estate or other investments which they may make. The Related Parties may have economic interests in or other relationships with respect to investments made by Clients. In particular, but subject to Highland's personal trading policy the Related Parties may make and/or hold an investment, including investments in securities, that may compete with, be pari passu, senior or junior in ranking to an, investment, including investments in securities, made and/or held by Clients or in which partners, security holders, members, officers, directors, agents or employees of such Clients serve on boards of directors or otherwise have ongoing relationships. Each of such ownership and other relationships may result in restrictions on transactions by Clients and otherwise create conflicts of interest for

- 37 -

Clients. In such instances, the Related Parties may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to Client investments, subject to the capital structure conflicts procedures discussed above. In connection with any such activities described above, but subject to Highland's personal trading policy the Related Parties may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable for Clients. Subject to Highland's personal trading policy, the Related Parties will not be required to offer such securities or investments to Clients or provide notice of such activities to Clients. In addition, in managing Client portfolios, each of the Related Advisors may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest. Furthermore, in connection with actions taken in the ordinary course of business of the Related Advisors in accordance with their fiduciary duties to their other Clients, the Related Advisors may take, or be required to take, actions which adversely affect the interests of their Clients.

The Related Parties have invested and may continue to invest in investments that would also be appropriate for Clients. Such investments may be different from those made on behalf of Clients. No Related Advisor nor any Related Party has any duty, in making or maintaining such investments, to act in a way that is favorable to Clients or to offer any such opportunity to Clients, subject to Highland's allocation policy and personal trading policy. The investment policies, fee arrangements and other circumstances applicable to such other parties may vary from those applicable to Clients. Any Related Party may also provide advisory or other services for a customary fee with respect to investments made or held by Clients, and no stockholders nor Clients shall have any right to such fees except to the extent the governing documents of the applicable Client expressly provide otherwise. Any Related Party may also have ongoing relationships with, render services to or engage in transactions with other Clients, who make investments of a similar nature to those of Clients, and with companies whose securities or properties are acquired by Clients and may own equity or debt securities issued by Clients. In connection with the foregoing activities any Related Party may from time to time come into possession of material nonpublic information that limits the ability of the Related Advisors to effect a transaction for Clients, and Client investments may be constrained as a consequence of the Related Advisors' inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its Clients.

Although the professional staff of the Related Advisors will devote as much time to Clients as they deem appropriate to perform their duties, the staff may have conflicts in allocating its time and services among Client accounts.

- 38 -

The directors, officers, employees and agents of the Related Parties may, subject to applicable law, serve as directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for Clients or any Related Party, or for any Client joint ventures or any affiliate thereof, and no Clients nor their stockholders shall have the right to any such fees except to the extent the governing documents of the applicable Client expressly provide otherwise.

The Related Parties serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as Clients, or of other investment funds managed by Related Advisors.  In serving in these multiple capacities, they may have obligations to other Clients or investors in those entities, the fulfillment of which may not be in the best interests of Clients or their stockholders.  Clients may compete with other entities managed by Related Advisors for capital and investment opportunities.

There is no limitation or restriction on Related Advisors with regard to acting as investment manager (or in a similar role) to other parties or persons.  This and other future activities of Related Parties may give rise to additional conflicts of interest.  Such conflicts may be related to obligations that Related Advisor or their affiliates have to other Clients.

Certain Related Parties, including NexBank SSB and Governance Re among others, may provide banking, agency, insurance and other services to Clients and their operating affiliates for customary fees, and no Client, nor its subsidiaries will have a right to any such fees except to the extent the governing documents thereof expressly provide otherwise.

Related Advisors may direct Clients to acquire or dispose of investments in cross or principal trades involving Clients of the Advisory Parties in accordance with applicable legal and regulatory requirements as described above.  In addition, Clients may make and/or hold an investment, including an investment in securities, in which Related Parties have a debt, equity or participation interest, and the holding and sale of such investments by Clients may enhance the profitability of Related Parties' own investments in such companies.  Moreover, Clients and their operating affiliates may invest in assets originated by, or enter into loans, borrowings and/or financings with Related Parties, including but not limited to NexBank, including in primary and secondary transactions with respect to which Related Parties may receive customary fees from the applicable issuer, and no Client nor their subsidiaries shall have the right to any such fees except to the extent the governing documents of such Client expressly provide otherwise.   In each such case, Related Parties may have a potentially conflicting division of loyalties and responsibilities regarding Clients and the other parties to such investment.   Under certain circumstances, the Related

- 39 -

Advisors may determine that it is appropriate to avoid such conflicts by selling an investment at a fair value that has been calculated pursuant to our valuation procedures to another fund managed or advised by the Related Advisors.  In addition, the Related Advisors may enter into agency cross-transactions where it or any of its affiliates act as broker for Clients, to the extent permitted under applicable law.

Related Parties may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of investments purchased by Clients.  Such transactions are on an arm's-length basis and may be subject to arm's-length fees.  There is no expectation for preferential access to transactions involving investments that are underwritten, originated, arranged or placed by Related Parties and no Client nor their stockholders shall have the right to any such fees except to the extent the governing documents of such Client expressly provide otherwise.

*Material Non-Public Information*

There are generally no ethical screens or information barriers among the Related Advisors and certain of their affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions.  If any Related Advisor, any of their personnel or affiliates were to receive material non-public information about an investment or issuer, or have an interest in causing a Client to acquire a particular investment, we may be prevented from causing the Client to purchase or sell such asset due to internal restrictions imposed on us.  Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Related Advisors, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information.  In addition, while the Related Advisors and certain of their affiliates generally operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers.  In such event, our ability to operate as an integrated platform could also be impaired, which would limit our access to personnel of our affiliates and potentially impair our ability to manage Client investments.

- 40 -

# ITEM 12.  BROKERAGE PRACTICES

BROKER-DEALER SELECTION

Highland has an obligation to obtain "best execution" for Client transactions considering the execution price and overall commission costs paid and certain other factors.  Our trading desk routes orders to various broker-dealers for execution at their discretion.  Where possible, we deal directly with the dealers who make a market in the securities involved, except in those circumstances where we believe better prices and execution are available elsewhere.

Through periodic meetings of the Brokerage Committee, Highland reviews compensation paid to broker-dealers.  The meetings include an in-depth review of "best execution reports" which are third party reports that show how Highland's execution compared to its peers.  The reports also include information regarding the most used broker-dealers, lowest and highest cost broker-dealers, and other information used in reviewing broker-dealer selection and compensation.

Factors involved in selecting brokerage firms include:

*Broker Specific*

❖ Size of broker

❖ Reputation

❖ Quality of service

❖ Experience

❖ Financial stability and creditworthiness

❖ Financial statements

❖ Regulatory filings

❖ Standing in financial community

❖ Ability to handle block trades

❖ Acceptable record of delivery and payment on past transactions

❖ Quality of research and investment information provided

*Transaction Specific*

❖ Best available execution

- 41 -

❖ Market knowledge regarding specific industries and securities

❖ Access to sources of supply or markets

❖ Nature of the market for the security

THE APPROVAL PROCESS

Highland's trading desk is only allowed to trade with broker-dealers that are approved by our Brokerage Committee unless interim approval is expressly provided by the Compliance Department, in which case such approval shall be ratified by the Brokerage Committee at the next meeting of the Committee. New broker-dealers are added to Highland's approved list of broker-dealers subject to a formal review process which closely analyzes all of the above mentioned broker specific selection items. The Brokerage Committee reviews the requirements and determines what additional procedures or reporting are necessary.

Highland generally has discretion to select brokers for its Clients that are pooled investment vehicles, such as, Retail Funds and Unregistered Investment Funds. For the Retail Funds, the Board of Trustees/Directors of each Retail Fund is ultimately responsible for the oversight of the Retail Fund and has the authority to direct or limit the brokers that may be used for the particular Retail Fund.

SOFT DOLLARS

In those circumstances where more than one broker-dealer is able to satisfy our obligation to obtain best execution, Highland may place a trade order on behalf of Client Accounts with a broker-dealer that charges more than the lowest available commission cost or price. Highland may do this in exchange for certain brokerage and research services provided either directly from the broker-dealer or through a third party ("Soft Dollar Arrangements"), provided that each of the following is met:

❖ Highland determines:

   1. The research or brokerage product or service constitutes an eligible brokerage or research service;
   2. The product or service provides lawful and appropriate assistance in the performance of Highland's investment decision making responsibilities; and
   3. In good faith the amount of Client commissions paid is reasonable in light of the value of the products or services provided.

❖ The brokerage or research is "provided by" a broker-dealer who participates in effecting the trade that generates the commission. Highland may not incur a direct obligation for research with a third party vendor and then arrange to have a broker-dealer pay for that research in exchange for brokerage commissions.

- 42 -

❖ Highland may only generate soft dollars with commissions in agency transactions. Highland may not use dealer markups in principal transactions to generate soft dollars. In addition, a trade for a fixed income security or over-the-counter ("OTC") security may be done on an agency basis only if the trader determines that it would not result in a broker-dealer unnecessarily being inserted between Highland and the market for that security.

❖ No soft dollars are generated on accounts for which:

1. Investment discretion resides with the Client (i.e. non-discretionary accounts);
2. Client mandates restrict or prohibit the generation of soft dollar commissions;
3. The Client has a directed brokerage arrangement.

❖ The brokerage trade placed is for "securities" transactions (and not, for example, futures transactions).

Research services furnished by brokers through whom Highland effects securities transactions may be used in servicing all of Highland's accounts, and not all such services may be used in connection with the accounts which paid commissions to the broker providing such services.

If a Client Account is under the custody of one brokerage firm and another brokerage firm is a selling group member for an underwriting syndicate, such a Client Account may not be able to participate in the purchase of securities in the underwriting because the custodial brokerage firm was not a selling group member. In addition, to the extent that a Client directs brokerage trades to be placed with a particular broker, the allocation of securities transactions may be impacted.

When Highland uses Client brokerage commissions (or markups or markdowns) to obtain research or other products or services, Highland receives a benefit because the firm does not have to produce or pay for research, products, or services. Consequently, Highland may have an incentive to select or recommend a broker-dealer based on our interest in receiving the research or other products or services, rather than Clients' interest in receiving most favorable execution.

PRODUCTS AND SERVICES ACQUIRED WITH SOFT DOLLARS

All products and services acquired with soft dollars qualify under the Safe Harbor of 28(e) of the Securities Exchange Act of 1934. Examples of eligible services and products include independent stock research, economic research, research in specific industry sectors, real time feeds, newswires, strategic analysis, and back office systems.

- 43 -

DIRECTED BROKERAGE

Highland does not require Clients to direct brokerage, but in those situations where a Client
has directed Highland to place trades with a particular broker-dealer, Highland may not be
free to seek the best price, volume discounts or best execution by placing transactions with
other broker-dealers.  Additionally, as a result of directing Highland to place trades with a
particular broker-dealer, a disparity in commission charges may exist between the
commissions charged to Clients who direct us to use a particular broker-dealer and those
Clients who do not direct us to use a particular broker-dealer as well as a disparity among
the brokers to which different Clients have directed trades.

TRADE AGGREGATION

Orders of Clients may be combined (or "bunched") when possible to obtain volume discounts
resulting in a lower per share commission.  Please see the section entitled Code of Ethics,
Participation or Interest in Client Transactions, and Personal Trading for additional
information regarding Highland's trade aggregation procedures.

# ITEM 13.   REVIEW OF ACCOUNTS

ACCOUNT REVIEW

Highland has an Investment Committee which, subject to certain size thresholds, is responsible for (i) assessing and approving new issues and new credits and (ii) determining general account suitability for those investments.

In circumstances where the decision to buy is made outside of the Investment Committee (i.e. where limited quantity purchases are allowed or with respect to follow-on investments), allocations will be made by consultation with the Portfolio Managers, typically from a "Gatekeepers" email request sent by or at the direction of the requesting Portfolio Manager.  In determining the aggregate amount to be sought, the Investment Committee and/or Portfolio Managers consider, without limitation, the normal investment amount of the account, the general level of cash on hand and available to be drawn, cash generating activities, withdrawals and other factors affecting the desired purchase amount for Clients.  The Investment Committee also may reconsider buy decisions relating to existing Client holdings when there are significant changes in relevant factors relating to the investment, including, but not limited to, the market value of the investment, the business of the issuer or borrower, results of operations, balance sheet and creditworthiness of the issuer or in the case of an equity security, the outlook for the issuer.  An initial target allocation is determined by the committee at the time of any buy or sell decision based on appropriate factors (e.g., suitability, cash needs/availability, transaction size, etc.) which is then reconciled and adjusted, as appropriate, by the Allocation Committee prior to the commencement of trading on the next trading day.  Our fiduciary duty requires that we recommend only those investments that are suitable for a Client, based on the Client's particular investment objectives, needs and circumstances. We are responsible for inquiring and documenting the criteria discussed above and shall develop suitable investment guidelines for each Client.

*Traders Book*

In certain circumstances, our Authorized Traders, as from time to time amended, determine that an investment is a good short-term opportunity for technical trading reasons. In these cases, an Authorized Trader propose these investment ideas to the Portfolio Managers who will consider the short-term investment based on the facts known to them and presented by the Authorized Trader. If the Portfolio Managers agree to participate in the short-term trade, the Authorized Trader executes the trade for the benefit of those accounts. The trade will then follow our Allocation Policy for immediate term investments.

- 45 -

*Equities*

Investment decisions with respect to equity investments are generally made independently by each applicable Portfolio Manager and allocated solely within the accounts managed by such Portfolio Manager, provided that in certain circumstances, such as debt to equity conversions, such determination may be presented to the Investment Committee in accordance with the process typically applicable to credit investments.

Investments in all Client Accounts are reviewed periodically and are reviewed collectively and individually by multiple reviewers in order to provide multiple perspectives on the accounts. Reviewers evaluate Client objectives along with, among other factors, applicable portfolio restrictions, available cash, particularized investment suitability, investment performance and diversification. In addition to, and not as a substitute for the foregoing, additional reviews are conducted in accordance with Client requests as set forth in the relevant investment advisory contract.

NATURE AND FREQUENCY OF REPORTING

Client reporting varies based on the type of product/vehicle. The following summarizes the reporting provided to each Client. The reports provided to a Client within a particular investment product/vehicle may differ from our description depending upon strategies and Client needs.

*Structured Product Vehicles*

Investors in Structured Product Vehicle Clients generally have access to a written monthly report provided by the trustee and the ability to review a marked portfolio on a monthly basis. The monthly trustee report primarily includes compliance reporting and portfolio holdings.

*Unregistered Investment Funds – Hedge Funds*

Investors in Hedge Fund Clients are generally provided a written monthly account statement with their respective net asset value. They also receive a written monthly reporting package, which includes a one-page summary with a fund overview, market commentary, and Highland's outlook on the market. In addition, the report includes fund specific details around the portfolio statistics, composition, and attribution.

On a quarterly basis, Highland may hold a conference call for a portfolio update with the Portfolio Manager, which will be accompanied by a written presentation to provide an update on the portfolio as well as the credit markets.

- 46 -

In addition to the above mentioned reporting, investors also receive audited written financial statements on an annual basis.

*Unregistered Investment Funds – Private Equity Funds*

Investors in Private Equity Fund Clients are provided a quarterly written capital statement with their respective investment commitments and capital balances, as well as periodic capital call written notices describing amounts being called on commitments and a detailed description of the use of proceeds.

On a quarterly basis, Highland may hold a conference call for a portfolio update with the Portfolio Manager, which will be accompanied by a written presentation to provide an update on the portfolio holdings.

In addition to the above mentioned reporting, investors also receive annual audited written financial statements.

*Separate Accounts*

Separate Account Clients typically have reporting that is tailored based on their expressed desired format and frequency. However, in general, the reporting Highland provides Separate Account Clients mirrors that of Hedge Fund Client written reporting. Reports to Separate Account Clients may be customized to include more detailed statistics, holdings, etc., at the request of the Client since there are generally fewer limitations on the type of information Highland can share regarding their investments. In addition to this reporting, Separate Account Clients have the ability to access the portfolio holdings as they deem necessary through the custodian of the account. An audit may or may not be required depending on the Client.

- 47 -

# ITEM 14.  CLIENT REFERRALS
## AND OTHER COMPENSATION

As stated in Item 12, we may allocate portfolio transactions to brokers or dealers who provide research and/or related services.  For a more detailed discussion of such practices, please refer to Item 12.

Employees of Highland Capital Funds Distributor, Inc. are compensated based on their activities in soliciting investors through FINRA and/or SEC registered intermediaries for Clients advised by our advisory affiliates and may be similarly compensated in respect of our future Clients..  These employees are compensated with a base salary and discretionary bonus.  Unaffiliated persons may from time to time serve as solicitors for Highland and may be compensated for referrals.  Any agreement with a solicitor will be in compliance with Rule 206(4)-3 of the Advisers Act.

# ITEM 15.   CUSTODY

Highland does not act as custodian for Client assets.  However, under Rule 206(4)-2 under the Advisers Act, Highland is deemed to have custody of certain Client assets.  In the case of Retail Funds and Unregistered Investment Funds, such Clients have made arrangements with qualified custodians as disclosed in the relevant offering and other fund documents.  In addition, such Clients obtain additional financial statements which statements are provided to investors no later than 120 days following the fiscal year end.  With respect to Structured Product Vehicles, the trustee has custody of the Client's assets in accordance with the relevant offering and other fund documents.

In the case of Separate Accounts, Clients may give Highland the power to withdraw funds or securities maintained with a custodian upon request.  Without coming to a legal conclusion as to whether Highland would have custody over these assets, Highland operates as if it does have custody in such situations.  Accordingly, unless an exception is available, any Separate Account Clients would receive an annual surprise custody audit and receive account statements from their broker-dealer, bank, or qualified custodian and should carefully review those statements.  Separate Accounts Clients should carefully review those statements and, to the extent Highland also delivers statements to such Clients, compare the Highland statement to the statements of the qualified custodian.  For tax and other purposes, the custodial statement is the official record of a Separate Account Client's account and assets.

Loans held in Client Accounts may be agented by NexBank, SSB.  As Agent Bank, NexBank, SSB will receive cash or send cash to such Clients for interest or principal payments or borrowings.  Client Accounts (other than Retail Funds) may also have bank accounts or account control agreements in place at NexBank, SSB.  In such instances NexBank receives an independent control examination pursuant to Rule 206(4)-2.

- 49 -

## ITEM 16.   INVESTMENT DISCRETION

Highland advises a wide variety of Client Accounts and manages assets on a discretionary basis.  For a description of limitations Clients may impose on our discretionary authority to manage securities, please see the section titled Our Advisory Business.

Highland accepts discretionary authority to manage Clients' assets through an investment management agreement with its Clients.

Additionally, before an investment may be made into an Unregistered Investment Fund, or other similar structure, Highland provides all potential investors in the fund with an offering document, which sets forth in detail the investment strategy and program.  By completing the subscription documents to acquire an interest or shares in an Unregistered Investment Fund, investors give us complete authority to manage the capital contributed in accordance with the offering document received.

# ITEM 17.   VOTING CLIENT SECURITIES

### SECURITIES HELD IN CLIENT ACCOUNTS

Highland's proxy voting policy ensures proxies are voted on behalf of each Client Account's securities and in the best economic interests of such Client Account, without regard to the interests of Highland or any other Client of Highland.  Portfolio Manager(s) of the applicable Client Account(s) evaluate the subject matter of each proxy and vote on behalf of the Client Account in accordance to the guidelines set forth in our proxy voting policy.  In any case where a Client has instructed the Company to vote in a particular manner on the Client's behalf, those instructions will govern in lieu of parameters set forth in the proxy voting policy.

If the Portfolio Manager(s) determines that Highland may have a potential material conflict of interest, whether actual or perceived, in voting a proxy, the Portfolio Manager(s) will contact Highland's Compliance Department prior to the voting deadline. In the event of a conflict, the Company may choose to address such conflict by: (i) voting in accordance with the Proxy Advisor's recommendation; (ii) the CCO determining how to vote the proxy (if the CCO approves deviation from the proxy advisor's recommendation, then the CCO shall document the rationale for the vote); (iii) "echo voting" or "mirror voting" the proxy in the same proportion as the votes of other proxy holders that are not Clients; or (iv) with respect to Clients other than Retail Funds, notifying the affected Client of the material conflict of interest and seeking a waiver of the conflict or obtaining such Client's voting instructions.

### OBTAINING A COPY OF THE POLICY

Clients and prospective Clients can obtain a copy of the proxy voting policy or information on how Highland voted proxies by contacting Highland's Chief Compliance Officer at (972) 628-4100.

## ITEM 18.   FINANCIAL INFORMATION

Highland does not charge or solicit pre-payment of more than $1200 in fees per Client six or more months in advance.

Highland has discretionary authority or custody of Client funds or securities. There is no financial condition that is reasonably likely to impair our ability to meet contractual commitments to Clients.

- 52 -

## ITEM 19.  REQUIREMENTS FOR
## STATE-REGISTERED ADVISERS

Not Applicable.

**App. 345**
APP.3420

# EXHIBIT Q

FORM ADV PART 2A

# ACIS CAPITAL MANAGEMENT, L.P.

June 29, 2018

300 Crescent Court, Suite 700
Dallas, Texas 75201
(972) 628-4100

This brochure provides information about the qualifications and business practices of Acis
Capital Management, L.P., an investment adviser registered with the Securities and
Exchange Commission.  If you have any questions about the contents of this brochure, please
contact us at (972) 628-4100.  The information in this brochure has not been approved or
verified by the United States Securities and Exchange Commission or by any state securities
authority.  Additional information about Acis Capital Management, L.P. is also available at
the  Securities  and  Exchange  Commission's  website  www.adviserinfo.sec.gov.   Our
registration as an investment adviser does not imply any level of skill or training.

# ITEM 2.   MATERIAL CHANGES

The sole material change to this brochure since the last annual update dated March 31, 2018, is as follows:

On April 13, 2018, the Bankruptcy Court for the Northern District of Texas (the "Court") entered an Order for Relief placing Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC ("Acis GP") in involuntary Chapter 7 bankruptcy.  On May 11, 2018, the bankruptcy was converted into a Chapter 11 reorganization, and Robin Phelan, an attorney based in Dallas, Texas, was appointed by the Court as the trustee to oversee the bankruptcy (the "Trustee"). Mr. Phelan, in his capacity as Trustee, exercises discretionary control over all Acis investment decisions and transactions. Accordingly, the Trustee is a control person of both Acis and Acis GP. The bankruptcy proceeding is on-going. Highland Capital Management, L.P. continues to provide non-discretionary investment advice and back office services to Acis pursuant to subadvisory and shared service agreements with Acis.

ii

## ITEM 3.    TABLE OF CONTENTS

ITEM 1.    COVER PAGE ................................................................................................ i

ITEM 2.    MATERIAL CHANGES ................................................................................ ii

ITEM 3.    TABLE OF CONTENTS .............................................................................. iii

ITEM 4.    ADVISORY BUSINESS ................................................................................1

ITEM 5.    FEES AND COMPENSATION .....................................................................3

ITEM 6.    PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT.........6

ITEM 7.    TYPES OF CLIENTS....................................................................................7

ITEM 8.    METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF
LOSS.............................................................................................................8

ITEM 9.    DISCIPLINARY INFORMATION .............................................................17

ITEM 10.    OTHER FINANCIAL INDUSTRY  ACTIVITIES AND AFFILIATIONS .........18

ITEM 11.    CODE OF ETHICS, PARTICIPATION  OR INTEREST IN CLIENT
TRANSACTIONS  AND PERSONAL TRADING ................................................23

ITEM 12.    BROKERAGE PRACTICES BROKER-DEALER SELECTION .......................37

ITEM 13.    REVIEW OF ACCOUNTS .........................................................................41

ITEM 14.    CLIENT REFERRALS AND  OTHER COMPENSATION ...............................44

ITEM 15.    CUSTODY ................................................................................................45

ITEM 16.    INVESTMENT DISCRETION....................................................................46

ITEM 17.    VOTING CLIENT SECURITIES................................................................47

ITEM 18.    FINANCIAL INFORMATION ...................................................................48

ITEM 19.    REQUIREMENTS  FOR STATE-REGISTERED ADVISERS...........................49

iii

# ITEM 4.   ADVISORY BUSINESS

Acis Capital Management, L.P. ("we", "us", "our", "Company", or "Acis") is an investment adviser registered with the SEC as an alternative fixed income manager since 2010. Acis specializes in investments in rated and unrated debt instruments relating to collateralized loan obligations. Our Client base consists of separate accounts, structured product vehicles, and unregistered investment funds at this time and may manage others from time to time.

OWNERSHIP OF ACIS

Acis is 100% owned, directly, or indirectly, by senior management. James Dondero and Mark Okada, directly or indirectly are principal owners of Acis.

Figures are in US$ millions as of 12/31/2017.

| Total Assets Under Management | $3,114.22 |
|---|---|

*By Vehicle Type:*

| Separate Accounts | $639.65 |
|---|---|
| Structured Product Vehicles | $2,474.57 |

The stated AUM above is managed on a discretionary basis.

OUR ADVISORY SERVICES

Acis provides investment advisory services to single Client accounts ("Separate Accounts"), and provides advisory services to, unregistered investment funds ("Unregistered Investment Funds"), structured product vehicles (including but not limited to Collateralized Loan Obligations ("CLOs") and Collateralized Debt Obligations ("CDOs")), together with Separate Accounts, "Client Accounts" or "Clients").

Acis is an affiliate of Highland Capital Management, L.P. ("Highland"), a SEC registered investment advisor. Employees of Acis may also be employees of Highland. In addition, Highland provides Acis a variety of services mentioned herein pursuant to shared services and sub-advisory agreements, which services include, without limitation: advisory services, back office support, valuation services, legal and compliance services, administration, and tax and finance services. Payments to Highland under this agreement are funded solely by the Management Fee except for permitted fund expenses.

- 1 -

TAILORING SERVICES

We tailor our investment advice to the needs of our Clients and subject to applicable investment restrictions set forth in the governing documents for the applicable Clients.

- 2 -

# ITEM 5.   FEES AND COMPENSATION

For providing investment advisory services, Acis typically charges Clients a management fee and/or performance fee or carried interest, and other fees as necessary and agreed to (including, but not limited to, expenses related to servicing accounts, such as administration and legal services).

Under appropriate circumstances and where permitted by applicable law, the terms of an investment advisory contract, including fees, terms of payment and performance fees and termination provisions, are negotiable.  In negotiating fees, Acis considers various factors, including assets under management, investment objectives, strategies and restrictions, and the resources required to meet investment objectives.

We have entered into service agreements with Highland Capital Management, L.P., a Delaware limited partnership ("HCM" or "Highland"), pursuant to which HCM will provide administrative, managerial and/or advisory services to the General Partner on mutually agreed terms.  Payments from Acis to HCM pursuant to the service agreements are funded solely by the Management Fee, except for permitted account expenses that are borne by the applicable accounts.

Clients incur brokerage and other transaction costs associated with Acis' management of Client Accounts.  Please see Item 12. Brokerage Practices of this ADV Part 2 for a discussion of Acis' brokerage practices.

FEE SCHEDULE

The following summary of fees is typically updated in this brochure annually (on or about March 31) and does not reflect subsequent changes unless expressly indicated otherwise.  Fees in the below Fee Schedule are annualized.

| Product | Management Fee | Performance Fee or Carried Interest | Other Fees |
|---|---|---|---|
| Separate Accounts | From 0.60% to 2.00% | Up to 20% over IRR on some accounts | None |
| Structured Products | From 0.15% to 0.85% | From 0.00% to 20.00% | None |
| Unregistered Investment Funds | From 0.7% to 2.00% | From 0.00% to 20.00% | None |

- 3 -

Certain investment vehicles managed by Acis invest in other investment vehicles managed by Acis or our affiliates. For example, an Acis managed Separate Account purchase interest in the debt or equity of a CLO of which Highland acts as collateral manager. Both investment vehicles may impose management fees, performance fees or other expenses (including administrative fees). This results in greater expense to a Client than if such Client had invested directly in the underlying investment vehicle. Certain companies in which Clients are invested also use the products or services, or invest in investment vehicles, offered by Acis or its affiliates and pay fees or other compensation accordingly.

SEPARATE ACCOUNTS

For our Separate Accounts, the agreement entered into with Acis will determine the fee structure. Typically, a Separate Account will pay Acis management fees of 0.60% to 2.0% (per annum) based upon the average daily net assets, which may or may not be net of investment leverage. Acis may also collect a performance fee after reaching an internal rate of return ("IRR") for some accounts. Fees may be deducted from the Separate Account's assets in advance at the beginning of each calendar quarter.

STRUCTURED PRODUCT VEHICLES

As compensation for our advisory services, each Structured Product Vehicle pays Acis management fees ranging from 0.15% to 0.85% annually. Management fees are based on the principal balance of the assets held in the portfolio on defined determination dates. Management fees are established during structuring and remain constant for the duration of the life of the Structured Product Vehicle. Management fees also accrue during a payment period.

In addition to management fees, performance fees, and brokerage and transaction costs, investors in Structured Product Vehicles will indirectly bear the fees and expenses paid by the Structured Product Vehicle, including administration, legal, audit and accounting fees, and certain other fees and expenses. Each Structured Product Vehicle's governing documents include more detailed information about the fees and expenses paid by such Structured Product Vehicle.

*Unregistered Investment Funds*

As compensation for our advisory services, each Unregistered Investment Fund typically pays Highland management fees that range from 0.7% to 2.00% annually. Management fees are based upon outstanding capital accounts or amounts of committed capital and are deducted quarterly in advance or in arrears depending on the specific fund. For accounts that also provide for incentive compensation, Highland also deducts performance fees or investment profit allocations in the form of carried interest ranging from 0% to 20% of returns, which may be after the achievement of a hurdle rate, and which is typically contingent on the manager of the applicable Unregistered Investment Fund eclipsing the

- 4 -

high-water mark.  In some cases, certain investors in an Unregistered Investment Fund enter into side letter agreements with Highland, under which they may pay a different fee than others based on the terms of their agreement with Highland or may otherwise receive certain additional rights.  Upon termination of the applicable Unregistered Investment Fund's advisory agreement, any management fees that have been prepaid are generally returned on a pro-rated basis.

In addition to management fees, performance fees, and brokerage and transaction costs, investors in the Unregistered Investment Funds will indirectly bear the fees and expenses paid by the Unregistered Investment Funds, including custody fees, administration, legal, audit and tax preparation fees, and certain other fees and expenses.  Each Unregistered Investment Fund's offering documents include more detailed information about the fees and expenses paid by such Unregistered Investment Fund.

OTHER COMPENSATION

Client Accounts may hold significant positions, individually or collectively, directly or indirectly, in the securities issued by a company.  Accordingly, Acis or an affiliate may have the right to appoint a board member or officer for such company.  Acis or an affiliate may appoint an employee or a third party to such position as it sees fit in the best interest of the company and its Clients.  Employee are permitted to retain all compensation received for such positions except to the extent contrary to the governing documents for one or more Client Accounts, in which case the proportion of such compensation related to such Client Account(s) will be paid to those Account(s) (generally in proportion to relative assets of the Client Account as of the date paid).

In addition, to the extent permitted by the offering and/or governing documents of the applicable advised accounts, Acis and/or its affiliates receive other fees for services provided to portfolio companies, provided such fees are on arms-length terms and approved by the Board of Directors or other governing body of the applicable portfolio company.  See also Item 10. Other Financial Industry Activities and Affiliations.

We have established procedures designed to address possible conflicts of interest that such board or officer positions might present, including requiring authorization from the Chief Compliance Officer prior to an officer or employee serving as a board member.  As a result of such activities, Acis may acquire confidential information, which may restrict Client Accounts from transacting in certain securities.  As a result, we may not initiate a transaction on behalf of Clients which we otherwise might have.

Please see Item. 6 Performance-Based Fees and Side-By-Side Management of this ADV Part 2 for additional information regarding performance fees or investment profit allocations in the form of carried interest.

- 5 -

# ITEM 6.   PERFORMANCE-BASED FEES
# AND SIDE-BY-SIDE MANAGEMENT

As described above, certain Clients pay Acis a performance fee or investment profit allocations in the form of carried interest.  To the extent that Acis charges a performance-based fee, the performance-based fee will comply with the requirements of Section 205 and Rule 205-3 under the Investment Advisers Act of 1940 (the "Advisers Act").  In situations where Acis has entered into a performance fee arrangement, it has an economic incentive to make riskier investments and/or pursue riskier strategies than it might otherwise.  In addition, because Acis manages both accounts with an asset-based fee and accounts with a performance fee or a combination of an asset-based fee and performance fee, we have an incentive to favor Client accounts for which we receive a performance-based fee.  In addition, Acis and its principals also make investments through a number of proprietary accounts, including Acis Capital Management, L.P.  In order to mitigate any such conflicts, Acis has also developed allocation of limited offering securities (such as IPOs and registered secondary offerings) procedures intended to result in fair and equitable allocation over time.  To mitigate any actual or perceived conflicts of interest, allocation to principal accounts that do not include third party investors may only be made after all other Client Account orders for the security have been filled. A more detailed summary of our allocation guidelines is available to Clients or prospective Clients upon request.

A description of performance-based fees is included in the section titled <u>Fees and Compensation</u>.

# ITEM 7.   TYPES OF CLIENTS

Our Clients include:

- ❖ Separate Accounts

- ❖ Structured Product Vehicles

- ❖ Unregistered Investment Funds

Investment advice is provided directly to Clients and not individually to investors in a particular Client.

Acis has minimum account requirements for Unregistered Investment Funds, Structured Product Vehicles and Separate Accounts and generally requires a minimum investment of $100,000 to $50 million depending on the structure.  Minimum account size may be waived for certain investors at Acis' discretion.

**App. 356**
APP.3431

# ITEM 8.   METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS

The items below are types of investment strategies we currently utilize although we may add or subtract from this list based on various factors including macro-economic conditions.

INVESTMENT STRATEGIES

### CLO Strategy

The primary focus is investing and trading in rated and unrated debt instruments relating to collateralized loan obligations ("CLO" or "CLO Securities") in the primary and secondary markets.  CLO securities rates of return are determined primarily by reference to the total rate of return on one or more loans referenced in such instruments.  The rate of return on the CLO securities may be determined by applying a multiplier to the rate of total return on the reference loan or loans.

### Floating Rate Loan Strategy

This strategy seeks to achieve its objective by investing, under normal market conditions, approximately 80% of its net assets in a portfolio of interests in adjustable rate senior loans, the interest rates of which float or vary periodically based upon a benchmark indicator of prevailing interests rates, to domestic or foreign corporations, partnerships and other entities that operate in a variety of industries and geographic regions.  The strategy may invest all or substantially all of its assets in senior loans that are rated below investment grade and unrated senior loans of comparable quality.  This strategy may also include investments in (i) high quality, short-term debt securities; (ii) warrants, equity securities and junior debt securities; (iii) senior loans of foreign issuers that are foreign currency denominated; and (iv) senior loans the interest rate of which are fixed and do not float.

### Structured Finance Investments

Acis invests in various structured finance instruments, including asset-backed securities; collateralized loan obligations and collateralized debt obligations; and swaps (including total rate of return swaps) whose rates of return are determined primarily by reference to the total rate of return on one or more loans referenced in such instruments.  The rate of return on the structured finance instrument may be determined by applying a multiplier to the rate of total return on the reference loan or loans.  Application of a multiplier is comparable to the use of financial leverage, a speculative technique.  Leverage magnifies the potential for gain and the risk of loss, because of a relatively small decline in the value of a reference loan could result in a relatively large loss for the value of a structured finance instrument.

- 8 -

METHOD OF ANALYSIS

For all Client Accounts, we utilize both fundamental and technical analysis methods.  Our investment philosophy is rooted in a value-oriented, long-term approach, which combines bottom-up research with top-down technical market analysis.  Our analysts follow a rigorous and time-tested bottom-up credit analysis for each credit we manage.  We have also devised and applied an institutionalized process of credit evaluation and approval, via our Investment Committee, and have built a dedicated experienced restructuring team that has been integrated into Acis' investment process.

Acis' self-discipline is largely enforced by the ongoing monitoring of individual credit names by the responsible analyst and his or her supervisor.

Other sources of information include obtaining and reviewing due diligence packages prepared by debt issuers and underwriters of institutional private placements and meetings with management of issuers.

MATERIAL RISKS OF SIGNIFICANT STRATEGIES AND METHODS OF ANALYSIS:

In this section we summarize some of the material risks of Acis' investment strategies and methods of analysis.  More complete information about the specific risks associated with each strategy or Client Account is available in the applicable offering documents.  All methods of investments in securities and loans involve risk of loss including risk that a Client will lose the entire value of their investment.

*Allocation of Investments*

There is a risk that the allocations methodology employed by Acis will not result in optimal allocation and may disadvantage one Client Account while benefiting another Client Account.  Since the process involves human input, there is the risk that human error may cause harm to a Client Account.  Poor or mistaken allocation decisions could result in the loss of money for investors.

*Credit Risk*

Clients engage in transactions in securities and financial instruments that involve counterparties.  Under certain conditions, a counterparty to a transaction could default or the market for certain securities and/or financial instruments may become illiquid.  There is a risk that the issuer of a fixed income security will be unable to make timely principal and interest payments on the security.  Certain Clients invest in securities rated below investment grade (which are commonly referred to as "high yield" securities or "junk" securities).  These investments are regarded as predominately speculative with respect to the issuer's continuing ability to meet principal and interest payments.  The downgrade of a security held by a Client

- 9 -

Account may decrease its value.  Securities are subject to varying degrees of credit risk, which are often reflected in ratings assigned by commercial rating companies such as Moody's Investor Service, Standard & Poor's Corporation, Duff & Phelps Credit Rating Co. and Fitch Investors Service.

*Currency Risk*

If a Client Account invests directly in non-U.S. currencies or in securities of issuers that trade in, and receive revenues in, non-U.S. currencies, or in derivatives that provide exposure to non-U.S. currencies, it will be subject to the risk that those currencies will decline in value relative to the U.S. dollar, or, in the case of hedging positions, that the U.S. dollar will decline in value relative to the currency being hedged.  Currency rates in foreign countries may fluctuate significantly over short periods of time for a number of reasons, including changes in interest rates, intervention (or the failure to intervene) by U.S. or foreign governments, central banks or supranational entities such as the International Monetary Fund, or by the imposition of currency controls or other political developments in the United States or abroad.  As a result, a Client's investments in foreign currency-denominated securities may reduce the returns of the Client Account.

*Derivatives Risk*

Derivatives, such as futures and options, are subject to the risk that changes in the value of a derivative may not correlate perfectly with the underlying asset, rate or index.  Derivatives also expose the Client to the credit risk of the derivative counterparty.  Derivative contracts may expire worthless and the use of derivatives may result in losses to the Client.

*Frequency of Trading*

Some of the strategies and techniques to be employed by Acis require frequent trades to take place and, as a consequence, portfolio turnover and brokerage commissions will be greater than for other investment vehicles of similar size that do not employ frequent trading techniques.

*Hedging*

Acis may (but is not required to) utilize financial instruments both for investment purposes and for risk management purposes in order to (i) protect against possible changes in the market value of  a Client Account resulting from fluctuations in the markets and changes in interest rates; (ii) protect the unrealized gains in the value of a Client Account; (iii) facilitate the sale of any such investments; (iv) enhance or preserve returns, spreads or gains on any investment in a Client Account; (v) hedge against a directional trade; (vi) hedge the interest rate, credit or currency exchange

rate on any of financial instruments; (vii) protect against any increase in the price of any financial instruments Acis anticipates purchasing at a later date; or (viii) act for any other reason that Acis deems appropriate. For a variety of reasons, Acis may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged. Such imperfect correlation may prevent a Client from achieving the intended hedge or expose the Client to risk of loss. The successful utilization of hedging and risk management transactions requires skills complementary to those needed in the selection of portfolio holdings. Moreover, it should be noted that the Client Account will be exposed to certain risks that cannot be hedged.

*Illiquid Securities*

Acis may cause a Client to invest in a security that is illiquid. This could present a problem in realizing the prices quoted (selling a bond at or near its true value) and in effectively trading the position(s). The primary measure of liquidity is the size of the spread between the bid price and the offer price quoted by a dealer. The greater the dealer spread, the greater the liquidity risk. Liquidity risk is less relevant for investments that are intended to be held until maturity. Lack of liquidity means Acis may not be able to sell such investments at prices that reflect Acis' assessment of their value or the amount paid for such investments. Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale by Acis and other factors. Furthermore, the nature of Acis' investments, especially those in financially distressed companies, may require a long holding period prior to profitability.

*Inflation Risk*

Inflation risk results from the variation in the value of cash flows from a security due to inflation, as measured in terms of purchasing power. For example, if Acis purchases a 5 year bond in which it can realize a coupon rate of 5 percent, but the rate of inflation is 6 percent, then the purchasing power of the cash flow has declined. For securities other than adjustable bonds or floating rate bonds, the investment is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

*Investments in Distressed Assets*

Debt obligations and other securities of distressed companies will by their nature relate to companies in unstable financial condition and entail substantial inherent risks. Consequently, many of these companies will likely have significantly leveraged capital structures, making them highly sensitive to declines in revenues and to increases in expenses and interest rates. The leveraged capital structure of such

- 11 -

investments will increase the exposure of the portfolio companies to adverse economic factors such as downturns in the economy or deterioration in the condition of the portfolio company or its industry.  Distressed investing also involves significant expenses of legal counsel, experts, consultants and other third parties.

*Investments in Equity Securities*

Investments in public equities are subject to the risk that stock prices will fall over short or long periods of time.  In addition, common stock represents a share of ownership in a company, and rank after bonds and preferred stock in their claim on the company's assets in the event of bankruptcy.

*Investments in Foreign Securities*

A Client may invest a portion of its assets in securities of companies domiciled or operating in one or more foreign countries.  Investing in foreign securities involves considerations and possible risks not typically involved in investing in securities of companies domiciled and operating in the U.S., including instability of some foreign governments, the possibility of expropriation, limitations on the use or removal of funds or other assets, foreign currency risk, changes in governmental administration or economic or monetary policy (in the U.S. or abroad) or changed circumstances in dealings between nations.  The application of foreign tax laws (e.g., the imposition of withholding taxes on dividend or interest payments) or confiscatory taxation may also affect investment in foreign securities.  Higher expenses may result from investment in foreign securities than would from investment in domestic securities because of the costs that must be incurred in connection with conversion between various currencies and foreign brokerage commissions that may be higher than in the U.S.  Foreign securities markets also may be less liquid, more volatile and subject to less governmental supervision than in the U.S., including lack of uniform accounting, auditing and financial reporting standards and potential difficulties in enforcing contractual obligations.

*Investments in Structured Finance Instruments*

Acis may cause Clients to invest in structured finance instruments.  A portion of leveraged loans, high yield debt securities, structured finance instruments and synthetic securities (collectively the "Collateral Debt Obligations") may consist of equipment trust certificates, collateralized mortgage obligations, collateralized bond obligations, collateralized loan obligations or similar instruments. Structured finance instruments present risks similar to those of the other types of Collateral Debt Obligations in which the Client may invest and such risks may be of greater significance in the case of structured finance instruments.  Moreover, investing in structured finance instruments entails a variety of unique risks, including prepayment risk.  In addition, the performance of a structured finance instrument

- 12 -

will be affected by a variety of factors, including its priority in the capital structure of the issuer thereof, the availability of any credit enhancement, the level and timing of payments and recoveries on and the characteristics of the underlying receivables, loans or other assets that are being securitized, remoteness of those assets from the originator or transferor, the adequacy of and ability to realize upon any related collateral and the capability of the servicer of the securitized assets. Each structured finance instrument to be purchased by a Client must be rated by a rating agency.

*Investments in Synthetic Securities*

Acis may cause Clients to invest in synthetic securities. In addition to credit risks associated with holding non-investment grade loans and high yield debt securities, with respect to synthetic securities, Acis or its Clients will usually have a contractual relationship only with the counterparty of such synthetic securities, and not the obligor on a reference obligation (the "Reference Obligor"). Such agreement generally stipulates that Acis or its Client will have no right to directly enforce compliance by the Reference Obligor with the terms of the reference obligation (defined herein as the debt security or other obligation upon which the synthetic security is based), nor any rights of set-off against the Reference Obligor, nor have any voting rights with respect to the reference obligation. In addition, in the event of insolvency of the counterparty, the Client will be treated as a general creditor of such counterparty, and will not have any claim with respect to the reference obligation. Consequently, the Client will be subject to the credit risk of the counterparty as well as that of the Reference Obligor. As a result, concentrations of synthetic securities in any one counterparty subject the notes to an additional degree of risk with respect to defaults by such counterparty as well as by the Reference Obligor. Acis will not perform independent credit analyses of the counterparties, any such counterparty, or an entity guaranteeing such counterparty, individually or in the aggregate.

*Investments in Senior Secured Loan*s

Senior secured loans have significant credit risks and material losses may occur. As with other debt obligations, claims and collateral may be difficult to enforce in the event of a default. No assurance can be made that full or significant recovery of principal and/or interest will be received or that any collateral recovered will be marketable or sufficient.

*Leverage*

When deemed appropriate by Acis and subject to applicable regulations, a Client may use leverage in its investment program, including the use of borrowed funds and investments in certain types of options, such as puts, calls and warrants, which may be purchased for a fraction of the price of the underlying securities while giving the purchaser the full benefit of movement in the market of those underlying securities.

- 13 -

While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. To the extent a Client purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Client. If the interest expense on borrowings were to exceed the net return on the portfolio securities purchased with borrowed funds, the Client's use of leverage would result in a lower rate of return than if the Client were not leveraged.

*Maturity Risk*

In certain situations, Acis may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these circumstances, Acis will make an adjustment to account for the differential interest-rate risks in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

*Market or Interest Rate Risk*

The price of most fixed income securities move in the opposite direction of the change in interest rates. For example, as interest rates rise, the prices of fixed income securities fall. If a Client holds a fixed income security to maturity, the change in its price before maturity will have little impact on the Clients performance; however, if the Client has to sell the fixed income security before the maturity date, an increase in interest rates will result in a loss. Senior secured bank loans generally pay interest at rates that are determined periodically by reference to a base lending rate plus a premium. These rates often are re-determined daily, monthly, quarterly or semi-annually. Recently, domestic and international markets have experienced a period of acute stress starting in the real estate and financial sectors and then moving to other sectors of the world economy. This stress has resulted in unusual and extreme volatility in the equity and debt markets and in the prices of individual investments. These market conditions could add to the risk of short-term volatility of investments.

*Options*

A Client may use a number of option strategies. Put options and call options typically have similar structural characteristics and operational mechanics regardless of the underlying instrument on which they are purchased or sold. A put option gives the purchaser of the option, upon payment of a premium, the right to sell, and the writer

- 14 -

the obligation to buy, the underlying security, commodity, index, currency or other instrument at the exercise price. A call option, upon payment of a premium, gives the purchaser of the option the right to buy, and the seller the obligation to sell, the underlying instrument at the exercise price.

With certain exceptions, exchange listed options generally settle by physical delivery of the underlying security or currency, although in the future cash settlement may become available. Index options are cash settled for the net amount, if any, by which the option is "in-the-money" (i.e., where the value of the underlying instrument exceeds, in the case of a call option, or is less than, in the case of a put option, the exercise price of the option) at the time the option is exercised. Frequently, rather than taking or making delivery of the underlying instrument through the process of exercising the option, listed options are closed by entering into offsetting purchase or sale transactions that do not result in ownership of the new option. The Client's ability to close out its position as a purchaser or seller of a listed put or call option is dependent, in part, upon the liquidity of the option market.

Over-the-counter ("OTC") options are purchased from or sold to securities dealers, financial institutions or other parties ("Counterparties") through direct bilateral agreement with the Counterparty. In contrast to exchange listed options, which generally have standardized terms and performance mechanics, all the terms of an OTC option, including such terms as method of settlement, term, exercise price, premium, guarantee, and security, are set by negotiation of the parties. Unless the parties provide for it, there is no central clearing or guaranty function in an OTC option. As a result, if the Counterparty fails to make or take delivery of the security, currency or other instrument underlying an OTC option it has entered into with the Client or fails to make a cash settlement payment due in accordance with the terms of that option, the Client will lose any premium it paid for the option as well as any anticipated benefit of the transaction.

If a put or call option purchased by the Client were permitted to expire without being sold or exercised, its premium would be lost by the Client. The risk involved in writing a put option is that there could be a decrease in the market value of the underlying security caused by rising interest rates or other factors. If this occurred, the option could be exercised and the underlying security would then be sold to the Client at a higher price than its current market value. The risk involved in writing a call option is that there could be an increase in the market value of the underlying security caused by declining interest rates or other factors. If this occurred, the option could be exercised and the underlying security would then be sold by the Client at a lower price than its current market value. Purchasing and writing put and call options and, in particular, writing "uncovered" options are highly specialized activities and entail greater than ordinary investment risks.

- 15 -

*Valuation of Portfolio Investments*

From time to time, special situations affecting the valuation of the investments (such as limited liquidity, unavailability or unreliability of third-party pricing information and acts or omissions of service providers to the Client) could have an impact on the value of a Client's investment, particularly if prior judgments as to the appropriate valuation of an investment should later prove to be incorrect after a net asset value-related calculation or transaction is completed. Generally, Acis is not required to make retroactive adjustments to prior subscription or withdrawal transactions, management fees or performance allocations based on subsequent valuation data. In addition, Acis may, but is not required to, discount the value of its positions due to limited liquidity, concentration levels or for other reasons. Due to the nature of its investments, Acis may not be able to place a precise value on positions and therefore may need to estimate values.

- 16 -

## ITEM 9.   DISCIPLINARY INFORMATION

Not Applicable.

# ITEM 10.  OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS

Acis and its advisory affiliates manage various strategies and some strategies are managed by more than one adviser.  For this reason certain Clients of Acis (or Clients of Acis' advisory affiliates) may be referred to and enter into advisory agreements with such affiliated adviser.  Neither Acis nor its advisory affiliates charge a fee for such referral or receive any portion of the advisory fees charged Clients managed by an affiliated adviser.

As shared in Item 4, Advisory Business, Acis may use the services of affiliates to service its' Clients.  Acis believes using such services benefits Clients as a whole as the reserves available to them are greater.

BROKER-DEALER, BANKING, AND CONSULTING AFFILIATES

Acis is under common control with Nexbank Capital Inc., whose wholly owned subsidiaries include Nexban Securities, Inc. (also doing business as Nexbank Capital Advisors and Nexbank Wealth Advisors)("NexBank Securities"), and NexBank SSB. Certain employees of Acis, including James Dondero and Mark Okada, serve on the Board of Directors of NexBank.

### NexBank Securities, Inc.

NexBank Securities is a registered broker-dealer and a Member of FINRA/SIPC.  It may provide distribution assistance in connection with the sale or placement of funds managed by Acis. NexBank Securities, Inc., also doing business as NexBank Wealth Advisors, is also a SEC registered investment adviser.

### NexBank, SSB

NexBank, SSB, a state chartered bank, is an affiliate of Acis and may, from time to time, provide banking and agency services to portfolio companies in which Client Accounts may be invested.  Client Accounts and portfolio companies may invest in assets originated by, or enter into loans, borrowings and/or financings with NexBank, including in primary or secondary transactions.  These services generally may result in compensation to NexBank, SSB in various forms, including administrative agent fees, structuring fees, origination and syndication fees, and assignment fees.  As a result, we have an incentive to select, or attempt to influence the selection of, NexBank for such services.  Fees are charged at rates competitive with those offered by third parties.  Acis may also refer Client Accounts or controlled investments to NexBank, SSB for banking services.  NexBank, SSB may charge its customary fees for the provision of such banking services.

- 18 -

To the extent permitted by applicable law, NexBank, SSB, may sell or offer participations to Acis Accounts in a variety of commercial loans for which NexBank will receive compensation.

*Highland Capital Funds Distributor, Inc.*

Highland Capital Funds Distributor, Inc., a SEC-registered broker dealer and a Member of FINRA/SIPC, is under common control through James Dondero's indirect ownership of Highland Capital Funds Distributor. It may provide distribution assistance in connection with the sale or placement of funds managed by Highland.

INVESTMENT ADVISER AFFILIATES

A related person of Acis is the general partner of a number of other collective investment vehicles organized as partnerships including those managed by the following affiliated investment advisers:

*Acis CLO Management, LLC*

Acis CLO Management, LLC is a Relying Adviser and files a single Form ADV with Highland, the Filing Adviser.  Therefore, Acis CLO Management, LLC is under common control with Highland.

*Falcon E&P Opportunities GP, LLC*

Falcon E&P Opportunities GP, LLC, a SEC-registered investment adviser, may be deemed to be under common control with us because James Dondero controls this entity.

*Granite Bay Advisors, L.P.*

Granite Bay Advisors, L.P., a SEC-registered investment adviser, is under common control with Acis because the owners of Acis own substantially all of Granite Bay Advisors, L.P.

*Highland Capital Management, L.P.*

Highland is a SEC-registered investment adviser, and under common control with Acis because the owners of Acis own substantially all of Highland.  Highland also acts as sub-adviser for Acis advised funds.

- 19 -

*Highland Capital Management Fund Advisors, L.P.*

Highland Capital Management Fund Advisors, L.P., a SEC-registered investment adviser, is under common control with us because James Dondero controls the Highland Capital Management Fund Advisors general partner.

Additionally, Highland Capital Management Fund Advisors serves as advisor or sub-advisor to investment companies registered under the Investment Company Act of 1940, as amended.

*Highland Capital Management Latin America, L.P.*

Highland Capital Management Latin America, L.P. is a Relying Adviser and files a single Form ADV with Highland, the Filing Adviser.  Therefore, Highland Capital Management Latin America is under common control with Highland.

*Highland Capital Management Korea Limited*

Highland Capital Management Korea Limited is a Relying Adviser and files a single Form ADV with Highland, the Filing Adviser.  Therefore, Highland Capital Management Korea Limited is under common control with Highland.

*Highland HCF Advisor, Ltd.*

Highland HCF Advisor, Ltd. is a Relying Adviser and files a single Form ADV with Highland, the Filing Adviser.  Therefore, Highland HCF Advisor is under common control with Highland.

*NexPoint Advisors, L.P.*

NexPoint Advisors, L.P., a SEC-registered investment adviser, is under common control with us because James Dondero controls the NexPoint Advisors general partner.

*NexPoint Real Estate Advisors II, L.P.*

NexPoint Real Estate Advisors II, L.P., a SEC-registered investment adviser, is under common control with us because James Dondero controls the NexPoint Real Estate Advisors II general partner.

Thomas Surgent, our Chief Compliance Officer, is also the Chief Compliance Officer of Acis CLO Management, LLC, Highland Capital Management, L.P., Granite Bay Advisors, L.P., Highland Capital Management Latin America, L.P., Highland Capital Management Korea Limited, Highland HCF Advisor, Ltd., and NexPoint Real Estate Advisors II, L.P.  Jason Post is the Chief Compliance Officer of Highland Capital Management Fund Advisors, L.P., and

- 20 -

NexPoint Advisors, L.P. Eric Holt is the Chief Compliance Officer of NexBank Securities, Inc., also doing business as NexBank Advisors.

Highland and/or Highland personnel provide advisory services to each of these affiliated investment advisors, with the exception of Falcon E&P Opportunities GP, LLC, either through sub-advisory or "dual hatting" arrangements with respect to Highland personnel. In addition, Highland is a party to Shared Services Agreement with each of these advisors, under which Highland provides certain administrative and back office services to such advisors, including finance and accounting, human resources, marketing, legal, information technology and operations.

INSURANCE COMPANY AFFILIATES

Highland Capital Management Services, Inc. is an affiliate of Acis and parent company of Governance Re Ltd., a captive insurance agency issuing directors & officers' liability insurance and employment practice liability insurance to Acis, its affiliates, and their respective portfolio companies. NexVantage Title Services is a title insurance company affiliated with NexBank and Highland, which may provide title insurance with respect to real property investments owned by Client Accounts or their portfolio companies. A conflict of interest exists due to the fact that these entities receive premiums from portfolio companies of Client Accounts. As a result, Acis is incentivized to choose these affiliates to provide these services over a third party even though such party's services may be better suited for the company.

INDEPENDENT BUSINESS ENTITIES

Employees, including the owners, of Acis also own personal interests in a variety of independent business entities. A conflict of interest exists due to the potential for the owners' personal relationships and financial interests to conflict with our Client's interests.

BUSINESS ACTIVITIES WITH PORTFOLIO COMPANIES

Acis or its affiliates provide on a periodic basis certain services to portfolio companies including, but not limited to, forensic accounting, interim management consulting services and merger and acquisition advisory services. Acis or our affiliates may also furnish operational consulting services to certain portfolio companies of Acis' Clients. The time spent with respect to such activities depends upon a number of factors including the size of the investment, the relationship with the portfolio company and the financial and strategic position of such company. Acis or its affiliated advisors (including employees) may be directly or indirectly compensated for such services provided such compensation is received as a result of an arm's length contract between the company and such person. Employees of Acis may be granted equity or options in the portfolio companies for which they provide certain services.

- 21 -

Additional information regarding potential conflicts of interest arising from Acis' relationship and activities with its affiliates is provided in the section titled Code of Ethics, Participation or Interest in Client Transactions and Personal Trading.

# ITEM 11.  CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

Acis maintains a policy of strict compliance with the highest standards of ethical business conduct and the provisions of applicable federal securities laws, including rules and regulations promulgated by the SEC, and has adopted policies and procedures described in its Code of Ethics.  The Code of Ethics applies to each employee of Acis and any other "access person" as defined under the Advisers Act.  It is designed to ensure compliance with legal requirements of Acis' standard of business conduct.

A complete copy of Acis' Code of Ethics is available to any Client or prospective Client upon request.

STANDARDS OF CONDUCT

Acis and its access persons are expected to comply with all applicable federal and state laws and regulations.  Access persons are expected to adhere to the highest standards of ethical conduct and maintain confidentiality of all information obtained in the course of their employment and bring any risk issues, violations, or potential violations to the attention of the Chief Compliance Officer.  Access persons are expected to deal with Clients fairly and disclose any activity that may create an actual or potential conflict of interest between them and Acis or Client.

ETHICAL BUSINESS PRACTICES

Falsification or alteration of records or reports, also known as a prohibited financial practice, or knowingly approving such conduct is prohibited.  Payments to government officials or employees are prohibited except for political contributions approved by our Chief Compliance Officer.  We seek to outperform our competition fairly and honestly and seek competitive advantages through superior performance not illegal or unethical dealings.  Access persons are strictly prohibited from (i) participating in online blogging and communication with the media, unless approved by the Chief Compliance Officer or the Compliance Department, and (ii) spreading of false rumors pertaining to any publicly traded company.

CONFIDENTIALITY

Employees must maintain the confidentiality of Acis' proprietary and confidential information, and must not disclose that information unless the necessary approval is obtained.  Acis has a particular duty and responsibility, as investment adviser, to safeguard Client information.  Information concerning the identity and transactions of investors is

- 23 -

confidential, and such information will only be disclosed to those employees and outside parties who need to know it in order to fulfill their responsibilities.

GIFT AND ENTERTAINMENT POLICY

Access persons are permitted, on occasion, to accept gifts and invitations to attend entertainment events. When doing so, however, employees should always act in our best interests and that of our Clients and should avoid any activity that might create an actual or perceived conflict of interest or impropriety in the course of our business relationship. Under no circumstances may (i) gifts of cash or cash equivalents be accepted or (ii) may any gifts be received in consideration or recognition of any services provided to or transactions entered into by, Client Accounts.

PERSONAL TRADING

*Personal Trading Policy*

Access persons are allowed to trade reportable securities during designated time periods, however all transactions in reportable securities other than ETFs must be pre-approved by the Chief Compliance Officer or his/her designee. Except in very limited circumstances approved by the Chief Compliance Officer, access persons are not permitted to trade any security of which we or a Client own any portion of the capital structure or that is on our restricted list without permission. Access persons who violate the personal trading policy are reprimanded in accordance with the sanctions provisions outlined in the Code of Ethics. Personal securities transactions are reviewed by the Chief Compliance Officer or his/her designee for compliance with the personal trading policy and applicable SEC rules and regulations.

*Prohibition against Insider Trading*

Acis forbids any access person from trading, either personally or on behalf of others, including Clients advised by Acis, on material non-public information or communicating material non-public information to others in violation of the law or duty owed to another party. This conduct is frequently referred to as "insider trading". The concepts of material non-public information, penalties for insider trading, and processes for identifying insider trading are addressed in detail in the Compliance Manual and Code of Ethics.

*Reporting Requirements*

In compliance with SEC rules, access persons are required to disclose all of their personal brokerage accounts and holdings within 10 days of initial employment with Acis, within 10 days of opening a new account, and annually thereafter. Additionally, no later than the last day of the month after quarter-end, all access persons must

- 24 -

report all transactions in reportable securities over which the access person had any direct or indirect beneficial ownership. Access persons are also required annually to affirm all reportable transactions from the prior year.

POTENTIAL CONFLICTS

Acis and its affiliates engage in a broad range of activities, including activities for their own account and for the accounts of Clients. This section describes various potential conflicts that may arise in respect of its business, as well as how Acis addresses such conflicts of interest. The discussion below does not describe all conflicts that may arise.

Any of the following potential conflicts of interest will be discussed and resolved on a case by case basis. Acis' determination as to which factors are relevant, and the resolution of such conflicts, will be made using Acis' best judgment, but in its sole discretion. In resolving conflicts, Acis will take into consideration the interests of the relevant Clients, the circumstances giving rise to the conflict and applicable laws. Certain procedures for resolving specific conflicts of interest are set forth below.

*Allocation of Investment Opportunities*

Acis, together with its affiliates, may act as investment adviser to Clients that have similar investment objectives and pursue similar strategies. Certain investments identified by Acis may be appropriate for multiple Clients. Investment decisions for such Clients are made by Acis and the applicable affiliates in their best judgment, but in their discretion, taking into account such factors as Acis believes relevant. Such factors may include investment objectives, regulatory restrictions, current holdings, availability of cash for investment, the size of investments generally, risk-return considerations, tax consequences, and limitations and restrictions on a Client's account that are imposed by such Client. In addition, if it is fair and reasonable that certain Clients are fully filled of their appetite before others (e.g., for tax considerations, to avoid de minimis partial allocations, to cover or close out an existing position to mitigate risk or losses, etc.), then these Clients may receive full or disproportionate allocations, with the remaining amounts allocated in accordance with normal procedures among the other participating Clients. One or more of the foregoing considerations in this paragraph may (and are often expected to) result in allocations among accounts other than on a pari passu basis. Accordingly, particular investment may be bought or sold for only one Client or in different amounts and at different times for more than one but less than all Clients, even though it could have been bought or sold for other Clients at the same time. Likewise, a particular investment may be bought for one or more Clients when one or more other Clients are selling the investment. In addition, purchases or sales of the same investment may be made for two or more Clients on the same date. There can be no assurance that a Client will not receive less (or more) of a certain investment than it would otherwise

- 25 -

receive if Acis, together with its affiliates, did not have a conflict of interest among Clients.

In effecting transactions, it is not always possible, or consistent with the investment objectives of Acis' and its affiliates' various Clients, to take or liquidate the same investment positions at the same time or at the same prices. Certain investment restrictions may limit Acis' and its affiliates' ability to act for a Client and may reduce performance. Regulatory and legal restrictions (including restrictions on aggregation of positions) may also restrict the investment activities of Acis and result in reduced performance.

Acis seeks to manage and/or mitigate these potential conflicts of interest described by following procedures with respect to the allocation of investment opportunities among its and its affiliates' Clients, including the allocation of limited investment opportunities. Our allocation policy is based on a fundamental desire to treat each Client Account fairly over time. Please refer to the Investment Discretion – *Allocation Conflicts* section for a more detailed explanation of Acis' allocation process.

In addition to the investment strategies implemented by the portfolio managers for each of our Clients, such portfolio managers may also give trading desk personnel of the adviser general authorization to enter into a limited amount of short-term trades (purchases expected to be sold within 15 business days) in debt instruments on behalf of such Clients. Over time, it is expected that these trades will not exceed 2% of each such Client's assets. Such investments executed by authorized traders are generally allocated on a weighted rotational basis, based on the AUM of the accounts eligible to participate in such investment opportunities.

*Investment Negotiation*

In order to ensure compliance with Section 17(d) under the Investment Company Act whenever an investment professional proposes to negotiate a term other than price for an investment (including any amendments), he/she must check to see if the investment (or any other position in the issuer's capital structure) is held (or proposed to be invested) in any retail accounts of our advisory affiliates.

If the investment is held in any retail accounts, that person must contact the Chief Compliance Officer for guidance.

(i)      The transaction is generally permitted if all accounts are in the same part of the capital structure and participate in the investment pro rata

(ii)      Alternatively, impose "Chinese Wall" between retail/institutional investment decision-making

- 26 -

One person can negotiate, provided final investment decision still made separately.

May also consult outside counsel and/or the retail board for guidance.

*Capital Structure Conflicts*

Conflicts will arise in cases when Clients of Acis and its affiliates invest in different parts of an issuer's capital structure, including circumstances in which one or more Clients own private securities or obligations of an issuer and other Clients may own public securities of the same issuer.  In addition, one or more Clients may invest in securities, or other financial instruments, of an issuer that are senior or junior to securities, or financial instruments, of the same issuer that are held by or acquired for, one or more other Clients.  If such issuer encounters financial problems, decisions related to such securities (such as over the terms of any workout or proposed waivers and amendments to debt covenants) will raise conflicts of interests.  For example, a Client holding debt securities of the issuer may be better served by a liquidation of the issuer in which it may be paid in full, whereas a Client holding equity securities of the issuer might prefer a reorganization that holds the potential to create value for the equity holders.

In the event of conflicting interests within an issuer's capital structure, Acis will generally pursue the strategy that Acis, together with its affiliated advisers, reflects what would be expected to be negotiated in an arm's length transaction with due consideration being given to our fiduciary duties to each of our accounts (without regard to the nature of the fees received from such accounts):

- This strategy may be recommended by one or more Acis or affiliated investment professionals
- A single person may represent more than one part of an issuer's capital structure
- The recommended course of action will be presented to our Conflicts Committee for final determination as to how to proceed.  We may elect, but are not required, to assign different teams to make recommendations for different parts of the capital structure as the Conflicts Committee determines in its discretion.
- It is acknowledged that the applicable retail portfolio manager will separately and independently make his or her decision on suitability as to the course of action for the applicable retail portfolio and will leave the Conflicts Committee meeting prior to the final determination being made by the Conflicts Committee.

Acis and its affiliated advisers may elect, but is not required, to assign different teams to make recommendations for different parts of the capital structure as the Conflicts Committee determines in its discretion.

- 27 -

In the event any Acis or affiliated personnel serve on the Board of the subject company, they may recuse themselves from voting on transactions involving a capital structure conflict.

- Acis or affiliated personnel board members may still make recommendations to the Conflicts Committee
- If any such persons are also on the Conflicts Committee, they may recuse themselves from the Committee's determination

Acis may use external counsel for guidance and assistance.

*Position Conflicts*

Another type of conflict may arise if we cause one Client account of Acis or its affiliates to buy a security and another Client Account to sell or short the same security. Currently, such opposing positions are generally not permitted within the same account without prior trade approval by the Chief Compliance Officer.  However, a portfolio manager may enter into opposing positions for different Clients to the extent each such Client has a different investment objective and each such position is consistent with the investment objective of the applicable Client.  In addition, transactions in investments by one or more affiliated Client accounts may have the effect of diluting or otherwise disadvantaging the values, prices or investment strategies of other Client accounts.

Generally, Acis does not purchase, sell or hold securities on behalf of Clients contrary to the current recommendations made to other affiliated Client accounts.  However, because certain Client accounts may have investment objectives, strategies or legal, contractual, tax or other requirements that differ (such as the need to take tax losses, realize profits, raise cash, diversification, etc.), Acis may purchase, sell or continue to hold securities for certain Client accounts contrary to other recommendations.  In addition, Acis may be permitted to sell securities or instruments short for certain Client accounts and may not be permitted to do so for other affiliated Client accounts.

*Principal Trading*

In situations where we determine that we are a *related person* by our ownership of greater than 25% of the equity voting securities of such entity, such fund is considered a "*Principal Account.*"

To the extent Acis wishes to trade an asset from a Client Account to or from a Principal Account (a "Principal Cross Trade"), the SEC has stated that a Principal Cross Trade may only occur if the Client Account on the other side from the Principal Account consents to the trade after a disclosure by Acis of all material facts.  Acis' Compliance

- 28 -

Manual sets forth procedures for executing both cross trades and principal cross trades.

*Cross Trading*

In an effort to reduce transaction costs, increase execution efficiency, and capitalize on timing opportunities, Acis may execute cross trades, or sell a security for one affiliated Client to another affiliated Client, without interposing a broker-dealer. All cross trades are subject to the cross trade procedures set forth in Acis' compliance manual. Cross trades, however, may present an inherent conflict of interest because Acis and/or its affiliates represent the interest of the buyer and seller in the same transaction. As a result, Clients involved in a cross trade bear the risk that the price obtained from a cross trade may be less favorable than if the trade had been executed in the open market.

*Conflicts Related to Investment Activities*

Acis and/or its affiliates may buy or sell the same securities for an affiliate's account that it buys or sells for a Client or may pursue the same investment strategies for an affiliate's account as for a Client's. Acis and/or its affiliates also may receive greater management or performance-based fees or incentives in connection with managing certain Client Accounts than from other Client Accounts. In addition, if Acis allocates a Client's assets among pooled vehicles managed by Acis, it may have an incentive to allocate assets into vehicles that produce the greatest fees for Acis. Each of these situations give rise to a potential conflict of interest in the allocation of investment opportunities. In addition, Acis has an incentive to resolve conflicts of interest in favor of affiliated Clients over non-affiliated Clients. As previously described, Acis has adopted trade allocation policies and procedures that seek to ensure fair and equitable access to investment opportunities for all accounts.

*Trade Aggregation*

In some circumstances, Acis and/or its affiliates may seek to buy or sell the same securities contemporaneously for multiple Client Accounts. Acis and/or its affiliates may, in appropriate circumstances aggregate securities trades for a Client with similar trades for other Clients, but is not required to do so. In particular, Acis and/or its affiliates may determine not to aggregate transactions that relate to portfolio management decisions that are made independently for different accounts or if Acis and/or its affiliates determine that aggregation is not practicable, not required or inconsistent with Client direction. When transactions are aggregated and it is not possible, due to prevailing trading activity or otherwise, to receive the same price or execution on the entire volume of securities purchased or sold, the various prices may be averaged or allocated on another basis deemed to be fair and equitable. In addition, under certain circumstances, the Clients will not be charged the same commission or

- 29 -

commission equivalent rates in connection with a bunched or aggregated order. The effect of the aggregation may therefore, on some occasions, either advantage or disadvantage any particular Client.

From time to time, aggregation may not be possible because a security is thinly traded or otherwise not able to be aggregated and allocated among all affiliated Client account seeking the investment opportunity or a Client may be limited in, or precluded from, participating in an aggregated trade as a result of that Client's specific brokerage arrangements. Also, an issuer in which Clients wish to invest may have threshold limitations or aggregate ownership interests arising from legal or regulatory requirements or company ownership restrictions, which may have the effect of limiting the potential size of the investment opportunity and thus the ability of the applicable Client to participate in the opportunity.

*Company Errors*

For the Company's Clients, the Company's responsibility for its trade errors is set forth in the governing documents for the relevant Client. No soft-dollars may be used to satisfy any trade errors. In addition, the Company may not use the securities in one Client's account to settle the trade error in another Client's account.

*Conflicts Related to Valuation*

Acis or an affiliate may have a role in determining asset values with respect to Client Accounts and may be required to price an asset when a market price is unavailable or unreliable. This may give rise to a conflict of interest because Acis may be paid an asset-based fee on certain Client Accounts. In order to mitigate these conflicts, Acis and its affiliates determine asset values in accordance with valuation procedures, which generally are set forth in Acis' Compliance Manual.

*Conflicts Related to Investments in Affiliated Funds*

Acis and/or its affiliates purchase for Client Accounts interests in other pooled vehicles, including structured product vehicles, unregistered investment funds and retail funds, offered by Acis or its affiliates, unless prohibited under applicable law or the relevant account investment guidelines. Investment by a Client in such a vehicle means Acis or its affiliates receive advisory or other fees from the Client in addition to advisory fees charged for managing the Client's Account. The details of any possible fee offsets, rebates or other reduction arrangements in connection with such investments are provided in the documentation relating to the relevant Client Account and/or underlying investment vehicle. In choosing between vehicles managed by Acis and those not affiliated with Acis, Acis may have a financial incentive to choose Acis-affiliated vehicles over third parties by reason of additional investment management, advisory or other fees or compensation Acis or its affiliates may earn.

- 30 -

The potential for fee offsets, rebates or other reduction arrangements may not necessarily eliminate this conflict and Acis may nevertheless have a financial incentive to favor investments in Acis-affiliated vehicles. If Acis invests in an affiliated vehicle, a Client should not expect Acis to have better information with respect to that vehicle than other investors may have (and if Acis does have better information it may be prohibited from acting upon it in a way that disadvantages other investors).

Additionally, Acis' affiliates may sponsor and manage funds and accounts that compete with Acis or make investments with funds sponsored or managed by third-party advisers that would reduce capacity otherwise available to Acis' Clients.

*Other Potential Conflicts*

Acis and its affiliates may provide services other than advice to a Client, including administration, organizing/managing business affairs, executing and reconciling trades, preparing financials and providing audit support, preparing tax documents, sales and investor relations support, and diligence and valuation services, for additional fees. A potential conflict arises in such circumstances because Acis and its affiliates are incentivized to favor its Clients that pay such additional fees. However, the individuals who provide advice to Clients do not provide these additional services.

Acis and its affiliates may cause a Client to purchase, sell or hold securities of issuers in which Acis or its affiliate makes a market or has an equity, debt or other financial interest or securities of issuers or other investments in which Acis or its affiliates, its officers or employees or its affiliated broker-dealers and other related persons and their officers or employees have positions or other financial interests. For example, Acis may purchase on behalf of a Client unregistered securities for which an affiliate acts as placement agent, which may result in additional fees to the affiliate or assist the affiliate in meeting its contractual obligations. Acis may also cause a Client to borrow money from Acis' affiliates, and the affiliates may earn interest or fees on such transactions. Conflicts also may arise if Acis implements a portfolio decision or strategy (including a decision to hold an investment) for one Client ahead of, or contemporaneously with, another Client. Such transactions may have the effect of diluting or otherwise disadvantaging the values, prices or investment strategies of other Client Accounts and could result in one Client receiving more favorable trading results or reduced costs at the expense of the other Client.

Acis or its affiliates may invest (or recommend that a Client invest) in securities issued by a Client and may hedge derivative positions by buying or selling securities issued by a Client. A potential conflict may arise in such circumstances because Acis may be incentivized to favor its Clients that issue securities, or such Clients of its affiliates, over the Client on whose behalf Acis is making the investment. In addition to Clients,

- 31 -

some of Acis' service providers are issuers of securities. Acis may determine that it is in the best interests of a Client to purchase securities issued by one of these entities. Acis has adopted policies and procedures designed to address conflicts of interest arising from the foregoing activities. Furthermore, it is Acis' general policy not to take into account the fact that an issuer is a Client, service provider or vendor when making investment decisions.

Certain qualified employees and affiliates invest in Clients either through general partner entities or as limited partners, shareholders or otherwise. Acis generally reduces or waives all or a portion of the management fee, performance-based fee, or other costs and expenses related to the investments by such persons.

*Conflicts Related to Information Possessed by or Provided by Acis*

Certain persons within Acis or its affiliates may receive or create information (*e.g.*, proprietary technical models) that is not generally available to the public. Acis or its affiliates has no obligation to provide such information to Clients or effect transactions for Clients on the basis of such information and in many cases Acis or its affiliates will be prohibited from trading for the same Clients based on the information. Similarly, some Clients may have access to information regarding Acis' or its affiliates' transactions or views that is not available to other Clients, and may act on that information through accounts managed by persons other than Acis or its affiliates. Such transactions may negatively impact other Clients (*e.g.*, through market movements or decreasing availability or liquidity of securities). Additionally, our personnel or those of our advisory affiliates may from time to time serve on the board of directors of portfolio companies, and in such capacity may recommend investment opportunities to such companies.

*Conflicts Related to Acis' Relationships with Third Parties*

Acis or its affiliates may advise third-parties regarding valuation, risk management, transition management and potential restructuring or disposition activities in connection with proprietary or Client investments, which may create an incentive to purchase securities or other assets from those third parties or engage in related activities to bid down the price of such assets, which may have an adverse effect on a Client.

Acis' or its affiliates' Client may work with pension or other institutional investment consultants and such consultants may also provide services to Acis or its affiliates. Consultants may provide brokerage execution services to employees of Acis and its affiliates and such employees may attend conferences sponsored by consultants. Acis or its affiliates also may be hired to provide investment management or other services to a pension or other institutional investment consultant that works with a Client, which may create conflicts.

- 32 -

Acis or its affiliates may in-source or out-source to third parties certain processes or functions, which may give rise to conflicts. There may be conflict when negotiating with third-party service providers if Acis or its affiliates bears operational expenses of various Clients to the extent that a given fee structure would tend to place more expense on Clients for which Acis or its affiliates has a greater entitlement to reimbursement or less expense on Clients for which Acis has lesser (or no) entitlement to reimbursement. Acis or its affiliates may provide information about a Client's portfolio positions to unrelated third parties to provide additional market analysis and research to Acis or its affiliates and they may use such analysis to provide investment advice to other Clients.

Acis or its affiliates may purchase information (such as periodicals, conference participation, papers, surveys) from professional consultant firms, and such firms may believe they have an incentive to give favorable evaluations of Acis to their Clients.

In selecting broker-dealers that provide research or other products or services that are paid with soft dollars, conflicts may arise between Acis and a Client because Acis may not produce or pay for these benefits but may use brokerage commissions generated by Client transactions. Soft dollar arrangements may also give Acis an incentive to select a broker-dealer based on a factor other than Acis' interest in receiving the most favorable execution. Conflicts of interest related to soft dollar relationships with brokerage firms may be particularly influential to the extent that Acis uses soft dollars to pay expenses it might otherwise be required to pay itself. Furthermore, research or brokerage services obtained using soft dollars or that are bundled with trade execution, clearing, settlement or other services provided by a broker-dealer may be used in such a way that disproportionately benefits one Client over another (*e.g.*, economics of scale or price discounts). For example, research or brokerage services paid for through one Client's commission may not be used in managing that Client's account. Additionally, where a research product or brokerage service has a mixed-use, determining the appropriate allocation of the product or service may create conflicts. Please refer to the section titled <u>Brokerage Practices</u> for information regarding Acis' use of soft dollars.

Conflicts may arise where Acis has the responsibility and authority to vote proxies on behalf of its Clients. Please refer to the section titled <u>Voting Client Securities</u> for information regarding the policies and procedures governing Acis' proxy voting activities.

Employees of Acis and its affiliates may serve on the boards of directors and/or investment committees of external organizations, including those organizations that are currently or may become Clients of Acis, and such service may present conflicts of interest to the extent the employee becomes aware of material non-public information

- 33 -

and may be unable to initiate some transactions for other Clients while in possession of that information.

Acis and its affiliates may conduct business with institutions such as broker dealers or investment banks that invest, or whose Clients invest, in pooled vehicles sponsored or advised by Acis or its affiliates, or may provide other consideration to such institutions or recognized agents, and as a result Acis may have a conflict of interest in placing its brokerage transactions.

Employees or affiliates of Acis or a related person may receive stock options from companies, the securities of which may be held in accounts of Acis' Clients, in exchange for providing consulting services, including but not limited to, Advisory services and financial services, for the company.

*Other Accounts and Relationships*

As part of our regular business, Acis and its affiliates holds purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective Clients, on a principal or agency basis, subject to applicable law including Section 206(3) of the Advisers Act, with respect to loans, securities and other investments and financial instruments of all types.  Acis also provides investment advisory services, among other services, and engages in private equity, real estate and capital markets-oriented investment activities.  Acis will not be restricted in its performance of any such services or in the types of debt, equity, real estate or other investments which it may make.  Acis may have economic interests in or other relationships with respect to investments made by Clients.  In particular, but subject to Acis' personal trading policy, Acis may make and/or hold an investment, including investments in securities, that may compete with, be pari passu, senior or junior in ranking to an, investment, including investments in securities, made and/or held by Clients or in which partners, security holders, members, officers, directors, agents or employees of such Clients serve on boards of directors or otherwise have ongoing relationships.   Each of such ownership and other relationships may result in restrictions on transactions by Clients and otherwise create conflicts of interest for Clients.    In  such  instances,  Acis  may  in  its  discretion  make  investment recommendations and decisions that may be the same as or different from those made with  respect  to  Client  investments,  subject  to  the  capital  structure  conflicts procedures discussed above.  In connection with any such activities described above, but subject to Acis' personal trading policy, Acis and its affiliates may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable for Clients.  Subject to Acis' personal trading policy, Acis will not be required to offer such securities or investments to Clients or provide notice of such activities to Clients.  In addition, in managing Client portfolios, Acis may take into account its relationship or the relationships of its affiliates with obligors and their

- 34 -

respective affiliates, which may create conflicts of interest. Furthermore, in connection with actions taken in the ordinary course of business of Acis in accordance with its fiduciary duties to its other Clients, Acis may take, or be required to take, actions which adversely affect the interests of their Clients.

Acis has invested and may continue to invest in investments that would also be appropriate for Clients. Such investments may be different from those made on behalf of Clients. Acis does not have any duty, in making or maintaining such investments, to act in a way that is favorable to Clients or to offer any such opportunity to Clients, subject to Acis' allocation policy and personal trading policy. The investment policies, fee arrangements and other circumstances applicable to such other parties may vary from those applicable to Clients. Acis may also provide advisory or other services for a customary fee with respect to investments made or held by Clients, and no stockholders nor Clients shall have any right to such fees except to the extent the governing documents of the applicable Client expressly provide otherwise. Acis may also have ongoing relationships with, render services to or engage in transactions with other Clients, who make investments of a similar nature to those of Clients, and with companies whose securities or properties are acquired by Clients and may own equity or debt securities issued by Clients. In connection with the foregoing activities Acis may from time to time come into possession of material nonpublic information that limits the ability of Acis to effect a transaction for Clients, and Client investments may be constrained as a consequence of Acis' inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its Clients.

Although the professional staff of Acis will devote as much time to Clients as they deem appropriate to perform its duties, the staff may have conflicts in allocating its time and services among Client accounts.

The directors, officers, employees and agents of Acis and its affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for Clients or Acis, or for any Client joint ventures or any affiliate thereof, and no Clients nor their stockholders shall have the right to any such fees except to the extent the governing documents of the applicable Client expressly provide otherwise.

Acis and its affiliates serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as Clients, or of other investment funds managed by Acis. In serving in these multiple capacities, they may have obligations to other Clients or investors in those entities, the fulfillment of which may not be in the best interests of Clients or their stockholders. Clients may compete with other entities managed by Acis for capital and investment opportunities.

- 35 -

There is no limitation or restriction on Acis with regard to acting as investment manager (or in a similar role) to other parties or persons. This and other future activities of Acis may give rise to additional conflicts of interest. Such conflicts may be related to obligations that Acis or its affiliates have to other Clients.

Certain Acis affiliates, including NexBank SSB and Governance Re among others, may provide banking, agency, insurance and other services to Clients and their operating affiliates for customary fees, and no Client, nor its subsidiaries will have a right to any such fees except to the extent the governing documents thereof expressly provide otherwise.

Acis may direct Clients to acquire or dispose of investments in cross or principal trades involving Clients of Acis in accordance with applicable legal and regulatory requirements as described above. In addition, Clients may make and/or hold an investment, including an investment in securities, in which Acis and its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by Clients may enhance the profitability of Acis' own investments in such companies. Moreover, Clients and their operating affiliates may invest in assets originated by, or enter into loans, borrowings and/or financings with Acis, including but not limited to NexBank, including in primary and secondary transactions with respect to which Acis may receive customary fees from the applicable issuer, and no Client nor their subsidiaries shall have the right to any such fees except to the extent the governing documents of such Client expressly provide otherwise. In each such case, Acis may have a potentially conflicting division of loyalties and responsibilities regarding Clients and the other parties to such investment. Under certain circumstances, Acis may determine that it is appropriate to avoid such conflicts by selling an investment at a fair value that has been calculated pursuant to our valuation procedures to another fund managed or advised by Acis. In addition, Acis may enter into agency cross-transactions where it or any of its affiliates act as broker for Clients, to the extent permitted under applicable law.

Acis may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of investments purchased by Clients. Such transactions are on an arm's-length basis and may be subject to arm's-length fees. There is no expectation for preferential access to transactions involving investments that are underwritten, originated, arranged or placed by Acis and no Client nor their stockholders shall have the right to any such fees except to the extent the governing documents of such Client expressly provide otherwise.

- 36 -

*Material Non-Public Information*

There are generally no ethical screens or information barriers among Acis and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions.  If Acis, any of its personnel or affiliates were to receive material non-public information about an investment or issuer, or have an interest in causing a Client to acquire a particular investment, we may be prevented from causing the Client to purchase or sell such asset due to internal restrictions imposed on us.  Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in Acis, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information.  In addition, while the Acis and certain of its affiliates generally operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, our ability to operate as an integrated platform could also be impaired, which would limit our access to personnel of our affiliates and potentially impair our ability to manage Client investments.

# ITEM 12.  BROKERAGE PRACTICES
## BROKER-DEALER SELECTION

Acis has an obligation to obtain "best execution" for Client transactions considering the execution price and overall commission costs paid and certain other factors.  Our trading desk routes orders to various broker-dealers for execution at their discretion.  Where possible, we deal directly with the dealers who make a market in the securities involved, except in those circumstances where we believe better prices and execution are available elsewhere.

- 37 -

Through periodic meetings of the Brokerage Committee, Acis reviews compensation paid to broker-dealers.  The meetings include an in-depth review of "best execution reports" which are third party reports that show how Acis' execution compared to its peers.  The reports also include information regarding the most used broker-dealers, lowest and highest cost broker-dealers, and other information broker-dealer selection and compensation.

Factors involved in selecting brokerage firms include:

*Broker Specific*

- ❖ Size of broker

- ❖ Reputation

- ❖ Quality of service

- ❖ Experience

- ❖ Financial stability and creditworthiness

- ❖ Financial statements

- ❖ Regulatory filings

- ❖ Standing in financial community

- ❖ Ability to handle block trades

- ❖ Acceptable record of delivery and payment on past transactions

- ❖ Quality of research and investment information provided

*Transaction Specific*

- ❖ Best available execution

- ❖ Market knowledge regarding specific industries and securities

- ❖ Access to sources of supply or markets

- ❖ Nature of the market for the security

THE APPROVAL PROCESS

Acis' trading desk is only allowed to trade with broker-dealers that are approved by our Brokerage Committee unless interim approval is expressly provided by the Compliance Department, in which case such approval shall be ratified by the Brokerage Committee at the next meeting of the Committee.  New broker-dealers are added to Acis' approved list of

- 38 -

broker-dealers subject to a formal review process which closely analyses all of the above mentioned broker specific selection items.   The Brokerage Committee will review the requirements and determine what additional procedures or reporting are necessary.

SOFT DOLLARS

In those circumstances where more than one broker-dealer is able to satisfy our obligation to obtain best execution, Acis may place a trade order on behalf of Client Accounts with a broker-dealer that charges more than the lowest available commission cost or price.   Acis may do this in exchange for certain brokerage and research services provided either directly from the broker-dealer or through a third party ("Soft Dollar Arrangements"), provided that each of the following is met:

❖   Acis determines:

    1.   The research or brokerage product or service constitutes an eligible brokerage or research service;
    2.   The product or service provides lawful and appropriate assistance in the performance of Acis' investment decision making responsibilities; and
    3.   In good faith the amount of Client commissions paid is reasonable in light of the value of the products or services provided.

❖   The brokerage or research is "provided by" a broker-dealer who participates in effecting the trade that generates the commission.   Acis may not incur a direct obligation for research with a third party vendor and then arrange to have a broker-dealer pay for that research in exchange for brokerage commissions.

❖   Acis may only generate soft dollars with commissions in agency transactions.   Acis may not use dealer markups in principal transactions to generate soft dollars.   In addition, a trade for a fixed income security or over-the-counter ("OTC") security may be done on an agency basis only if the trader determines that it would not result in a broker-dealer unnecessarily being inserted between Acis and the market for that security.

❖   No soft dollars are generated on accounts for which:

    1.   Investment discretion resides with the Client (i.e. non-discretionary accounts);
    2.   Client mandates restrict or prohibit the generation of soft dollar commissions;
    3.   The Client has a directed brokerage arrangement.

❖   The brokerage trade placed is for "securities" transactions (and not, for example, futures transactions).

- 39 -

Research services furnished by brokers through whom Acis effects securities transactions may be used in servicing all of Acis' accounts, and not all such services may be used in connection with the accounts which paid commissions to the broker providing such services.

If a Client Account is under the custody of one brokerage firm and another brokerage firm is a selling group member for an underwriting syndicate, such a Client Account may not be able to participate in the purchase of securities in the underwriting because the custodial brokerage firm was not a selling group member.  In addition, to the extent that a Client directs brokerage trades to be placed with a particular broker, the allocation of securities transactions may be impacted.

When Acis uses Client brokerage commissions (or markups or markdowns) to obtain research or other products or services, Acis receives a benefit because the firm does not have to produce or pay for research, products, or services.  Consequently, Acis may have an incentive to select or recommend a broker-dealer based on our interest in receiving the research or other products or services, rather than Clients' interest in receiving most favorable execution.

PRODUCTS AND SERVICES ACQUIRED WITH SOFT DOLLARS

All products and services acquired with soft dollars qualify under the Safe Harbor of 28(e) of the Securities Exchange Act of 1934.  Examples of eligible services and products include independent stock research, economic research, research in specific industry sectors, real time feeds, newswires, strategic analysis, and back office systems.

DIRECTED BROKERAGE

Acis does not require Clients to direct brokerage, but in those situations where a Client has directed Acis to place trades with a particular broker-dealer, Acis may not be free to seek the best price, volume discounts or best execution by placing transactions with other broker-dealers.  Additionally, as a result of directing Acis to place trades with a particular broker-dealer, a disparity in commission charges may exist between the commissions charged to Clients who direct us to use a particular broker-dealer and those Clients who do not direct us to use a particular broker-dealer as well as a disparity among the brokers to which different Clients have directed trades.

TRADE AGGREGATION

Orders of Clients may be combined (or "bunched") when possible to obtain volume discounts resulting in a lower per share commission.  Please see the sections entitled Code of Ethics, Participation or Interest in Client Transactions, and Personal Trading for additional information regarding Acis' trade aggregation procedures.

- 40 -

# ITEM 13. REVIEW OF ACCOUNTS

ACCOUNT REVIEW

Acis has an Investment Committee which, subject to certain size thresholds, is responsible for (i) assessing and approving new issues and new credits and (ii) determining general account suitability for those investments.

In circumstances where the decision to buy is made outside of the Investment Committee (i.e. where limited quantity purchases are allowed or with respect to follow-on investments), allocations will be made by consultation with the Portfolio Managers, typically from a "Gatekeepers" email request sent by or at the direction of the requesting Portfolio Manager.  In determining the aggregate amount to be sought, the Investment Committee and or Portfolio Managers consider, without limitation, the normal investment amount of the account, the general level of cash on hand and available to be drawn, cash generating activities, withdrawals and other factors affecting the desired purchase amount for Clients.  The Investment Committee also may reconsider buy decisions relating to existing Client holdings when there are significant changes in relevant factors relating to the investment, including, but not limited to, the market value of the investment, the business of the issuer or borrower, results of operations, balance sheet and creditworthiness of the issuer or in the case of an equity security, the outlook for the issuer.  An initial target allocation is determined by the committee at the time of any buy or sell decision based on appropriate factors (e.g., suitability, cash needs/availability, transaction size, etc.) which is then reconciled and adjusted, as appropriate, by the Allocation Committee prior to the commencement of trading on the next trading day.  Our fiduciary duty requires that we recommend only those investments that are suitable for a Client, based on the Client's particular investment objectives, needs and circumstances. We are responsible for inquiring and documenting the criteria discussed above and shall develop suitable investment guidelines for each Client.

*Traders Book*

In certain circumstances our Authorized Traders, as from time to time amended, determine that an investment is a good short-term opportunity for technical trading reasons. In these cases, an Authorized Trader proposes these investment ideas to the Portfolio Managers who will consider the short-term investment based on the facts known to them and presented by the Authorized Trader. If the Portfolio Managers agree to participate in the short-term trade, the Authorized Trader executes the trade for the benefit of those accounts. The trade will then follow our Allocation Policy for immediate term investments.

- 41 -

*Equities*

Investment decisions with respect to equity investments are generally made independently by each applicable Portfolio Manager and allocated solely within the accounts managed by such Portfolio Manager, provided that in certain circumstances, such as debt to equity conversions, such determination may be presented to the Investment Committee in accordance with the process typically applicable to credit investments.

Investments in all Client Accounts are reviewed periodically and are reviewed collectively and individually by multiple reviewers in order to provide multiple perspectives on the accounts. Reviewers evaluate Client objectives along with, among other factors, applicable portfolio restrictions, available cash, particularized investment suitability, investment performance and diversification. In addition to, and not as a substitute for the foregoing, additional reviews are conducted in accordance with Client requests as set forth in the relevant investment advisory contract.

NATURE AND FREQUENCY OF REPORTING

Client reporting varies based on the type of product/vehicle. The following summarizes the reporting provided to each Client. The reports provided to a Client within a particular investment product/vehicle may differ from our description depending upon strategies and Client needs.

*Separate Accounts*

Separate Account Clients typically have reporting that is tailored based on their expressed desired format and frequency. However, in general, the reporting Acis provides Separate Account Clients mirrors that of Hedge Fund Client written reporting. Reports to Separate Account Clients may be customized to include more detailed statistics, holdings, etc., at the request of the Client since there are generally fewer limitations on the type of information Acis can share regarding their investment. In addition to this reporting, Separate Account Clients have the ability to access the portfolio holdings as they deem necessary through the custodian of the account. An audit may or may not be required depending on the Client.

*Structured Product Vehicles*

Investors in Structured Product Vehicle Clients would generally have access to a written monthly report provided by the trustee and the ability to review a marked portfolio on a monthly basis. The monthly trustee report typically includes compliance reporting and portfolio holdings.

- 42 -

*Unregistered Investment Funds – Hedge Funds*

Investors in Hedge Fund Clients are generally provided a written monthly account statement with their respective net asset value.  They also receive a written monthly reporting package, which includes a one-page summary with a fund overview, market commentary, and Acis' outlook on the market.  In addition, the report includes fund specific details around the portfolio statistics, composition, and attribution.

- 43 -

# ITEM 14.  CLIENT REFERRALS AND
## OTHER COMPENSATION

As stated in Item 12, we may allocate portfolio transactions to brokers or dealers who provide research and/or related services.  For a more detailed discussion of such practices, please refer to Item 12.

Employees of Highland Capital Funds Distributor, Inc. are compensated based on their activities in soliciting investors through FINRA and/or SEC registered intermediaries for Clients advised by our advisory affiliates and may be similarly compensated in respect of our future Clients. These employees are compensated with a base salary and discretionary bonus. Unaffiliated persons may from time to time serve as solicitors for Acis and may be compensated for referrals.  Any agreement with a solicitor will be in compliance with Rule 206(4)-3 of the Advisers Act.

- 44 -

# ITEM 15.  CUSTODY

Acis does not act as custodian for Client assets.  However, under Rule 206(4)-2 under the Advisers Act, Acis is deemed to have custody of certain Client assets.  In the case of Unregistered Investment Funds, such Clients have made arrangements with qualified custodians as disclosed in the relevant offering and other fund documents.  With respect to Structured Product Vehicles, the Trustee has custody of the Client's assets in accordance with the relevant offering and other fund documents.  In addition, such Clients obtain additional financial statements which statements are provided to investors no later than 120 days following the fiscal year end.

In the case of Separate Accounts, Clients may give Acis the power to withdraw funds or securities maintained with a custodian upon request.  Without coming to a legal conclusion as to whether Acis would have custody over these assets, Acis operates as if it does have custody in such situations.  Accordingly, unless an exception is available, any such Separate Account Clients would receive an annual surprise custody audit and receive account statements from their broker-dealer, bank, or qualified custodian and should carefully review those statements.  Separate Accounts Clients should carefully review those statements and, to the extent Acis also delivers statements to such Clients, compare the Acis statement to the statements of the qualified custodian.  For tax and other purposes, the custodial statement is the official record of a Separate Account Client's account and assets.

Loans held in Client Accounts may be agented by NexBank, SSB.  As Agent Bank, NexBank, SSB will receive cash or send cash to such Clients for interest or principal payments or borrowings.  Client Accounts may also have bank accounts or account control agreements in place at NexBank, SSB.  In such instances NexBank receives an independent control examination pursuant to Rule 206(4)-2.

- 45 -

# ITEM 16.  INVESTMENT DISCRETION

Acis advises a wide variety of Client Accounts and manages assets on a discretionary basis. For a description of limitations Clients may impose on our discretionary authority to manage securities, please see Item 4. <u>Advisory Business</u>.

Acis accepts discretionary authority to manage Clients' assets through an investment management agreement with its Clients.

Additionally, before an investment may be made into an Unregistered Investment Fund, a Separate Account or other similar structure, Acis provides all potential investors in the fund with an offering document, which sets forth in detail the investment strategy and program. By completing the subscription documents to acquire an interest or shares in an Unregistered Investment Fund, investors give us complete authority to manage the capital contributed in accordance with the offering document received.

- 46 -

# ITEM 17.   VOTING CLIENT SECURITIES

## SECURITIES HELD IN CLIENT ACCOUNTS

Acis' proxy voting policy ensures proxies are voted on behalf of each Client Account's securities and in the best economic interests of such Client Account, without regard to the interests of Acis or any other Client of Acis.  Portfolio manager(s) of the applicable Client Account(s) evaluate the subject matter of each proxy and vote on behalf of the Client Account in accordance to the guidelines set forth in our proxy voting policy. In any case where a Client has instructed the Company to vote in a particular manner on the Client's behalf, those instructions will govern in lieu of parameters set forth in the proxy voting policy.

If the portfolio manager(s) determines that Acis may have a potential material conflict of interest, whether actual or perceived, in voting a proxy, the portfolio manager(s) will contact Acis' Compliance Department prior to the voting deadline.  In the event of a conflict, the Company may choose to address such conflict by: (i) voting in accordance with the Proxy Advisor's recommendation; (ii) the CCO determining how to vote the proxy (if the CCO approves deviation from the proxy advisor's recommendation, then the CCO shall document the rationale for the vote); (iii) "echo voting" or "mirror voting" the proxy in the same proportion as the votes of other proxy holders that are not Clients; or (iv) with respect to Clients other than Retail Funds, notifying the affected Client of the material conflict of interest and seeking a waiver of the conflict or obtaining such Client's voting instructions

## OBTAINING A COPY OF THE POLICY

Clients and prospective Clients can obtain a copy of the proxy voting policy or information on how Acis voted proxies by contacting Acis' Chief Compliance Officer at (972) 628-4100.

# ITEM 18. FINANCIAL INFORMATION

Acis does not charge or solicit pre-payment of more than $1,200 in fees per Client six or more months in advance.

Acis has non-discretionary authority or custody of Client funds or securities.

On April 13, 2018, the Bankruptcy Court for the Northern District of Texas (the "Court") entered an Order for Relief placing Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC ("Acis GP") in involuntary Chapter 7 bankruptcy.  On May 11, 2018, the bankruptcy was converted into a Chapter 11 reorganization, and Robin Phelan, an attorney based in Dallas, Texas, was appointed by the Court as the trustee to oversee the bankruptcy (the "Trustee"). Mr. Phelan, in his capacity as Trustee, exercises discretionary control over all Acis investment decisions and transactions. Accordingly, the Trustee is a control person of both Acis and Acis GP. The bankruptcy proceeding is on-going. Highland Capital Management, L.P. continues to provide non-discretionary investment advice and back office services to Acis pursuant to subadvisory and shared service agreements with Acis.

- 48 -

# ITEM 19.  REQUIREMENTS
# FOR STATE-REGISTERED ADVISERS

Not Applicable.

# EXHIBIT R

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 397 of 511   PageID 16178
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 297 of 403

Case 18-30264-sgj11   Claim 27   Filed 08/01/18   Desc Main Document   Page 1 of 3

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Acis Capital Management, L.P. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Northern District of Texas |
| Case number | 18-30264-sgj11 |

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1: Identify the Claim

| 1. Who is the current creditor? | Highland Capital Management, L.P. |
|---|---|
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |

| 2. Has this claim been acquired from someone else? | ☑ No |
|---|---|
| | ☐ Yes.  From whom? _____ |

| 3. Where should notices and payments to the creditor be sent? Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| | Holland O'Neil, Foley Gardere, Foley & Lardner | Scott Ellington, Highland Capital Management |
| | Name | Name |
| | 2021 McKinney Ave, Suite 1600 | 300 Crescent Court, Suite 700 |
| | Number        Street | Number        Street |
| | Dallas           TX        75201 | Dallas           TX        75201 |
| | City              State        ZIP Code | City              State        ZIP Code |
| | Contact phone 214-999-3000 | Contact phone _____ |
| | Contact email honeil@foley.com | Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |

| 4. Does this claim amend one already filed? | ☑ No |
|---|---|
| | ☐ Yes.  Claim number on court claims registry (if known) _____    Filed on ____ / ____ / ____   MM / DD / YYYY |

| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
|---|---|
| | ☐ Yes.  Who made the earlier filing? _____ |

Official Form 410                    Proof of Claim                    page 1

**App. 400**
APP.3475

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 398 of 511   PageID 16179
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 298 of 403

Case 18-30264-sgj11   Claim 27   Filed 08/01/18   Desc Main Document   Page 2 of 3

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _____ 4,672,140.38 _____

**Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Sub-Advisory Services and Shared Services _____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $ _____

Amount of the claim that is secured: $ _____

Amount of the claim that is unsecured: $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $ _____

Annual Interest Rate (when case was filed) _____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.   $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410 | Proof of Claim | page 2

**App. 401**

APP.3476

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 399 of 511   PageID 16180
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 299 of 403

Case 18-30264-sgj11   Claim 27   Filed 08/01/18   Desc Main Document   Page 3 of 3

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
|---|---|---|
| | ☑ Yes. *Check one:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)( 3 ) that applies. | $    2,049,564.35 |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   08/01/2018
                   MM / DD / YYYY

_____
Signature

Print the name of the person who is completing and signing this claim:

| Name | Scott Ellington | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | General Counsel | | |
| Company | Highland Capital Management, L.P. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 300 Crescent Court, Suite 700 | | |
| | Number   Street | | |
| | Dallas | TX | 75201 |
| | City | State | ZIP Code |
| Contact phone | _____ | Email | _____ |

**App. 402**
APP.3477

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 400 of 511   PageID 16181
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2    Page 300 of 403
Case 18-30264-sgj11    Claim 27 Part 2    Filed 08/01/18   Desc Exhibit A    Page 1 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
**United States Bankruptcy Court for the Northern District of Texas**

## EXHIBIT A TO PROOF OF CLAIM

1.    <u>Claimant</u>: Highland Capital Management, L.P. ("**Highland**") maintains its business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. Highland files its proof of claim (the "**Claim**") pursuant to 11 U.S.C. §§ 105(a), 501, and 502(f) and the Federal Rules of Bankruptcy Procedure 3002 and 3003. Prior to the Involuntary Petition Date (defined below), Highland provided sub-advisory and shared services to the Debtors (defined below). Highland has provided portfolio management and advisory services to the Debtors pursuant to that certain Third Amended and Restated Sub-Advisory Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Sub-Advisory Agreement**") (**Exhibit 1**). Specifically, Highland has acted as an investment manager and has identified, evaluated, and recommended investments to investment vehicles advised or sub-advised by the Debtors.  Highland has also provided the Debtors with back and middle office services pursuant to that certain Fourth Amended and Restated Shared Services Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Shared Services Agreement**") (**Exhibit 2**). Highland has provided the Debtors with all of the employees and staff necessary to manage the portfolios.  Highland continued to provide the same sub-advisory and shared services to the Debtors throughout the Gap Period (defined below). To date, Highland continues to provide such services.

2.    <u>Debtors</u>: Acis Capital Management, L.P. and Acis Capital Management, G.P. (the "**Debtors**"). The Debtors' cases have been consolidated under case number 18-30264 in the United States Bankruptcy Court for the Northern District of Texas. Highland provides the service at the following address:  300 Crescent Court, Suite 700, Dallas, Texas 75201.

Case 3:21-cv-00879-K    Document 41-5    Filed 04/04/23    Page 401 of 511    PageID 16182
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 301 of 403
Case 18-30264-sgj11    Claim 27 Part 2    Filed 08/01/18    Desc Exhibit A    Page 2 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
**United States Bankruptcy Court for the Northern District of Texas**

3.    <u>Indebtedness</u>: Because the Debtors were put into bankruptcy involuntarily, the amount included in the proof of claim accounts for pre-petition claims as well as Gap Claims (defined below).

a.    <u>Pre-Petition</u>: Joshua Terry, the petitioning creditor, filed the involuntary petition on January 30, 2018 (the "**Petition Date**"). As of the Petition Date, the outstanding indebtedness owing from the Debtors to Highland was as set forth below by account number:

| Invoice | Type | Balance |
|---|---|---|
| A1-A7; BVK[1] | Sub-Advisory | $1,605,362.41 |
| A1-A7; BVK | Shared Services | $1,017,213.62 |
| | **Totals** | **$2,622,576.03** |

b.    <u>Gap Period</u>: When a debtor files bankruptcy, the order for relief is typically entered on the date the petition is filed. However, an involuntary bankruptcy case diverges from the simultaneous entry of an order for relief in that an order for relief is entered at a later date than when a petition is filed. This creates a period of time, referred to as the "gap period", where the debtor may accrue post-petition but pre-order for relief debt. Pursuant to Section 502(f) of the Bankruptcy Code:

> In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section…the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. 502(f).

---

[1] A1-A7 and BVK account for the following vehicles: Acis CLO 2013-1, Ltd.; Acis CLO 2013-2, Ltd.; Acis CLO 2014-3, Ltd.; Acis CLO 2014-4, Ltd.; Acis CLO 2014-5, Ltd.; Acis CLO 2015-6, Ltd.; Acis CLO 2017-7, Ltd.; BayVK R2 Lux S.A., SICAV-FIS.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 402 of 511   PageID 16183
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 302 of 403
Case 18-30264-sgj11   Claim 27 Part 2   Filed 08/01/18   Desc Exhibit A   Page 3 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
**United States Bankruptcy Court for the Northern District of Texas**

Claims arising during the gap period are entitled to priority treatment under section 507(a)(3). The Court entered the Order for Relief on April 13, 2018 ("**Order for Relief Date**"). Highland continued to provide services to the Debtors from January 30, 2018 to April 13, 2018 ("**Gap Period**"). The outstanding balance owed from the Debtors to Highland for the sub-advisory and shared services during the Gap Period is set forth below (and shall be referred to as the "**Gap Claim**"):

| Account No. | Type | Balance |
|---|---|---|
| A1-A7; BVK | Sub-Advisory | $1,170,147.06 |
| A1-A7; BVK | Shared Services | $879,417.29 |
| | **Totals** | **$2,049,564.35** |

c.   <u>Reservation of Rights as to Administrative Claim</u>: Highland has provided uninterrupted sub-advisory and shared services since the Order for Relief Date. Highland reserves its rights to seek allowance of its administrative claims.

d.   <u>Indemnity Claims</u>: Highland has contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement.  According to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement,  "the Management Company [Debtors] hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless Covered Person [Highland and its representatives] from…any and all claims, demands, liabilities, costs…suits, proceedings, judgments, assessments, actions…of whatever nature, known or unknown, liquidated, or unliquidated...arising out of the investment or other activities of the Management Company." Highland reserves such contractual indemnification right.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 403 of 511   PageID 16184
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 303 of 403
Case 18-30264-sgj11   Claim 27 Part 2   Filed 08/01/18   Desc Exhibit A   Page 4 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
**United States Bankruptcy Court for the Northern District of Texas**

    4.    <u>Reservation of Rights; Other Rights</u>: The Claims described in this Attachment are legal, binding, enforceable, allowed, and not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature, whatsoever; provided, however, the Chapter 11 Trustee alleges that he may offset Highland's Claims and recover from Highland through his current adversary proceeding against Highland (Adversary Proceeding 18-03212). Highland disputes such contention, and believes all Claims sought herein are recoverable despite the Chapter 11 Trustee's allegations. No portion of the Claims or any funds previously paid to Highland are subject to impairment, avoidance, subordination, or disallowance pursuant to the Bankruptcy Code (including, without limitation, Bankruptcy Code § 502) or applicable non-bankruptcy law. Highland expressly reserves the right in the future to assert any and all claims that it may have, including, without limitation, imposition of a constructive trust, equitable lien, security interest, subrogation, marshaling, or other legal or equitable remedies to which it may be entitled. The filing of this proof of claim is not to be construed as an election of remedies. Highland further reserves the rights (a) to amend, modify or supplement this proof of claim, including any exhibit, schedule or annex, or to file an amended proof of claim for the purpose of modifying or liquidating the amount of any interest, fees, costs and expenses accrued or incurred subsequent to the Petition Date or any contingent or unliquidated claims or rights of Highland set forth herein; (b) file additional proofs of claim; and (c) against third parties.

    5.    <u>Notices</u>: All notices to Highland are to be sent to:

    Highland Capital Management, L.P.
    Attn: David Klos
    300 Crescent Court
    Suite 700
    Dallas, Texas 75201

    *with copies to:*

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 404 of 511   PageID 16185
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 304 of 403
Case 18-30264-sgj11   Claim 27 Part 2   Filed 08/01/18   Desc Exhibit A   Page 5 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
**United States Bankruptcy Court for the Northern District of Texas**

> Foley Gardere
> Foley & Lardner, LLP
> c/o Holland O'Neil
> 2021 McKinney Avenue, Suite 1600
> Dallas, TX 75201

6.      Payments:  All payments and distributions to Highland with respect to this proof of claim are to be made as follows:

> Highland Capital Management, L.P.
> Attn: David Klos
> 300 Crescent Court
> Suite 700
> Dallas, Texas 75201
> Re:  *In re Acis Capital Management, L.P.*

7.      Miscellaneous:  This proof of claim is filed under compulsion of the bar date established in this bankruptcy case solely out of an abundance of caution to protect Highland from forfeiture of its claim within this bankruptcy proceeding. The amounts set forth in this proof of claim shall not be construed as an admission by Highland as to the amounts due and owing outside of this bankruptcy proceeding. The filing of this proof of claim is **not:**  (a) a waiver or release of and/or Highland's rights or remedies against any person, entity or property; (b) a consent by Highland to entry of final judgment by this Court in any core proceeding commenced in this bankruptcy case, consistent with the United States Supreme Court's holding in *Stern v. Marshall*, 131 S. Ct. 2594 (2011); (c) a waiver of the right to move to withdraw the reference or otherwise challenge the jurisdiction of this Court; (d) a waiver of the right to a jury trial; (e) an election of a remedy which waives or otherwise affects any other remedy; or (f) a waiver of the right to assert a different or enhanced classification of priority for its Claim in respect of the other claims asserted in this bankruptcy case.

**EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND**
4820-3752-6894.1

**EXECUTION VERSION**

**THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 406 of 511   PageID 16187
Case 18-03078-sgj    Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 306 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 2 of 21

## TABLE OF CONTENTS

**Page**

1.   Appointment; Limited Scope of Services ........................................................... 1

2.   Compensation ................................................................................................. 3

3.   Representations and Warranties ..................................................................... 3

4.   Standard of Care; Liability; Indemnification ................................................. 4

5.   Limitations on Employment of the Sub-Advisor; Conflicts of Interest ......... 7

6.   Termination; Survival .................................................................................... 8

7.   Cooperation with Management Company ...................................................... 8

8.   Management Agreements and Related Agreements ..................................... 8

9.   Amendments; Assignments ........................................................................... 9

10.  Advisory Restrictions ..................................................................................... 9

11.  Records; Confidentiality ................................................................................ 10

12.  Notice ............................................................................................................ 11

13.  Governing Law .............................................................................................. 11

14.  WAIVER OF JURY TRIAL ............................................................................ 11

15.  Severability .................................................................................................... 11

16.  No Waiver ...................................................................................................... 11

17.  Counterparts .................................................................................................. 12

18.  Third Party Beneficiaries .............................................................................. 12

19.  No Partnership or Joint Venture ................................................................... 12

20.  Entire Agreement .......................................................................................... 12

i

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 407 of 511   PageID 16188
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 307 of 403

Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 3 of 21

### THIRD AMENDED AND RESTATED
### SUB-ADVISORY AGREEMENT

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1. Appointment; Limited Scope of Services.

(a) Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 408 of 511   PageID 16189
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 308 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 4 of 21

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of <u>Section 8</u>, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

      (b)    Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

      (i)    make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

      (ii)    place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

      (iii)    identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

      (iv)    assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

      (v)    provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

      (vi)    assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

      (vii)    assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "<u>Services</u>."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company.  Furthermore, the

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 409 of 511   PageID 16190
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 309 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 5 of 21

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein.  The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.     <u>Compensation</u>.

(a)     As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto.  The "<u>Sub-Advisory Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

(b)     Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)     Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)     From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.     <u>Representations and Warranties</u>.

(a)     Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)     it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

3

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 410 of 511   PageID 16191
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 310 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 6 of 21

      (ii)     this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

      (iii)    no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

      (iv)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

      (b)    The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

      (c)    The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission. The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

      4.    <u>Standard of Care; Liability; Indemnification</u>.

      (a)    <u>Sub-Advisor Standard of Care</u>. Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

4

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 411 of 511   PageID 16192
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 311 of 403
Case 18-30264-sgj11    Claim 27 Part 3    Filed 08/01/18    Desc Exhibit 1    Page 7 of 21

Related Agreements.  To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)        Exculpation.  To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

5

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 412 of 511   PageID 16193
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 312 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 8 of 21

(c)    <u>Indemnification</u>.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person.  The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

(d)    <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 413 of 511   PageID 16194
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 313 of 403
Case 18-30264-sgj11    Claim 27 Part 3    Filed 08/01/18    Desc Exhibit 1    Page 9 of 21

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

      (e)    <u>Rights of Heirs, Successors and Assigns</u>.  The indemnification rights provided by <u>Section 4(c)</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

      (f)    <u>Reliance</u>.  A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.  Each Covered Person may act directly or through his, her or its agents or attorneys.

      (g)    <u>Rights Under Management Agreements and Related Agreements</u>.  The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to <u>Section 8</u> if such indemnification and exculpation rights are not reasonably acceptable to it.

     5.    <u>Limitations on Employment of the Sub-Advisor; Conflicts of Interest</u>.

      (a)    The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

      (b)    So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

7

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 414 of 511   PageID 16195
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 314 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 10 of 21

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)     The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in Appendix B hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such Appendix B, as amended from time to time with mutual consent of the Parties.

6.     Termination; Survival.

(a)     This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)     This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements.  Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and Appendix A hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)     All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.     Cooperation with Management Company.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor.  Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.     Management Agreements and Related Agreements.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement.  The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company.  No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 415 of 511   PageID 16196
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 315 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 11 of
21

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

       9.    <u>Amendments; Assignments</u>.

       (a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

       (b)    Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

       (c)    The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

       10.    <u>Advisory Restrictions</u>. This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof. It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

9

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 416 of 511   PageID 16197
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 316 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 12 of
21

11.   <u>Records; Confidentiality</u>.

(a)   The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)   The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

10

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 417 of 511   PageID 16198
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 317 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 13 of
21

12.   <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

      (a)     If to the Management Company:

           Acis Capital Management, L.P.
           300 Crescent Court
           Suite 700
           Dallas, TX 75201

      (b)     If to the Sub-Advisor:

           Highland Capital Management, L.P.
           300 Crescent Court
           Suite 700
           Dallas, TX 75201

13.   <u>Governing Law</u>.   This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.   <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.   <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.   <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 418 of 511   PageID 16199
Case 18-03078-sgj    Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 318 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 14 of 21

17.    Counterparts.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.    Third Party Beneficiaries.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.    No Partnership or Joint Venture.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.    Entire Agreement.  This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 319 of 403

Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 15 of
21

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: James Dondero
Title:   President

ACIS CAPITAL MANAGEMENT, L.P.,
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By:_____
Name: James Dondero
Title:  President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

Case 18-30264-sgj11    Claim 27 Part 3    Filed 08/01/18    Desc Exhibit 1    Page 16 of 21

### **Appendix A**

The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank*]

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 421 of 511   PageID 16202
Case 18-03078-sgj    Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 321 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 17 of 21

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

2

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 422 of 511   PageID 16203
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 322 of 403
Case 18-30264-sgj11    Claim 27 Part 3    Filed 08/01/18    Desc Exhibit 1    Page 18 of 21

## APPENDIX B

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account.  Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise.  Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)     serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)     receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)     be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)     be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e)     sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)     underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

B-1

**App. 425**
APP.3500

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 423 of 511   PageID 16204
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 323 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 19 of 21

(g)     serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)     act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement.  Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account.  The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions.  The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement.  As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 424 of 511   PageID 16205
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 324 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 20 of
21

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

B-3

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 425 of 511   PageID 16206
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01    Desc
Appendix Volume 2   Page 325 of 403
Case 18-30264-sgj11   Claim 27 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 21 of 21

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

**EXECUTION VERSION**

**FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 427 of 511   PageID 16208
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 327 of 403
Case 18-30264-sgj11    Claim 27 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 2 of 24

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ............................................................. 2

    Section 1.01    Certain Defined Terms........................................ 2

    Section 1.02    Interpretation.................................................... 3

ARTICLE II SERVICES ................................................................ 4

    Section 2.01    General Authority. ............................................ 4

    Section 2.02    Provision of Services. ....................................... 4

    Section 2.03    Shared Employees............................................. 6

    Section 2.04    Applicable Asset Criteria and Concentrations. ................... 8

    Section 2.05    Compliance with Management Company Policies and
                       Procedures. ..................................................... 8

    Section 2.06    Authority. ........................................................ 8

    Section 2.07    Third Parties.................................................... 9

    Section 2.08    Management Company to Cooperate with the Staff and
                       Services Provider. ............................................ 9

    Section 2.09    Power of Attorney............................................. 9

ARTICLE III CONSIDERATION AND EXPENSES.......................... 9

    Section 3.01    Consideration .................................................. 9

    Section 3.02    Costs and Expenses ......................................... 10

    Section 3.03    Deferral ......................................................... 10

ARTICLE IV REPRESENTATIONS AND COVENANTS ................... 10

    Section 4.01    Representations ............................................... 10

ARTICLE V COVENANTS............................................................ 10

    Section 5.01    Compliance; Advisory Restrictions. .................... 10

    Section 5.02    Records; Confidentiality. .................................. 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION.................... 12

    Section 6.01    Standard of Care ............................................. 12

    Section 6.02    Exculpation. ................................................... 12

    Section 6.03    Indemnification by the Management Company................... 13

    Section 6.04    Other Sources of Recovery etc .......................... 14

    Section 6.05    Rights of Heirs, Successors and Assigns ............. 14

    Section 6.06    Reliance........................................................ 14

i

Case 3:21-cv-00879-K    Document 41-5    Filed 04/04/23    Page 428 of 511    PageID 16209
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 328 of 403
Case 18-30264-sgj11    Claim 27 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 3 of 24

# TABLE OF CONTENTS
### (continued)

Page

ARTICLE VII TERMINATION ....................................................................................... 14
     Section 7.01     Termination. ................................................................................ 14
ARTICLE VIII MISCELLANEOUS .............................................................................. 15
     Section 8.01     Amendments ............................................................................... 15
     Section 8.02     Assignment and Delegation. ...................................................... 15
     Section 8.03     Non-Recourse; Non-Petition. ..................................................... 15
     Section 8.04     Governing Law. .......................................................................... 16
     Section 8.05     WAIVER OF JURY TRIAL ....................................................... 17
     Section 8.06     Severability ................................................................................ 17
     Section 8.07     No Waiver .................................................................................. 17
     Section 8.08     Counterparts .............................................................................. 17
     Section 8.09     Third Party Beneficiaries ........................................................... 17
     Section 8.10     No Partnership or Joint Venture ................................................. 17
     Section 8.11     Independent Contractor .............................................................. 17
     Section 8.12     Written Disclosure Statement .................................................... 18
     Section 8.13     Headings .................................................................................... 18
     Section 8.14     Entire Agreement ....................................................................... 18
     Section 8.15     Notices ....................................................................................... 18

## FOURTH AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 430 of 511   PageID 16211
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 330 of 403
Case 18-30264-sgj11   Claim 27 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 5 of 24

**ARTICLE I**

**DEFINITIONS**

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Advisers Act" shall have the meaning set forth in the Recitals to this Agreement.

"Advisory Restriction" shall have the meaning set forth in Section 5.01(b).

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble to this Agreement.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"CLO or Account" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

2

Case 3:21-cv-00879-K    Document 41-5    Filed 04/04/23    Page 431 of 511    PageID 16212
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 331 of 403
Case 18-30264-sgj11    Claim 27 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 6 of 24

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Highland" shall have the meaning set forth in the preamble to this Agreement.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Management Company" shall have the meaning set forth in the preamble to this Agreement.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Portfolio" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Staff and Services Fee" shall have the meaning set forth in Section 3.01 of this Agreement.

"Staff and Services Provider" shall have the meaning set forth in the preamble to this Agreement.

"Shared Employee" shall have the meaning set forth in the Recitals to this Agreement.

Section 1.02    Interpretation.    The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

3

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 432 of 511   PageID 16213
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 332 of 403
Case 18-30264-sgj11    Claim 27 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 7 of 24

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01    <u>General Authority</u>.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02    <u>Provision of Services</u>.  Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)    *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)    *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)    *Management of Collateral Obligations and CLOs and Accounts*.  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)    *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 433 of 511   PageID 16214
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 333 of 403
Case 18-30264-sgj11    Claim 27 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 8 of 24

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e)     *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f)     *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g)     *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h)     *Administrative Services*.  The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i)     *Shared Employees*.  The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

(j)     *Ancillary Services*.  Assistance and advice on all things ancillary or incidental to the foregoing; and

(k)     *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

5

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 434 of 511   PageID 16215
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 334 of 403
Case 18-30264-sgj11   Claim 27 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 9 of 24

Section 2.03    Shared Employees.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

6

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 435 of 511   PageID 16216
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 335 of 403
Case 18-30264-sgj11   Claim 27 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 10 of 24

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.   To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 436 of 511   PageID 16217
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 336 of 403
Case 18-30264-sgj11   Claim 27 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 11 of
24

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.2 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

8

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 437 of 511   PageID 16218
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 337 of 403
Case 18-30264-sgj11   Claim 27 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 12 of
24

Section 2.07   <u>Third Parties</u>.

(a)   The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)   In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   <u>Management Company to Cooperate with the Staff and Services Provider</u>. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   <u>Power of Attorney</u>.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).   Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01   <u>Consideration</u>.  As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.  The "<u>Staff and Services Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 438 of 511   PageID 16219
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 338 of 403
Case 18-30264-sgj11   Claim 27 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 13 of
24

Section 3.03 <u>Costs and Expenses</u>. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04 <u>Deferral</u>. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01 <u>Representations</u>. Each of the Parties hereto represents and warrants that:

(a) It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b) this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c) no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d) neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01 <u>Compliance; Advisory Restrictions</u>.

(a) The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

10

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 439 of 511   PageID 16220
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 339 of 403
Case 18-30264-sgj11    Claim 27 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 14 of 24

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)     This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

11

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 440 of 511   PageID 16221
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 340 of 403
Case 18-30264-sgj11   Claim 27 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 15 of
24

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01   <u>Standard of Care</u>.   Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02   <u>Exculpation</u>.   To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "<u>Disabling Conduct</u>") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To

**App. 443**
APP.3518

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 441 of 511   PageID 16222
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 341 of 403
Case 18-30264-sgj11   Claim 27 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 16 of 24

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03   Indemnification by the Management Company.   The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

13

Case 3:21-cv-00879-K  Document 41-5  Filed 04/04/23  Page 442 of 511  PageID 16223
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 342 of 403
Case 18-30264-sgj11    Claim 27 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 17 of 24

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04  Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05  Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06  Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

### ARTICLE VII

### TERMINATION

Section 7.01  Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

14

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 443 of 511   PageID 16224
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 343 of 403
Case 18-30264-sgj11    Claim 27 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 18 of 24

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01    <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    <u>Assignment and Delegation</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

15

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 444 of 511   PageID 16225
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 344 of 403
Case 18-30264-sgj11    Claim 27 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 19 of
24

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive.  The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Section 8.04    Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts.  The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

16

Case 3:21-cv-00879-K    Document 41-5    Filed 04/04/23    Page 445 of 511    PageID 16226
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 345 of 403
Case 18-30264-sgj11    Claim 27 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 20 of
24

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.    EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.    Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties.    Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party.    Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument.    This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09    Third Party Beneficiaries.    This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture.    Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.    Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor.    Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 446 of 511   PageID 16227
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01    Desc
Appendix Volume 2   Page 346 of 403
Case 18-30264-sgj11    Claim 27 Part 4    Filed 08/01/18   Desc Exhibit 2    Page 21 of
24

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)   If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)   If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

18

**App. 449**
APP.3524

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: James Dondero
Title:   President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By:_____
Name: James Dondero
Title:  President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

Case 18-30264-sgj11    Claim 27 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 23 of 24

## **Appendix A**

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank.*]

Case 18-30264-sgj11   Claim 27 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 24 of 24

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

# EXHIBIT S

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 451 of 511   PageID 16232
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 351 of 403

Case 18-30265-sgj11    Claim 13    Filed 08/01/18    Desc Main Document    Page 1 of 3

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Acis Capital Management, G.P. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Northern District of Texas |
| Case number | 18-30265-sgj11 |

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:    Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | Highland Capital Management, L.P.<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes.  From whom? _____ |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Holland O'Neil, Foley Gardere, Foley & Lardner<br>Name<br><br>2021 McKinney Ave, Suite 1600<br>Number        Street<br><br>Dallas                    TX            75201<br>City                          State          ZIP Code<br><br>Contact phone 214-999-3000<br><br>Contact email honeil@foley.com | **Where should payments to the creditor be sent?** (if different)<br><br>Scott Ellington, Highland Capital Management<br>Name<br><br>300 Crescent Court, Suite 700<br>Number        Street<br><br>Dallas                    TX            75201<br>City                          State          ZIP Code<br><br>Contact phone _____<br><br>Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br>_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ |
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____                  Filed on _____<br>                                                                                                        MM  / DD  / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |

Official Form 410

**Proof of Claim**

page 1

**App. 454**

APP.3529

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 452 of 511   PageID 16233
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 352 of 403

Case 18-30265-sgj11   Claim 13   Filed 08/01/18   Desc Main Document   Page 2 of 3

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____ 4,672,140.38   Does this amount include interest or other charges?

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Sub-Advisory Services and Shared Services _____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 453 of 511   PageID 16234
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 353 of 403

Case 18-30265-sgj11   Claim 13   Filed 08/01/18   Desc Main Document   Page 3 of 3

| | | Amount entitled to priority |
|---|---|---|
| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ No<br>☑ Yes. Check one: | |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)( 3 ) that applies. | $    2,049,564.35 |

*Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   08/01/2018
                   MM / DD / YYYY

_____
Signature

Print the name of the person who is completing and signing this claim:

Name          Scott Ellington
              First name          Middle name          Last name

Title         General Counsel

Company       Highland Capital Management, L.P.
              Identify the corporate servicer as the company if the authorized agent is a servicer.

Address       300 Crescent Court, Suite 700
              Number    Street
              Dallas                    TX    75201
              City                      State  ZIP Code

Contact phone  _____    Email  _____

App. 456
APP.3531

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 454 of 511   PageID 16235
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 354 of 403
Case 18-30265-sgj11    Claim 13 Part 2    Filed 08/01/18    Desc Exhibit A    Page 1 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
**United States Bankruptcy Court for the Northern District of Texas**

## EXHIBIT A TO PROOF OF CLAIM

1.    <u>Claimant</u>: Highland Capital Management, L.P. ("**Highland**") maintains its business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. Highland files its proof of claim (the "**Claim**") pursuant to 11 U.S.C. §§ 105(a), 501, and 502(f) and the Federal Rules of Bankruptcy Procedure 3002 and 3003. Prior to the Involuntary Petition Date (defined below), Highland provided sub-advisory and shared services to the Debtors (defined below). Highland has provided portfolio management and advisory services to the Debtors pursuant to that certain Third Amended and Restated Sub-Advisory Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Sub-Advisory Agreement**") (**Exhibit 1**). Specifically, Highland has acted as an investment manager and has identified, evaluated, and recommended investments to investment vehicles advised or sub-advised by the Debtors. Highland has also provided the Debtors with back and middle office services pursuant to that certain Fourth Amended and Restated Shared Services Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Shared Services Agreement**") (**Exhibit 2**). Highland has provided the Debtors with all of the employees and staff necessary to manage the portfolios. Highland continued to provide the same sub-advisory and shared services to the Debtors throughout the Gap Period (defined below). To date, Highland continues to provide such services.

2.    <u>Debtors</u>: Acis Capital Management, L.P. and Acis Capital Management, G.P. (the "**Debtors**"). The Debtors' cases have been consolidated under case number 18-30264 in the United States Bankruptcy Court for the Northern District of Texas. Highland provides the service at the following address:  300 Crescent Court, Suite 700, Dallas, Texas 75201.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 455 of 511   PageID 16236
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 355 of 403
Case 18-30265-sgj11    Claim 13 Part 2    Filed 08/01/18    Desc Exhibit A    Page 2 of 5

*In re Acis Capital Management, L.P.- Case No. 18-30264*
*In re Acis Capital Management, G.P.- Case No. 18-30265*
**United States Bankruptcy Court for the Northern District of Texas**

3.   <u>Indebtedness</u>: Because the Debtors were put into bankruptcy involuntarily, the amount included in the proof of claim accounts for pre-petition claims as well as Gap Claims (defined below).

a.   <u>Pre-Petition</u>: Joshua Terry, the petitioning creditor, filed the involuntary petition on January 30, 2018 (the "**Petition Date**"). As of the Petition Date, the outstanding indebtedness owing from the Debtors to Highland was as set forth below by account number:

| Invoice | Type | Balance |
|---|---|---|
| A1-A7; BVK[1] | Sub-Advisory | $1,605,362.41 |
| A1-A7; BVK | Shared Services | $1,017,213.62 |
| | **Totals** | **$2,622,576.03** |

b.   <u>Gap Period</u>: When a debtor files bankruptcy, the order for relief is typically entered on the date the petition is filed. However, an involuntary bankruptcy case diverges from the simultaneous entry of an order for relief in that an order for relief is entered at a later date than when a petition is filed. This creates a period of time, referred to as the "gap period", where the debtor may accrue post-petition but pre-order for relief debt. Pursuant to Section 502(f) of the Bankruptcy Code:

> In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section…the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. 502(f).

---

[1] A1-A7 and BVK account for the following vehicles: Acis CLO 2013-1, Ltd.; Acis CLO 2013-2, Ltd.; Acis CLO 2014-3, Ltd.; Acis CLO 2014-4, Ltd.; Acis CLO 2014-5, Ltd.; Acis CLO 2015-6, Ltd.; Acis CLO 2017-7, Ltd.; BayVK R2 Lux S.A., SICAV-FIS.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 456 of 511   PageID 16237
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 356 of 403
Case 18-30265-sgj11   Claim 13 Part 2   Filed 08/01/18   Desc Exhibit A   Page 3 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
**United States Bankruptcy Court for the Northern District of Texas**

Claims arising during the gap period are entitled to priority treatment under section 507(a)(3). The Court entered the Order for Relief on April 13, 2018 ("**Order for Relief Date**"). Highland continued to provide services to the Debtors from January 30, 2018 to April 13, 2018 ("**Gap Period**"). The outstanding balance owed from the Debtors to Highland for the sub-advisory and shared services during the Gap Period is set forth below (and shall be referred to as the "**Gap Claim**"):

| Account No. | Type | Balance |
|---|---|---|
| A1-A7; BVK | Sub-Advisory | $1,170,147.06 |
| A1-A7; BVK | Shared Services | $879,417.29 |
| | **Totals** | **$2,049,564.35** |

c.     Reservation of Rights as to Administrative Claim: Highland has provided uninterrupted sub-advisory and shared services since the Order for Relief Date. Highland reserves its rights to seek allowance of its administrative claims.

d.     Indemnity Claims: Highland has contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement.  According to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement,  "the Management Company [Debtors] hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless Covered Person [Highland and its representatives] from…any and all claims, demands, liabilities, costs…suits, proceedings, judgments, assessments, actions…of whatever nature, known or unknown, liquidated, or unliquidated...arising out of the investment or other activities of the Management Company." Highland reserves such contractual indemnification right.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 457 of 511   PageID 16238
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 357 of 403
Case 18-30265-sgj11   Claim 13 Part 2   Filed 08/01/18   Desc Exhibit A   Page 4 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

    4.    <u>Reservation of Rights; Other Rights</u>: The Claims described in this Attachment are legal, binding, enforceable, allowed, and not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature, whatsoever; provided, however, the Chapter 11 Trustee alleges that he may offset Highland's Claims and recover from Highland through his current adversary proceeding against Highland (Adversary Proceeding 18-03212). Highland disputes such contention, and believes all Claims sought herein are recoverable despite the Chapter 11 Trustee's allegations. No portion of the Claims or any funds previously paid to Highland are subject to impairment, avoidance, subordination, or disallowance pursuant to the Bankruptcy Code (including, without limitation, Bankruptcy Code § 502) or applicable non-bankruptcy law. Highland expressly reserves the right in the future to assert any and all claims that it may have, including, without limitation, imposition of a constructive trust, equitable lien, security interest, subrogation, marshaling, or other legal or equitable remedies to which it may be entitled. The filing of this proof of claim is not to be construed as an election of remedies. Highland further reserves the rights (a) to amend, modify or supplement this proof of claim, including any exhibit, schedule or annex, or to file an amended proof of claim for the purpose of modifying or liquidating the amount of any interest, fees, costs and expenses accrued or incurred subsequent to the Petition Date or any contingent or unliquidated claims or rights of Highland set forth herein; (b) file additional proofs of claim; and (c) against third parties.

    5.    <u>Notices</u>: All notices to Highland are to be sent to:

    Highland Capital Management, L.P.
    Attn: David Klos
    300 Crescent Court
    Suite 700
    Dallas, Texas 75201

    *with copies to:*

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 458 of 511   PageID 16239
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 358 of 403
Case 18-30265-sgj11    Claim 13 Part 2    Filed 08/01/18    Desc Exhibit A    Page 5 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
**United States Bankruptcy Court for the Northern District of Texas**

> Foley Gardere
> Foley & Lardner, LLP
> c/o Holland O'Neil
> 2021 McKinney Avenue, Suite 1600
> Dallas, TX 75201

6.    Payments:  All payments and distributions to Highland with respect to this proof of claim are to be made as follows:

> Highland Capital Management, L.P.
> Attn: David Klos
> 300 Crescent Court
> Suite 700
> Dallas, Texas 75201
> Re:  *In re Acis Capital Management, L.P.*

7.    Miscellaneous:  This proof of claim is filed under compulsion of the bar date established in this bankruptcy case solely out of an abundance of caution to protect Highland from forfeiture of its claim within this bankruptcy proceeding. The amounts set forth in this proof of claim shall not be construed as an admission by Highland as to the amounts due and owing outside of this bankruptcy proceeding. The filing of this proof of claim is **not:**  (a) a waiver or release of and/or Highland's rights or remedies against any person, entity or property; (b) a consent by Highland to entry of final judgment by this Court in any core proceeding commenced in this bankruptcy case, consistent with the United States Supreme Court's holding in *Stern v. Marshall*, 131 S. Ct. 2594 (2011); (c) a waiver of the right to move to withdraw the reference or otherwise challenge the jurisdiction of this Court; (d) a waiver of the right to a jury trial; (e) an election of a remedy which waives or otherwise affects any other remedy; or (f) a waiver of the right to assert a different or enhanced classification of priority for its Claim in respect of the other claims asserted in this bankruptcy case.

**EXECUTION VERSION**

**THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 460 of 511   PageID 16241
Case 18-03078-sgj     Doc 85-2     Filed 11/27/18     Entered 11/27/18 14:12:01     Desc
Appendix Volume 2     Page 360 of 403
Case 18-30265-sgj11     Claim 13 Part 3     Filed 08/01/18     Desc Exhibit 1     Page 2 of 21

## TABLE OF CONTENTS

**Page**

1. Appointment; Limited Scope of Services ..................................................................... 1
2. Compensation .............................................................................................................. 3
3. Representations and Warranties. ................................................................................. 3
4. Standard of Care; Liability; Indemnification. ............................................................. 4
5. Limitations on Employment of the Sub-Advisor; Conflicts of Interest. ..................... 7
6. Termination; Survival .................................................................................................. 8
7. Cooperation with Management Company .................................................................... 8
8. Management Agreements and Related Agreements .................................................... 8
9. Amendments; Assignments ......................................................................................... 9
10. Advisory Restrictions.................................................................................................... 9
11. Records; Confidentiality. ............................................................................................ 10
12. Notice ......................................................................................................................... 11
13. Governing Law ........................................................................................................... 11
14. WAIVER OF JURY TRIAL ....................................................................................... 11
15. Severability ................................................................................................................. 11
16. No Waiver ................................................................................................................... 11
17. Counterparts ............................................................................................................... 12
18. Third Party Beneficiaries ........................................................................................... 12
19. No Partnership or Joint Venture ................................................................................ 12
20. Entire Agreement ....................................................................................................... 12

i

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 461 of 511   PageID 16242
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 361 of 403

Case 18-30265-sgj11   Claim 13 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 3 of 21

### THIRD AMENDED AND RESTATED
### SUB-ADVISORY AGREEMENT

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

### R E C I T A L S

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1.     Appointment; Limited Scope of Services.

(a)     Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 462 of 511   PageID 16243
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 362 of 403
Case 18-30265-sgj11    Claim 13 Part 3    Filed 08/01/18    Desc Exhibit 1    Page 4 of 21

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of <u>Section 8</u>, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

      (b)    Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

      (i)    make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

      (ii)    place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

      (iii)    identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

      (iv)    assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

      (v)    provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

      (vi)    assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

      (vii)    assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "<u>Services</u>."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company.  Furthermore, the

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 463 of 511   PageID 16244
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 363 of 403
Case 18-30265-sgj11   Claim 13 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 5 of 21

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein.  The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.     <u>Compensation</u>.

(a)     As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto.  The "<u>Sub-Advisory Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

(b)     Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)     Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)     From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.     <u>Representations and Warranties</u>.

(a)     Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)     it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

3

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 464 of 511   PageID 16245
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 364 of 403
Case 18-30265-sgj11    Claim 13 Part 3    Filed 08/01/18    Desc Exhibit 1    Page 6 of 21

(ii)      this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)      no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)      neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)      The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)      The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission.  The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.      Standard of Care; Liability; Indemnification.

(a)      Sub-Advisor Standard of Care.  Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 465 of 511   PageID 16246
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 365 of 403
Case 18-30265-sgj11    Claim 13 Part 3    Filed 08/01/18    Desc Exhibit 1    Page 7 of 21

Related Agreements.  To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)        <u>Exculpation</u>.  To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "<u>Covered Person</u>") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "<u>Management Company Related Parties</u>"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "<u>Disabling Conduct</u>") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

**App. 468**
APP.3543

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 466 of 511   PageID 16247
Case 18-03078-sgj    Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2    Page 366 of 403
Case 18-30265-sgj11   Claim 13 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 8 of 21

(c)     <u>Indemnification</u>.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person.  The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

(d)     <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

6

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 467 of 511   PageID 16248
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 367 of 403
Case 18-30265-sgj11   Claim 13 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 9 of 21

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

       (e)   <u>Rights of Heirs, Successors and Assigns</u>.  The indemnification rights provided by <u>Section 4(c)</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

       (f)   <u>Reliance</u>.  A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.  Each Covered Person may act directly or through his, her or its agents or attorneys.

       (g)   <u>Rights Under Management Agreements and Related Agreements</u>.  The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to <u>Section 8</u> if such indemnification and exculpation rights are not reasonably acceptable to it.

       5.   <u>Limitations on Employment of the Sub-Advisor; Conflicts of Interest</u>.

       (a)   The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

       (b)   So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 468 of 511   PageID 16249
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 368 of 403
Case 18-30265-sgj11   Claim 13 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 10 of
21

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)     The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in <u>Appendix B</u> hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such <u>Appendix B</u>, as amended from time to time with mutual consent of the Parties.

6.     <u>Termination; Survival</u>.

(a)     This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)     This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements.  Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and <u>Appendix A</u> hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)     All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.     <u>Cooperation with Management Company</u>.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor.  Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.     <u>Management Agreements and Related Agreements</u>.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement.  The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company.  No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

8

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 469 of 511   PageID 16250
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 369 of 403
Case 18-30265-sgj11   Claim 13 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 11 of
21

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9. <u>Amendments; Assignments</u>.

(a)     Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)     Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)     The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10. <u>Advisory Restrictions</u>. This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof. It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

9

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 470 of 511   PageID 16251
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 370 of 403
Case 18-30265-sgj11   Claim 13 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 12 of
21

11.   Records; Confidentiality.

(a)   The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)   The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

10

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 471 of 511   PageID 16252
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 371 of 403
Case 18-30265-sgj11   Claim 13 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 13 of
21

12.  <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

(a)   If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)   If to the Sub-Advisor:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

13.  <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.  <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.  <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.  <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 472 of 511   PageID 16253
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 372 of 403
Case 18-30265-sgj11   Claim 13 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 14 of
21

17.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.     <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.     <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.     <u>Entire Agreement</u>.  This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

**App. 475**
APP.3550

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: James Dondero
Title:   President

**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By:_____
Name: James Dondero
Title:  President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

Case 18-30265-sgj11   Claim 13 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 16 of 21

## **Appendix A**

The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank*]

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 475 of 511   PageID 16256
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 375 of 403
Case 18-30265-sgj11   Claim 13 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 17 of
21

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture  Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture  Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture  Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture  Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

2

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 476 of 511   PageID 16257
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 376 of 403
Case 18-30265-sgj11    Claim 13 Part 3    Filed 08/01/18   Desc Exhibit 1    Page 18 of
21

## APPENDIX B

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account.  Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise.  Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)      serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)      receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)      be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)      be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e)      sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)      underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

B-1

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 477 of 511   PageID 16258
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 377 of 403
Case 18-30265-sgj11    Claim 13 Part 3    Filed 08/01/18    Desc Exhibit 1    Page 19 of
21

(g)     serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)     act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement.  Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account.  The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions.  The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement.  As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 478 of 511   PageID 16259
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 378 of 403
Case 18-30265-sgj11   Claim 13 Part 3   Filed 08/01/18   Desc Exhibit 1   Page 20 of
21

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

Defined Terms

    For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

    "<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 479 of 511   PageID 16260
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01    Desc
Appendix Volume 2   Page 379 of 403
Case 18-30265-sgj11    Claim 13 Part 3    Filed 08/01/18    Desc Exhibit 1    Page 21 of
21

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"<u>Portfolio Asset</u>" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"<u>Transaction</u>" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

**EXECUTION VERSION**

**FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 481 of 511   PageID 16262
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 381 of 403
Case 18-30265-sgj11    Claim 13 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 2 of 24

**TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS .......................................................................... 2

    Section 1.01     Certain Defined Terms.......................................... 2

    Section 1.02     Interpretation.......................................................... 3

ARTICLE II SERVICES ............................................................................. 4

    Section 2.01     General Authority. .................................................. 4

    Section 2.02     Provision of Services. ........................................... 4

    Section 2.03     Shared Employees.................................................. 6

    Section 2.04     Applicable Asset Criteria and Concentrations. ................................... 8

    Section 2.05     Compliance with Management Company Policies and Procedures. ................................................ 8

    Section 2.06     Authority. ................................................................ 8

    Section 2.07     Third Parties............................................................ 9

    Section 2.08     Management Company to Cooperate with the Staff and Services Provider. ............................................... 9

    Section 2.09     Power of Attorney.................................................. 9

ARTICLE III CONSIDERATION AND EXPENSES ...................................... 9

    Section 3.01     Consideration ......................................................... 9

    Section 3.02     Costs and Expenses ............................................. 10

    Section 3.03     Deferral ................................................................. 10

ARTICLE IV REPRESENTATIONS AND COVENANTS ............................. 10

    Section 4.01     Representations ..................................................... 10

ARTICLE V COVENANTS.......................................................................... 10

    Section 5.01     Compliance; Advisory Restrictions. .................. 10

    Section 5.02     Records; Confidentiality. .................................... 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION................................ 12

    Section 6.01     Standard of Care .................................................. 12

    Section 6.02     Exculpation. .......................................................... 12

    Section 6.03     Indemnification by the Management Company.............................. 13

    Section 6.04     Other Sources of Recovery etc ......................... 14

    Section 6.05     Rights of Heirs, Successors and Assigns .......... 14

    Section 6.06     Reliance................................................................. 14

i

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 482 of 511   PageID 16263
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 382 of 403
Case 18-30265-sgj11    Claim 13 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 3 of 24

## TABLE OF CONTENTS
### (continued)

Page

ARTICLE VII TERMINATION .................................................................................... 14

    Section 7.01    Termination. ........................................................................ 14

ARTICLE VIII MISCELLANEOUS ............................................................................. 15

    Section 8.01    Amendments ...................................................................... 15

    Section 8.02    Assignment and Delegation. ............................................. 15

    Section 8.03    Non-Recourse; Non-Petition. ........................................... 15

    Section 8.04    Governing Law. ................................................................ 16

    Section 8.05    WAIVER OF JURY TRIAL ............................................. 17

    Section 8.06    Severability ....................................................................... 17

    Section 8.07    No Waiver ......................................................................... 17

    Section 8.08    Counterparts ..................................................................... 17

    Section 8.09    Third Party Beneficiaries ................................................. 17

    Section 8.10    No Partnership or Joint Venture ....................................... 17

    Section 8.11    Independent Contractor .................................................... 17

    Section 8.12    Written Disclosure Statement .......................................... 18

    Section 8.13    Headings ........................................................................... 18

    Section 8.14    Entire Agreement ............................................................. 18

    Section 8.15    Notices ............................................................................. 18

## FOURTH AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 484 of 511   PageID 16265
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 384 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 5 of 24

## ARTICLE I

## DEFINITIONS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Advisers Act" shall have the meaning set forth in the Recitals to this Agreement.

"Advisory Restriction" shall have the meaning set forth in Section 5.01(b).

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble to this Agreement.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"CLO or Account" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

2

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 485 of 511   PageID 16266
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 385 of 403
Case 18-30265-sgj11    Claim 13 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 6 of 24

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Highland" shall have the meaning set forth in the preamble to this Agreement.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Management Company" shall have the meaning set forth in the preamble to this Agreement.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Portfolio" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Staff and Services Fee" shall have the meaning set forth in Section 3.01 of this Agreement.

"Staff and Services Provider" shall have the meaning set forth in the preamble to this Agreement.

"Shared Employee" shall have the meaning set forth in the Recitals to this Agreement.

Section 1.02   Interpretation.   The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

3

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 486 of 511   PageID 16267
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 386 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 7 of 24

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   <u>General Authority</u>.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   <u>Provision of Services</u>.  Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)   *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)   *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)   *Management of Collateral Obligations and CLOs and Accounts*.  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)   *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

4

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 487 of 511   PageID 16268
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 387 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 8 of 24

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e)     *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f)     *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g)     *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h)     *Administrative Services.*  The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i)     *Shared Employees.*  The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

(j)     *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

(k)     *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 488 of 511   PageID 16269
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 388 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 9 of 24

Section 2.03    Shared Employees.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

6

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 489 of 511   PageID 16270
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 389 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 10 of
24

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.   To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

7

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 490 of 511   PageID 16271
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 390 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 11 of
24

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.2 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 491 of 511   PageID 16272
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 391 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 12 of
24

Section 2.07    Third Parties.

(a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).   Any such power shall be revocable in the sole discretion of the Management Company.

### ARTICLE III

### CONSIDERATION AND EXPENSES

Section 3.01    Consideration.  As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.  The "Staff and Services Fee" shall be payable in accordance with Appendix A attached hereto, as such appendix may be amended by the Parties from time to time.

From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

9

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 492 of 511   PageID 16273
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 392 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 13 of
24

Section 3.03   <u>Costs and Expenses</u>.  Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04   <u>Deferral</u>.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01   <u>Representations</u>.  Each of the Parties hereto represents and warrants that:

(a)   It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)   this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)   no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)   neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01   <u>Compliance; Advisory Restrictions</u>.

(a)   The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

10

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 493 of 511   PageID 16274
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 393 of 403
Case 18-30265-sgj11    Claim 13 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 14 of
24

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

11

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 494 of 511   PageID 16275
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 394 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 15 of
24

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01   Standard of Care.   Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02   Exculpation.   To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To

12

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 495 of 511   PageID 16276
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 395 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 16 of
24

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03  Indemnification by the Management Company.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

13

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 496 of 511   PageID 16277
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 396 of 403
Case 18-30265-sgj11    Claim 13 Part 4    Filed 08/01/18   Desc Exhibit 2   Page 17 of
24

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04   Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05   Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.  Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

14

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 497 of 511   PageID 16278
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01    Desc
Appendix Volume 2   Page 397 of 403
Case 18-30265-sgj11    Claim 13 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 18 of
24

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01    <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    <u>Assignment and Delegation</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

15

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 498 of 511   PageID 16279
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 398 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 19 of
24

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive.  The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)  Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)  The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)  The provisions of this <u>Section 8.03</u> shall survive termination of this Agreement for any reason whatsoever.

Section 8.04   <u>Governing Law</u>.

(a)  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)  The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts.  The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 499 of 511   PageID 16280
Case 18-03078-sgj    Doc 85-2    Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 399 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 20 of
24

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   <u>WAIVER OF JURY TRIAL</u>.   EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   <u>Severability</u>.   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   <u>No Waiver</u>.   The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party.  Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09   <u>Third Party Beneficiaries</u>.   This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   <u>No Partnership or Joint Venture</u>.   Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   <u>Independent Contractor</u>.   Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

Case 3:21-cv-00879-K   Document 41-5   Filed 04/04/23   Page 500 of 511   PageID 16281
Case 18-03078-sgj   Doc 85-2   Filed 11/27/18   Entered 11/27/18 14:12:01   Desc
Appendix Volume 2   Page 400 of 403
Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 21 of
24

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   Written Disclosure Statement.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   Headings.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   Notices.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)      If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)      If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

18

**App. 503**
APP.3578

Case 18-03078-sgj    Doc 85-2    Filed 11/27/18    Entered 11/27/18 14:12:01    Desc
Appendix Volume 2    Page 401 of 403

Case 18-30265-sgj11    Claim 13 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 22 of
24

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date
first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: James Dondero
Title:   President

ACIS CAPITAL MANAGEMENT, L.P.,
as the Management Company

By: Acis Capital Management GP, LLC, its General
Partner

By:_____
Name: James Dondero
Title:  President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

Case 18-30265-sgj11    Claim 13 Part 4    Filed 08/01/18    Desc Exhibit 2    Page 23 of 24

## **Appendix A**

      The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank.*]

Case 18-30265-sgj11   Claim 13 Part 4   Filed 08/01/18   Desc Exhibit 2   Page 24 of 24

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In Re:                        )   **Case No. 19-34054-sgj-11**
                              )   Chapter 11
                              )
HIGHLAND CAPITAL              )   Dallas, Texas
MANAGEMENT, L.P.,             )   Thursday, June 10, 2021
                              )   9:30 a.m. Docket
        Debtor.               )
                              )   MOTION TO COMPEL COMPLIANCE
                              )   WITH BANKRUPTCY RULE 2015.3
                              )   FILED BY GET GOOD TRUST AND
                              )   THE DUGABOY INVESTMENT TRUST
                              )   (2256)
_____)
HIGHLAND CAPITAL              )   **Adversary Proceeding 21-3006-sgj**
MANAGEMENT, L.P.,             )
                              )
        Plaintiff,            )   DEFENDANT'S MOTION FOR LEAVE
                              )   TO FILE AMENDED ANSWER AND
v.                            )   BRIEF IN SUPPORT [15]
                              )
HIGHLAND CAPITAL              )
MANAGEMENT SERVICES, INC.,    )
                              )
        Defendant.            )
_____)
                              )
HIGHLAND CAPITAL              )   **Adversary Proceeding 21-3007-sgj**
MANAGEMENT, L.P.,             )
                              )
        Plaintiff,            )   DEFENDANT'S MOTION FOR LEAVE
TO                            )   TO AMEND ANSWER TO PLAINTIFF'S
v.                            )   COMPLAINT [16]
                              )
HCRE PARTNERS, LLC            )
N/K/A NEXPOINT REAL           )
ESTATE PARTNERS, LLC,         )
                              )
        Defendant.            )
_____)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APP. 3582

```
 1   WEBEX APPEARANCES:

 2   For the Get Good Trust        Douglas S. Draper
     and Dugaboy Investment        HELLER, DRAPER & HORN, LLC
 3   Trust:                        650 Poydras Street, Suite 2500
                                   New Orleans, LA  70130
 4                                 (504) 299-3300

 5   For the Debtor:               Jeffrey Nathan Pomerantz
                                   PACHULSKI STANG ZIEHL & JONES, LLP
 6                                 10100 Santa Monica Blvd.,
                                     13th Floor
 7                                 Los Angeles, CA  90067-4003
                                   (310) 277-6910
 8
     For the Debtor:               John A. Morris
 9                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                   780 Third Avenue, 34th Floor
10                                 New York, NY  10017-2024
                                   (212) 561-7700
11
     For the Official Committee    Matthew A. Clemente
12   of Unsecured Creditors:       SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
13                                 Chicago, IL  60603
                                   (312) 853-7539
14
     For James Dondero:            Clay M. Taylor
15                                 BONDS ELLIS EPPICH SCHAFER
                                     JONES, LLP
16                                 420 Throckmorton Street,
                                     Suite 1000
17                                 Fort Worth, TX  76102
                                   (817) 405-6900
18
     For the NexPoint              Lauren K. Drawhorn
19   Parties:                      WICK PHILLIPS
                                   3131 McKinney Avenue, Suite 100
20                                 Dallas, TX  75204
                                   (214) 692-6200
21
     Recorded by:                  Michael F. Edmond, Sr.
22                                 UNITED STATES BANKRUPTCY COURT
                                   1100 Commerce Street, 12th Floor
23                                 Dallas, TX  75242
                                   (214) 753-2062
24

25
```

APP. 3583

Case 19-34054-sgj11  Doc 2445  Filed 06/12/21  Entered 06/12/21 21:36:02  Desc
Case 3:21-cv-00879-K  Document 20-5 Filed 04/06/23  Main Document  Page 506 of 511  PageID 16287  Page 3 of 91

3

1   Transcribed by:              Kathy Rehling
                                 311 Paradise Cove
2                                Shady Shores, TX  76208
                                 (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
              Proceedings recorded by electronic sound recording;
24                 transcript produced by transcription service.

25

Case 19-34054-sgj11  Doc 2445  Filed 06/12/21  Entered 06/12/21 21:36:02  Desc
Case 3:21-cv-00879-K  Document 5  Filed 07/08/21  Page 507 of 511  PageID 16288
Main Document  Page 231 of 261

81

1   cost, $70 million of notes get forgiven?  How is that

2   possible?  How is that possible?  It doesn't pass the good

3   faith test.  The Court should deny the motion.

4        Thank you, Your Honor.

5           THE COURT:  Mr. Morris, in all of your listing of

6   allegedly problematic things, one trail my brain was going

7   down is this:  Is this adversary going to morph even further

8   to add fraudulent transfer allegations?  I mean, if notes --

9           MR. MORRIS:  Here's the --

10          THE COURT:  -- were forgiven or agreements were made

11  --

12          MR. MORRIS:  Yeah, I --

13          THE COURT:  -- that they would be forgiven if, you

14  know, assets are sold at a dollar more than cost, is the

15  Debtor going to say, well, okay, if this is an agreement,

16  there was a fraudulent transfer?

17          MR. MORRIS:  Your Honor, that is an excellent

18  question, one which I was discussing with my partners just

19  this morning.  You know, we have to -- we're balancing a

20  number of things on our side, including the delay that that

21  might entail; including, you know, what happens if we go down

22  that path.  You know, the benefit of suing under the notes, of

23  course, is that he's contractually obligated to pay all of our

24  fees.

25      And so we're balancing all of those things as these -- as

Case 19-34054-sgj11    Doc 2445    Filed 06/12/21    Entered 06/12/21 21:36:02    Desc
Case 3:21-cv-00879-K    Document 5    Main Document    Filed 07/23/21    Page 232 of 331    Page 508 of 511    PageID 16289

82

1    these defenses metastasize.  But it's something that we're

2    considering, and we reserve the right to do exactly that, as

3    these defenses continue to get -- and it would be fraudulent

4    transfer, it would be breach of fiduciary duty against Nancy

5    Dondero, it would be breach of fiduciary duty against Jim

6    Dondero.  I'm sure that there are other claims, Your Honor.

7    But if they want to -- if I'm forced to go down that path, I'm

8    certainly going to use every tool that I have available to

9    recover these amounts from the -- for the Debtor and their

10   creditors.  This is just an abuse of process.

11        How do you -- how does one enter into agreements of this

12   type without telling your CFO, without telling your auditors,

13   without putting it in writing?  And I asked Mr. Dondero, what

14   benefit did the Debtor get from all of this?  And you know

15   what his answer was, Your Honor?  Because it's really -- it's

16   appalling.  It was going to give him heightened focus on

17   getting the job done because of this agreement that he entered

18   into with his sister, Nancy, acting on behalf of the Debtor,

19   with no information, with no documents, with no notes, with no

20   advice, with no corporate resolutions.  The Debtor was going

21   to get Mr. Dondero's heightened focus to sell MGM, Trussway,

22   or Cornerstone for one dollar above cost.

23        I think the fraudulent transfer claim is probably a pretty

24   solid one.  But why do we have to do this?  Why do we have to

25   do this?

1          THE COURT:  Well, one of the reasons I'm asking is I

2     would not set the motion to withdraw the reference status

3     conference on an expedited basis, which I was asked to do a

4     few days ago in these two adversary proceedings, and I can't

5     remember when I've set it, but now I'm even worried, if I

6     grant this motion, is it going to be premature to have that

7     status conference in a month or so, whenever I've set it,

8     because if I grant this motion I'm wondering, am I going to

9     have your motion to amend to add fraudulent transfer claims?

10    It's -- you know, I want to give as complete a package to the

11    District Court as I can whenever I have that motion to

12    withdraw the reference.

13        All right.  Ms. Drawhorn, back to you.  As I said --

14             MS. DRAWHORN:  Yes.

15             THE COURT:  -- before inviting Mr. Morris to make his

16    argument, I know the law is very much on your clients' favor

17    as far as the law construing Rule 15(a).  But my goodness, I'm

18    wondering if your client needs -- your client needs to be

19    careful what they're asking for here, after what I've just

20    heard.

21        Anyway, what -- you get the last word on this.

22             MS. DRAWHORN:  Yes.  Thank you, Your Honor.  My

23    response is that Mr. Morris's argument was all on the merits

24    of the defenses, and certainly he is free to argue on the

25    merits, but that's not a determination for today and that's

Case 19-34054-sgj11   Doc 2445   Filed 06/12/21   Entered 06/12/21 21:36:02   Desc
Case 3:21-cv-00879-K   Document 1-5  Filed 04/12/21   Page 510 of 511   PageID 16291
Main Document    Page 290 of 291

90

1          THE COURT:  Please upload an order, Ms. Drawhorn,

2    granting your motion with these specific requirements that

3    I've orally worked in.

4        I think clients need to be careful what they ask for.  I'm

5    very concerned.  And I know it was just argument and I'll hear

6    evidence, but of all of the things that I guess -- well, I'm

7    concerned about a lot of things, but do we have audited

8    financial statements that didn't disclose these agreements

9    with regard to --

10         MR. MORRIS:  Yes, Your Honor.

11         THE COURT:  I mean, that's -- I'm just -- you know,

12   there's a lot to be concerned about on that point alone, I

13   would think.  But, all right.  If there's nothing further, we

14   are adjourned.  Thank you.

15         THE CLERK:  All rise.

16       (Proceedings concluded at 11:58 a.m.)

17                            --oOo--

18

19                          CERTIFICATE

20       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                        **06/12/2021**

23   _____        _____

24   Kathy Rehling, CETD-444                              Date
     Certified Electronic Court Transcriber

25

91

1

INDEX

2

PROCEEDINGS                                                                              4

3

WITNESSES

4

-none-

5

EXHIBITS

6

-none-

7

RULINGS

8

<u>19-34054-sgj</u>

9
10

Motion to Compel Compliance with Bankruptcy Rule 2015.3    49/54
filed by Get Good Trust, The Dugaboy Investment Trust
(2256)

11

<u>21-3006-sgj</u>

12
13

Motion for Leave to File Amended Answer and Brief in    86
Support filed by Defendant Highland Capital Management
Services, Inc. (15)

14

<u>21-3007-sgj</u>

15
16
17

Motion for Leave to Amend Answer to Plaintiff's    86
Complaint filed by Defendant HCRE Partners, LLC (n/k/a
NexPoint Real Estate Partners, LLC) (16)

18

END OF PROCEEDINGS                                                                     90

19

INDEX                                                                                 91

20

21

22

23

24

25